UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

AMERICAN BROADCASTING COMPANIES, INC.,  :  **INITIAL PRE-HEARING MEMORANDUM**
DISNEY ENTERPRISES, INC., CBS BROADCASTING  :
INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA,  :
LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK  :
TELEVISION, LLC, TELEMUNDO NETWORK GROUP  :
LLC. and WNJU-TV BROADCASTING LLC,  :
                  :  12 Civ. 1540 (AJN)
        Plaintiffs,  :
                  :
        v.  :
                  :
AEREO, INC.,  :  Bruce P. Keller (bpkeller@debevoise.com)
                  :  Jeffrey P. Cunard (jpcunard@debevoise.com)
        Defendant.  :  Michael R. Potenza (mpotenza@debevoise.com)

-------------------------------------------------------------------------X

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for Plaintiffs*

-------------------------------------------------------------------------X

WNET, THIRTEEN, FOX TELEVISION STATIONS, INC.,  :
TWENTIETH CENTURY FOX FILM CORPORTION,  :
WPIX, INC., UNIVISION TELEVISION GROUP, INC.,  :
THE UNIVISION NETWORK LIMITED PARTNERSHIP  :
and PUBLIC BROADCASTING SERVICE,  :
                  :  12 Civ. 1543 (AJN)
        Plaintiffs,  :
                  :
        v.  :
                  :
AEREO, INC. f/k/a BAMBOOM LABS, INC.,  :  Steven B. Fabrizio (sfabrizio@jenner.com)
                  :  Steven R. Englund (senglund@jenner.com)
        Defendant.  :  Scott B. Wilkens (swilkens@jenner.com)

-------------------------------------------------------------------------X

JENNER & BLOCK LLP
1099 New York Ave., N.W., Suite 900
Washington, D.C. 20001
(202) 639-6000

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ............................................................................................................5

A.    Plaintiffs Are Likely To Succeed In Showing Aereo Infringes Their Public
Performance Rights...........................................................................................6

        1.    Aereo's Retransmissions Are Unlicensed, Infringing Public
             Performances.........................................................................................6

        2.    Aereo's Private Rental Fiction Consistently Has Been Rejected By The
             Courts..................................................................................................10

        3.    Cablevision Does Not Protect Aereo. .......................................................13

B.    Plaintiffs Will Suffer Irreparable Injury In The Absence Of Immediate Injunctive
Relief..............................................................................................................21

        1.    Loss Of Control....................................................................................22
        2.    Disruption Of The Market For And Value Of Plaintiffs' Programming. ......23
        3.    Threat To The Development Of A Lawful Internet Streaming Market.........24

C.    The Balance Of Hardships Tips Decidedly In Plaintiffs' Favor..............................25

D.    The Public Interest Is Served By Enjoining Infringing Activity. ...........................25

CONCLUSION.......................................................................................................26

# TABLE OF AUTHORITIES

CASES

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008)..............................................................*passim*

*CBS Broadcasting, Inc. v. FilmOn.com, Inc.*,
    No. 10-cv-07532 (S.D.N.Y. 2010)...........................................................9, 22

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*,
    749 F.2d 154 (3d Cir. 1984)...................................................................11

*eBay, Inc. v. Bidder's Edge, Inc.*,
    100 F. Supp. 2d 1058 (N.D. Cal. 2000) ..............................................23

*eBay, Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)..............................................................................21

*Fortnightly Corp. v. United Artists Television*,
    392 U.S. 390 (1968)........................................................................1, 7, 8

*Hounddog Prods., L.L.C. v. Empire Film Group, Inc.*,
    ___ F. Supp. 2d ___, 2011 WL 5519829 (S.D.N.Y. Nov. 10, 2011) ...................25

*Live Nation Motor Sports, Inc. v. Davis*,
    No. 3:06-CV-276-L, 2007 WL 79311 (N.D. Tex., Jan. 9, 2007) .................9

*National Football League v. PrimeTime 24 Joint Venture*,
    211 F.3d 10 (2d Cir. 2000)....................................................................18

*On Command Video Corp. v. Columbia Pictures Indus.*,
    777 F. Supp. 787 (N.D. Cal. 1991) .......................................................11

*Pearson Educ., Inc. v. Vergara*,
    No. 09 Civ. 6832, 2010 WL 3744033 (S.D.N.Y. Sept. 27, 2010).........23

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).....................................................6, 21, 23, 25

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)..............................................................................13

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
    415 U.S. 394 (1974)........................................................................1, 7, 8

*Twentieth Century Fox Film Corp. v. iCraveTV*,
   Nos. Civ.A. 00-121, Civ.A. 00-120, 2000 WL 255989 (W.D. Pa. Feb. 8, 2000)....................9

*United States v. ASCAP*,
   627 F.3d 64 (2d Cir. 2010)...................................................................................9

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
   192 F. Supp. 2d 321 (D.N.J. 2002) .......................................................................9

*Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*,
   ___ F. Supp. 2d ___, 2011 WL 4001121 (C.D. Cal. Aug. 1, 2011) ............................... *passim*

*WGN Cont'l Broad. Co. v. United Video, Inc.*,
   693 F.2d 622 (7th Cir. 1982) ...............................................................................7

*WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011) ............................................. *passim*

**STATUTES**

17 U.S.C. § 101........................................................................................................ *passim*

17 U.S.C. § 107........................................................................................................13

17 U.S.C. § 111........................................................................................................2, 6, 8

17 U.S.C. § 119........................................................................................................2, 8

17 U.S.C. § 122........................................................................................................2, 8

**OTHER AUTHORITIES**

Associated Press, "Startup Sends Live Local TV to the iPhone" (February 21, 2012)...................2

