# EXHIBIT 2

Case 1:12-cv-01540-AJN   Document 17-2   Filed 03/21/12   Page 1 of 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

WPIX, INC., WNET.ORG, AMERICAN
BROADCASTING COMPANIES, INC., DISNEY
ENTERPRISES, INC., CBS BROADCASTING INC.,
CBS STUDIOS INC., THE CW TELEVISION
STATIONS INC., NBC UNIVERSAL, INC., NBC
STUDIOS, INC., UNIVERSAL NETWORK
TELEVISION, LLC, TELEMUNDO NETWORK GROUP
LLC., NBC TELEMUNDO LICENSE COMPANY,
OFFICE OF THE COMMISSIONER OF BASEBALL,
MLB ADVANCED MEDIA, L.P., COX MEDIA GROUP,
INC., FISHER BROADCASTING-SEATTLE TV, L.L.C.,
TWENTIETH CENTURY FOX FILM CORPORATION,
FOX TELEVISION STATIONS, INC., TRIBUNE
TELEVISION HOLDINGS, INC., TRIBUNE
TELEVISION NORTHWEST, INC., UNIVISION
TELEVISION GROUP, INC., THE UNIVISION
NETWORK LIMITED PARTNERSHIP, TELEFUTURA
NETWORK, WGBH EDUCATIONAL FOUNDATION
THIRTEEN, and PUBLIC BROADCASTING SERVICE,

    Plaintiffs,

    v.

IVI, INC. and TODD WEAVER,

    Defendants
------------------------------------------------------------X

10 Civ. 7415 (NRB)

## DECLARATION OF MARTIN D. FRANKS

I, Martin D. Franks, hereby declare under penalty of perjury, that the following statement is true and correct, to my personal knowledge.

1.     I am employed as Executive Vice President, Planning, Policy and Government Relations for CBS Corporation ("CBS").

-1-

2. I have been with CBS since 1988, when I joined the Company as Vice President, Washington. In 1997, I was named Senior Vice President, CBS Corporation, overseeing the company's corporate relations functions. Later, I became Executive Vice President of CBS Television and Senior Vice President of Viacom Inc., after the former CBS Corporation was acquired by Viacom in May 2000. In September 2005, I was promoted to my present position, several months before Viacom effectuated a corporate restructuring pursuant to which the present CBS Corporation became an independent, publicly-traded company. As presently constituted, CBS's businesses include, among others, the CBS Television Network, the CBS Television Stations Group, CBS Studios Inc. (which produces and syndicates television programming), CBS Studios International (which markets CBS-owned programming abroad), Showtime Networks, Inc. (which consists of a variety of premium cable networks) and CSTV Networks, Inc. (which distributes the cable network CBS College Sports).

3. I have managed a wide range of activities for CBS, including oversight of the corporation's activities in Washington, its relations with state and local governments, its corporate philanthropy, and supervision of the CBS Program Practices Department. As CBS's Vice President, Washington, I was deeply involved in the legislative process leading to enactment of the Cable Television Consumer Protection and Competition Act of 1992, which for the first time afforded television stations the right to negotiate compensation for the carriage of their signals by cable operators. Around the same time, I was one of CBS's principal advocates in the ultimately successful effort to repeal the FCC's financial interest/syndication rules, which allowed television network companies to produce, own and market the programs they air, and opened the door to what is now one of CBS's major businesses. Policy and legislative issues relating to the protection of CBS's copyrights and intellectual property are also among my main

concerns, including matters such as the so-called "broadcast flag" to protect digital television programming from unauthorized copying and distribution over the Internet.

4. Currently, one of my chief responsibilities is handling CBS's retransmission consent negotiations with multichannel video providers. Accordingly, I am intimately familiar with the kinds of issues that arise in such negotiations.

5. Unless stopped, the activities of ivi, Inc. ("ivi") will cause irreparable harm to CBS. Most importantly, they will cause CBS to lose control of the distribution of its copyrighted programming in ways that could damage its standing with both business partners and consumers. Further, by distributing CBS's programming in digital form over the Internet – without CBS's having any say about the employment of copy protection measures -- ivi exposes CBS to virtually infinite piracy. And by making CBS's programs available online at bargain basement rates and in real time, ivi preempts CBS's ability to exploit new media markets, while at the same time lessening the value of those programs to traditional providers of linear broadcast programming, whether multichannel distributors, over-the-air television network affiliates (which will potentially lose viewers -- and thus advertising revenues -- to an out-of-market CBS station), or foreign telecasters.

6. One of the most essential rights belonging to an owner of intellectual property is the ability to control the manner of its distribution, the persons entrusted with its dissemination, and the manner of its display – including the environment in which it appears. CBS is deprived of those rights by ivi's unauthorized retransmission of the signals of its owned television stations and its copyrighted programming.

