UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., DISNEY ENTERPRISES, INC., CBS BROADCASTING INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA, LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK TELEVISION, LLC, TELEMUNDO NETWORK GROUP LLC, and WNJU-TV BROADCASTING LLC, | Civil Action No. 12-CV-1540 (AJN) |
| Plaintiffs/Counterclaim Defendants, | |
| v. | |
| AEREO, INC. | |
| Defendant/Counterclaim Plaintiff. | |
| WNET, THIRTEEN, FOX TELEVISION STATIONS, INC., TWENTIETH CENTURY FOX FILM CORPORATION, WPIX, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK LIMITED PARTNERSHIP, and PUBLIC BROADCASTING SERVICE, | Civil Action No. 12-CV-1543 (AJN) |
| Plaintiffs/Counterclaim Defendants, | |
| v. | |
| AEREO, INC., f/k/a BAMBOOM LABS, INC., | |
| Defendant/Counterclaim Plaintiff. | |

**DEFENDANT'S INITIAL PRE-HEARING MEMORANDUM**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................5

    The Aereo Technology ...............................................................................................7

LEGAL STANDARD..........................................................................................................9

ARGUMENT ....................................................................................................................9

I.     PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS ...................................................................................................................9

    A.    The Aereo Customer's Transmission Is A Lawful "Private" Performance...........10

        1.    Plaintiffs' Cases Do Not Apply. ...............................................14

    B.    Aereo Does Not Do Any Public Performance. .......................................................17

II.    PLAINTIFFS CANNOT SHOW ANY IRREPARABLE HARM....................................19

III.   THE BALANCE OF HARDSHIPS TIPS IN FAVOR OF AEREO ................................22

IV.   THE PUBLIC INTEREST WOULD BE DISSERVED BY AN INJUNCTION ............23

CONCLUSION....................................................................................................................24

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Arista Records LLC v. Usenet.com*, Inc.,
    633 F. Supp. 2d 124 (S.D.N.Y. 2009)..................................................................18

*Cartoon Network LP v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008).............................................................. *passim*

*CBS Broadcasting Inc. v. FilmOn.com, Inc.*,
    No. 10-CV-07532 (S.D.N.Y. Oct. 1, 2010) ..........................................15

*In re Cellco P'ship*,
    663 F. Supp. 2d 363 (S.D.N.Y. 2009)................................................18

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)............................................................19, 20

*City of Newburgh v. Sarna*,
    690 F. Supp. 2d 136 (S.D.N.Y. 2010)................................................21

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
    412 U.S. 94 (1973).............................................................................5

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*,
    749 F.2d 154 (3d Cir. 1984)..........................................................14, 15

*CoStar Group, Inc. v. LoopNet, Inc.*,
    373 F.3d 544 (4th Cir. 2004) .........................................................18

*Disney Enters., Inc. v. Hotfile Corp.*,
    798 F. Supp. 2d 1303 (S.D. Fla. 2011) ...........................................18

*Dorsett v. County of Nassau*,
    762 F. Supp. 2d 500 (E.D.N.Y. 2011) ............................................21

*Fortnightly Corp. v. United Artists Television, Inc.*,
    392 U.S. 390 (1968)........................................................................16

*Hologic, Inc. v. Senorx, Inc.*,
    No. 08-CV-00133, 2008 WL 1860035 (N.D. Cal. Apr. 25, 2008) .........................................23

*Live Nation Motor Sports, Inc. v. Davis*,
    Civ. A. No. 06-CV-276, 2007 WL 79311 (N.D. Tex. Jan. 9, 2007)........................................14

*On Command Video Corp. v. Columbia Pictures Indus.*,
   777 F. Supp. 787 (N.D. Cal. 1991) ...................................................................15

*Perfect 10, Inc. v. Google, Inc.*,
   653 F.3d 976 (9th Cir. 2011) ...........................................................................21

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
   907 F. Supp. 1361 (N.D. Cal. 1995) .............................................................17, 18

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010)..................................................................................9

*Sony Corp. of America v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)................................................................................ *passim*

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
   415 U.S. 394 (1974)..........................................................................................16

*Twentieth Century Fox Film Corp. v. iCraveTV*,
   Civ. A. No. 00-CV-120, 2000 WL 255989 (W.D. Pa. Feb. 8, 2000) ......................14

*Universal City Studios, Inc. v. Sony Corp. of Am.*,
   480 F. Supp. 429 (C.D. Cal. 1979) ......................................................................5

*Warner Bros. Entm't Inc. v. WTV Sys.*, Inc.,
   Civ. A. No. 11-CV-2817, 2011 WL 4001121 (C.D. Cal. Aug. 1, 2011)...............15

*Wolk v. Kodak Imaging Network, Inc.*,
   No. 10-CV-4135, 2012 WL 11270 (S.D.N.Y. Jan. 3, 2012)  ..................................18

*WPIX, Inc. et al. v. ivi, Inc.*,
   765 F. Supp. 2d 594 (S.D.N.Y. 2011)................................................................15

**STATUTES**

17 U.S.C. § 101..........................................................................................................10

17 U.S.C. § 106....................................................................................................10, 17

17 U.S.C. § 111..........................................................................................................15

17 U.S.C. § 512..........................................................................................................13

47 U.S.C. § 151......................................................................................................5, 23

47 U.S.C. § 303............................................................................................................5

The Radio Act of 1927, Pub. L. No. 69-169, 44 Stat. 1162 (1927).................................................5

OTHER AUTHORITIES

Brief for the United States as Amicus Curiae, *Cable News Network, Inc. v. CSC
  Holdings, Inc.* (May 29, 2009)..............................................................................................12

THE MEDIA BUREAU, FCC, THE PUBLIC AND BROADCASTING: HOW TO GET THE MOST
  SERVICE FROM YOUR LOCAL STATION (2008). ..................................................................6, 24

Defendant Aereo, Inc. ("Aereo") submits this initial pre-hearing memorandum in response to Plaintiffs' brief filed March 21, 2012.  As shown below, Plaintiffs are not entitled to a preliminary injunction because their claims are contrary to controlling precedent; they cannot demonstrate irreparable injury, while an injunction would cripple Aereo; and an injunction is not in the public interest.

