```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

AMERICAN BROADCASTING COMPANIES,
INC., et al.,

                Plaintiffs,

            v.                          12 Cv. 1540 (AJN)

AEREO, INC.,

                Defendant.
------------------------------x

WNET, et al.,

                Plaintiffs,

            v.                          12 Cv. 1543 (AJN)

AEREO, INC.,

                Defendant.
------------------------------x
                                        March 23, 2012
                                        10:30 a.m.
Before:

                    HON. ALISON J. NATHAN

                                        District Judge
```

```
 1                         APPEARANCES

 2    DEBEVOISE & PLIMPTON, LLP
           Attorneys for Plaintiffs
 3    BY:  BRUCE P. KELLER
           MICHAEL R. POTENZA
 4
      JENNER & BLOCK, LLP
 5         Attorneys for Plaintiffs
      BY:  STEVEN B. FABRIZIO
 6
      GOODWIN PROCTER, L.L.P.
 7         Attorneys for Defendant
      BY:  JOHN C. ENGLANDER
 8         R. DAVID HOSP

 9    BRENDA COTTER
           General Counsel
10         AEREO, Inc.
```

1        (In chambers; phone conference)

2        THE COURT: Hello, everyone. This is Judge Nathan. We are here in ABC, et al. v. AEREO, 12 Cv. 01540. Good morning. If each party could formally enter their appearance. And let me just say at the outset, ground rules for all my telephone conferences, I will always give everyone an opportunity to speak before me leave any particular topic and before we leave the call so there is no need to jump in at any point. I will give you a chance. And always please indicate your name before you speak for the court reporter, who is here with me now and you are on speaker.

        Should we begin with Mr. Keller?

        MR. KELLER: Bruce Keller, Debevoise & Plimpton, for the plaintiffs in 12 Cv. 1540. With me is Mike Potenza of our office.

        MR. FABRIZIO: Steven Fabrizio for the WNET plaintiff, and I am here by myself this morning.

        THE COURT: Good morning, Mr. Fabrizio. I should have called the case. The cases are now consolidated. In addition to 12 Cv. 1540 we have 12 Cv. 1543.

        On behalf of AEREO.

        MR. ENGLANDER: John Englander and David Hosp, and also Brenda Cotter who is general counsel, who is on the line.

        THE COURT: Good morning, Mr. Englander, Mr. Hosp, and Ms. Cotter.

Despite our marathon scheduling conference a few weeks ago after I received your letter and before I set down a final schedule, and I will say at the outset that I am comfortable extending by one week the deadline that I had imposed so that will wrap up briefing by May 21. But my question is somewhat related to that. I am thinking about what makes most sense, given the nature of this case, for things like proposed findings of fact and conclusions of law and timing around those, whether or not I am going to want post-hearing briefing and whether I do in fact want to ask for the direct testimony of anticipated live witnesses in advance by declaration as well.

I think all of those things that I am chewing on turn a bit on the following question, which is why I have asked you to gather on the phone. Just basically, who do you anticipate, if you can at this point, will be the live witnesses? Will this be something akin, I gather, to what occurred in Cablevision, where it was essentially, I understand, a tutorial and then largely spent on argument, or will it be more fact intensive than that?

So, Mr. Keller, let me begin with you and just ask if you're able at this point to predict what the nature of the live testimony will be?

MR. KELLER: At this point, we think there will be perhaps a general fact witness with respect to facts that if we

can avoid testimony on and achieve by stipulation that will be great, but if we can't, there will be some facts that obviously are going to lay the foundation for the claims that we have. There will be an irreparable harm witness, and it may be that as happened in some of the other similar cases, similar in our perspective, there can be one composite witness explaining on an industry-wide basis the nature of the irreparable harm. Then there will be a couple of experts, and we have begun to identify and to share the identity of those experts with AEREO already.

So at this point I think it is about four or five witnesses or so. To the extent it's all plaintiffs in both cases, that needs to be worked out, but I think that's where we are headed.

Then, of course, depending upon things that we don't know yet and that we will learn in discovery, as part of our presentation of our case, we may choose to have an adverse witness or two from AEREO, but that has yet to be decided.

THE COURT: Well, let me ask Mr. Fabrizio if he wants to add to that before turning to Mr. Englander.

