UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

AMERICAN BROADCASTING COMPANIES, INC.,
DISNEY ENTERPRISES, INC., CBS BROADCASTING
INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA,
LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK
TELEVISION, LLC, TELEMUNDO NETWORK GROUP
LLC. and WNJU-TV BROADCASTING LLC,

      Plaintiffs,

      v.

AEREO, INC.,

      Defendant.

-------------------------------------------------------------------------X

12 Civ. 1540 (AJN)

Bruce P. Keller
(bpkeller@debevoise.com)
Jeffrey P. Cunard
(jpcunard@debevoise.com)
Michael R. Potenza
(mpotenza@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for ABC Plaintiffs*

-------------------------------------------------------------------------X

WNET, THIRTEEN, FOX TELEVISION STATIONS, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
WPIX, INC., UNIVISION TELEVISION GROUP, INC.,
THE UNIVISION NETWORK LIMITED PARTNERSHIP
and PUBLIC BROADCASTING SERVICE,

      Plaintiffs,

      v.

AEREO, INC. f/k/a BAMBOOM LABS, INC.,

      Defendant.

-------------------------------------------------------------------------X

12 Civ. 1543 (AJN)

Steven B. Fabrizio
(sfabrizio@jenner.com)
Steven R. Englund
(senglund@jenner.com)
Scott B. Wilkens
(swilkens@jenner.com)
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001
(202) 639-6000

*Attorneys for WNET Plaintiffs*

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' JOINT MOTION
FOR A PRELIMINARY INJUNCTION**

Redacted Public Filing

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ......................................................................................................4

ARGUMENT ..........................................................................................................................7

I.     Aereo Infringes Plaintiffs' Public Performance Rights. ................................................7

       A.    Aereo's Service Contravenes Plaintiffs' Exclusive Rights Under The Plain
            Language Of The Transmit Clause. ..........................................................................8

       B.    Aereo Provides A Full-Fledged Retransmission Service Through A
            System Of Shared Resources That Does Much More Than "Enable
            Consumers." ............................................................................................................12

       C.    *Cablevision* Expressly Limited Its Holding And Did Not Address
            Contemporaneous Retransmissions. .......................................................................17

II.    Plaintiffs Will Suffer Irreparable Injury In The Absence Of Immediate Injunctive
      Relief. ............................................................................................................................24

       A.    Aereo Disrupts The Economic Basis Of The Television Industry Carefully
            Constructed By Congress. .......................................................................................24

       B.    Plaintiffs Did Not Delay. .......................................................................................31

III.   The Balance Of Hardships And Public Interest Tip Decidedly In Plaintiffs' Favor. ........34

CONCLUSION......................................................................................................................36

Redacted Public Filing

## <u>TABLE OF AUTHORITIES</u>

CASES

*A & M Records, Inc. v. Napster, Inc.*,
   114 F. Supp. 2d 896 (N.D. Cal. 2000) ................................................................................31

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110, 117 (2d Cir. 2010) ........................................................................................8

*Autoskill, Inc. v. Nat'l Educ. Support Sys.*,
   994 F.2d 1476 (10th Cir. 1993) ..........................................................................................35

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002) .............................................................................................................8

*Cartoon Network LP v. CSC Holdings, Inc.*,
   536 F.3d 121 (2d Cir. 2008) ........................................................................................*passim*

*CBS Broad., Inc. v. FilmOn.com, Inc.*,
   No. 10-cv-07532 (S.D.N.Y. Nov. 22, 2010) ......................................................................13

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*,
   749 F.2d 154 (3d Cir. 1984) ...............................................................................................16

*David v. Showtime/The Movie Channel, Inc.*,
   697 F. Supp. 752 (S.D.N.Y. 1988) ...............................................................................11, 22

*eBay, Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ...........................................................................................................24

*Fortnightly Corp. v. United Artists Television*,
   392 U.S. 390 (1968) ......................................................................................................10, 12

*Freytag v. Comm'r of Internal Revenue*,
   501 U.S. 868 (1991) .............................................................................................................9

*Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*,
   No. 02 Civ. 0861, 2002 WL 1543817 (S.D.N.Y. July 12, 2002) .......................................33

*Harrison v. PPG Indus., Inc.*,
   446 U.S. 578 (1980) .............................................................................................................9

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
   858 F.2d 70 (2d Cir. 1988) .................................................................................................33

*Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*,
   ___ F. Supp. 2d ___, 2011 WL 5519829 (S.D.N.Y. Nov. 10, 2011) ..................................35

Redacted Public Filing

*Lotus Dev. Corp. v. Paperback Software Int'l,*
  740 F. Supp. 37 (D. Mass. 1990) .......................................................... 32

*Marvel Characters, Inc. v. Simon,*
  310 F.3d 280 (2d Cir. 2002) ................................................................... 8

*Nat'l Football League v. PrimeTime 24 Joint Venture,*
  211 F.3d 10 (2d Cir. 2000) .............................................................. 22, 23

*N.Y. Times Co. v. Tasini,*
  533 U.S. 483 (2001) .............................................................................. 21

*On Command Video Corp. v. Columbia Pictures Indus.,*
  777 F. Supp. 787 (N.D. Cal. 1991) ..................................................... 17

*ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.,*
  314 F.3d 62 (2d Cir. 2002) ................................................................... 32

*Salinger v. Colting,*
  607 F.3d 68 (2d Cir. 2010) ........................................................ 7, 24, 34

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
  464 U.S. 417 (1984) .............................................................................. 17

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.,*
  415 U.S. 394 (1974) ........................................................................ 10, 12

*United States v. Am. Soc'y of Composers, Authors & Publishers,*
  627 F.3d 64 (2d Cir. 2010) ..................................................................... 8

*United States v. Turkette,*
  452 U.S. 576 (1981) ............................................................................... 9

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.,*
  ___ F. Supp. 2d ___, 2011 WL 4001121 (C.D. Cal. Aug. 1, 2011) ............................ 16, 31, 34

*WPIX, Inc. v. ivi, Inc.,*
  765 F. Supp. 2d 594 (S.D.N.Y. 2011) .................................. 13, 26, 28, 30, 34, 35

**STATUTES**

17 U.S.C. § 101 ............................................................................. *passim*

17 U.S.C. § 106 ..................................................................................... 1, 8

17 U.S.C. § 122 ........................................................................................ 26

17 U.S.C. § 410 ......................................................................................... 8

iii

17 U.S.C. § 501 ................................................................................................................8

47 U.S.C. § 325 .........................................................................................................25, 26

Cable Television Consumer Protection & Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 ..................................................................................................24

