**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X
AMERICAN BROADCASTING　　　　　　　:
COMPANIES, INC., et al.,　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:　Civil Action No. 12-CV-1540 (AJN)
　　　　Plaintiffs/Counterclaim Defendants,　:　ECF Case
v.　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
AEREO, INC.　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　Defendant/Counterclaim Plaintiff.　　:
---------------------------------------------------------X
WNET, et al.,　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:　Civil Action No. 12-CV-1543 (AJN)
　　　　Plaintiffs/Counterclaim Defendants,　:　ECF Case
　　　　　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
AEREO, INC., f/k/a/ BAMBOOM LABS　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　Defendant/Counterclaim Plaintiff.　　:
---------------------------------------------------------X

## BRIEF *AMICI CURIAE* OF NETCOALITION AND COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION IN SUPPORT OF NEITHER PARTY

Jonathan Band　　　　　　　　　　　　　　　Markham C. Erickson
Jonathan Band PLLC　　　　　　　　　　　　Holch & Erickson LLP
21 Dupont Circle NW, Suite 800　　　　　　Executive Director, NetCoalition
Washington, D.C. 20036　　　　　　　　　　400 N. Capitol Street NW, Suite 585
(202) 296-5675　　　　　　　　　　　　　　Washington, D.C. 20001
jband@policybandwidth.com　　　　　　　　(202) 624-1460
　　　　　　　　　　　　　　　　　　　　　merickson@holcherickson.com
　　　　　　　　　　　　　　　　　　　　　*Counsel of Record*

Matthew Schruers　　　　　　　　　　　　　Erik Stallman
Vice President, Law & Policy　　　　　　　Holch & Erickson LLP
Computer & Communications Industry Ass'n　400 N. Capitol Street NW, Suite 585
900 Seventeenth Street NW, Suite 1100　　Washington, D.C. 20001
Washington, D.C. 20006　　　　　　　　　　(202) 624-1460
(202) 783-0070　　　　　　　　　　　　　　estallman@holcherickson.com
mschruers@ccianet.org

May 22, 2012

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................iii

INTEREST OF *AMICI* ......................................................................................................1

INTRODUCTION ..............................................................................................................1

ARGUMENT ......................................................................................................................3

    I.   THE *CABLEVISION* DECISION IS CRITICAL FOR CLOUD COMPUTING ......3

    II.  *CABLEVISION*'S HOLDING IS NOT LIMITED TO A SINGLE
        TECHNOLOGY, PLACE, MEDIUM, OR DEVICE ................................................6

    III. PLAINTIFFS CAN DISTINGUISH *CABLEVISION* ONLY BY LIMITING IT
        ARTIFICIALLY TO THE TECHNOLOGY AT ISSUE IN THAT CASE ..............8

        A.  *Cablevision* Is Not Limited To The Hardware At Issue In That Case ................8

        B.  *Cablevision* Is Not Limited To The DVR Copies Made In That Case ................9

CONCLUSION ..................................................................................................................10

# TABLE OF AUTHORITIES

*Cases*

*Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008)............*passim*

*CBS Broadcasting, Inc. v. FilmOn.com, Inc.*, No. 10-cv-07532
   (S.D.N.Y. Nov. 22, 2010) .................................................................................................8

*On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787 (N.D. Cal.
   1991) ................................................................................................................................8

*Religious Technology Center v. Netcom On-Line Communications Services*, 907 F. Supp.
   1361 (N.D. Cal 1995)...................................................................................................... 6

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) .......................11

*WPIX, Inc. v. ivi*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011) .........................................................8

*Statutes*

17 U.S.C. § 101................................................................................................................9

17 U.S.C. § 107................................................................................................................3

*Other Materials*

John F. Gantz, Stephen Minton, Anna Toncheva, "Cloud Computing's Role in Job
   Creation," IDC White Paper, sponsored by Microsoft, March 2012, at 1, *available at*
   http://www.microsoft.com/en-
   us/news/download/features/2012/IDC_Cloud_jobs_White_Paper.pdf. ............................5

