UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., DISNEY ENTERPRISES, INC., CBS BROADCASTING INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA, LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK TELEVISION, LLC, TELEMUNDO NETWORK GROUP LLC, and WNJU-TV BROADCASTING LLC,<br><br>        Plaintiffs/Counterclaim Defendants,<br>v.<br><br>AEREO, INC.<br><br>        Defendant/Counterclaim Plaintiff. | Civil Action No. 12-CV-1540 (AJN) |
| WNET, THIRTEEN, FOX TELEVISION STATIONS, INC., TWENTIETH CENTURY FOX FILM CORPORATION, WPIX, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK LIMITED PARTNERSHIP, and PUBLIC BROADCASTING SERVICE,<br><br>        Plaintiffs/Counterclaim Defendants,<br>v.<br><br>AEREO, INC., f/k/a BAMBOOM LABS, INC.,<br><br><br><br>        Defendant/Counterclaim Plaintiff. | Civil Action No. 12-CV-1543 (AJN) |

## AEREO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION ON COPYRIGHT

Redacted Public Filing

**TABLE OF CONTENTS**

INTRODUCTION. .................................................................................................................1

FACTS.. ...............................................................................................................................6

ARGUMENT.......................................................................................................................10

I.      CONSUMER TRANSMISSIONS USING AEREO ARE NOT PUBLIC
        PERFORMANCES UNDER THE PLAIN LANGUAGE OF 17 U.S.C. § 101. .............12

II.     AEREO CONSUMER TRANSMISSIONS ARE NOT PERFORMANCES "TO
        THE PUBLIC" UNDER SECOND CIRCUIT CASE LAW...............................................13

        A.      Consumer Transmissions Using Aereo's System Are of an Individual
                Copy to One Specific User. ..............................................................................14

                1.      The Consumer Playback Is A Private Performance..................................15

                2.      *Cablevision's* Public Performance Analysis Is Not Limited To
                        Time-Shifting Technology..........................................................................16

                3.      Aereo "Time Shifts" Even in "Watch Now" Mode. .................................17

        B.      The Aereo System Does Not Function as a Community Antenna........................18

        C.      Aereo's Use of "Shared Resources" Is Irrelevant to "Public Performance." ........19

        D.      A Finding That Consumers Use Aereo to Make Private Performances
                Would Not Exempt All Internet Streaming From Copyright Liability.................20

III.    PLAINTIFFS' MOTION ALSO FAILS BECAUSE THEY CANNOT SHOW
        IRREPARABLE HARM AND ANY POTENTIAL HARM TO PLAINTIFFS IS
        OUTWEIGHED BY THE HARM TO AEREO IF AN INJUNCTION WERE
        ALLOWED....................................................................................................................21

        A.      Plaintiffs' Long Delay Undermines Any Claim of Irreparable Harm. .................22

        B.      Plaintiffs Have Failed to Identify Any Irreparable Harm. ...................................25

                1.      Any Loss of Advertising Revenue Is Purely Speculative..........................25

                2.      Any Claimed Disruption of the Market for Plaintiffs' Programming
                        Is Equally Remote and Speculative. ..........................................................26

                3.      Plaintiffs Can Point to No Harm to their Entrance into the Mobile
                        Streaming Television Market......................................................................26

                4.      Any Potential Harm Is Purely Economic....................................................27

      C.      Plaintiffs' Efforts to Rely on Federal Legislation Not at Issue Fail to Justify Injunctive Relief Here. .................................................................................28

IV.    THE BALANCE OF HARDSHIPS TIPS IN FAVOR OF AEREO. ...............................29

V.     AN INJUNCTION IS NOT IN THE PUBLIC INTEREST. ............................................31

CONCLUSION...................................................................................................................31

Redacted Public Filing

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Buffalo Forge Co. v. Ampco–Pittsburgh Corp.*,
   638 F.2d 568 (2d Cir. 1981)................................................................................29

*Cartoon Network LP v. CSC Holdings, Inc.*,
   536 F.3d 121 (2d Cir. 2008) ("*Cablevision*") ............................................... *passim*

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985)............................................................................5, 22

*City of Newburgh v. Sarna*,
   690 F. Supp. 2d 136 (S.D.N.Y. 2010)...........................................................25, 27

*Funrise Canada (HK) Ltd. v. Zauder Bros., Inc.*,
   Civ. A. No. 1:99-cv-01519-ARK-RML, 1999 WL 1021810 (E.D.N.Y. July 2, 1999)..........30

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
   13 F. Supp. 2d 417 (S.D.N.Y. 1998)..............................................................23, 24

*Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.*,
   824 F. Supp. 2d 389 (E.D.N.Y. 2011) ...............................................................30

*Harrison/Erickson, Inc. v. Chicago Bulls Ltd. P'ship*,
   Civ. A. No. 1:91-cv-01585-PKL, 1991 WL 51118 (S.D.N.Y. Apr. 3, 1991).........................28

*Hologic, Inc. v. Senorx, Inc.*,
   No. C-08-00133, 2008 WL 1860035 (N.D. Cal. Apr. 25, 2008).......................................22, 23

*In re Application of Cellco P'ship*,
   663 F. Supp. 2d 363 (S.D.N.Y. 2009)................................................................16

*Lotus Dev. Corp. v. Paperback Software Int'l*,
   740 F. Supp. 2d 37 (D. Mass. 1990)..................................................................24

*Loveridge v. Pendleton Woolen Mills, Inc.*,
   788 F.2d 914 (2d Cir. 1986).............................................................................28

*National Football League v. PrimeTime 24 Joint Venture*,
   211 F.3d 10 (2d Cir. 2000) ("*NFL*")............................................................15, 17

*ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*,
   314 F.3d 62 (2d Cir. 2002)...............................................................................24

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010).....................................................................................5

*Shapiro v. Cadman Towers, Inc.*,
51 F.3d 328 (2d Cir. 1995)....................................................................................25

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ("*Sony*")......................................................................... *passim*

*Tiger Direct, Inc. v. Apple Computer, Inc.*,
Civ. A. No. 1:05-cv-21136-JAL, 2005 WL 1458046 (S.D. Fla. May 11, 2005)....................23

*Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*,
478 F. Supp. 2d 607 (S.D.N.Y. 2007) ("*Cablevision I*")...................................14, 19

*U.S. v. Am. Soc'y of Composers, Authors & Publishers*,
627 F.3d 64 (2d Cir. 2010) ("*ASCAP*") ...................................................................12

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*,
824 F. Supp. 2d 1003 (C.D. Cal. 2011) ...................................................................27

**STATUTES**

17 U.S.C. § 101................................................................................................7, 12, 13

47 U.S.C. § 151.......................................................................................................31

47 U.S.C. § 309(a) ..................................................................................................31

**OTHER AUTHORITIES**

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 .........................13

Redacted Public Filing

## INTRODUCTION

This case presents the question whether consumers can use Aereo's technology to exercise three basic, well-established rights:  (1) the right to use an antenna to receive over-the-air broadcast television, (2) the right to use a remote DVR to make a copy of a television program for their own use, and (3) the right to play the copy that they made back to themselves.[1] Broadcasters received a license to broadcast in exchange for the obligation to make over-the-air broadcasts available to the public.  The Supreme Court has confirmed the consumer's right to record over-the-air broadcasts for personal convenience.  *See Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 454-56 (1984) ("*Sony*").  The Second Circuit has held that providing remote equipment to consumers to engage in lawful recording, and to play back that recording to themselves, does not violate the Copyright Act.  *See Cartoon Network LP v. CSC Holdings, Inc.,* 536 F.3d 121, 139-40 (2d Cir. 2008) ("*Cablevision*").  In both of those cases, many of these same Plaintiffs sought to restrict consumers' right to use new technologies, lest such innovation disrupt their preferred business models.  In each case, the courts, however, rejected those attempts.  This Court should do the same.

At this stage, Plaintiffs are only asserting a public performance copyright claim and challenging only the consumer's right to watch "live" television using Aereo's remote DVR; therefore, the only relevant legal issue is whether Aereo enables consumers to access a performance "to the public" within the meaning of the Copyright Act.  The facts and the law demonstrate, emphatically, that it is not.  The Aereo consumer, by selecting a program and pressing "Watch":  (1) activates an individual Aereo antenna exclusively assigned to that consumer; (2) tunes that antenna to capture only the broadcast signal for the particular channel

---

[1] Aereo hereby incorporates by reference the content of its Initial Pre-Hearing Memorandum and to avoid repetition will not restate the analysis in its entirety in this brief.

that the consumer wants; (3) starts the DVR to record a separate and unique copy of the program accessible only to that consumer; and (4) enables transmission of that copy only to that consumer.[2]  *See* Declaration of Joseph Lipowski ("Lipowski Decl.") ¶¶ 50, 56; Declaration of Paul Horowitz ("Horowitz Decl.") Ex. 1 (Horowitz Expert Report ¶¶ 55, 79).  As a result, each consumer makes her own copy from her own antenna, and transmits it only to herself—whether using the "Watch Now" or "Record" mode.

