UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

AMERICAN BROADCASTING COMPANIES, INC.,           :
DISNEY ENTERPRISES, INC., CBS BROADCASTING       :
INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA,      :
LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK         :
TELEVISION, LLC, TELEMUNDO NETWORK GROUP         :
LLC and WNJU-TV BROADCASTING LLC,                :
                                                 :
          Plaintiffs,                            :
                                                 :
          v.                                     :
                                                 :
AEREO, INC.,                                     :
                                                 :
          Defendant.                             :
----------------------------------------------------------------------X

12 Civ. 1540 (AJN)

Bruce P. Keller
(bpkeller@debevoise.com)
Jeffrey P. Cunard
(jpcunard@debevoise.com)
Michael R. Potenza
(mpotenza@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for ABC Plaintiffs*

----------------------------------------------------------------------X

WNET, THIRTEEN, FOX TELEVISION STATIONS, INC.,   :
TWENTIETH CENTURY FOX FILM CORPORATION,          :
WPIX, INC., UNIVISION TELEVISION GROUP, INC.,    :
THE UNIVISION NETWORK LIMITED PARTNERSHIP        :
and PUBLIC BROADCASTING SERVICE,                 :
                                                 :
          Plaintiffs,                            :
                                                 :
          v.                                     :
                                                 :
AEREO, INC. f/k/a BAMBOOM LABS, INC.,            :
                                                 :
          Defendant.                             :
----------------------------------------------------------------------X

12 Civ. 1543 (AJN)

Steven B. Fabrizio
(sfabrizio@jenner.com)
Steven R. Englund
(senglund@jenner.com)
Scott B. Wilkens
(swilkens@jenner.com)
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001
(202) 639-6000

*Attorneys for WNET Plaintiffs*

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFFS' JOINT MOTION
FOR A PRELIMINARY INJUNCTION**

**Redacted Public Version**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ..............................................................................................................5

I.  Aereo's Public Performances Are Not Protected By Consumers' Reception Of Broadcast Television Or Excused By *Sony* Or *Cablevision.* ................................5

  A.  Nothing Authorizes Aereo To Retransmit Copyrighted Works Embedded In OTA Broadcast Signals. ...............................................................5

  B.  *Sony* And *Cablevision* Do Not Help Aereo Because Neither Involved Retransmission In A Medium Different From That Of Reception. ........................8

  C.  *Cablevision* Does Not Provide A Safe Harbor For Aereo's Retransmission Service...............................................................................10

    1.  Aereo Provides An Internet Retransmission Service That Emanates From The Original Broadcast Signal. ...................................10

    2.  Aereo Makes Performances "To The Public." ...........................15

    3.  Aereo's Interpretation Would Lead To Absurd Results. .........................16

II.  Plaintiffs Have Demonstrated Irreparable Harm. .........................................18

CONCLUSION.........................................................................................................25

**Redacted Public Version**

## **TABLE OF AUTHORITIES**

**CASES**

*Cartoon Network LP v. CSC Holdings, Inc.,*
 536 F.3d 121 (2d Cir. 2008)..................................................................*passim*

*CBS Broad., Inc. v. FilmOn.com, Inc.,*
 No. 10-cv-07532 (S.D.N.Y. Nov. 22, 2010) ...........................................18

*Fortnightly Corp. v. United Artists Television,*
 392 U.S. 390 (1968)....................................................................................6

*Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.,*
 No. 02 Civ. 0861, 2002 WL 1543817 (S.D.N.Y. July 12, 2002) ............22

*Infinity Broad. Corp. v. Kirkwood,*
 150 F.3d 104 (2d Cir. 1998)........................................................................6

*N.Y. Times Co. v. Tasini,*
 533 U.S. 483 (2001)..................................................................................15

*Nat'l Football League v. PrimeTime 24 Joint Venture,*
 211 F.3d 10 (2d Cir. 2000)..............................................................11, 13, 14

*Rex Medical L.P. v. Angiotech Pharm. (US), Inc.,*
 754 F. Supp. 2d 616 (S.D.N.Y. 2010) ....................................................18

*Salinger v. Colting,*
 607 F.3d 68 (2d Cir. 2010)........................................................................21

*Shapiro v. Cadman Towers, Inc.,*
 51 F.3d 328 (2d Cir. 1995)........................................................................19

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
 464 U.S. 417 (1984)............................................................................*passim*

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.,*
 415 U.S. 394 (1974)................................................................................6, 7

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
 60 F.3d 27 (2d Cir. 1995)..........................................................................18

*WPIX, Inc. v. ivi, Inc.,*
 765 F. Supp. 2d 594 (S.D.N.Y. 2011)..........................................9, 18, 21, 23

**Redacted Public Version**

STATUTES

17 U.S.C. § 101 ...................................................................................................3, 16

17 U.S.C. § 111 ...................................................................................................5, 11

17 U.S.C. § 114 ...................................................................................................16

17 U.S.C. § 122 ...................................................................................................5

47 U.S.C. § 325 ...................................................................................................6

47 U.S.C. § 338 ...................................................................................................6

Cable Television Consumer Protection and Competition Act of 1992...........................9

Communications Act of 1934 ...................................................................................1

Satellite Home Viewer Act of 1988..........................................................................9

Satellite Home Viewer Improvement Act of 1999 .......................................................9

OTHER AUTHORITIES

*In re Implementation of the Cable Television Consumer Prot. & Competition Act of 1992*,
    Report and Order, 8 FCC Rcd. 2965, 3004-05 (1993)...............................................5

PAUL GOLDSTEIN, 2 GOLDSTEIN ON COPYRIGHT § 7.7.2 (3d ed. 2012 supp.)................................17

H.R. REP. NO. 94-1476 (1976)...................................................................................11, 13

S. REP. NO. 102-92 (1992) .......................................................................................5

11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL
    PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995) .................................................19

iii

**Redacted Public Version**

## PRELIMINARY STATEMENT

Aereo's defenses require the Court to disregard (i) the plain language of the Copyright Act of 1976 (the "Copyright Act"), including its definitions of "publicly perform" and "transmit," (ii) multiple, clear statements by Congress that unauthorized retransmissions of over-the-air ("OTA") broadcasts are prohibited and (iii) the Second Circuit's express limitation of *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), to its specific facts and its caution against broad applications of *Cablevision*'s holding. Moreover, although Aereo now tells the Court that its "Watch Now" service is really a time-shifting DVR service – with just a shorter delay – it tells potential paying customers that using "Watch Now" is the same as watching "live" television, only "no cable required."

