USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 1 1 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
AMERICAN BROADCASTING COMPANIES, INC.                       :
ET AL.,                                                     :
                              Plaintiffs,                   :        12 Civ. 1540 (AJN)
                                                            :
              -v-                                           :        OPINION
                                                            :
                                                            :
AEREO, INC.,                                                :
                              Defendant,                    :
------------------------------------------------------------X
                                                            :
WNET ET AL.,                                                :
                              Plaintiffs,                   :        12 Civ. 1543
                                                            :
              -v-                                           :
                                                            :
                                                            :
AEREO, INC.,                                                :
                              Defendant,                    :
------------------------------------------------------------X

ALISON J. NATHAN, District Judge:

Plaintiffs, a group of corporate entities engaged in the production, marketing, distribution, and transmission of broadcast television programs, move to enjoin Defendant AEREO, Inc., ("Aereo") from engaging in those aspects of its service that allow its users to access "live" copyrighted content over the internet. Aereo claims that its conduct does not violate copyright law, relying on *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"). But for *Cablevision*'s express holding regarding the meaning of the provision of the Copyright Act in issue here—the transmit clause—Plaintiffs would likely prevail on their request for a preliminary injunction. However, in light of that decision, this Court concludes that it is bound to DENY Plaintiffs' request.

1

## I.   PROCEDURAL POSTURE

On March 1, 2012, Plaintiffs filed two Complaints against Aereo alleging that its service

unlawfully captures broadcast television signals in the New York City area, including at least

some corresponding to television programs on which Plaintiffs hold the copyright (Pls. Ex. 83),

and provides them over the internet to Aereo subscribers.[1]   (*E.g.*, Hrg. Tr. at 132:7-141:13,

292:3-25; Pls. Br. at 4-5; Aereo Br. at 6).   Although Plaintiffs' Complaints assert multiple

theories of liability, including infringement of the right of public performance, infringement of

the right of reproduction, and contributory infringement (Complaint at ¶¶ 28-38, *ABC, Inc. v.*

*AEREO, Inc.*, No. 12-cv-01540, Docket Entry 1; Complaint at ¶¶ 42-58, *WNET v. AEREO, Inc.*,

No. 12-cv-01543, Docket Entry 1), the issue presently before the Court is quite limited.   On

March 13, 2012, Plaintiffs moved for a preliminary injunction, asserting that Aereo was directly

liable for copyright infringement by publicly performing Plaintiffs' copyrighted works.[2]

(3/13/12 Tr. at 7:23-8:5, 28:12-29:5).   This motion was further limited in scope, challenging only

the aspects of Aereo's service that allow subscribers to view Plaintiffs' copyrighted television

programs contemporaneously with the over-the-air broadcast of these programs.   (Hrg. Tr.

255:6-18, 267:14-23).   After a roughly eleven week period of expedited discovery and briefing

on the preliminary injunction motion, the Court held a two-day evidentiary hearing on May 30

and 31, 2012, to establish the record for deciding the motion.

---

[1] Aereo characterizes itself as a technology platform, rather than a service, and argues that it is not liable because it is the user, rather than Aereo, that controls the operation of Aereo's system and "makes" the performances at issue. (Aereo Prop. COL at ¶¶ 48; *see also* Aereo Br. at 6-7).  As explained below, *infra* Section IV.B.6, the Court does not reach this question, and any description of Aereo as providing a "service" or of Aereo "doing" any particular acts should not be viewed as a decision on this issue.

[2] Certain of the Plaintiffs also moved for a preliminary injunction on a theory of unfair competition.  (3/13/12 Tr. at 28:12-29:5; Mem. in Support of Mot. for Preliminary Injunction on the WNET Plaintiffs' Claim in the Alternative for Unfair Competition, *WNET v. AEREO, Inc.*, No. 12-cv-01543, Docket Entry 72).  The Court dismissed this claim prior to the hearing as preempted by 17 U.S.C. § 301(a).  *See WNET v. Aereo, Inc.*, No. 12-cv-01543, 2012 U.S. Dist. LEXIS 70749 (S.D.N.Y. May 21, 2012).

## II.   **PRELIMINARY INJUNCTION STANDARD**

A preliminary injunction is an extraordinary remedy, granted only if the plaintiff

establishes "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm

in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 24 (2008).  Even if a

plaintiff has not demonstrated a likelihood of success on the merits, a preliminary injunction may

still be granted if the plaintiff shows "a serious question going to the merits to make them a fair

ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor."  *Metro.*

*Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010).

## III.   **FACTS**

### A. **Aereo's System**

The facts surrounding the operation of Aereo's system are largely—though not entirely—

undisputed.  (*See, e.g.*, Hrg. Tr. at 14:12-15, 23:6-15, 309:8-22).  Even if not disputing facts, the

parties are significantly at odds as to how Aereo's service should be properly characterized.

#### 1.  The Audience Perspective

Aereo's system allows users to access free, over-the-air broadcast television through

antennas and hard disks located at Aereo's facilities.  (*See infra* Section II.A.2).  A user of

Aereo's system, after logging into their account on Aereo's website, may navigate through a

programming guide to select television programs that are currently being aired or that will be

aired at a later time.  (Hrg. Tr. at 133:2-134:24).  If the user selects a program that is currently

being aired, the user is given two options, "Watch" and "Record."  (Hrg. Tr. at 73:2-19; Kelly

Decl. ¶¶ 38-39; Horowitz Rep. ¶ 64).  Selecting "Watch" causes Aereo's system to transmit a

web page to the user in which the program starts after a short delay, allowing the user to view the

3

program "live," *i.e.*, roughly contemporaneous with its over-the-air broadcast.  (Hrg. Tr. at 73:9-19; Kelly Decl. ¶¶ 39, 41).  While viewing the program, the user may pause or rewind it, increasing the disparity between the time at which the program is *initially* broadcast and the time at which the user watches it.  (Hrg. Tr. at 107:9-18, 111:20-112:12).  If enough time has passed, a user may end up watching the program "live" after it has been fully broadcast.  If the user presses the "Record" button after having begun watching a program using the "Watch" feature, the Aereo system retains the copy that the user has been watching, and the user may watch that program again later; if "Record" is not selected, the copy is not retained and cannot be viewed again later.  (Hrg. Tr. at 88:15-90:9, 112:22-114:17 ; 121:15-25, 141:7-13; Kelly Decl. ¶¶ 42-43).

Instead of selecting the "Watch" function at the outset, the user may press the "Record" button to schedule a recording of a program that will be broadcast at a later time or that is currently being aired.  (Hrg. Tr. at 73:15-74:6, 134:11-24, 136:8-15).  However, the "Record" feature can also be used, like the "Watch" feature, to view programs "live": users can direct Aereo's system to begin a recording and then immediately begin playback of the recording as it is being made.  (Hrg. Tr. at 121:15-25, 138:3-139:3, 140:18-141:6).

Thus, from the user's perspective, Aereo's system is similar in operation to that of a digital video recorder ("DVR") (*See, e.g.*, Hrg. Tr. 290:11-291:10, 298:16-23, 305:9-306:12), particularly a remotely located DVR, although Aereo users access their programming over the internet rather than through a cable connection.  One further difference is that Aereo allows users to view the programming on their computers, laptops, or mobile devices, whereas to watch television on these devices using a standard DVR, the user might need to purchase an additional device, such as a Slingbox.  (Hrg. Tr. at 132:16-20; 306:16-308:25; Lipowski Decl. ¶ 6). Slingbox allows users to stream video, including live broadcast television, over the internet to

4

their mobile devices. (Hrg. Tr. at 306:23-307:4). Plaintiffs do not appear to contend in this litigation that services such as Slingbox are unlawful, instead claiming that they are "irrelevant" and that Aereo's service is distinguishable because Slingbox consumers themselves set up the Slingbox in their homes. (Def. Ex. 41; Pls. Obj. to Aereo's Proposed FOF ¶¶ 24, 26).

    2.  <u>Behind the Scenes</u>

Behind the scenes, the process is more complicated. When a user clicks on the "Watch" button, the web browser sends a request to Aereo's Application Server, which in turn sends a request and certain information about the user and the requested television program to Aereo's Antenna Server. (Hrg. Tr. at 74:10-21; Kelly Decl. ¶¶ 44-45; *see also* Lipowski Decl. ¶ 35). The Antenna Server allocates resources to the user, including an antenna and transcoder, depending on whether the user is a "static" or "dynamic" user, a distinction based on the user's subscription plan with Aereo. (Hrg. Tr. at 74:22-78:2; Kelly Decl. ¶¶ 45-46; Lipowski Decl. ¶¶ 32, 35). Static users have a set of previously selected antennas that have been assigned to them, whereas dynamic users—the vast majority of Aereo's subscribers—are randomly assigned an antenna each time they use Aereo's system. (Hrg. Tr. at 74:22-78:2; Kelly Decl. ¶¶ 47-49; *see also* Lipowski Decl. ¶¶ 32, 35). No two users are assigned a single antenna at the same time. (Hrg. Tr. at 104:20-105:1, 234:3-15).

Thus, although any particular antenna can be used by only one user at a time, dynamic users "share" antennas in that a given antenna may be assigned to different users at different times.[3] (Hrg. Tr. at 74:22-78:2, 104:20-106:24, 234:3-15). Static users may similarly "share" antennas in the event that the antennas permanently assigned to them are unavailable, in which case the Aereo system will randomly assign them another unused antenna that may at some other

---

[3] Other components of the system are also "shared" resources, such as the computer servers, insofar as the servers hold and process data for multiple users—although the data for each user is kept segregated—and transcoders which also may be randomly assigned. (Hrg. Tr. at 250:5-19; Kelly Decl. ¶¶ 47-49; *see also* Lipowski Decl. ¶ 32)

time be allocated to another user. (Hrg. Tr. at 74:22-78:2, 104:20-106:24; Kelly Decl. ¶¶ 47-49). However, just as the antennas are not shared when they are in use, the data obtained by a particular antenna while allocated to a particular user is not "shared" with or accessible by any other Aereo user. (Hrg. Tr. at 104:20-106:24, 137:1-7, 139:12-16; Pozar Decl. ¶¶ 10-14, 19; Pozar Rep. at 6; Horowitz Rep. ¶ 59;Volakis Decl. ¶ 66).

Once these resources are allocated, the Antenna Server sends a "tune" request that directs the user's antenna to "tune into" a particular broadcast frequency band to obtain the desired program. (Hrg. Tr. at 103:4-21; Kelly Decl. ¶ 50; Volakis Decl. ¶ 58; Lipowski Decl. ¶¶ 33, 35-37; Horowitz Rep. ¶ 64). The Antenna Server also sends a request to the Streaming Server that creates a unique directory, assigned to the user, for storing the output data received by the antennas and processed by the transcoder. (Kelly Decl. ¶ 50). Once this directory is created, an electrical signal is sent from the antenna, processed and converted into data packets, and then sent to the transcoder, which encodes it in a form to be transmitted over the internet. (Hrg. Tr. at 82:13-85:5; Kelly Decl. ¶ 51; Volakis Decl. ¶¶ 59-63, 65; *see also* Lipowski Decl. ¶¶ 37, 41-45; Horowitz Rep. ¶ 62). The encoded data is sent to the Streaming Server, where it is saved on a hard disk to a file in the previously created directory and, once saved, is read from that file into a "RAM memory buffer" that sends the data to the user over the internet once a sufficient amount of data—at least six or seven seconds of programming— has accumulated. (Hrg. Tr. at 85:6-88:3, 106:25-107:8, 139:8-11, 248:18-22; Kelly Decl. ¶ 52; Lipowski Decl. ¶ 42; Horowitz Rep. ¶ 63). As additional data is received from the antenna, that data continues to be saved to the hard disk and then read into the RAM memory buffer to be transmitted to the user. (Hrg. Tr. at 85:6-88:3, 137:1-138:15; Kelly Decl. ¶ 52). Whereas the file saved to the hard disk retains all of the data received by the antenna at least until the user finishes watching the program, allowing the

user to pause and rewind, the data in the RAM memory buffer contains only a small packet of data that is continuously replaced as data is sent to the user and new packets of data are fed into the buffer. (Hrg. Tr. at 87:11-88:3, 107:9-108:1, 108:23-110:15, 111:20-112:21, 309:25-311:8).