Brief for the United States as Amicus Curiae, *Cable News Network, Inc. v. CSC
   Holdings, Inc.* (May 29, 2009)........................................................................20, 21

Nitasha Tiku, "In Counterclaim Against TV Networks, Aereo Compares Itself to the
   Advent of the VCR and DVD" (March 13, 2012) ..................................................3

H.R. REP. No. 83, 90th Cong., 1st Sess. (1967) ..........................................................12

H.R. REP No. 94-1476, 94th Cong., 2d Sess. (1976) ..................................................7, 18

At the scheduling conference held on March 13, 2012, the Court requested briefs from the parties, in advance of expedited discovery, setting forth their principal legal arguments. This memorandum, submitted by Plaintiffs, explains why, even at this early stage, it is clear that Aereo, Inc. ("Aereo") should be enjoined from retransmitting Plaintiffs' copyrighted television programs in violation of Plaintiffs' exclusive rights of public performance.

## PRELIMINARY STATEMENT

Under the Copyright Act of 1976 ("Copyright Act"), to publicly perform a work means "***to transmit*** or otherwise communicate a performance . . . to the public, ***by means of any device or process***, whether the members of the public ***capable of receiving*** the performance or display ***receive it in the same place or in separate places and at the same time or at different times***." 17 U.S.C. § 101 (the "Transmit Clause") (emphasis added).

The Transmit Clause is purposefully broad. Congress intended the Transmit Clause to be expansive so that it would encompass both primary (originating) and secondary transmissions (retransmissions), as well as all technologies by which such performances could be made. The decision to include retransmissions was deliberate. Congress wanted specifically to overturn two Supreme Court decisions from the late 1960's and early 1970's.[1] Based on the language from the then-applicable Copyright Act of 1909 and arguments very much like those resurrected by Aereo before this Court, those

---

[1] *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390 (1968); *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974).

cases had held that cable systems were not "performing" television programming when they received it with antennas and retransmitted it to their subscribers.

Congress changed that. The Transmit Clause now establishes that **all** transmissions of copyrighted works to members of the public, by "any device or process," 17 U.S.C. § 101, including secondary transmissions, are public performances.[2] Recognizing the breadth of the clause, Congress also enacted specifically tailored provisions that authorize certain types of retransmissions, including by cable systems and satellite broadcasters, to qualify for statutory licenses, and establish other statutory limitations on the exclusive right of public performance.[3]

Aereo does not qualify for any statutory license, has not negotiated any license with any Plaintiff and does not otherwise come within any limitation. Instead, it relies on a futile fiction: that it temporarily "rents" to its subscribers countless miniature antennas and tuners. According to Aereo, this means those customers are individually retransmitting Plaintiffs' television programs to themselves. Aereo puts several colloquial spins on its service. It claims to have strung "a very long antenna cable" between it and the subscriber.[4] It has led the media to believe its service is "the new rabbit ears."[5] In Court, it

---

[2]    *See* 17 U.S.C. § 111(f) ("secondary transmissions" are those that "further transmit[] . . . a primary transmission simultaneously with the primary transmission").

[3]    *See*, *e.g.*, 17 U.S.C. §§ 111, 119 & 122.

[4]    *See* Associated Press, "Startup Sends Live Local TV to the iPhone" (February 21, 2012), *available at* http://www.wcnc.com/news/consumer/Startup-sends-live-local-TV-to-the-iPhone-139808833.html (last visited March 21, 2012).

represented that Aereo simply provides "a system that a consumer can use to do nothing different than a consumer has every right to do right now."  3/13/12 Hearing Tr. at 14:24-25.

There are at least three things wrong with those characterizations.  ***First,*** Aereo performs the exact same functions that cable and satellite operators do when they retransmit live, over-the-air broadcast programming to their subscribers, pursuant to negotiated or statutory licenses.  The differences are that, using Aereo's "technology platform," *see* https://aereo.com/faqs, Aereo's retransmissions are made over the Internet instead of via cable or satellite systems and are not authorized.  Congress has had ample opportunity to create a statutory license or another limitation to the public performance right to authorize Internet retransmissions of television broadcasts.  It consistently has declined to do so, however, and every court to have considered the issue has held that the unlicensed Internet retransmission of television broadcasts violates the public performance right.  Simply put, absent a statutory or negotiated license to retransmit copyrighted programming to its customers, or an applicable statutory limitation, Aereo infringes the public performance right.  *See* pp. 6 – 10 *infra.*

***Second***, the reception of a broadcast signal by using multiple miniature antennas rather than a cable headend or any other form of receiving "device" does not affect

---

[5]   Nitasha Tiku, "In Counterclaim Against TV Networks, Aereo Compares Itself to the Advent of the VCR and DVD" (March 13, 2012)*, available at* http://www.betabeat.com/2012/03/13/aereo-files-counterclaim-in-copyright-infringement-lawsuit-from-abc-nbc-cbs-universal-03132012/ (last visited March 21, 2012).

whether Aereo is engaged in a public performance. Aereo plainly uses "**any device or process**," in this case a collection of countless antennas and infrastructure used to receive, tune, encode and otherwise process the broadcast signals, to transmit a performance of a work so that it is "capable" of being received by different members of the public. It is Aereo's retransmission of programs to multiple individuals, here done simultaneously with the original broadcast, that makes it a public performance, whether Aereo uses a single antenna or multiple antennas. *See* pp. 10 – 13 *infra.*

  ***Third***, Aereo's "private performance" arguments, based on the holding in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), are misplaced. Aereo argues that its service does nothing more than enable consumers to receive programming as if they were receiving broadcasts using roof-top antennas. 3/13/12 Hearing Tr. at 14:25-15:6 ("A consumer right now can get over-the-air broadcasting by having an antenna on the roof of their home . . . . All we are doing is remotely locating . . . . very small antennas."). It reads *Cablevision* as rendering retransmissions of television broadcasts to multiple members of the public "private," as long as each member receives the transmission via a separate antenna.