7. For example, CBS has no control of the advertising that may appear on ivi's web site, the other programming that may be offered adjacent to that of its owned television stations,

or the technical quality with which its programming is transmitted. All of these factors have the potential to diminish a worldwide brand that CBS has developed over more than six decades. One need look no further than the statements of ivi's chief executive officer in a recent interview with the industry-news web site, TVNewsCheck, for an example of how this could occur. Commenting on another recently-announced Internet broadcast streaming service, FilmOn.com, which operates in a manner substantially similar to ivi (and which CBS and others are also suing in this Court), Todd Weaver (who is a defendant in this action) observed that on his competitor's service "right next to the major broadcasters you have porn." The fact that ivi has not at this point chosen to engage in this particular denigration of CBS's brand (and that Mr. Weaver was apparently referring to the FilmOn.com site intended for the United Kingdom) is irrelevant to the point that this is the sort of thing against which a copyright owner has no defense when it loses control of the distribution and display of its product.

8. The unauthorized dissemination of its copyrighted programs over the Internet also exposes CBS to piracy far beyond that of which ivi itself is guilty. Internet transmissions are notoriously insecure and intellectual property in digital form is famously susceptible to copying and further unlimited distribution. That is what has given rise to elaborate "DRM" – or digital rights management – technology.

9. CBS distribution agreements with cable operators and others typically require the distributors to employ copy protection measures consistent with existing industry standards. Because ivi's dissemination of its programming is unauthorized, CBS has no ability to ensure that appropriate steps are taken to protect its security from further copying and distribution.

10. If ivi is permitted to stream CBS's copyrighted programming over the Internet until final adjudication of this action, the value of those programs will likely be irreparably compromised.

11. Defendant's actions will also threaten CBS's ability to exploit existing and potential markets for its programming. For example, by making the signals of CBS's owned television stations, and CBS's copyrighted programs, available over the Internet without the Company's consent, ivi undermines CBS's own efforts to benefit from the nascent and promising market for online distribution of its programming. At the same time, by making CBS's programming available over the Internet at cut rates – rates made possible by its copyright infringement – ivi jeopardizes the revenues for retransmission of its signals that CBS realizes from legitimate cable and satellite operators.

12. It is my understanding that on September 13, 2010, ivi began offering online access to all of the programming broadcast by WCBS-TV New York, New York and KSTW (TV) Tacoma, Washington, television stations that are ultimately wholly-owned by CBS. Apparently, anyone with Internet access anywhere in the world can now view all of the programming on those stations simply by subscribing to ivi's service. I am informed that, to do this, a person need only (a) access the ivi website (http://www.ivi.tv/) on his computer; (b) create an account by providing an e-mail address and a password; (c) agree to the terms of an end user license; and (d) pay the defendant a fee. This allows an ivi subscriber to download and install the ivi TV application through which CBS's owned-television stations, and many others, may be viewed as they are streamed live from ivi's servers. After a 30 day free trial, the fee is $4.99 per month. I understand that for an additional fee of $0.99 per month, the subscriber is able to record, pause, fast-forward and rewind the programming that ivi streams.

13. I understand that ivi also plans to offer iPhone and Android compatible versions of its TV application, and has already submitted an "iPad app" which ivi's chief executive officer has stated he expects to be available for sale within weeks. I further understand that ivi plans to make its service available to users of third-party set-top boxes, such as Vudu, Boxee, and Tivo.

14. All of this threatens immense harm to CBS's businesses. It appropriates our right to sell advertising in those of our programs that we choose to make available online – if we control the necessary rights – pursuant to business arrangements and at prices that *we* determine. It competes, illegally, with CBS's legitimate licensees – including independently-owned television stations affiliated with the CBS Television Network, cable and satellite operators licensed to retransmit the signals of CBS's owned television stations, and the foreign television networks which license CBS product – thereby inevitably diminishing the value of those rights to CBS's lawful customers. It severely undermines CBS's ability to realize licensing revenues from the online distribution of programs it owns. Indeed, it threatens all of the revenue streams that CBS might in the future realize from the distribution of its intellectual property on new media platforms by offering a cheaper alternative – cheaper because the underlying product has been stolen.

15. Broadcast television stations and networks – including those owned by CBS – presently earn most of their revenues from advertising. I understand that defendant Todd Weaver has claimed that ivi's taking of broadcasters' programming without their consent will actually *help* them by increasing the audiences against which they can sell advertising. This assertion is entirely specious.

16. Through its subsidiary CBS Interactive Inc., CBS is already distributing a number of its network programs online, on an advertiser-supported basis, both through its own website

TV.com and through authorized websites affiliated with the CBS Audience Network. The advertising in the online versions of these programs is unique – that is, it differs from the advertising that appears on the linear television broadcast of those same programs – and it is sold independently and priced separately from the broadcast ads. These programs are made available on an on-demand basis only *after* the linear broadcasts of the programs have been completed, so that the online audiences are additive to those for the live broadcast, rather than reducing them. In contrast, the live streaming done by ivi competes directly both with the live broadcast itself and with CBS's chosen means of online distribution.