## INTRODUCTION

This case is fundamentally about a consumer's right to (1) receive over-the-air broadcast television, (2) make a copy of a television program, and (3) play the copy back to herself.  A consumer necessarily needs machinery to do this—an antenna, a DVR, and a playback mechanism.  Aereo supplies to consumers the machinery, or system, to do so.

Two seminal decisions—*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*") and *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*")—establish the consumers' rights here.  Plaintiffs are well acquainted with those decisions—as copyright holders they were on the losing side of both—and their brief tries and fails to distinguish Aereo's system from the technology at issue in those cases.  Just as in those cases, Plaintiffs are trying to prevent innovation that allows consumers easier access to the content to which they are legally entitled.  Plaintiffs' brief concedes, as it must in view of *Cablevision*, that Aereo's remote-storage DVR ("RS-DVR") is lawful; so Plaintiffs instead focus on the "watch now" mode of Aereo's system, and contend that Aereo is a direct infringer, because, according to Plaintiffs, Aereo conducts a "public performance" through "simultaneous" "retransmission" of live over-the-air broadcasts to its customers.  *See*, *e.g.*, Plaintiffs' Initial Pre-Hearing Memorandum (hereinafter "Plaintiffs' Mem.") at 5, 16, 21.  Plaintiffs' claims are unsupportable as a matter of both fact and law.

This case turns on the way Aereo's system actually works, and the way Aereo's system works is fundamentally different than the assertions made in Plaintiffs' brief.  A consumer can use Aereo's system to perform three basic functions, each of which is entirely lawful under controlling law:

> First, a consumer turns on a remotely located and individually assigned television antenna, accessible only by her, and tunes to the over-the-air television programming of her choice;

> Second, a consumer uses the Aereo system to make a unique copy of the over-the-air program, from the signals received by her antenna, and to store that copy in a remotely located DVR; and

> Third, a consumer uses the Aereo system to play back her unique copy to herself, and only to herself, on her Internet-enabled device.

What Plaintiffs fail to recognize is that Aereo's system employs these exact same steps whether the consumer operates it in the "watch now" mode—*i.e.*, play back at approximately the time the program airs—or whether the consumer waits until a later time to initiate playback of the recorded programming.  In either mode, the consumer makes her own unique copy of the program, and plays that unique copy back to herself and no one else.  The only difference is how long the copy is retained and **when** playback occurs.  In the "watch now" mode, the consumer can initiate playback within seconds after recording begins, whereas in the "record" mode the playback occurs at a later time of the consumer's choosing.

Once the facts of Aereo's system are correctly understood, there can be no question that the use of the system does not violate any copyright and there is no "public" performance of Plaintiffs' works.  The legal standard for determining whether a performance is public is set forth in *Cablevision*, and notably, the parties do not appear to disagree on that standard.  According to Plaintiffs, there is no "public performance" in

> the act of playback, from a unique, user-made copy, solely to the user who, . . . "made" that copy.  The [Second Circuit] stressed that

> the Cablevision system, "as designed, only makes transmissions to one subscriber using a copy made by that subscriber."  536 F.3d at 137.  It also noted that the "universe of people capable of receiving" the transmission remained at all times "the ***single subscriber*** whose ***self-made*** copy [was] used ***to create that*** transmission."  *Id.*

Plaintiffs' Mem. at 15-16 (emphasis by Plaintiffs).  Aereo's system meets each and every element of the test described by Plaintiffs:  whether viewing in "watch now" or record mode, a consumer uses the Aereo system to do (1) "the act of playback," (2) "from a unique, user made copy," (3) "solely to the user who . . . 'made' that copy."  *See id.*

As *Cablevision* makes very clear, it is fundamentally correct to view what the consumer does, using Aereo's system, as a "private" performance.  The copy that the consumer makes and plays back to herself is her unique copy, from her unique antenna.  The copy begins at the unique time that the consumer designates, and the data contained in the copy is unique and specific to what is captured by that antenna.  When the consumer transmits that single, unique copy to herself, the performance is quintessentially "**private**," not public.  The fact that other consumers, using the Aereo system, may be transmitting to themselves their own unique copies of the same underlying programming does not turn multiple, quintessentially private performances into a collective "public performance."  *See Cablevision*, 536 F.3d at 135-36.

Plaintiffs' arguments evaporate in the face of these facts.  According to Plaintiffs, Aereo is no different than a cable company that simultaneously retransmits Plaintiffs' programming to its customers, or a video-on-demand service that begins with a single copy of copyrighted work it selects, and streams that same copy to multiple customers.  These arguments are wrong on the facts—*i.e.*, no transmission is sent to multiple persons using Aereo.  This is equally true of the "watch now" mode, as that is just a playback by the consumer of her unique RS-DVR copy,

where playback is initiated shortly after the copy is made.  Under these circumstances, the

complete answer to Plaintiffs' arguments is found in *Cablevision* itself:

> we find that the transmit clause directs us to identify the potential
> audience of a given transmission, *i.e.*, the persons "capable of
> receiving" it, to determine whether that transmission is made "to
> the public." Because each RS-DVR playback transmission is made
> to a single subscriber using a single unique copy produced by that
> subscriber, we conclude that such transmissions are not
> performances "to the public," and therefore do not infringe any
> exclusive right of public performance.

*Cablevision*, 536 F.3d at 139.[1]

In sum, Plaintiffs in this case are really trying to prevent Aereo from supplying the

machinery, or system, that consumers may use to more easily or conveniently perform acts that

are entirely lawful.  *Sony* and *Cablevision* establish that there can be no liability for providing

such a system.  And it is no answer to suggest, as Plaintiffs do, that there is something improper

with Aereo's system because **many** consumers may use it to exercise these basic rights.  Each

consumer possesses the right, individually, to copy over-the-air television programming for

herself, and to play back that same unique copy to herself.