MR. FABRIZIO: No. I think we see the cases substantially the same way, but I think in response to something you said earlier I would comment. As between the plaintiffs' groups and the defendant, I believe we did agree that our preliminary injunction briefing would include the

1  declarations of witnesses even if they were planned to be
2  called live.
3            THE COURT: You had dropped footnote 3 in the letter
4  and I couldn't tell if that was meant to encompass everyone
5  including live witnesses, which I am inclined to require in any
6  event.
7            MR. FABRIZIO: Our problem is that it would be better
8  for the Court to see the entire factual case at the outset and,
9  frankly, putting in those declarations may very well, as we
10 prepare for the hearing, lead the parties and the Court to
11 conclude that certain witnesses are simply not needed live or
12 other witnesses may be needed live only for cross-examination
13 so that we can streamline the actual hearing as much as
14 possible.
15           THE COURT: I believe that's right. Thank you.
16           Mr. Englander.
17           MR. ENGLANDER: We are in complete agreement that all
18 of the evidentiary submissions should be complete before the
19 hearing, and as far as live testimony goes, I think we would
20 expect one or two technical experts, which would very much,
21 your Honor, be in the nature of what happened in Cablevision,
22 in the sense that they would be providing testimony regarding
23 how the system works, in the nature of a tutorial and perhaps
24 clarifying technical aspects of the system.
25           We likely will have a fact witness on the issue of the

1  harms to AEREO if any injunction were entered, and there may be
2  a witness or two on irreparable harm. And that really remains
3  to be seen. It depends on the course of discovery that's just
4  begun.
5      So I think it's anywhere from two to four or maybe
6  five. I don't anticipate any of these being particularly
7  lengthy witnesses though.
8      THE COURT: OK.
9      MR. ENGLANDER: The tutorials would be the longest
10  part.
11      THE COURT: Well, that's helpful to me.
12      Let me go back. Based on what Mr. Fabrizio said that
13  you do anticipate putting everything in front of me prior to
14  the hearing, which I do think is necessary, let's talk then
15  about timing of that. Is it that you intend to submit all
16  declarations together with your respective briefs, Mr. Keller?
17      MR. KELLER: Yes, your Honor. I think that's what the
18  plan was.
19      THE COURT: All right.
20      Mr. Fabrizio and Mr. Englander, does anyone disagree?
21      MR. FABRIZIO: No, your Honor, we don't.
22      MR. ENGLANDER: Neither do we. That's our
23  understanding.
24      THE COURT: Very well. Then a couple of things.
25  Proposed findings of fact and conclusions of law, deposition

1  designations and the like, final witness list, sort of
2  traditional pretrial materials.
3       Mr. Keller, I will start with you, do you have a
4  proposal on those?
5       MR. KELLER:  No specific date at this time, your
6  Honor.  I think that that will be determined over the next
7  couple of weeks after we get a little better sense of just how
8  voluminous they will be.  Obviously, everyone knows we need to
9  get it to you sufficiently in advance of the hearing so you
10 have time to digest it, that you're completely up to speed on
11 what the hearing will look like, and that any disputes between
12 the parties that may pop up in the context of putting those
13 final plans together will be crystallized so you can make any
14 prehearing rulings that you might need to make.  But I don't
15 think we have actually sat down and talked about that level of
16 detail.
17      THE COURT:  I think we just need to try to get some
18 space on my calendar because I am in trials leading into -- at
19 least currently, I am in trials leading into the hearing.  We
20 should set potentially a final prehearing conference and build
21 back from there.
22      MR. FABRIZIO:  If I could make a suggestion in that
23 regard.
24      THE COURT:  Go ahead.
25      MR. FABRIZIO:  It's probably the case that the parties