Satellite Home Viewer Improvement Act of 1999, tit. I of the Intellectual Prop. & Comm'ns Omnibus Reform Act of 1999, Pub. L. No. 106-13, 113 Stat. 1501 .....................26

OTHER AUTHORITIES

Brief for the United States as Amicus Curiae, *Cable News Network, Inc. v. CSC Holdings, Inc.*, 129 S. Ct. 2890 (2009) (No. 08-448) ............................................21

2 GOLDSTEIN ON COPYRIGHT § 7.7.2 (3d ed. 2012 supp.).......................................11, 21

H.R. REP. NO. 106-464 (1999)....................................................................................26

H.R. REP. NO. 94-1476 (1976)......................................................................10, 11, 22

H.R. REP. NO. 90-83 (1967)........................................................................................16

S. REP. NO. 102-92 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1133 ...................11, 25, 35

WILLIAM M. LANDES & RICHARD A. POSNER, THE ECONOMIC STRUCTURE OF INTELLECTUAL PROPERTY LAW 40 (2003) ...............................................................29

Redacted Public Filing

## PRELIMINARY STATEMENT

Beginning with the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* ("Copyright Act"), Congress has taken multiple steps to ensure that the owners of copyrighted television programming are protected against the unauthorized retransmission of their works when they are transmitted in over-the-air ("OTA") broadcast signals.  The linchpin of those protections is 17 U.S.C. § 106(4), which grants copyright owners the exclusive right to perform their works publicly.  Plaintiffs are both owners and licensees of copyrighted television programming and broadcasters.

Aereo, Inc. ("Aereo") commercially launched its subscription-based, live television retransmission service on March 14, 2012.

## REDACTED

Aereo's retransmissions are unauthorized.  They violate the plain language of the Copyright Act, which gives Plaintiffs the exclusive right to perform their works publicly by "***transmit[ting]*** or otherwise communicat[ing] a performance or display of the work . . . to the public, ***by means of any device or process***, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."  17 U.S.C. § 101 (emphasis added) (the "Transmit Clause").

The language of the Transmit Clause is intentionally broad and plainly covers what Aereo calls its "Watch Now" function. "Watch Now":

- "communicate[s] . . . performance[s]" (*i.e.*, retransmits Plaintiffs' copyrighted broadcast programs at the same time they originally air);

- through a "device or process" (*i.e.*, Aereo's antennas, cables, transcoders, hard drives and Internet streaming servers);

- to "members of the public capable of receiving the performance" (*i.e.*, Aereo's paid subscribers).

Aereo claims to be entirely outside of the statutory framework that Congress established for the licensing and compensation of broadcast retransmissions based on *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"). According to Aereo, that single decision provides a "blueprint" to engage in Internet retransmission of OTA television broadcasts without authorization from, or payment to, anybody. *See* Potenza Decl. Ex. 3 (Hr'g Tr., Mar. 13, 2012, 14:17).

*Cablevision*, as a legal matter, could not circumscribe the broad language of the Transmit Clause. More importantly, as a factual matter, *Cablevision* did not even consider, let alone address, real-time retransmissions of live OTA broadcasts, because that service was licensed. *Cablevision*, 562 F.3d at 123 (noting Cablevision's "numerous licensing agreements" to retransmit "copyrighted . . . television programs"). The only service before the Second Circuit was the recording and playback by subscribers of television shows they previously had made for purposes of time-shifting. In *Cablevision*, the playback of a time-shifted recording was limited to the same set-top box, *i.e.*, it was only to the same place, through the same media, and to be received by the same device. Nothing in the opinion even remotely suggests the Court designed a means to circumvent the statutory framework

2

prohibiting the unauthorized retransmission of broadcast signals and protecting the economic viability of the OTA broadcast system.

Unlike *Cablevision*, which focused only on time-shifting, this motion addresses Aereo's "Watch Now" service, expressly promoted by Aereo as a substitute for a cable or satellite subscription. As Aereo puts it, "Watch Now" is "live . . . TV" meeting the "Internet. . . . No cable required." Potenza Decl. Ex. 4 (Screenshot of Aereo home page). "Watch Now" is contrasted with, and emphasized largely to the exclusion of, Aereo's "Record for Later" function. The difference between the two features is significant. Aereo's home page – not to mention document after document in Aereo's files – demonstrates that the live, real-time retransmission of OTA television is the key to the Aereo service. "Watch Now" is touted as a way to watch live events over the Internet, such as the Super Bowl, the Oscars and Grammy Awards, the way consumers like to watch them – as they happen in real time. *See id.* Ex. 4 (Screenshot of Aereo home page: "With Aereo you can now watch live, broadcast television online. On devices you already have. No cable required.").

Aereo's core contention is that it escapes the Transmit Clause by using two technological gimmicks:

## REDACTED

According to Aereo, the antennas and buffer copies operate as an infringement filter, laundering out the otherwise public nature of Aereo's real-time retransmissions to its subscribers and rendering private each and every retransmission it makes to an individual.

Aside from ignoring the plain language of the Transmit Clause and that *Cablevision* did not address live retransmissions of OTA broadcasts, this argument fails for yet another reason:  it would render most of today's Internet webstreaming of audio or video works – acknowledged to be public performances – private simply because they involve buffer copying and individually addressed, one-to-one communications associated with end users. Taken to its logical end, Aereo's argument would allow every service provider – whether using cable or Internet retransmission media – to avoid the public performance clause by interposing a unique buffer copy in the transmission path.

Aereo's position simply cannot be reconciled with (a) the well-settled understanding of the scope of the public performance right and (b) the common understanding that Internet transmissions by a service provider to multiple members of the public are public performances.  It also cannot be reconciled with Congress' repeated recognition that supporting free OTA television is a public policy imperative.  Congress has acted consistently to protect OTA television from the irreparable harm that free-riders, like Aereo, pose to the health and viability of the free OTA broadcast system.  *See infra* pp. 24-34.  Aereo should be enjoined.

## STATEMENT OF FACTS

On March 14, 2012, Aereo purportedly began the commercial launch in New York City of a subscription service that allows paying customers to view, on any Internet-connected device (*i.e.*, personal computers, smartphones, tablets), retransmissions of "[a]ll the broadcasts -- NBC, ABC, CBS, PBS, FOX, CW & over 20 local channels!" serving the New York, New York market.  *See* Potenza Decl. Ex. 5 (screenshot of https://aereo.com/features).

4

For $12 a month, through what Aereo calls its "Watch Now" function, Aereo customers can log in to the Aereo website and watch "live," over the Internet, Plaintiffs' OTA television broadcasts as they are initially aired.  Declaration of Dr. John Kelly ("Kelly Decl.") ¶ 41.[1]

REDACTED

Aereo has designed its service so that these antennas capture New York City OTA broadcast television programming.