Josh Lerner, "The Impact of Copyright Policy Changes on Venture Capital Investment in
   Cloud Computing Companies," Nov. 1, 2011, *available at*
   http://www.ccianet.org/CCIA/files/ccLibraryFiles/Filename/000000000559/Cablevisio
   n%20white%20paper%20(11.01.11).pdf.......................................................................2, 5

Peter Mell & Timothy Grance, Nat'l Inst. Of Standards & Tech., U.S. Dep't of
   Commerce, Special Publication 800-145: NIST Definition of Cloud Computing (Draft)
   (2011), *available at* http://csrc.nist.gov/publications/drafts/800-145/Draft-SP-800-
   145_cloud-definition.pdf. ................................................................................................2

Sand Hill Group, "Job Growth in the Forecast: How Cloud Computing is Generating
   New Business Opportunities and Fueling Job Growth in the United States," March
   2012, *available at* http://www.news-sap.com/files/Job-Growth-in-the-Forecast-
   012712.pdf. .....................................................................................................................5

## INTEREST OF *AMICI*

NetCoalition serves as the public policy voice for some of the world's most innovative Internet companies on legislative and administrative proposals affecting the online realm.[1]

The Computer & Communications Industry Association (CCIA) represents large, medium-sized, and small companies in the high technology products and services sectors, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services – companies that collectively generate more than $250 billion in annual revenues.[2]

*Amici* filed a brief *amici curiae* in *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*").  The legal certainty provided by the Second Circuit's decision in that case has allowed *amici*'s members to invest significant resources in the development and operation of a wide variety of services, including cloud computing.[3]  It is no exaggeration to say that the proper interpretation and application of *Cablevision* is critical to the future of the Internet.

## INTRODUCTION

*Amici* represent leading-edge innovative companies that develop and deploy technologies that the "network of networks" known as the Internet makes possible.  The importance of the Internet to the American economy and culture cannot be overstated;

---

[1] NetCoalition's members include Amazon.com, Bloomberg LP, eBay, IAC, Google, Wikipedia, and Yahoo!.  IAC did not participate in the preparation of this brief.
[2] A complete list of CCIA members is available at http://www.ccianet.org/members.
[3] "Cloud computing is a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or service provider interaction." *See* Peter Mell & Timothy Grance, Nat'l Inst. Of Standards & Tech., U.S. Dep't of Commerce, Special Publication 800-145: NIST Definition of Cloud Computing (Draft), at 2 (2011), available at http://csrc.nist.gov/publications/drafts/800-145/Draft-SP-800-145_cloud-definition.pdf.

1

nor can the Internet's reliance on a stable, certain, and consistent application of copyright law to the digital environment. Without urging a particular result in this case, *amici* submit this brief to underscore the potential effect of this case on nearly all activity that takes place on the Internet and, in particular, on emerging cloud computing technologies.

As much as Plaintiffs urge this court to limit *Cablevision* to its facts, the importance of *Cablevision*'s holding goes well beyond the facts of that case, the facts of this case, or even the medium of television. Every time a consumer uses an Internet cloud-based backup system or storage locker, both the consumer and the company providing that system rely on *Cablevision*'s clear holding that it is the user – not the provider of that system – who copies the underlying work, and *Cablevision*'s clear holding that the transmission of that work *to that same user* is a private performance that infringes no exclusive right of the rightsholder in the underlying work.