These facts are not in dispute and preclude a finding that Aereo customers make "public" performances.  In its holding that transmissions from an RS-DVR do not constitute "public" performances, the *Cablevision* court analyzed at length the definition of a public performance (specifically, the "transmit clause") and reached two important conclusions of law directly applicable to the facts here.  First, where only one person is "capable of receiving" a particular performance, the performance is private, not public:

> Because each RS-DVR playback transmission is made to a single subscriber using a single unique copy produced by that subscriber, we conclude that such transmissions are not performances "to the public," and therefore do not infringe any exclusive right of public performance.

*Cablevision*, 536 F.3d at 139.  Second, even if other consumers use the system to view different, unique copies of the same underlying work, each transmission or performance is still private.  *Id.* at 135.  The transmit clause "speaks of people capable of receiving a particular 'transmission' or 'performance,' and not of the potential audience of a particular 'work.'"  *Id.*  The *Cablevision* court concluded that each communication that originates with a unique copy of a work constitutes a separate "transmission."  *Id.* at 136-38.  Applying *Cablevision*'s careful analysis of

---

[2]  A more detailed explanation of how the Aereo system works is found *infra* at pages 6-7, and in the accompanying Declarations of Aereo's President and CEO, Chaitanya Kanojia, Aereo's Chief Technology Officer, Joseph Lipowski, and the Expert Report of Paul Horowitz.

Redacted Public Filing

the transmit clause, consumers using Aereo's system make only private, not public,
performances. Just as in *Cablevision*, "the universe of people capable of receiving" the
transmission using the Aereo technology remains, at all times, "the single subscriber whose self-
made copy [was] used to create that transmission." *Id.* at 137.

Plaintiffs have already filed two briefs in this matter, yet they have failed to directly deal
with *Cablevision* or distinguish it from the facts here. Instead, they have largely ignored it.
Although Plaintiffs frequently quote and extensively highlight certain language of the transmit
clause, tellingly they never highlight the critical statutory language—"to the public"—that was
the focus of the Second Circuit's analysis in *Cablevision*. They certainly do not reconcile either
*Cablevision* or the transmit clause with the incontrovertible fact that the transmissions here—of a
unique copy made by a consumer back to that consumer—are exactly the same type of
transmissions as those in *Cablevision*.

Plaintiffs' arguments amount to nothing more than the repeated mantra that Aereo is
"retransmitting live TV." Repetition simply does not make it true. Plaintiffs' position is directly
contrary to fact and law.

- First, it is the consumer, not Aereo, who makes the transmission. The Aereo system
  responds automatically to user commands. *See* Declaration of Chaitanya Kanojia
  ("Kanojia Decl.") ¶ 29.

- Second, the Aereo system does not simultaneously "retransmit" the same broadcast signal
  to multiple people. In fact, each transmission created by a consumer using Aereo is
  unique. Using Aereo's system in "Watch Now" mode, the consumer creates a unique
  fixed copy of the broadcast signal that is played back only by and only to the consumer
  who recorded it. *See* Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶¶ 55, 79); Lipowski
  Decl. ¶ 56.

- Third, the consumer transmits to herself a recording, not a "live" signal. *See* Declaration
  of Yvonne W. Chan ("Chan Decl.") Ex. 1 (Kelly Dep. 103:8-17, 109:20-110:21);
  Lipowski Decl. ¶ 51; Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶ 57). The
  consumer can choose to begin watching within a short time after the start of the

Redacted Public Filing

recording, or hours later—at her convenience.  *See* Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶ 57); Kanojia Decl. ¶¶ 33-34.  The duration of the time-shift is irrelevant; in all cases the transmission comes from a fixed, recorded copy.

- Fourth, Plaintiffs' attempt to analogize Aereo's innovative technology to the "community antennas" of the 1960s is baseless.  A "community antenna" uses a single antenna to receive and ingest all over-the-air broadcasts simultaneously, then retransmits that same multi-channel signal in real time to potentially hundreds, often thousands, of users.  *See* Lipowski Decl. ¶ 64.  That is precisely the opposite of how Aereo operates.  An Aereo consumer uses her individual Aereo antenna to access and ingest one channel and the unique signal captured is available only to that consumer.  Lipowski Decl. ¶ 65.

- Fifth, it is critical to understand that the functionality that Plaintiffs challenge here is indistinguishable from the operation of *every* DVR, whether it be a TiVo, a set-top box DVR, or a remote DVR.  When a consumer uses a DVR to watch a "live" program, she is in fact watching a fixed copy from the DVR hard drive.  *See* Lipowski Decl. ¶ 7.  That is why the consumer can pause and rewind "live" programming whether using Aereo or a DVR located in her home.  *See id.*  And, just as with Aereo, the consumer can press "record" to save that entire DVR copy for later viewing.  *See* Kanojia Decl. ¶ 33.  In short, Aereo's "Watch Now" mode merely replicates how a home DVR user watches "live" TV.  *See* Kelly Decl. ¶ 42 (user can press "Record" in "Watch Now" mode to save an entire recording of a show, beginning from when the user pressed "Watch"); Kanojia Decl. ¶¶ 33, 34.[3]

On these bases alone, the requested injunction should be denied.

Plaintiffs also have failed to demonstrate any irreparable harm required for issuance of a preliminary injunction.  Plaintiffs acknowledge that they have known about Aereo and its business model since at least April 2011 (*see infra* Section IV.A), and in many cases referred the matter to their legal departments.  Yet they sent Aereo no cease and desist letters or objections of any kind until they filed this action just prior to Aereo's launch in March 2012.  *See* Kanojia

---

[3]  Moreover, the basic Aereo technology works the same in the "Watch Now" mode as in the "Record" mode.  Just as in the "Record" mode, in "Watch Now" the consumer first records a program on hard disk, and then plays that recording back from that disk.  Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶ 57).  The only potential difference is whether the length of the time-shift is as little as several seconds, or hours, days, or longer.  But, even that overstates the distinction and is only sometimes the case.  The consumer who presses "Record" can start watching the recording in progress; and a consumer who presses "Watch Now" can start watching the recording long after the program began.  Kanojia Decl. ¶ 34.  Thus, inasmuch as the "Record" mode results in private performances under *Cablevision*, which Plaintiffs appear to concede, the outcome for the "Watch Now" mode must be the same.

Redacted Public Filing

Decl. ¶ 19.  As a matter of equity, plaintiffs cannot sit idly by, raising not a single objection, and then file suit only when they anticipate (correctly) that it would most harm the defendant.

Plaintiffs' delay speaks volumes about the severity of the harm they belatedly alleged. Further, Plaintiffs' allegations of "harm" are entirely speculative.  It is hard to see how they can complain of harm from the fact that consumers might access television signals to which they are entitled.  Indeed, Plaintiffs can point to no actual or even threatened lost advertising revenue or lost "retransmission" revenue even though Aereo's business model and intentions have been known for well over a year.  Moreover, Plaintiffs cannot meet the requirement that the claimed harm must be *imminent*.  *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). Plaintiffs' irreparable harm arguments amount to the assertion that if there is copyright infringement, irreparable harm follows as a matter of course.  Even if they could show a likelihood of success on the merits here, that is not the law.  *See Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010).

Against the Plaintiffs' belated, speculative, and conclusory assertions of harm, Aereo would suffer devastating harm if an injunction were granted.  It would lose, among other things, the very substantial goodwill it has built with respect to its brand and its business, future business opportunities, the ability to attract new investments at a crucial stage of the company's development, competitive market position, and in all likelihood many of its highly-skilled engineering and software development employees.  The balance of harm clearly weighs in favor of Aereo.

The public interest is also strongly served by denial of Plaintiffs' effort to enjoin Aereo. If Plaintiffs were to succeed here, consumers will have lost the opportunity for a compelling new

Redacted Public Filing

technology to use to exercise their right to receive, record, and watch broadcast television at their convenience.

It is easy to understand why Plaintiffs oppose Aereo.  Plaintiffs believe they make more money when they can confine free broadcast television behind a paywall.  But Plaintiffs cannot claim legally cognizable, much less irreparable, harm merely because consumers might find sophisticated antennas and recording capability to be a more attractive and affordable alternative. And Plaintiffs neither articulate nor demonstrate any legal right that should trump the consumer's fundamental right to record over-the-air broadcasts, and to watch the programs they have recorded where they want and when they want, on the device of their own choosing. Plaintiffs' request for preliminary injunction must be denied.