Aereo invites the Court to make bad law. Copyright cases should be decided on logical readings of the Copyright Act and prior cases, as well as in accordance with congressional intent and common sense. Aereo's approach is the opposite of all that. Stripped of its technological artifice, Aereo's service differs little from the infringing Internet streaming services enjoined in *ivi*, *iCraveTV*, *WTV Sys.*, and *FilmOn*. Pls. 3/21/12 Br. 9. Aereo tries to serve the same market as authorized services, such as cable and satellite, that pay for the right to retransmit OTA broadcast content. Aereo is a real-time Internet-streaming service that relies on the unauthorized public performance of Plaintiffs' copyrighted works to make money. That is infringement.

Aereo's arguments require a dramatic extension of the fact-specific holding of *Cablevision*. They also rely on legal irrelevancies, including the Communications Act of 1934 (the "Communications Act") and *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ("*Sony*"), in an effort to shift the emphasis from its commercial retransmission service to

**Redacted Public Version**

a consumer's supposed "right" to "receive over-the-air broadcast television," Aereo 5/19/12 Br.

1.  That is a diversion for the following reasons.

*First*, Aereo's service bears no resemblance to the receipt of broadcast signals by

consumers, at home, on their television sets.  Aereo does not make it easier for users to "access,"

Aereo 5/19/12 Br. 21, broadcast *signals* at all.  Instead, Aereo captures the signals and then

processes the embedded copyrighted programming into a different medium so it can be streamed

to subscribers over the Internet, a distribution channel and market distinct from OTA

broadcasting.  Nothing in the Communications Act, *Sony* or even *Cablevision* speaks to any right

to receive, let alone retransmit, copyrighted broadcast television programming over the Internet,

but the Copyright Act does.  It places contemporaneous Internet retransmission of OTA

television broadcasts within the exclusive rights of the owners of the copyrights in the

retransmitted programs; not the broadcast public and certainly not Aereo.  Multiple cases hold

exactly that.  No case is to the contrary.  *See* Pls. 5/1/12 Br. 13 n.9, 16; Pls. 3/21/12 Br. 9.

*Second*, both *Sony* and *Cablevision* involved recording television programs from

authorized sources, transmitted or retransmitted over an authorized medium, for later viewing

over that same medium (television set or through a cable television set-top box).  The viewers in

those cases "consumed" the programming in exactly the same way they consumed the original

broadcast, in home, on televisions, only later in time.  That is why the *Sony* and *Cablevision*

courts viewed the impact of time-shifting as limited.

Aereo's service is different, due to both the display medium and the harm caused by the

service.  Aereo's service is designed to permit viewing on any Internet-connected device,

principally because Aereo wants to exploit the out-of-home viewing market to provide a

different viewing experience.  Potenza Decl. Ex. 16 (Dec. 26, 2011 Aereo E-mail (noting it

2

**Redacted Public Version**

would be "pretty sweet to be a subscriber to the only platform that can deliver the superbowl live to a train, plane or car")).  Aereo's service directly undermines Plaintiffs' rights to decide when and how to disseminate their copyrighted programs over the Internet and creates, in Aereo's own words, significant market disruption in the process.  Pls. 5/1/12 Br. 1.  *Cablevision* does not immunize such conduct.

**Third**, this background leads the analysis back to the central point Plaintiffs have made from the outset.  Potenza Suppl. Decl. Ex. 1 (3/13/12 Hr'g Tr. 6:11-21).  Absent an extension of *Cablevision* from its specific facts to something it simply did not address – *i.e.*, retransmission of live, OTA broadcasts over the Internet – Aereo is engaged in what is, in every common-sense meaning of the Copyright Act, a public performance of Plaintiffs' works.  17 U.S.C. § 101 (2006).  The pivotal question on this motion therefore is whether running Plaintiffs' OTA broadcasts through Aereo's streaming servers, resulting in a delay of only seconds, is simply the latest "device or process" by which Plaintiffs' programs can be sent to the public.

The context and specific facts of *Cablevision* do not excuse Aereo from public performance liability.  The Second Circuit concluded that the recordings in *Cablevision* were user-made for time-shifting purposes.[1]  It viewed those recordings, each of an entire program, as a "unique," fixed copy, volitionally made by the subscriber, and the playback of that program – at a later time chosen by the subscriber – distinct from the original broadcast precisely because it was time-shifted.  The copy was deemed the source of the transmission, in both a temporal and

---

[1]   The Second Circuit did not use the literal words "time-shifting," but repeatedly described the case that way.  *Cablevision*, 536 F.3d at 123 (consumers' use of "digital video recorders ('DVRs') instead of video-cassette recorders ('VCRs') to record television programs and play them back later at their convenience"), 125 (discussing playback of "previously requested" programs), 136 (differentiating "real-time cablecast" and "RS-DVR playback").

3

**Redacted Public Version**

physical sense. *Cablevision*, 536 F.3d at 133, 137. It broke the continuous chain of transmissions that otherwise would have culminated in a retransmission to the public.

The "Watch Now" copy made by Aereo is different. It is neither a copy of an entire program, made and controlled by the user, nor a separate source for a transmission distinct from the original OTA broadcast. It is temporary and made by Aereo to facilitate the transmission to users as a seamless next step in sending the original OTA broadcast on. Aereo advertises itself as a way to watch television programs "live," as they are broadcast. That Aereo's real-time service emanates from a temporary server copy on a few seconds delay is insufficient to convert its contemporaneous retransmissions to the public into the individualized, time-shifted, private performances at issue in *Cablevision*.

***Finally***, Aereo ignores unmistakable congressional intent, evidenced through multiple statutes that prohibit free-riding, real-time retransmission services. Pls. 3/21/12 Br. 6-10; Pls. 5/1/12 Br. 24-31. Worse still, Aereo's expansive reading of *Cablevision* effectively would ensure most Internet-based retransmissions are made immune from public performance liability because they also involve temporary, individualized copies made for buffer purposes and one-to-one transmissions to each separate user. Extending *Cablevision* as Aereo urges also is inconsistent with the Second Circuit's own caution as to how its decision should be read. *See Cablevision*, 536 F.3d at 139 ("emphasiz[ing]" it should not be read to "permit content delivery networks to avoid all copyright liability" based on subscriber-made "individual copies").

4

**Redacted Public Version**

## ARGUMENT

**I.**   **Aereo's Public Performances Are Not Protected By Consumers' Reception Of Broadcast Television Or Excused By *Sony* Or *Cablevision*.**

Aereo claims the combination of a consumer "right" to receive OTA broadcast television, *Sony* and *Cablevision* allows it essentially to stand in its subscribers' shoes to retransmit programming to them.  Aereo 4/4/12 Br. 1.  This argument is flawed and, as a result, Aereo has no defense to its unauthorized retransmissions of Plaintiffs' copyrighted works.