Essentially the same process occurs when the user engages the "Record" function of Aereo's system. (Hrg. Tr. at 88:15-90:9, 294:1-300:5). The only substantial difference between the "Watch" and "Record" functions is that when a user engages the "Record" function, the file saved to the hard disk is tagged as permanent and automatically retained, whereas the file saved to the hard disk using the "Watch" function is not automatically retained unless the user clicks "Record" while the show is still open on the user's web browser. (Hrg. Tr. at 88:15-90:9, 112:22-114:17, 121:15-25, 141:7-13).

## B. Aereo's Antennas

The only significant factual dispute concerns the operation of Aereo's antennas. Aereo contends that each of its antennas functions separately to receive the incoming broadcast signals. Plaintiffs assert that Aereo's antennas function collectively as a single antenna, aided by a shared metallic substructure. (Volakis Decl. ¶¶ 58, 66, 68).

Each of Aereo's antennas consists of a pair of metal loops roughly the size of a dime. (Volakis Decl. ¶¶ 2, 53-54). Eighty such antennas are packed on one end of a circuit board, with a metal rail that separates the area with the antenna elements from an area housing the electronic components used to operate the antennas and process the signal. (Hrg. Tr. at 80:11-82:12; Volakis Decl. ¶¶ 2-3, 53, 55; Horowitz Rep. ¶ 59; Pls. Ex. 80). Sixteen such boards are stored parallel to one another in a metal housing, like books a on shelf, with the portion of the circuit board containing the antennas sticking out of the housing. (Hrg. Tr. at 80:11-82:12; Volakis Decl. ¶¶ 2, 52-53; Pls. Ex. 80; Pls. Ex. 81). When the boards are placed in the housing, the metal

rails fit close together and form a barrier between the antennas and the other electronic elements of Aereo's system. (Hrg. Tr. at 80:11-82:12; Volakis Decl. ¶ 2).

In support of their contention that single Aereo antennas cannot function on their own to receive usable television signals, Plaintiffs submit the declaration of Dr. John Volakis. According to Dr. Volakis, minimizing antenna size is challenging, because smaller antennas tend to have lower bandwidth and higher "impedance mismatch" than larger antennas, both of which impair their performance. (Volakis Decl. ¶¶ 33-34, 41, 43-44). Although these problems can be reduced or eliminated, doing so typically means the antenna will need to receive a more powerful broadcast signal to function. (Volakis Decl. ¶¶ 45-49). These principles lead Dr. Volakis to opine that Aereo's antennas do not function independently. Instead, according to Dr. Volakis, the antennas are packed on the board so close together that the incoming signal "does not see the loops as separate elements, but rather as one continuous piece of metal," the function of which is further aided by a common metal substructure formed by the circuit boards and the metal rails. (Volakis Decl. ¶¶ 71, 73-74; *see also* Pls. Ex. 86 at 200:21-201:11, 204:11-205:2; Pls. Ex. 87 at 36:7-15, 137:4-7, 137:24-138:3; Pls. Ex. 88 at 54:5-12).

Dr. Volakis's declaration sets forth a series of tests that he claims support this opinion. First, Dr. Volakis "activate[d] only a single [antenna] element, while leaving the loop elements immediately around it turned off," and observed an electromagnetic field around not just the active loop, but also the inactive loops as well. (Volakis Decl. ¶ 79-80). Second, he made "metallization changes" on the circuit board, and found that none of the changes affected reception, contrary to what he would expect if the antenna were functioning independently. (Volakis Decl. ¶¶ 81, 83). Third, he obstructed roughly half of the antenna loops with radio absorbing material to suppress their presence and monitored reception of a single unobstructed

8

loop element, and saw a substantial drop in signal received by that antenna as compared to when the other antenna loops were unobstructed.  (Volakis Decl. ¶ 82).

Aereo's experts note two overarching flaws in the tests Dr. Volakis performed.  First, Dr. Volakis oriented the antennas vertically and with the antenna board "broadside" to the signal transmitter, whereas Aereo orients the antennas horizontally, with the board oriented "edge-on" toward the transmitter, a significant change according to Dr. Horowitz.  (Hrg. Tr. 323:17-325:1; Pozar Decl. ¶¶ 24-26; Horowitz Decl. ¶¶ 36-37; Pls. Ex. 80).  Second, Aereo also notes the lack of a "control" in several of Dr. Volakis's experiments, because Dr. Volakis did not perform these tests on a single, stand-alone antenna element.[4]  (Pozar Decl. ¶¶ 27-28; Horowitz Decl. ¶¶ 32, 46).

Aereo's experts also dispute the reliability of each of Dr. Volakis's particular tests.  As to the test in which Dr. Volakis activated only a single loop element (Volakis Decl. ¶¶ 79-80), Aereo notes that Dr. Volakis's conclusions were drawn from a computer simulation which inaccurately positioned the antennas and did not properly model the antennas resistive elements, and that Dr. Volakis was unable to precisely reproduce or explain his results at his deposition.  (Hrg. Tr. at 318:13-319:3, 322:13-323:14; Pozar Decl. ¶¶ 22, 30-32; Horowitz Decl. ¶¶ 29-31, 33).  As to Dr. Volakis's metallization experiments (Volakis Decl. ¶¶ 81, 83), Dr. Volakis could not identify precisely how he changed the metallization of the board and, according to Aereo's experts, his results could be fairly interpreted to mean that the antennas at issue simply are not

---

[4] As previously explained in the Court's April 30, 2012 order, whether due to inadvertence or strategy, Plaintiffs failed to request permission to conduct destructive testing on Aereo's antenna board until the close of discovery and well after the service of their expert reports, despite their awareness since the outset of this litigation that the function of Aereo's antennas would be at issue in this case.  (Order, *WNET v. AEREO, Inc.*, No. 12-cv-01543, Docket Entry 67).  To the extent that Plaintiffs' questioning of witnesses at the hearing suggests that they believe their decision not to perform such testing during the discovery period in this case hindered their ability to conduct such "control" experiments, the Court notes that it has numerous other reasons to credit Aereo's experts' conclusions that the antennas function independently.  In particular, the live testimony of Dr. Horowitz and Mr. Lipowski, detailed herein, was highly credible and persuasive.

affected by nearby metallization and do, in fact, function independently.  (Pozar Decl. ¶ 27; Horowitz Decl. ¶¶ 34, 40, 48-49; *see also* Hrg. Tr. at 239:9-12).  Finally, Aereo's experts opine that Dr. Volakis's tests using radio absorbing material were flawed because the size of the absorbing material and its proximity to the measured antenna element would have disrupted the electromagnetic field around the antenna being measured.  (Pozar Decl. ¶ 28; Horowitz Decl. ¶¶ 42-45, 47).

Because Plaintiffs did not offer Dr. Volakis as a witness at the hearing or otherwise defend his results, these substantial criticisms are largely unrebutted.  Moreover, Plaintiffs provide only a general description of the tests Dr. Volakis performed rather than explaining the details of this testing, which renders his experiments difficult to assess or credit in the first instance; combined with the flaws Aereo points out in these tests, the Court cannot accept their reliability at this stage of the proceedings.

In contrast, Aereo presented significant evidence that each antenna functions independently.  Dr. Pozar and Dr. Horowitz maintain that the construction of the antenna system requires the antennas to function independently, and Dr. Horowitz has observed numerous (if small) differences in recordings of the same program created by two different antennas.  (Hrg. Tr. at 240:23-241:1, 300:16-304:14; Pozar Decl. ¶¶ 10-14, 19; Pozar Rep. at 6; Horowitz Rep. ¶ 59; Def. Ex. 55 at 54:13-55:20, 71:20-72:3).  Aereo's chief technology officer, Joe Lipowski, attests that his experience with the antennas suggests that the proximity of one antenna to another does not improve and may actually degrade signal reception, a point on which Aereo's experts concur.  (Lipowski Decl. ¶¶ 62-63; Pozar Decl. ¶ 19; Horowitz Decl. ¶ 28; Def. Ex. 50 at 42:20-43:4, 78:13-79:11.  Moreover, tests performed at the Aereo site demonstrate that the signal received by Aereo's antennas is 1,000 times stronger than that needed for reliable reception,

allowing Aereo to circumvent the difficulties associated with creating small antennas, discussed above. (Horowitz Decl. ¶ 26; Lipowski Decl. ¶ 61; Hrg. Tr. at 319:8-320:24). Such evidence goes to the heart of whether Aereo's antennas are capable of functioning independently, as even Dr. Volakis testified at his deposition that a sufficiently strong signal would overcome the problems he identified relating to small antenna size. (Def. Ex. 49 at 205:3-23). Finally, Aereo's expert Dr. Pozar also tested a single Aereo antenna which he observed to function with a signal level well above that required to generate the television picture. (Pozar Rep. at 10-12; *see also* Hrg. Tr. at 245:12-246:23). Dr. Volakis argues that such tests are not meaningful because the antenna was mounted on a circuit board with a metal plate that served as a substructure enhancing the performance of the antenna.[5] (Volakis Decl. ¶¶ 85-87, 90; *see also* Pls. Ex. 88 at 223:15-22). However, Dr. Pozar testified at his deposition that he could "pretty much guarantee" that the metal plate was not going to have any effect on whether the single antenna loop could function given the strength of the signal received at Aereo's facilities, a point on which Dr. Horowitz agrees. (Pls. Ex. 88 at 232:14-233:21; Def. Ex. 55 at 233:22-235:7, 270:13-271:9; *see also* Pls. Ex. 88 at 239:16-240:24; Horowitz Decl. ¶¶ 52-53).

Based on the evidence at this stage of the proceedings, the Court finds that Aereo's antennas function independently. That is to say, each antenna separately receives the incoming broadcast signal, rather than functioning collectively with the other antennas or with the assistance of the shared metal substructure.

---

[5] Plaintiffs also argue that the antenna used in Dr. Pozar's tests was not the final production version of the antenna. (Volakis Decl. ¶ 88; Pls. Ex. 87 at 118:6-22, 120:23-123:8; Pls. Ex. 88 at 211:23-212:18, 215:5-21). Aereo responds that the antennas used in Dr. Pozar's tests were "designed to be electronically the same as the production antennas" and were the "test pair and board from which the production antennas were created." (Lipowski Decl. ¶ 58-59; *see also* Def. Ex. 55 at 212:13-18, 216:2-11). Dr. Pozar testified that he did not believe that such differences affected his analysis or the results he obtained during his testing. (Def. Ex. 55 at 243:4-244:8). Although Plaintiffs have identified certain differences between the antenna used for Dr. Pozar's tests and those used at Aereo's facilities, they have not demonstrated that the differences are sufficient to render Dr. Pozar's tests unreliable in demonstrating that Aereo's antennas can function independently. (*See also* Volakis Decl. ¶ 88-89).

IV.   **LIKELIHOOD OF SUCCESS**

The first consideration in the preliminary injunction analysis is the probability of success

on the merits. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).  "[T]o make out a *prima facie*

case of copyright infringement, a party must establish ownership of a valid copyright and that the

defendant violated an exclusive right conferred by the ownership."  *Blue Moon Media Group,*

*Inc. v. Field*, No. 08-cv-01000, 2011 U.S. Dist. LEXIS 108066, at *46-47 (E.D.N.Y. Apr. 11,

2011) (citing *Feist Publ'ns, Inc., v. Rural Tel. Serv. Co.*, 499 U.S. 340, 360 (1991)); *see also*

*Arista Records LLC v. Doe*, 604 F.3d 110, 117 (2d Cir. 2010).  Plaintiffs may make a *prima facie*

showing of a valid copyright by submitting certificates of registration of the copyrights at issue,

*see* 17 U.S.C. § 410(c), and there appears to be no dispute for purposes of this motion that

Plaintiffs' works are copyrighted or that Aereo's users will access those works using Aereo's

service. (Pls. Ex. 83).

A.  *Cablevision*

At issue in this case is the applicability of the Second Circuit's decision in *Cablevision*,

which held, *inter alia*, that Cablevision's Remote Storage DVR ("RS-DVR") system did not

infringe the plaintiffs' public performance right under the Copyright Act.  *Cablevision*, 536 F.3d

at 139-40.  In particular, *Cablevision* construed the "transmit clause" in 17 U.S.C. § 101, which

provides in relevant part that

> [t]o perform or display a work "publicly" means . . . to transmit or otherwise
> communicate a performance or display of the work . . . to the public, by means of
> any device or process, whether the members of the public capable of receiving the
> performance or display receive it in the same place or in separate places and at the
> same time or at different times.