  Aereo is simply incorrect on this crucial point. *Cablevision* dealt with the limited context of a cable system that was ***licensed*** to retransmit telecasts of copyrighted programming. On the record before it, the Second Circuit determined that the performance at issue originated from a unique, subscriber-made copy, stored at the cable system's headend. It therefore held that the subsequent on-demand playback of that unique copy, solely to that same subscriber's home, was a private performance and did not violate the

public performance right. Those facts, however, are not present here. Aereo's retransmissions originate directly from and are made simultaneously with the primary transmission and go to multiple members of the public, over the Internet, without limitation as to the location where, or the device on which, the transmission can be received. Just as is true of the original over-the-air transmissions from a broadcast tower, or the subsequent retransmission of that same signal by cable and satellite operators, the retransmission to Aereo subscribers is a public performance and Aereo makes it. *See* pp. 13 – 21 *infra*.

In a nutshell, each of Aereo's arguments is contrary to the plain language, structure and purpose of the Copyright Act, common sense and nearly thirty years of case law applying both. Unless restrained by this Court, Aereo's unlawful conduct causes Plaintiffs to lose control over the dissemination of their copyrighted programming, disrupts their relationships with licensed distributors and viewers and usurps their right to decide how and on what terms to make available and license content over new Internet distribution media. That constitutes irreparable harm and Aereo's service should be enjoined. *See* pp. 21 – 25 *infra*.

## ARGUMENT

Well-established principles of copyright law amply support preliminary injunctive relief in this case. Plaintiffs expect that discovery will only underscore their ability to demonstrate: "(1) (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [Plaintiff's] favor"; (2) likely "irreparable injury in the

absence of an injunction;" (3) that "the balance of hardships" tips decidedly in Plaintiffs' favor; and (4) "that the public interest would not be disserved by the issuance of a preliminary injunction."  *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotation omitted).

### A.     Plaintiffs Are Likely To Succeed In Showing Aereo Infringes Their Public Performance Rights.

#### 1.     Aereo's Retransmissions Are Unlicensed, Infringing Public Performances.

The Copyright Act embraces two kinds of performances to the "public":  (1) a performance in a place open to the public, such as the exhibition of a motion picture in a theater or of a broadcast of a sporting event in bar and (2) a transmission of a performance to members of the public.  The former is not relevant here; the latter very much is.

A public performance by means of transmission is defined by the Copyright Act as follows:

> ***to transmit*** or otherwise communicate a performance . . . to the public, ***by means of any device or process***, whether the members of the public ***capable of receiving*** the performance or display ***receive it in the same place or in separate places and at the same time or at different times***.

17 U.S.C. § 101 (emphasis added).  In turn, to "transmit" a "performance" means "to communicate it ***by any device or process*** whereby images or sounds are received beyond the place from which they are sent."  *Id*. (emphasis added).  This includes both "primary transmissions" (those "made to the public by the transmitting facility" itself, 17 U.S.C. § 111(f)), and "secondary transmissions" (those that "further transmit[] . . . a primary transmission simultaneously with the primary transmission").  *Id.*

The "broad" language of the Transmit Clause is deliberate.[6]  Congress drafted it to respond to two Supreme Court decisions, *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390 (1968), and *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974), which had interpreted the 1909 Copyright Act to mean that cable systems were not "performing" broadcast programming when retransmitting broadcast signals.  "As a result, cable systems had essentially received authorization to retransmit broadcast television programming without incurring any costs to the copyright owners."  *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 602 (S.D.N.Y. 2011).

Congress viewed this result as an "injustice."  *Id.*  It overturned the decisions by having the Transmit Clause embrace not only primary transmissions, such as television or radio broadcasts, but also retransmissions of a primary transmission, such as by cable operators, satellite carriers or any other device or process.  *See WGN Cont'l Broad. Co. v. United Video, Inc.*, 693 F.2d 622, 625 (7th Cir. 1982) (retransmission of a broadcast signal by satellite common carrier).

Congress was well aware of the breadth of the Transmit Clause.  That is why, both at the time the Copyright Act was enacted and in subsequent amendments, it established certain limitations on "the Copyright Act's exclusive right to public performance," *ivi*, 765

_____

[6]     *See* H.R. REP. NO. 94-1476, 94th Cong., 2d Sess., at 64-65 (1976) (definition of "transmit" is "***broad enough to include all conceivable forms and combinations of wired or wireless communications media***, including but by no means limited to radio and television broadcasting as we know them.  ***Each and every method*** by which the images or sounds comprising a performance or display ***are picked up and conveyed*** is a 'transmission,' and ***if the transmission reaches the public in any form***, the case comes within the scope of clauses (4) or (5) of section 106.") (emphasis added).

F. Supp. 2d at 603, and to authorize such performances.  These include statutory licenses authorizing cable systems and satellite carriers, under specified conditions (including payment to content owners), to engage in retransmissions of broadcast programs, 17 U.S.C. §§ 111(c) (cable systems), 111(a)(4), 119 & 122 (satellite carriers), and other statutory limitations, such as for passive carriers, 17 U.S.C. § 111(a)(3).