17. It is highly doubtful that ivi's illegal activities will have any positive effect on the prices commanded for advertising on the CBS Television Network. In order to be sold to advertisers, audiences need to be measured. Nielsen Media Research has long been the dominant provider of such measurement with respect to traditional television viewing, and Nielsen is presently working on the development of techniques for estimating the size of online audiences for video programming. Although there are also firms, such as comScore, that currently provide this function, there is no indication that ivi has made any arrangements at all for the measurement of viewership to its service. In the absence of such data, ivi's assertion that broadcasters will be compensated for its infringement by higher advertising rates is totally groundless.

18. In any case, it is not for ivi to determine that its unauthorized streaming of CBS's programming will be of greater benefit to CBS than the strategy for online distribution that CBS has chosen. The means by which intellectual property is to be exploited is a decision for its owner, not a presumptuous infringer.

19. But ivi's activities do not only undermine CBS's ability to sell online advertising. They also threaten new and growing revenue streams that are vital for CBS's success.

20. As I have noted above, advertising is the primary revenue source for television networks and stations. However, over the last few decades, technological change and increasing competition from new sources of video entertainment and information have significantly eroded broadcast audiences. This in turn has placed the traditional, advertising-only business model of broadcasters under increasing strain.

21. It is now widely recognized by industry analysts that television networks and stations must develop new revenue streams if they are to prosper. This is also essential if free over-the-air broadcasting is to remain a viable competitor to cable networks – which have long enjoyed revenues from both advertising and licensing fees – for premiere sports events and other top-quality programming.

22. CBS has responded to this challenge. Most significantly, it has been an industry leader in negotiating cash compensation from cable, satellite and teleco providers for the right to retransmit the signals of its owned television stations. Since becoming an independent company in December 2005, CBS has completed more than 60 cash deals with multichannel providers, including most of the country's largest operators.

23. Retransmission consent is also a growing source of revenue for the broadcast industry as a whole. According to a 2009 SNL Kagan study, retransmission consent revenues reached $500.1 million in 2008 and were projected to grow to $738.7 million in 2009, crossing the billion-dollar threshold by 2011. Retransmission consent may therefore be expected to play a key role in ensuring the continued vitality of local television stations.

24. Another major revenue source threatened by ivi's infringement – one which is also not dependent on the vagaries of the advertising market – is the licensing of CBS-owned programming abroad. Indeed, foreign syndication (through CBS Studios International) is one of the fastest growing revenue sources provided by any of CBS's businesses.

25. In the interview with TVNewsCheck that I have referred to above, defendant Weaver claims that ivi uses a "three-pronged approach" to prevent the broadcast signals that it retransmits from being viewed outside the United States. This is at variance with his earlier boast, as reported in the press, that ivi would be available "anywhere on the planet." In any event, I am informed that persons outside the United States who were asked to do so have successfully viewed the streamed version of U.S. broadcast stations through the ivi web site. This is hardly surprising, since experience has shown that methods such as the verification of credit card billing addresses, used as a means to limit the geographic area in which Internet transmissions are available, are easily circumvented.

26. I have described CBS's realization of additional advertising revenues by making some of its network programs available over the Internet on a post-broadcast, on-demand basis. Licensing multichannel providers to exhibit that programming online to their customers is another promising way for us to monetize our content.

27. Last July, CBS reached a comprehensive, 10 year programming agreement with Comcast, the nation's largest owner of cable systems. While the terms of that agreement are confidential, expanded access to CBS content for Comcast's video-on-demand and online platforms was an essential part of that deal.

28. The revenue opportunities I have just described are all threatened by ivi's piracy. Simply put, multichannel providers will not pay significant amounts of money to be able to

provide their subscribers with delayed, on-demand access to CBS programs online if those same programs are available live – and more cheaply – from a free-rider like ivi. Nor will those multichannel providers ignore, in negotiations for the carriage of CBS's owned television stations on their traditional distribution platforms, the real-time availability of those signals on ivi's service. By the same token, television stations affiliated with the CBS Television Network will find their exclusive right to air network programming in their communities diluted by unauthorized competition from ivi -- and by the ivi imitators that will inevitably follow if its piracy is not stopped. The same will be true of foreign telecasters who pay large sums for the exclusive right to exhibit CBS's copyrighted programs in their territories.

29. CBS's ability to market distribution rights to its copyrighted programming to subscription services such as Netflix will also be undermined by ivi's theft. The market for the sale of CBS programming on DVDs, and for electronic sales and rentals through services such as iTunes, will also be affected. This is especially true given ivi's offer of a functionality that allows recording of those programs for 99 cents.

30. For these reasons, CBS will suffer immediate and irreparable injury unless the Court acts to enjoin ivi's service.

> I declare under penalty of perjury that the foregoing is true and correct.
>
> _____
> MARTIN D. FRANKS
>
> Executed on October 5, 2010