Much as Plaintiffs may wish it to be otherwise, Congress did not and does not prohibit

consumers from making private performances of a copyrighted work.  Moreover, the Supreme

Court has cautioned courts to be "circumspect" when confronted with policy arguments such as

the ones the Plaintiffs make here, which amount to attempts to expand the Copyright Act in the

face of technological innovations such as Aereo's.  As the Court instructed:

---

[1]    When Plaintiffs bold-face language in the definition of to perform "publicly" from Section 101 of the Copyright Act (Plaintiffs' Mem. at 1 and 6), they notably omit emphasizing the two phrases that *Cablevision* held most relevant:  that the performance must be made "*to the public*," and that the members of the public must be "*capable of receiving the performance or display*," *i.e.*, the particular transmission.  *See Cablevision*, 536 F.3d at 135 (the transmit clause "directs us to examine who precisely is 'capable of receiving' a particular transmission of a performance").

> Sound policy, as well as history, supports our consistent deference
> to Congress when major technological innovations alter the market
> for copyrighted materials. Congress has the constitutional authority
> and the institutional ability to accommodate fully the varied
> permutations of competing interests that are inevitably implicated
> by such new technology.
>
> In a case like this, in which Congress has not plainly marked our
> course, we must be circumspect in construing the scope of rights
> created by a legislative enactment which never contemplated such
> a calculus of interests.

*Sony*, 464 U.S. at 430.  As only private performances are at issue here, there is no copyright

violation and Plaintiffs' claim fails.

## **BACKGROUND**

Aereo's technology operates at the intersection of three core principles of

telecommunications policy and copyright law.

First, the airwaves are owned by the public and licensed to broadcasters for the

convenience of the public.[2]  Indeed, Congress enacted the Communications Act, which created

the Federal Communications Commission, for the purpose of "regulating interstate and foreign

commerce in communication by wire and radio so as to make [it] available, so far as possible, to

all the people of the United States."  47 U.S.C. § 151 (emphasis added).  The Supreme Court has

acknowledged a "public interest in increasing access to television programming, an interest that

'is consistent with the First Amendment policy of providing the fullest possible access to

information through the public airwaves.'"  *Sony*, 464 U.S. at 425 (quoting *Universal City*

*Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 429, 454 (C.D. Cal. 1979) (citing *Columbia*

*Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 102 (1973))).

---

[2]     Section 1 of the Radio Act of 1927 created the Federal Radio Commission to allocate the "use of such
[broadcast] channels, *but not the ownership thereof*, by individuals, firms, or corporations . . . under licenses granted
by Federal authority").  Pub. L. No. 69-169, 44 Stat. 1162 (1927) (emphasis added).  Section 4 of that Act directed
the Commission to grant licenses to the public airwaves in the "public convenience, interest, or necessity"—a
requirement carried forward today in the Communications Act of 1934, 47 U.S.C. § 303.

Television stations broadcast over these public airwaves not as a matter of right, but under licenses granted by the public.  Those licenses come with responsibility:  "In exchange for obtaining a valuable license to operate a broadcast station using the public airwaves, each [] television licensee is required by law to operate its station in the 'public interest, convenience and necessity.'"  THE MEDIA BUREAU, FCC, THE PUBLIC AND BROADCASTING: HOW TO GET THE MOST SERVICE FROM YOUR LOCAL STATION 6 (2008), *available at* http://transition.fcc.gov/mb/ audio/decdoc/public_and_broadcasting.html.  Consumers are as entitled to receive these free over-the-air broadcasts as cable company subscribers are to receive the same signals retransmitted by cable companies.

Second, consumers have a well-established right to record this programming, which they are legally entitled to receive, for their own personal use.  In *Sony*, the Supreme Court held that Sony was not liable for indirect copyright infringement for selling a video recorder (the Betamax) because personal consumer recording of television programming is not copyright infringement.  464 U.S. at 455.  The Court concluded that when consumers record and play back television programming available to them for their own personal use, they are engaged in a "fair use" and do not violate the Copyright Act.  *Id*.  This fundamental principle applies regardless of the technology used to make the recording, *e.g.*, Betamax, a VCR, a DVR, or a computer. Indeed, to hold otherwise, would be to effectively limit consumers' fair use rights to outdated technologies.

Third, it is lawful for companies to make available to consumers the technology to do remotely what they could otherwise do with home equipment—that is, to make unique recordings remotely and to transmit those recordings back to themselves.  As noted above, Sony was found not liable for copyright infringement for manufacturing and selling a recording and

playback device to be located in the consumer's home.  More recently, in *Cablevision*, the Second Circuit held that a company is not liable for infringement where it provides technology owned by the company and located on the company's premises—in that case a "remote storage DVR" or "RS-DVR"—that consumers may use to record programming.  The Court noted that as with a home based system, it is **the consumer** who makes the recordings.  *See Cablevision*, 536 F.3d at 131-32.  In addition, *Cablevision* held that so long as the consumer's unique recording is only played back to the consumer who made it, any performance is private and lawful—not public.  *Id*. at 137.

Aereo's technology rests squarely on these fundamental legal principles.  Consumers may use the Aereo technology to do exactly what they are entitled to do: (1) receive over-the-air broadcast television, (2) make a copy of a television program, and (3) play back the unique copy to themselves.

### The Aereo Technology

Consumers typically receive over-the-air broadcast programming by using a "rabbit ears" antenna or installing an antenna on the roof of their home.  Aereo furthers public access by allowing the consumer to remotely locate an antenna.  This is feasible because Aereo developed a new television antenna that is very small and less expensive to manufacture.  The Aereo antennas are the size of a dime and may be arranged efficiently together so that tens of thousands of individual antennas can be located in a small space on a single rooftop.  Other than in its size, the antenna functions identically to antennas that are already used by consumers to capture over-the-air broadcasts.

When a consumer uses the Aereo system, whether using the "record" mode or the "watch now" mode, she makes a unique copy of the program in question, stores it on a hard drive, and

then plays that unique copy back to herself.  In all respects, the system functions automatically, and only in response to the consumer's volition.