1  will start to have a good idea of the witnesses, if there are
2  going to be disputes on the expert side or fact side as
3  discovery comes to a close, but those will crystallize when we
4  put in our first two submissions. Maybe a prehearing
5  conference in the late afternoon of May 15th or the morning of
6  the 16th after defendants' brief is in, that will allow us to
7  see whether we can all get together and agree that certain
8  witnesses are simply not necessary anymore.
9      THE COURT: That makes some sense. I am on trial the
10  15th and the 16th, possibly the 17th, but I doubt I will need
11  the 17th for this trial. So I can schedule something on the
12  17th, if that's available. That should be sufficient. But we
13  are losing a few days.
14      MR. FABRIZIO: Those days will actually give the
15  plaintiffs and the defendants an opportunity to concur so our
16  session is more productive and more by agreement rather than
17  hashing it out on the fly.
18      THE COURT: That would be great. So why don't we pick
19  an afternoon time on the 17th, 4 p.m. on the 17th, and that way
20  at least I will have the space on the calendar.
21      MR. FABRIZIO: Your Honor is contemplating that will
22  be in your courtroom, not telephonically, correct?
23      THE COURT: Whatever the parties wish. I would prefer
24  in court if it's going to be substantive, but otherwise, if we
25  are just talking scheduling, it can be telephonic.

|   |   |
|---|---|
| 1 | MR. KELLER: Why don't we plan on it now being in your |
| 2 | courtroom on the 17th at 4:00, and if it turns out that enough |
| 3 | has been accomplished by agreement so that there is not that |
| 4 | much to discuss, we can always reschedule it telephonically. |
| 5 | THE COURT: You can do that. You can submit a joint |
| 6 | letter if the request is to do it telephonically. |
| 7 | MR. FABRIZIO: As to some of the pretrial, the normal |
| 8 | pretrial activities, some of that I believe we can streamline |
| 9 | and obviate because we are going to be submitting full |
| 10 | testimony from our witnesses in the form of declarations. |
| 11 | THE COURT: That's right. |
| 12 | MR. FABRIZIO: In that context, I don't know that the |
| 13 | parties need to engage in a process of deposition designations |
| 14 | or that we need to inundate the Court with extra paper in that |
| 15 | regard. Depositions will effectively be just for |
| 16 | cross-examination anyway. The real question I guess becomes, |
| 17 | with the briefing and the declarations and the hearings, what |
| 18 | would be most convenient and most helpful for the Court as far |
| 19 | as findings of fact and conclusions of law, and are they even |
| 20 | going to be necessary with the prebriefing and depositions and |
| 21 | declarations? |
| 22 | MR. ENGLANDER: I want to just follow up on what Mr. |
| 23 | Fabrizio said. I don't know what the Court's practice is, but |
| 24 | with the volume of the submissions and the nature of the |
| 25 | submissions that you should be getting and briefing, is it |

1     really necessary to do a separate set of proposed findings and
2     conclusions?
3          THE COURT:  When I was making my to-do list it was
4     dependent a little bit on whether you all agreed to submit the
5     declarations all in advance.  So it may not be.  I think it
6     won't be necessary in light of what I am hearing in terms of
7     prehearing.
8          Now, whether the witness list stays sort as extensive
9     as it currently is, and includes a number of fact witnesses and
10    the like, I may ask for it quickly post hearing.
11         MR. ENGLANDER:  Understood, your Honor.
12         THE COURT:  But in light of what you told me to
13    anticipate, both in terms of what you imagine happening live,
14    or potentially happening live at the hearing, and what you will
15    include with your submissions, I don't think it's necessary
16    prehearing.
17         MR. ENGLANDER:  I have one other question, which is I
18    guess as the defendant you always worry in a trial-type setting
19    that the plaintiffs occupy the field and you have little time
20    to put your witnesses on.  Should we have some mechanism for
21    dividing available time?
22         THE COURT:  I will ask you to confer on that and
23    propose a time division, and I will be happy to just run off a
24    clock time as each side uses it.
25         MR. ENGLANDER:  Thank you, your Honor.

1      THE COURT:  All right.  That's all I have.
2      Mr. Keller, anything further?
3      MR. KELLER:  No, your Honor.
4      THE COURT:  Mr. Fabrizio?
5      MR. FABRIZIO:  There is potentially one housing
6  keeping matter, but if you will indulge me.  We have submitted
7  and your Honor has entered a protective order, and we
8  appreciate you tending to it right away so that we could get
9  discovery going.  There was one open issue left in that
10 protective order.  A placeholder was left for the provision for
11 in-house counsel having access to materials that are designated
12 highly confidential.  The general nature of the dispute is that
13 AEREO has agreed to and is prepared to allow a single in-house
14 counsel to have access to highly confidential information,
15 which obviously works very well for AEREO since I believe they
16 have a single in-house counsel.  But for most of the plaintiffs
17 that creates an untenable situation since a lot of the
18 materials that are going to be produced are going to be about
19 technical and forward looking business plan nature so much of
20 the information will probably be designated highly
21 confidential.
22     I am living with this in another case right now where
23 legal executives, from general counsel to heads of IP policy,
24 down to the one, two or three litigators who have
25 responsibility to oversee a case aren't able to review the