REDACTED

---

[1] Through the separate "Record for Later" function, consumers also can use Aereo's computer servers to record up to 40 hours of live broadcast programming for later viewing.  Potenza Decl. Ex. 6 (Aereo FAQ: How many programs can I record…).  In this motion, only the "Watch Now" live broadcast retransmission service is at issue.

Redacted Public Filing

REDACTED

---

[2]

[3]                                REDACTED

6

None of these erector-set of arguments – Aereo's purported use of individual antennas, buffer copies and individualized streams to subscribers or its claim to limit its Internet retransmissions to New York City – can insulate Aereo from the plain language of the Copyright Act.  As explained below, Aereo infringes Plaintiffs' public performance right.

## ARGUMENT

Preliminary injunctive relief should be granted because Plaintiffs have shown, and will demonstrate at the hearing, that there is:  (1) "(a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in [plaintiff]'s favor"; (2) likely "irreparable injury in the absence of an injunction"; (3) that "the balance of hardships" tips decidedly in Plaintiffs' favor; and (4) "that the public interest would not be disserved by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010) (internal quotation marks omitted).

**I.    Aereo Infringes Plaintiffs' Public Performance Rights.**

Plaintiffs own copyrights in vast numbers of copyrighted audiovisual works, including the registered copyrights in motion pictures and television programs retransmitted by Aereo. Aereo does not dispute that Plaintiffs own those copyrights, that transmissions of Plaintiffs' copyrighted works are received by Aereo subscribers every day and that Plaintiffs have not

---

REDACTED

7

authorized these transmissions.[4]  The sole disputed copyright issue for purposes of this motion

is whether such transmissions violate Plaintiffs' exclusive right "to perform the copyrighted

work publicly."  17 U.S.C. § 106(4); *see also id.* § 501(a) ("Anyone who violates any of the

exclusive rights of the copyright owner . . . is an infringer . . . .").  Because Aereo captures

Plaintiffs' copyrighted programs carried in broadcasts and retransmits the programs to a

public audience of Aereo subscribers capable of receiving such transmissions, Aereo infringes

Plaintiffs' rights.

> **A.    Aereo's Service Contravenes Plaintiffs' Exclusive Rights Under The Plain
> Language Of The Transmit Clause.**

In copyright cases, as in all statutory interpretation cases, "[t]he first step is to

determine whether the language at issue has a plain and unambiguous meaning with regard to

the particular dispute in the case."  *United States v. Am. Soc'y of Composers, Authors &*

*Publishers*, 627 F.3d 64, 72 (2d Cir. 2010) ("*ASCAP*") (quoting *Barnhart v. Sigmon Coal Co.*,

534 U.S. 438, 450 (2002)).  "When the language of a statute is unambiguous, judicial inquiry

is complete."  *Id.* (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir.

2002)).  The unambiguous language of the Transmit Clause, applied to Aereo, confirms Aereo

violates Plaintiffs' right of public performance.

---

[4]    To establish infringement under the Copyright Act, a plaintiff must show "(1) ownership
of a valid copyright and (2)" infringement "of any of the . . . exclusive rights described in
§ 106."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (citation and
internal quotation marks omitted).  *Prima facie* evidence of ownership and validity is
established by certificates of registration issued by the Copyright Office and attached to
the Complaints.  17 U.S.C. § 410(c).  To the extent those elements are contested at the
hearing, Plaintiffs will introduce those proofs at the hearing.

Redacted Public Filing

Here, the statutory text could not be more clear.  To "perform" a work "publicly" means "to **transmit** or **otherwise communicate** a performance or display of the work . . . to the public, by means of **any device or process**, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."  17 U.S.C. § 101 (emphasis added).  The Copyright Act defines "to transmit" a "performance" broadly.  That happens whenever a work is "communicat[ed] . . . by **any device or process** whereby images or sounds are received beyond the place from which they are sent."  *Id.* (emphasis added).[5]

Aereo performs multiple acts when it "communicate[s]" performances of Plaintiffs' television programs to "members of the public" contemporaneously with Plaintiffs' own OTA public performances.  Aereo starts with a "device or process" – the Aereo owned and operated system that powers the Aereo service.  That is the means by which Aereo's transmissions are sent "beyond the place" (Brooklyn) from which Aereo captures, processes and retransmits Plaintiffs' works to Aereo subscribers who "receive[]"the images and sounds making up Plaintiffs' copyrighted programs.  Put simply, using the "Watch Now" service, multiple subscribers, complete "strangers" to one another, can contemporaneously view the same television programs, in separate places, and at the same time as the original OTA broadcast.

---

[5]   These statutory terms twice use "any device and process."  The Supreme Court repeatedly has noted that the word "any" has unqualified breadth.  *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 874 (1991) (noting "broad sweep" of phrase "any other proceeding"); *United States v. Turkette*, 452 U.S. 576, 580 (1981) (concluding that "any person" and "any individual" admitted of "no restriction upon the associations embraced by the definition"); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 589 (1980) ("This expansive language [('any other final action')] offers no indication whatever that Congress intended the limiting construction . . . that the respondents now urge.").

Redacted Public Filing

Potenza Decl. Ex. 1 (Kanojia Dep. 42:19-43:14).  That is a quintessential public performance, as not only the text, but also the legislative history, of the Copyright Act make clear.

That history confirms Congress wanted to ensure that the Transmit Clause included not only the "initial rendition or showing" of a work – such as Plaintiffs' own OTA broadcasts – but also all "further act[s]" by which such "rendition or showing is transmitted or communicated to the public," whatever technological methods might be used.[6]  Congress explained that a performance may be accomplished by "***any sort of*** transmitting apparatus, any type of electronic retrieval system, and any other ***techniques and systems not yet in use or even invented***."  *See* House Report at 63 (emphasis added); *id*. at 64 ("The definition of 'transmit' . . . is ***broad enough to include all conceivable forms and combinations of wired or wireless communications media***, including but by no means limited to radio and television broadcasting as we know them.  ***Each and every method*** by which the images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and ***if the transmission reaches the public in any form***, the case comes within the scope of clauses (4) or (5) of section 106." (emphasis added)).  Whether regarded as a "device or process," as in the Copyright Act, or a "technique[] and system[]," as in the legislative history, Aereo's "remotely located . . . antenna[s]," transcoders and streaming servers, Aereo Br. 7-9, Potenza

---

[6]  *See* H.R. REP. No. 94-1476, at 63 (1976) ("House Report") ("a cable television system is performing when it retransmits the broadcast to its subscribers . . ."); Pls.' Pre-Hr'g Mem. 7-8 (explaining how Congress deliberately defined performances to include retransmissions, to overturn the rationale of two Supreme Court decisions, *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390 (1968), and *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394 (1974)).