Cloud computing refers to the practice of using a network of remote servers hosted on the Internet to store, manage, and process data. Cloud computing represents a huge new economic opportunity as users begin to take for granted their ability to access their own documents, emails, music collections, and other data across multiple devices, seamlessly. The cloud computing industry has been built in reliance on the certainty provided by the 2008 ruling in *Cablevision*. That certainty directly led to an increased investment in cloud computing in the United States of up to $1.3 billion over two-and-a-half years.[4] That investment has allowed American companies to lead the way in this

---

[4] Josh Lerner, "The Impact of Copyright Policy Changes on Venture Capital Investment in Cloud Computing Companies," Nov. 1, 2011, at 24, available at
http://www.ccianet.org/CCIA/files/ccLibraryFiles/Filename/000000000559/Cablevision%20white%20paper%20(11.01.11).pdf.

2

emerging and vital sector of the global economy. An unduly narrow or unclear interpretation of *Cablevision* in this case would seriously undermine that leadership.

## ARGUMENT

### I. THE *CABLEVISION* DECISION IS CRITICAL FOR CLOUD COMPUTING.

The Second Circuit's decision in *Cablevision* has implications far beyond cable television and digital video recorders (DVRs). The *Cablevision* court reached three common sense conclusions that have enabled digital technology to progress in the new century. *First*, the *Cablevision* court held that when a user directs a computer to make a copy, the user is the person making the copy, regardless of whether the computer is in her living room or in a remote location.[5] This holding is essential to cloud computing, where a user stores data and receives services from a remote computer, but is hardly novel. In the words of the Second Circuit, "Here, by selling access to a system that automatically produces copies on command, Cablevision more closely resembles a store proprietor who charges customers to use a photocopier on his premises, and it seems incorrect to say, without more, that such a proprietor 'makes' any copies when his machines are actually operated by his customers." *Cablevision*, 536 F.3d at 132. Considering the user, rather than the provider of cloud services, as the volitional actor who made the copy means that the lawfulness of the copy is evaluated from the perspective of the user, who is the one that decides what to copy, when to copy it, and when to later access it. That is, was it lawful for the *user* to make the copy? Did the *user* have a license? Or was it fair use under 17 U.S.C. § 107 for the *user* to make the copy? This focus on the user is crucial to ensuring legal parity between those who make technologies available to users in the

---

[5] A set-top DVR is a special purpose computer.

offline world (like the copy shops described in *Cablevision*) and those who make technologies available to users remotely over the Internet.

*Second*, the *Cablevision* court found that the transmission of the copy made by the user from the remote computer back to the user was not a public performance, even if many users made copies of the same work and subsequently viewed their copies.  This holding, too, is critical for cloud computing as it ensures that a user's retrieval of the content she stored is not treated as a public performance within the meaning of the Copyright Act.  For example, if a user opts to use one of the new breed of cloud-based online backup services like Mozy or Carbonite, and later needs to restore her own music collection from that online backup, it can hardly be said that a public performance has occurred.

*Third*, the *Cablevision* court found that a buffer copy of very short duration was not fixed and thus was not a copy within the meaning of the Copyright Act.  Because buffer copies are an inevitable feature of all digital technology, including cloud computing, this holding means that a cloud computing provider does not need to rely exclusively on the fair use right to excuse the temporary copies it makes that are incidental to the operation of its system.

Cloud computing is a revolutionary technological development that provides enormous benefits for users.  It decreases a user's storage costs while providing her with easy access to her stored content from any location with a broadband connection – her home, her office, or on the street with her smartphone.  Moreover, cloud computing increases network efficiency by pooling storage and bandwidth resources.

4

Cloud computing is becoming an increasingly important sector of the U.S. economy. In 2011, spending on public cloud information technology ("IT") services made up an estimated $28 billion of the $1.7 trillion spent globally on all IT products and services.[6] A recent study projected that revenue growth at cloud computing companies will exceed $20 billion per year for each of the next five years.[7] It also found that cloud computing services present a potential savings of more than $625 billion over the next five years for entities that invest in cloud computing. And it found that cloud computing investments will create 213,000 new jobs in the United States and abroad over the next five years.