## FACTS

The Aereo technology allows a consumer to remotely locate an antenna and DVR system. To use the Aereo system in "Watch Now" mode, the consumer logs on to the Aereo website from an Internet-enabled device and selects a broadcast program from the "Guide" section of the website.  Kanojia Decl. ¶ 30.  By doing this, she (1) activates an assigned Aereo antenna and tunes it to the station carrying that broadcast, (2) makes a unique copy of the program in question, which is stored on a hard drive, and (3) plays that unique copy back to herself.  *Id.* ¶¶ 31, 33; Lipowski Decl. ¶ 50-56.  In all respects, the system functions automatically, and only in response to the consumer's volition.  Kanojia Decl. ¶ 29.

As set forth in Aereo's supporting declarations, the following are the key facts concerning the Aereo system:

- The individual antenna elements within the Aereo system are tuned by individual consumers.  When an individual antenna element is not being used by a consumer, that antenna receives no broadcast signal.  Lipowski Decl. ¶¶ 14, 36; Declaration of David M.

Pozar ("Pozar Decl.") Ex. 1 (Pozar Expert Report ¶ 3a); Chan Decl. Ex. 4 (Volakis Dep. II. 201:21-23); Chan Decl. Ex. 1 (Kelly Dep. 76:12-21, 77:10-17).

- The signal generated from an individual antenna element tuned by a consumer (whether in "Record" or "Watch Now" mode) is used to record a copy of the program carried by that signal for only that individual consumer who tuned the antenna element.  From the moment a signal enters the Aereo system via the consumer's individual antenna, that signal is separately identified and identifiable, and is associated with only one possible recipient.  Lipowski Decl. ¶¶ 37, 47; Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶ 64 & Fig. 11, ¶ 81); Chan Decl. Ex. 1 (Kelly Dep. 134:14-137:13).

- The signal generated from an individual antenna element tuned by a consumer (whether in "Record" or "Watch Now" mode) is unique and may have variations in signal attributes different from the signals recorded from another antenna element, or, indeed, the signal may not be captured at all (e.g., if a bird flies in front of an antenna in one area of the system, the signal generated from that antenna element will be different from the signal generated from a different antenna that is tuned to the same show but located in a slightly different area).  Chan Decl. Ex. 1 (Kelly Dep. 78:15-24); Lipowski Decl. ¶ 37.

- The signal generated from an individual antenna element tuned by a consumer (whether in "Record" or "Watch Now" mode) is recorded and fixed to hard drive disk storage that is associated with and can be accessed only by the individual consumer who tuned that antenna, and this fixation takes place before any playback occurs.  Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶¶ 57, 64); Chan Decl. Ex. 1 (Kelly Dep. 109:23-110:12, 123:10-124:23, 134:20-135:1); Lipowski Decl. ¶¶ 50, 56.  These fixed copies (whether in "Record" or "Watch Now" mode) are unique copies that have their own individual attributes, glitches, and artifacts (Horowitz Ex. 1 (Horowitz Expert Report ¶ 55 & n.42); Chan Decl. Ex. 1 (Kelly Dep. 141:19-142:9); Lipowski Decl. ¶ 43.

- In "Watch Now" mode, the copy of the signal from a consumer's individual antenna element, recorded to hard drive disk storage and associated solely with that consumer, is maintained for as long as the consumer continues to watch the program.  Because it is fixed "for a period of more than transitory duration," 17 U.S.C. § 101, the consumer can pause and rewind her copy.  Horowitz Ex. 1 (Horowitz Expert Report ¶ 57); Chan Decl. Ex. 1 (Kelly Dep. 103:8-17, 123:16-124:21); Kelly Decl. ¶¶ 42-43; Lipowski Decl. ¶ 53.

- The playback of the consumer's copy in "Watch Now" mode is time-shifted.  In some instances, the time-shift is minor enough (between seven and twenty seconds) for consumers to consider the experience as watching "live television"; in other instances (such as where a consumer pauses or rewinds a program), the time-shift can be a matter of hours.  Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶ 80); Chan Decl. Ex. 1 (Kelly Dep. 51:14-19, 101:18-103:1); Kelly Decl. ¶ 52; Lipowski Decl. ¶ 51; Kanojia Decl. ¶¶ 33-34.

Redacted Public Filing

These facts establish that Aereo enables only private performances permissible under *Cablevision* and copyright law.  Further, these facts are not challenged by Plaintiffs' experts. Rather, Plaintiffs' proffered experts attempt to create factual issues where none exist.  Dr. Kelly, for example, essentially makes four points: (1) the Aereo system is complex; (2) there are shared resources in the Aereo system; (3) the "Watch Now" function is different from the "Record" function because, he argues, consumers watch the recorded programming sooner; and (4) geo-location can be defeated by a consumer determined to violate Aereo's terms of use and other protections.  *See* Kelly Decl. ¶¶ 3-6.  As a threshold matter, Plaintiffs never explain how any of these assertions support their public performance claim, and they do not.

However, in short response to these points:  First, it is of no legal consequence that the Aereo technology is complex—the remote DVR considered in *Cablevision* was complex as well (indeed, a home DVR is complex).  Second, although Aereo's system has certain shared resources (as did Cablevision's system), the unique, individual signal from antenna to consumer is never shared.  *See* Chan Decl. Ex. 1 (Kelly Dep. 134:14-137:13); Lipowski Decl. ¶¶ 37, 47. Third, as Dr. Kelly's testimony demonstrates, his position is that the "Watch Now" and "Record" functions differ only in that the consumer interface buttons are different, and the consumer using "Watch Now" (he claims) may watch the show sooner in "Watch Now" mode.[4]  Kelly Decl.

---

[4] Dr. Kelly is wrong that consumers using the "Watch Now" function always watch their programming sooner than in "Record" mode.  If a consumer pauses the program, the playback can be (often significantly) delayed.  *See* Kanojia Decl. ¶ 34.  In addition, there is not necessarily a difference in timing between a consumer watching in "Watch Now" mode, and a consumer watching in "Record Mode."  Using the "Record" function, a consumer can access her recorded copy as soon as the recording begins and can play that recording back roughly contemporaneously with the original broadcast.  *See id.*; *see also* Chan Decl. Ex. 1 (Kelly Dep. 98:19-99:2) ("So the way the Aereo system works is that if you are in the record mode and you have a recording in progress, you can also watch that recording by clicking the watch button before the recording is complete, correct?  A: Um, that's – that's my recollection, yes.").  Dr. Kelly also paused his recording while in "Watch Now" mode for a few minutes and resumed watching from the moment at which he paused.  Chan Decl. Ex. 1 (Kelly Dep. 102:14-103:1).  Thus, the logical conclusion is that one can watch programming sooner in "Record" mode.

Redacted Public Filing

¶¶ 57-58.  He confirms the more relevant points, though, that copies are recorded to disk before viewing by the consumer in both instances.[5]  *See* Chan Decl. Ex. 1 (Kelly Dep. 109:23-110:21, 123:16-124:21).  Finally, as to geo-location, Dr. Kelly notes that he was able to use the Aereo system in California.  Kelly Decl. ¶ 75.  That, however, is because the Court directed Aereo not to enforce geo-location limitations for the Plaintiffs' accounts.  Dr. Kelly does not dispute that the geo-location limitations effectively prevent consumers from accessing the system unless they are willing to repeatedly lie and violate Aereo's Terms of Use.[6]  *See* Chan Decl. Ex. 1 (Kelly Dep. 151:4-152:16).

Likewise, the opinions of Plaintiffs' antenna expert, Dr. Volakis, do not affect the public performance analysis.  None of his views, even as they have changed over time, contradict the undisputable facts set forth in the bullet points above.[7]

---

[5]  Dr. Kelly tries to characterize one of these copies as a "buffer" copy and the other as a "recording," but this is mere obfuscation.  The recording process is the same in both modes.  *See* Lipowski Decl. ¶ 50; Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶ 80).  As Dr. Kelly admits, a recording of an entire program made in "watch now" mode can be saved by pressing "record."  Kelly Decl. ¶ 42.

[6]  Again, Plaintiffs never explain the legal significance of this point.  For example, Slingbox, a technology that has been on the market since 2005, and is now incorporated into set-top boxes offered by the Dish satellite network, gives consumers the ability to access live and recorded programming outside of the home area on the Internet, and has never been challenged by Plaintiffs.  *See* Chan Decl. Ex. 9 (Franks Dep. 183:12-184:11); http://www.slingbox.com/go/home.