### A.   Nothing Authorizes Aereo To Retransmit Copyrighted Works Embedded In OTA Broadcast Signals.

Aereo does not provide consumers with any access to broadcast television ***signals***.  Aereo takes broadcast signals and processes them so that the embedded ***programming*** can be made available through the Internet, a non-broadcast medium.  Aereo's assertion of consumer rights blurs the distinction between the ***signals***, subject to the Communications Act's regulatory framework, and the copyrighted ***programming*** transmitted by those signals, for which the Copyright Act controls.  These are two distinct statutory schemes.[2]  Aereo's retransmissions violate the Copyright Act, which prohibits retransmissions to the public of broadcast programs absent statutory or negotiated licenses.  That Plaintiffs make their copyrighted programs available for free OTA reception on television sets does not mean they have abandoned their

---

[2]    *See In re Implementation of the Cable Television Consumer Prot. & Competition Act of 1992*, Report and Order, 8 FCC Rcd. 2965, 3004-05 (1993) ("[C]opyright applies to the programming and is thus distinct from signal retransmission rights."); S. REP. NO. 102-92 at 36, *reported in* 1992 U.S.C.C.A.N. 1133, 1169 ("The Committee is careful to distinguish between the authority granted broadcasters under the new section 325(b)(1) of the 1934 Act . . . and the interests of the copyright holders in the programming contained on the signal."); 17 U.S.C. §§ 111(c)(1) (distinguishing ***work*** from transmission of ***signals*** (emphasis supplied)), 122(a)(1) (same for satellite carriers).

5

**Redacted Public Version**

copyright rights or lost the right to commercialize those programs through other distribution channels and markets, including the Internet and/or mobile devices.

Other than in statutory exceptions inapplicable to Aereo, neither the Communications Act nor the Copyright Act confers on anyone – including members of the public – any statutory right to receive and disseminate either television broadcast signals or the programming that they carry. The Communications Act expressly ***prohibits*** programming distribution services from retransmitting OTA broadcast signals absent retransmission consent (or, in the case of cable operators, must carry). *See* 47 U.S.C. §§ 325(b)(1), 338.[3]

Whether standing in the shoes of its subscribers or on its own, Aereo has no right to retransmit copyrighted programming over the Internet without the authority of the copyright owner, even though the broadcast signal containing such programming can be received by the public using an OTA broadcast antenna. *Compare* Aereo 5/19/12 Br. 21 (*Cablevision* permits all unauthorized retransmissions as long as "*the consumer has [an] independent right*" to the underlying content (emphasis in original)), *with Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 112 (2d Cir. 1998) (for-profit radio retransmission service infringed; rejecting "stand in the shoes" argument) (internal citation omitted).

Congress long ago rejected Aereo's "consumers' rights to broadcast signals" argument when, in the Transmit Clause, it overturned *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390 (1968), and *Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974). *See* Pls. 3/21/12 Br. 7-8; *Fortnightly*, 392 U.S. at 399 (cable system did "no more than enhance[]

---

[3]    The point is not whether those particular statutory schemes actually "apply to Aereo," Aereo 5/19/12 Br. 28; it is that Congress repeatedly has recognized the risk to broadcasters of easy retransmission of their OTA broadcasts by free-riders.  Pls. 5/1/12 Br. 24-26.

**Redacted Public Version**

the viewer's capacity to receive the broadcaster's signals" by providing "a well-located antenna"); *Teleprompter*, 415 U.S. at 408 (cable system non-infringing because it enhanced the "privilege of receiving the broadcast electronic signals" that "inheres in all members of the public"). Understanding the consequences of those decisions for the broadcasting industry, Congress expressly included retransmissions of primary broadcast signals – in any medium and over any system – within the Transmit Clause. Nowhere does Aereo address either these decisions or the persuasive legislative history of the Transmit Clause. Aereo 4/4/12 Br. 16.

It simply is not true that Aereo does nothing more than enable a consumer to receive a broadcast signal just as if she had moved her rooftop antenna to Aereo's facility.

REDACTED

None of Aereo's current features (program guide, carousel of featured programs and other functions, *id.* 12-13) is available to consumers receiving OTA broadcasts through rooftop antennas, but they are the hallmarks of cable and satellite packages and Internet services such as Netflix and Hulu. *See* Pls. 5/1/12 Br. 13. Moreover, Aereo transcodes and processes the signal to deliver the embedded programming to its subscribers over the Internet. In no sense is Aereo simply doing what ordinary consumers do – *i.e.*, receive broadcast signals on broadcast receiving devices. As it describes itself, Aereo is a full-fledged "online television business[]," Potenza Decl. Ex. 17, for which subscribers eventually will pay Aereo a subscription fee of about $144 a year.[4]

---

[4]   Plaintiffs consistently have explained that the particulars of the Aereo technology are not determinative. It is worth noting, however, that Aereo has shifted emphasis from alleged individual antennas to its "disk" server copies. That is hardly surprising. Although the

7

**Redacted Public Version**

**B.      *Sony* And *Cablevision* Do Not Help Aereo Because Neither Involved Retransmission In A Medium Different From That Of Reception.**

*Sony* is largely irrelevant because it held only that an individual consumer's in-home recording of an OTA broadcast program, for purposes of later playback (*i.e.*, time-shifting), was, under those circumstances, a fair use that did not infringe the reproduction right.  *See Sony*, 464 U.S. at 421.  *Sony* did not address the public performance right, much less the question at issue here – namely, whether the unauthorized real-time retransmission of broadcast programming violates that right.  It is, therefore, of little analytical value to the Court on this motion.

*Cablevision* also did not address the retransmission of live OTA broadcast programs, only the later playback of a DVR recording over a cable system to the ***same authorized set-top box*** of the subscriber, who, the court found, previously had made the recording for time-shifting purposes.  That programming was content Cablevision had been licensed to retransmit and that the subscriber had been authorized to receive, through a cable system, on that set-top box.  *See Cablevision*, 536 F.3d at 123-24.

For all of its reliance on both decisions, Aereo never mentions their common, crucial thread – in both, the later playback was limited to the ***same manner***, ***medium***, ***place*** and ***receiving device*** as the original broadcast, typically the viewer's home television.  *Id.* at 124 (playback limited to the same set-top box authorized to receive the original cable transmission). That is why both courts viewed a consumer's recording and playback activities as neither harmful to the copyright owner nor threatening to the economic structure Congress created to compensate broadcasters.  The distribution channels were authorized and, as a result, the

---

parties' experts may disagree about the extent to which the collective Aereo antennas work together to receive a signal, there is, at a minimum, substantial doubt that Aereo's antennas work as Aereo claims.  *See* Volakis Decl. ¶¶ 78-84, 91.