17 U.S.C. § 101.  The same provision is at issue here.

Aereo argues that as in *Cablevision* it effectively rents to its users remote equipment

comparable to what these users could install at home, and that its activities are materially identical to those in *Cablevision* such that the Second Circuit's analysis and holding in that case are directly applicable, precluding any public-performance liability. Plaintiffs contend that there are factual distinctions between *Cablevision* and the present case that render that decision inapplicable and require the Court to find that Aereo engages in a public performance under the transmit clause. Because this case turns on determining if the analysis in *Cablevision* is controlling or, as Plaintiffs maintain, there are factual distinctions sufficient to escape *Cablevision*'s holding, the Court must undertake a detailed review of that case, including the mechanics of Cablevision's RS-DVR system.

     1. The Mechanics of the *Cablevision* RS-DVR System

The RS-DVR system in *Cablevision* was designed to allow customers who did not have a stand-alone DVR in their homes to record cable programming on central hard drives housed and maintained by Cablevision at a remote location. *See Cablevision*, 536 F.3d at 124. Customers could receive playback of those programs using a remote control on their home television sets, allowing those consumers to achieve DVR functionality without actually possessing an in-home set-top DVR. *See id.* at 124-25.

To provide this service, Cablevision took the single stream of data that it received containing the programming of various television channels and split it into two separate streams. *Id.* at 124. The first stream was treated as standard cable programming and routed immediately to customers. *See id.* The second stream of data was used for Cablevision's unlicensed RS-DVR service. *See id.* at 124-25. The second stream of data was first sent to a primary ingest buffer, which queried whether any consumer wanted to record any of the programming contained in the data stream. *Id.* at 124-25. If so, the data for that program moved to a secondary buffer, and then

13

onto a portion of the hard disk allocated to that consumer where a copy was created and stored

for playback by the consumer. *See id.* A unique "playback copy" of the television program was

thus stored on the hard drive for each individual subscriber, to be sent to the consumer when they

requested to watch the program. *See id.* at 125, 130, 135, 138-39. As a result, Cablevision's RS-

DVR system allowed numerous consumers to watch the same television program with DVR

functionality, although each consumer did so through playback of a unique copy that he or she

created and that was accessible only to that consumer.

　　　2.　The District Court's Decision

　　　Considering these facts, then-District Court Judge Chin concluded that, notwithstanding

the specifics of how Cablevision's system operated, Cablevision was engaged in a public

performance of the plaintiffs' copyrighted works. *Twentieth Century Fox Film Corp. v.*

*Cablevision Sys. Corp.*, 478 F. Supp. 2d 607, 624 (S.D.N.Y. 2007). In doing so, the district court

rejected Cablevision's argument that any "performance is fundamentally private . . . [because]

each streaming emanates from a distinct copy of a program uniquely associated with one

customer's set-top box and intended for that customer's exclusive viewing in his or her home."

*Id.* at 622. Instead, the district court focused on the fact that each of Cablevision's RS-DVR

subscribers were being transmitted the same underlying program, and found that this resulted in

a public performance. *See id.* at 622-23.

　　　In reaching this conclusion, the district court found two out-of-circuit cases particularly

instructive, *On Command Video Corp. v. Columbia Picture Indus.*, 777 F. Supp. 787 (N.D. Cal.

1991) and *Columbia Pictures Indus. v. Redd Horne*, 749 F.2d 154 (3d Cir. 1984). Both cases

involved infringers who delivered copyrighted programming to multiple people, albeit at

different times and in different places, and in both cases the court found that the infringers

14

engaged in public performances under the transmit clause. In *Columbia Pictures*, 749 F.2d at 156-57, the defendants operated video rental stores and set up private booths in which customers could watch copyrighted videotapes played by a VCR at the front of the store. Similarly, in *On Command*, 777 F. Supp. at 788-89, the infringing plaintiff developed a system through which a hotel could use a bank of VCRs to play videotapes to rooms in the hotel. The district court explained that, as in these cases, Cablevision's service fell within the scope of the transmit clause and that it made no difference that the subscribers may have viewed the programs at different times and in different places. *See Twentieth Century Fox Film Corp.*, 478 F. Supp. 2d at 623-24. Thus, the district court effectively viewed the transmit clause broadly, with the "same time or . . . different times" and "same place or . . . different places" language controlling the outcome of the case because the relevant transmission was that of the underlying program, and not each playback copy to each particular user.

### 3.  The Second Circuit's Decision

The Second Circuit approached the problem posed by *Cablevision* from a substantially different starting point, one that led it to reverse the district court. *See Cablevision*, 536 F.3d at 140. In particular, the Court of Appeals began its analysis with two crucial premises in mind. First, the Court of Appeals explained that under the "transmit clause," "a transmission of a performance is itself a performance" for infringement purposes. *Cablevision*, 536 F.3d at 134-35, 139. This meant that, in determining whether there has been a public performance, courts are to look to the transmission being made as the performance at issue, rather than simply to whether the public receives the underlying work. *See id.* at 134-36 ("[W]e believe that when Congress speaks of transmitting a performance to the public, it refers to the performance created by the act of transmission."); *see also United States v. Am. Soc'y of Composers*, 627 F.3d 64, 73-74 (2d

Cir. 2010) ("'[T]ransmittal of a work' is distinct from a transmittal of 'a performance'—the former being a transmittal of the underlying work and the latter being a transmittal that is itself a performance of the underlying work."). Second, the Court of Appeals found that the transmit clause directs courts to "examine who precisely is 'capable of receiving' a particular transmission of a performance" to determine if a performance is public. *Cablevision*, 536 F.3d at 135.

From this perspective, the Second Circuit's view of the transmit clause was substantially narrower than the district court's. Because the Second Circuit considered the relevant performance to be the discrete transmission of each user's unique playback copy of the television program to that user, the potential audience "capable of receiving" that performance was limited to that user, and each such performance was private, not public. *See id.* at 125, 135, 139. Specifically, the Second Circuit explained that because "each RS-DVR playback transmission is made to a single subscriber using a single unique copy produced by that subscriber, . . . such transmissions are not performances 'to the public.'" *Id.* at 139. As such, the Second Circuit held that "the use of a unique copy may limit the potential audience of a transmission and is therefore relevant to whether that transmission is made 'to the public.'" *Id.* at 138. Importantly, the Second Circuit viewed the transmissions in that case as made from each unique playback copy, even though those playback copies could arguably have been viewed as merely part of a "device or process" through which a large-scale transmission to the public was accomplished. *See* 17 U.S.C. § 101; *Cablevision*, 536 F.3d at 124-25, 137.

This reading of the transmit clause also led the Second Circuit to expressly reject the district court's reasoning, explaining that the transmit clause "speaks of people capable of receiving a particular 'transmission' or 'performance,' and not of the potential audience of a

16

particular 'work.'" *Cablevision*, 536 F.3d at 135.  Likewise, it concluded that *Redd Horne* and *OnCommand* were inapposite, in large part because each of those cases involved the retransmission of a copyrighted work from a single "master copy," rather than unique copies created for each viewer, as in *Cablevision*.  *See id.* at 138-39.

Similar reasoning led the Second Circuit to reject the plaintiffs' argument on appeal that Cablevision was engaged in a public performance because it transmitted to the public the "same performance" of any given work—the performance of that work that "occurs when the programming service supplying Cablevision's content transmits that content to Cablevision and the service's other licensees."  *Id.* at 136.  In other words, the plaintiffs argued that because the upstream content providers transmitted the copyrighted work to Cablevision and other cable companies, which Cablevision retransmitted to its subscribers, the Second Circuit should view the initial transmission from the content providers as the relevant performance (rather than the subsequent transmission of each playback copy to each user) and treat *that* performance as made "to the public."  *See id.*  The Second Circuit disagreed, explaining that "HBO transmits its own performance of a work when it transmits to Cablevision, and Cablevision transmits its own performance of the same work when it retransmits the feed from HBO," and it was therefore inappropriate to look back to the initial transmission made by the plaintiffs as the relevant performance.  *Id.*  Importantly, the Second Circuit held that courts should look "downstream, rather than upstream or laterally, to determine whether any link in a chain of transmissions made by a party constitutes a public performance."  *Id.* at 137.

B.  **Lawfulness of Aereo's System**

Aereo characterizes its system as merely allowing users to rent a remotely located antenna, DVR, and Slingbox-equivalent device, in order to access content they could receive for

free and in the same manner merely by installing the same equipment at home.  Housing this argument more specifically in the terms defined by *Cablevision*, Aereo contends that, like the RS-DVR system in *Cablevision*, its system creates unique, user-requested copies that are transmitted only to the particular user that created them and, therefore, its performances are non-public.  Moreover, Aereo submits that because each of its antennas function independently, even if the Court adopts Plaintiffs' view that these copies are not legally significant, an injunction still should not issue because each user is receiving a distinct transmission generated by their own individually rented antenna.

Plaintiffs disagree, arguing that *Cablevision* does not control and the Court should view Aereo's system as a technological gimmick—a "device or process"—through which Aereo passes along Plaintiffs' copyrighted content to the public.  Specifically, Plaintiffs attempt to distinguish *Cablevision* on its facts, arguing that because Aereo's subscribers are watching these programs as they are still being broadcast, they are not using the copies Aereo creates for "time-shifting" and these copies therefore do not "break[ ] the chain of the [over-the-air] transmission" received by Aereo. (Pls. Br. at 22-23; Pls. Reply at 14).  Thus, Plaintiffs contend, Aereo is engaged in a public performance that "emanates from the original broadcast signal" (Pls. Reply at 10), much like a "community antenna" which simply passes along a broadcast signal to the public.  In other words, according to Plaintiffs, Aereo's copies should be viewed as merely facilitating the transmission of a single master copy—in this case, the broadcast signal—rather than as copies from which a distinct transmission is made.[6]  Having identified this hook on which to hang their legal position, Plaintiffs advocate that the Court is bound only by *Cablevision*'s specific holding as applied to its precise facts and is free to depart from the

---

[6] For the sake of brevity, the Court will refer to the former as "facilitating copies" and the latter as "transmission copies."

transmit clause analysis of that case to find that Aereo engages in a public performance. (*See,
e.g.*, Hrg. Tr. at 400:5-402:19 (citing *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650
F.3d 876, 899 (2d Cir. 2011) (explaining that "appellate judges cannot make law except insofar
as they reach a conclusion based on the specific facts and circumstances presented to the court in
a particular appeal"))).

Despite this creative attempt to escape from the express holding of *Cablevision*, for the
reasons discussed below this Court finds itself constrained to reject the approach Plaintiffs urge.
Contrary to Plaintiffs' arguments, the copies Aereo's system creates are not materially
distinguishable from those in *Cablevision*, which found that the transmission was made from
those copies rather than from the incoming signal.  Moreover, Plaintiffs' attempt to distinguish
*Cablevision* based on time-shifting fails when confronted with the reasoning of that case,
particularly considering that the Second Circuit's analysis was directly focused on the
significance of Cablevision's copies but did not say one word to suggest that time-shifting played
any part in its holding.

1.   *Cablevision* Suggests that the Copies Saved to Aereo's Hard Disks Do Not Merely
     Facilitate a Broader Transmission

In assessing the parties' arguments, this Court first looks to *Cablevision*'s basis for
finding that the copies created by Cablevision's RS-DVR system thwarted the plaintiffs' public
performance claim, as this holding is necessarily premised on the conclusion that the copies in
that case were not mere facilitating copies.  *See Cablevision*, 536 F.3d at 139 ("[E]ach RS-DVR
playback transmission is made to a single subscriber using a single unique copy produced by that
subscriber").  In doing so, this Court finds that on the key points on which *Cablevision* actually
relied, *see id.*, Aereo's system is materially identical to that in *Cablevision*, suggesting that the
copies Aereo creates are as significant as those created in *Cablevision*.  First, Aereo's system

creates a unique copy of each television program for each subscriber who requests to watch that program, saved to a unique directory on Aereo's hard disks assigned to that user. *See id.* at 124 ("If a customer has requested a particular program, the data for that program move from the primary buffer into a secondary buffer, and then onto a portion of one of the hard disks allocated to that customer."). Second, each transmission that Aereo's system ultimately makes to a subscriber is from that unique copy. *See id.* at 137 ("[T]he RS-DVR system, as designed, only makes transmissions to one subscriber using a copy made by that subscriber"). Third, the transmission of the unique copy is made *solely* to the subscriber who requested it;[7] no other subscriber is capable of accessing that copy and no transmissions are made from that copy except to the subscriber who requested it. *See id.* ("[T]he universe of people capable of receiving an RS-DVR transmission is the single subscriber whose self-made copy is used to create that transmission."). The overall factual similarity of Aereo's service to *Cablevision* on these points suggests that Aereo's service falls within the core of what *Cablevision* held lawful.