Aereo admits it does not qualify for any statutory license or limitation.  Instead, in words that directly echo those Supreme Court decisions of some forty years ago:

- Aereo argues that "[a]ll we are doing is remotely locating an antenna." 3/13/12 Hearing Tr. at 15:8-9.  The Supreme Court said that cable systems "[e]ssentially" do "no more than enhance[] the viewer's capacity to receive the broadcaster's signals" by "provid[ing] a well-located antenna with an efficient connection to the viewer's television set." *Fortnightly*, 392 U.S. at 399.[7]

- Aereo argues that "[c]onsumers use the Aereo Technology to do no more than what they are entitled to do:  access local television broadcasts on the public airwaves using an individual antenna."  Counterclaim (Preamble) [Dkt. 7].  The Supreme Court said that the "privilege of receiving the broadcast electronic signals and of converting them into the sights and sounds of the program inheres in all members of the public who have the means of doing so." *Teleprompter*, 415 U.S. at 408.

- Aereo argues that it "let[s] [the consumer] control [his or her] antenna[] [t]hrough the Internet." *See* https://www.aereo.com/how-it-works.  The Supreme Court said that the "reception and rechanneling of these signals for simultaneous viewing is essentially a viewer function." *Teleprompter*, 415 U.S. at 408.

There is no mistaking it:  Aereo's argument is the exact rationale Congress emphatically rejected in 1976 when it determined that unauthorized retransmissions of over-the-air

---

[7] Given Aereo's emphasis on building a community of antennas which it then purports to "rent out," it is interesting to note that cable systems originally were commonly known as CATV systems, which stood for "Community *Antenna* Television." *See Fortnightly*, 392 U.S. at 391.

broadcasts violate the public performance right regardless of form or technological gimmickry.

Courts uniformly hold that streaming a copyrighted work over the Internet is a public performance, because it is equivalent to a radio, television, cable or satellite transmission:

- *United States v. ASCAP*, 627 F.3d 64, 74 (2d Cir. 2010) (Internet streaming of musical works "constitute[s] public performances" just "like [] television or radio broadcast[s]");

- *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 601 (S.D.N.Y. 2011) ("undisputed" that unauthorized Internet streaming of over-the-air broadcast signals "is making public performances"), *appeal docketed*, No. 11-788 (2d Cir. Mar. 1, 2011);

- *CBS Broadcasting, Inc. v. FilmOn.com, Inc.*, No. 10-cv-07532 (S.D.N.Y. Order to Show Cause for a Preliminary Injunction with Temporary Restraining Order, Nov. 22, 2010) (entering temporary restraining order prohibiting Internet retransmissions of plaintiffs' over-the-air broadcasts);

- *Warner Bros. Entm't, Inc. v. WTV Sys., Inc.*, ___ F. Supp. 2d ___, 2011 WL 4001121 (C.D. Cal. Aug. 1, 2011) (streaming of motion pictures played from an individually "rented" remote DVD player was a public performance because each customer was a member of the public);

- *Live Nation Motor Sports, Inc. v. Davis*, No. 3:06-CV-276-L, 2007 WL 79311 (N.D. Tex., Jan. 9, 2007) (audio webcasts of Supercross event infringe);

- *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 332 (D.N.J. 2002) (transmissions of video clips from motion pictures over the Internet are public performances, even when it is the customer who selects the clip to be shown), *aff'd on other grounds*, 342 F.3d 191 (3d Cir. 2003);

- *Twentieth Century Fox Film Corp. v. iCraveTV*, Nos. Civ.A. 00-121, Civ.A. 00-120, 2000 WL 255989, at *7 (W.D. Pa. Feb. 8, 2000) (retransmission of over-the-air broadcast signals via the Internet "through use of 'streaming' technology . . . by means of the telephone lines and computers that make up

the Internet" "violates plaintiffs' rights to perform their works publicly and to authorize others to do so").

Congress has had ample opportunity over the last twenty years to enact a statutory license for Internet retransmissions. It has declined to do so. *See ivi*, 765 F. Supp. 2d at 601, 616 ("as far as this Court is aware, not a single member of Congress has even introduced legislation which would alter" the compulsory license provisions to apply to Internet retransmissions). That refusal underscores Congress' view that unauthorized Internet streaming infringes the public performance right, just as the courts uniformly have held. *Id.* at 614-15, 616 (noting the "consistency and resoluteness" of Copyright Office position that Internet retransmissions are infringing public performances and congressional "acquiesc[ence]" in that "prevailing administrative view").

### 2. Aereo's Private Rental Fiction Consistently Has Been Rejected By The Courts.

Aereo knows that absent a statutory or negotiated license, Internet retransmissions to the public infringe Plaintiffs' exclusive public performance right. That is why it argues that its model is based on the "rental" of "private antennas." It believes this artifice allows it to claim its transmissions are "private" because "renters" are triggering reception by the antenna and because the broadcast signal, once received and transcoded for Internet transmission, is routed only to that subscriber. For over thirty years, however, courts have pierced the fiction of a purportedly "private rental" – whether of a DVD player, a videocassette or a viewing room – to conclude that, as a matter of law rather than semantics, the performances they analyzed were "to the public."

In *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984), customers of a video rental store could, on an individual basis, rent private booths where they could watch movies as part of the defendant's so-called "in-store rental" service. *Id.* at 156. This "rental service" consisted of the defendant placing videocassettes into a VHS machine at the front desk and then transmitting the performances to patrons in the private booth at the back of the store. *Id.* The Third Circuit saw through the defendant's "euphemistic[]" "rental" label, holding that "the transmission of a performance to members of the public," even if at different times and "in private settings such as hotel rooms or [the defendant's] viewing rooms, constitutes a public performance." *Id.* at 159.

In *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787 (N.D. Cal. 1991), the defendant provided hotel guests with the ability to watch on TV sets located in their hotel rooms movies that were played back from a centrally-located hotel VCR. Notwithstanding the private nature of the hotel room while the guest occupied it, the playback was held to infringe the public performance right. The court specifically rejected, as "without merit," the argument that "On Command's system involves not 'transmissions' but 'electronic rentals.'" *Id.* at 789.