To use Aereo's system, the consumer first begins by logging on to the Aereo website from an Internet enabled device (such as a laptop, iPad, or iPhone), and peruses the "Guide" section of the website to identify a program that she would like to see.  In the "record" mode, the consumer clicks the "record" button to set the program date, time and channel for recording.  At the appointed time, the Aereo system automatically follows the consumer's direction to record that particular program.  The system activates the consumer's assigned antenna, and tunes to the station carrying that broadcast.  The antenna acquires a signal only for that particular consumer's use.[3]  The acquired signal is transcoded and a unique digital copy is stored on a hard drive so that the consumer can access it and play it back later.  The consumer can access and play back only the unique recording that he or she made, and the recording—which is identified solely with that consumer—cannot be accessed or played back by anyone else.

The process is virtually identical in the "watch now" mode.  After logging on to the Aereo website from an Internet enabled device, the consumer selects a broadcast program from the "Guide" section of the website.   By clicking the "watch now" button, the consumer activates her Aereo antenna, and the Aereo system tunes to the station carrying that broadcast.  That antenna-acquired signal is accessible only to that particular consumer.  The Aereo system begins storing a unique digital copy of that program on a hard drive so that the consumer can access it and play it back after the recording begins.  That consumer can access and play back only the unique recording that she made, and the recording—which is identified solely for that consumer—cannot be accessed or played back by anyone else.

---

[3]       For example, if 100 Aereo members choose to record a given program there will be 100 unique copies of that program, each only accessible to the member who recorded it.

By recording a program when using the "watch now" mode, the consumer makes a unique recording that is fixed from the time of acquisition of the signal, and the consumer can pause or rewind the recording as they choose.[4]  The consumer can retain the recording for later playback by pressing "record" before tuning to another channel or logging off Aereo.  If the consumer does not press "record," the recording is discarded after the program ends or the consumer tunes to another channel.

## LEGAL STANDARD

The parties agree on the relevant legal standard for issuance of a preliminary injunction: Plaintiffs must show (1) (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in Plaintiffs' favor; (2) irreparable injury absent an injunction; (3) that the balance of hardships tips in Plaintiffs' favor; and (4) that the public interest would not be disserved by the issuance of a preliminary injunction.  *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010); *see* Plaintiffs' Mem. at 5-6 (citing same).  Plaintiffs can satisfy none of these factors here.

## ARGUMENT

## I.   PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS.

Before addressing the merits of Plaintiffs' claim, it is useful to identify, specifically, **what** Plaintiffs claim.  Plaintiffs allege direct infringement by Aereo, but not with respect to the RS-DVR portion of the Aereo technology.  Instead, Plaintiffs only challenge the Aereo system as used in the "watch now" mode.  Plaintiffs contend that the "watch now" transmission is a public,

---

[4]      This functionality is essentially identical to the automatic copy that set-top DVRs rented to consumers by cable and satellite companies and Tivo brand DVRs make whenever a consumer watches a "live" program.  With those widely used technologies the consumer is watching a copy being automatically made and played back.  This is how the consumer can rewind, pause, and, if sufficiently behind the program, fast forward even when not watching a previously recorded program.

not a private, performance.  Plaintiffs' Mem. at 13 n.8 ("Plaintiffs are not herein challenging Aereo's so-called virtual DVR service, only its real-time retransmission of Plaintiffs' television programs.").[5]

The scope of Plaintiffs' claim is important for two reasons.  First, Plaintiffs' claim on preliminary injunction presents a narrow legal inquiry that can be readily resolved by the facts of how the Aereo technology actually works.  Second, as will be shown, Plaintiffs' brief and interpretation of *Cablevision* support **Aereo's** position.

### A.     The Aereo Customer's Transmission Is A Lawful "Private" Performance.

Under the Copyright Act, content owners have the exclusive right to "perform the copyrighted work publicly."  17 U.S.C. § 106(4).  The relevant definitional section of the Act states that:

> [t]o perform or display a work 'publicly' means . . . to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.* § 101.[6]  In *Cablevision*, the Second Circuit analyzed this statutory language and concluded that "[t]his plain language instructs us that, in determining whether a transmission is 'to the public,' it is of no moment that the potential recipients of the transmission are in different places, or that they may receive the transmission at different times."  536 F.3d at 134.  The panel continued, "[t]he implication from this same language, however, is that it is relevant, in

---

[5]       Plaintiffs also do not challenge the lawfulness of "time-shifting."  *See* Plaintiffs' Mem. at 16 ("They are not, as noted at the March 13 scheduling conference, challenging the time-shifting DVR aspect of the Aereo service.").

[6]       The ellipses omit clause one, which the parties agree is not at issue here.

determining whether a transmission is made to the public, to discern who is 'capable of

receiving' the performance being transmitted."  *Id*.  Ultimately, the panel concluded,

> the transmit clause directs us to identify the potential audience of a
> given transmission, *i.e.*, the persons "capable of receiving" it, to
> determine whether that transmission is made "to the public."
> **Because each RS-DVR playback transmission is made to a
> single subscriber using a single unique copy produced by that
> subscriber, we conclude that such transmissions are not
> performances "to the public," and therefore do not infringe
> any exclusive right of public performance.**

*Id*. at 139 (emphasis added).[7]

Plaintiffs do not dispute this holding.  Indeed, in attempting to distinguish *Cablevision*

from what they assert (incorrectly) are the facts of the Aereo system, Plaintiffs essentially make

Aereo's case.  Plaintiffs argue that:

> The Court stressed that the Cablevision system, "as designed, only
> makes transmissions to one subscriber using a copy made by that
> subscriber." 536 F.3d at 137.  It also noted that the "universe of
> people capable of receiving" the transmission remained at all times
> "the ***single subscriber*** whose ***self-made*** copy [was] used ***to create***
> that transmission."  *Id*. (emphasis added); *see also id.* at 138
> ("Given that each . . . transmission is made to a given subscriber
> ***using a copy made by that subscriber***, we conclude that such a
> transmission is not 'to the public' . . . .") & 139 ("Because each . . .
> playback transmission is made to a ***single subscriber*** using a ***single
> unique copy produced by that subscriber***, we conclude that such
> transmissions are not performances 'to the public' . . . .").