final briefs. And that just simply can't be a situation that the plaintiffs can be expected to live with. It makes it impossible for in-house counsel to participate in the prosecution of the case. For most of my clients, they are very active in helping to shape the direction of a case, and without having any sense of what the record is, they simply have no ability to do that.

   MR. HOSP: Obviously, the parties are discussing this, but I think we can state fairly clearly defendants' position that this is a case that arguably could have been done without any in-house counsel having access to the confidential information at issue here. To be clear, the confidential information at issue here is the central core trade secret documents that form the fundamental value of this company, including things like, essentially, executable software code, including technical documents that describe in great detail how the system works. These are documents that truly are the most valuable assets that this company has.

   Now, we have agreed to allow one in-house counsel to have access to those, and we think that that should be more than sufficient. In Cablevision, for example, no in-house counsel had access to the same sorts of confidential information, and that was a case that was conducted and the parties obviously had the ability to participate. They just didn't have the ability to look at the truly confidential

1 information.

2 Again, I don't recall doing a case where there was an
3 in-house designation that had more than one, and certainly
4 these are large companies that litigate all the time.  The
5 initial proposal that was put on the table was for four
6 in-house counsel to have access to this, which I believe would
7 mean that there would be somewhere between 68 and 72 depending
8 on -- I haven't counted up the plaintiffs, but you're talking
9 about, roughly, 70 in-house counsel having the ability to have
10 access to literally the most confidential, most valuable
11 information that this small company has.  So I don't think it's
12 appropriate to broaden it.

13 MR. FABRIZIO:  If I may, we don't really even have to
14 take issue with much of what Mr. Hosp said.  We are sensitive
15 to the fact that they have produced some source code and some
16 extremely detailed technical documents at this point and
17 presume that as discovery continues more materials of that
18 nature will be produced.  Truth be told, no in-house counsel
19 needs to see the source code.  It's just not something they are
20 going to understand, nor do they need to be privy on a regular
21 basis to any of the highly technical documents.

22 The problem is, your Honor, that the protective orders
23 of this nature, as you know, prevent them from seeing anything
24 derived from that information, and even things that disclose at
25 a high level the functions that we learn about through that

highly confidential information. I refer to that as sort of the brief or memorandum level high level summaries. Your Honor can imagine that our briefs would not be very effective to you if they consisted of source code quotations or incredibly detailed line level engineering documents in large chunks or quotations. I am assuming your Honor is not an engineer by background.

So what we are talking about is allowing the clients to see, at the in-house counsel level, high-level summaries, again, at the brief memorandum level, so that they can participate in the case, not the details. But if we learn, for instance, through an analysis of their antennas that they absolutely do not work the way defendants say they work, well, we need to be able to share at a high level that information with our clients, but under the protective order we would be prohibited from doing so.

THE COURT: OK. I am a little surprised, given how you folks have conducted yourselves so far, that you can't work this out. If that continues to be true, when do you need resolution?

MR. FABRIZIO: Since we have a protective order in place that allows one counsel to see it, I think we can muddle through the next week to try and resolve this, but if we don't have resolution by middle of next week, I think we do have to bring it to your Honor in order to get resolution because

1     that's when things are going to be happening so fast that the
2     input of our in-house counsel is going to become important.
3             THE COURT:  If you do, submit letters pursuant to my
4     rules and I will give you a quick resolution.
5             MR. FABRIZIO:  Thank you, your Honor.
6             THE COURT:  Mr. Fabrizio, anything further other than
7     that?
8             MR. FABRIZIO:  No, your Honor.  Thank you very much.
9             THE COURT:  Mr. Englander?
10            MR. ENGLANDER:  No, your Honor.
11            THE COURT:  All right.  In that case, we are
12    adjourned.  Thank you.
13            (Adjourned)
14
15
16
17
18
19
20
21
22
23
24
25