Redacted Public Filing

Decl. Ex. 1 (Kanojia Dep. 13:18-14:8), transmit performances in a way contemplated by Congress.[7]

In drafting the Transmit Clause, Congress had in mind a specific public policy: protecting the economic vitality of free OTA broadcasting by ensuring that creators of broadcast programming, who bear the enormous cost of producing and licensing broadcast content, are compensated by those who retransmit it.  *See* House Report at 89 (cable retransmitters "are **commercial enterprises whose basic retransmission operations are based on the carriage of copyrighted program material**" and recognizing that, in general and subject to the compulsory license, "**copyright royalties should be paid** by cable operators to the creators of such programs" (emphasis added)).  *See generally* S. Rep. No. 102-92, at 35 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1168 ("Senate Report") (complaining that, prior to the Copyright Act, cable retransmitters could "use these signals without having to seek the permission of the originating broadcaster or having to compensate the broadcaster for the value [of] its product").  The Transmit Clause provides broadcasters the means by which they can protect, and receive compensation for, secondary transmissions of their works and stop retransmitters, like Aereo, who commercially use them without permission or compensation.

---

[7]    There is a reason the Transmit Clause reads so broadly.  Congress wanted to ensure that "**every conceivable** aspect of performance" would be covered in furtherance of "a central copyright principle:  all who derive value from using a copyrighted work should pay for that use."  2 Goldstein on Copyright § 7.7.2, at 7:158 (3d ed. 2012 supp.).  Indeed, "it would strain logic to conclude that Congress would have intended the degree of copyright protection to turn on the mere method by which [works] are transmitted to the public." *David v. Showtime/The Movie Channel, Inc.*, 697 F. Supp. 752, 759 (S.D.N.Y. 1988).

Redacted Public Filing

**B.**     **Aereo Provides A Full-Fledged Retransmission Service Through A System Of Shared Resources That Does Much More Than "Enable Consumers."**

REDACTED

It argues that "[c]onsumers use the Aereo Technology to do no more than what they are entitled to do: access local television broadcasts on the public airwaves using an individual antenna . . . ." Counterclaim (Preamble) [12-cv-1540, Dkt. 7].

That is precisely the reasoning the Supreme Court used when it held that cable operators could retransmit OTA broadcast signals without authority from, or compensation to, broadcasters. *See Fortnightly*, 392 U.S. at 390, and *Teleprompter*, 415 U.S. at 394. Congress, however, emphatically rejected that exact argument in 1976, when it drafted the Transmit Clause to include retransmissions of OTA broadcasts, for the express purpose of overruling the rationale of the Supreme Court.

REDACTED

*First*, through its website, Aereo provides a multi-featured, full-fledged live OTA television retransmission service that relies exclusively on content that Aereo neither produces,

---

8

REDACTED

12

owns nor licenses.

REDACTED

None of these features can be characterized, as Aereo would have it, as "equipment" or a "platform." Instead, they are part and parcel of a video content delivery "service," developed, maintained and operated by the provider for its paying subscribers. It defies

---

[9]  These features also were available from the services of defendants recently enjoined in two OTA broadcast Internet retransmission cases: *WPIX, Inc. v. ivi, Inc.,* 765 F. Supp. 2d 594 (S.D.N.Y. 2011), and *CBS Broadcasting,, Inc. v. FilmOn.com, Inc.*, No. 10-cv-07532 (S.D.N.Y. Nov. 22, 2010). *See* Potenza Decl. Ex. 13 (Enabling Lawful Consumer Viewing Choice, noting that Aereo differs from the then-recently enjoined *ivi* and *FilmOn* retransmission services only in that Aereo does not even attempt to rely on the narrow exceptions for Congressionally authorized retransmitters of copyright broadcasts; "Copyright arguments lodged against these other systems do not apply to [Aereo].").

common sense to think that a licensed entity, such as a cable operator or satellite broadcaster, legitimately could argue that by means of "renting" a set-top box to individual customers it becomes nothing more than a "platform."  Aereo is in no better position to make that argument with its individual antenna/buffer copy system.

REDACTED

14

Redacted Public Filing

REDACTED

Redacted Public Filing

REDACTED

Courts regularly have rejected efforts by providers of transmission services to hide

behind characterizations as equipment providers.  In the recent *WTV Systems* decision, the

defendant also streamed audiovisual copyrighted works over the Internet, from DVD players

it purported to associate with and "rent" to individual users.  *Warner Bros. Entm't Inc. v. WTV*

*Sys., Inc.*, ___ F. Supp. 2d ___, 2011 WL 4001121, at *1 (C.D. Cal. Aug. 1, 2011).  The court

saw through that artifice and explained, in terms fully applicable here, that the Transmit

Clause was intended to cover all cases where "sounds or images [are] stored in an information

system and [are] capable of being performed or displayed at the initiative of individual

members of the public," *id.* (quoting H.R. REP. No. 90-83, at 29 (1967)), including computer

equipment such as "servers" and the "internet."  *Id.*  Accordingly, it rejected the "rental" label

and enjoined the Internet retransmission service.  *Id.* at *3; *see also, e.g., Columbia Pictures*

---

10  *See* Pls.' Pre-Hr'g Mem. 8 n.7.

16

*Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 156 (3d Cir. 1984) (rejecting "euphemistic[]"

"rental" label for in-store transmission from central VHS machine); *On Command Video*

*Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787, 789 (N.D. Cal. 1991) (rejecting

'electronic rental[]' label for centrally-located hotel VCR); Pls.' Pre-Hr'g Mem. 11-12.

### C. *Cablevision* Expressly Limited Its Holding And Did Not Address Contemporaneous Retransmissions.

REDACTED

Its single-

minded reliance on *Cablevision*, however, is misplaced.  The Second Circuit limited that

decision to time-shifted copies of an already-aired program made by the subscriber, the

transmission rights for which were licensed by statute and negotiation.  In *Cablevision*, the

"playback" of the time-shifted copy occurred through the in-home set-top box of the

subscriber who made the copy – meaning it was limited to the same *place*, through the same

*medium*, and to viewing through the same *device*.  That is *time-shifting* by a consumer in the

narrowest sense, addressed not only by the Second Circuit but also the Supreme Court in *Sony*

*Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).