The cloud computing sector has relied on *Cablevision* when making investments in cloud computing products and technologies. A November 2011 economic study found that after the decision, the average quarterly investment in cloud computing in the United States increased by approximately 41 percent.[8] That study also concluded that *Cablevision* led to additional incremental investment in U.S. cloud computing firms of between $728 million and $1.3 billion over the two-and-half years after the decision. When coupled with the study's findings regarding enhanced effects of venture capital investment in this space, the author concluded that such sums may be the equivalent of two to five billion dollars in traditional investment in research and development.[9]

---

[6] John F. Gantz, Stephen Minton, Anna Toncheva, "Cloud Computing's Role in Job Creation," IDC White Paper sponsored by Microsoft (March 2012) at 1, available at http://www.microsoft.com/en-us/news/download/features/2012/IDC_Cloud_jobs_White_Paper.pdf.
[7] Sand Hill Group, "Job Growth in the Forecast: How Cloud Computing is Generating New Business Opportunities and Fueling Job Growth in the United States," March 2012, available at http://www.news-sap.com/files/Job-Growth-in-the-Forecast-012712.pdf (also available at http://sandhill.com/article/sand-hill-group-study-finds-massive-job-creation-potential-through-cloud-computing/).
[8] Lerner at 9.
[9] *Id*. at 24.

Given the growing importance of cloud computing, and the reliance on *Cablevision* when investing in this sector, *amici* respectfully request that this Court avoid any ruling that has the effect of undermining the core holdings of *Cablevision* and casting doubt on the copyright doctrines on which cloud computing is built.

## II.  *CABLEVISION*'S HOLDING IS NOT LIMITED TO A SINGLE TECHNOLOGY, PLACE, MEDIUM, OR DEVICE.

Plaintiffs contend that the Second Circuit limited its holding in *Cablevision* to "playbacks" of time-shifted copies of work "to the same *place*, through the same *medium*, and to viewing through the same *device*."[10]  Tellingly, Plaintiffs offer no citation support from *Cablevision* for that contention and, indeed, *Cablevision* does not support it. Plaintiffs here appear to be attempting to do to *Cablevision* what the plaintiffs in *Cablevision* attempted to do to *Religious Technology Center v. Netcom On-Line Communications Services*, 907 F. Supp. 1361 (N.D. Cal 1995) ("*Netcom*").  The *Cablevision* decision clearly explained that "*Netcom* and its progeny direct our attention to the volitional conduct that causes the copy to be made" and applied *Netcom* to the facts before it.  *Cablevision*, 536 F.3d at 130-31.  In so doing, the court rejected the position of the plaintiffs and the lower court that *Netcom* was "premised on the unique attributes of the Internet" or amounted to "a special-purpose rule applicable only to [Internet service providers]."  *Cablevision*, 536 F.3d at 131.

Here, Plaintiffs put forward a crabbed reading of *Cablevision* as a special-purpose rule that applies only to devices and technologies that permit playbacks of works to the same place, through the same medium and on the same device.  Plaintiffs contend that, if not so limited here, *Cablevision* will open the door to all manner of Internet streaming of

---

[10] Plaintiffs' Mem. at 17 (emphasis in original).

copyrighted works.  Plaintiffs' Mem. at 4.  Again, nothing in *Cablevision* supports that contention.  The court in *Cablevision* quite clearly held that when a "playback transmission is made to a single subscriber using a single unique copy produced by that subscriber, we conclude that such transmissions are not performances 'to the public,' and therefore do not infringe any exclusive right of public performance."  *Cablevision*, 536 F.3d at 139.  Nothing in that holding would permit a user to use the Internet to transmit a copy she has made to the public.  There simply is no support in *Cablevision* for the parade of horribles that Plaintiffs insist would flow from a plain reading and application of its holding.