[7]  Moreover, Dr. Volakis's opinions in this case have become the ultimate moving target.  In his first expert report, he opined that individual Aereo antennas could not work and the array was necessary for them to work.  *See* Chan Decl. Ex. 5 (Volakis Report p. 2).  When it became clear that that opinion was demonstrably incorrect (as demonstrated by Dr. Pozar), at his deposition, Dr. Volakis abandoned his expert report and said that he made no conclusions about the Aereo antenna itself.  Chan Decl. Ex. 3 (Volakis I Dep. 48:13-17, 50:5-14).  The latest and current iteration of his opinion is that the individual Aereo antennas form a substructure that adds *some* received power, thus the entire antenna board acts as a "larger single antenna," similar to a "community" antenna, but he declines to opine whether the individual Aereo antenna will work on its own.  *See* Volakis Decl. ¶ 6; Chan Decl. Ex. 4 (Volakis II Dep. 205:3-8) ("Q: You have not offered an opinion in your declaration – A: Um-hm.  Q: -- on whether a single Aereo antenna is capable of receiving a signal on its own, correct?  A:  That is correct.").  As shown in the declarations of Dr. Pozar and Dr. Horowitz, what is left of Dr. Volakis's opinion is flatly wrong.  Pozar Decl. ¶¶ 20-32; Horowitz Decl. ¶¶ 24-50.  Aereo's antennas are fundamentally different from a community antenna.  Pozar Decl. ¶ 16; Horowitz Decl. ¶ 26.  They function individually, and are used and tuned individually by users to capture signals unique to the user.  Pozar Decl. ¶ 13; Horowitz Decl. ¶ 55.

Redacted Public Filing

Notwithstanding their statement in their initial brief that it is the "substance of the transmissions" that matter, "not the euphemism used to describe them," (Plaintiffs' Initial Pre-Hearing Memorandum ("Pl. Initial Br.") at 13), Plaintiffs, after conducting discovery, now are content to resort continually to the "retransmission" label rather than deal with the way the system actually works.  But facts are stubborn things, and in this case the facts demonstrate that Aereo's system does not result in any public performances.

## ARGUMENT

The sole copyright issue to be addressed by the Court is whether the consumer's playback of her unique copy in the Aereo "Watch Now" mode is a "public performance."[8]  The legal standard for determining whether a performance is public is set forth in *Cablevision*, and notably the parties do not disagree about that standard.  Plaintiffs acknowledged in their initial brief, as they must, that there is no "public performance" in

> the act of playback, from a unique, user-made copy, solely to the user who, . . . "made" that copy.  The [Second Circuit] stressed that the Cablevision system, "as designed, only makes transmissions to one subscriber using a copy made by that subscriber."  536 F.3d at 137.  It also noted that the "universe of people capable of receiving" the transmission remained at all times "the ***single subscriber*** whose ***self-made*** copy [was] used ***to create that*** transmission."  *Id.*

Pl. Initial Br. at 15-16 (emphases by Plaintiffs).  The facts show that when operated in "Watch Now" mode Aereo's system meets each and every element of this test:  a consumer uses the Aereo system to do (1) "the act of playback," (2) "from a unique, user-made copy," (3) "solely to the user who . . . 'made' that copy."  *Id*.  This is a paradigmatic "private" performance under *Cablevision*.  On that basis alone, Plaintiffs are unlikely to succeed on the merits of their claim.

---

[8]  As mentioned above, Plaintiffs expressly do not challenge Aereo's "Record" mode.

Redacted Public Filing

The copy that the consumer makes and plays back to herself is her unique copy, from her unique antenna.  *See* Lipowski Decl. ¶ 56; Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶¶ 56, 64 & Fig. 11); Chan Decl. Ex. 1 (Kelly Dep. 134:14-137:13).  The copy begins at the unique time that the consumer designates, and the data contained in the copy are unique and specific to what is captured by that consumer's individual antenna.  Lipowski ¶ 56.  When the consumer utilizes the "Watch Now" function, she transmits that single, unique copy to herself. *Id.*  The fact that other consumers, using the Aereo system, may be transmitting to themselves their own unique copies of the same underlying television program does not turn multiple quintessential private performances into a collective "public performance."  *See Cablevision*, 536 F.3d at 135-38.  As a result, Plaintiffs are not likely to—and indeed, cannot—succeed on their public performance claims.

In trying to somehow avoid the clear Second Circuit case law, Plaintiffs first focus on the undisputed question of whether the consumer's "Watch Now" playback is a "performance." Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Preliminary Injunction ("Br.") at 9-10.  But the relevant question under the Copyright Act is not whether the "Watch Now" playback is a "performance"—it is—but whether the performance is made "to the public."  The Second Circuit in *Cablevision* makes clear that it is not.  *See Cablevision*, 536 F.3d at 135-38.  Despite the clear import of *Cablevision*, Plaintiffs argue that the performance is "public" because other consumers can watch the same underlying program; but *Cablevision* holds that the relevant performance is the particular transmission, *not the underlying work.  See id.*  Using the Aereo technology, consumers clearly transmit individual, unique copies or transmissions only to themselves.  Finally, Plaintiffs argue (without any support) that *Cablevision*'s public performance analysis applies only to time-shifting technology.  There is no

11

such holding or suggestion in that case; but even if there was, Aereo *is* a time-shifting

technology.  Accordingly, and as set forth more fully below, none of Plaintiffs' attempts to avoid

*Cablevision* have any substance.  Applying the analysis in *Cablevision* makes very clear that

Aereo users make only private performances.

**I.**      **CONSUMER TRANSMISSIONS USING AEREO ARE NOT PUBLIC PERFORMANCES UNDER THE PLAIN LANGUAGE OF 17 U.S.C. § 101.**

The Second Circuit in *Cablevision* analyzed in depth the meaning of the transmit clause

and concluded that the phrase "to the public" does not apply to uses of systems that involve a

private transmission of a unique copy only to the recipient who made it—in other words, the

Aereo system.  Nevertheless, Plaintiffs' lead argument is that "Aereo's service contravenes

Plaintiffs' exclusive rights under the plain language of the transmit clause."  Br. at 8.  This entire

argument, however, is directed toward the uncontroversial question of whether the Aereo

consumer makes a performance, rather than the dispositive question of whether that performance

is *to the public*.  Completely ignoring the phrase "to the public"—the critical statutory language

for the analysis in this case—Plaintiffs instead highlight the phrases like "transmit or otherwise

communicate," and "any device or process."  Br. at 9.  But the parties do not disagree that

consumers use the Aereo "device" to "transmit or otherwise communicate" television

programming to themselves.  The only issue is whether those transmissions are "to the public."[9]

They are not.

_____

[9]  Plaintiffs' reliance on *U.S. v. Am. Soc'y of Composers, Authors & Publishers*, 627 F.3d 64, 72 (2d Cir. 2010) ("*ASCAP*") in this respect, is misplaced.  In that case, the Second Circuit considered the meaning of the transmit clause *only* to determine whether any performance was made when consumers downloaded songs onto their hard drives.  Because it found that no performances were made in the download process at all (neither publicly nor privately), the Court was never called on to analyze the meaning of the phrase "to the public."  *Id.* at 71-74.  The case is irrelevant.

Redacted Public Filing

Plaintiffs make the same error in their analysis of the legislative history, focusing on the fact that Congress intended the transmit clause to apply to "any sort of transmitting apparatus" and "techniques and systems not in use or even invented."  Br. at 10.  Of course, this is true. Congress intended the transmit clause to apply to all of these forms of transmissions—but only if those transmissions were "to the public."[10]

## II. AEREO CONSUMER TRANSMISSIONS ARE NOT PERFORMANCES "TO THE PUBLIC" UNDER SECOND CIRCUIT CASE LAW.

*Cablevision* is clear: a playback of a unique copy made by the consumer, only to herself, is not a performance "to the public."  *Cablevision*, 536 F.3d at 138.  This is what happens in the Aereo system.  Plaintiffs ignore the controlling Second Circuit law on this issue and instead rely on the factually and legally incorrect *ipse dixit* that Aereo "retransmits live TV," and the suggestion that Aereo's technology is nothing more than a ruse or a fiction.  As set forth in Aereo's submissions, its technology is very real.  It took great skill and creativity, as well as countless hours of hard work, for Aereo's engineers to conceive, develop, and implement innovative technology to enable consumers to remotely locate their antennas and DVRs and access television on portable (as well as in-home) devices.  Kanojia Decl. ¶ 48.  Aereo's intention has always been to model its technology on the principles espoused in *Cablevision*: that a company can provide remote equipment that enables a consumer to make unique copies of programming which she has the right to watch, and then play that unique copy back to herself at her convenience.

---

[10]  Indeed, as noted in the legislative history for the 1976 Copyright Act:  "Although any act by which the initial performance or display is transmitted, repeated, or made to recur would itself be a 'performance' or 'display' under the bill, it would not be actionable as an infringement unless it were done 'publicly,' as defined in section 101. Certain other performances and displays, in addition to those that are 'private,' are exempted or given qualified copyright control under Section 107 through 118."  H.R. Rep. No. 94-1476, at 63 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5677.