**Redacted Public Version**

copyright owner was being compensated, whether through the sale of advertising time during the OTA broadcast or through the license fees Cablevision paid to broadcasters. *Sony*, 464 U.S. at 453-54; *Cablevision*, 536 F.3d at 123.

Aereo is entirely different. The whole point of Aereo's service – and the reason consumers might be willing to pay for it – is to enable them to consume Plaintiffs' broadcast programming on an Internet-enabled device through a distribution channel entirely different from OTA broadcasting. In sharp contrast to the time-shifted recordings at issue in *Sony* and *Cablevision*, Aereo usurps Plaintiffs' rights to enter and to control distribution of their copyrighted programming in a new and distinct medium, here, the Internet. Plaintiffs actively participate in that market in many ways, including through licensing arrangements that provide for separate compensation for Internet distribution. *See* Pls. 5/1/12 Br. 30-31.

Aereo asserts that it, unlike other authorized content providers, need pay nothing. Worse still, it plans to use Plaintiffs' OTA content to "bring" subscribers "in," then entice them to cancel subscriptions to Plaintiffs' other licensees. *See id.* 13, 27-28. This defies repeated recognition by Congress – in enacting the Transmit Clause, the Cable Television Consumer Protection and Competition Act of 1992, the Satellite Home Viewer Act of 1988 and the Satellite Home Viewer Improvement Act of 1999 – that services that retransmit OTA broadcasts, over the Internet or anywhere else, must be authorized. *Id.* 24-26.[5]

---

[5]    In *Sony*, the Supreme Court stated that "[s]ound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably implicated in such new technology." *Sony*, 464 U.S. at 431. Aereo quotes from that passage, Aereo 5/19/12 Br. 28-29, but neglects to add that Congress itself has already spoken through the forward-looking Transmit Clause ("any device or process") and has

**Redacted Public Version**

### C.  *Cablevision* Does Not Provide A Safe Harbor For Aereo's Retransmission Service.

#### 1.  Aereo Provides An Internet Retransmission Service That Emanates From The Original Broadcast Signal.

Absent its *Cablevision*-based arguments, Aereo plainly is engaged in a public performance.  Members of the public are capable of receiving Aereo's retransmissions of copyrighted programs.  Aereo claims that its performances are private under *Cablevision* because each of its transmissions is made from a unique, user-made server "copy" and can only be received by that same user.  Aereo 5/19/12 Br. 3, 10.  As noted above, however, the copies in *Cablevision* played a fundamentally different role – enabling viewing of entire programs at a later time, at the same place (typically in the home) and on the same receiving device (a television set), not through a new medium.

Aereo's creation of a temporary buffer copy, used to facilitate its live real-time retransmissions to its subscribers, does not shield those transmissions from liability under the Copyright Act for several reasons.[6]  ***First***, the "any device or process" language of the Transmit Clause plainly includes retransmissions that involve interposed buffer or temporary "disk"

---

declined, despite ample opportunity, to create any statutory license for Internet retransmissions.  *See WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 616 (S.D.N.Y. 2011) (noting congressional inaction).

[6]  For Aereo's real-time retransmissions, Aereo passes the transcoded data through a "streaming server" which creates a temporary file in "disk" memory.  That is a pure pass-through – after buffering for a short time, approximately six to twenty seconds, the data is transmitted to the subscriber.  Aereo stores the data as it is being watched simply to enable it to provide its subscribers with the functions of rewinding, pausing and fast-forwarding while watching a real-time transmission.  Beyond a few seconds, the "temporary file" is not in any way needed to watch the real-time transmission contemporaneously with the OTA broadcast.  The temporary file is automatically deleted at the end of the program unless the user has affirmatively elected to save it by pressing a "Record" button.  Kelly Decl. ¶ 52.  Semantics aside, Aereo's temporary file is like any Internet transmission buffer.

**Redacted Public Version**

copies.  The language does not provide that retransmissions are not "to the public" if the service provider uses such copies to facilitate those retransmissions.

**Second**, *Cablevision* did not involve the retransmission of live OTA broadcasts.  The Second Circuit itself drew a distinction between the "playback" of "previously recorded programs" and the "real time" "process[ing] and transmi[ssion]" of programming to cable subscribers.  *Cablevision*, 536 F.3d at 124-26.  That is significant because the legislative history of the Transmit Clause, other provisions of the Copyright Act and courts all are clear that the source of a contemporaneous retransmission is the original (or primary) transmission – here, Plaintiffs' OTA broadcasts.  For that reason, the retransmission of copyrighted works embodied in the original transmission is only permitted where it is expressly authorized, whether by negotiated or statutory license.  *See* H.R. REP. NO. 94-1476, at 63 (1976) ("[A] cable television system is performing when it retransmits the broadcast to its subscribers . . . ."); *see also* 17 U.S.C. §§ 111(a), 111(f)(1)-(2) (exempting from liability and defining certain transmissions); *Nat'l Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000) (contemporaneous retransmission violates public performance right); Pls. 3/21/12 Br. 7.

Users of Aereo's "Watch Now" service who want to watch a program "live" – not subsequent to the original broadcast – demand a contemporaneous retransmission.  Aereo delivers just that, making it functionally indistinguishable from any other type of contemporaneous retransmitter sending an original signal in a way that allows the original transmission to be viewed in real time.  Aereo's temporary buffer of a few seconds is simply the technical device or process that facilitates those retransmissions, no different than the short delays in true "live" performances seen OTA, or through cable or satellite.  As Aereo's Chief

11

**Redacted Public Version**

Technology Officer acknowledges, "[t]he 'Watch' mode is designed to be identical to how consumers use conventional DVRs to watch 'live' television."  Lipowski Decl. ¶ 55.

*Third*, Aereo is flatly wrong to argue that the Second Circuit "in no way restricted its public performance analysis" to the facts before it.  Aereo 5/19/12 Br. 16-17.  That is the opposite of what the court actually said.  *See Cablevision*, 536 F.3d at 133 ("We conclude only . . . on the facts of this case . . . ."); *id.* at 139 ("We base this decision on the application of undisputed facts . . . .").  Any fair reading of the decision demonstrates that it turns on the court's understanding of the "RS-DVR" system, which it found, on the undisputed record, was used (a) first to record a program and (b) then to view it later.  That led to the court's express analogy to a standard, in-home DVR used by viewers to record television programs in order to "play them back later at their convenience."  *See id.* at 123.  The Second Circuit held the permanent prior-recorded copy of the entire work – not the original OTA broadcast – was the sole source of the playback:  the "self-made copy is used to *create* that transmission."  *Id.* at 137 (emphasis added).