Another point of similarity between this case and *Cablevision* is found in the undercurrent to the Second Circuit's reasoning suggesting that the Cablevision system merely allowed subscribers to enjoy a service that could also be accomplished using any standard DVR or VCR. *See, e.g., id.* at 125 ("To the customer, however, the processes of recording and playback on the RS-DVR are similar to that of a standard set-top DVR."); *see also id.* at 131 (noting that it "d[id] not believe that an RS-DVR customer is sufficiently distinguishable from a VCR user to impose liability" for infringement of the reproduction right). As in *Cablevision*, the functionality of Aereo's system from the user's perspective substantially mirrors that available

---

[7] That Aereo users may "share" resources like antennas by using them at different times does not affect this analysis, as it remains clear that the copies Aereo's system makes are unique for each user and are not "shared." Moreover, a number of the resources in *Cablevision* were also "shared," including the servers and, most significantly, the unlicensed signal from which the unique copies were made. *See Cablevision*, 536 F.3d at 124-25; (Hrg. Tr. at 116:1-10).

using devices such as a DVR or Slingbox, which allow users to access free, over-the-air

broadcast television on mobile internet devices of their choosing. (*See supra* Section II.A.1). To

the extent that the Second Circuit's holding in *Cablevision* was premised on an inability to

distinguish Cablevision's system from otherwise lawful activities, Aereo's system deserves the

same consideration.

In addition, beyond the substantial factual similarities of Aereo's copies to those in

*Cablevision*, the analysis the Second Circuit undertook in finding that the performance to the end

user was made from those copies rather than from, for example, the incoming stream of data, is

equally applicable here.  For one thing, *Cablevision* held that a public performance does not

occur merely because a number of people are transmitted the same television program. *See id.* at

135-36.  The Second Circuit was similarly unwilling to accept the plaintiffs' arguments on

appeal that, notwithstanding its creation of unique copies, Cablevision was actually transmitting

to its users the performance of that work that "occurs when the programming service supplying

Cablevision's content transmits that content to Cablevision and the service's other licensees."

*Id.* at 136.  Plaintiffs' argument that Aereo's transmissions actually "emanate[ ] from the original

broadcast signal" rather than from the unique copies Aereo's system creates is just another

variant of these arguments, rejected by *Cablevision*, that the Court should look back (or

"upstream") to the point at which Aereo's antennas obtain the broadcast content to conclude that

Aereo engages in a public performance in retransmitting this content.

In fact, the Second Circuit expressly refused to look back to the received signal to

conclude that Cablevision was engaged in a public performance, finding a dividing line between

the transmissions made by the content providers and the transmissions made by Cablevision. *See*

*id.* ("HBO transmits its own performance of a work when it transmits to Cablevision, and

Cablevision transmits its own performance of the same work when it retransmits the feed from HBO."). Indeed, in light of this Court's factual determination that each antenna functions independently, in at least one respect the Aereo system is a stronger case than *Cablevision* for attaching significance to such copies because, unlike *Cablevision* in which multiple copies were all created from a *single* stream of data, *see id.* at 124, each copy made by Aereo's system is created from a *separate* stream of data. *See id.* at 137 (refusing to accept the plaintiffs' argument that Cablevision publicly performs a work when it splits and retransmits the incoming programming stream); *see also Am. Soc'y of Composers*, 627 F.3d at 75 (applying the "same distinction" as drawn in *Cablevision* regarding the creation of unique copies to conclude that a performance made from those copies is not public). Taken in conjunction with the substantial factual parallels between Aereo's service and that in *Cablevision*, that Plaintiffs raise arguments profoundly similar to those already considered and rejected by the Second Circuit demonstrates, in part, why *Cablevision* controls this case.

      2.  <u>Plaintiffs Cannot Persuasively Distinguish *Cablevision* Based on Time-Shifting</u>

      In the face of these controlling similarities, Plaintiffs try to devise factual distinctions to circumvent *Cablevision*'s holding. Primarily, Plaintiffs argue that the copies in this case are unlike those in *Cablevision* because *Cablevision* addressed only copies used for time-shifting— recording programs to view them at a later time—whereas Aereo's system allows users to view television programs close in time to their initial broadcast. Plaintiffs further contend that in order to be time-shifted, there can be no overlap between the over-the-air broadcast of the program and consumer playback of a recorded copy of that program—that any time-shifting must be "complete" to turn a facilitating copy into a transmission copy. (*See, e.g.*, Hrg. Tr. at 386:19-387:8, 416:24-420:15). The Court cannot accept this reading of *Cablevision*, which applies controlling significance to facts on which the Second Circuit did not rely, requests that this Court

read volumes into *Cablevision*'s silence, and has no foundation in the articulated reasoning on which the Second Circuit's decision was actually grounded.

      a.   Plaintiffs apply controlling significance to facts on which *Cablevision* does not rely.

Beginning with the first point, that Plaintiffs attempt to apply controlling significance to facts on which *Cablevision* did not rely, the Second Circuit's holding regarding the meaning of the transmit clause required a focus on who is "capable of receiving" a given performance—*i.e.*, the potential audience—in determining whether that performance was made "to the public." *See Cablevision*, at 134-35, 139. The facts on which the Second Circuit relied in holding that the potential audience of the transmissions in *Cablevision* was limited are the same as those present here, namely the use of unique copies, accessible only to the users who requested them, and transmitted only to those users. *See id.* at 139. Notwithstanding the scattered background-section references in *Cablevision* to programs that were "previously recorded" that Plaintiffs cite (Pls. Br. at 17-18; Pls. Reply at 3 n.1, 11, 13; Hrg. Tr. at 420:7-15, 425:5-24), time-shifting is simply not the basis of the Second Circuit's opinion. Far from it: the Second Circuit never even mentioned time-shifting, whether complete or partial, as a reason to conclude the copies Cablevision created were significant or that the performances at issue were non-public. *See generally id.* Thus, even accepting that a distinction based on time-shifting exists in this case, nothing in the Second Circuit's analysis indicates that this distinction is material, and this Court remains obligated to apply Circuit precedent with fidelity to its underlying reasoning. *See, e.g.*, *Rutherford v. Katonah-Lewisboro Sch. Dist.*, 670 F. Supp. 2d 230, 247 (S.D.N.Y. 2009); *Shipkevich v. Staten Island Univ. Hosp.*, No. 08-cv-01008, 2009 U.S. Dist. LEXIS 51011, at *5 (E.D.N.Y. June 16, 2009). Indeed, even in *Theflyonthewall.com, Inc.,* 650 F.3d at 899, 902, on which Plaintiffs heavily rely for the proposition that "appellate judges cannot make law except

23

insofar as they reach a conclusion based on the specific facts and circumstances presented to the court in a particular appeal," the Second Circuit still applied the *reasoning* of controlling precedent to reach its result.[8]

> b. *Cablevision*'s silence on time-shifting refutes Plaintiffs' argument

Turning to the second basic flaw in Plaintiffs' argument, Plaintiffs admit that nowhere in *Cablevision* did the Second Circuit articulate a requirement that the copies be used for time-shifting in order to "break the chain" of transmission—the distinction on which they now found their case. (Hrg. Tr. at 402:23-412:7). Specifically, Plaintiffs argue that the lawfulness of playback of programs contemporaneous with the initial broadcast of those programs was not before the Second Circuit because Cablevision was licensed to make live transmissions of this content. (Hrg. Tr. at 397:5-398:5, 398:19-400:4). *See Cablevision*, 536 F.3d at 124 ("Generally, this stream [of data comprising the content of various television programs] is processed and transmitted to Cablevision's customers in real time. . . . The first [data stream used in the RS-DVR service] is routed immediately to customers as before."). As such, Plaintiffs contend that the Second Circuit was only called upon to rule on the lawfulness of a system allowing users to access time-shifted programming and that this Court should disregard the Second Circuit's complete silence on the significance of time-shifting to its analysis.

Plaintiffs' position that the Second Circuit's decision in *Cablevision* turned on its unstated reliance on the importance of time-shifting as "breaking the chain of transmission" is

---

[8] Plaintiffs also direct the Court to the conclusion of the *Cablevision* opinion in which the Second Circuit explains that "[t]his holding . . . does not generally permit content delivery networks to avoid all copyright liability by making copies of each item of content and associating one unique copy with each subscriber to the network, or by giving their subscribers the capacity to make their own individual copies." *Cablevision*, 536 F.3d at 139. (Pls. Reply at 4). Plaintiffs argue that this portion of the opinion limited *Cablevision* to its facts and that, therefore, this Court should not "extend [] *Cablevision* as Aereo urges." (Pls. Reply at 4). This excerpt from *Cablevision* is better construed as directing that copyright liability may attach to these actions for violations of other exclusive rights provided for by copyright or through contributory liability, not as limiting *Cablevision*'s public performance holding to its precise facts. *See id* at 139-40.

unpersuasive.  The Second Circuit's analysis of the public performance claim was entirely directed toward explaining why the copies created by the system in *Cablevision* were significant and resulted in performances to a limited, non-public audience.  *See generally id.*  Plaintiffs' view of *Cablevision* requires the dubious conclusion that despite the Second Circuit's extensive discussion of the importance of these unique copies, the Second Circuit relied on the time-shifted nature of these copies as case-dispositive but left this crucial consideration in the background for subsequent courts to puzzle out on their own.  Moreover, Plaintiffs' contention that the parties in *Cablevision* extensively relied on time-shifting before the district court and Second Circuit (Pls. Prop. COL ¶¶ 40-43, 67) completely undercuts their claim that the Second Circuit did not discuss time-shifting because that issue was not squarely before them.  (Hrg. Tr. at 397:5-398:5, 398:19-400:4).  By Plaintiffs' own admission, the purported significance of time-shifting was "actually presented to the Second Circuit in *Cablevision*" (Pls. Prop. COL ¶ 43) through Cablevision's briefing, yet the Second Circuit gave no indication it considered these facts important, let alone controlling.  Plaintiffs' argument relying on time-shifting is, therefore, implausible.

c.  Plaintiffs' arguments are contrary to the reasoning of *Cablevision*

Third, and perhaps most importantly, Plaintiffs' arguments are simply not consistent with the reasoning of *Cablevision*.  For example, although they gesture toward housing their position within the reasoning of *Cablevision* by suggesting that complete time-shifting limits the potential audience of a program, (Pls. Reply at 14; Pls. Proposed COL at ¶ 63); *see id.* at 138 (explaining that "the use of a unique copy *may* limit the potential audience of a transmission and is therefore *relevant* to whether that transmission is made 'to the public.'" (emphasis added))), the logic of this argument is opaque. Whether a user watches a program through Aereo's service as it is being broadcast or after the initial broadcast ends does not change that the transmission is made from a unique copy, previously created by that user, accessible and transmitted only to that user,

the factors *Cablevision* identified as limiting the potential audience. *See id.* at 134-39. To the

extent Plaintiffs mean to suggest that time-shifting limits the potential audience because it

"breaks the chain of transmission," this is merely a restatement of the conclusion that Plaintiffs

hope the Court will draw, not an independent argument that explains why *only* a time-shifted

copy limits the potential audience of a transmission to render the resulting performance non-

public.

In fact, nothing in *Cablevision* suggests that whether a performance is public turns on the

times at which individuals receive the transmission. Focusing on the text of the Copyright Act,

*Cablevision* explained that "it is of no moment that the potential recipients of the transmission . .

. may receive the transmission at different times." *Id.* at 134; *see also* 17 U.S.C. § 101

(explaining that a transmission may be "to the public . . . whether the members of the public

capable of receiving the performance . . . receive it . . . at the same time or at different times.").