Last year, yet another court enjoined a fictional "rental" scheme, this time in a directly analogous Internet streaming context. In *WTV Sys.*, 2011 WL 4001121, the defendants' Zediva service massed together individual DVD players, just like Aereo masses together antennas. Zediva purported to "rent" an individual DVD player to each customer for the purpose of streaming digital copies of motion pictures to individual customers, *id.* at *3, just like Aereo purports to rent the antenna. When a customer

requested Zediva to perform a particular motion picture, Zediva assigned a specific DVD player to the customer for the duration of the "rental," converted the video signal into a "form suitable for streaming across the Internet," transmitted the performance via the Internet to the customer and provided the software "necessary to view the video stream." *Id.*

Applying *Redd Horne* and *On Command*, the court held that Zediva's service infringed the public performance right "directly under the language of the statute," because it

> "communicates" the "images and sounds" of Plaintiffs'
> Copyrighted Works through the use of a "device or process"
> – the equipment, including various servers, and internet –
> from a central bank of DVD players to individual customer's
> computers, where the images and sounds are received
> "beyond the place from which they are sent."

*Id.* at *5. It rejected Zediva's characterization of its service as a "rental" and emphasized that Congress crafted the language of the "transmit clause to cover precisely the sort of single-viewer system developed by Defendants." *Id.* at *6. It also rejected the same long cord analogy Aereo uses. *Id.* at *5 ("immaterial" that "Zediva's customers initiate the transmission by turning on their computers and choosing which of Plaintiffs' Copyrighted Works they wish to view"). In particular, the court found persuasive that portion of the legislative history making clear that even when "***at the initiative of individual members of the public***," "a performance made available by transmission to the public at large is 'public'" when it is "capable of reaching different recipients at different times." H.R. REP. No. 83, 90th Cong., 1st Sess., at 29 (1967) (emphasis added).

12

These courts looked to the substance of the transmission services, not the euphemisms used to describe them. Applying that approach here, it is clear that Aereo's service falls squarely within the plain language of the Copyright Act's definition of a public performance.

### 3. *Cablevision* Does Not Protect Aereo.

In the absence of any license, Aereo pins all its hopes to the decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"). It argues that its individual antenna scheme is the functional equivalent of the unique, user-made remote DVR copy of a program analyzed by the Second Circuit in *Cablevision*. Aereo is wrong.[8]

*Cablevision* involved direct infringement claims against Cablevision's proposed "Remote Storage DVR System" ("RS-DVR"). Cablevision, an otherwise licensed retransmitter of television signals, proposed to allow its subscribers to make a unique copy of a program on a DVR located at the cable headend, for time-shifting purposes, for later playback to the same subscriber. *See Cablevision*, 536 F.3d at 124. To enable playback from the RS-DVR, the subscriber could use a remote control and set top box to locate the unique copy he or she previously had recorded and stored on Cablevision's servers, press

---

[8] Aereo's reliance on *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 421 (1984), also is misplaced. *Sony* held that consumer copying of over-the-air television broadcasts for in-home "time-shifting," as the Supreme Court defined it, is a permissible fair use under 17 U.S.C. § 107. Secondary transmissions were not at issue in the case and, for that reason, *Sony* does not address the public performance right. Plaintiffs are not herein challenging Aereo's so-called virtual DVR service, only its real-time retransmission of Plaintiffs' television programs.

play and a performance of the program would be transmitted from that copy. *Id.* As a result, Cablevision's playback service was a completely closed transmission. Each transmission emanated from a uniquely-created, standalone copy that, the Second Circuit found, had been made by the subscriber and was accessible only by that subscriber.

*Cablevision* separately analyzed both the reproduction right, which was implicated by the recording of the RS-DVR copies, and the public performance right implicated in the playback from those copies to subscribers. With respect to the reproduction right, the Second Circuit first analyzed "*who*," as between Cablevision and the customer, "made this copy" and, therefore, could be potentially liable for direct infringement. *Id.* at 130.[9] After conceding that the lines between direct and secondary liability were not always clear, *id.*, it held that, as in the case of a home DVR operated by a user, Cablevision's subscribers were responsible for "making" the copies and, therefore, Cablevision could not be directly liable for violating that right. *Id.* at 134.

The Second Circuit also analyzed whether the "buffer" copy made by Cablevision in connection with the RS-DVR service violated the reproduction right. Because the programming stream was "buffered before any customer requests a recording, and would be buffered even if no such request were made," it was "undisputed" that "Cablevision, not any customer or other entity," made it. *Id.* at 127. The only reason Cablevision was held not to infringe the reproduction right was because the buffer copy lasted for no "more than

---

[9]    Cablevision's potential secondary liability was not at issue because that "theory of liability was expressly disavowed by plaintiffs" by stipulation. *Id.* at 130.

1.2 seconds before being automatically overwritten," *id.* at 130, and, therefore, was too transitory to have "create[d] copies, as the Copyright Act defines that term." *Id.* at 130.[10]

The Second Circuit then turned to the public performance right. On the specific facts before it, *Cablevision* held that the RS-DVR service did not result in a public performance when the copy was played back. The Second Circuit emphasized that the playback performances were not made "to the public" within the meaning of 17 U.S.C. § 101, because the audience of that transmission was limited by its source and destination: "a single unique copy of a work, made by an individual subscriber," *id.* at 135, where the transmission could be received and "decoded exclusively by that subscriber's cable box." *Id.*; *see also generally id.* at 135-39 (repeatedly stating that the holding was based on the specific facts of the case, in which a single copy was made by, and transmitted to, a single user).