Plaintiffs' Mem. at 15-16 (emphases by Plaintiffs); *see also id.* at 17 ("[In Cablevision], the

transmission was from a unique, previously-stored copy, sent back to the cable box of the same

subscriber whom, the Second Circuit found, had made the copy, for playback in that subscriber's

home."); *id.* at 18 ("[The copy in Cablevision] – not the original broadcast – was the basis of the

---

[7]     The public/private distinction reflects the fact that Congress chose to protect public performances, but
chose not to protect private performances.  *Cablevision*, 536 F.3d at 136 ("the transmit clause obviously
contemplates the existence of non-public transmissions; if it did not, Congress would have stopped drafting that
clause after 'performance.'").

RS-DVR playback.  There was no retransmission and, because the new, RS-DVR playback was private, neither Cablevision nor the user was engaged in a public performance.").

Plaintiffs are right about what *Cablevision* holds, but their own explication establishes why the "watch now" transmission by an Aereo member is private, not public.  As noted, the Aereo "watch now" and "record" modes operate the same way using the same technology.  In both cases, the consumer makes a copy of programming from a unique capture of broadcast signals by her antenna, and then plays back that unique, fixed copy of the program she caused to be made.  In the case of "watch now," the consumer first makes a unique, fixed recording in her RS-DVR, and then plays back that unique recording from her RS-DVR *after* the recording has occurred, and *after* she presses "play."  Thus, Plaintiffs are right when they state that Cablevision "held that the subsequent on-demand playback of that unique copy, solely to that same subscriber's home, was a private performance and did not violate the public performance right." Plaintiffs' Mem. at 4-5.  But Plaintiffs are wrong when they continue, "Those facts, however, are not present here."  *Id*. at 5.[8]

Plaintiffs' legal theory seems to be based on a fundamental misunderstanding about how the Aereo technology works in numerous respects.  Plaintiffs apparently believe that Aereo directly retransmits over-the-air broadcasts to the consumer: "Aereo's retransmissions originate

---

[8]     In their description of the law, Plaintiffs also extensively quote and rely upon the brief filed by the United States Solicitor General in *opposition* to the petition for certiorari that was filed, and denied, in *Cablevision*.  Once again, Aereo has no quarrel with the below statement, made by Solicitor General Kagan, as it likewise reinforces the legality of Aereo's system:

> [t]he Second Circuit repeatedly explained that its rejection of petitioners' public-performance claim depended on a range of factors: not only that each transmission would be sent to a single recipient, but also that (1) each transmission would be made using a ***unique copy*** of the relevant program; and (2) each transmission would be made ***solely to the person*** who had previously made ***that unique copy***.

Plaintiffs' Mem. at 20-21 (emphasis by Plaintiffs)  (citing Brief for the United States as Amicus Curiae at 21, *Cable News Network, Inc. v. CSC Holdings, Inc.*, 129 S. Ct. 2890 (May 29, 2009)).

directly from and *are made simultaneously with* the primary transmission."  *See* Plaintiffs' Mem. at 5 (emphases added); *see also id.* at 16 ("Aereo's *simultaneous* retransmissions *originate from the original, over-the-air broadcast*, which Aereo receives with its multiple antennas and *then retransmits simultaneously to multiple subscribers*.") (emphases added); *id.* at 21 ("No matter what euphemisms, devices or processes are employed, *the source of Aereo's retransmission remains Plaintiffs' over-the-air broadcast signals, not a unique, user-made copy*.  That means *Cablevision* is inapplicable . . . .") (emphasis added).[9]  But as discussed above, Aereo does not make multiple transmissions from a single source.  Each Aereo member accesses the broadcast he or she selects through an antenna uniquely assigned to that member and that independent signal is made into a unique copy that is accessible only by that particular customer.  Customers do not use Aereo's system to "simultaneously retransmit"; in all cases, the consumer's transmission originates from the consumer's unique, time-shifted and fixed copy.

Plaintiffs furthermore misrepresent Aereo's argument as it relates to the customer's individual antennas.  Thus, Plaintiffs state that Aereo:

> relies on a futile fiction:  that it temporarily "rents" to its subscribers countless miniature antennas and tuners.  According to Aereo, this means those customers are individually retransmitting plaintiffs' television programs to themselves.

Plaintiffs' Mem. at 2; *see also id.* at 4 and 13.  Plaintiffs' poetic license aside, there is nothing "fictional" about the Aereo antennas.  The antennas enable the consumers' right to access the local free television broadcasts they are entitled to receive.  From a consumer convenience perspective, Aereo's innovative engineering has advanced antenna technology much the way the RS-DVR advanced DVR technology.

---

[9]  Notably, to the extent Plaintiffs contend that the "watch now" RS-DVR process is legally distinguishable from *Cablevision* (it is not) Plaintiffs' claim runs headlong into the safe harbor provided to intermediaries in the Digital Millennium Copyright Act ("DMCA").  *See* 17 U.S.C. § 512.  Section 512(a) of the DMCA limits the relief available against service providers that facilitate the consumer's actions over digital networks.

However, the conclusion that use of Aereo's technology only results in "private performances" does not depend solely upon the individual antennas, but also on the fact that the unique broadcast that consumers capture by those antennas is recorded in the RS-DVR, and then played back from that copy only to the consumer who initiated that recording. Since even in the "watch now" mode the customer is playing back his or her own unique copy, the customer can initiate playback when he or she wants, and can rewind or pause as with a traditional DVR. As the customer's recording is unique, it is also subject to whatever glitches may occur in the individual recording by the customer's individual antenna and the RS-DVR. For example, if the customer's antenna did not work properly, then the customer will not have a recording to play back. These facts bring this case squarely within *Cablevision*, and make clear that the consumer makes a private performance of her unique copy, accessible only to that consumer.

### 1.  Plaintiffs' Cases Do Not Apply.

In light of the above, the cases Plaintiffs rely upon are readily distinguished. *See* Plaintiffs' Mem. at 9-10 (listing cases). In those cases, the defendants made public performances from a single transmission or copy, to multiple members of the public at the same or different times.