*Cablevision* addressed infringement claims involving a remote DVR (RS-DVR)

service.  Cablevision offered its playback service solely for time-shifting purposes – the ***later***

playback of a previously recorded program to the subscriber who the Court had determined

"made" the recording.  *See Cablevision*, 536 F.3d at 124 ("RS-DVR users can only play

content that they ***previously*** requested to be recorded." (emphasis added)).

17

The Second Circuit concluded that the location of the recording – Cablevision's facilities – was insufficient to distinguish Cablevision's servers from a DVR sitting atop the subscriber's in-home television. *Cablevision*, 536 F.3d at 131 ("We do not believe that an RS-DVR customer is sufficiently distinguishable from a VCR user . . . ."). In reaching its conclusion, however, the Second Circuit emphasized repeatedly that its holding was limited to the specific facts before it: use of a remote DVR designed to (1) **play back** (2) a **time-shifted previously recorded** copy of an entire program, (3) made by the subscriber and (4) available only to **the same set-top box** (*i.e.*, same place, medium and receiving device). *See* Pls.' Pre-Hr'g Mem. 15-16 (multiple citations to language in *Cablevision* stressing fact-specific limits on holding). It recognized the distinction between "playback" of "previously recorded programs," to the same set-top box, as compared with the process by which programs carried by cable television systems are "transmitted to . . . customers in real time." *Compare Cablevision*, 536 F.3d at 124 ("[C]able companies immediately re-transmit the data to customers . . . ."), *with id.* at 125 ("[C]ustomer can record programming [and begin playback] by selecting [show from] previously recorded programs.").[11]  Because the Second Circuit did not have before it the question of real-time streaming, or whether using a buffer copy to facilitate such retransmissions has the effect of converting a public performance into a private

---

[11]

REDACTED

18

Redacted Public Filing

one, there is no basis for reading *Cablevision* as applicable to real-time retransmissions simply because Aereo's "device or process" employs a buffer copy and a streaming server.[12]

***Aereo's "Watch Now" Service Retransmits Live Broadcast Programming***.

Aereo's "Watch Now" service stands in sharp contrast to the facts in Cablevision.  It provides for real-time retransmission of broadcasts to different places, through different media and for reception on different devices.  According to Aereo, the real-time nature of its "Watch Now" retransmissions is irrelevant as long as it involves the use of a recording.  *See* Aereo Br. 2 ("The only difference [between "watch now" and "record for later" modes] is how long the copy is retained and **when** playback occurs." (emphasis in original)).  Nothing in *Cablevision* supports that view and Aereo's own documents show why.


REDACTED


---

[12]   In the course of providing its RS-DVR service, Cablevision automatically made certain buffer copies prior to a customer requesting a recording; the Second Circuit held that those buffer copies were made by Cablevision (not its users) but were not fixed copies that violate the reproduction right of the Copyright Act.  *See Cablevision*, 536 F.3d at 130 ("Given that the data reside in no buffer for more than 1.2 seconds before being automatically overwritten . . . . the acts of buffering in the operation of the RS-DVR do not create copies, as the Copyright Act defines that term.").


REDACTED


19

REDACTED

The text of Aereo's home page does not even bother to mention Aereo's recording service. *See id.* Ex. 2.

These facts contrast with those in *Cablevision*, where the Second Circuit opined that Cablevision's RS-DVR was – and would be seen by consumers as being – functionally identical to the home DVR that sits atop a cable subscriber's television set and is used only

20

Redacted Public Filing

time-shifting purposes.  *See Cablevision*, 536 F.3d at 125 ("***To the customer***, however, the processes of recording and playback on the RS-DVR *are similar* to that of a standard set-top DVR." (emphasis added)); *cf. N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001) (analyzing copyright claim based on how works are "presented to" and "perceptible by" users).

    If all it took to create private performances were unique buffers, virtually all Internet performances of audio and video works could be deemed "private."  As is true of Aereo's service, Internet streaming of audio/video content begins with a user clicking a "play" or "watch" button to indicate to the service provider that the user wants to watch a video or listen to a song.

REDACTED

            To the extent that a service provider chooses to uniquely associate a buffer with a user, Aereo's theory would allow the provider to assert that all of its obviously public performances are, therefore, "private."  That would contravene not only the plain language of the Transmit Clause but congressional intent and well-developed norms and expectations about Internet performances.[13]

---

[13]    As noted, that is the exact point then-Solicitor General, now-Justice, Kagan made in her amicus brief to the Supreme Court in opposition to the petition for a writ of certiorari in *Cablevision. See* Pls.' Pre-Hr'g Mem. 20-21.  She specifically warned against a reading of *Cablevision* that would purport to insulate "VOD services or situations ***in which a party streams copyrighted material on an individualized basis*** over the Internet."  Brief for the United States as Amicus Curiae at 21, *Cable News Network, Inc. v. CSC Holdings, Inc.*, 129 S. Ct. 2890 (2009) (No. 08-448); *see also* 2 GOLDSTEIN ON COPYRIGHT § 7.7.2, at 7:168 ("Congress's intention in its same place-separate place, same time-different time formulation [was] to bring individual on-demand performances within the scope of the public performance right, lest this technology displace traditional, compensated instances of public and broadcast performance with uncompensated private ones.").

21

***Each Step In A Contemporaneous Performance To The Public, Even If Internal, Remains "Public."***

That the analysis of the Transmit Clause in *Cablevision* does not apply to Aereo is underscored by the Second Circuit's decision in *National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000) ("[A] public performance . . . includes 'each step in the process by which a protected work wends it way to its audience.'").  In *PrimeTime*, the defendant captured protected content in the United States, transmitted it from the United States to a satellite and from the satellite to the public in Canada.  It argued that the uplink transmission to the satellite was not a public performance under the Transmit Clause, notwithstanding that the signal it had captured eventually was transmitted to the public.  *See id.*

The Second Circuit rejected that argument, holding it was "clear that PrimeTime's uplink transmission of signals captured in the United States is a step in the process by which NFL's protected work wends its way to a public audience."  *Id.*; *see also David*, 697 F. Supp. at 759 (concluding that cable channel engaged in a public performance even though its transmissions were not directly to the public but to local cable companies that then passed along the signal; examples in legislative history make "apparent" that "Congress intended . . . to encompass each step in the process by which a protected work wends its way to its audience"); House Report at 63 ("[P]ublic performance [covers] any further act by which [initial] rendition or showing is transmitted or communicated to the public.").