In contrast, an artificial "same-place-medium-and-device" limitation on *Cablevision*'s holding would jeopardize the principal benefits of cloud computing.  The very reason that consumers use remote storage or backup systems is to ensure that their content will be available to them on multiple devices when they travel away from their local storage devices or when those devices catastrophically fail.  Under Plaintiffs' reading, however, the user's conduct in transmitting that content to a different place or device is a public performance for which the user or the provider of the remote storage or backup system, or both, could be liable.

Under Plaintiffs' reading, for example, if a consumer uploads a compact disc from her laptop to a remote storage account such as Amazon.com's "cloud drive" so she can listen to it on her smartphone, tablet computer or other mobile Internet device, the user (and possibly Amazon.com) would be deemed to have engaged in a *public* performance because she is performing the work in a different place, through a different medium and on a different device.  To conclude that *Cablevision* requires this result would bring

7

innovation and economic growth in cloud computing industries to a standstill and rob those industries of the certainty that *Cablevision*'s clear, settled meaning provides.

### III. PLAINTIFFS CAN DISTINGUISH *CABLEVISION* ONLY BY LIMITING IT ARTIFICIALLY TO THE TECHNOLOGY AT ISSUE IN THAT CASE.

*Amici* are unfamiliar with Aereo's technology, and thus cannot take any position on its ultimate lawfulness. Nonetheless, assuming for purposes of this brief that the technology operates in the manner described by Aereo in its pleadings, Plaintiffs' attempt to place that technology outside of *Cablevision*'s holding is unpersuasive. Nothing in the *Cablevision* decision suggests that it is limited to the taping and playback of cable broadcasts using a specific hardware configuration.

#### A. *Cablevision* Is Not Limited To The Hardware At Issue In That Case.

In the cases cited by Plaintiffs where defendants were found liable for infringing the public performance right, the defendant received one copyrighted input, and then transmitted it to many people, either simultaneously (in cable retransmission cases) or sequentially (in the case of on-demand transmissions).[11] Here, in contrast, by virtue of Aereo's array of antennas, each copyrighted input is transmitted to only one person. In this respect, this case is the same as *Cablevision*. The Second Circuit found that there was no public performance because each copy was transmitted only to one person. It didn't matter whether the DVR was in the user's home, or in Cablevision's facility; in either case, the copyrighted material moved from a single DVR to a single subscriber. Similarly, it shouldn't matter whether Aereo places an antenna on the subscriber's roof or on the roof of its facility; in either case, the copyrighted material moves from a single

---

[11] *WPIX, Inc. v. ivi*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011); *CBS Broadcasting, Inc. v. FilmOn.com, Inc.*, No. 10-cv-07532 (S.D.N.Y. Nov. 22, 2010); *On Command Video Corp. v. Columbia Pictures Indus.*, 777 F. Supp. 787 (N.D. Cal. 1991).

antenna to a single subscriber.  Plaintiffs consider the individual antennas to be a "technological gimmick," Plaintiffs' Mem. at 3, but Aereo's individualized hardware is no more a gimmick than Cablevision's remote DVRs.

### B.  *Cablevision* Is Not Limited To The DVR Copies Made In That Case.

Plaintiffs insist that the "buffer copies" made during an Aereo "Watch Now" session are a "technological gimmick" that "does not break the chain of continuous live television transmission" unlike the RS-DVR copies in *Cablevision*.  Plaintiffs' Mem. at 23.  This argument is a red herring.

Plaintiffs' motion turns on a single question—whether Aereo's technology enables transmissions "to the public" within the meaning of the "transmit clause" of 17 U.S.C. § 101.  For this analysis, it is entirely irrelevant whether the transmission was from a "buffer" or "live" or "previously recorded."  The question is whether the transmission is "to the public," and the Second Circuit's ruling in *Cablevision* plainly holds that a transmission of a copy made by a user solely to that user is not "to the public."