Redacted Public Filing

### A.   Consumer Transmissions Using Aereo's System Are of an Individual Copy to One Specific User.

The Second Circuit in *Cablevision* held that, in determining whether a performance is "to the public," the performance considered is not the original program carried in the over-the-air broadcast, but rather is the particular transmission at issue.  536 F.3d at 138.  Plaintiffs attempt to re-litigate that clear holding.  They assert that Aereo consumers utilizing the "Watch Now" function engage in "a quintessential public performance" because "using the 'Watch Now' service, multiple subscribers . . . can contemporaneously view the same television *programs*, in separate places, and at the same time as the original OTA broadcast."  Br. at 9-10 (emphasis added).  But this is the very argument the Second Circuit rejected, and it disagreed with the District Court's decision for finding otherwise:

> [The District Court] concluded that the RS-DVR playbacks constituted public performances because "Cablevision would transmit the *same program* to members of the public, who may receive the performance at different times, depending on whether they view the program in real time or at a later time as an RS-DVR playback."  *Cablevision I*, 478 F. Supp. 2d at 623 (emphasis added [in Second Circuit decision]).  In essence, the district court suggested that, in considering whether a transmission is "to the public," we consider not the potential audience of a particular transmission, but the potential audience of the underlying work (i.e., "the program") whose content is transmitted.

> We cannot reconcile the district court's approach with the language of the transmit clause.  *That clause speaks of people capable of receiving a particular "transmission" or "performance," and not of the potential audience of a particular "work."*  Indeed, such an approach would render the "to the public" language surplusage.

*Cablevision*, 536 F.3d at 135 (emphasis added).

The Second Circuit thus firmly established that, in determining whether a transmission constitutes a "public performance," the only two relevant issues are:  (1) the source of the transmission, and (2) the potential audience for that specific transmission.  In this case, the source of the transmission at issue is the copy that is recorded by the individual consumer on the

14

Aereo hard drive, and the potential audience of that transmission consists solely of that consumer.

### 1.       The Consumer Playback Is A Private Performance.

Plaintiffs' last argument attempts to distinguish this case from *Cablevision* based on an erroneous interpretation of *National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10 (2d Cir. 2000) ("*NFL*"), and asserts that a DVR copy does not "insulate" Aereo from the "live" nature of the "Watch Now" transmission.  Br. at 22-23.  Essentially, Plaintiffs try to lump together *their* public performance broadcasts with the private transmissions of Aereo users, and pretend that the DVR copying that enables those transmissions to occur does not exist at all. This argument has no basis in law or fact.  In *NFL*, the defendant captured copyrighted material from the United States and transmitted it to its satellite for retransmission to multiple subscribers (*i.e.*, the public) in Canada.  *Id.* at 11-12.  The Court held that because the defendant's transmission was an integral step in a process intended to result in a public performance, the defendant's uplink to the satellite was also a public performance.  *Id.* at 13.

Unlike in *NFL*, first, the process of using the Aereo system results in a transmission from the consumer's unique copy only to herself.  All content viewed by a consumer using the Aereo system is recorded content.  *See* Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶ 80).  In the "Watch Now" mode, the entire program can be—and often is—recorded entirely to disk.  *See* Lipowski Decl. ¶ 53; Kelly Decl. ¶ 42.  Each transmission is individual and unique, because each recording by the consumer is made using a unique signal from an individual antenna.  Lipowski ¶ 56; Horowitz Decl. Ex. 1 (Horowitz Expert Report ¶ 55 & n. 42).  Under *Cablevision* and *NFL*, the DVR recording could only be considered a "link" in a public performance if the end transmission were a public performance.  *See Cablevision*, 536 F.3d at 137; *NFL*, 211 F.3d at

15

13; *In re Application of Cellco P'ship*, 663 F. Supp. 2d 363, 373 (S.D.N.Y. 2009). Here, pursuant to *Cablevision*, the Aereo consumer's end transmission is clearly a private performance.

Second, the transmission of the consumer's DVR copy to herself is not simultaneous with the live broadcast, as demonstrated *supra* at page 7. Whether in "Record" or "Watch Now" mode, the final transmission is made by the consumer from her own unique DVR copy, and only to herself.

Finally, Plaintiffs cannot avoid that the Aereo consumer has the right to receive, copy, privately perform, and watch over-the-air television. That fundamental disconnect undermines virtually every argument in Plaintiffs' brief. As *Cablevision* makes clear, businesses like Aereo can provide a consumer with remote equipment to exercise her rights to receive, record, and transmit private copies of programming she is entitled to see.

### 2.     *Cablevision's* Public Performance Analysis Is Not Limited To Time-Shifting Technology.

In view of the clear legal principles and undisputable facts above which are dispositive of this matter, Plaintiffs make another play for avoiding *Cablevision*. They contend that *Cablevision's* analysis was limited to "time-shifted" performances, and that Aereo consumers do not time shift "live play." Br. at 20-21. Again, Plaintiffs are wrong on the law and on the facts.

To begin with, *Cablevision* in no way restricted its public performance analysis to cases involving time-shifting technology. In examining whether or not the performance at issue was "public," *Cablevision* never mentioned "time-shifting," and gave no weight to the length of the delay between recording and playback. Rather, the Second Circuit's decision rested solely on the source of the transmission and the nature of the potential audience of that particular transmission source:

16

> In sum, we find that the transmit clause directs us to identify the potential audience of a given transmission, i.e., the persons "capable of receiving" it, to determine whether that transmission is made "to the public."  Because each RS-DVR playback transmission is made to a single subscriber using a single unique copy produced by that subscriber, we conclude that such transmissions are not performances "to the public," and therefore do not infringe any exclusive right of public performance.

*Cablevision*, 536 F.3d at 139.[11]

Furthermore, the plain language of the Copyright Act forecloses Plaintiffs' argument as it makes clear that a "copy" exists when the work "is fixed" in a material object.  Whether that fixation occurs seconds or months before playback is irrelevant to its status as a fixed "copy."  The playback of a single copy to a single consumer, by the volition of that consumer, is a private performance, regardless of when the consumer starts that playback.  *Cablevision*, 536 F.3d at 138.

### 3.  Aereo "Time Shifts" Even in "Watch Now" Mode.

Further, even if Plaintiffs were correct that the Second Circuit somehow limited *Cablevision* to time-shifting technology, Plaintiffs' claims would still fail.  Aereo's technology is, in fact, a time-shifting technology, even when operated in "Watch Now" mode; it is designed to enable consumers to pause and rewind programming, which is, by definition, "time-shifting."  Indeed, in all instances the programming is delayed by between seven and twenty seconds, but if a consumer pauses or rewinds a program, it can be shifted by a substantial amount of time.  *See* Kanojia Decl. ¶ 34; Lipowski Decl. ¶ 51; Kelly Decl. ¶ 52; Chan Decl. Ex. 1 (Kelly Dep. 41:2-13, 101:18-103:1).

---

[11]  What is more, the test is the same, and has been applied consistently, in cases dealing with live transmissions as well as time-shifting technology.  As the Second Circuit noted in *Cablevision*, the decision in *NFL* was based not on the "live" nature of the transmission, but rather on the fact that the final transmission itself was "to the public." *Cablevision*, 536 F.3d at 137.  Thus the same test is applied irrespective of the timing of playback.

Redacted Public Filing

Of course, this is how all DVRs work, whether they are remote DVRs or set-top DVRs. Anyone watching a program "live" on a DVR is actually watching a time-shifted recording. That is what gives DVR "live" TV viewers the ability to pause, rewind, and then fast-forward through "live" recorded programming.  *See* Lipowski Decl. ¶ 7.  That personalized control over the "live" viewing experience is a fundamental purpose of DVR time-shifting technology.  Thus, even if Plaintiffs were right that the public performance analysis in *Cablevision* is limited in its application to "time-shifting" technologies, the *Cablevision* analysis would still apply in this case.

### B.    The Aereo System Does Not Function as a Community Antenna.

With their legal arguments collapsing around them, Plaintiffs attempt to manufacture factual issues about the functioning of the Aereo antennas.  The factual "disputes" urged by Plaintiffs' experts, however, are both irrelevant and unfounded.  For example, Plaintiffs advance an argument that Aereo's antennas operate as a "community antenna."  The Aereo system is not a "community antenna."  In a community antenna system, a single antenna ingests all of the broadcast television channels simultaneously.  *See* Pozar Decl. ¶ 15; Lipowski Decl. ¶¶ 64, 65. A cable from the antenna site carries all of the broadcast television channels received by the antenna, and this cable feeds each of the televisions connected to the antenna.  *See* Pozar Decl. ¶ 15.  There is one data stream for each channel, and any television connected to the antenna can be tuned to receive the same data stream for any available channel.  *See* Pozar Decl. ¶ 15; Horowitz Decl. ¶ 55.[12]  In those circumstances, multiple members of the public are accessing the exact same transmission of a performance—not just the same program.