Aereo differs from *Cablevision* in at least two ways.  First, Aereo transcodes the programming for delivery through a different medium and into a new and distinct commercial market.  It does not play back the program to the same medium, place and receiving device.

Second, Aereo captures OTA broadcast signals and, upon conversion to an Internet-ready format, contemporaneously retransmits the programs carried in those signals to any subscriber who has chosen to "Watch" a program "Now."  That retransmission begins immediately upon Aereo receiving the signal at the antenna assigned to that subscriber.  Unlike the new transmission from a truly time-shifted recording, it is the OTA broadcast, not the temporary pass-through server copy, that is the source "used to create" Aereo's retransmission.

**Redacted Public Version**

Aereo understands that *Cablevision*'s holding was predicated on fixed, previously recorded copies of previously broadcast programs. That is why it tries to analogize its temporary copies to entire programs previously recorded for purposes of time-shifting. That is not accurate, either as a technical matter or under copyright law.

When Aereo begins retransmitting a program after only its first few seconds have been recorded, the work itself – the entire program – has yet to be fixed in a copy. At that point, and at every point thereafter, once the next few seconds have been recorded, the "Watch Now" copy, when used for real-time viewing is, in fact, a buffer of the data for those seconds. That is nothing like the permanent, fixed copy of an entire program in *Cablevision. Id.* at 123 (explaining that DVR was used to "record television programs" and "play them back later"); *id.* at 125 (explaining that RS-DVR users "can only play content that they previously requested to be recorded"); *id.* at 126 (contrasting playback "at a later time" with "real time").

The Second Circuit held in *Nat'l Football League* that a "public performance . . . includes each step in the process by which a protected work wends its way to its audience." 211 F.3d at 13; *see also Cablevision*, 536 F.3d at 137 ("[A]ny link in a chain of transmissions made by a party constitutes a public performance . . . ."); H.R. REP. No. 94-1476, at 63 (explaining that concepts of public performance "cover not only the initial rendition or showing, but also ***any further act*** by which that rendition or showing is transmitted or communicated to the public" (emphasis added)). The Second Circuit distinguished *Cablevision* from the facts in *Nat'l Football League* because, in its view, the time-shifted, user-made copy broke the chain of contemporaneous retransmission. That copy – not the original broadcast – was the basis of the RS-DVR playback because that copy was "content that [users] ***previously*** requested to be recorded." *Cablevision*, 536 F.3d at 125 (emphasis added). The RS-DVR playback of that copy

13

**Redacted Public Version**

was thus viewed by the court as a new transmission, not a retransmission, and, because it was deemed to be private, neither Cablevision nor the user was engaged in a public performance.

By contrast, regardless of whether Aereo's temporary copy is on "disk," RAM or some other storage medium, it is made to facilitate a live, real-time television viewing experience and does not serve to break the chain of transmission. Aereo's goal is to get its real-time retransmissions as close to the live broadcast as possible. Potenza Decl. Ex. 7 (Lipowski Dep. 203:4-13). Nor do the Aereo copies in any way "limit" the audience for Aereo's retransmissions of an OTA broadcast. *Cablevision*, 536 F.3d at 138. All of Aereo's subscribers who have tuned into a program to "Watch" it live receive the program from Aereo's system at the same time and on a real-time basis (aside from delays attributable to Internet connections). Potenza Decl. Ex. 1 (Kanojia Dep. 47:23-49:4) (admitting that multiple viewers, "strangers" to one another, can watch the same television program in different places at the same time). Because the source is the original broadcast and Aereo can effectively make a limitless number of temporary copies, the "Watch Now" copies do not, in any meaningful way, "limit" the audience for the retransmitted broadcast. The temporary copies are just a step in a process that culminates in a performance to many members of the public, all of whom are capable of receiving that retransmission. *See Nat'l Football League*, 211 F.3d at 13.

On this critical issue, Plaintiffs urge the Court to look to how Aereo advertises itself: "When you want to watch live TV, your miniature antenna acquires the signal and processes it in real-time, so you can pipe it through the Cloud for your private viewing." Potenza Decl. Ex. 24 (Introducing Bamboom). Aereo thus tells its own potential customers that it is a real-time retransmission service. That makes it impossible for *Cablevision* to protect Aereo. *See* Pls. 5/1/12 Br. 20-21 (citing *Cablevision*, 536 F.3d at 125 ("***To the customer***, however the processes

14

**Redacted Public Version**

of recording and playback on the RS-DVR *are similar* to that of a standard set-top DVR."
(emphasis added)); *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001) (analyzing copyright
claim based on how works are "presented to" and "perceptible by" users)).  To the Aereo
subscriber, "Watch Now" is the antithesis of time-shifting.

## 2.    Aereo Makes Performances "To The Public."

Aereo also argues that performances to its subscribers are, just like the ones in
*Cablevision*, "private" because its subscriber makes the server copy and then plays that copy
back to herself.  Aereo 5/19/12 Br. 2-3.  That is incorrect.

Aereo "makes" the "temporary" server copy used to facilitate the real-time transmission,
and it is Aereo, not the subscriber, that retransmits the OTA broadcast programming to its
subscribers.[7]  The Second Circuit found, on the facts before it, that Cablevision's subscribers
themselves made the RS-DVR recordings, but noted its finding regarding the *reproduction* right
did "not dictate a parallel conclusion that the customer . . . '*performs*' the copyrighted work."
*Cablevision*, 536 F.3d at 134 (emphasis added).  In distinguishing the reproduction and public
performance rights, the Second Circuit concluded that the applicable definitions "vary in
significant ways," including that the Copyright Act defines the verb "perform" but not the verbs
"reproduce" or "copy."  *Id.*  Apart from its finding that the user had made the RS-DVR copy, the

---

[7]    *Cablevision* held the subscriber made the copy because the "necessary element of volition"
was "supplie[d]" by the subscriber, who "actually presses the button to make the recording."
*Cablevision*, 536 F.3d at 131.  There is no consumer volition in causing the copy to be made
during Aereo's "Watch Now" function because, to "Watch Now," the subscriber selects
"Watch," not RECORD.  Kelly Decl. ¶ 41.  To volitionally elect to "Save" a program, the
subscriber must click on the "RECORD" button.  That corresponds to "press[ing] the
button" to make the recording on an RS-DVR in *Cablevision* and makes Aereo's temporary
"Watch Now" copy directly analogous to the buffer copy in *Cablevision*.  That copy, the
court concluded, was made by Cablevision, not the user.  *Cablevision*, 536 F.3d at 133.