Rather, as *Cablevision* instructed, it is not the timing of the receipt of the transmission that courts

should look to in determining whether the transmission is to the public, but the factors set forth

in *Cablevision.  See Cablevision*, 536 F.3d at 134 ("The implication from this same language,

however, is that it is relevant, in determining whether a transmission is made to the public, to

discern who is 'capable of receiving' the performance being transmitted.").[9]

Furthermore, in rejecting the plaintiffs' arguments on appeal, the Second Circuit

---

[9] Consider a television program initially broadcast at 6:00 pm Eastern Standard Time in New York but initially broadcast at 6:00 pm Pacific Standard Time in California. An Aereo user in New York who begins watching his or her recording of that program at 9:00 pm Eastern watches that program fully time-shifted from one perspective, but also concurrently to the over-the-air broadcast of that program to a segment of the public. Similarly, consider a program that is broadcast for the first time at 10:00 pm, and then rebroadcast the next day at 2:00 pm—is a user who watches a recording of the 10:00 pm program the next day at 2:00 pm part of a public performance?  If not, how is he or she distinguishable from the user using Aereo to watch that program "live" from a recording begun at 2:00?  Keying whether a performance is public off of whether it has been time-shifted and whether other users are simultaneously receiving the program "over-the-air" creates odd dilemmas regarding under what circumstances a performance is public or private.

26

explained in *Cablevision* that certain of these arguments would lead to "odd results," such as imposing public performance liability on "a hapless customer who records a program in his den and later transmits the recording to a television in his bedroom." *Id.* at 136. Plaintiffs' position raises a similar concern that "a hapless customer who records a program in his den" and then uses a Slingbox to "transmit[ ] the recording to a [mobile device] in his bedroom would be liable for publicly performing the work." *Id.* Such a consumer, watching a program "live" on his or her mobile device would not, according to Plaintiffs' logic, "break the chain of transmission" from the initial, over-the-air broadcast. As such, that consumer would merely be passing along a transmission that "emanates from the broadcast signal" (Pls. Reply at 10) distributed to the public generally, and thus would have engaged in a public performance even though the transmission was made from a unique copy stored on his or her DVR, solely to himself.[10]

Finding *Cablevision* cuts against them, Plaintiffs also try to locate their claimed distinction of *Cablevision* in other precedent, particularly the holding in *NFL v. Primetime 24 Joint Venture* that "a public performance or display includes each step in the process by which a protected work wends its way to its audience." *NFL v. Primetime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000) (quotation marks omitted). In that case, the Second Circuit addressed whether PrimeTime's satellite transmissions were an infringing "public performance" under the transmit clause, even though the transmissions from the satellite were received in Canada, where the Copyright Act does not apply. *See id.* at 11-12. The Second Circuit found that PrimeTime's uplink transmission of the signals, which occurred in the United States, was a step in the process of transmission and, therefore, PrimeTime was making a public performance in the United States

---

[10] Any attempt to distinguish this hypothetical by arguing that Aereo transmits the broadcast signal to multiple users fails when one considers that each copy is uniquely generated from a single antenna for each user and follows a distinct signal path, much as it would be for the stand-alone hapless consumer. As such, to find that Aereo engages in a public performance the Court must look back to the over-the-air broadcast signal as the "master copy" being retransmitted—hence the Court's belief, articulated above, that Plaintiffs' argument is merely a variant of those rejected by *Cablevision*.

subject to the Copyright Act. *See id.* at 13.  Moreover, in *American Society of Composers* the Second Circuit explained its conclusion in *NFL*, noting that the fact that "the *immediately sequential* downlink from the satellite to Canadian PrimeTime subscribers was a public performance of the games" was of "controlling significance" to *NFL*'s conclusion that PrimeTime's satellite uplink was part of this public performance. *Am. Soc'y of Composers*, 627 F.3d at 74 (emphasis added).  Plaintiffs hope to persuade the Court that this holding in *NFL* should lead it to conclude that Aereo creates mere facilitating copies.

Again, however, this argument simply runs hard against the reasoning and holding of *Cablevision*.  Both *Cablevision* and *Composers* expressly distinguished *NFL* based on the creation, in those cases, of unique copies from which the transmissions were made, explaining that such copies meant that the ultimate performance was not "to the public." *See id.* at 75 ("Just as in *Cartoon Network*, the Internet Companies transmit a copy of the work to the user, who then plays his unique copy of the song whenever he wants to hear it; because the performance is made by a unique reproduction of the song that was sold to the user, the ultimate performance of the song is not 'to the public.'"); *Cablevision*, 536 F.3d at 137.  Moreover, Plaintiffs' attempts to analogize this case to *NFL* cannot overcome the substantial other points that demonstrate that *Cablevision* controls this case, including *Cablevision*'s rejection of the arguments that it should look back to the receipt of the initial broadcast signal as the relevant performance. (*See supra* at Section IV.B.1); *Cablevision*, 536 F.3d at 136-37 (discussing *NFL*'s holding that courts should consider each step in which a public performance wends its way to its audience and explaining that *NFL* only directs courts to look "downstream" rather than "upstream or laterally" and rejecting the argument that splitting the single data stream in *Cablevision* resulted in a public performance).

28

Plaintiffs further attempt to rely on cases in which courts have concluded or the parties have conceded that internet streaming results in a public performance. *See, e.g.*, *Am. Soc'y of Composers*, 627 F.3d at 74 (explaining that "[a] stream is an electronic transmission that renders the musical work audible as it is received by the client-computer's temporary memory" and that "all parties agree [such stream transmissions] constitute public performances"); *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 601 (S.D.N.Y. 2011) (undisputed that internet streaming at issue was a public performance); *Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1008-11 (C.D. Cal. 2011) (internet streaming of DVDs was a public performance). *But see Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 649-50 (S.D.N.Y. 2011) (finding that a data compression algorithm that eliminated redundant digital data from stored copies did not result in the creation of a "master copy" storage system and, under *Cablevision*, there was no public performance liability).  Such cases, however, have generally not considered the impact of the creation of unique copies—the focus of *Cablevision*'s analysis—on whether internet streaming transmissions involve a public performance and thus did not address the question currently before the Court. *See, e.g.*, *Am. Soc'y of Composers*, 627 F.3d at 74-75 (using streaming transmissions to distinguish downloading unique copies of songs); *ivi, Inc.*, 765 F. Supp. 2d at 601; *Warner Bros. Entm't, Inc.*, 824 F. Supp. 2d at 1008-11 (C.D. Cal.  2011) (streaming was accomplished from master copies of "rented" DVDs).

Even though these cases did not address the question presented by *Cablevision*, Plaintiffs suggest that they are persuasive because they present facts similar to this case, arguing that the copies Aereo creates are equivalent to the buffer copies generally used in internet streaming. (*See* Hrg. Tr. at 92:5-96:7).  In particular, Plaintiffs emphasize that the copies Aereo creates in the "Watch" mode—in contrast to those created using "Record"—are retained only until the user

finishes watching the program. (*See, e.g.*, Pls. Reply at 3-4, 10 & n.6, 11-15; *see generally* Pls.

Br. (describing Aereo's copies as "buffer" copies)).  The difference between the "Watch" and

"Record" services has always been tenuous, hinging as it does on this sole point of distinction,

and Plaintiffs cannot persuasively analogize the copies stored on Aereo's hard disk to "buffer"

copies.  Even the copies created by the "Watch" mode are not "buffer" copies, as they are stored

for the duration of the user's viewing experience, and are not purely fleeting repositories of data

as it is immediately passed to the user.  *See, e.g.*, *Cablevision*, 536 F.3d at 124-25, 127-30

(describing the fleeting nature of these buffer copies).  This difference is established by, among

other things, the testimony of Dr. Horowitz—which Plaintiffs repeatedly misconstrue (*see, e.g.*,

Pls. Prop. FOF at 13 n.4; Pls. Obj. to Aereo's Prop. FOF at 3-4, 8, 25-26).  In particular, Dr.

Horowitz contrasted the "firehose" nature of buffer copies, which act purely to pass through data,

with the copies saved to Aereo's hard disk, which are "nonvolatile storage" as typically used to

make a recorded copy on a standard DVR.  (Hrg. Tr. at 310:8-311:6; *see also* Hrg. Tr. at 106:25-

107:24, 111:12-114:17, 298:14-23; Lipowski Decl. ¶¶ 51-55).  Moreover, by clarifying that their

present challenge in this motion encompasses all retransmissions of their content while the initial

broadcast is occurring (*Compare* Pls. Br. at 3, 5 n.1 *with* Hrg. Tr. 255:6-18, 267:14-23),

including through the "Record" mode in which Plaintiffs' own expert conceded the copies made

are "permanent" (Hrg. Tr. at 90:7-9, 113:6-19), even the tenuous point of distinction between the

"Watch" and "Record" function vanishes, and Aereo's copies cannot be viewed as purely

"temporary."

Finally, Plaintiffs try to side-step *Cablevision* and refocus this Court on the text of the

transmit clause which provides that "[t]o 'perform' a work 'publicly' means 'to *transmit* or

*otherwise communicate* a performance or display of the work . . . to the public, by means of *any*

*device or process*." (Pls. Br. at 9-10 (quoting 17 U.S.C. § 101). In doing so, Plaintiffs claim that

Aereo is engaged in a "quintessential public performance" because it uses a device or process to

communicate performances of Plaintiffs' copyrighted work to members of the public. (Pls. Br.

at 9-10). But *Cablevision* makes this argument a non-starter. If Plaintiffs' view of the transmit

clause were correct, the Second Circuit in *Cablevision* would have affirmed the result reached by

the district court, as Cablevision likewise used a "device or process" to "transmit" the

copyrighted works to multiple subscribers. Indeed, *Cablevision* expressly rejected the argument,

advanced again here, that the mere fact that a content provider is making a given work available

to all of its subscribers results in a public performance. *See id.* at 135-36. Thus, although the

text of the transmit clause suggests that Congress intended that clause's coverage to sweep

broadly, absent a persuasive distinction that demonstrates Aereo's copies—unlike those in

*Cablevision*—are merely such a "device or process," Plaintiffs gain no ground through reliance

on this language.

   3. <u>Plaintiffs Reliance on "Complete" Time-Shifting Further Undermines Their Arguments</u>

   Plaintiffs' proposed requirement of "complete" time-shifting is even less justified than

their contention that *Cablevision sub silentio* relied on time-shifting in reaching its holding.[11]

Plaintiffs' sole legal rationale for this argument is an attempt to locate it in the Supreme Court's

decision in *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), by

claiming that *Sony* defined what it means to time-shift a television program, and that the

technology at issue in *Sony* only allowed "complete" time-shifting. (Hrg. Tr. at 385:21-386:10,

420:1-6, 428:19-429:6). This argument is wholly misplaced. First, the Court in *Sony* never

---

[11] Another way of phrasing this argument for complete time-shifting is that the copy saved on Aereo's system must be complete before viewing begins. Regardless of how this argument is articulated, this Court's analysis does not change and *Cablevision* did not give any indication its conclusion turned on this factor.

31

required that time-shifting of a program be "complete." The Court merely described time-shifting as "the practice of recording a program to view it once at a later time, and thereafter erasing it." *Id.* at 423. Second, Plaintiffs' argument that *Sony* only addressed complete time-shifting because the technology at issue required that the programming be broadcast in full before the recording could be watched is incorrect. Nothing prevents a person from recording the first half of a show on a VCR, stopping that recording, and watching that recording while the second half of that program continues to be broadcast. Finally, as Plaintiffs concede, the *Sony* court discussed time-shifting in the context of fair use and infringement of the right of reproduction, *see id.* at 447-56 (*see also* Pls. Reply at 18), not in the context of Plaintiffs' novel argument regarding whether a copy sufficiently "breaks the chain of transmission" to avoid liability for a public performance. Thus, even if Plaintiffs were right regarding how the *Sony* Court defined time-shifting, they have provided no principled reason to apply this definition here.

More fundamentally, the basis for Plaintiffs' argument that time-shifting is required to "break the chain of transmission" is that copies immediately used to retransmit a signal are more akin to simply passing along that signal than those also used for substantial time-shifting. Such immediacy also is the other part of the basis for Plaintiffs' attempt to analogize Aereo's service to cases involving standard internet streaming and "buffer" copies, as well as the arguable basis for analogizing this case to *NFL*. As already explained, it is difficult to locate this requirement in *Cablevision* in the first place, but Plaintiffs' position requiring "complete" time-shifting is even more difficult, as it is no longer tied to the immediacy of the retransmission but rather would require the Court to conclude that even if there has inarguably been substantial time-shifting, Aereo still engages in a public performance.