The Second Circuit was extremely careful to limit its holding on the public performance right to the facts before it: the act of playback, from a unique, user-made copy, solely to the user who, it had ruled, "made" that copy. The Court stressed that the

---

[10]    After the March 13 conference, Aereo disclosed, in general terms, that it might be making buffer copies as part of the retransmission process. Although the details were unclear, it seems that these copies may last for substantially longer than a few seconds. The significance of this disclosure is that Aereo also may be liable for violating the reproduction right for the buffer copies made during the retransmission process. During the conference, however, Aereo kept silent on this point, so Plaintiffs currently are unsure about whether such a claim exists. Because expedited discovery already will cover, among other things, the overall architecture and operation of the Aereo system, the issue of whether non-transitory copies are being made by Aereo as part of its retransmissions to the public does not affect the central focus, or the schedule of, the preliminary injunction hearing.

Cablevision system, "as designed, only makes transmissions to one subscriber using a copy made by that subscriber." 536 F.3d at 137. It also noted that the "universe of people capable of receiving" the transmission remained at all times "the ***single subscriber*** whose ***self-made*** copy [was] used ***to create*** that transmission." *Id*. (emphasis added); *see also id.* at 138 ("Given that each . . . transmission is made to a given subscriber ***using a copy made by that subscriber***, we conclude that such a transmission is not 'to the public' . . . .") & 139 ("Because each . . . playback transmission is made to a ***single subscriber*** using a ***single unique copy produced by that subscriber***, we conclude that such transmissions are not performances 'to the public' . . . .") (emphasis added).

Even before discovery, the available facts show that Aereo's service operates very differently from these critical aspects of Cablevision's RS-DVR service. Plaintiffs challenge herein Aereo's retransmission of television broadcasts of programs to Aereo subscribers as those programs are transmitted over-the-air to the general public. They are not, as noted at the March 13 scheduling conference, challenging the time-shifting DVR aspect of the Aereo service. Aereo itself touts its service as enabling Aereo subscribers to watch, on any Internet-connected device, a retransmission of a program simultaneously with its primary transmission by the broadcaster, as well as simultaneously with the retransmissions made by Aereo to all of its subscribers who are watching the same channel. *See* https://aereo.com/faqs ("Aereo is a technology platform that enables you to watch live broadcast television at home or on the go."). Aereo's simultaneous retransmissions originate from the original, over-the-air broadcast, which Aereo receives with its multiple antennas and then retransmits simultaneously to multiple subscribers.

The "source material" is always the primary broadcast transmission itself. That is quite different than *Cablevision*. There, the transmission was from a unique, previously-stored copy, sent back to the cable box of the same subscriber whom, the Second Circuit found, had made the copy, for playback in that subscriber's home. In contrast to Aereo, *Cablevision* did not involve retransmission at all, much less across the Internet, to any Internet-enabled device.

Aereo glosses over another difference between this case and *Cablevision*. The Second Circuit concluded, when it analyzed the reproduction right, that the user "made" the copy. *Cablevision*, 536 F.3d at 134. Aereo argues, by analogy, that its subscribers are "making" the transmissions to themselves (and not to other members of the public) and that such transmissions, therefore, can only be private, not public, performances.

The Second Circuit, however, specifically refused to embrace the very argument that Aereo urges. *Id.* at 134. It emphasized its holding – that a subscriber (not Cablevision) made the RS-DVR copy – did not extend beyond the reproduction right to an analysis of who made the performance. *Id.* Noting that the relevant definitions "vary in significant ways," including that the Copyright Act defines the verb "perform" but not the verbs "reproduce" or "copy," the Second Circuit emphasized that the conclusion that a Cablevision customer "does" the copying did not require the "parallel conclusion that the customer . . . 'performs' the copyrighted work." *Id.* In fact, to the Second Circuit, it seemed more reasonable to "assume," *arguendo*, that Cablevision "makes the transmission." *Id.*

That "assum[ption]" flows naturally from the statutory definitions to which the Second Circuit referred. *See* 17 U.S.C. § 101 ("To 'perform' a work means to recite, render, *play*, dance, or act it, either directly or ***by means of any device or process***") (emphasis added); *id.* ("To perform . . . a work 'publicly' means . . . ***to transmit or otherwise communicate [it]*** . . . to the public") (emphasis added). The active verbs in those definitions make it clear that it is the service provider, not a user, that performs a work, whether by transmitting or otherwise communicating it.

The definitions are consistent with the decisions that hold that every step in a process of a transmission to the public can be the basis for finding an infringing public performance. *See Nat'l Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000) ("a public performance . . . includes each step in the process by which a protected work wends its way to its audience"); *Cablevision*, 536 F.3d at 137 ("any link in a chain of transmissions made by a party constitutes a public performance"); *see also* H.R. REP. No. 94-1476, at 63 (1976) (concepts of public performance "cover not only the initial rendition or showing, but also any further act by which that rendition or showing is transmitted or communicated to the public"). The Second Circuit distinguished the *Cablevision* record from *PrimeTime 24*, because, in its view, the unique, user-made copy broke that chain. That copy – not the original broadcast – was the basis of the RS-DVR playback. There was no retransmission and, because the new, RS-DVR playback was private, neither Cablevision nor the user was engaged in a public performance.

Here, the publicly known facts show Aereo affirmatively engages in, and is responsible for virtually every step of, the process of publicly performing by retransmitting over-the-air broadcasts to its subscribers:

1.  An Aereo "rental" antenna at Aereo's data center receives a particular, over-the-air broadcast per a subscriber's instruction, communicated via the Aereo platform. Taking Aereo at its word, Aereo effectively retransmits "all major broadcast networks live in HD." *See* http://www.aereo.com/faqs.