For example, in *Live Nation Motor Sports, Inc. v. Davis*, the defendant streamed live audio webcasts of the plaintiff's races on a website in "real time," which permitted members of the public to listen to a multiplicity of performances from the same work. Civ. A. No. 06-CV-276, 2007 WL 79311, at *2 (N.D. Tex. Jan. 9, 2007). Similarly, in *Twentieth Century Fox Film Corp. v. iCraveTV*, the defendant offered a streaming television service that gave multiple consumers access to streams originating from a common television antenna. Civ. A. No. 00-CV-120, 2000 WL 255989, at *2 (W.D. Pa. Feb. 8, 2000) (describing streaming of single broadcast to multiple users). The other cases upon which Plaintiffs rely suffer from the same fault—they

each concern a **single** content source played to multiple members of the public at different times. *See*, *e.g.*, *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 157 (3d Cir. 1984) (a single cassette performed to separate members of the public at different times); *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787, 788 (N.D. Cal. 1991) (same); *Warner Bros. Entm't Inc. v. WTV Sys.*, Inc., Civ. A. No. 11-CV-2817, 2011 WL 4001121, at *3 (C.D. Cal. Aug. 1, 2011) (a single DVD performed to separate members of the public at different times).

The *Cablevision* and Aereo RS-DVR systems are fundamentally different than the systems at issue in the above cases, because in both *Cablevision* and the Aereo system, each consumer plays back only the unique copy made by, and available to, that individual consumer. For "public performance" purposes, *Cablevision* drew this critical distinction, founded in the language of the Copyright Act, between the original work, and a copy of that work that was actually transmitted to the consumer, and held that each playback of a unique copy is a separate, private performance:

> Given this interplay between the various rights in this context, it seems quite consistent with the Act to treat a transmission made using Copy A as distinct from one made using Copy B, just as we would treat a transmission made by Cablevision as distinct from an otherwise identical transmission made by Comcast.

*Cablevision*, 536 F.3d at 138.  None of Plaintiffs' cases (other than *Cablevision*) concern the transmission of unique, user-made copies; they are all inapposite.

Plaintiffs' reliance on *WPIX, Inc. et al. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011) and *CBS Broadcasting Inc. v. FilmOn.com, Inc.*, No. 10-CV-07532 (S.D.N.Y. Oct. 1, 2010) also is misplaced, because those cases do not even concern the question of whether the defendants were making a public performance.  In those cases, the defendants did not contest that they were making public performances.  Instead they argued that they were "cable systems" entitled to a

compulsory retransmission license under 17 U.S.C. § 111.  Aereo does not engage in any "retransmission" of a single transmission, and does not claim it is a "cable system," and these cases thus are irrelevant to the issues here.

Finally, Plaintiffs argue that the transmissions made by Aereo's customers should be deemed public performances because the public performance clause amendment was intended, in part, to overturn *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968) and *Teleprompter Corp. v. Columbia Broadcasting System, Inc*., 415 U.S. 394 (1974), which held that television retransmitters such as cable companies did not "perform" the broadcasts in question.  Again, Plaintiffs' argument is based on a misconception of the facts.  In *Fortnightly* and *Teleprompter*, the *same* transmission was distributed to the public at large via community antenna services.  There is no dispute that the public performance clause was intended to encompass such a system, but again, the Aereo system is wholly different.  In this case, the transmission made by an Aereo member is made only from the unique recording made by that member, and transmitted only to that member.  Such a system does not fall within the language Congress employed to address *Fortnightly* and *Teleprompter*.

The Aereo technology allows consumers to do no more than customers could do with their own antennas and the type of RS-DVR system considered and found lawful in *Cablevision*. The only difference is that when consumers use the Aereo technology, they are accessing programming content from a different source than in *Cablevision*.  Instead of giving the consumer the ability to record the licensed content cable companies offer their subscribers, the Aereo technology allows its members to record and play back to themselves the over-the-air broadcasts that are, as described above, free and available to everyone—no license is

necessary.[10]  In both cases, the consumer is entitled to receive the programming content and

legally permitted to record it for his or her own use.  *See Sony*, 464 U.S. at 449 ("[T]imeshifting

merely enables a viewer to see such a work which he had been invited to witness in its entirety

free of charge.").  By their arguments here, Plaintiffs would, clearly, prefer to have the right to

put their broadcasts behind the pay-wall of a cable subscription, thereby limiting the consumers'

right to receive the over-the-air broadcasts to which they are entitled.  But that is not the law.

 For these reasons, Plaintiffs are not likely to prevail on their asserted claims.

 **B.**  **Aereo Does Not Do Any Public Performance.**

 Plaintiffs' public performance claim fails to meet the statutory language for a second,

independent reason, which is that **Aereo** is not "doing" the actions that constitute an alleged

public performance, and thus cannot be a direct infringer.  To the contrary, the consumer initiates

the playback by pressing "play" and thereby causing the Aereo system to automatically play

back the consumer's unique previously-recorded copy.  *Cablevision* mentions this issue but does

not decide it in the "public performance" context.  However, the reasoning of *Cablevision* with

the respect to the "reproduction" right, 17 U.S.C. § 106(1), compels the conclusion that Aereo is

not "doing" any public performance.  *See Cablevision*, 536 F.3d at 133.

 It has long been established that copyright infringement requires a "volitional act"

initiating the unauthorized use.  Fifteen years ago, in *Religious Tech. Ctr. v. Netcom On-Line*

*Commc'n Servs., Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995), a district court was asked to find an

Internet service provider ("ISP") liable for creating a computer system that allowed third-parties

to post, *i.e.*, copy, copyrighted images to its website.  In finding the ISP not liable, the court

recognized that, "[a]lthough copyright is a strict liability statute, there should still be some

---

[10] And Aereo needs no more "license" to provide hardware and software to individuals than does Radio
Shack to provide antennas or Cablevision to lease DVRs.

element of volition or causation which *is lacking where a defendant's system is merely used to create a copy by a third party*." *Id*. at 1370 (emphasis added).