In *Cablevision*, because the Court viewed the RS-DVR as materially the same as an in-home DVR, the Second Circuit viewed the user-made, time-shifted copy as breaking the chain of transmission.  It viewed that time-shifted copy – not the original broadcast – as the

22

source for the private, in-home playback.  That copy was not a retransmission nor was it any part of the real-time transmission.  Unlike the copy made for time-shifting purposes in *Cablevision*, however, Aereo's buffer copy does not break the chain of a continuous live television retransmission that results in a performance to the public.  It is made at the same time as the original transmission and is a necessary technological link in the chain by which the original source of that retransmission – the OTA broadcast – "wends its way to a public audience" in real time.  *See PrimeTime*, 211 F.3d at 13 (concluding that uplink is "step in the process by which" the work "wends it way to a public audience").

>    That is exactly how Aereo advertises its system:

REDACTED

Aereo's service retransmits a primary transmission contemporaneously with Plaintiffs' broadcasts.  In so doing, it infringes their public performance right.

Redacted Public Filing

## II.     Plaintiffs Will Suffer Irreparable Injury In The Absence Of Immediate Injunctive Relief.[14]

The Second Circuit, in *Salinger*, noted how the consequences of violating a copyright owner's "right to *exclude*" plainly renders monetary remedies inadequate in a wide range of circumstances.  607 F.3d at 82 (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006)).  If anything, the irreparable harm here is many times more severe than in an ordinary copyright infringement case involving the infringement of a single work.  Countless copyrighted broadcast programs, an entire statutory scheme, and a highly complex and evolved marketplace for the retransmission of broadcast programming are all at stake.

### A.     Aereo Disrupts The Economic Basis Of The Television Industry Carefully Constructed By Congress.[15]

The Copyright Act is not the only federal legislation affecting the economic system on which free OTA television is based.  In 1992, Congress passed the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 (the "1992 Act").  That gave local television broadcasters, for the first time, broad rights to choose

---

[14]    Accompanying this memorandum are the declarations of:  Matt Bond, Executive Vice President of Content Distribution for NBCUniversal Media, LLC ("Bond Decl."); Sherry Brennan, Senior Vice President, Distribution Strategy & Development, Fox Cable Network Services, LLC ("Brennan Decl."); Salil Dalvi, Senior Vice President and General Manager of Strategic Ventures at NBCUniversal Digital Distribution ("Dalvi Decl."); Dave Davis, President and General Manager of WABC-TV ("WABC") ("Davis Decl."); Martin D. Franks, Executive Vice President, Planning, Policy and Government Relations for CBS Corporation ("Franks Decl."); and Stephen Segaller, Vice President of Programming for WNET ("Segaller Decl."), which set forth in greater detail the irreparable harms summarized herein.

[15]    *See* Bond Decl. ¶¶ 5-27; Brennan Decl. ¶¶ 6-20; Dalvi Decl. ¶¶ 4-16; Davis Decl. ¶¶ 10-31; Franks Decl. ¶¶ 5-30; Segaller Decl. ¶¶ 6-15.

Redacted Public Filing

to negotiate with a local cable system serving a particular broadcast community for the carriage of their signals.[16]  Congress recognized that free OTA television would not survive in its current form if stations and networks continued to bear the enormous costs of production without compensation from retransmitters beyond that provided under the Copyright Act.  *See* Senate Report at 35 ("The Committee has concluded that the [present law] for cable retransmissions has created ***a distortion in the video marketplace*** which ***threatens the future of over-the-air broadcasting***." (emphasis added)).[17]

Every time Congress has considered the specific type of harm Aereo poses – free-riding by retransmitters of OTA broadcast television programs – it has concluded that harm threatens the future of free OTA television and has acted to ensure a statutory framework by which the retransmission of broadcast programming is licensed.  First in the Copyright Act, then with cable retransmission consent under the 1992 Act, and again in 1999 with the

---

[16]   The Copyright Act had created a compulsory license for cable systems' retransmission of all copyrighted programs transmitted in OTA broadcasts but, at that time and until the 1992 Act, cable operators paid royalties only for distant, not local, signals.  *See* 47 U.S.C. § 325(b)(1)(A) ("No cable system or other multichannel video programming distributor shall retransmit the signal of a broadcasting station, or any part thereof, except with the express authority of the originating station."); Senate Report at 34 ("Congress' intent was to allow broadcasters to control the use of their signals by anyone engaged in retransmission ***by whatever means***." (emphasis added)).

[17]   *See also* Senate Report at 35 ("Using the revenues they obtain from carrying broadcast signals, cable systems have been able to support the creation of cable services . . . in competition with broadcasters. . . . [The Committee] does not believe that public policy supports a system under which broadcasters in effect subsidize the establishment of their chief competitors."); *id.* at 36 (stating that intent of 1992 Act "is to ensure that our system of free broadcasting remain vibrant, and not be replaced by a system which requires consumers to pay for television service").

25

Redacted Public Filing

Satellite Home Viewer Improvement Act,[18] Congress has established a framework in which entities retransmitting broadcast programs operate under statutory or negotiated licenses. Aereo defies that policy by asserting that, alone among all retransmitters, it need not license content from OTA broadcasters, even while recognizing that it does need to obtain content from other program suppliers by agreement, as opposed to simply taking it for free.[19]

REDACTED

In *ivi*, the court rejected a similar argument. *See ivi*, 765 F. Supp. 2d at 619 ("[Defendants] cannot contend that since ivi is small and plaintiffs are large, they should be allowed to continue to steal plaintiffs' programming for personal gain until a resolution of this case on the merits."). Aereo's "fledgling" status matters only insofar as it makes Aereo unlikely to be capable of paying damages that ultimately may be awarded. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1219 (C.D. Cal. 2007) ("Damages are no remedy at all if they cannot be collected." (citations omitted)).

---

[18]   In the Satellite Home Viewer Improvement Act of 1999, tit. I of the Intellectual Property & Communications Omnibus Reform Act of 1999, Pub. L. No. 106-113, 113 Stat. 1501, Congress established a statutory license for direct-to-home satellite broadcasters such as DirecTV and the DISH Network, to the extent that they provide local-into-local (*i.e.*, local broadcast content delivered to the same local market) retransmission of broadcast stations. *See* 17 U.S.C. § 122; 47 U.S.C. § 325(b)(1). As with the 1992 Act, Congress expressly recognized that the purpose of these provisions was to avoid "undermin[ing]" "Congress' interest in maintaining free over-the-air television." H.R. REP. NO. 106-464, at 101 (1999).

[19]   *See supra* p. 14.

Redacted Public Filing

REDACTED

just as

Plaintiffs contend will happen.  *See* Bond Decl. ¶¶ 7-19; Brennan Decl. ¶¶ 10, 14; Davis Decl.