In an effort to avoid this binding precedent, Plaintiffs first urge this court to limit *Cablevision* to its facts, thereby effectively ignoring the Second Circuit's clarification of the meaning of "to the public," a clarification on which many industries have reasonably relied.  In the alternative, Plaintiffs invent a "live broadcast" exception to *Cablevision*.  There is simply no basis for such a *sui generis* exclusive right attaching only to live, free, over-the-air television broadcasts.  Regardless of the nature of the copyrighted work— television programs, software stored in a personal online backup service, music files accessed from a personal "cloud locker"—transmissions of a copy made by a user that

9

are accessible solely to that user *are not to the public*.  That is one of the core holdings of *Cablevision*.  Contrary to Plaintiffs' implication, *Cablevision* does not impose a "cooling off" period before which a playback is a public performance.  Nothing in *Cablevision* prevents the transmission of a lawfully made copy to the user who made it soon after it was made.

According to Aereo, there is no technological difference between a copy made in the "Watch Now" mode and a copy made in the "Record" mode, other than that the copy in the "Watch Now" is deleted automatically at the end of the "Watch Now" session.  Moreover, with standard DVRs, the RS-DVR in *Cablevision*, and presumably with Aereo, a viewer can start playback of a program recorded in the "Record" mode while the program is still being recorded.[12]  Indeed, one can start playback as soon as the program starts (with a few-second delay built into the system).  The common sense approach adopted by the Second Circuit in *Cablevision* would reject treating a playback in the "Watch Now" mode with a few-second delay differently from a playback in the "Record" mode with the identical delay.  At the same time, treating these playbacks the same – as private performances – would not spell the end of the public performance right in Internet streaming, as suggested by Plaintiffs.

## CONCLUSION

*Amici* respectfully request that the Court reject Plaintiffs' attempt to limit and obscure the clear holding of *Cablevision*.  That holding has paved the way for innovation and millions of dollars of investment in Internet cloud-based technologies.  Cloud computing's potential in terms of job creation, economic growth and consumer

---

[12] Many viewers of live events such as the Super Bowl pause the DVR at the beginning of the game, then start watching the game from the beginning an hour after the game started.  By fast forwarding through game stoppages and the half time "analysis," the viewer can "catch up" by the end of the game.

empowerment is still unknown but growing by the day. That potential will not be realized if Plaintiffs are successful here in hamstringing *Cablevision* in a way that allows new technologies to exist only in so far as they resemble old ones.

To the extent Plaintiffs are concerned that new technologies and business models that do not run afoul of the Copyright Act nevertheless may disrupt their existing business arrangements, those concerns are best put to Congress. As the Supreme Court observed in another case involving new uses of free, over-the-air television:

> The judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme. . . . Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated by such new technology. In a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests.

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 431 (1984).

Whatever the final result in this case, that result should not turn on the "same-place-medium-and-device" limitation or any other artificial qualification that Plaintiffs seek to place on the clear and settled meaning of *Cablevision*.

Respectfully submitted,

/s/ Markham C. Erickson

| | |
|---|---|
| Jonathan Band | Markham C. Erickson |
| Jonathan Band PLLC | Holch & Erickson LLP |
| 21 Dupont Circle NW, Suite 800 | Executive Director, NetCoalition |
| Washington, D.C. 20036 | 400 N. Capitol Street NW, Suite 585 |
| (202) 296-5675 | Washington, D.C. 20001 |
| jband@policybandwidth.com | (202) 624-1460 |
| | merickson@holcherickson.com |
| | *Counsel of Record* |
| | |
| Matthew Schruers | Erik Stallman |
| Vice President, Law & Policy | Holch & Erickson, LLP |
| Computer & Communications Industry Ass'n | 400 N. Capitol Street NW, Suite 585 |
| 900 Seventeenth Street NW, Suite 1100 | Washington, D.C. 20001 |
| Washington, D.C. 20006 | (202) 624-1460 |
| (202) 783-0070 | estallman@holcherickson.com |
| mschruers@ccianet.org | |

May 22, 2012