_____

[12]  While Plaintiffs' expert Dr. Volakis analogizes the Aereo system to a single communal antenna on an apartment building roof (Volakis Decl. ¶ 6), it is notable that he does not go so far as to state that the Aereo system is a

Redacted Public Filing

Case 1:12-cv-01540-AJN   Document 76   Filed 05/29/12   Page 24 of 38

Aereo's system is fundamentally different.  In the Aereo system each member is allocated a single receiving antenna, television tuner, and signal path to their television or viewing device. *See* Lipowski Decl. ¶¶ 35, 38, 47.  The Aereo user's antenna is individually tuned to a single channel selected by the member.  *Id.* ¶¶ 35, 36, 65.  Unlike the community antenna, an individual Aereo antenna never ingests anything other than a signal for the single channel tuned by the user. *See id.*; Pozar Decl. ¶ 16.  The user has access only to a copy made from that signal; another user, tuning a different antenna, will access only a copy made from her antenna's own unique signal.  *See* Lipowski Decl. ¶¶ 43, 56.  The Aereo signal path for each user is entirely unique, and independent of other members.  *See* Pozar Decl. ¶ 16; Horowitz Decl. ¶ 20; Lipowski Decl. ¶ 47.  In light of these facts, Plaintiffs' attempt to label Aereo's system as a "community antenna" is plainly incorrect.

### C.  Aereo's Use of "Shared Resources" Is Irrelevant to "Public Performance."

Plaintiffs next highlight the "complexity" of the Aereo system and its "shared resources" and "program guide."  Br. at 12-13.  Again, Plaintiffs do not explain how any of this would distinguish Aereo from *Cablevision*'s public performance analysis—because it does not.  This same sort of "complexity" was present in *Cablevision*, but had no impact on the public performance analysis.  Indeed, home DVRs are complex.[13]

---

community antenna.  To the contrary, he testified that he agrees that the individual Aereo antennas are each connected to their own feed lines, (Chan Decl. Ex. 4 (Volakis Dep. II at 201:12-15)), that individual Aereo antennas are each connected to their own tuners, (*id.* at 201:16-20), and each are tuned independently (*id.* at 201:21-23).  He likewise agrees that at any given time one antenna on a board may be tuned to one channel and another antenna on the same board can be tuned to another channel.  *Id.* at 201:24-202:8.

[13]  While the "complexity" argument led the District Court in *Cablevision* to find that the defendant was a "service" (and was therefore liable for direct infringement), *see Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607, 618-20 (S.D.N.Y. 2007) ("*Cablevision I*"), that finding was reversed by the Second Circuit. The Second Circuit held that the characterization of whether Cablevision offered a "service" was irrelevant.  The Court instead focused on whether consumer volition caused the creation of a particular copy and any later transmission.  *Cablevision*, 536 F.3d at 131-32.  This Court should reject Plaintiffs' similar arguments.

19

Redacted Public Filing

**D.**    **A Finding That Consumers Use Aereo to Make Private Performances Would Not Exempt All Internet Streaming From Copyright Liability.**

Because the facts do not support Plaintiffs' original theories of the case, and the law forecloses any possibility that a consumer's use of Aereo's "Watch Now" function can constitute a public performance, Plaintiffs argue that the facts and law must be disregarded to avoid a "parade of horribles."  One of the consequences foretold by Plaintiffs is that if Aereo prevails, "it would render most of today's Internet webstreaming of audio or video works—acknowledged to be public performances—private simply because they involve buffer copying and individually addressed, one-to-one communications associated with end users."  Br. at 4.

As a threshold matter, Aereo consumers are streaming to themselves copies of over-the-air broadcasts to which they have a right.  This is not a case of consumers streaming "pirated" content.  The consumer has the clear right to the content at issue.

Plaintiffs' hyperbole also fails because the transitory "buffer" used in Internet streaming transmissions cannot be equated factually or legally with the copy created by the consumer in the Aereo "Watch Now" mode.  The "buffer" utilized in Internet webstreaming consists of a small slice of data that is used solely to facilitate the transmission, and is held only as long as necessary to transmit that small portion of the entire work.  These ephemeral buffers are inaccessible to the consumer, and are emptied and refilled with new data as each small portion of the transmission is complete.  By contrast, Aereo stores the data in a hard drive copy that is retained for an extended period of time, is intended to be controlled and managed by the Aereo user, and can be used to store a copy of the entire work.  That is a "fixed" "copy" under the Copyright Act.[14]  Importantly,

---

[14]  The differences between these two separate types of storage are addressed in detail in *Cablevision*, 536 F.3d at 127-30.  Plaintiffs' argument attempts to elevate semantic uses of the word "buffer" by technologists over the distinctions between fixed copies and transitory storage as a matter of copyright law.  In the computer world, a

20

the Second Circuit in *Cablevision* specifically addressed and dismissed the very concern that

Plaintiffs assert here:

> This holding, we must emphasize, does not generally permit
> content delivery networks to avoid *all* copyright liability by
> making copies of each item of content and associating one unique
> copy with each subscriber to the network, or by giving their
> subscribers the capacity to make their own individual copies.  We
> do not address whether such a network operator would be able to
> escape any other form of copyright liability, such as liability for
> unauthorized reproductions or liability for contributory
> infringement.

*Cablevision*, 536 F.3d at 139-40 (emphasis added).

Thus, *Cablevision* does not immunize an enterprise that enables private performances of

recorded content *to which the consumer has no independent right*, and neither would a decision

here for Aereo.  In this case, the consumer has the unchallenged rights to individually access

over-the-air broadcasts via an antenna, to copy those broadcasts for personal time-shifting use

under *Sony*, and to transmit that personal copy to herself under *Cablevision*.  Consequently, the

reception, copying, and private performance at issue in this case are entirely proper and lawful.

## III.   PLAINTIFFS' MOTION ALSO FAILS BECAUSE THEY CANNOT SHOW IRREPARABLE HARM AND ANY POTENTIAL HARM TO PLAINTIFFS IS OUTWEIGHED BY THE HARM TO AEREO IF AN INJUNCTION WERE ALLOWED.

Plaintiffs' motion also should be denied because they cannot show the irreparable harm

required to justify preliminary injunctive relief.  This is made clear by their long delay in filing

this suit alone.  Even were Plaintiffs' claimed harms not wholly undermined by their eleven-

month delay, they are too speculative and remote to support a preliminary injunction, and fully

reparable by monetary damages.

---

"buffer" refers generically to any storage function that enables the data to be processed or manipulated in some way, regardless of its duration.

Redacted Public Filing

### A.    Plaintiffs' Long Delay Undermines Any Claim of Irreparable Harm.

Plaintiffs' inordinate delay in seeking relief belies any claim of irreparable harm.  With one limited exception, each Plaintiff learned of both Aereo's existence (then called Bamboom) and the implementation of its Beta testing in April 2011.  *See, e.g.,* Chan Decl. Ex. 9 (Franks Dep. at 10:9-15, 20:23-21:14); Chan Decl. Ex. 15 (Davis Dep. at 98:15-20, 100:15-20); Chan Decl. Ex. 13 (Bond Dep. at 25:18-6); Chan Decl. Ex. 11 (Brennan Dep. at 9:7-11:14).  Each Plaintiff then engaged in months of internal and external dialogue while Aereo continued to move toward a full launch.  *See infra* p.23.  Plaintiffs not only did not file suit; they never even sent a cease and desist notice or other objection.  Indeed, some of the Plaintiffs and their parent companies *encouraged* Aereo with talks of investment and collaboration.  Kanojia Decl. ¶ 18.  Plaintiffs' long delay—and the timing of their lawsuits to impose maximum hardship on Aereo—is at odds with their claim that any harms they posit require a preliminary injunction.

To justify extraordinary preliminary relief, Plaintiffs must show that the irreparable harms they claim are "imminent"—that is, that they will occur before the Court can resolve the case on its merits.  The Second Circuit has characterized imminent irreparable harm as perhaps the "single most important prerequisite" for the issuance of a preliminary injunction.  *Citibank*, 756 F.2d at 275.  That Court has likewise recognized that delay in bringing suit demonstrates the lack of imminence—indeed, the Second Circuit has reversed preliminary injunctions based upon less delay than present here.  *See id.* at 276 (reversing grant of preliminary injunction because "[d]elay in seeking enforcement of [plaintiff's] rights . . . tends to indicate at least a reduced need for such drastic, speedy action").  Similarly, where a movant's knowledge of the potentially infringing activity arose during a pre-launch period, courts have found that plaintiffs cannot lie in wait until the launch of a party's product.  In *Hologic, Inc. v. Senorx, Inc.*, the court focused on

Redacted Public Filing

plaintiff's delay and the timing of filing suit as it related to defendant's launch, and found that the delay militated against preliminary relief.  No. C-08-00133, 2008 WL 1860035, at *19 (N.D. Cal. Apr. 25, 2008) (where "it appear[ed] that [Plaintiff] waited until it would be most harmful to [Defendant] to seek this injunction," "[s]uch a tactical delay, in addition to tending to weigh against a finding of irreparable harm to [Plaintiff], also provides support that [Defendant] would suffer a greater harm by an injunction than [Plaintiff] would suffer should the requested injunction be denied"); *see also Tiger Direct, Inc. v. Apple Computer, Inc.*, Civ. A. No. 1:05-cv-21136-JAL, 2005 WL 1458046, at *22-23  (S.D. Fla. May 11, 2005).