15

**Redacted Public Version**

Second Circuit assumed that it was Cablevision, and not the subscriber, who "makes the transmission" upon playback. *Id.*[8]

Aereo contends its subscribers are transmitting programs to themselves. That illogic knows no bounds. *See* Potenza Decl. Ex. 1 (Kanojia Dep. 217:3-13 (characterizing download transmissions from iTunes as consumer generated and Apple's role solely as "enable[ing] the technology for the consumer")).[9] Moreover, Aereo does not acknowledge the language in *Cablevision* that undercuts it.

Aereo, not the subscriber, has developed and then controls and operates each and every element of Aereo's so-called "platform" – *i.e.*, the system of miniature antennas, individual tuners, servers and webstreaming. Because it is Aereo that "communicate[s]" OTA broadcast programming to its subscribers, it is the transmitter and is liable for violating the public performance right.

### 3. Aereo's Interpretation Would Lead To Absurd Results.

Adopting Aereo's position leads to results that expose the inherent problems with its interpretations of the Copyright Act and *Cablevision*. Every service that delivers streaming

---

[8] That assumption was based on the plain language of the Copyright Act and the ordinary understanding of "transmit." Pls. 5/1/12 Br. 17-18. These make clear that it takes two – a sender and a receiver – to transmit and publicly perform a work. It is the transmitter who "communicate[s]" the performance "*by* any device or process," to members of the public "capable of receiving" the performance, *i.e.*, that the transmitter is "communicat[ing]" to persons other than the sender itself. 17 U.S.C. § 101 (emphasis added).

[9] Virtually every Internet streaming service initiates the stream only when the user pushes a "Play" button. If that act meant, as Aereo argues, that the user performs the work to herself, no Internet stream could ever be a public performance, because the user would only be performing to herself. That would not only upend well-established norms about Internet performances, but also would contravene specific Copyright Act provisions that create statutory licenses for certain Internet performances of music. *See, e.g.*, 17 U.S.C. § 114.

**Redacted Public Version**

video over the Internet uses a buffer copy unique to each recipient. That is because the original content must be broken into data packets that can be sent to an individual user's computer; nearly every transmission is one-to-one. Kelly Decl. ¶¶ 27, 32, 70. Taking Aereo's position at face value means that all providers of such retransmissions could be exempted from having public performance liability. That is plainly contrary to congressional intent and an unbroken line of authority that such conduct is infringing. *Cablevision* cannot be read so broadly.

Aereo's unbounded interpretation of *Cablevision* would have the effect of rendering all Internet streaming and video-on-demand services outside the scope of the Transmit Clause. *See* Pls. 5/1/12 Br. 21 n.13 (noting then-Solicitor General Kagan's point that *Cablevision* should not be read to permit such a result). It also would read the "same place/same time" "different place/different time" language out of the statutory definition of public performance. *See* PAUL GOLDSTEIN, 2 GOLDSTEIN ON COPYRIGHT § 7.7.2, at 7:168 (3d ed. 2012 supp.) (cautioning against a reading of *Cablevision* that would effectively render the "same place/same time" "different place/different time" language surplusage).

In response, Aereo asserts its reading of *Cablevision* would not "immunize an enterprise" provided the infringer was performing content "*to which the consumer has no independent right.*" Aereo 5/19/12 Br. 21. Once again, Aereo is driven back to its flawed starting point. Its subscribers have no "independent right" to have the programming from OTA broadcast signals reformatted and retransmitted to them over the Internet. Aereo is thus left without ***any*** limiting principle to its otherwise overbroad reading of *Cablevision.*

Finally, and perhaps most importantly, were Aereo correct, cable operators and other multichannel video programming distributors could readily use Aereo to provide retransmissions of OTA broadcasts to their own subscribers, thus avoiding copyright and retransmission licenses.

**Redacted Public Version**

Alternatively, they could themselves choose to create unique copies of OTA broadcasts for each of their subscribers and then transmit programs from those copies to them either over the public Internet or through Internet-based services on their own cable systems. Those practices, too, would be completely contrary to the intent of Congress in ensuring that such distributors pay for the right to retransmit the programming in OTA television broadcasts.

Congress has acted repeatedly to prevent free-riders from undermining the free OTA broadcasting system. Regardless of its technological sleights-of-hand, Aereo is a free-rider and should be enjoined.

## II.   Plaintiffs Have Demonstrated Irreparable Harm.

In declarations and depositions, Plaintiffs detailed why irreparable harm is both imminent and "inevitable." Potenza Suppl. Decl. Ex. 3 (Bond Dep. 56:18, 105:18, 106:3); Franks Decl. ¶ 26. Aereo has responded with incorrect legal propositions and selective interpretations of the witnesses' testimony. It does not even mention the two cases in this District that found irreparable harm flowed from services indistinguishable to consumers from Aereo. *ivi*, 765 F. Supp. 2d at 617-20; *FilmOn.com*, No. 10-cv-07532 (S.D.N.Y. Nov. 22, 2010) [Dkt. 8].

The suggestions that Plaintiffs waited too long to sue or, conversely, that Aereo is too new to cause immediate harm, Aereo 5/19/12 Br. 22-26, are wrong. Preliminary injunction plaintiffs do not have to suffer actual harm for it to be imminent. *See ivi*, 765 F. Supp. 2d at 620 (prospective harms, including "taking away viewers," is imminent, not speculative). Prospective harm often is enjoined – that is the purpose of an injunction. *See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-39 (2d Cir. 1995) (finding irreparable harm based on prospective loss of goodwill and sales); *see also Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 621-22 (S.D.N.Y. 2010) (irreparable harm exists where damage is

**Redacted Public Version**

inevitable, even if prospective); 11A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995) ("[I]njury need not have been inflicted when application is made or [even] be certain to occur; a strong threat of irreparable injury before trial is an adequate basis."). *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332-33 (2d Cir. 1995), cited by Aereo to support its argument that Plaintiffs' harms are too speculative, stands for precisely the opposite proposition.