For example, as Plaintiffs would have it, an Aereo user who begins watching a recording of the Academy Awards, initially broadcast at 6:00 pm, one minute before the program ends at 11:00 pm has not allowed the chain of transmission to be broken, despite the nearly five hours of time-shifting that has occurred. In contrast, a user who begins watching a standard half-hour sit-com just a minute after its initial broadcast ends would "break the chain of transmission" for that program after just 31 minutes of time shifting. These examples suggest the extent to which Plaintiffs' position regarding "complete" time-shifting is unmoored from its foundation in "breaking the chain of transmission."

Indeed, Plaintiffs concede that their position that copies must be completely time-shifted for *Cablevision*'s analysis to apply is not "completely principled." (Hrg. Tr. 416:24-420:6, 428:6-429:6). In particular, Plaintiffs were unable to provide an argument as to why a user who begins watching a recording of a program one minute (or five minutes, or ten minutes) before the broadcast ends is part of a public performance but a user who begins watching a minute after the program ends is not, instead asserting that complete time-shifting provides a bright line rule. (Hrg. Tr. 416:24-420:6, 428:6-429:6). The mere existence of a potential bright-line is not, in itself, a sufficient basis to draw such a line. *Cf., e.g.*, *Colon v. Howard*, 215 F.3d 227, 235-36 (2d Cir. 2000) (Walker, J., concurring) (discussing bright-line rules and noting that "any rule we announce must be justified as necessary to its present application").

As this Court has concluded, Plaintiffs' attempt to distinguish *Cablevision* from this case based on time-shifting is unsustainable, and Plaintiffs proposal that the Court require "complete" time-shifting further drives home why the Court cannot adopt this position.

4. *Cablevision* Is Not Distinguishable Based on Aereo's Transmissions to Different Devices, Mediums, and Places than the Broadcast Transmission

Plaintiffs also suggest that *Cablevision* addressed only transmissions using the same

medium as the initial broadcast that were made to the same device and to the same place as the initial transmission. (*See, e.g.*, Pls. Br. at 17). Although these may be points of distinction from *Cablevision*, there is no reason to believe that they are material. Plaintiffs made no showing at the hearing that whether a transmission is made over co-axial cable or the internet, and whether it is to a user's television in their home or their mobile device on the street has any bearing, in itself, on who is "capable of receiving" that transmission or whether Aereo "breaks the chain of transmission."

5. Jurisprudential Principles Caution Against Plaintiffs' Creative Approach

Plaintiffs raise the specter of congressional intervention should this Court find that Aereo's system is lawful, noting Congress's overruling of the Supreme Court's decisions in *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390 (1968) and *Teleprompter Corp. v. Columbia Broadcasting Systems, Inc.*, 415 U.S. 394 (1974), cases which held that "cable systems were not 'performing' broadcast programming when retransmitting its signals" and thus were not infringing any copyrights. *ivi, Inc.*, 765 F. Supp. 2d at 602 (summarizing these cases); (Pls. Br. at 7-8, 10 n.6; Pls. Pre-Hearing Br. at 6-8). Plaintiffs maintain that in doing so, Congress evinced an intent that the transmit clause be construed broadly (Pls. Pre-Hearing Br. at 7-8), and that this Court should follow suit. (Pls. Reply at 10).

This argument, however, cuts both ways, as it also demonstrates that to the extent that a court concludes that the Copyright Act does not cover an activity, it is Congress's prerogative to step in if it "view[s] this result as an 'injustice.'" (Pls. Pre-Hearing Br. at 7). In fact, the Supreme Court has cautioned that "it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors." *Sony*, 464 U.S. at 429. As such, the "judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme" in copyright jurisprudence and, in

34

"case[s] like this, in which Congress has not plainly marked [the Court's] course, [it] must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests." *Id.* at 431-32. This Court must be guided by the law as it has been written by Congress and, importantly for present purposes, how that law has been interpreted by the Second Circuit.

Such caution is additionally warranted in light of the value of preserving the expectations of parties, like Aereo, who rely on binding precedent. *Republic of Aus. v. Altmann*, 541 U.S. 677, 693 (2004) (noting, in the retroactivity context, that predictability and stability are matters of prime importance in considering contractual or property rights); *Allied-Signal, Inc. v. Dir., Div. of Taxation*, 504 U.S. 768, 783 (1992) (noting that adherence to precedent promotes stability, predictability, and respect for judicial authority); *cf. McDonald v. City of Chicago*, 130 S. Ct. 3020, 3102 (2010) (Stevens, J., dissenting) (explaining that stare decisis is a rule of judicial process "prizing stability and order in the law" and "respecting reliance interests"). As detailed below, Aereo has made substantial investments of money and human capital in its system, all in reliance on the assumption that the Second Circuit meant what it said in *Cablevision* rather than what it did not say. Particularly considering the role of district courts to faithfully apply their best understanding of the Second Circuit's precedent, this Court does not believe it would be appropriate to blaze a trail that runs opposed to the direction dictated by *Cablevision*.

In urging the Court to depart from the course set by the Second Circuit, Plaintiffs have relied on statements in the brief of the United States opposing *certiorari* in *Cablevision* that arguably criticize that decision. In particular, Plaintiffs cite to then-Solicitor General Kagan's brief stating: "scattered language in [*Cablevision*] could be read to endorse overly broad, and

incorrect, propositions about the Copyright Act" and, as such, the Second Circuit "carefully

tie[d] its actual holdings to the facts of [the] case." Brief of the United States as Amicus Curiae

at 6, *Cable News Network, Inc. v. CSC Holdings, Inc.*, 129 S. Ct. 2890 (2009) (No. 08-448).  To

the extent that the Solicitor General's brief suggests that the Second Circuit's interpretation of

the transmit clause was "overly broad and incorrect," this Court is still bound by the Second

Circuit's decision.  Moreover, to the extent that this brief suggests that *Cablevision*'s holding is

limited, the precise limiting factors the Solicitor General identified are *all* present here.  *See id.* at

21 ("The Second Circuit repeatedly explained that its rejection of petitioners' public-

performance claim depended on a range of factors: not only that each transmission would be sent

to a single recipient, but also that (1) each transmission would be made using a unique copy of

the relevant program; and (2) each transmission would be made solely to the person who had

previously made that unique copy."); *see also supra* Section IV.B.1.

   For all of the reasons articulated above, this Court concludes that faithful application of

*Cablevision* requires the conclusion that Plaintiffs are unlikely to succeed on the merits of their

public performance claim.

   6.   Scope of the Court's Decision

   A few words are in order regarding the scope of the Court's decision.  First, the Court

need not, and does not, accept Aereo's position that the creation of any fixed copy from which a

transmission is made always defeats a claim for a violation of the public performance right.

(Hrg. Tr. at 451:7-454:4).  This position would eviscerate the transmit clause given the ease of

making reproductions before transmitting digital data, and *Cablevision* does not require such a

far sweep.  *See United States v. Aleynikov*, 676 F.3d 71, 81 (2d Cir. 2012) ("[O]ne of the most

basic interpretive canons [is] that a statute should be construed so that effect is given to all its

provisions, so that no part will be inoperative or  superfluous, void or insignificant.").

Neither does the Court need to resolve Aereo's argument that their antennas, standing alone, defeat Plaintiffs' claim that Aereo engages in a public performance. Aereo's use of single antennas does, however, reinforce the conclusion that the copies created by Aereo's system are unique and accessible only to a particular user, as they indicate that the copies are created using wholly distinct signal paths. Moreover, Aereo's antennas also reinforce the dividing line between the over-the-air signal the Aereo antennas receive and the transmissions Aereo's system makes to its users. Because the copies are created from a signal received independently by each antenna, in order to find a "master" copy that is arguably being transmitted, the Court would be required to look back to the incoming over-the-air signal rather than simply an earlier step in Aereo's process. Aereo's antennas thus reinforce the significance of the copies its system creates and aid the Court in finding that Aereo does not create mere facilitating copies.

As such, the Court's holding that Plaintiffs have not demonstrated a likelihood of success is limited. There may be cases in which copies are purely facilitory, such as true buffer copies or copies that serve no function whatsoever other than to pass along a clearly identifiable "master" copy from which the transmission is made. These facts, however, are not before the Court today.

Finally, Aereo has argued that it cannot be held liable for copyright infringement because it does not engage in "volitional conduct" sufficient to impose such liability, contending that it is Aereo's users, rather than Aereo itself, who direct the operation of Aereo's system. (Aereo Prop. COL at ¶¶ 45-48). Because the Court concludes that Plaintiffs have failed to demonstrate they are likely to succeed in establishing that Aereo's system results in a public performance, the Court need not reach the issue of whether Aereo escapes liability because it is "the consumer, not Aereo, who makes the transmissions that Plaintiffs complain of." (Aereo Prop. COL at ¶ 48).

## V.   IRREPARABLE HARM

Having determined that Plaintiffs have not persuasively distinguished *Cablevision* and therefore are not likely to prevail on the merits, the Court could conclude its analysis here. *See, e.g.*, *Pope v. County of Albany*, __ F.3d __, 2012 U.S. App. LEXIS 10851, at *13-14 n.2 (2d Cir. May 29, 2012). However, this Court recognizes that this case turns on important legal questions and Plaintiffs' have indicated that they are likely to seek interlocutory appeal to the Second Circuit. (3/13/12 Tr. at 42:2-10). Accordingly, the Court will set forth its analysis of the remaining factors to ensure that the record is fully developed. Moreover, district courts deciding preliminary injunction motions routinely consider alternative bases for their holdings, even if they find that one or more of the preliminary injunction factors would itself dispose of the case. *See, e.g.*, *Int'l Bhd. of Teamsters v. Nason's Delivery, Inc.*, No. 11-cv-00186S, 2011 U.S. Dist. LEXIS 98422, at *6-18 (W.D.N.Y. Aug. 31, 2011); *Pope v. County of Albany*, No. 11-cv-00736, 2011 U.S. Dist. LEXIS 93103, at *5-7 (N.D.N.Y Aug. 18, 2011); *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 530-31 (S.D.N.Y. 2009).

The second preliminary injunction factor is whether Plaintiffs will suffer irreparable harm in the absence of an injunction. "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger*, 607 F.3d at 81. The Court may not presume irreparable harm, but rather must consider the injury Plaintiffs will suffer if they lose on the preliminary injunction but ultimately prevail on the merits. *Id.* at 82; *ivi, Inc.*, 765 F. Supp. 2d at 617. However, "it may well be the case" that "most copyright plaintiffs who have shown a likelihood of success on the merits would . . . be irreparably harmed absent preliminary injunctive relief," and that the historical tendency to readily issue such injunctions in copyright cases reflects this possibility. *Salinger*, 607 F.3d at 82; *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006)

38

(Roberts, C.J., concurring) ("Th[e] 'long tradition of equity practice' [of granting injunctions in patent cases] is not surprising, given the difficulty of protecting a right to exclude through monetary remedies . . . ."). *But see MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1216 (C.D. Cal. 2007).

"'The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction.'" *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)). "Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger*, 607 F.3d at 81. Courts have tended to issue injunctions in the copyright context because proving loss of sales due to infringement is "notoriously difficult." *Id.*; *see also MGM Studios, Inc.*, 518 F. Supp. 2d at 1215 (explaining that proof of irreparable harm in the copyright context is not difficult to establish in the run-of-the-mill copyright case based on, for example, the infringing acts).

A. Plaintiffs Have Demonstrated That They Will Suffer Irreparable Harm

The evidence establishes that Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. Plaintiffs have identified a number of categories of irreparable harm, several of which have been accepted in similar cases as supporting the issuance of a preliminary injunction.

First, Aereo will damage Plaintiffs' ability to negotiate with advertisers by siphoning viewers from traditional distribution channels, in which viewership is measured by Nielsen ratings, into Aereo's service which is not measured by Nielsen, artificially lowering these ratings. (Franks Decl. ¶¶ 18-20; Davis Decl. ¶¶ 12-20; Bond Decl. ¶¶ 23-25; Brennan Decl. ¶¶

7-9; Hrg. Tr. at 48:10-49:2, 57:4-18, 62:20-64:6, 351:7-22, 357:9-22).  The record establishes the

importance of Nielsen ratings to Plaintiffs' ability to negotiate with advertisers to monetize their

programming, as well as the importance of such advertising revenue.  (*See, e.g.*, Hrg. Tr. at 57:4-

18, 58:23-59:5, 351:8-11, 357:14-19).  Harm of this sort has been accepted as irreparable based,

at least in part, on the difficulty of proving or quantifying such damages—even if Plaintiffs can

generally track declines in advertising revenue, as Aereo suggests (Def. Ex. 51 at 55:20-56:13),

this does not necessarily allow them to determine the extent to which such declines are

attributable to Aereo.[12]  *See ivi, Inc.*, 765 F. Supp. 2d at 618 (explaining that allowing viewers to

access programming from unsanctioned sources would inevitably damage the plaintiffs' ability

to profit from sanctioned sources, and that such losses a notoriously difficult to prove and

"nearly impossible to quantify"); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d

Cir. 2004) (affirming finding of irreparable harm based on inability to quantify or measure harm

resulting from damage to business relationships); *Pearson Educ., Inc. v. Vergara*, No. 09-cv-

06832, 2010 U.S. Dist. LEXIS 101597, at *11-12 (S.D.N.Y. Sept. 27, 2010); *Les Ballets*

*Trockadero De Monte Carlo v. Trevino*, 945 F. Supp. 563, 574 (S.D.N.Y. 1996) (damage to

licensing negotiations constituted irreparable harm).