2.  Once Aereo's antennas receive the over-the-air broadcasts, Aereo routes the broadcast signals to its processing center. *Id.*

3.  Aereo transcodes and converts the program broadcast so it can be simultaneously retransmitted through the Internet to all of its subscribers who have requested it. *Id.*

That a subscriber instructs Aereo to activate and assign an antenna so he or she can receive the signal for the duration of the broadcast cannot undercut the plain language of the Copyright Act, buttressed by the common sense conclusion, that Aereo, not the subscriber, is forging each link in the chain of delivering the copyrighted program. Aereo, therefore, is directly liable for infringing Plaintiffs' public performance rights.

In short, *Cablevision* does not protect performances or transmissions that, like Aereo's, are designed to offer the public real-time retransmissions of primary transmissions. *See WTV Sys.*, 2011 WL 4001121, at *6 n.7 (*Cablevision* inapplicable where "customers do not produce their own unique copy of Plaintiffs' Copyrighted Works" and use that as the source of the transmission). Moreover, it is not the case that, as Aereo would have it, a subscriber's decision to initiate receipt of a copyrighted work automatically results in excluding the service provider from having any public performance liability. Particularly in the online context, individuals invariably undertake

some act, such as clicking on a website or player to initiate an Internet stream, that causes a service provider to transmit a performance of a work to the requesting recipients. In such cases, the transmission by the service provider initiated by that individual is a public performance under the Transmit Clause because members of the public are "capable" of receiving that transmission.

Aereo also argues it simply facilitates multiple "private" performances, because each transmission is purportedly directed to just one individual. That, too, flies in the face of the Copyright Act's definition of public performance. That is the point then-Solicitor General, now-Justice, Kagan made in her amicus brief to the Supreme Court in opposition to the petition for a writ of certiorari in *Cablevision*. She expressly cautioned against the broad reading Aereo now presses: *i.e.*, interpreting *Cablevision* to mean that "a performance is not made available 'to the public' unless more than one person is capable of receiving a *particular* transmission." Brief for the United States as Amicus Curiae at 20, *Cable News Network, Inc. v. CSC Holdings, Inc.*, 129 S. Ct. 2890 (2009) (emphasis in original). "Such a construction," General Kagan wrote, "could threaten to undermine copyright protection in circumstances far beyond those presented [in *Cablevision*], including with respect to [video-on-demand] services *or situations in which a party streams copyrighted material on an individualized basis over the Internet*." *Id.* at 20-21 (emphasis supplied). That reading of *Cablevision* is improper, General Kagan noted, because:

> [t]he Second Circuit repeatedly explained that its rejection of
> petitioners' public-performance claim depended on a range
> of factors: not only that each transmission would be sent to a

> single recipient, but also that (1) each transmission would be made using a ***unique copy*** of the relevant program; and (2) each transmission would be made ***solely to the person*** who had previously made ***that unique copy***.

*Id.* at 21 (emphasis added). It was, according to General Kagan, those specific factors that led the Second Circuit to sustain "the legality of respondents' proposed RS-DVR service without casting doubt on ***the widespread premise that VOD and similar services involve public performances***." *Id.* (emphasis added).

No matter what euphemisms, devices or processes are employed, the source of Aereo's retransmission remains Plaintiffs' over-the-air broadcast signals, not a unique, user-made copy. That means *Cablevision* is inapplicable and the "widespread premise" noted by General Kagan that transmissions like Aereo's are public performances – even if directed to individual subscribers – applies with full and equal force.

### B. Plaintiffs Will Suffer Irreparable Injury In The Absence Of Immediate Injunctive Relief.

That irreparable harm must be proven and is no longer simply presumed from a finding of likely success on the merits does not affect the analysis in this case. Plaintiffs do not rely on any presumption, *eBay*, *Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), and injunctive relief "has nearly always" been issued "upon a finding of likelihood of success on the merits" in a copyright case. *Salinger*, 607 F.3d at 76. That is because the factual consequences of a violation of a "right to *exclude*" plainly render monetary remedies inadequate in a wide range of circumstances. *Id.* at 82 (quoting *eBay*, 547 U.S. at 395 (emphasis in original)). Under any test, the wholesale acts of infringement committed

on a continuous basis by Aereo are causing and, unless enjoined, will continue to cause Plaintiffs irreparable harm.

Aereo's acts of infringement cause irreparable injury in at least three ways, any one of which is more than sufficient for injunctive relief.

### 1. Loss Of Control.

Copyright owners of over-the-air broadcast programming depend on the ability to control the time, place, manner and quality of those broadcasts. Plaintiffs' loss of control over the manner in which their works are transmitted is, in and of itself, irreparable harm. It is precisely the type of harm found sufficient for injunctive relief in cases involving other Internet-streaming services. In *WTV Sys.*, 2011 WL 4001121, for example, the court first noted that "[a]s the copyright holders, Plaintiffs have the exclusive right to decide when, where, to whom, and for how much they will authorize transmission of their Copyrighted Works to the public." *Id.* at *7. The court held that unauthorized streaming of those works irreparably harmed plaintiffs in just the same ways as Aereo harms the Plaintiffs:

> Defendants interfere with Plaintiffs' grants of exclusivity to their licensees, Plaintiffs' ability to negotiate similar agreements in the future (because potential licensees will not be willing to pay a premium for a non-exclusive period), Plaintiffs' relationships, including the goodwill developed with their licensees, and Plaintiffs' overall ability to control the use and transmission of their Copyrighted Content.

*Id.* That loss of control alone constituted irreparable harm. *Id.* ("interference" with "Plaintiffs' ability to control the use and transmission of their Copyrighted Works" causes "irreparable injury"); *FilmOn.com*, No. 10-cv-07532 (S.D.N.Y. Nov. 22, 2010) [Dkts. 8 &

14] (Declaration of Martin S. Franks) (irreparable harm based on loss of "control of the distribution of [plaintiff's] copyrighted programming in ways that could damage its standing with both business partners and consumers").