Thereafter, in *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004), the Court of Appeals for the Fourth Circuit agreed, holding:

> to establish direct liability [for copyright infringement] . . . something more must be shown than mere ownership of a machine used by others to make illegal copies.  There must be actual infringing conduct with *a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner*. The *Netcom* court described this nexus as requiring some aspect of volition.

*Id*. (emphasis added).  Since that time, "courts have repeatedly held that the automatic conduct of software, unaided by human intervention, is not 'volitional'" and cannot give rise to liability for the provider of the technology.  *See Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d. 1303, 1309 (S.D. Fla. 2011) (citing *Netcom*, *CoStar*, and others); *see also Wolk v. Kodak Imaging Network, Inc.*, No. 10-CV-4135, 2012 WL 11270 at *15 (S.D.N.Y. Jan. 3, 2012) (finding no infringement where there was "no dispute that any reproduction, display or transmission of the Plaintiff's images by or through the KODAK Gallery website is an automated process with no human intervention by any employee of the Kodak Defendants."); *Arista Records LLC v. Usenet.com*, Inc., 633 F. Supp. 2d. 124, 147-48  (S.D.N.Y. 2009) ("direct infringement . . . requires a showing that Defendants engaged in some volitional conduct sufficient to show that they actively engaged in distribution of the copies of Plaintiffs' copyrighted . . . recordings."). Further, courts have expressly applied the volitional act requirement in the "public performance" context.  *See In re Cellco P'ship*, 663 F. Supp. 2d 363, 370 (S.D.N.Y. 2009) (applying the "volition" analysis to alleged public performances and concluding that "a defendant must have engaged in conduct that is volitional or causally related to th[e] purported infringement").

Here, it is not Aereo, but the consumer, who is "doing" any "transmission" of a performance by the volitional act of issuing a command to the Aereo technology to play back their personal copy of a given work. The consumer exclusively uses Aereo's web-based interface to initiate and control automated processes. There is no intervening action by any Aereo employees in this process, and no recording or transmission occurs except by the consumer's direction. Indeed, the system is less "active" than the RS-DVR system addressed in *Cablevision*, which transitorily "buffers" a portion of the work before the consumer initiates a request to record.

For this independent reason, Plaintiffs are not likely to prevail on their asserted claims.

## II. PLAINTIFFS CANNOT SHOW ANY IRREPARABLE HARM.

Plaintiffs' extraordinary delay in bringing suit or raising any question or objection to the Aereo technology belies any claim of irreparable harm. As the Second Circuit has stated,

> Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.

*See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)

Here, Plaintiffs have been aware of Aereo and its plans for nearly one year. Aereo had a website announcing its plans since at least April 2011 and it was covered in the press at that time. Moreover, certain of the Plaintiffs and their affiliates met with representatives of Aereo and were briefed on Aereo's technology and business plans throughout the year leading up to Aereo's launch. Plaintiffs not only did not sue or make a timely request for an injunction or a declaratory judgment, they did not even contact Aereo, through a cease and desist letter or otherwise. Aereo heard nothing until Plaintiffs filed this lawsuit last month, more than two weeks after Aereo announced the date of its public launch, an announcement that was covered

extensively in major national press.

In *Citibank*, the Second Circuit noted that plaintiffs should have been aware of Citytrust's intent to open a branch in Long Island for nearly one year prior to filing suit, as Citytrust's plans were public knowledge and had appeared in several newspapers. *Id*. But even taking the actual opening of the Long Island branch as the operative date that Citibank was on notice, the court ruled that Citibank still delayed too long to effectively claim irreparable harm, as it waited *four months* before seeking the preliminary injunction. *Id.* at 276-77. As in *Citibank*, Plaintiffs have simply waited too long to credibly claim irreparable harm. *Id.* at 277 ("Citibank's failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.") (internal quotations and citation omitted).

Plaintiffs' delay in bringing suit is symptomatic of a related failing, which is that the harms Plaintiffs complain of lack the necessary immediacy to warrant a preliminary injunction. The Second Circuit has characterized immediacy as perhaps the "single most important prerequisite" for the issuance of a preliminary injunction. *See Citibank*, 756 F.2d at 275 ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm *before a decision on the merits can be rendered*.") (internal citations omitted and emphasis added). Before this Court on March 13, 2012, counsel for Plaintiffs claimed that a fast-tracked preliminary injunction was absolutely necessary to protect some unelucidated harm to Plaintiffs' business. Transcript of March 13, 2012 Scheduling Conference at 2:24-3:1 ("Our position is there is irreparable harm that will ensue as of tomorrow when AEREO publicly launches its service . . . ."). Plaintiffs seem to suggest that the mere existence of Aereo, a fledgling company,

as opposed to any substantial or actual effects from Aereo, will cause them irreparable harm. Plaintiffs have no evidence, however, that any of their claimed harms are likely to happen—*if at all*—in the intervening months that it will take to resolve this case.

Plaintiffs' claims are also impermissibly speculative.  Plaintiffs' declarations make conclusory assertions that their ability to distribute and license their copyrighted works will be irreparably harmed unless Aereo is enjoined.  Plaintiffs' Mem. at 21-24.  Plaintiffs offer no specifics, however, and cannot identify a single identifiable lost sale or lost market share attributable to Aereo's conduct.  Incredibly, Plaintiffs declarations on irreparable harm are not even specific to Aereo—they are from other cases, with different facts.  This suggests their position is that any potential harm to their business model—regardless of details—is irreparable harm.  It is settled law in this Circuit that "[t]he threat of irreparable harm must not be merely speculative . . . ."  *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 164 (S.D.N.Y. 2010); *see also Dorsett v. County of Nassau*, 762 F. Supp. 2d 500, 534-36 (E.D.N.Y. 2011) (finding that defendants' blanket statements about generalized harms were insufficiently precise to constitute irreparable harm).