¶¶ 21-26; Franks Decl. ¶¶ 23-26.

Neutral observers confirm this, too.  Moody's Investor Service recently stated that the

existence of Aereo "undermine[s]" retransmission revenues, which "would be negotiated

downward by cable operators if there is increasing usage of free distribution at their expense."

It went on to say that Aereo "jeopardize[s]" Plaintiffs' advertising revenues "since viewership

measurement systems lag the industry and do not currently have capability of capturing online

viewing accurately."  *See* Potenza Decl. Ex. 30 (*Moody's Said That the New Television

Streaming Service, Aereo, Faces Long-Shot Odds Against Broadcast Station Lawsuit*,

MOODY'S INVESTOR SERVICE, GLOBAL CREDIT RESEARCH, Mar. 16, 2012).

In *ivi* and *FilmOn*, other services that retransmitted OTA broadcast content over the

Internet were held to have caused obvious irreparable harm.  Although Aereo claims that its

individual-antenna-based technology is different, the actual service it provides to subscribers

– real-time Internet retransmission of OTA broadcasts – is equivalent to the services in *ivi* and

*FilmOn*.  The types of irreparable harm presented by Aereo are among the types of irreparable

harm found by the *ivi* and *FilmOn* courts:

    **1.  Loss of Advertising Revenue**:[20]  Since the beginning of commercial, OTA

broadcast television in the United States, the primary source of revenue has been the sale of

air-time to advertisers.  Commercial television time cannot be sold to potential advertisers

unless viewership is both measurable and, in fact, measured.  That traditionally has been done

through ratings agencies like The Nielsen Company ("Nielsen").  Nielsen currently does not

offer a comprehensive or industry-accepted measurement for audiences that watch a live

television program over the Internet or on many mobile devices.

<br>

REDACTED

<br>

    These effects cannot be quantified, making the harm to Plaintiffs

irreparable.  *See ivi*, 765 F. Supp. 2d at 618 (noting that such losses are "'notoriously difficult'

to prove and nearly impossible to quantify, and accordingly are considered irreparable").

---

[20]   *See* Bond Decl. ¶¶ 23-25; Brennan Decl. ¶¶ 7-9, 13; Dalvi Decl. ¶¶ 14-15; Davis Decl. ¶¶ 12-20; Franks Decl. ¶¶ 18-22.

Redacted Public Filing

   **2. *Disruption of the Market for and Value of Plaintiffs' Programming***:[21]   Aereo currently offers the same OTA broadcast content as do cable systems and satellite broadcasters but it pays nothing for that content.  In addition to adversely affecting Plaintiffs' relationships with their licensed distributors, Aereo's service will diminish the fees Plaintiffs can negotiate for their copyrighted programming.  That is the inevitable factual economic consequence of free-riding.  *See* Potenza Decl. 32 (Bond Dep. 46:21-47:6, "Those exhibiting distributors, be they cable or satellite companies, are also distributors of other NBC content in a variety of modes and under a variety of licensing schemes and in a variety of windows. Once those customers disconnect from a satellite provider or a cable provider . . . they now cease to be a customer for the rest of those businesses."); WILLIAM M. LANDES & RICHARD A. POSNER, THE ECONOMIC STRUCTURE OF INTELLECTUAL PROPERTY LAW 40 (2003) ("In the absence of copyright protection, the market price of a book or other expressive work will eventually be bid down to the marginal cost of copying . . . .").  Accordingly, a cable company or other distributor of OTA programming would likely elect a one-time capital expense to build an Aereo-like system rather than pay retransmission consent fees, a point Aereo reiterates throughout its internal documents,[22] or would demand a reduction in its license fees.

---

[21]   *See* Bond Decl. ¶¶ 7-19; Brennan Decl. ¶¶ 10, 14; Davis Decl. ¶¶ 21-26; Franks Decl. ¶¶ 23-26.

[22]

REDACTED

29

That, too, constitutes irreparable injury. *See ivi*, 765 F. Supp. 2d at 618 ("If ivi continues its infringement, . . . the ability of plaintiffs to profit from sanctioned sources would inevitably drop.").

### 3. *Threat to the Development of a Lawful Internet Streaming/Mobile Market*:[23]

Aereo's service undermines the ability of content owners to control the distribution of programming over new media, including the Internet and mobile platforms, a nascent but extremely promising area that broadcasters are actively pursuing. Several of the Plaintiffs have formed a joint venture involving a service called DYLE, which offers consumers the same service as Aereo's – *i.e.*, the ability to receive OTA broadcast signals on their mobile devices – but in a way that is measurable and encrypted to ensure against piracy and viral infringement. *See* Potenza Decl. Ex. 35 (Dalvi Dep. 9:13-16, 95:6-17, 100:3-7).

REDACTED

---

REDACTED

[23]   *See* Bond Decl. ¶¶ 20-22; Brennan Decl. ¶¶ 15-18; Dalvi Decl. ¶¶ 6-13; Davis Decl. ¶¶ 27-31; Franks Decl. ¶¶ 8-17; Segaller Decl. ¶¶ 7, 9, 10.

Redacted Public Filing

The same type of disruption to authorized, new media markets was deemed irreparable injury in *WTV Sys.*:

> Defendants' service threatens the development of a successful and lawful video on demand market and, in particular, the growing internet-based video on demand market.

2011 WL 4001121, at *8; *see also A & M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 925 (N.D. Cal. 2000) (concluding that plaintiffs were likely to suffer irreparable harm absent a preliminary injunction because "plaintiffs have invested in the digital downloading market and . . . their business plans are threatened by a service that offers the same product for free").[24]

### B.    Plaintiffs Did Not Delay.

Aereo's argument that Plaintiffs delayed in bringing these actions ignores both facts and law.  As a threshold matter, it is undisputed that some Plaintiffs did not become aware of Aereo at all until its February 14, 2012 launch announcement.  Potenza Decl. Ex. 36 (Segaller Dep. 54:2-10); Segaller Decl. ¶ 16.  Their two-week delay in filing suit can hardly be considered undue.  Aereo does not even try to address that point.

Even as to the Plaintiffs that knew of Aereo's existence at the time of Aereo's beta test there has been no delay.  The obligation to sue only arises when the threat of infringement

---

[24]    These irreparable harms are by no means the only ones.  As detailed in the accompanying declarations, Aereo causes the Plaintiffs to face the risk of viral infringement, increased costs of content, drawing viewers away from their home markets, being unable to provide viewers with a quality viewing experience, being unable to have viewers watch pledge drives and being unable to provide viewers with closed captioning.  *See* Bond Decl. ¶¶ 26-27; Brennan Decl. ¶¶ 11-12, 16; Dalvi Decl. ¶¶ 16; Franks Decl. ¶¶ 27-30; Segaller Decl. ¶¶ 6, 12-14.