In this case Plaintiffs' delay is undisputed.  Plaintiffs, individually and collectively, engaged in numerous internal and external discussions about Aereo following Aereo's initial press releases in April 2011.  *See* Chan Decl. Ex. 16 (Davis Dep. Exs. 9-18); Chan Decl. Ex. 14 (Bond Dep. Exs. 3-11); Chan Decl. Ex. 10 (Franks Dep. Exs. 2-4, 7); Chan Decl. Ex. 12 (Brennan Dep. Exs. 2, 3, 6, 8, 12, 17).  Several Plaintiffs engaged in extensive discussions *with* Aereo, in which they learned about the Aereo system and its current operational status.  Chan Decl. Ex. 11 (Brennan Dep. at 9:24-19:3); *id.* Ex. 17 (Dalvi Dep. at 118:5-120:21); Kanojia Decl. ¶ 18.  Apparently, Plaintiffs only determined that Aereo was a threat to their business *after* Aereo received an additional round of capital investment in February 2012.  *See, e.g.*, Chan Decl. Ex. 9 (Franks Dep. at 46:12-48:19).  Neither Aereo's technology nor its business plan had changed as of February 14, 2012.  All that changed was Plaintiffs' fervor to suppress a well-funded enterprise.  The desire to suppress another's business, however, is not a viable basis to impose a preliminary injunction.  *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 420 (S.D.N.Y. 1998) (plaintiff's several month delay "is consistent with the hypothesis that [plaintiff]

Redacted Public Filing

is concerned less with the loss of control over the Saporiti Italia mark and more with the suppression of [defendant] as a potential competitor").

Plaintiffs offer no authority granting preliminary injunctive relief after similar delay, and the cases they do cite are readily distinguishable.  For example, *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002), merely found that a trademark plaintiff responding to a laches affirmative defense need not sue immediately pursuant to the *trademark* doctrine of "progressive encroachment."  No such doctrine exists in copyright law.  Nor does the Copyright Act or common law copyright jurisprudence recognize a plaintiff's right to lie in wait for nearly a year.  *Lotus Development Corp. v. Paperback Software International* simply denied a laches affirmative defense where a copyright plaintiff required a significant investment of time to evaluate whether the defendant's software code was infringing.  740 F. Supp. 37, 82-83 (D. Mass. 1990).  According to Plaintiffs here, however, Plaintiffs believed Aereo's commercial activities were clearly infringing, and they have been aware of those activities since as early as May 2011.  *See, e.g.*, Chan Decl. Ex. 9 (Franks Dep. at 20:23-21:14).

Plaintiffs could have moved to enjoin Aereo in April 2011 when Aereo released its first public statements about the then-operational platform, and launched its website, or in June 2011 after executives from Fox and NBC engaged in extensive discussions with Mr. Kanojia and others from Aereo about the platform, the technology, and Aereo's business plan.  Kanojia Decl. ¶ 18; Chan Decl. Ex. 11 (Brennan Dep. at 9:24-19:3); *id.* Ex. 17 (Dalvi Dep. at 118:5-120:21).  If it is indeed Plaintiffs' practice generally to aggressively and immediately pursue acts of infringement, they failed to do so here.  *Id.* Ex. 11 (Brennan Dep. at 188:8-17); *id.* Ex. 15 (Davis Dep. at 169:11-19).

24

**B.**     **Plaintiffs Have Failed to Identify Any Irreparable Harm.**

It is not surprising, given Plaintiffs' delay, that the harms they claim are entirely

speculative and remote.  Plaintiffs assert three purported harms caused by Aereo: (1) loss of

advertising revenue; (2) disruption of the market for Plaintiffs' programming; and

(3) competition to Internet streaming ventures controlled by Plaintiffs.  Br. at 28-31.  Plaintiffs

concede that none of these postulated harms has actually occurred nor have they adduced any

evidence that they are imminent.  They have shown no loss of advertising revenues, no loss of

retransmission revenue and no harm to any internet ventures.

It is settled law in this Circuit that in order to establish irreparable harm, Plaintiffs "must

demonstrate an injury that is neither remote nor speculative, but actual and imminent."  *Shapiro*

*v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (internal quotation marks and citation

omitted); *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 164 (S.D.N.Y. 2010).  Plaintiffs here

have offered nothing but pure speculation about the future.  *See, e.g.,* Chan Decl. Ex. 13 (Bond

Dep. at 107:6-18).

**1.**     **Any Loss of Advertising Revenue Is Purely Speculative.**

Despite having the ability to track and compare changes in advertising revenue over time,

Plaintiffs cannot identify any real impact that Aereo has had, or will have, on Plaintiffs'

advertising revenue.  Chan Decl. Ex. 9 (Franks Dep. at 102:19-23); *id.* Ex. 11 (Brennan Dep. at

55:20-56:13); *id.* Ex. 15 (Davis Dep. at 74:19-20, 76:16-77:9).  Plaintiffs point to no lost revenue

now.  And, while Plaintiffs assert without support that advertisers will negotiate lower

advertising rates because of Aereo's existence as an unmetered source for television, Plaintiffs

admit that they have faced the same situation with regard to DVR functionality, and still

Redacted Public Filing

successfully negotiated advertising deals.  *Id.* Ex. 13 (Bond Dep. at 154:20-155:20); *id.* Ex. 9

(Franks Dep. at 116:3-17).

Plaintiffs also admit that viewership over the Internet and on mobile devices can be and is

tracked.  *Id.* Ex. 17 (Dalvi Dep. at 100:14-25).  NBC's fact witness Salil Dalvi testified that

Nielsen offers a product that tracks mobile viewership of live television.  *Id.* (Dalvi Dep. at

102:13-103:10).  The fact that                     REDACTED

                                                                              further undermines their

argument that Nielsen's supposed failure to track viewership on Aereo constitutes irreparable

harm.  *Id.* (Dalvi Dep. at 101:6-9).  It is also worth noting that Aereo is willing to work with

Nielsen.  Kanojia Decl. ¶ 39.

### 2.   <u>Any Claimed Disruption of the Market for Plaintiffs' Programming Is Equally Remote and Speculative.</u>

Plaintiffs' claimed disruption to the market for their programming is also remote and

speculative, and belied by Plaintiffs' admissions that they have hardly addressed Aereo with their

licensees—if at all.  *See, e.g.,* Chan Decl. Ex. 9 (Franks Dep. at 83:2-85:25); *id.* Ex. 11 (Brennan

Dep. at 76:18-77:13); *id.* Ex. 15 (Davis Dep. at 157:12-158:5).  And contrary to their arguments,

Plaintiffs concede that the placement of their individual content alongside that of any other

individual Plaintiff is not itself harmful or disruptive.  *Id.* Ex. 9 (Franks Dep. at 64:19-65:8); *id.*

Ex. 11 (Brennan Dep. at 33:16-34:7).

### 3.   <u>Plaintiffs Can Point to No Harm to their Entrance into the Mobile Streaming Television Market.</u>

Plaintiffs also can point to no harm to their entrance into the mobile streaming television

market.  Only two Plaintiffs claim to have even considered entering into the market for mobile

broadcast television.  *See* Chan Decl. Ex. 14 (Bond Dep. Ex. 16); *id.* Ex. 12 (Brennan Dep. Ex.

Redacted Public Filing

17).  Any claimed "harm" to the "Dyle" product being developed by Plaintiffs NBC and Fox is,

at best, entirely speculative and remote.  Not only has Aereo not "killed" Dyle, Plaintiffs have no

factual basis for claiming that Aereo specifically has impeded the *development* of Dyle.  *Id.* Ex.

17 (Dalvi Dep. at 153:13-162:11).  In fact, despite over two years of development—a process

beginning long before Aereo became public or operational—Dyle is not, and has never been, a

functioning product.  *Id.* at 9:17-22.  Although Plaintiffs claim that Dyle is set for public

availability            REDACTED            (*id.* at 57:7-11), there is still no commercially

available equipment that can utilize the Dyle product and            REDACTED

                                           *Id.* at 21:16-22:3, 97:19-23.  Plaintiffs are

simply using an as-yet untested and unavailable product to argue that Aereo is preventing

Plaintiffs' own entrance into the mobile television market.  *Id.* at 58:17-61:3; *id.* Ex. 14 (Bond

Dep. Ex. 16 at DNC0001528).