It is neither "speculative" nor "remote" to note it is cheaper for Plaintiffs' licensees to pay the one-time expense to build infrastructure similar to Aereo than to continue paying licensing fees.  Aereo 5/19/12 Br. 21.  "[C]able companies have already considered such a model."  Potenza Suppl. Decl. Ex. 3 (Bond Dep. 54:11-55:20).[10]  Without such fees, OTA broadcasters will be unable to continue to broadcast marquee events, such as live sports or awards shows like the Academy Awards or the Grammys, which are enormously expensive.  *See* Bond Decl. ¶¶ 11, 12.  This is not speculation – it is the basis of Congress' decision in 1992 to grant broadcasters the right to negotiate with cable systems for retransmission consent fees for local OTA broadcasts.  *See* Franks Decl. ¶¶ 22-24; Pls. 3/21/12 Br. 6-10.  Aereo's contemporaneous documents corroborate its impact on those fees.[11]

---

[10]  Even if cable and satellite operators do not adopt Aereo's technology, their payments to broadcasters will be reduced if Aereo can compete directly by retransmitting the same content for free.  Bond Decl. ¶ 18 ("Any economically rational cable operator (or satellite company) will use that as leverage in . . . retransmission negotiations.").

[11]  *See* Potenza Decl. Ex. 29 (Jan. 12, 2012 Aereo E-mail, "I think the cable people are benign [sic (probably "beginning")] to wake up to the possibility that they can get out of broadcast retransmission."); *id.* Ex. 28 (Feb. 3, 2011 Aereo E-mail, "[Retransmission fees] going to 2.4 [billion dollars] next year; Now u know the attraction we will have for cableguys").

**Redacted Public Version**

Several Plaintiffs also have specific plans to directly serve the distinct and growing market for mobile device delivery of their programming.  In addition to DYLE, which will broadcast OTA signals to mobile devices, Potenza Decl. Ex. 35 (Dalvi Dep. 9:13-16), existing providers, such as Time Warner Cable, are working to enter the mobile space with television content.  *See* Potenza Suppl. Decl. Ex. 4 (Amy Chozick, *Viacom and Time Warner Cable Reach Deal on App for Streaming Programs*, N.Y. TIMES, May 16, 2012).  Plaintiffs' ability to license their content through such avenues will decrease dramatically if Aereo's service continues. Potenza Suppl. Decl. Ex. 5 (Franks Dep. 89:8-15); *id.* Ex. 6 (Brennan Dep. 210:17-211:11); *id.* Ex. 7 (Davis Dep. 138:13-139:24); *id.* Ex. 3 (Bond Dep. 54:11-55:20).

Plaintiffs also have contracts with companies such as Amazon, Hulu and Netflix to provide Plaintiffs' content on an on-demand basis over the Internet, *id.* Ex. 5 (Franks Dep. 82:9-84:4), and Plaintiffs themselves provide similar access to on-demand content to cable and satellite providers.  Franks Decl. ¶ 26.  If Aereo continues its operations, the value of Plaintiffs' content in that market will be diminished.  *Id.*; Potenza Suppl. Decl. Ex. 5 (Franks Dep. 84:2-4).

Aereo causes another form of unquantifiable harm:  loss of advertising revenue.  Aereo responds that it causes no irreparable harm because (i) Plaintiffs said broadcast television advertising viewed over the Internet on mobile devices can be tracked, (ii) Plaintiffs do not know Nielsen's position on Aereo, and (iii) Aereo would be willing to have Nielsen measure its audience.  Aereo 5/19/12 Br. 25-26; Aereo 5/19/12 Unfair Comp. Br. 10 n.8.  Plaintiffs, however, never stated that mobile viewing of OTA broadcast television advertising is currently tracked.  Aereo 5/19/12 Br. 26 (citing Dalvi Dep.).  What Mr. Dalvi actually said is that some research firms measure *mobile* viewership of *video on demand.*  Potenza Suppl. Decl. Ex. 8 (Dalvi Dep. 103:12-17).  Others testified that Nielsen does not track Internet viewers in a manner

20

**Redacted Public Version**

that advertisers accept.  For that reason, they had no need to inquire about Aereo.[12]  That an infringer like Aereo has "no objection" to being measured is irrelevant.  Kanojia Decl. ¶ 39.[13]

Aereo's argument about the absence of any measurable impact is a resurrection of the defense rejected in *ivi*.  The *ivi* decision noted that just because a copyright infringer is "small," does not mean it "should be allowed to continue to steal plaintiffs' programming for personal gain until a resolution on the merits."  *ivi*, 765 F. Supp. 2d at 619.  Moreover, that harm is as yet unmeasurable makes it, by definition, irreparable.  *Id.* at 618 (concluding that losses, including reduced advertising revenue, constitute irreparable harms because they are "'notoriously difficult' to prove and nearly impossible to quantify") (quoting *Salinger v. Colting*, 607 F.3d 68, 82 (2d Cir. 2010)).

As for the purported delay, from April 2011 until January 2012, Aereo's service was the very definition of "vaporware," available only to 30 or so hand-picked, technologically savvy testers, none of whom were ordinary customers or actual subscribers.  Potenza Decl. Ex. 1 (Kanojia Dep. 170:4-10).[14]  As recently as mid-January 2012, Aereo was not available to anyone

---

[12]   Bond Decl. ¶ 25; Brennan Decl. ¶ 9, Dalvi Decl. ¶ 14; Davis Decl. ¶ 18; Franks Decl. ¶ 19; Potenza Suppl. Decl. Ex. 3 (Bond Dep. 154:6-155:14 ("Even if Nielsen were able to [track Internet viewing], . . . advertisers do not pay for that.")); *id.* Ex. 5 (Franks Dep. 97:10-23 ("do[es] not believe" Nielsen tracks Aereo because CBS has "been trying to get Nielsen to come up with a product that we could take to advertisers where they would accept it as a currency to use in our sales")).

[13]   Aereo's pre-litigation internal communications again corroborate Plaintiffs' position. Potenza Decl. Ex. 28 (Feb. 3, 2011 Aereo E-mail ("Their coin of the realm is ad $ driven by Nielsen ratings.  The GMs will not release meaningful amounts of programming to the web *until it is measured*." (emphasis added)).

[14]   *See* Potenza Suppl. Decl. Ex. 9 (defining "vaporware" as "a product that is announced months or years before its release, and for which public development details are lacking").

**Redacted Public Version**

else.  *Id.* (Kanojia Dep. 168:15 – 170:25).[15]  At best, Aereo might have reached the "alpha" test

stage prior to March 2012, but under no circumstances did that impose any obligation on

Plaintiffs to have acted any sooner.  *See Guinness United Distillers & Vintners B.V. v. Anheuser-*

*Busch, Inc.*, No. 02 Civ. 0861, 2002 WL 1543817, at *6 (S.D.N.Y. July 12, 2002) (no obligation

to act, even if infringer is in true test market mode).  Even now, although Aereo claims to plan to

be in 75-100 cities in the next few months, Potenza Suppl. Decl. Ex. 10 (Ari Levy, *IAC*

*Chairman Diller Sees Aereo TV Service in up to 100 Cities Within Year*, BLOOMBERG, Mar. 12,

2012), it still has no paying subscribers.  There has been no delay.