      Similarly, the evidence shows that by poaching viewers from cable or other companies

that license Plaintiff's content, Aereo's activities will damage Plaintiffs' ability to negotiate

retransmission agreements, as these companies will demand concessions from Plaintiffs to make

up for this decrease in viewership.  (Franks Decl. ¶¶ 11, 23-26; Davis Decl. ¶¶ 21-26; Bond Decl.

¶¶ 7-19; Brennan Decl. ¶¶ 10, 14; Hrg. Tr. at 59:6-60:21; Pls. Ex. 89 at 158:6-160:7; Def. Ex.

---

[12] That Aereo is willing to have its subscriber's viewing habits measured by Nielsen (Kanojia Decl. ¶ 39), or that other distribution media are not or, in the case of standard DVRs, previously were not measured by Nielsen (Hrg. Tr. at 48:23-49:8, 51:15-52:6) does not detract from this harm, as it appears undisputed that Nielsen presently does not measure Aereo's subscribers.

43); *ivi, Inc.*, 765 F. Supp. 2d at 618.  The record reflects that such agreements amount to billions of dollars of revenue for broadcasters.  (Pls. Ex. 5; Bond Decl. ¶ 15).  Because these harms go to Plaintiffs' negotiating position with the cable companies, they are difficult to measure.  *See Register.com, Inc.*, 356 F.3d at 404; *ivi, Inc.*, 765 F. Supp. 2d at 618; (*See, e.g.*, Bond Decl. ¶¶ 16-17; Davis Decl. ¶ 25).  This lack of quantifiability is compounded by the difficulty of determining whether consumers have "cut the cord" with their cable company due to Aereo's service or for other reasons.  (Bond Decl. ¶ 19).

This harm is not speculative.  For example, Sherry Brennan, a Fox executive, testified that based on her many years of experience, cable companies will demand such concessions or refuse to pay retransmission fees based on Aereo's refusal to do so.  (Hrg. Tr. at 357:9-358:7; Brennan Decl. ¶ 10; *see also* Hrg. Tr. at 40:10-41:2; Def. Ex. 43 (identifying suppression of retransmission fees as a threat)).  Ms. Brennan further testified that such retransmission agreements are currently being renegotiated.  (Hrg. Tr. at 361:10-15).  Martin Franks, a CBS executive, similarly testified that cable companies were concerned about free-riders such as Aereo and suggested they would be unwilling to pay "when other people can take the exact same product for free."  (Hrg. Tr. at 60:8-21).

Although Aereo has submitted evidence that cable companies have not yet raised Aereo's service during retransmission agreement negotiations (Def. Ex. 53 at 157:2-158:5; Def. Ex. 52 at 56:4-8; Def. Ex. 51 at 77:5-13), Aereo's service has only just begun to operate on any significant scale and Aereo has conceded that, if not enjoined, it intends to expand its operations.  (Hrg. Tr. at 225:19-226:23).  The record reflects evidence that Aereo may expand beyond its limited New York market over the next year.  (Hrg. Tr. at 225:22-25; Pls. Ex. 2).  Moreover, even if Aereo does not intend to grow beyond the New York market until after this case is decided, it is clear

41

that it has the capacity to grow rapidly in this market (Hrg. Tr. 229:16-230:5) and is, in fact, doing so, having gone from 100 users earlier this year to 3,500 users by the time of the preliminary injunction hearing a few months later. "The standard for preliminary injunctive relief requires a *threat* of irreparable harm, not that irreparable harm already have occurred," *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010), and Plaintiffs have demonstrated such a threat.

In fact, Aereo has conducted surveys suggesting its services could prompt a substantial proportion of its subscribers to cancel their cable subscriptions. (Hrg. Tr. at 209:5-13; Pls. Ex. 41 at 6, 24). Moreover, Aereo's CEO, Chaitanya Kanojia, has explained that part of the idea behind Aereo was to allow consumers to bypass cable companies to watch broadcast television, including live television, and the record is replete with other evidence that Aereo recognizes that its service will likely prompt cable subscribers to cancel their subscriptions. (Kanojia Decl. ¶¶ 6-7; Hrg. Tr. at 202:17-203:21; *see also* Hrg. Tr. at 130:1-25, 184:20-185:12, 188:9-190:21, 201:21-24; Pls. Ex. 13; Pls. Ex. 33 at 5-6; Pls. Ex. 34; Pls. Ex. 47; Def. Ex. 37; Potenza Decl. Ex. 1 at 293:8-298:16).

Plaintiffs' loss of control over their content is likely to harm them in other ways. For example, Plaintiffs stream their content over their own websites, in which they have invested substantial sums, and which provide an opportunity for Plaintiffs to engage in marketing and demographic research, and to build goodwill. (Brennan Decl. ¶¶ 9, 18; Franks Decl. ¶ 18; Davis Decl. ¶¶ 29-30). Moreover, Aereo's activities may damage Plaintiffs' relationships with content providers, advertisers, or licensees to the extent that Aereo's internet streaming of Plaintiffs' programs causes Plaintiffs to violate agreements with these entities. (*See, e.g.*, Segaller Decl. ¶¶ 4-5, 9, 11; Davis Decl. ¶ 29; Franks Decl. ¶ 12; Hrg. Tr. at 61:8-62:3).

The Court does not, however, believe that Plaintiffs will suffer the full magnitude of their claimed irreparable harm during the pendency of this litigation. *See Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir. 1995) ("[I]rreparable harm is measured in terms of the harm arising during the interim between the request for an injunction and final disposition of the case on the merits . . . ."). For example, Plaintiffs' attempt to claim dramatically at oral argument that free broadcast of major television events such as the Super Bowl would become a thing of the past if Aereo is not enjoined (Hrg. Tr. at 429:25-430:7; *see also* Bond Decl. ¶ 12) is flawed because there is no evidence such harm would actually occur during the pendency of this litigation (*cf., e.g.*, Pls. Ex. 4 (noting the execution of a nine-year contract)). Similarly, although Plaintiffs assert that cable companies may abandon their present business model of licensing content from Plaintiffs in favor of adopting a content delivery service similar to Aereo's (Davis Decl. ¶ 26, Franks Decl. ¶ 26; Bond Decl. ¶ 18; Hrg. Tr. at 216:7-217:14; Pls. Ex. 38; Pls. Ex. 39), Plaintiffs have not demonstrated that this shift is likely to occur before this case is disposed of on the merits.

Similarly, the Court does not find that the evidence establishes that Aereo's continued activities during this litigation would irreparably damage Plaintiffs' ability to enter the mobile viewing market. (*See* Dalvi Decl. ¶¶ 5-13; Bond Decl. ¶¶ 20-21; Brennan Decl ¶ 16). Although Plaintiffs have submitted evidence that they are investing in such platforms, which may launch later this year, (*see, e.g.*, Bond Decl. ¶¶ 20-22; Def. Ex. 51 at 180:16-181:5; Def. Ex. 54:16-57:16; Pls. Ex. 53; 54; 71), they have provided little evidence that Aereo will impede this launch beyond the bare assertion that if Aereo continues to operate, television stations and device manufacturers may not be willing to incur the expenses associated with launching this service (Bond Decl. ¶ 22; Dalvi Decl. ¶ 13). Plaintiffs have not, for example, established that Aereo's service has prompted them to forgo their plans to launch this venture (Def. Ex. 51 at 102:24-

103:11; Hrg. Tr. at 372:25-373:23), nor have they provided a foundation for their claim that Aereo's service threatens the survival of their mobile venture. Particularly given that other products are already available that can provide broadcast content to mobile devices contemporaneous with its initial broadcast (Hrg. Tr. at 306:23-307:4), Plaintiffs have not established that this harm is imminent and non-speculative.

Plaintiffs also maintain that Aereo's geographic limitation on its service is easily overridden by Aereo's users, which may damage Plaintiffs' relationships with local licensed broadcasters or advertisers. *See ivi, Inc.*, 765 F. Supp. 2d at 618. While the evidence suggests that Aereo users willing to disable Aereo's location verification measures and lie about their location may circumvent Aereo's geographic restrictions (Hrg. Tr. at 166:14-167:22), and that this may cause harm to the Plaintiffs (*see, e.g.*, Hrg. Tr. at 348:22-350:11), there is no evidence on the frequency with which users actually do so. Likewise, Plaintiffs' witnesses were unable to provide sufficient details as to how Aereo's service would increase the risk of viral infringement for the Court to accept this testimony as non-speculative, and the Court therefore does not rely on this claimed element of Plaintiffs' irreparable harm. (Franks Decl. ¶¶ 27-30; Dalvi Decl. ¶ 16; Bond Decl. ¶¶ 6, 26-27; Brennan Decl. ¶ 11; Hrg. Tr. at 46:6-48:9).

In sum, the Court concludes that Aereo threatens Plaintiffs with irreparable harm by luring cable subscribers from that distribution medium into Aereo's service, diminishing Plaintiffs' ability to benefit from their content in ways that are fundamentally difficult to measure or prove with specificity. Plaintiffs' showing of imminent irreparable harm is substantial, but not overwhelming.

B. Plaintiffs Did Not Unduly Delay

Aereo points out that most of the Plaintiffs were aware of its existence for roughly a full

year before seeking this injunction and, during that time, took no meaningful steps to seek to
have Aereo shut down. (Franks Decl. ¶¶ 31-33; Davis Decl. ¶¶ 32-34; Dalvi Decl. ¶¶ 17-21;
Bond Decl. ¶¶ 28-30; Brennan Decl ¶ 21; Segaller Decl. ¶ 16). Aereo submits that this delay
rebuts Plaintiffs' claims of irreparable harm and the Court should therefore disregard Plaintiffs'
evidence of such harm. (Aereo Br. at 22-24).

Unexcused delay in seeking a preliminary injunction has been held to undermine or rebut
a claim of irreparable harm.[13] *See, e.g., MGM-Pathe Commc'ns Co. v. Pink Panther Patrol*, 774
F. Supp. 869, 873 (S.D.N.Y. 1991) (collecting cases). However, where plaintiffs have
demonstrated that they did not unduly sleep on their rights, courts have discounted delay as an
argument against irreparable harm. *See King v. Innovation Books*, 976 F.2d 824, 831-832 (2d
Cir. 1992) (eight month delay excused where, during that time, plaintiff sought information
regarding the alleged unlawful conduct and objected to the conduct at issue); *MGM-Pathe
Commc'ns Co.*, 774 F. Supp. at 873 (roughly six month delay in seeking a preliminary injunction
excused because plaintiffs were "caught in a bind" with regard to whether to file suit). These
cases demonstrate that delay undermines a claim of irreparable harm not as an absolute rule, but
rather because undue delay tends to be counter to the sense of urgency that typically
accompanies the prospect of irreparable harm. *See King*, 976 F.2d at 831 ("This is not conduct
that undercuts a sense of urgency or of an imminent threat . . . ."); *MGM-Pathe Commc'ns Co.*,
774 F. Supp. at 873.