### 2. Disruption Of The Market For And Value Of Plaintiffs' Programming.

In ways that cannot be calculated with certainty or made compensable, Aereo's unauthorized retransmissions significantly undermine the existing marketplace, which establishes the value of the content for all other licensed programming distributors – including cable systems, satellite services, multichannel video programming distributors and licensed websites – that compensate copyright owners. That, too, constitutes irreparable injury, as Judge Buchwald found in *ivi*:

> Plaintiffs claim that ivi's existence threatens their ability to profit from their works by diminishing their value through greater access and interfering with advertising models. This harm is analogous to the claim often found in cases alleging that violations of the reproduction right by an infringing work will cause a loss of sales. If ivi continues its infringement, viewers will be able to obtain plaintiffs programming from unsanctioned sources, and thus the ability of plaintiffs to profit from sanctioned sources would inevitably drop. . . . These losses are "notoriously difficult" to prove and nearly impossible to quantify, and accordingly are considered irreparable.

*ivi*, 765 F. Supp. 2d at 618 (citing *Salinger*, 607 F.3d at 82); *Pearson Educ., Inc. v. Vergara*, No. 09 Civ. 6832, 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010) (decline in sales of textbook as a result of greater access to infringing works "difficult to quantify and hence irreparable harm"); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066

(N.D. Cal. 2000) ("Harm resulting from lost profits and lost customer goodwill is irreparable because it is neither easily calculable, nor easily compensable . . . .").

### 3. Threat To The Development Of A Lawful Internet Streaming Market

Unauthorized Internet retransmission of Plaintiffs' programming will undermine their ability to license that content to authorized Internet providers and to control the time, place and manner in which that programming is made available to Web-based users. The same type of interference was deemed irreparable injury in *WTV Sys.*, which involved the unauthorized streaming of motion pictures from DVD copies:

> Defendants' service threatens the development of a successful and lawful video on demand market and, in particular, the growing internet-based video on demand market. The presence of Defendants' service in this market threatens to confuse consumers about video on demand products, and to create incorrect but lasting impressions with consumers about what constitutes lawful video on demand exploitation of Plaintiffs' Copyrighted Works . . . .

2011 WL 4001121, at *8; *ivi*, 765 F. Supp. 2d at 619 ("Defendants cannot seriously argue that the existence of thousands of companies who *legitimately* use plaintiffs' programming and pay full freight means that ivi's *illegal* and uncompensated use does not harm plaintiffs") (emphasis in original).

In short, the harm inflicted by Aereo is no different than the harm inflicted by the defendants in *ivi*, *WTV Sys.* and *FilmOn.com*. Plaintiffs intend to present the same type of irreparable harm evidence deemed sufficient in those cases. To assist the Court and to narrow the scope of discovery, attached to this brief as Exhibits 1 – 9 are copies of the irreparable harm declarations from *ivi*, *FilmOn.com*, and *WTV Sys.*

**C. The Balance Of Hardships Tips Decidedly In Plaintiffs' Favor.**

In contrast to the irreparable harm facing Plaintiffs in the absence of an injunction, Aereo faces no cognizable harm if an injunction is granted. As the *ivi* court recognized, "[i]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." *ivi*, 765 F. Supp. 2d at 621. *See also WTV Sys.*, 2011 WL 4001121, at *9 (balance of hardships "sharply" favors Plaintiffs; defendants "cannot complain of the harm that will befall them when properly forced to desist from their infringing activities").

**D. The Public Interest Is Served By Enjoining Infringing Activity.**

The object of copyright law is to "promote the store of knowledge available to the public" by providing authors with exclusive rights and a corresponding "financial interest to contribute to the store of knowledge." *Salinger*, 607 F.3d at 82. "If Plaintiffs lost control over their products or potential revenue sources, they will lose valuable incentives to continue to create programming." *ivi*, 765 F. Supp. 2d at 621; *see also Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, ___ F. Supp. 2d ___, 2011 WL 5519829, at *11 (S.D.N.Y. Nov. 10, 2011) (reasoning under *Salinger* that "if Plaintiffs suffer financial losses due to Empire's infringement, and as a result produce fewer motion pictures, the public's 'store of knowledge' will be diminished"). Thus, an injunction is in the public interest.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' request for an

immediate injunction against Aereo's retransmission service.

Respectfully submitted,


/s/ Steven B. Fabrizio
Steven B. Fabrizio
(sfabrizio@jenner.com)
Steven R. Englund
(senglund@jenner.com)
Scott B. Wilkens
(swilkens@jenner.com)
JENNER & BLOCK LLP
1099 New York Ave., N.W., Suite 900
Washington, D.C. 20001
(202) 639-6000

*Attorneys for Plaintiffs WNET, Thirteen,
Fox Television Stations, Inc., Twentieth
Century Fox Film Corporation, WPIX,
Inc., Univision Television Group, Inc., The
Univision Network Limited Partnership
and Public Broadcasting Service*

Dated:  March 21, 2012

/s/ Bruce P. Keller
Bruce P. Keller
(bpkeller@debevoise.com)
Jeffrey P. Cunard
(jpcunard@debevoise.com)
Michael R. Potenza
(mpotenza@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for Plaintiffs American
Broadcasting Companies, Inc., Disney
Enterprises, Inc., CBS Broadcasting Inc.,
CBS Studios Inc., NBCUniversal Media
LLC, NBC Studios, LLC, Universal
Network Television, LLC, Telemundo
Network Group LLC and WNJU-TV
Broadcasting LLC*