Finally, Plaintiffs have not identified (and cannot identify) any causal connection between Aereo's conduct and any alleged lost sales or market share.  *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976 (9th Cir. 2011) is instructive.  In that case, the Ninth Circuit found the plaintiff had not shown irreparable harm and was not entitled to an injunction because Google's use of plaintiff's copyrighted images took place in a market where the same images were otherwise available for free.  *Id*. at 982.  The same facts apply here.  Consumers have the right to access and record for free, using an antenna and DVR, the same broadcasts they play back using their antenna and RS-DVR.  Aereo's system merely enables consumers to record and to access

these same free over-the-air broadcasts on their own terms—at their convenience and on the device of their choice.  Plaintiffs' claim amounts to the assertion that they are harmed because, using Aereo's system, more consumers are watching their programming and their advertising.

As Plaintiffs' purported irreparable harm is belied by their unreasonable delay and as they have failed to provide any specific evidence of imminent potential irreparable harm, no injunction should issue.

## III.   THE BALANCE OF HARDSHIPS TIPS IN FAVOR OF AEREO.

Plaintiffs also cannot show that the balance of harms favors an injunction.  Although Plaintiffs clearly face no immediate or irreparable harm in the absence of an injunction, an injunction would be devastating to Aereo.  Aereo has spent millions of dollars creating innovative antenna technology and software, and developing a compelling easy-to-use user experience.  It has spent over a year testing its technology and promoting its launch.  It has executed a carefully designed roll out and marketing campaign that has been timed to maximize initial interest, build its brand and associated goodwill and get ahead of any potential competitors in the space.  This is a critical time for Aereo.  If Aereo is prevented from continuing its launch it will, among other things, lose substantial investments because its technology, which is expensive to maintain, will lay idle and unsupported by member revenue.  In addition, due to the widespread publicity associated with the launch, if Aereo is enjoined it will cause substantial harm to the Aereo brand; its customers may lose confidence and not return, even if Aereo prevails.

For Plaintiffs' part, they have acknowledged that this case should be decided on an expedited schedule, including discovery.  It is unlikely Plaintiffs will lose material market power in the few months it will take to resolve this case on an expedited basis.  In addition, there is little to suggest that denial of a preliminary injunction will cause them harm because all the content

they seek to protect is already available for free to anyone with an antenna.  There is no

identifiable harm causally related to Aereo's conduct.

The court in *Hologic, Inc. v. Senorx, Inc.* confronted similar facts.  There, the court

focused on plaintiff's delay and the timing of filing suit as it related to defendant's launch, and

found that the delay militated against preliminary relief:

> a 60 to 90 day injunction would scuttle the launch of [defendant's
> product] at the height of [defendant's] plans..[*sic*] As the court
> determined above, it appears that [plaintiff] waited until it would
> be most harmful to [defendant] to seek this injunction. Such a
> tactical delay, in addition to tending to weigh against a finding of
> irreparable harm to [plaintiff], also provides support that
> [defendant] would suffer a greater harm by an injunction than
> [plaintiff] would suffer should the requested injunction be denied.

No. 08-CV-00133, 2008 WL 1860035, at *19 (N.D. Cal. Apr. 25, 2008).  This Court should take

the same practical approach and weigh the parties' interests similarly.

## IV.    THE PUBLIC INTEREST WOULD BE DISSERVED BY AN INJUNCTION.

As discussed above, the airwaves are owned by the public and licensed to broadcasters

for the convenience of the public.  There is statutorily recognized public policy to "to make

[broadcasts] available, so far as possible, to all the people of the United States."  47 U.S.C. §

151.  The Supreme Court also has acknowledged a "public interest in increasing access to

television programming, an interest that 'is consistent with the First Amendment policy of

providing the fullest possible access to information through the public airwaves.'"  *Sony*, 464

U.S. at 425 (internal quotation omitted).  Aereo furthers these public policies by making over-

the-air broadcasts more accessible and convenient for the consumer.

Plaintiffs are bound to further similar public policies.  "In exchange for obtaining a

valuable license to operate a broadcast station using the public airwaves, each [] television

licensee is required by law to operate its station in the 'public interest, convenience and

necessity.'"  THE MEDIA BUREAU, FCC, THE PUBLIC AND BROADCASTING: HOW TO GET THE

MOST SERVICE FROM YOUR LOCAL STATION 6 (2008).  An injunction would hinder the public

interest of consumer convenience and access.

 In addition to statutory policy, there are practical public concerns that disfavor an

injunction.  Modern technology enables consumers to watch video content on a variety of

devices with screen displays.  The public has an interest in promoting access to the public

airwaves using the devices of their choice.  There is no public policy limiting consumers to

watching over-the-air television broadcasts only on a television set.  As such, an injunction is

against the public interest.

**<u>CONCLUSION</u>**

 For the foregoing reasons, this Court should deny Plaintiffs' motion for a preliminary

injunction.


Dated: April 4, 2012       Respectfully submitted,

                AEREO, INC.

                By its attorneys,

                /s/ R. David Hosp
                R. David Hosp  (DH 3344)
                John C. Englander (admitted *pro hac vice*)
                Mark S. Puzella (admitted *pro hac vice*)
                Yvonne W. Chan (admitted *pro hac vice*)
                GOODWIN PROCTER LLP
                Exchange Place
                Boston, MA 02109
                617.570.1000 (tel.)
                617.523.1231 (fax)
                rhosp@goodwinprocter.com
                jenglander@goodwinprocter.com
                mpuzella@goodwinprocter.com
                ychan@goodwinprocter.com

Seth Greenstein (admitted *pro hac vice*)
CONSTANTINE | CANNON, LLP
One Franklin Square
1301 K Street, NW, Suite 1050 East
Washington, DC 20005
202.204.3514 (tel.)
202.204.3500 (fax.)
sgreenstein@constantinecannon.com

Michael S. Elkin
Thomas Patrick Lane
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
212.294.6700 (tel)
212.294.4700 (fax)
melkin@winston.com
tlane@winston.com

Jennifer A. Golinveaux (*pro hac vice*
forthcoming)
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111
415.591.1000 (tel)
415.591.1400 (fax)
jgolinveaux@winston.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies, via first class mail, postage pre-paid, will be sent to those indicated as non-registered participants on April 4, 2012.

/s/ R. David Hosp

25