Redacted Public Filing

"looms large." *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002).

REDACTED

When it finally drew back the "cloak" and announced its seed financing in April 2011, Plaintiffs considered its development to see whether (1) might become a viable business that (2) posed a ripe and concrete threat to Plaintiffs' rights.  Bond Decl. ¶¶ 28-29; Brennan Decl. ¶ 21; Dalvi Decl. ¶¶ 17-20; Davis Decl. ¶¶ 32-33; Franks Decl. ¶¶ 31-32;

REDACTED

At that time, the Plaintiffs that knew of Aereo had very serious doubts that the Aereo technology could in fact work in the manner that Aereo was indicating.  *See*, *e.g.*, Brennan Decl. ¶ 21; Dalvi Decl. ¶ 18; Brennan Decl. ¶ 21.  *E.g.*, *Lotus Dev. Corp. v. Paperback Software Int'l*, 740 F. Supp. 37, 82 (D. Mass. 1990) ("Prudent business judgment, Rule 11 and basic common sense required Lotus first to ascertain that the threat to its intellectual property interest was serious and that its legal position was sound before filing suit." (internal quotation marks omitted)).

REDACTED

32

REDACTED

Irreparable harm first "loomed large" on February 14, 2012, when Aereo announced that it planned to commercially launch its service in New York City on March 14, 2012.  *See* Bond Decl. ¶ 30; Brennan Decl. ¶ 21; Dalvi Decl. ¶ 21; Davis Decl. ¶ 34; Franks Decl. ¶ 33.  Plaintiffs filed their complaint eleven business days later, on March 1, 2012.  *See Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*, No. 02 Civ. 0861, 2002 WL 1543817, at *6 (S.D.N.Y. July 12, 2002) (concluding 6-month "delay" while product was in beta "test market" of 20-30 establishments in New York City reasonable "[b]ased on the limited distribution and media penetration"); *see also Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 79 (2d Cir. 1988) (concluding "delay" of 7 months from launch of product to preliminary injunction motion not unreasonable because defendant had not extensively advertised, marketed, or promoted its product prior to the preliminary injunction motion and had minimal sales).

REDACTED

REDACTED

*id.* Ex. 38 (Stacey Higginbotham, *Call the Lawyers:  Bamboom Wants to Be Netflix for Broadcasters*, GiGaOM (Apr. 14, 2011, 2:06 PM),  http://gigaom.com/video/bamboom/ ("'Our investors planned for this,' Kanojia said.  'We need money for infrastructure and lawsuits.'").

REDACTED

III.    **The Balance Of Hardships And Public Interest Tip Decidedly In Plaintiffs' Favor.**

The public interest is also served by granting the requested injunction.  In contrast to the irreparable harm facing Plaintiffs in the absence of an injunction, Aereo faces no cognizable harm if an injunction is granted.  As the *ivi* court recognized, "[i]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product."  *ivi*, 765 F. Supp. 2d at 621; *see also WTV Sys.*, 2011 WL 4001121, at *9 (balance of hardships "sharply" favors plaintiffs; defendants "cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities" (internal quotation marks omitted)).

REDACTED

34

The object of copyright law is to "promote the store of knowledge available to the public" by providing authors with exclusive rights and a corresponding "financial incentive to contribute to the store of knowledge." *Salinger*, 607 F.3d at 82.  Congress expressly has recognized that, for decades, "television broadcasting has provided vital local service through its programming, including its news and public affairs offerings and its emergency broadcasts."  Senate Report at 42.  "If Plaintiffs lose control over their products or potential revenue sources, they will lose valuable incentives to continue to create programming." *ivi*, 765 F. Supp. 2d at 621; *see also Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, ___ F. Supp. 2d ___, 2011 WL 5519829, at *11 (S.D.N.Y. Nov. 10, 2011) (reasoning under *Salinger* that "if Plaintiffs suffer financial losses due to Empire's infringement, and as a result produce fewer motion pictures, the public's 'store of knowledge' will be diminished"); Senate Report at 42 (recognizing television broadcasting "will be jeopardized" if retransmitters are permitted to "carry such signals . . . without proper consideration to the programmer").  An injunction is in the public interest.  *See Autoskill, Inc. v. Nat'l Educ. Support Sys.*, 994 F.2d 1476, 1499 (10th Cir. 1993) (stating that, in copyright case affirming issuance of preliminary injunction, "we think this factor normally weighs in favor of the issuance of an injunction because the public interest is the interest in upholding copyright protections").

Redacted Public Filing

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' request for a preliminary injunction against Aereo's retransmission service.

Respectfully submitted,

/s/ Steven B. Fabrizio                    /s/ Bruce P. Keller
Steven B. Fabrizio                        Bruce P. Keller
(sfabrizio@jenner.com)                    (bpkeller@debevoise.com)
Steven R. Englund                         Jeffrey P. Cunard
(senglund@jenner.com)                     (jpcunard@debevoise.com)
Scott B. Wilkens                          Michael R. Potenza
(swilkens@jenner.com)                     (mpotenza@debevoise.com)
JENNER & BLOCK LLP                        DEBEVOISE & PLIMPTON LLP
1099 New York Ave., N.W.                  919 Third Avenue
Washington, D.C. 20001                    New York, NY 10022
(202) 639-6000                            (212) 909-6000

David J. Bradford                         *Attorneys for Plaintiffs American*
JENNER & BLOCK LLP                        *Broadcasting Companies, Inc., Disney*
353 N. Clark St.                          *Enterprises, Inc., CBS Broadcasting*
Chicago, IL 60656-3456                    *Inc., CBS Studios Inc., NBCUniversal*
Telephone (312) 222-9350                  *Media LLC, NBC Studios, LLC,*
Facsimile (312) 527-0484                  *Universal Network Television, LLC,*
                                          *Telemundo Network Group LLC and*
Kenneth D. Klein                          *WNJU-TV Broadcasting LLC*
JENNER & BLOCK LLP
633 West 5th Street
Los Angeles, CA 90071-2054
Telephone (213) 239-5100
Facsimile (213) 239-5199

*Attorneys for Plaintiffs WNET,*
*Thirteen, Fox Television Stations, Inc.,*
*Twentieth Century Fox Film*
*Corporation, WPIX, Inc., Univision*
*Television Group, Inc., The Univision*
*Network Limited Partnership and*
*Public Broadcasting Service*

Dated:  May 1, 2012

36

Redacted Public Filing