  To the extent Plaintiffs argue that Aereo is preventing some other as-yet-unknown entry

by Plaintiffs' into the mobile television market, or disrupting the current market for broadcast

television, such purported harm is by definition speculative.  Plaintiffs can offer no evidence that

Aereo is a "sub-optimal customer experience" likely to contribute to a "[l]oss of customer

goodwill and damage to consumer perceptions about the video on demand market."  *Warner*

*Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1014 (C.D. Cal. 2011).

### 4. <u>Any Potential Harm Is Purely Economic.</u>

  Finally, even if the harms claimed by Plaintiffs were not entirely speculative, they can be

remedied by monetary damages, making a preliminary injunction an unnecessary and drastic

remedy at this stage.  *City of Newburgh*, 690 F. Supp. 2d at 164 ("To be irreparable, the injury

must be one that cannot be remedied by monetary damages.") (internal quotations and citation

Redacted Public Filing

omitted); *see also Harrison/Erickson, Inc. v. Chi. Bulls Ltd. P'ship,* Civ. A. No. 1:91-cv-01585-PKL, 1991 WL 51118, at *7 (S.D.N.Y. Apr. 3, 1991) ("in order to be deemed 'irreparable,' so as to warrant the granting of injunctive relief, the harm alleged by the movant 'must be one requiring a remedy of more than mere monetary damages") (citations omitted).  Indeed, one Plaintiff has testified that the *only* potential present harms are financial in nature.  Chan Decl. Ex. 15 (Davis Dep. at 158:11-25).  Plaintiffs' argument that Aereo will diminish Plaintiffs' advertising revenue is purely an economic harm argument.  *See Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 917-18 (2d Cir. 1986) (damage resulting from lost profits is compensable through monetary award).

### C.    Plaintiffs' Efforts to Rely on Federal Legislation Not at Issue Fail To Justify Injunctive Relief Here.

Unable to point to any specific and irreparable harm, Plaintiffs claim that allowing Aereo to exist pending a decision on the merits in this case would generally dishonor various statutory schemes not at issue in this case.  Without even attempting to argue that those statutory schemes apply to Aereo, Plaintiffs ask this Court to anticipate congressional action and presume liability as to Aereo because Plaintiffs have successfully lobbied for statutory licensing schemes in other markets.  As is clear from the three discrete acts of Congress related to Plaintiffs' licensing of their broadcast content, if Congress wishes to act in this area, it knows how to do so.  Particularly in cases involving novel application of technological advancements, courts should not expand the Copyright Act where Congress has not acted.  As Justice Stevens stated in *Sony*,

> The judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme.  Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials.  Congress has the constitutional authority and the institutional ability to

Redacted Public Filing

> accommodate fully the varied permutations of competing interests
> that are inevitably implicated in such new technology.

464 U.S. at 431 (citations omitted).

## IV.   THE BALANCE OF HARDSHIPS TIPS IN FAVOR OF AEREO.

While Plaintiffs cannot demonstrate imminent irreparable harm, Aereo would be severely crippled by an injunction. *See Buffalo Forge Co. v. Ampco–Pittsburgh Corp.,* 638 F.2d 568, 569 (2d Cir. 1981) ("the movant must show that the harm which he would suffer from the denial of his motion is 'decidedly' greater than the harm his opponent would suffer if the motion was granted"). Here, Aereo stands to lose its ability to operate should the Court grant Plaintiffs' motion. *See* Kanojia Decl. ¶¶ 52-56. Aereo has spent well over a year and its employees have spent thousands of hours of extraordinary effort and innovation to develop and implement Aereo's technology and business plan. *Id.* ¶ 48. It has built infrastructure with millions of dollars of investment in equipment, leases, and, most importantly, people. *Id.* It has marketed its products and in doing so has generated an enormous amount of brand recognition and goodwill. *Id.* ¶ 49. Indeed, there were hundreds of articles about Aereo after it launched, including articles by many very well-known media outlets, and a reference to Aereo on the front page of The New York Times. *Id.* ¶ 27 & Ex. 4. In technology and television circles and within New York, Aereo became well-known overnight and achieved the kind of brand recognition money cannot buy. *Id.* ¶ 27. It has allowed users to experience Aereo and those users have in turn touted the product. *Id.* ¶ 49. The goodwill built as a result of Aereo's extensive marketing campaign and careful roll-out of its business is entirely dependent upon users actually being able to access Aereo. *Id.* ¶ 52. Without that, Aereo's substantial investments in technology and infrastructure are rendered useless. Even were Aereo to ultimately succeed on the merits and an injunction were to be lifted, the negative impact on *potential* Aereo customers would be enormous. *Id.*

29

Redacted Public Filing

Aereo's existing customers may lose confidence in the product during the period of injunction and cancel their memberships, while prospective customers will never have an opportunity to experience Aereo until after any publicity from the initial launch has dissipated.  *Id.* ¶¶ 52, 53.

Plaintiffs make no effort to address the specific hardships that they will face, rather resting on the false argument that the "harm" they face is unquestionably "irreparable."  Br. at 34.  As discussed above, any harm alleged by Plaintiffs is not irreparable; it is speculative, remote, or—at best—remediable by monetary damages.  Aereo, on the other hand, has expended considerable resources, attracted highly talented engineers and software developers, and generated extraordinary customer goodwill and market interest for such a young company, which will be lost if Plaintiffs' injunction is successful.  *Funrise Canada (HK) Ltd. v. Zauder Bros., Inc.*, Civ. A. No. 1:99-cv-01519-ARK-RML, 1999 WL 1021810, at *10 (E.D.N.Y. July 2, 1999) (non-moving party's loss of substantial investments and customer goodwill found to decidedly outweigh moving party's loss of prospective business).  Moreover, Aereo is limited to a single market, and Aereo has had no actual impact on Plaintiffs' means of revenue generation.  Chan Decl. Ex. 9 (Franks Dep. at 83:2-85:25); *id.* Ex. 11 (Brennan Dep. at 76:18-77:13); *id.* Ex. 15 (Davis Dep. at 157:12-158:5).  Where the hardship faced by one party is nonexistent or *de minimis*, there is a strong likelihood that the balance must tip in favor of the more greatly harmed party.  *See, e.g., Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 419 (E.D.N.Y. 2011) (where plaintiff failed to demonstrate any lost sales and defendant had invested a significant amount of money into its business relationships and product "the balance of hardships [did] not tip decidedly in plaintiff's favor").

Redacted Public Filing

## V.    AN INJUNCTION IS NOT IN THE PUBLIC INTEREST.

Congress has expressed a clear public policy "to make [the broadcast airwaves] available, so far as possible, to all the people of the United States."  47 U.S.C. § 151; *see also Sony*, 464 U.S. at 425 (affirming the District Court's decision and acknowledging that there is a "public interest in increasing access to television programming, an interest that 'is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves.'") (citation omitted).  Aereo furthers the goals expressed by Congress and the Supreme Court.  Plaintiffs' attempt to stifle Aereo's lawful behavior—and Aereo's users lawful access to over-the-air broadcast television—is antithetical to congressional intent and decidedly against the public interest consumer convenience and access to broadcast network television. *See* 47 U.S.C. §§ 151, 309(a).  Aereo furthers the policies enumerated by Congress and provides a lawful solution to practical problems inherent in consumer access to over-the-air broadcasting in New York City.  For these reasons, an injunction should be denied.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion for a preliminary injunction.

31

Dated: May 19, 2012

Respectfully submitted,

AEREO, INC.

By its attorneys,

John C. Englander (admitted *pro hac vice*)
R. David Hosp  (DH 3344)
Mark S. Puzella (admitted *pro hac vice*)
Yvonne W. Chan (admitted *pro hac vice*)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
617.570.1000 (tel.)
617.523.1231 (fax)
jenglander@goodwinprocter.com
rhosp@goodwinprocter.com
mpuzella@goodwinprocter.com
ychan@goodwinprocter.com

Seth Greenstein (admitted *pro hac vice*)
CONSTANTINE | CANNON, LLP
One Franklin Square
1301 K Street, NW, Suite 1050 East
Washington, DC 20005
202.204.3514 (tel.)
202.204.3500 (fax.)
sgreenstein@constantinecannon.com

Michael S. Elkin
Thomas Patrick Lane
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
212.294.6700 (tel)
212.294.4700 (fax)
melkin@winston.com
tlane@winston.com

Jennifer A. Golinveaux (admitted *pro hac vice*)
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111
415.591.1000 (tel)
415.591.1400 (fax)
jgolinveaux@winston.com

32

Redacted Public Filing

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document will be sent electronically to all counsel of record on May 19, 2012.

_____

R. David Hosp

33