More insidious is the false suggestion that before March 2012, Aereo somehow was

misled while Plaintiffs watched to see if Aereo would advance beyond incubator project stage.

Aereo 5/19/12 Br. 22.  Mr. Kanojia's contemporaneous statements tell a different story.

REDACTED

---

[15]  Plaintiff WNET had not even heard of Aereo until February 2012.  Segaller Decl. ¶ 16.
Moreover, throughout this period, the Plaintiffs that were aware of Aereo had legitimate
doubts whether the Aereo technology could even work as claimed.  *See* Dalvi Decl. ¶ 18.

[16]  Mr. Bond's deposition testimony independently corroborates this.  Potenza Suppl. Decl. Ex.
3 (Bond Dep. 96:15-97:4 ("I was aware of [Bamboom]. . . . I did not think it was legal [and
was not interested] in a business relationship or an investment . . . .")).  Mr. Kanojia's
unsupported statement that Brian Roberts (or anyone else) at Comcast encouraged Aereo,
Kanojia Decl. ¶ 18(i), is baseless.  Mr. Bond testified that Mr. Roberts and others recognized
Aereo's implications for NBCU and made Mr. Bond aware of Aereo's proposed business
model.  Mr. Bond's unequivocal response was that Aereo "wasn't legal" and communication
between Aereo and Comcast ended.  Potenza Suppl. Decl. Ex. 3 (Bond Dep. 90:3-98:4).

**Redacted Public Version**

Mr. Kanojia's claim that Aereo was "*encouraged . . .* with talks of investment and collaboration," Aereo 5/19/12 Br. 22 (emphasis in original), does not withstand scrutiny.  Mr. Dalvi described his meeting with Mr. Kanojia as purely informational, but leaving him thinking Aereo was a competitor and its conduct unlawful.  Potenza Suppl. Decl. Ex. 8 (Dalvi Dep. 113:5-9, 119:17-120:4-25).  The contemporaneous record confirms that.  *Id.* Ex. 15 (Bond Dep. Ex. 9 (MCV Presentation, June 27, 2011)).  Sherry Brennan (Fox), during her conversation with Mr. Kanojia, "asked for more detailed technical information that could be passed on to engineers so that they could more appropriately evaluate the service," but "did not receive that information." *Id.* Ex. 6 (Brennan Dep. 19:7-12).  Marty Franks (CBS) rejected a meeting specifically because "we might have to sue" Aereo.  *Id.* Ex. 16 (Franks Dep. Ex. 1, May 5, 2011 CBS E-mail). Zander Lurie (CBS) has no memory of even speaking to anyone at First Round Capital about Aereo.  *Id.* Ex. 17 (Lurie Dep. 37:8-40:16).[17]

Mr. Kanojia also knew, during this period, that Aereo's infringing counterparts, ivi and FilmOn, were being sued, by some of these same companies, for conduct similar to that in which Aereo proposed to engage.  Potenza Suppl. Decl. Ex. 18 (E-mail chain among Chaitanya Kanojia, Richard Greenfield, and others, Feb. 21, 2012, analyzing *ivi*).  Although Aereo hoped its different legal defenses were stronger, *id.*, its current claims that meetings with the Plaintiffs were "encourag[ing]," Aereo 5/19/12 Br. 22, is, at best, wishful thinking.

As for the supposed burden of enjoining Aereo, Mr. Kanojia now claims that an injunction would make future potential investors "wary" of the "risk of losing their entire

---

[17]   A "cease and desist notice" notice, Aereo 5/19/12 Br. 22, therefore, was unnecessary and would have been futile.  Mr. Kanojia admitted Aereo would not have changed its plans. Potenza Decl. Ex. 1 (Kanojia Dep. 279:14-282:15).

**Redacted Public Version**

investment," Kanojia Decl. ¶ 55, but those investors willingly signed up for that risk.  Potenza

Suppl. Decl. Ex. 11 (Kanojia Dep. 378:15-18 ("[A]ll the investors understood that there was a

potential [to be sued by Plaintiffs.]")).  As Mr. Kanojia put it, his investors planned on being

sued.  Potenza Decl. Ex. 38 ("'Our investors planned for this,' Kanojia said. 'We need money for

infrastructure and lawsuits.'"); Potenza Suppl. Decl. Ex. 11 (Kanojia Dep. 378:11-379:10).

REDACTED                                             Potenza Suppl. Decl.

Ex. 12 (May 28, 2011 Aereo E-mail), and, even before its February 14, 2012 press

announcement, had retained its principal expert, Dr. Horowitz.  *Id.* Ex. 13 (Horowitz Dep. 23:4-

8).

REDACTED

24

**Redacted Public Version**

CONCLUSION

The Court should grant Plaintiffs' request for preliminary injunctive relief.

Respectfully submitted,

/s/ Steven B. Fabrizio
Steven B. Fabrizio
(sfabrizio@jenner.com)
Steven R. Englund
(senglund@jenner.com)
Scott B. Wilkens
(swilkens@jenner.com)
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Washington, D.C. 20001
(202) 639-6000

David J. Bradford
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60656-3456
Telephone (312) 222-9350
Facsimile (312) 527-0484

Kenneth D. Klein
JENNER & BLOCK LLP
633 West 5th Street
Los Angeles, CA 90071-2054
Telephone (213) 239-5100
Facsimile (213) 239-5199

*Attorneys for Plaintiffs WNET,
Thirteen, Fox Television Stations, Inc.,
Twentieth Century Fox Film
Corporation, WPIX, Inc., Univision
Television Group, Inc., The Univision
Network Limited Partnership and
Public Broadcasting Service*

Dated:  May 25, 2012

/s/ Bruce P. Keller
Bruce P. Keller
(bpkeller@debevoise.com)
Jeffrey P. Cunard
(jpcunard@debevoise.com)
Michael R. Potenza
(mpotenza@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for Plaintiffs American
Broadcasting Companies, Inc., Disney
Enterprises, Inc., CBS Broadcasting
Inc., CBS Studios Inc., NBCUniversal
Media LLC, NBC Studios, LLC,
Universal Network Television, LLC,
Telemundo Network Group LLC and
WNJU-TV Broadcasting LLC*

**Redacted Public Version**