Here, Plaintiffs' delay was for roughly one year and was based on the limited availability

---

[13] Plaintiffs claim that Aereo's delay argument is a vestige of a line of cases in which delay rebutted a presumption
of irreparable harm and that such cases are now abrogated after the Supreme Court's decision in *eBay* that no such
presumption exists. (Pls. Prop. COL ¶ 115; Hrg. Tr. at 475:14-476:10); *see Salinger*, 607 F.3d at 82. This is a
dubious proposition given the reasons, discussed herein, why delay has been found to rebut irreparable harm. In
addition, Plaintiffs have not explained why evidence that is sufficient to rebut a presumption of irreparable harm—
*i.e.*, evidence courts have held suggests irreparable harm does not exist—cannot also rebut a factual showing of such
harm.

of Aereo's service, its status in beta testing, and the prospect that litigation was unnecessary until it became clear that Aereo posed a viable threat of harm. (Franks Decl. ¶¶ 31-33; Davis Decl. ¶¶ 32-34; Dalvi Decl. ¶¶ 17-21; Bond Decl. ¶¶ 28-30; Brennan Decl ¶ 21; Segaller Decl. ¶ 16 ; Kanojia Decl. ¶ 17; Hrg. Tr. at 34:12-17, 38:1-24, 42:2-45:19, 55:20-25, 356:10-357:4; Def. Ex. 42; Def. Ex. 44). Although this claim is undercut by Aereo's April 2011 announcement which disclosed that it had already received a substantial $4.5 million in seed financing and the media attention this announcement received (Hrg. Tr. at 147:17-25, 149:16-24, 375:9-18; Pls. Ex. 45 at 2), the evidence suggests that Aereo's service was not an imminent threat of harm to Plaintiffs until substantially later. Until January 2012, just months before Plaintiffs filed suit, Aereo had only about 100 total subscribers and to this day remains an "invitation only" product, although it now has roughly 3,500 users. (Hrg. Tr. at 164:25-165:20; 218:25-219:10). Moreover, there is testimony that suggests at least some of the Plaintiffs believed that Aereo's technology, as described, was simply not viable. (Hrg. Tr. at 356:20-25). With this in mind, it was not unreasonable for Plaintiffs to wait until Aereo's February 2012 announcement that it had received yet more venture financing and that it would publicly launch in New York to conclude that Aereo posed a substantial and imminent threat of irreparable harm. (Franks Decl. ¶¶ 31-33; Davis Decl. ¶¶ 32-34; Dalvi Decl. ¶¶ 17-21; Bond Decl. ¶¶ 28-30; Brennan Decl ¶ 21; Def. Ex. 39). Plaintiffs promptly filed suit after this announcement.

As such, Plaintiffs' delay in this case does not suggest that Plaintiffs will avoid the harms described above or that those harms will be reparable.[14] *See Tom Doherty Assocs. v. Saban*

---

[14] Aereo notes that, before filing suit, representatives of Plaintiffs or their affiliates met with Aereo personnel, expressed interest in Aereo's system, or indicated that they might be interested in doing business with Aereo. (Kanojia Decl. ¶ 18; Hrg. Tr. 150:7-151:15, 162:13-24). The Court does not find credible claims that Aereo was caught off guard by Plaintiffs' decision to sue (Hrg. Tr. at 172:16-173:1), particularly given the evidence that Aereo knew its activities would likely be viewed as infringement (Hrg. Tr. at 142:16-22), its knowledge of the likelihood it would be sued and its decisions to earmark funds for defending an infringement suit (Hrg. Tr. at 175:8-177:4; *see also* Pls. Ex. 77), and media coverage suggesting that it was likely to be sued (Hrg. Tr. at 174:6-10; Pls. Ex. 20).

*Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) ("The cases in which we have found that a delay rebutted the presumption of irreparable harm are trademark and copyright cases in which the fair inference was drawn that the owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of the commercial competition."); *Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*, No. 02-cv-00861, 2002 U.S. Dist. LEXIS 12722, at *19-20 (S.D.N.Y. July 12, 2002) ("Based on the limited distribution and media penetration of 'Red Label From Budweiser' to date, this Court will not deny injunctive relief based on plaintiff's delay in seeking relief."); *cf. Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002). A contrary holding would require plaintiffs to rush to court at the first sign of potential infringement, even if the prospect of harm is remote, and is thus counter to the requirement that irreparable harm must be "imminent." *See Rex Med. L.P.*, 754 F. Supp. 2d at 621.

## VI.   **BALANCE OF HARDSHIPS**

The third factor that the Court must consider is the balance of hardships, issuing an injunction only if the balance of hardships tips in the Plaintiffs' favor. *Salinger*, 607 F.3d at 80. The harms Plaintiffs are likely to suffer if Aereo is not enjoined are discussed above.

Aereo identifies several hardships that it will suffer should an injunction issue, the majority of which could not be remedied through the requirement of an injunction bond. *See* Fed. R. Civ. Proc. 65(c); *Collagenex Pharms., Inc. v. IVAX Corp.*, 375 F. Supp. 2d 120, 140 (E.D.N.Y. 2005) (Pohorelsky, M.J.) (financial harm to defendant could be ameliorated by the requirement of a bond). First and foremost, the evidence establishes that an injunction may quickly mean the end of Aereo as a business. *See MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 195 (2d Cir. 2004) ("[I]f a preliminary injunction were issued, D'Agostino would

be forced to shut down its online grocery store, at least temporarily, perhaps permanently losing customers."); *Vanlines.com LLC v. Net-Marketing Group, Inc.*, 486 F. Supp. 2d 292, 297 (S.D.N.Y. 2007). Aereo has sufficient capital to continue operations for just six to seven months, after which it would likely shut down absent investment of further capital. (Hrg. Tr. at 170:10-16, 231:13-232:17). The extent of this harm is further manifest in the substantial investment in both labor and capital that Aereo has already expended to develop and launch its system, at least some of which would come to naught if Aereo were to go out of business. (Kanojia Decl. ¶¶ 48-49; Hrg. Tr. at 144:10-24, 238:9-239:17). For example, Mr. Kanojia testified that the development of Aereo's antennas and selecting a site for Aereo's facilities required substantial investment. (Hrg. Tr. at 144:10-24, 145:19-146:10). Further, because Aereo offers users a free 90-day trial, if it is enjoined at this point it will not be able to recoup the money it has spent so far, as it anticipated at the hearing that it would only begin receiving revenue in June 2012. (Kanojia Decl. ¶ 51).

Aereo also presented testimony that an injunction will diminish or destroy a variety of its intangible resources. For example, an injunction is likely to cause Aereo to lose employees and damage its ability to attract investors to obtain new capital. *See M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*, 250 F. Supp. 2d 91, 105 (E.D.N.Y. 2003); (Kanojia Decl. ¶¶ 54-55). A majority of Aereo's employees left jobs at other companies in order to come to Aereo and, according to Mr. Kanojia's testimony, would be likely to seek other employment should an injunction issue. (Hrg. Tr. at 160:2-16, 170:5-20, 171:17-172:2). Moreover, Aereo also maintains that an injunction will damage its goodwill with its customers, defeat its substantial investments in launching its service, and diminish its competitive advantage in launching a unique and innovative product. *See id.*; (Kanojia Decl. ¶¶ 52-53). For example, Aereo has

expended substantial funds to develop its brand and market its service, and to develop favorable media coverage. (Hrg. Tr. at 159:3-12, 163:2-164:24). Mr. Kanojia testified that, should an injunction issue, Aereo likely would lose all of its customers and the goodwill it has generated. (Hrg. Tr. at 170:21-23; Kanojia Decl. ¶52)

Plaintiffs put forward only a limited factual challenge to Aereo's claimed hardships.[15] Rather, Plaintiffs' primary argument on this point is to cite *ivi* for the proposition that Aereo's harms are not cognizable because Aereo's business is based on infringement. *See ivi, Inc.*, 765 F. Supp. 2d at 620-21 ("Having found that ivi has infringed plaintiffs' copyrights, it follows that ivi is not legally harmed by the fact that it cannot continue streaming plaintiffs' programming, even if this ultimately puts ivi out of business."). *ivi*'s conclusion on this point is unpersuasive in the present case, however, because it is founded on at least a strong showing of likelihood of success, if not a firm conclusion of liability, and does not adequately contemplate the possibility that the infringer's service may be lawful. Having concluded, in this case, that Aereo's service is likely lawful, the Court cannot disregard the harms to Aereo that an injunction would cause by assuming its business is founded on infringement. *See, e.g.*, *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 234 (S.D.N.Y. 2002) ("The harm to Cruz, who operates a new and relatively small business, if she is *improperly* enjoined from operating her business for the few months required to hold a trial in this case will be much greater than the harm to Shred-It . . . .") (emphasis added); *Ottoman's v. Sunshine State Laboratories*, No. 92-cv-05386, 1992 U.S. Dist. LEXIS 12710, at *3-4 (S.D.N.Y. Aug. 24, 1992); *see also Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988).

In light of this evidence, the Court finds that the balance of hardships certainly does not

---

[15] Plaintiffs have suggested that Aereo might sell the antenna technology it has developed, but have not put forth evidence as to the feasibility of doing so (Hrg. Tr. at 232:24-233:17), and this possibility does not respond to the prospect that Aereo's business model, as it currently stands, could be disrupted or destroyed.

tip "decidedly" in favor of Plaintiffs.

## VII.   **PUBLIC INTEREST**

Finally, the Court must consider whether an injunction is in the public interest. *Salinger*, 607 F.3d at 82; *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (courts must consider whether the public interest would be disserved by granting an injunction). There is limited Second Circuit precedent on where the public interest lies because the Court only recently began considering this factor. *Salinger*, 607 F.3d at 80 n. 8 ("This Court has rarely considered the public's interest before deciding whether an injunction should issue. . . . [T]he public's interest has not in the past been a formal factor in this Court's standard for when to issue copyright injunctions."). However, the Court finds that an injunction in this case would not disserve the public interest.

There is a strong public interest in the copyright system's function of motivating individuals to make available their creative works and increase the store of public knowledge. *See id.* at 82 ("The object of copyright law is to promote the store of knowledge available to the public. But to the extent it accomplishes this end by providing individuals a financial incentive to contribute to the store of knowledge, the public's interest may well be already accounted for by the plaintiff's interest."); *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 146 (E.D.N.Y. 2011) (noting the strong public interest in protecting copyrights and concluding that this supported issuing an injunction); *WPIX, Inc. v. ivi, Inc.*, No. 10-cv-07415 2011 U.S. Dist. LEXIS 43582, at *13-14 (S.D.N.Y. Apr. 18, 2011) ("The programming that defendants wish to make available to the public is not a natural resource that may be exploited by whomever obtains access. It is proprietary material that plaintiffs spend millions of dollars to develop and protect. The public is served by enjoining those who seek to illegally exploit the statutory rights of

copyright holders."). In particular, Plaintiffs note the public interest in maintaining the copyright system and protecting the content that they generate, arguing that the disruption to their business model by activities like Aereo's jeopardizes the creation of such content.

Aereo and *amici* argue that the public interest would be disserved by an injunction because the public has an interest in the availability of the broadcast and the free receipt of Plaintiffs' content in the marketplace of ideas. This argument is not persuasive, as there are numerous other methods through which the public can lawfully receive access to Plaintiffs' content, including standard broadcast transmission, cable television, and licensed internet streaming sites, among others. There is a logical gap—one that Aereo and *amici* fail to bridge— between any public interest in receiving broadcast television signals generally and the public interest in receiving them from Aereo's particular service.

Relatedly, *amici* argue that there is a public interest in the free access to and reception of broadcast television. (EFF Br. at 19). The Court notes, however, that even setting aside the other lawful methods through which consumers may access broadcast television even in Aereo's absence, Aereo is a business and does not provide "free" access to broadcast television. Moreover, although this argument carries some force to the extent that there is a public interest in access to television broadcast over the free public airwaves and Aereo facilitates such access, it cannot be afforded substantial weight because it proves too much. The same logic would support a finding that the public interest favors imposing no copyright restrictions on any form of redistribution of Plaintiffs' broadcast television, as unrestrained piracy of that content would also increase public access to content broadcast over the free public airwaves. For example, distributing over the internet an infringing bootleg copy of a television program that was initially broadcast on the public airwaves increases access to that program. *Amici*'s argument thus bears

51

an unacceptable resemblance to advocacy that copyright infringement of broadcast television is generally in the public interest, a point on which this Court cannot agree.

## CONCLUSION

Because the Court concludes that it cannot accept Plaintiffs' novel attempt to distinguish *Cablevision*, Plaintiffs have not shown a likelihood of success on the merits. And although they have demonstrated that they face irreparable harm, they have not demonstrated that the balance of hardships decidedly tips in their favor. As such, the Court DENIES Plaintiffs motion for a preliminary injunction.

SO ORDERED:

Dated: July  11 , 2012
      New York, New York

                              ALISON J. NATHAN
                        United States District Judge