UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JAN 2 8 2013

---------------------------------------------------------------X

AMERICAN BROADCASTING COMPANIES, INC. ET :
AL.,
                Plaintiffs,    :

       -v-                  :

                                :

AEREO, INC.,
                Defendant,   :

---------------------------------------------------------------X

WNET ET AL.,
                Plaintiffs,    :

       -v-                  :

                                :

AEREO, INC.,
                Defendant,   :

---------------------------------------------------------------X

12 Civ. 1540 (AJN)

ORDER

12 Civ. 1543

ALISON J. NATHAN, District Judge:

      The Court has received the attached letters requesting an extension or stay of the current

February 22, 2013, deadline for fact discovery in the above-captioned case. The renewed request

for a stay of discovery is denied. The Court neither grants nor denies the extension at this time,

but hereby ORDERS that the parties appear for a conference at 4:00 PM on February 8, 2013.

At that conference, the Court will consider the extension, taking into account: (i) what discovery

has been produced; (ii) what discovery remains to be produced; and (iii) what disputes, if any,

the parties or the Court must resolve in order for discovery to be completed.

      To that end, the Court ORDERS that each party submit, by 5:00 PM on February 1, 2013,

a letter detailing the most up-to-date responses to the three previously listed queries.

Specifically, each party should describe, as of the date of its letter: (i) what materials it has

produced; (ii) what requested materials -- contested and uncontested -- it has not produced (except that the parties are not requested to provide further information regarding the contested privilege logs, which the Court will address at the conference); and (iii) what specific disputes, if any, the parties or the Court must resolve in order for discovery to be completed, as well as an estimated timeline for production of the disputed materials following a ruling by the Court.

The parties should be prepared to discuss these letters at the February 8, 2013, conference and to update the Court on what additional steps they have made, between the date of the letter and the date of the conference, to press forward with the discovery process (e.g., additional discovery that has been produced or disputes that have been resolved). The Court's willingness to extend the discovery deadline for a particular party will be dependent on that party's ability to demonstrate its diligence and good faith efforts to complete discovery thus far.

SO ORDERED:


Dated: January 28, 2013
       New York, New York

_____
            ALISON J. NATHAN
         United States District Judge

2

CHICAGO   LOS ANGELES   NEW YORK   WASHINGTON, DC

# J E N N E R & B L O C K LLP

January 16, 2013

Julie A. Shepard
Tel  213 239-2207
Fax 213 239-2217
jshepard@jenner.com

**VIA EMAIL
(NathanNYSDChambers@nysd.uscourts.gov)**

The Honorable Alison J. Nathan
United States District Judge
U.S. District Court for the Southern District of New York
500 Pearl Street, Room 615
New York, NY  10007

> *Re:*    *WNET, et al., v. Aereo, Inc., No. 12-Civ.1540-AJN (S.D.N.Y.)* **(Consolidated)**

Dear Judge Nathan:

The WNET Plaintiffs write to request an extension of the fact discovery cutoff from February 22, 2013 to May 15, 2013. This request is necessitated by Aereo's untimely production of documents which has made it impossible for the Plaintiffs to complete discovery by February 22 without jeopardizing Plaintiffs' ability to adequately prepare their case. Plaintiffs' counsel has discussed this extension with Aereo's counsel several times in recent weeks. As reflected in the attached email from Aereo's counsel, Aereo acknowledges that a continuance is warranted, but Aereo claims that it cannot determine the precise date to which the cutoff should be extended until Aereo has a better understanding of what documents Plaintiffs will be producing in an attempt to resolve pending disputes over Aereo's 92 document requests and when those documents will be produced. Plaintiffs believe the proposed May 15 date will enable both sides to complete discovery. Further, it is important to have an understanding now of what the new cutoff will be to facilitate scheduling depositions and other case management matters.

It is already abundantly clear that fact discovery cannot be completed by February 22 despite Plaintiffs' diligent efforts to do so. Plaintiffs will be severely prejudiced if an extension is not granted while Aereo, which is not subject to an injunction and which has recently announced massive expansion plans and $38 million in new financing, cannot claim any prejudice from the brief extension requested.

As detailed below, additional time is necessary because, among other things:

- Aereo's production of documents, which were due in October, remains incomplete even though there has never been any dispute as to Aereo's obligation to produce key categories of documents.
- Aereo's delays have prevented Plaintiffs from taking substantive depositions.
- The parties are in the midst of resolving disputes as to Aereo's 92 document requests to Plaintiffs which Aereo did not serve until approximately six weeks

The Honorable Alison J. Nathan
United States District Judge
January 16, 2013
Page 2

after discovery was reopened.  Resolution of these disputes will result in
Plaintiffs producing numerous additional documents to Aereo.
- There are other disputes regarding certain requests that Aereo has refused to
respond to even after extensive meet and confer efforts by Plaintiffs.  Those
disputes will be presented to this Court in the near future, which will, in all
likelihood, necessitate further discovery.

The reason this request is being filed at this time is because until recently Plaintiffs, based
upon Aereo's representations, believed that discovery could be completed by February 22.
Specifically, following the Court's September 21 scheduling order, Plaintiffs promptly served
their document requests on September 24.  Aereo's responses were due October 29.  Although
Aereo did not produce a single responsive email until December 7, Aereo represented that its
production would be substantially complete by December 21.  As detailed below, that was not
the case.  However, because Aereo has been producing some documents on a periodic basis and
making such representations, Plaintiffs have refrained from burdening the Court with a motion to
compel.  Whether deliberately or not, Aereo has staged its production of documents so that the
bulk of its production – and some of the more crucial categories of documents – have been
delayed until just recently, with some significant categories still outstanding.  Specifically, on
January 14, 2013, Aereo produced over 27,000 documents totaling over 250,000 pages.  This
single production almost doubled the number of non-source code documents Aereo has produced
since discovery was re-opened.  And, its production remains incomplete.  Plaintiffs are devoting
extensive attorney resources, but the review and analysis of the late-produced documents will
require at least two or three more weeks.  And, only then can substantive depositions be taken.

***Aereo's Delays In Responding To Undisputed Discovery.***  As noted above, Aereo's
responses were due on October 29.  Aereo did not produce documents on this date, but did agree
to produce documents responsive to a number of Plaintiffs' discovery requests.  After being
confronted with Aereo's lack of production of any emails and non-source code documents,
Aereo committed to Plaintiffs in early December that Aereo would complete its production of
emails and attachments by December 21 and voluntarily offered to provide an index of Aereo's
other electronic documents housed in Google Docs and Arena.  But it was not until January 7,
2013, that Aereo even produced emails sent after August 6, 2012.  Aereo's email production
remains incomplete.

On January 4, Aereo announced it would not provide the promised index of electronic
documents, only the electronic documents themselves.  Aereo only commenced its production of
those documents on January 14, and its production appears to be incomplete.

With respect to technical documents required for further testing of Aereo's antenna
boards and subscriber data related to Plaintiffs' reproduction claims, Aereo initially produced
only updated source code, some low level engineering documents, and data (in a non-native and
difficult-to-use format).  While such documents are important, Aereo resisted producing any
meaningful higher level engineering documents, forcing Plaintiffs to conduct an ESI deposition
of Aereo's head of technology just to confirm the existence and location of such higher level
documents.  Since the ESI deposition, Aereo has provided additional critical documentation.
However, Aereo is only now completing the production of these documents.

Indeed, Aereo's January 14 production included portions of Aereo's wiki (a document
repository used by Aereo's employees).  Aereo has conceded that this wiki is a resource used by
Aereo and contains critical information about Aereo's development, powering and operation of

2169436.1

The Honorable Alison J. Nathan
United States District Judge
January 16, 2013
Page 3

the antennas.  But, Aereo despite multiple promises regarding its production, did not produce any sections of the wiki until January 14, 2013.

Aereo's failure to complete its production of documents in a timely manner – documents that even Aereo conceded were relevant and responsive – has prevented Plaintiffs from taking depositions and has substantially delayed Plaintiffs' ability to complete fact discovery prior to the February 22 deadline.  For example, Plaintiffs had to cancel the deposition of Joseph Lipowski noticed for mid-December because Aereo failed to produce a single responsive email until December 7.  And, as Aereo's production has remained largely incomplete as demonstrated by its production of over 27,000 documents on January 14, Plaintiffs have been reluctant to schedule further depositions until Aereo represents that its production is substantially complete.

***Discovery Disputed By Aereo.***  After Plaintiffs' extensive meet and confer efforts to narrow the issues in dispute regarding seven document requests that Aereo either refused to respond to entirely or tried to sidestep with inappropriate limitations, the parties whittled those issues down to four categories.  Those issues will shortly be presented to the Court and, in view of the fact that they could lead to additional discovery, are yet another impediment to the parties' ability to complete fact discovery by February 22. [1]

***Plaintiffs' Discovery Responses to Aereo Are Subject to Ongoing Meet and Confer Efforts And Will Result In Additional Documents Being Produced.***  In contrast to the 24 focused document requests served by Plaintiffs in September, Aereo served 92 broad document requests in November.  The parties are in the midst of resolving disputes as to Aereo's 92 overbroad document requests to Plaintiffs which will result in Plaintiffs producing some additional documents to Aereo and then Aereo, presumably, will need additional time to review those documents and then take depositions relating to them.  Inexplicably, as discussed above, Aereo is using the existence of this dispute as a justification for its refusal to mutually agree upon an extension of the fact discovery cutoff.

For all of these reasons, the February 22, 2013 fact discovery cutoff is no longer feasible.  Accordingly, Plaintiffs respectfully request that the Court extend the fact discovery cutoff to May 15, 2013.

Respectfully submitted,

*Julie A. Shepard*
Partner

cc: All Counsel of Record

Attachment

---

[1]  Plaintiffs have also served several third party subpoenas that are in dispute.  The subpoenaed documents largely relate to Plaintiffs' reproduction claims and market harm.  Plaintiffs would be materially disadvantaged by conducting key depositions of Aereo without these documents.

## Shepard, Julie A.

| | |
|---|---|
| **From:** | David Hosp [Hosp@fr.com] |
| **Sent:** | Tuesday, January 15, 2013 2:28 PM |
| **To:** | Shepard, Julie A.; Spitzer, Seth E.; 'bpkeller@debevoise.com'; 'mpotenza@debevoise.com'; 'jinsleypruitt@debevoise.com'; 'mbharris@debevoise.com'; Klein, Kenneth D.; Fabrizio, Steven B; Stone, Richard L.; Wilkens, Scott B; Friedman, Joshua N.; Glickstein, Ethan A. |
| **Cc:** | Elkin, Michael S.; Golinveaux, Jennifer A.; Lane, Thomas Patrick; Mark Puzella; Salazar Garcia, Jessica C.; Chan, Yvonne W; Michael, Erin M |
| **Subject:** | RE: ABC et al. v. Aereo, Inc., 12-cv-1540-AJN; WNET et al. v. Aereo, Inc., 12-cv-1543-AJN |

Ken:

This email responds to your phone call regarding an extension of the discovery schedule. We agree that an adjustment to the schedule may be appropriate, but, as I have indicated previously, we do not have the ability to determine the appropriate timing until we find out what Plaintiffs will produce in discovery and when. As you are aware, Plaintiffs initially responded to Aereo's discovery requests with numerous blanket objections and refusals to produce documents, and to date have produced virtually nothing of use. As a result, Aereo has already had to put off numerous noticed depositions. Late last night, WNET Plaintiffs backed off several of their unsustainable blanket objections, and agreed to provide additional documents (though there are still broad categories of documents that WNET Plaintiffs are refusing to produce without justification). You have given us no idea when even these limited additional documents will actually be produced. WABC Plaintiffs have not notified us that they will alter their stance from their initial blanket refusals, and we must assume they stand by their original positions.

As we have repeatedly indicated, we need to get the issues regarding the scope of the Plaintiffs' productions before the judge. In the interests of avoiding unnecessary motion practice and attempting to reach a resolution to these matters without Court intervention, we have (at your express demand) delayed bringing the issues to the Court for nearly a month. Your demand for an extension and threat to file a request with the Court in the absence of a near-immediate agreement, notwithstanding a complete lack of understanding on the scope of Plaintiffs' production, seems unnecessary and contrived. We hope that you will reconsider and allow the parties to come to reasonable understanding of an appropriate schedule based on complete information regarding core discovery matters. If not, please include this email along with your submission, and we will respond as appropriate.

Best,

Dave Hosp

*************************************************************************************************************
This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized use or disclosure is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

IRS CIRCULAR 230 DISCLOSURE: Any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.(FR08-i203d)
*************************************************************************************************************

D E B E V O I S E  &  P L I M P T O N  LLP

919 Third Avenue
New York, NY 10022
Tel  212 909 6000
Fax  212 909 6836
www.debevoise.com

January 16, 2012

BY E-MAIL

Hon. Alison J. Nathan
United States District Judge
Southern District of New York
500 Pearl Street, Rm. 615
New York, New York 10007

**American Broadcasting Companies, Inc. et al. v. Aereo, Inc.,**
**12 CV 1540 (S.D.N.Y.) (AJN)**

Dear Judge Nathan:

The ABC Plaintiffs agree with the central point made in the WNET Plaintiffs' January 16, 2013 letter:  Fact discovery cannot be completed in the next five weeks.  They continue to believe, however, that it makes much more sense for the Court to stay this matter until May 15, 2013, rather than extend the current fact discovery deadline until that date.

As the Court may recall, at the September 19, 2012 conference, the ABC Plaintiffs expressed their view, given the Second Circuit's expedited treatment of the appeal in this matter, that it made more sense to defer the costs and burdens of discovery until after the Second Circuit ruled.  9/19/12 Tr. 14:19-16:13.  The Court's decision not to adopt that approach was driven, in large part, by what was, at that time, complete uncertainty as to how long it might be before (a) argument was held and (b) a decision issued.  *Id.* 14:12-18; 47:19-22.

Part of that uncertainty has been eliminated since September.  On October 4, 2012 (almost a month before briefing of the appeal even had been completed), the Second Circuit underscored its decision to treat the appeal expeditiously by setting November 30, 2012 as the argument date.  12-2807-cv, 2d Cir., Dkt. 141.  (A copy of the transcript of that argument is attached.)  It also is worth noting that in the somewhat similar *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012) matter, the Second Circuit issued its decision 89 days after argument – in a non-expedited appeal.  Moreover, Judges Chin and Droney, two members of the *ivi* panel, also heard the appeal in this matter, along with Judge Gleeson of the Eastern District of New York.  Finally, the Second Circuit's docket shows this Panel already has ruled in three other matters argued that day.  Summary Order, *Woodard v. Shanley*, No. 12-361-pr, 2012 WL 6176756 (2d Cir. Dec. 12, 2012); Summary Order, *United States v. Alhakk*, No. 12-155-cr, 2012 WL 6176742 (2d Cir. Dec. 12, 2012); Summary Order, *United States v. Marimon*, No. 11-4921-cr, 2012 WL 6720523 (2d Cir. Dec. 28, 2012).

New York  •  Washington, D.C.  •  London  •  Paris  •  Frankfurt  •  Moscow  •  Hong Kong  •  Shanghai

Hon. Alison J. Nathan                      2                      January 16, 2013

     Regardless of the exact date by which the Second Circuit rules, there is no disputing its decision – however it comes out – will shape the scope of discovery in this case – perhaps eliminating the need for it entirely.  For the reasons set forth in your decision, *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 397-402 (S.D.N.Y. 2012), all of the Plaintiffs still continue to suffer irreparable harm.  Nonetheless, the ABC Plaintiffs do not believe that, at this point, a 120-day stay until May 15, 2013 will seriously exacerbate the harm suffered to date.  Despite claiming it will expand nationwide, Aereo continues to retransmit broadcast television programs from New York City stations only.

     In addition to these practical reasons for a short stay of this action until May 15, 2013, there is the additional benefit of avoiding the contentious back and forth on the merits of the discovery disputes that have arisen.  The ABC Plaintiffs completely agree with the WNET Plaintiffs that Aereo appears to have adopted a strategy of seeking to penalize Plaintiffs for having sought to protect their copyrights with overly broad and burdensome requests.  One example of its unprecedented and extraordinarily burdensome approach was Aereo's insistence on a privilege log that would have required logging of even purely internal communications of *any* outside counsel who *ever* has represented *any* of the Plaintiffs or provided advice or analysis with respect to "Aereo and/or similar technologies (e.g., RS-DVRs, TiVo, DVRs, etc)."  1/11/13 Order, 12 Civ. 1540, Dkt. 158, at 3 (noting such a requirement would be "immensely burdensome").  Another is its 92 post-preliminary injunction document requests.  By contrast, the two groups of Plaintiffs, pre- and post-preliminary injunction combined, have requested altogether about only two dozen different categories of documents.  The WNET Plaintiffs' letter dated January 16 catalogues the other discovery issues in detail, and, of course, Aereo has its own views on the matter.  A short stay avoids the need for the Court to sort through these disputes and allows time for the Second Circuit to rule and guide the scope of further discovery, if any, as this matter proceeds.

                      Respectfully submitted,

                      *Bruce P. K*

                      Bruce P. Keller

cc:    All Counsel of Record

Attachment

# In The Matter Of:

*WNET, THIRTEEN, et al.*
*v.*
*AEREO, INC., F/K/A BAMBOOM LABS, INC.*

---

## HEARING - Vol. 1
### November 30, 2012

---

**MERRILL CORPORATION**
LegaLink, Inc.

179 Lincoln Street
Suite 401
Boston, MA 02110
Phone: 617.542.0039
Fax: 617.542.2119

Page 1

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

-----------------------------------x

WNET, THIRTEEN, FOX TELEVISION
STATIONS, INC., TWENTIETH CENTURY FOX
FILM CORPORATION, WPIX, INC., UNIVISION
TELEVISION GROUP, INC., THE UNIVISION
NETWORK LIMITED PARTNERSHIP, AND PUBLIC
BROADCASTING SERVICE,

Plaintiffs-Counter-Defendants-
Appellants,

     v.                          12-12786-cv

AEREO, INC., F/K/A BAMBOOM LABS, INC.

Defendant-Counter-Claimant-Appellee.

-----------------------------------x

AMERICAN BROADCASTING COMPANIES, INC.,
DISNEY ENTERPRISES, INC., CBS
BROADCASTING INC., CBS STUDIOS INC.,
NBCUNIVERSAL MEDIA, LLC, NBC STUDIOS,
LLC, UNIVERSAL NETWORK TELEVISION, LLC,
TELEMUNDO NETWORK GROUP, LLC AND
WNJU-TV BROADCASTING, LLC,

Plaintiffs-Counter-Defendants-
Appellants,

     v.                          12-2807-cv

AEREO, INC.,

Defendant-Counter-Claimant-Appellee.

-----------------------------------x

                         November 30, 2012

                         500 Pearl Street
                         New York, New York

HEARING - 11/30/2012

Page 2

BEFORE:
JUDGE DENNIS CHIN
JUDGE CHRISTOPHER DRONEY
JUDGE JOHN GLEESON

ERIC J. FINZ, Hearing Reporter

PARTIES:
PAUL M. SMITH, ESQ.
BRUCE P. KELLER, ESQ.
R. DAVID HOSP, ESQ.

Page 3

PROCEEDINGS
JUDGE CHIN: We have sitting with us again today Judge Gleeson from the Eastern District of New York, and we are grateful for his assistance.
I understand that everyone is here. Accordingly, we'll hear the first cases in tandem.
MR. SMITH: Good morning, your Honors, I'm Paul Smith, representing the WNET appellants in this case.
Congress in the 1976 Copyright Act overruled the Supreme Court and provided services that retransmits broadcast television programs to subscribers is engaging in public performance of those programs and needs a license to retransmit.
Aereo is a business that receives and retransmits broadcast television programming over the internet to its subscribers for a fee. It nevertheless claims to be

Page 4

PROCEEDINGS
exempt from the rule barring unlicensed retransmission services, primarily arguing that this court in Cablevision carved out an exception to the rule whenever the unlicensed retransmission service takes the trouble to pause and make a copy of the program, interposing that in the screen before sending it on to each individual subscriber.
It also seems to argue that it's not really a retransmission service at all and it is instead a provider of access to equipment that it leases to subscribers who them use it themselves.
Neither of these arguments has my basis in the statute. Indeed, if accepted, either of them would effectively overrule Congress's determination in 1976 that people should not be able to profiteer from broadcast television

Page 5

PROCEEDINGS
programming by retransmitting it for a fee to their subscribers. The regime that existed before the '76 Act under Fortnightly and Teleprompter would be restored.
Now, regarding Cablevision, I think it's important to understand, and focus on the fact that the issue before the court there was very different from the one here. What you had there was a licensed retransmission service, not an unlicensed retransmission service. Cablevision was a cable company, so it had a license to do the straight through transmissions of all the programs. And the only issue before the court was whether it needed a second license when it was providing the DVR functionality not at the set top, but at the server level.
And the court came to the conclusion that if you focus just

2  (Pages 2 to 5)

HEARING — 11/30/2012

Page 6

PROCEEDINGS

1    on that single transmission from
2    the personalized copy to the
3    subscriber, to the individual
4    subscriber assigned to that copy,
5    that that could be viewed as a
6    private transmission rather than a
7    public transmission, or private
8    performance rather than a public
9    performance.
10        But that case is different
11   from this one because what you're
12   dealing with here is an entirely
13   unlicensed service, so everything
14   Aereo does is unlicensed, from the
15   moment it receives the programming
16   over its antennas, the
17   transmissions it makes from its
18   antennas to its servers, where the
19   programming is processed into
20   internet format.
21        JUDGE DRONEY: How does that
22   matter whether it's a public
23   performance or not?
24        MR. SMITH: Your Honor, once

Page 7

PROCEEDINGS

1    you start looking at the entire
2    service and everything it does,
3    including the servers that all the
4    subscribers share, the antennas
5    that are used, the wires over which
6    the signal goes before there is
7    even a copy made, then I think the
8    picture looks very different.
9        And the fact that at some
10   point in that process they
11   interpose a copy and then send it
12   on doesn't mean that their entire
13   service becomes a private
14   transmission.
15        JUDGE DRONEY: How does the
16   fact of a license matter?
17        MR. SMITH: Well, the license
18   was what confined the attention of
19   the Cablevision panel just to the
20   final end of the transmission.
21        JUDGE DRONEY: Is that the
22   basis for its decision?
23        MR. SMITH: I think it is.
24   That's what I were talking

Page 8

PROCEEDINGS

1    about.
2        After all, there was no issue
3    about the other transmissions that
4    were being made by Cablevision or
5    their receipt of the broadcast
6    programming or anything else, it
7    was just focused on that last
8    transmission.
9        And so the effect of allowing
10   Cablevision to morph into a
11   decision that authorizes what Aereo
12   does of course would be to mean
13   that everybody can engage in
14   license-free retransmission.
15   Because in current technology, it's
16   virtually cost-free to put these
17   copies of the stream and therefore
18   there would be a whole regime of
19   how television is delivered to
20   people over cable, over satellite,
21   with retransmission consent, with
22   license fees that are paid, that
23   whole thing --
24        JUDGE CHIN: What about the

Page 9

PROCEEDINGS

1    argument that Aereo is simply just
2    providing the equipment that
3    arguably as a technological matter
4    you could take these little
5    antennas and put them on to your
6    home computer and accomplish the
7    same thing, would that make it
8    closer to Cablevision?
9        MR. SMITH: Your Honor, the
10   notion that you can be a service
11   that serves multiple people and
12   provide some access to distant
13   programming like this and still say
14   all you are is an equipment
15   provider, that argument first was
16   overruled by Congress.
17        That's essentially what the
18   cable companies argued in
19   Fortnightly and in Teleprompter,
20   that they were just facilitating
21   the subscribers' receipt of
22   television over antennas, and that
23   they were not themselves engaged in
24   any kind of performance.

3  (Pages 6 to 9)

HEARING - 11/30/2012

Page 10

PROCEEDINGS

2  And the Congress said no, you
3  are not, you're a service that is
4  performing the shows, when you take
5  it in on your antenna and send it
6  on.
7      And the fact that there are
8  individual antennas can't change
9  that analysis. First of all, in
10  the Transmit Clause Congress was as
11  broad as it possibly could be, said
12  any device or process that involves
13  transmitting programs on to
14  subscribers.
15      JUDGE DRONEY: How about the
16  unique copies, isn't each recipient
17  of the Aereo service getting a
18  unique copy?
19      MR. SMITH: There is a copy
20  that's created in the stream of
21  transmission.
22      JUDGE DRONEY: For each
23  individual; right?
24      MR. SMITH: Yes, that's the
25  legal issue we're presented with,

Page 11

PROCEEDINGS

2  whether that can change the
3  analysis.
4      As a practical matter what
5  that would mean if it does change
6  the analysis is that Congress's
7  determination in 1976 is overruled;
8  there will be no more licensing of
9  retransmission services because
10  everyone will start doing it.
11      JUDGE DRONEY: Wasn't that the
12  basis of the Cablevision decision,
13  that each was a unique copy
14  thereto?
15      MR. SMITH: In that particular
16  context where all they were
17  focusing on was that one
18  transmission from that copy that
19  had been created adjunct to a
20  licensed service. But if you're
21  going to allow them to do
22  everything that a retransmission
23  service does, from taking it in on
24  antennas, processing it, having the
25  website where people order it up

Page 12

PROCEEDINGS

2  and send it on, including live,
3  effectively, so that the copy isn't
4  even perceptible to the user, well,
5  that's a very different
6  proposition. It takes Cablevision
7  and turns it into a complete carte
8  blanche for people to abuse the
9  copyright.
10      JUDGE GLEESON: Are you
11  familiar with the device called the
12  Slingbox?
13      MR. SMITH: I am, your Honor,
14  yes.
15      JUDGE GLEESON: Now, if I were
16  able to afford one, it would allow
17  me to be able to take a broadcast
18  and convert it something on my
19  laptop.
20      MR. SMITH: It would allow you
21  to take a broadcast and send it on
22  to the internet to one of your
23  devices, yes.
24      JUDGE GLEESON: That wouldn't
25  be a public performance, my viewing

Page 13

PROCEEDINGS

2  of it on my laptop would not be a
3  public performance?
4      MR. SMITH: The use of a
5  Slingbox may or may not involve
6  some copyright infringement. It
7  would not be a public performance,
8  that's correct.
9      JUDGE GLEESON: The potential
10  audience is just me.
11      MR. SMITH: That's correct.
12      JUDGE GLEESON: Your argument
13  I don't think takes sufficient
14  account of the fact that
15  Cablevision is part of the
16  landscape. And once you take that
17  kind of Slingbox phenomenon and
18  then push it back upstream and have
19  it be provided, here by Aereo, in
20  just the same way that Cablevision
21  provided the DVD function, it sure
22  looks like you've got a problem
23  with the Cablevision case.
24      MR. SMITH: But again, your
25  Honor, even before, before you get

4  (Pages 10 to 13)

HEARING — 11/30/2012

Page 14

PROCEEDINGS

1  to the creation of the copy and the
2  sending it out over the internet,
3  there is a lot of things that
4  Aereo's already done, including
5  transmissions inside its own
6  facility to get the thing to the
7  server where it's converted into
8  internet format.
9      And all of those things exist
10  separate and apart from any copy
11  that is made, and are not
12  individualized in the same way,
13  there is no preceding copy.
14     JUDGE GLEESON: But before it
15  goes to one of its subscribers, is
16  an individualized copy made with a
17  separate hard drive allocable to
18  that subscriber?
19     MR. SMITH: That's correct,
20  yes.
21     And the legal question is
22  whether you're going to read that
23  in light of the statute. The
24  statute, after all, makes it

Page 16

PROCEEDINGS

1  factual situations entirely
2  different from the one before the
3  court.
4      As the fly on the wall put it,
5  it's actually inadequate, the
6  precedent has to be viewed in light
7  of the facts before the panel.
8  Otherwise you say well, you have to
9  follow the law. But the law here
10  is a statute. And Congress could
11  not have been more clear that it
12  intended not to allow people to
13  engage in retransmission businesses
14  of this kind.
15     Now, they didn't anticipate
16  specific individual copies because
17  this was 1976, but they did say
18  whether it's live or time delayed,
19  it doesn't matter whether it's
20  individual streams, it doesn't
21  matter whether it goes at the same
22  time or different times, same
23  places, different places, any
24  device or process, legislative

Page 15

PROCEEDINGS

1  perfectly clear that Congress
2  intended to cover this --
3      JUDGE GLEESON: I get your
4  argument.
5      Can we do this consistent with
6  Cablevision?
7      MR. SMITH: I think this is an
8  important element of how far
9  decisis works. If you have a
10  statutory interpretation by a prior
11  panel that includes some language
12  that covers lots of different other
13  factual situations, that when you
14  get to those other factual
15  situations, and it's perfectly
16  evident that to apply that broad
17  language to those situations you
18  would be acting inconsistent with
19  the statute, then that broad
20  language becomes dictum to the
21  extent it applies to these other
22  fact situations.
23     I don't think a panel can bind
24  subsequent panels with respect to

Page 17

PROCEEDINGS

1  history says we're trying to be as
2  absolutely broad as we can because
3  of the kinds of technological
4  advances that are coming, we still
5  want retransmission has to be
6  something that you need to pay for.
7  Because you're profiteering on
8  somebody else's property.
9      So if this panel says we are
10  bound by this language that was
11  applied to a completely different
12  fact situation, then what you're
13  doing is you're following, I would
14  submit, is dictum, to the extent
15  that that broad language is applied
16  here in this context, you're
17  feeling as if you're bound by
18  something that that panel did not
19  have the authority to bind you on,
20  because they did not have these
21  facts before them at that time.
22     JUDGE CHIN: You have some
23  rebuttal time. We'll hear from
24  your colleague, Mr. Keller.

5 (Pages 14 to 17)

HEARING - 11/30/2012

Page 18

PROCEEDINGS

1  PROCEEDINGS
2  MR. SMITH: I appreciate it,
3  your Honor. Thank you.
4  MR. KELLER: May it please the
5  court, I'm Bruce Keller, I
6  represent the ABC parties in 2807.
7  I have three points to make
8  that I hope you'll find complement
9  those made by Mr. Smith. The first
10  is about the Transmit Clause, it's
11  foundational in nature. The second
12  is about Cablevision, it's
13  interpretive, I think those are
14  some of the questions Judge Gleeson
15  was asking. And the third is about
16  Aereo, and it's based on the
17  record.
18  The Transmit Clause point is
19  really this: When Congress enacted
20  the Transmit Clause it was
21  declaring to businesses that
22  publicly performed copyrighted
23  works are infringing, and if they
24  make their customers capable of
25  receiving transmissions or

Page 19

1  PROCEEDINGS
2  retransmissions of copyrighted
3  performances, regardless of the
4  technology, that business is being
5  outlawed.
6  And at the core of the
7  Transmit Clause are services that
8  retransmit over-the-air radio or
9  television broadcasts. Every case
10  that has addressed a retransmission
11  of either a radio or television
12  broadcast has concluded it's a
13  violation of the Transmit Clause.
14  Legislative history is clear on
15  that, the Kirkwood case, the
16  FineTime 24 case from this circuit
17  is clear on that.
18  And to make sure that
19  retransmitters are swept up within
20  the Transmit Clause, Congress
21  instructed courts to reject the
22  1960s era defense that if all we do
23  is enable someone who otherwise
24  could receive that performance, if
25  we just facilitate what they could

Page 20

1  PROCEEDINGS
2  do for themself, that's not a
3  performance. Congress said it is a
4  performance and if you do it for
5  all of your paying subscribers,
6  that's a public performance.
7  In other words, the stand in
8  the shoes of the consumer defense
9  was rejected through the new
10  Transmit Clause, that's what
11  Kirkwood/Infinity Broadcasting so
12  holds at pages 108 and 112.
13  The second point is that
14  Cablevision did not change that
15  Transmit Clause jurisprudence.
16  And here's why: The Cablevision
17  panel concluded that the RSDVR
18  service before it was a broadcast
19  service, not a retransmission
20  service. It was not a
21  retransmission of performances.
22  And that's why the unique
23  copies that they found meaningful
24  there don't make a difference here.
25  In that remote storage DVR case,

Page 21

1  PROCEEDINGS
2  you could not, for example, watch
3  the Super Bowl --
4  JUDGE CHIN: There is a
5  storage aspect to the Aereo system?
6  MR. KELLER: There is a
7  storage aspect to the Aereo system,
8  it is one that they downplay to the
9  virtual exclusion of their
10  retransmission service.
11  And it is absolutely clear
12  from their own advertising and from
13  the record that they enable their
14  subscribers to watch the Super Bowl
15  as it is broadcast.
16  JUDGE GLEESON: But even in
17  the watch mode they can stop, they
18  can pause, rewind. Correct?
19  MR. KELLER: Yes, that is
20  true.
21  But the Transmit Clause says
22  it doesn't matter when a
23  subscriber, how a user watches a
24  program, we're concerned with
25  whether a retransmitter is

6 (Pages 18 to 21)

HEARING - 11/30/2012

Page 22

1           PROCEEDINGS
2    retransmitting that program.
3           And the difference between
4    Cablevision and Aereo in this
5    regard is crisp.  You could not
6    watch the Super Bowl in real-time
7    as a retransmission of a
8    copyrighted performance through the
9    RSDVR service.
10          JUDGE GLEESON:  How about my
11   Slingbox example, they can, and
12   that's not a public performance,
13   right?
14          MR. KELLER:  So I took your
15   point about the private nature of
16   Slingbox.  I think Mr. Smith made
17   clear it's not been tested yet,
18   there is no precedent, there is no
19   court ruling on it.
20          JUDGE GLEESON:  It's hard to
21   figure why any precedent would be
22   construed in such a way to render
23   that a public performance.
24          MR. KELLER:  I'm not arguing
25   whether it is or it isn't.

Page 23

1           PROCEEDINGS
2           I think the bigger point is
3    under the Second Circuit precedent,
4    Kirkwood matters.  Kirkwood says
5    that what a consumer might be able
6    to do on his or her own with a
7    piece of equipment is one thing.
8    Cablevision basically says the same
9    thing when it uses the VCR analogy
10   as the analogy that governs the
11   day.
12          It's another thing when a
13   third party commercial service
14   insinuates itself into the process,
15   they don't get to stand in the
16   shoes of what you could do if you
17   could afford the Slingbox.
18          JUDGE CHIN:  How is the Aereo
19   system different from the Slingbox
20   system as a factual matter?
21          MR. KELLER:  I think that the
22   difference between the Aereo system
23   is that it is a full-fledged
24   service.  There are a number of
25   findings in the District Court's

Page 24

1           PROCEEDINGS
2    opinion --
3           JUDGE CHIN:  With a Slingbox
4    you're getting a transmission in
5    some other way, not through --
6           MR. KELLER:  Not through the
7    system.
8           So what drove the Second
9    Circuit in Cablevision was this
10   notion that the RSDVR service was a
11   storage service.  That led directly
12   to the analogy of the VCR in your
13   home moved upstream.
14          And the Second Circuit
15   concluded that because it was not a
16   retransmission service, it was not
17   a public performance at the point
18   at which you played back what you
19   previously had.
20          JUDGE DRONEY:  So in the Aereo
21   system, if you hit pause on the
22   watch mode for five seconds, is it
23   still a public performance after
24   that or is that a unique copy after
25   you do that?

Page 25

1           PROCEEDINGS
2           MR. KELLER:  The unique copies
3    don't matter here when the system
4    enables the subscribers to watch
5    it.
6           JUDGE DRONEY:  It's a private
7    performance then.  If you are in a
8    watch mode, you pause it for five
9    seconds and resume watching, does
10   that now become a private
11   performance?
12          MR. KELLER:  No.  Because --
13   and Congress, this gets to the
14   point earlier, Congress
15   contemplated technological devices
16   evolving over time.  They said,
17   doesn't matter how you do it.  Any
18   device or process that facilitates
19   the retransmission is going to be
20   swept up in the Transmit Clause.
21          And then went further.  It
22   said not only that, you could
23   retransmit at different times, same
24   time, different places, same
25   places, all of it is embraced.  The

Merrill Corporation - Boston
617-542-0039                              www.merrillcorp.com/law

HEARING – 11/30/2012

Page 26

PROCEEDINGS

1  eye is on the retransmission
2  service and what it does in terms
3  of retransmitting the initial
4  copyrighted performance.
5      And the difference between the
6  Cablevision decision and this case
7  is the difference between storage
8  and retransmission.
9      And how do we know that, we
10 know that from what the Second
11 Circuit subsequently said in the
12 ASCAP case.  Because in ASCAP they
13 drew the same distinction between a
14 musical file download, a stored
15 copy of something that was sent on
16 but not in any way that could
17 possibly be perceived, according to
18 the ASCAP panel, as a performance,
19 in a stream.  Which they said could
20 very well be a performance.
21     But Cablevision went further,
22 and this is really crucial.  Not
23 only did it distinguish between
24 storage and retransmission, it said

Page 27

PROCEEDINGS

1  we are not going to lay down a rule
2  that all unique copies always
3  render something a private
4  performance.
5      They did it at least three
6  places in the opinion.  The first
7  was saying that copies may be
8  relevant to whether or not
9  something's a private performance,
10 based on whether they truly play an
11 audience-limiting function.
12     Then they said, and another
13 thing, not only is it just relevant
14 and not determinative, they
15 qualified that statement in the
16 very next paragraph when they said,
17 and by the way, we're not analyzing
18 the concept of to the public for
19 all purposes, we are not analyzing
20 the contours of to the public in
21 any great detail.
22     And then it went on on the
23 very next page to say even more
24 about how cabined they were making

Page 28

PROCEEDINGS

1  their decision.  They said a
2  different delivery system design
3  may well result in a different
4  analysis of whether there is a
5  public performance.
6      So they started with the VCR
7  analogy because it was a storage
8  system.  They didn't exculpate all
9  retransmission services because
10 they used unique copies, and they
11 warn that different designs may
12 matter.  And here you have a very
13 different design.
14     Which takes me through the
15 third point about Aereo and the
16 record.
17     Aereo is at the heart of the
18 Transmit Clause because they admit
19 that they are a retransmission
20 service.  Super Bowl comes in,
21 Super Bowl goes out, all within
22 seconds.  They advertise themselves
23 as a service that you can use to
24 watch television without cable.  No

Page 29

PROCEEDINGS

1  cable required.  Broadcast TV is
2  right on its home page.
3      That's at pages 15 -- well,
4  page 55 of the record, and
5  Mr. Kanojo said it on the stand at
6  pages 1570 to 71 of the record.
7      And it's in its very
8  positioning statement.  Aereo is a
9  retransmission statement by its own
10 design.  And because it doesn't
11 break the retransmission chain,
12 which the Second Circuit found was
13 broken in Cablevision because of
14 the act of storage, and then the
15 subsequent act, private playback,
16 on those facts Aereo does not get
17 the benefit of the Cablevision
18 analysis.
19     I reserve some time.
20     JUDGE CHIN:  Yes.
21     MR. KELLER:  Thank you very
22 much.
23     MR. HOSP:  Your Honors, David
24 Hosp for Aereo.

8 (Pages 26 to 29)

HEARING – 11/30/2012

Page 30

PROCEEDINGS

1  May it please the court, I
2  will respond to a number of the
3  comments that have been made by
4  both attorneys for plaintiffs.
5  But first, I'd like to make
6  five basic points with respect to
7  this case. First, I think you
8  heard this from opposing counsel,
9  consumers have the right to make
10 private performances. They have
11 the right to use an antenna, they
12 have the right to use a DVR, and
13 they have the right to use a
14 Slingbox type system, an internet
15 connection that allows them to make
16 private performances.
17 Second, supplying the
18 technology to accomplish this does
19 not constitute a violation of the
20 private performance right. And
21 particularly it does not constitute
22 a direct infringement of any
23 copyright. And that is the only
24 thing that has been challenged

Page 31

PROCEEDINGS

1  here, is a direct infringement --
2  JUDGE CHIN: Do you concede
3  that Aereo is transmitting?
4  MR. HOSP: Consumers in the
5  Aereo system transmit a copy of --
6  JUDGE CHIN: My question is,
7  do you concede that Aereo is
8  retransmitting -- that Aereo
9  captures broadcasts and then
10 retransmits them?
11 MR. HOSP: No, your Honor.
12 Aereo transmits a copy that
13 has been made by the consumer.
14 That's what's done using the Aereo
15 system. And that is, it's a
16 significant difference.
17 I take your Honor back to the
18 ASCAP decision --
19 JUDGE CHIN: How does the
20 consumer -- are you suggesting the
21 consumer is making the copy on her
22 own, or is it doing with it with
23 the assistance of Aereo?
24 MR. HOSP: Well, your Honor,

Page 32

PROCEEDINGS

1  Judge Nathan in her decision was
2  very clear that in fact a consumer
3  makes the copy. She said, whether
4  a user watches a program through
5  Aereo's service as it is being
6  broadcast or after the initial
7  broadcast ends, does not change
8  that the transmission is made from
9  a unique copy previously created by
10 that user, accessible and
11 transmitted only to that user.
12 JUDGE CHIN: Only the prior
13 creation of that copy, the consumer
14 got it from Aereo. True?
15 MR. HOSP: Yes. The consumer
16 accessed it through the antenna
17 that Aereo provided.
18 JUDGE CHIN: It seems to me in
19 Cablevision, there was an ongoing
20 relationship between the consumer
21 and Cablevision. The consumer was
22 receiving the broadcast through
23 Cablevision. Cablevision as a
24 cable provider had the right to do

Page 33

PROCEEDINGS

1  that. And then the consumer is
2  making a copy. Instead of doing it
3  in his living room, he's doing it
4  through machinery at Cablevision.
5  Here there is no ongoing
6  relationship or prior relationship
7  with Aereo. And it's that first
8  capturing of the broadcasting that
9  results in the consumer having it.
10 So why doesn't that make this
11 case different from Cablevision?
12 MR. HOSP: It doesn't because
13 the Cablevision court specifically
14 addressed that issue. In fact, it
15 was an issue that was raised by the
16 plaintiffs in that case.
17 What the plaintiffs said was,
18 in fact they argued to this court,
19 the transmission, where Cablevision
20 split the stream and directed that
21 stream into the RSDVR system, the
22 plaintiffs themselves said that's
23 unlicensed, that's completely out
24 of bounds, nothing that they do

9 (Pages 30 to 33)

HEARING - 11/30/2012

Page 34

```
 1            PROCEEDINGS
 2   within the RSDVR system is licensed
 3   at all.
 4        And this court accepted that.
 5   It accepted them at their word, and
 6   they said --
 7        JUDGE CHIN:  But the
 8   plaintiffs were unsuccessful on
 9   that point.
10        But before it got to the point
11   where they were separating the
12   stream, there was a license for
13   that.  And doesn't that make this
14   case different?
15        MR. HOSP:  Your Honor, it
16   doesn't make this case different
17   because the transmission that this
18   court considered in Cablevision was
19   the transmission from the
20   individual copy to the individual.
21   And basically what Cablevision said
22   was, the court accepted the
23   plaintiffs' argument that in fact
24   the transmission, the splitting of
25   the stream that went into the RSDVR
```

Page 35

```
 1            PROCEEDINGS
 2   system, was not licensed.
 3        And what Cablevision said was,
 4   you know what, that doesn't matter.
 5   It doesn't matter whether or not
 6   that stream is licensed or not,
 7   because ultimately the only thing
 8   that we're looking at is the nature
 9   of the transmission itself.
10        And the transmission at issue,
11   and this is the fundamental holding
12   of Cablevision, but not just
13   Cablevision, it's the fundamental
14   holding, it's one of the
15   fundamental holdings of ASCAP too.
16   It is that a transmission from an
17   individual copy to a single
18   individual is not a public
19   performance.
20        JUDGE DRONEY:  Let's talk
21   about the individualization of
22   this.  Let's hypothetically say
23   Monday Night Football,
24   Giants/Redskins, next Monday, 5,000
25   Aereo customers are watching it on
```

Page 36

```
 1            PROCEEDINGS
 2   their watch function.  And none of
 3   them has paused it.
 4        Aren't those 5,000 people
 5   seeing the exact same thing at the
 6   exact same time?
 7        MR. HOSP:  They are not,
 8   actually.  And this was a finding
 9   that the court made.
10        In fact, what happens in the
11   Aereo system is a consumer logs on,
12   they are assigned an antenna.  And
13   that individual antenna receives
14   its own individual signal.
15        And what was shown at the
16   hearing was in fact the signals
17   that are generated in each
18   individual's antenna are different.
19   There was actual, an actual factual
20   determination, there was evidence
21   that showed that in fact antenna A
22   is generating a slightly different
23   signal from antenna B.
24        JUDGE DRONEY:  How is it
25   different?
```

Page 37

```
 1            PROCEEDINGS
 2        JUDGE GLEESON:  Redskins might
 3   win in some homes but lose in
 4   others?
 5        MR. HOSP:  They might.  It
 6   might be broadcast differently down
 7   in Washington.
 8        No, what was the difference
 9   is, again, they're not differences
10   that make a significant impact on
11   the perception and what you are
12   actually sort of seeing.
13        JUDGE DRONEY:  People have
14   different quality TVs too.  How is
15   what they're watching different?
16   If they're just on their watch
17   function, they haven't paused it,
18   aren't they seeing the same 3rd
19   down and 3 play at the same time as
20   the 4,000 other customers?
21        MR. HOSP:  Again, they may be
22   viewing it at the same time.
23        But under Cablevision and
24   under ASCAP what they are viewing,
25   what is being transmitted to them
```

10  (Pages 34 to 37)

Page 38

```
1              PROCEEDINGS
2    is different from what is being
3    transmitted to others.
4         JUDGE CHIN:  You're saying
5    that's an individualized copy?
6         MR. HOSP:  Yes, exactly.
7         It is both an individual -- --
8         JUDGE CHIN:  Does that make
9    any sense?  Millions of people are
10   watching the football game, they
11   get it through Aereo, and put aside
12   the record function, and that's not
13   getting a retransmission from
14   Aereo?  That's the position?
15        MR. HOSP:  Under the Transmit
16   Clause, and under particularly --
17        JUDGE CHIN:  But as a matter
18   of common sense.  Is it at all
19   logical that, you know, the 25,000
20   people who are watching it
21   individually on their, through
22   their Aereo system, that they are
23   watching an individualized copy and
24   they're not watching the football
25   game?
```

Page 39

```
1              PROCEEDINGS
2         MR. HOSP:  It is logical based
3    on the system that Congress put in
4    place.
5         This all goes back to the
6    Transmit Clause, and what the
7    Transmit Clause says is, that the
8    performance at issue --
9         JUDGE CHIN:  What if you took
10   away the record function
11   completely, and this were just a
12   system for streaming and watching.
13   Like I view.  Is that -- and that's
14   perfectly fine?
15        MR. HOSP:  No, no.  If you're
16   talking about a streaming service
17   where there is no fixed copy that's
18   being made, then no, that is a
19   public performance issue.
20        You could see this distinction
21   with respect to --
22        JUDGE CHIN:  But if you take
23   away the record function, instead
24   of two buttons your only choice is
25   to watch, you're saying it still
```

Page 40

```
1              PROCEEDINGS
2    would be consistent with the
3    Copyright Act because it's still a
4    copy.  Is that the position?
5         MR. HOSP:  Your Honor, just to
6    clarify your hypothetical.
7         Are you saying that there is
8    still a fixed copy that is
9    cognizable?
10        JUDGE CHIN:  Exact same
11   technology, except that the
12   consumer, the Aereo subscriber does
13   not have the option of hitting a
14   record button.  All he can do is
15   watch.
16        MR. HOSP:  That would be a
17   very, very different situation.
18   Because there -- and again, the
19   real question, under Cablevision
20   and ASCAP is whether or not a fixed
21   copy is made.  Which is different
22   from a streaming situation.
23        JUDGE CHIN:  The exact same
24   technology except you're not giving
25   the option of letting the person
```

Page 41

```
1              PROCEEDINGS
2    record it.  Otherwise the
3    technology is the same, in terms of
4    the copying, et cetera, that's all
5    the say.
6         Would that violate the
7    Copyright Act?
8         MR. HOSP:  If there was --
9    again, if there is a fixed copy
10   being made, then no, it would not.
11        Under Cablevision, under my
12   reading of Cablevision, again, you
13   don't need to reach that question
14   because that's not the question
15   that's presented in this case.
16        But under my reading of
17   Cablevision, what Cablevision says
18   is where you have a unique fixed
19   copy, you now have a reproduction
20   issue.  But it's no longer a public
21   performance issue.
22        And again, coming back to
23   ASCAP, think about it, you're
24   sitting at your computer and you
25   want to listen to a song, you want
```

11 (Pages 38 to 41)

HEARING - 11/30/2012

Page 42

PROCEEDINGS
1
2  to listen to a song right now.
3  You've got two ways to do it. You
4  can stream it, and if you stream it
5  what's happening is you are
6  actually streaming it from a common
7  copy that other people have access
8  to. And that's a public
9  performance issue. It's not a
10 reproduction issue, because there
11 is no fixed copy that's being made.
12     The other way you can listen
13 to music right now is to download
14 it. And what you do is you
15 download it, it takes a couple of
16 seconds, there is a couple of
17 seconds delay, and then when you
18 play that, again, within a couple
19 of seconds, what you are playing is
20 an individual copy.
21     And that's the circumstance
22 that ASCAP, this court examined in
23 ASCAP. What this court said was,
24 you know what, that's not a public
25 performance. It doesn't matter,

Page 43

PROCEEDINGS
1
2  because now you've got a copy
3  issue. You've got a reproduction
4  right issue. These are two rights
5  that work in tandem with each
6  other.
7     JUDGE DRONEY: Let me ask you
8  about the antennas.
9     Would you still be arguing
10 that these are not public
11 performances if instead of all
12 these antennas you just had one?
13 Is the system, without that
14 feature, still not a public
15 performance?
16     MR. HOSP: Well, again, it's a
17 very different case than what we
18 have here. And we do believe that
19 the antennas matter in this case.
20     But under the holding in
21 Cablevision, where you're talking
22 about a system like this, where
23 there is an individual copy that is
24 being made, under the ruling in
25 Cablevision, under the law as it

Page 44

PROCEEDINGS
1
2  stands in the Second Circuit, that
3  is, if that individual copy is
4  going directly to only one
5  individual and is only accessed by
6  that individual, what you have is a
7  copy issue.
8     JUDGE GLEESON: But if it was
9  just one retransmission, you
10 wouldn't win; right?
11     MR. HOSP: If it was --
12     JUDGE GLEESON: If you had no
13 individual antennas, no
14 individualized copies, you'd lose?
15     MR. HOSP: Yes. If it was one
16 antenna and no copies being made,
17 at that point you --
18     JUDGE GLEESON: Does the
19 provider of Video-on-Demand content
20 create a public performance when it
21 provides a movie to someone in
22 Video-on-Demand?
23     MR. HOSP: Yes, absolutely.
24     And that's exactly the same
25 situation that the court, the

Page 45

PROCEEDINGS
1
2  Cablevision court addressed when it
3  talked about the on-command in the
4  Redhorn cases.
5     JUDGE GLEESON: Would it be
6  different if a provider of
7  Video-on-Demand created an
8  individualized hard drive for each
9  of the subscribers, would they then
10 be creating a private performance
11 and not have to worry about paying
12 royalties?
13     MR. HOSP: That's exactly what
14 ASCAP is. And what ASCAP held was
15 in that situation where what you
16 have is somebody making an
17 individual copy, what you have is a
18 reproduction right issue. But it's
19 not a public performance right
20 issue.
21     That is exactly the issue that
22 was decided by this court in ASCAP
23 when it said, you know what, these
24 are two rights that function in a
25 complementary way. And Cablevision

12 (Pages 42 to 45)

HEARING - 11/30/2012

Page 46

PROCEEDINGS

1   recognized that. Cablevision
2   recognized the notion that it was
3   okay that by creating a copy you no
4   longer had a public performance
5   issue, because you now were
6   creating -- you essentially were
7   picking your poison. You were
8   creating a reproduction right
9   issue.
10      And what Cablevision says is,
11   that's okay because you have
12   another right to go under.
13      Now, in this particular case,
14   because of the Supreme Court's
15   decision in Sony, we believe that
16   the consumer making the copy is a
17   fair use. And therefore while it
18   does implicate the reproduction
19   right, we believe that it is not a
20   violation of that reproduction
21   right, because it's foreclosed
22   under Sony.
23      But that's an issue that's
24   being litigated in the District

Page 47

PROCEEDINGS

1   Court.
2      JUDGE DRONEY: Can I get back
3   to my antenna question.
4      It sounded like you said even
5   with one antenna you'd still be
6   arguing the same position under
7   Cablevision that the individualized
8   copies here do not constitute a
9   public performance. That's what
10   you said, right?
11      MR. HOSP: Your Honor, if we
12   were presented with that, it's my
13   reading of Cablevision that because
14   there is an individual copy, that
15   it would foreclose a public
16   performance finding there.
17      JUDGE DRONEY: Even with just
18   one antenna?
19      MR. HOSP: Even with just one
20   antenna. But again, that is not
21   our situation.
22      JUDGE DRONEY: So why did you
23   build all these antennas?
24      MR. HOSP: Well, there are a

Page 48

PROCEEDINGS

1   number of different reasons.
2      JUDGE DRONEY: Is there any
3   technological reason for it?
4      MR. HOSP: There is.
5      Is there a technological
6   reason in terms of?
7      JUDGE DRONEY: Does it make
8   the transmissions better? Why do
9   it, why do you spend all the money
10   on all these little antennas when
11   you can do it with one big antenna?
12      MR. HOSP: It makes it clear
13   that there are in fact two bases
14   for this being legal under the
15   Copyright Act. I mean, that's what
16   Judge Nathan made clear, was that
17   the copies themselves, under the
18   law as it is --
19      JUDGE CHIN: But it seems
20   you're exalting form over
21   substance. You're going through
22   this fiction of using, you know, a
23   million itty-bitty antennas when
24   really you'd rather do it with one,

Page 49

PROCEEDINGS

1   just to try to fit within
2   Cablevision.
3      Isn't that what's happening?
4      MR. HOSP: No, your Honor.
5      JUDGE CHIN: No? Is there any
6   legitimate business reason for
7   having all of these little
8   itty-bitty antennas?
9      MR. HOSP: I guess I'm not --
10      JUDGE CHIN: Any technological
11   reason.
12      MR. HOSP: Is there any
13   logical reason?
14      JUDGE CHIN: Technological
15   reason.
16      MR. HOSP: Technological
17   reason.
18      The reason for having the
19   antennas is to comply with the
20   Copyright Act. And we believe that
21   in both instances it complies with
22   the Copyright Act.
23      And again, this is something,
24   the argument that plaintiffs have

13 (Pages 46 to 49)

HEARING - 11/30/2012

Page 50

```
1              PROCEEDINGS
2    made that the court, the District
3    Court paid too much attention to
4    the form of --
5         JUDGE CHIN:  Let's extend this
6    to books.  You send an electronic
7    book to a consumer, you make it a
8    little bit different, you put the
9    purchaser's name on it.  Does that
10   now suddenly become a private
11   performance?
12        MR. HOSP:  Well, again --
13        JUDGE CHIN:  Under the logic
14   that you're advocating in this
15   case?
16        MR. HOSP:  Again, with respect
17   to books, the public performance
18   right obviously doesn't apply.
19        But taking your argument for
20   what I think that you're asking,
21   the answer is yes, this, for
22   example, all comes back to ASCAP.
23   If you basically take it in the
24   music industry situation, yes, what
25   this court held was that where you
```

Page 52

```
1              PROCEEDINGS
2    if you turn it around and you say
3    okay, let's accept, for example,
4    these aggregation arguments.  What
5    you're saying is every time
6    somebody goes up on a roof and puts
7    an antenna on a roof and then
8    transmits that signal down to their
9    own television, that's now a public
10   performance because that has to be
11   aggregated with the original
12   broadcaster's performance.
13        Every single question that is
14   raised by the plaintiffs was
15   actually specifically addressed in
16   the Cablevision decision.
17        JUDGE CHIN:  But that's not
18   what's happening here.  Aereo is
19   providing the service so the
20   consumer doesn't have to go up on
21   the roof.  And the consumer can
22   stay downstairs.
23        Why isn't that retransmission?
24        MR. HOSP:  Because the
25   analysis is the same under the
```

Page 51

```
1              PROCEEDINGS
2    make a copy, even if you're
3    listening to it right away, where
4    you make a copy, it's not a public
5    performance anymore.  And that's
6    important because you do have
7    another right to go under.
8        And in fact, when you read the
9    Cablevision decision, at the end of
10   the Cablevision decision, the end
11   of the Cablevision decision makes
12   clear that this court understood
13   exactly what it was doing.  This
14   court said, you know what, we're
15   not saying that there is no
16   copyright protection here, we're
17   not saying that there aren't
18   possibilities in many instances
19   where you're not going to have a
20   right either under indirect
21   infringement or potentially under
22   your reproduction right.  And
23   that's okay.
24        And it's important to do that
25   because if you take the flip side,
```

Page 53

```
1              PROCEEDINGS
2    Copyright Act in either instance.
3    What the Copyright Act held is --
4    what the Copyright Act says, what
5    Congress intended, was for the
6    analysis to be the transmission of
7    the performance, rather than the
8    transmission of the work.
9        And again, this is really what
10   plaintiffs are asking you to do, is
11   overturn Cablevision.  That's
12   what's at issue.  And what's being
13   said here is that Cablevision is
14   wrong.  We disagree with
15   Cablevision.
16        JUDGE CHIN:  I think the
17   District Judge got it right in
18   Cablevision.  But of course we're
19   bound by the Circuit decision.
20        MR. HOSP:  And that really is
21   what's, you know, in this instance
22   it's the sort of thing where --
23        JUDGE GLEESON:  And to put
24   your position as just as bluntly,
25   you seem to be reticent to say it
```

14 (Pages 50 to 53)

Page 54

```
 1           PROCEEDINGS
 2   out loud, the model is built around
 3   Cablevision?
 4       MR. HOSP: Yes.
 5       JUDGE GLEESON: You don't have
 6   all these little antennas because
 7   it makes any sense, it's kind of
 8   like constructing your business
 9   affairs to avoid taxes.  Right?
10   It's tax avoidance is different
11   from tax evasion.
12       But you built this business
13   and the technology with Cablevision
14   in mind to avoid copyright
15   violations; correct?
16       MR. HOSP: Everyone in this
17   case agrees that Aereo designed
18   this system to comply with
19   copyright and to follow the law as
20   this court laid down in
21   Cablevision.
22       Now, the plaintiffs --
23       JUDGE GLEESON: And the reason
24   you have all the little tiny
25   antennas is simple, it's because,
```

Page 55

```
 1           PROCEEDINGS
 2   in your view, kind of a belt and
 3   suspenders approach to avoiding the
 4   public performance?
 5       MR. HOSP: And it follows the
 6   law and it follows the Copyright
 7   Act.
 8       Now, plaintiffs suggested
 9   somehow this is a bad thing that
10   Cablevision -- that Aereo has
11   decided to follow the law.  It's an
12   argument that doesn't make sense.
13       The law, this court decided
14   what the law was.  And Aereo
15   followed it to a T.  And the law is
16   what it is.
17       This court -- let me make
18   clear, I believe that the Second
19   Circuit got it right in
20   Cablevision.  Because it's the
21   balance between private performance
22   and public performance that
23   Congress indicated it wanted to
24   strike.
25       And so this is a situation --
```

Page 56

```
 1           PROCEEDINGS
 2       JUDGE CHIN: Is it your view
 3   that this case is exactly like
 4   Cablevision?
 5       MR. HOSP: Well, the District
 6   Court --
 7       JUDGE CHIN: Even though there
 8   isn't that ongoing relationship
 9   between the subscriber and Aereo as
10   there was in Cablevision?
11       MR. HOSP: Well, your Honor, I
12   believe there is an ongoing
13   relationship.
14       But the District Court made
15   factual determinations that in fact
16   all of the facts that are relevant
17   to the Cablevision finding are
18   present here.  The District Court
19   made those factual findings
20   specifically.  And those factual
21   findings have not been challenged.
22       JUDGE CHIN: You don't think
23   you're asking us to go one step
24   further than Cablevision with this
25   case?
```

Page 57

```
 1           PROCEEDINGS
 2       MR. HOSP: No, no.  This
 3   doesn't extend Cablevision at all.
 4   Not even a little bit.  This case
 5   is on all fours with Cablevision.
 6       The question under Cablevision
 7   and under ASCAP, it's not just
 8   Cablevision, it's ASCAP as well,
 9   and other courts have followed this
10   as well, it's whether or not there
11   is a single unique copy and who can
12   receive that copy.  And that's what
13   the law says.  And in fact that's
14   how the law stands.
15       This is why the court -- and
16   this is why the Supreme Court noted
17   that in instances like this where
18   you're dealing with new technology,
19   courts have to be very circumspect
20   about extending copyright.
21       We're not asking to extend
22   Cablevision.  Plaintiffs are asking
23   to extend the Copyright Act.
24   Appellants here are asking you
25   fundamentally to change the law and
```

15 (Pages 54 to 57)

HEARING — 11/30/2012

Page 58

PROCEEDINGS

1   to overturn Cablevision. To
2   overturn ASCAP. And in the process
3   to punish Aereo for following the
4   law.
5       We're asking you not to do
6   this. We're asking you to uphold
7   Judge Nathan's exceptionally well
8   written opinion.
9       Thank you, your Honor.
10      JUDGE CHIN: Thank you.
11      We'll hear rebuttal.
12      MR. SMITH: Your Honors, I
13  think it's telling that you saw
14  from Mr. Hosp's argument no effort
15  to explain why their service and
16  his particular features with the
17  little antennas and the individual
18  copies should be exempt under the
19  statute as written by Congress.
20      Congress made the statute as
21  broad as possible. It said the
22  function of retransmission by any
23  device or process, whether it goes
24  to different people, different

Page 59

PROCEEDINGS

1   places, same time, same place, all
2   of that ought to be requiring a
3   license.
4       Instead what they did is they
5   designed a system by taking some
6   straight language out of the
7   Cablevision decision and said we
8   think we can exploit this.
9       But it makes no sense to think
10  that a decision about that one
11  little DVR function changed the
12  statute and that it binds
13  subsequent panels to say well, you
14  can do it this way when in fact, as
15  was brought out in the questioning,
16  they could have 5 million people
17  watching the same Monday Night
18  Football game live over their
19  internet devices without paying a
20  dime in license fees for it.
21      JUDGE GLEESON: Does this
22  enlarge the audience for the
23  content?
24      MR. SMITH: It might well,

Page 60

PROCEEDINGS

1   your Honor.
2       Another argument that was made
3   by the cable companies before the
4   '76 Act is we're not harming you,
5   we're simply getting your broadcast
6   to more people. And more people
7   seeing the commercials. Congress
8   disagreed with that determination
9   and said, if you're making money
10  off their broadcast programming
11  that they paid to create, you owe
12  them license fees.
13      What Aereo is saying is we
14  found a way to design around it
15  using stuff in a decision that is
16  about a different factual
17  situation.
18      The one point I want to make
19  is that the same thing is true with
20  respect to the record function.
21  The statute is clear that a
22  retransmission service that delays
23  is also covered and also requires a
24  license. So if Ivy, for example,

Page 61

PROCEEDINGS

1   decided to make a copy of Monday
2   Night Football and tell the
3   subscribers you can watch this copy
4   On Demand whenever you want to for
5   the next 36 hours, that would also
6   be covered by the Transmit Clause.
7   It says same time or different
8   times.
9       JUDGE DRONEY: As long as
10  they're watching the same copy
11  though, right?
12      MR. SMITH: That is a function
13  that clearly the Transmit Clause
14  covers in that situation.
15      Now, the only question then is
16  are you going to let Aereo, which
17  has provided this television to
18  them through the antennas and made
19  it available, suddenly say well,
20  we're just a VCR, we're just a DVR,
21  because we make individual copies
22  instead of doing what Ivy would be
23  doing, which is time delayed
24  retransmissions.

16 (Pages 58 to 61)

Page 62

PROCEEDINGS

1     PROCEEDINGS
2         I think the important point is
3     different times is the same as
4     saying delayed times. Delayed
5     retransmission is the same as the
6     live retransmission.
7         Thank you, your Honor.
8         JUDGE CHIN: Thank you.
9         JUDGE GLEESON: Thank you.
10        MR. KELLER: We are not asking
11    you to overturn the Second
12    Circuit's decision in Cablevision
13    notwithstanding the rulings of the
14    lower court in that case.
15        It is not the case that
16    Aereo --
17        JUDGE GLEESON: District
18    judges like overturning the Second
19    Circuit.
20        MR. KELLER: Mr. Hosp did not
21    answer the question directly, Judge
22    Chin, when you asked him to concede
23    whether Aereo is retransmitting.
24    But Aereo conceded it already, at
25    page 28 of their brief. There they

Page 63

1     PROCEEDINGS
2     say that Aereo is transmitting our
3     copyrighted performances, they're
4     just not doing it directly. It's
5     right at the top of page 28.
6         So what? A retransmission
7     service, by definition, indirectly
8     retransmits the copyrighted works
9     of the original broadcaster. That
10    is what a cable television system
11    does. It receives a signal, runs
12    it through the cable head end,
13    sends it to its subscribers.
14        Aereo is a retransmission
15    service in every sense of the word.
16    Judge Nathan made specific findings
17    on that point. She repeatedly
18    talked about Aereo's system
19    transmitting our copyrighted
20    broadcast to Aereo's subscribers.
21        And, Judge Droney, your point
22    really was the one I wanted to make
23    and never got to. I guarantee you
24    that when you watch Super Bowl XLVI
25    through Aereo, the Giants beat the

Page 64

1     PROCEEDINGS
2     Patriots every time 21-17. It is
3     exactly the same performance.
4         And the notion that somehow
5     it's encoded differently, the name
6     on the book example, somehow that
7     makes it private, that is not
8     common sensical at all. It is a
9     retransmission service, pure and
10    simple.
11        Now, Mr. Hosp suggested that
12    without a fixed copy, somehow the
13    result is different. No, it's not.
14    Either way, Congress said you use
15    any device or process, if the end
16    result is that the viewer gets the
17    performance, it's a retransmission
18    of a public performance, that
19    violates the Copyright Act without
20    a license.
21        Now, why is that important?
22    Because it's all about the
23    difference that clearly separates
24    us today on ASCAP. ASCAP came out
25    the way it did because at page 74

Page 65

1     PROCEEDINGS
2     of that opinion, Judge Walker wrote
3     that a performance, if it's not a
4     performance, it can't be a public
5     performance. That's the holding of
6     ASCAP.
7         And in that context, the
8     download of a previously stored
9     musical file to somebody's cell
10    phone was viewed, just like we
11    argue Cablevision's RSDVR service
12    should be viewed, was viewed by the
13    panel, as a stored service. It was
14    not perceptible at the time that
15    the original transmission was
16    coming in. There was input, but no
17    output.
18        And Aereo is not that. It is
19    a pure input/output service.
20    Without a license, it violates the
21    public performance right that the
22    broadcasters have because it sells
23    our broadcast, our performances, to
24    its own subscribers.
25        Thank you very much.

17 (Pages 62 to 65)

HEARING – 11/30/2012

Page 66

1        PROCEEDINGS
2    JUDGE CHIN:  Thank you.
3    We'll reserve decision.
4    (Time noted:  10:49 a.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 67

1        PROCEEDINGS
2        C E R T I F I C A T E
3    STATE OF NEW YORK  )
4                : ss.
5    COUNTY OF NEW YORK )
6        I, ERIC J. FINZ, a Shorthand
7    Reporter and Notary Public within and
8    for the State of New York, do hereby
9    certify that the foregoing proceedings
10   were taken before me on November 30,
11   2012;
12        That the within transcript is
13   a true record of said proceedings;
14        That I am not connected by
15   blood or marriage with any of the
16   parties herein nor interested directly
17   or indirectly in the matter in
18   controversy, nor am I in the employ of
19   the counsel.
20        IN WITNESS WHEREOF, I have
21   hereunto set my hand this ____ day of
22   _____, 2012.
23
24        _____
25        ERIC J. FINZ

18 (Pages 66 to 67)

HEARING – 11/30/2012

**A**

ABC 18:6
able 4:24 12:16,17
  23:5
absolutely 17:3 21:11
  44:23
abuse 12:8
accept 52:3
accepted 4:21 34:4,5
  34:22
access 4:16 9:13 42:7
accessed 32:17 44:5
accessible 32:11
accomplish 9:7 30:19
account 13:14
act 3:15 5:5 29:15,16
  40:3 41:7 48:16
  49:21,23 53:2,3,4
  55:7 57:23 60:5
  64:19
acting 15:19
actual 36:19,19
addressed 19:10 33:15
  45:2 52:15
adjunct 11:19
admit 28:19
advances 17:5
advertise 28:23
advertising 21:12
advocating 50:14
Aereo 1:11,20 3:21
  6:15 8:12 9:2 10:17
  13:19 18:16 21:5,7
  22:4 23:18,22 24:20
  28:16,18 29:9,17,25
  31:4,6,8,9,13,15,24
  32:15,18 33:8 35:25
  36:11 38:11,14,22
  40:12 52:18 54:17
  55:10,14 56:9 58:4
  60:14 61:17 62:16,23
  62:24 63:2,14,25
  65:18
Aereo's 14:5 32:6
  63:18,20

affairs 54:9
afford 12:16 23:17
aggregated 52:11
aggregation 52:4
agrees 54:17
allocable 14:18
allow 11:21 12:16,20
  16:13
allowing 8:10
allows 30:16
AMERICAN 1:14
analogy 23:9,10 24:12
  28:8
analysis 10:9 11:3,6
  28:5 29:19 52:25
  53:6
analyzing 27:18,20
answer 50:21 62:21
antenna 10:5 30:12
  32:17 36:12,13,18,21
  36:23 44:16 47:4,6
  47:19,21 48:12 52:7
antennas 6:17,19 7:5
  9:6,23 10:8 11:24
  43:8,12,19 44:13
  47:24 48:11,24 49:9
  49:20 54:6,25 58:18
  61:19
anticipate 16:16
anymore 51:5
apart 14:11
APPEALS 1:2
appellants 1:9,18 3:12
  57:24
applied 17:12,16
applies 15:22
apply 15:17 50:18
appreciate 18:2
approach 55:3
arguably 9:4
argue 4:13 65:11
argued 9:19 33:19
arguing 4:4 22:24
  43:9 47:7
argument 9:2,16

13:12 15:5 34:23
  49:25 50:19 55:12
  58:15 60:3
arguments 4:19 52:4
ASCAP 26:13,13,19
  31:19 35:15 37:24
  40:20 41:23 42:22,23
  45:14,14,22 50:22
  57:7,8 58:3 64:24,24
  65:6
aside 38:11
asked 62:22
asking 18:15 50:20
  53:10 56:23 57:21,22
  57:24 58:6,7 62:10
aspect 21:5,7
assigned 6:5 36:12
assistance 3:6 31:24
attention 7:19 50:3
attorneys 30:5
audience 13:10 59:23
audience-limiting
  27:12
authority 17:20
authorizes 8:12
available 61:20
avoid 54:9,14
avoidance 54:10
avoiding 55:3
a.m 66:4

**B**

B 2:4 36:23
back 13:18 24:18
  31:18 39:5 41:22
  47:3 50:22
bad 55:9
balance 55:21
BAMBOOM 1:11
barring 4:2
based 18:16 27:11
  39:2
bases 48:14
basic 30:7
basically 23:8 34:21

50:23
basis 4:20 7:23 11:12
beat 63:25
believe 43:18 46:16,20
  49:21 55:18 56:12
belt 55:2
benefit 29:18
better 48:9
big 48:12
bigger 23:2
bind 15:24 17:20
binds 59:13
bit 50:8 57:4
blanche 12:8
blood 67:15
bluntly 53:24
book 50:7 64:6
books 50:6,17
bound 17:11,18 53:19
bounds 33:25
Bowl 21:3,14 22:6
  28:21,22 63:24
break 29:12
brief 62:25
broad 10:11 15:17,20
  17:3,16 58:22
broadcast 3:17,22
  4:25 8:6 12:17,21
  19:12 21:15 29:2
  32:7,8,23 37:6 60:6
  60:11 63:20 65:23
broadcaster 63:9
broadcasters 65:22
broadcaster's 52:12
broadcasting 1:7,14
  1:15,17 20:11 33:9
broadcasts 19:9 31:10
broken 29:14
brought 59:16
Bruce 2:17 18:5
build 47:24
built 54:2,12
business 3:21 19:4
  49:7 54:8,12
businesses 16:14

18:21
button 40:14
buttons 39:24

**C**

C 67:2,2
cabined 27:25
cable 5:15 8:21 9:19
    28:25 29:2 32:25
    60:4 63:10,12
Cablevision 4:5 5:7,15
    7:20 8:5,11 9:9
    11:12 12:6 13:15,20
    13:23 15:7 18:12
    20:14,16 22:4 23:8
    24:9 26:7,22 29:14
    29:18 32:20,22,24,24
    33:5,12,14,20 34:18
    34:21 35:3,12,13
    37:23 40:19 41:11,12
    41:17,17 43:21,25
    45:2,25 46:2,11 47:8
    47:14 49:3 51:9,10
    51:11 52:16 53:11,13
    53:15,18 54:3,13,21
    55:10,20 56:4,10,17
    56:24 57:3,5,6,8,22
    58:2 59:8 62:12
Cablevision's 65:11
called 12:11
capable 18:24
captures 31:10
capturing 33:9
carte 12:7
carved 4:5
case 3:13 6:11 13:23
    19:9,15,16 20:25
    26:7,13 30:8 33:12
    33:17 34:14,16 41:15
    43:17,19 46:1 50:15
    54:17 56:3,25 57:4
    62:14,15
cases 3:9 45:4
CBS 1:14,15
cell 65:9

CENTURY 1:5
certify 67:9
cetera 41:4
chain 29:12
challenged 30:25
    56:21
change 10:8 11:2,5
    20:14 32:8 57:25
changed 59:12
Chin 2:5 3:2 8:25
    17:23 21:4 23:18
    24:3 29:21 31:3,7,20
    32:13,19 34:7 38:4,8
    38:17 39:9,22 40:10
    40:23 48:20 49:6,11
    49:15 50:5,13 52:17
    53:16 56:2,7,22
    58:11 62:8,22 66:2
choice 39:24
CHRISTOPHER 2:6
circuit 1:3 19:16 23:3
    24:9,14 26:12 29:13
    44:2 53:19 55:19
    62:19
Circuit's 62:12
circumspect 57:19
circumstance 42:21
claims 3:25
clarify 40:6
Clause 10:10 18:10,18
    18:20 19:7,13,20
    20:10,15 21:21 25:20
    28:19 38:16 39:6,7
    61:7,14
clear 15:2 16:12 19:14
    19:17 21:11 22:17
    32:3 48:13,17 51:12
    55:18 60:22
clearly 61:14 64:23
closer 9:9
cognizable 40:9
colleague 17:25
comes 28:21 50:22
coming 17:5 41:22
    65:16

comments 30:4
commercial 23:13
commercials 60:8
common 38:18 42:6
    64:8
companies 1:14 9:19
    60:4
company 5:15
complement 18:8
complementary 45:25
complete 12:7
completely 17:12
    33:24 39:11
complies 49:22
comply 49:20 54:18
computer 9:7 41:24
concede 31:3,8 62:22
conceded 62:24
concept 27:19
concerned 21:24
concluded 19:12 20:17
    24:15
conclusion 5:25
confined 7:19
Congress 3:14 9:17
    10:2,10 15:2 16:11
    18:19 19:20 20:3
    25:13,14 39:3 53:5
    55:23 58:20,21 60:8
    64:14
Congress's 4:22 11:6
connected 67:14
connection 30:16
consent 8:22
considered 34:18
consistent 15:6 40:2
constitute 30:20,22
    47:9
constructing 54:8
construed 22:22
consumer 20:8 23:5
    31:14,21,22 32:3,14
    32:16,21,22 33:2,10
    36:11 40:12 46:17
    50:7 52:20,21

consumers 30:10 31:5
contemplated 25:15
content 44:19 59:24
context 11:16 17:17
    65:7
contours 27:21
controversy 67:18
convert 12:18
converted 14:8
copies 8:18 10:16
    16:17 20:23 25:2
    27:3,8 28:11 44:14
    44:16 47:9 48:18
    58:19 61:22
copy 4:9 6:3,5 7:8,12
    10:18,19 11:13,18
    12:3 14:2,11,14,17
    24:24 26:16 31:6,13
    31:22 32:4,10,14
    33:3 34:20 35:17
    38:5,23 39:17 40:4,8
    40:21 41:9,19 42:7
    42:11,20 43:2,23
    44:3,7 45:17 46:4,17
    47:15 51:2,4 57:11
    57:12 61:2,4,11
    64:12
copying 41:4
copyright 3:14 12:9
    13:6 30:24 40:3 41:7
    48:16 49:21,23 51:16
    53:2,3,4 54:14,19
    55:6 57:20,23 64:19
copyrighted 18:22
    19:2 22:8 26:5 63:3
    63:8,19
core 19:6
CORPORATION 1:6
correct 13:8,11 14:20
    21:18 54:15
cost-free 8:17
counsel 30:9 67:19
COUNTY 67:5
couple 42:15,16,18
course 8:13 53:18

court 1:2 3:15 4:4 5:10
    5:19,24 16:4 18:5
    22:19 30:2 33:14,19
    34:4,18,22 36:9
    42:22,23 44:25 45:2
    45:22 47:2 50:2,3,25
    51:12,14 54:20 55:13
    55:17 56:6,14,18
    57:15,16 62:14
courts 19:21 57:9,19
Court's 23:25 46:15
cover 15:3
covered 60:24 61:7
covers 15:13 61:15
create 44:20 60:12
created 10:20 11:19
    32:10 45:7
creating 45:10 46:4,7
    46:9
creation 14:2 32:14
crisp 22:5
crucial 26:23
current 8:16
customers 18:24 35:25
    37:20

**D**

David 2:18 29:24
day 23:11 67:21
dealing 6:13 57:18
decided 45:22 55:11
    55:13 61:2
decision 7:23 8:12
    11:12 26:7 28:2
    31:19 32:2 46:16
    51:9,10,11 52:16
    53:19 59:8,11 60:16
    62:12 66:3
decisis 15:10
declaring 18:21
Defendant-Counter...
    1:12,21
defense 19:22 20:8
definition 63:7
delay 42:17

delayed 16:19 61:24
    62:4,4
delays 60:23
delivered 8:20
delivery 28:3
Demand 61:5
DENNIS 2:5
design 28:3,14 29:11
    60:15
designed 54:17 59:6
designs 28:12
detail 27:22
determination 4:23
    11:7 36:20 60:9
determinations 56:15
determinative 27:15
device 10:12 12:11
    16:25 25:18 58:24
    64:15
devices 12:23 25:15
    59:20
dictum 15:21 17:15
difference 20:24 22:3
    23:22 26:6,8 31:17
    37:8 64:23
differences 37:9
different 5:11 6:11 7:9
    12:5 15:13 16:3,23
    16:24 17:12 23:19
    25:23,24 28:3,4,12
    28:14 33:12 34:14,16
    36:18,22,25 37:14,15
    38:2 40:17,21 43:17
    45:6 48:2 50:8 54:10
    58:25,25 60:17 61:8
    62:3 64:13
differently 37:6 64:5
dime 59:21
direct 30:23 31:2
directed 33:21
directly 24:11 44:4
    62:21 63:4 67:16
disagree 53:14
disagreed 60:9
DISNEY 1:14

distant 9:13
distinction 26:14
    39:20
distinguish 26:24
District 3:4 23:25
    46:25 50:2 53:17
    56:5,14,18 62:17
doing 11:10 17:14
    31:23 33:3,4 51:13
    61:23,24 63:4
download 26:15 42:13
    42:15 65:8
downplay 21:8
downstairs 52:22
drew 26:14
drive 14:18 45:8
Droney 2:6 6:22 7:16
    7:22 10:15,22 11:11
    24:20 25:6 35:20
    36:24 37:13 43:7
    47:3,18,23 48:3,8
    61:10 63:21
drove 24:8
DVD 13:21
DVR 5:21 20:25 30:13
    59:12 61:21

**E**

E 2:4,4,15 67:2,2
earlier 25:14
Eastern 3:4
effect 8:10
effectively 4:22 12:3
effort 58:15
either 4:21 19:11
    51:20 53:2 64:14
electronic 50:6
element 15:9
else's 17:9
embraced 25:25
employ 67:18
enable 19:23 21:13
enables 25:4
enacted 18:19
encoded 64:5

ends 32:8
engage 8:14 16:14
engaged 9:24
engaging 3:18
enlarge 59:23
ENTERPRISES 1:14
entire 7:2,13
entirely 6:13 16:2
equipment 4:16 9:3,15
    23:7
era 19:22
ERIC 2:10 67:6,25
ESQ 2:16,17,18
essentially 9:18 46:7
et 41:4
evasion 54:11
everybody 8:14
evidence 36:20
evident 15:17
evolving 25:16
exact 36:5,6 40:10,23
exactly 38:6 44:24
    45:13,21 51:13 56:3
    64:3
exalting 48:21
examined 42:22
example 21:2 22:11
    50:22 52:3 60:25
    64:6
exception 4:6
exceptionally 58:8
exclusion 21:9
exculpate 28:9
exempt 4:2 58:19
exist 14:10
existed 5:4
explain 58:16
exploit 59:9
extend 50:5 57:3,21,23
extending 57:20
extent 15:22 17:15
eye 26:2

**F**

F 2:4 67:2

facilitate 19:25
facilitates 25:18
facilitating 9:21
facility 14:7
fact 5:9 7:10,17 10:7
  13:14 15:23 17:13
  32:3 33:15,19 34:23
  36:10,16,21 48:14
  51:8 56:15 57:13
  59:15
facts 16:8 17:22 29:17
  56:16
factual 15:14,15 16:2
  23:20 36:19 56:15,19
  56:20 60:17
fair 46:18
familiar 12:11
far 15:9
feature 43:14
features 58:17
fee 3:25 5:3
feeling 17:18
fees 8:23 59:21 60:13
fiction 48:23
figure 22:21
file 26:15 65:9
FILM 1:6
final 7:21
find 18:8
finding 36:8 47:17
  56:17
findings 23:25 56:19
  56:21 63:16
fine 39:14
FineTime 19:16
FINZ 2:10 67:6,25
first 3:9 9:16 10:9 18:9
  27:7 30:6,8 33:8
fit 49:2
five 24:22 25:8 30:7
fixed 39:17 40:8,20
  41:9,18 42:11 64:12
flip 51:25
fly 16:5
focus 5:9,25

focused 8:8
focusing 11:17
follow 16:10 54:19
  55:11
followed 55:15 57:9
following 17:14 58:4
follows 55:5,6
football 35:23 38:10
  38:24 59:19 61:3
foreclose 47:16
foreclosed 46:22
foregoing 67:9
form 48:21 50:4
format 6:21 14:9
Fortnightly 5:5 9:20
found 20:23 29:13
  60:15
foundational 18:11
fours 57:5
FOX 1:5,5
full-fledged 23:23
function 13:21 27:12
  36:2 37:17 38:12
  39:10,23 45:24 58:23
  59:12 60:21 61:13
functionality 5:21
fundamental 35:11,13
  35:15
fundamentally 57:25
further 25:21 26:22
  56:24
F/K/A 1:11

G

game 38:10,25 59:19
generated 36:17
generating 36:22
getting 10:17 24:4
  38:13 60:6
Giants 63:25
Giants/Redskins
  35:24
giving 40:24
Gleeson 2:7 3:3 12:10
  12:15,24 13:9,12

14:15 15:4 18:14
  21:16 22:10,20 37:2
  44:8,12,18 45:5
  53:23 54:5,23 59:22
  62:9,17
go 46:13 51:7 52:20
  56:23
goes 7:7 14:16 16:22
  28:22 39:5 52:6
  58:24
going 11:21 14:23
  25:19 27:2 44:4
  48:22 51:19 61:17
Good 3:10
governs 23:10
grateful 3:5
great 27:22
GROUP 1:6,16
guarantee 63:23
guess 49:10

H

hand 67:21
happening 42:5 49:4
  52:18
happens 36:10
hard 14:18 22:20 45:8
harming 60:5
head 63:12
hear 3:8 17:24 58:12
heard 30:9
hearing 2:10 36:16
heart 28:18
held 45:14 50:25 53:3
hereunto 67:21
history 17:2 19:14
hit 24:21
hitting 40:13
holding 35:11,14
  43:20 65:5
holdings 35:15
holds 20:12
home 9:7 24:13 29:3
homes 37:3
Honor 6:25 9:10 12:13

13:25 18:3 31:12,18
  31:25 34:15 40:5
  47:12 49:5 56:11
  58:10 60:2 62:7
Honors 3:11 29:24
  58:13
hope 18:8
Hosp 2:18 29:24,25
  31:5,12,25 32:16
  33:13 34:15 36:7
  37:5,21 38:6,15 39:2
  39:15 40:5,16 41:8
  43:16 44:11,15,23
  45:13 47:12,20,25
  48:5,13 49:5,10,13
  49:17 50:12,16 52:24
  53:20 54:4,16 55:5
  56:5,11 57:2 62:20
  64:11
Hosp's 58:15
hours 61:6
hypothetical 40:6
hypothetically 35:22

I

impact 37:10
implicate 46:19
important 5:8 15:9
  51:6,24 62:2 64:21
inadequate 16:6
includes 15:12
including 7:4 12:2
  14:5
inconsistent 15:19
indicated 55:23
indirect 51:20
indirectly 63:7 67:17
individual 4:11 6:4
  10:8,23 16:17,21
  34:20,20 35:17,18
  36:13,14 38:7 42:20
  43:23 44:3,5,6,13
  45:17 47:15 58:18
  61:22
individualization

35:21
**individualized** 14:13
  14:17 38:5,23 44:14
  45:8 47:8
**individually** 38:21
**individual's** 36:18
**industry** 50:24
**infringement** 13:6
  30:23 31:2 51:21
**infringing** 18:23
**initial** 26:4 32:7
**input** 65:16
**input/output** 65:19
**inside** 14:6
**insinuates** 23:14
**instance** 53:2,21
**instances** 49:22 51:18
  57:17
**instructed** 19:21
**intended** 15:3 16:13
  53:5
**interested** 67:16
**internet** 3:24 6:21
  12:22 14:3,9 30:15
  59:20
**interpose** 7:12
**interposing** 4:9
**interpretation** 15:11
**interpretive** 18:13
**involve** 13:5
**involves** 10:12
**issue** 5:10,18 8:3 10:25
  33:15,16 35:10 39:8
  39:19 41:20,21 42:9
  42:10 43:3,4 44:7
  45:18,20,21 46:6,10
  46:24 53:12
**itty-bitty** 48:24 49:9
**Ivy** 60:25 61:23

**J**

**J** 2:10 67:6,25
**JOHN** 2:7
**Judge** 2:5,6,7 3:2,3
  6:22 7:16,22 8:25

10:15,22 11:11 12:10
  12:15,24 13:9,12
  14:15 15:4 17:23
  18:14 21:4,16 22:10
  22:20 23:18 24:3,20
  25:6 29:21 31:3,7,20
  32:2,13,19 34:7
  35:20 36:24 37:2,13
  38:4,8,17 39:9,22
  40:10,23 43:7 44:8
  44:12,18 45:5 47:3
  47:18,23 48:3,8,17
  48:20 49:6,11,15
  50:5,13 52:17 53:16
  53:17,23 54:5,23
  56:2,7,22 58:8,11
  59:22 61:10 62:8,9
  62:17,21 63:16,21
  65:2 66:2
**judges** 62:18
**juris** 20:15

**K**

**Kanojo** 29:6
**Keller** 2:17 17:25 18:4
  18:5 21:6,19 22:14
  22:24 23:21 24:6
  25:2,12 29:22 62:10
  62:20
**kind** 9:25 13:17 16:15
  54:7 55:2
**kinds** 17:4
**Kirkwood** 19:15 23:4
  23:4
**Kirkwood/Infinity**
  20:11
**know** 26:10,11 35:4
  38:19 42:24 45:23
  48:23 51:14 53:21

**L**

**LABS** 1:11
**laid** 54:20
**landscape** 13:16
**language** 15:12,18,21
  17:11,16 59:7

**laptop** 12:19 13:2
**law** 16:10,10 43:25
  48:19 54:19 55:6,11
  55:13,14,15 57:13,14
  57:25 58:5
**lay** 27:2
**leases** 4:17
**led** 24:11
**legal** 10:25 14:22
  48:15
**legislative** 16:25 19:14
**legitimate** 49:7
**letting** 40:25
**let's** 35:20,22 50:5
  52:3
**level** 5:23
**license** 3:20 5:16,20
  7:17,18 8:23 34:12
  59:4,21 60:13,25
  64:20 65:20
**licensed** 5:12 11:20
  34:2 35:2,6
**license-free** 8:15
**licensing** 11:8
**light** 14:24 16:7
**LIMITED** 1:7
**listen** 41:25 42:2,12
**listening** 51:3
**litigated** 46:25
**little** 9:5 48:11 49:8
  50:8 54:6,24 57:4
  58:18 59:12
**live** 12:2 16:19 59:19
  62:6
**living** 33:4
**LLC** 1:15,16,16,16,17
**logic** 50:13
**logical** 38:19 39:2
  49:14
**logs** 36:11
**long** 61:10
**longer** 41:20 46:5
**looking** 7:2 35:8
**looks** 7:9 13:22
**lose** 37:3 44:14

**lot** 14:4
**lots** 15:13
**loud** 54:2
**lower** 62:14

**M**

**M** 2:16
**machinery** 33:5
**making** 27:25 31:22
  33:3 45:16 46:17
  60:10
**marriage** 67:15
**matter** 6:23 7:17 9:4
  11:4 16:20,22 21:22
  23:20 25:3,17 28:13
  35:4,5 38:17 42:25
  43:19 67:17
**matters** 23:4
**mean** 7:13 8:13 11:5
  48:16
**meaningful** 20:23
**MEDIA** 1:15
**million** 48:24 59:17
**Millions** 38:9
**mind** 54:14
**mode** 21:17 24:22 25:8
**model** 54:2
**moment** 6:16
**Monday** 35:23,24
  59:18 61:2
**money** 48:10 60:10
**morning** 3:10
**morph** 8:11
**moved** 24:13
**movie** 44:21
**multiple** 9:12
**music** 42:13 50:24
**musical** 26:15 65:9

**N**

**name** 50:9 64:5
**Nathan** 32:2 48:17
  63:16
**Nathan's** 58:8
**nature** 18:11 22:15
  35:8

**NBCUNIVERSAL**
 1:15
**need** 17:7 41:13
**needed** 5:20
**needs** 3:20
**Neither** 4:19
**NETWORK** 1:7,16,16
**never** 63:23
**nevertheless** 3:25
**new** 1:25,25 3:4 20:9
 57:18 67:3,5,8
**Night** 35:23 59:18
 61:3
**Notary** 67:7
**noted** 57:16 66:4
**notion** 9:11 24:10 46:3
 64:4
**notwithstanding**
 62:13
**November** 1:23 67:10
**number** 23:24 30:3
 48:2

**O**

**O** 2:4
**obviously** 50:18
**okay** 46:4,12 51:23
 52:3
**once** 6:25 13:16
**ongoing** 32:20 33:6
 56:8,12
**on-command** 45:3
**opinion** 24:2 27:7 58:9
 65:2
**opposing** 30:9
**option** 40:13,25
**order** 11:25
**original** 52:11 63:9
 65:15
**ought** 59:3
**outlawed** 19:5
**output** 65:17
**overrule** 4:22
**overruled** 3:15 9:17
 11:7

**overturn** 53:11 58:2,3
 62:11
**overturning** 62:18
**over-the-air** 19:8
**owe** 60:12

**P**

**P** 2:15,17
**page** 27:24 29:3,5
 62:25 63:5 64:25
**pages** 20:12 29:4,7
**paid** 8:23 50:3 60:12
**panel** 7:20 15:12,24
 16:8 17:10,19 20:17
 26:19 65:13
**panels** 15:25 59:14
**paragraph** 27:17
**part** 13:15
**particular** 11:15 46:14
 58:17
**particularly** 30:22
 38:16
**parties** 18:6 67:16
**PARTNERSHIP** 1:7
**party** 23:13
**Patriots** 64:2
**Paul** 2:16 3:11
**pause** 4:8 21:18 24:21
 25:8
**paused** 36:3 37:17
**pay** 17:7
**paying** 20:5 45:11
 59:20
**Pearl** 1:24
**people** 4:23 8:21 9:12
 11:25 12:8 16:13
 36:4 37:13 38:9,20
 42:7 58:25 59:17
 60:7,7
**perceived** 26:18
**perceptible** 12:4 65:14
**perception** 37:11
**perfectly** 15:2,16
 39:14
**performance** 3:19 6:9

6:10,24 9:25 12:25
 13:3,7 19:24 20:3,4,6
 22:8,12,23 24:17,23
 25:7,11 26:5,19,21
 27:5,10 28:6 30:21
 35:19 39:8,19 41:21
 42:9,25 43:15 44:20
 45:10,19 46:5 47:10
 47:17 50:11,17 51:5
 52:10,12 53:7 55:4
 55:21,22 64:3,17,18
 65:3,4,5,21
**performances** 19:3
 20:21 30:11,17 43:11
 63:3 65:23
**performed** 18:22
**performing** 10:4
**person** 40:25
**personalized** 6:3
**phenomenon** 13:17
**phone** 65:10
**picking** 46:8
**picture** 7:9
**piece** 23:7
**place** 39:4 59:2
**places** 16:24,24 25:24
 25:25 27:7 59:2
**plaintiffs** 30:5 33:17
 33:18,23 34:8,23
 49:25 52:14 53:10
 54:22 55:8 57:22
**Plaintiffs-Counter-...**
 1:8,18
**play** 27:11 37:19
 42:18
**playback** 29:16
**played** 24:18
**playing** 42:19
**please** 18:4 30:2
**point** 7:11 18:18 20:13
 22:15 23:2 24:17
 25:14 28:16 34:9,10
 44:17 60:19 62:2
 63:17,21
**points** 18:7 30:7

**poison** 46:8
**position** 38:14 40:4
 47:7 53:24
**positioning** 29:9
**possibilities** 51:18
**possible** 58:22
**possibly** 10:11 26:18
**potential** 13:9
**potentially** 51:21
**practical** 11:4
**precedent** 16:7 22:18
 22:21 23:3
**preceding** 14:14
**present** 56:18
**presented** 10:25 41:15
 47:13
**previously** 24:19
 32:10 65:8
**primarily** 4:4
**prior** 15:11 32:13 33:7
**private** 6:7,8 7:14
 22:15 25:6,10 27:4
 27:10 29:16 30:11,17
 30:21 45:10 50:10
 55:21 64:7
**problem** 13:22
**proceedings** 3:1 4:1
 5:1 6:1 7:1 8:1 9:1
 10:1 11:1 12:1 13:1
 14:1 15:1 16:1 17:1
 18:1 19:1 20:1 21:1
 22:1 23:1 24:1 25:1
 26:1 27:1 28:1 29:1
 30:1 31:1 32:1 33:1
 34:1 35:1 36:1 37:1
 38:1 39:1 40:1 41:1
 42:1 43:1 44:1 45:1
 46:1 47:1 48:1 49:1
 50:1 51:1 52:1 53:1
 54:1 55:1 56:1 57:1
 58:1 59:1 60:1 61:1
 62:1 63:1 64:1 65:1
 66:1 67:1,9,13
**process** 7:11 10:12
 16:25 23:14 25:18

58:3,24 64:15
processed 6:20
processing 11:24
profiteer 4:24
profiteering 17:8
program 4:9 21:24
  22:2 32:5
programming 3:23
  5:2 6:16,20 8:7 9:14
  60:11
programs 3:17,19
  5:18 10:13
property 17:9
proposition 12:6
protection 51:16
provide 9:13
provided 3:16 13:19
  13:21 32:18 61:18
provider 4:16 9:16
  32:25 44:19 45:6
provides 44:21
providing 5:21 9:3
  52:19
prudence 20:15
public 1:7 3:18 6:8,9
  6:23 12:25 13:3,7
  20:6 22:12,23 24:17
  24:23 27:19,21 28:6
  35:18 39:19 41:20
  42:8,24 43:10,14
  44:20 45:19 46:5
  47:10,16 50:17 51:4
  52:9 55:4,22 64:18
  65:4,21 67:7
publicly 18:22
punish 58:4
purchaser's 50:9
pure 64:9 65:19
purposes 27:20
push 13:18
put 8:17 9:6 16:5
  38:11 39:3 50:8
  53:23
puts 52:6

**Q**

qualified 27:16
quality 37:14
question 14:22 31:7
  40:19 41:13,14 47:4
  52:13 57:6 61:16
  62:21
questioning 59:16
questions 18:14

**R**

R 2:4,15,18 67:2
radio 19:8,11
raised 33:16 52:14
reach 41:13
read 14:23 51:8
reading 41:12,16
  47:14
real 40:19
really 4:14 18:19
  26:23 48:25 53:9,20
  63:22
real-time 22:6
reason 48:4,7 49:7,12
  49:14,16,18,19 54:23
reasons 48:2
rebuttal 17:24 58:12
receipt 8:6 9:22
receive 19:24 57:12
receives 3:22 6:16
  36:13 63:11
receiving 18:25 32:23
recipient 10:16
recognized 46:2,3
record 18:17 21:13
  28:17 29:5,7 38:12
  39:10,23 40:14 41:2
  60:21 67:13
Redhorn 45:4
Redskins 37:2
regard 22:5
regarding 5:7
regardless 19:3
regime 5:4 8:19
reject 19:21

rejected 20:9
relationship 32:21
  33:7,7 56:8,13
relevant 27:9,14 56:16
remote 20:25
render 22:22 27:4
repeatedly 63:17
Reporter 2:10 67:7
represent 18:6
representing 3:12
reproduction 41:19
  42:10 43:3 45:18
  46:9,19,21 51:22
required 29:2
requires 60:24
requiring 59:3
reserve 29:20 66:3
respect 15:25 30:7
  39:21 50:16 60:21
respond 30:3
restored 5:6
result 28:4 64:13,16
results 33:10
resume 25:9
reticent 53:25
retransmission 4:3,7
  4:14 5:13,14 8:15,22
  11:9,22 16:14 17:6
  19:10 20:19,21 21:10
  22:7 24:16 25:19
  26:2,9,25 28:10,20
  29:10,12 38:13 44:9
  52:23 58:23 60:23
  62:5,6 63:6,14 64:9
  64:17
retransmissions 19:2
  61:25
retransmit 3:20 19:8
  25:23
retransmits 3:16,22
  31:11 63:8
retransmitter 21:25
retransmitters 19:19
retransmitting 5:2
  22:2 26:4 31:9 62:23

rewind 21:18
right 10:23 22:13 29:3
  30:10,12,13,14,21
  32:25 42:2,13 43:4
  44:10 45:18,19 46:9
  46:13,20,22 47:11
  50:18 51:3,7,20,22
  53:17 54:9 55:19
  61:12 63:5 65:21
rights 43:4 45:24
roof 52:6,7,21
room 33:4
royalties 45:12
RSDVR 20:17 22:9
  24:10 33:22 34:2,25
  65:11
rule 4:2,6 27:2
ruling 22:19 43:24
rulings 62:13
runs 63:11

**S**

S 2:15
satellite 8:21
saw 58:14
saying 27:8 38:4 39:25
  40:7 51:15,17 52:5
  60:14 62:4
says 17:2,10 21:21
  23:4,8 39:7 41:17
  46:11 53:4 57:13
  61:8
screen 4:10
second 1:3 5:20 18:11
  20:13 23:3 24:8,14
  26:11 29:13 30:18
  44:2 55:18 62:11,18
seconds 24:22 25:9
  28:23 42:16,17,19
see 39:20
seeing 36:5 37:12,18
  60:8
sells 65:22
send 7:12 10:5 12:2,21
  50:6

sending 4:10 14:3
sends 63:13
sense 38:9,18 54:7
    55:12 59:10 63:15
sensical 64:8
sent 26:16
separate 14:11,18
separates 64:23
separating 34:11
server 5:22 14:8
servers 6:19 7:4
serves 9:12
service 1:7 4:7,15 5:13
    5:14 6:14 7:3,14
    9:11 10:3,17 11:20
    11:23 20:18,19,20
    21:10 22:9 23:13,24
    24:10,11,16 26:3
    28:21,24 32:6 39:16
    52:19 58:16 60:23
    63:7,15 64:9 65:11
    65:13,19
services 3:16 4:3 11:9
    19:7 28:10
set 5:22 67:21
share 7:5
shoes 20:8 23:16
Shorthand 67:6
showed 36:21
shown 36:15
shows 10:4
side 51:25
signal 7:7 36:14,23
    52:8 63:11
signals 36:16
significant 31:17
    37:10
simple 54:25 64:10
simply 9:2 60:6
single 6:2 35:17 52:13
    57:11
sitting 3:2 41:24
situation 17:13 40:17
    40:22 44:25 45:15
    47:22 50:24 55:25

60:18 61:15
situations 15:14,16,18
    15:23 16:2
slightly 36:22
Slingbox 12:12 13:5
    13:17 22:11,16 23:17
    23:19 24:3 30:15
Smith 2:16 3:10,11
    6:25 7:18,24 9:10
    10:19,24 11:15 12:13
    12:20 13:4,11,24
    14:20 15:8 18:2,9
    22:16 58:13 59:25
    61:13
somebody 17:9 45:16
    52:6
somebody's 65:9
something's 27:10
song 41:25 42:2
Sony 46:16,23
sort 37:12 53:22
sounded 47:5
specific 16:17 63:16
specifically 33:14
    52:15 56:20
spend 48:10
split 33:21
splitting 34:24
ss 67:4
stand 20:7 23:15 29:6
stands 44:2 57:14
start 7:2 11:10
started 28:7
State 67:3,8
statement 27:16 29:9
    29:10
STATES 1:2
STATIONS 1:5
statute 4:20 14:24,25
    15:20 16:11 58:20,21
    59:13 60:22
statutory 15:11
stay 52:22
step 56:23
stop 21:17

storage 20:18,25 21:5
    21:7 24:11 26:8,25
    28:8 29:15
stored 26:15 65:8,13
straight 5:16 59:7
stream 8:18 10:20
    26:20 33:21,22 34:12
    34:25 35:6 42:4,4
streaming 39:12,16
    40:22 42:6
streams 16:21
Street 1:24
strike 55:24
STUDIOS 1:15,15
stuff 60:16
submit 17:15
subscriber 4:12 6:4,5
    14:19 21:23 40:12
    56:9
subscribers 3:18,24
    4:17 5:3 7:5 9:22
    10:14 14:16 20:5
    21:14 25:4 45:9 61:4
    63:13,20 65:24
subsequent 15:25
    29:16 59:14
subsequently 26:12
substance 48:22
suddenly 50:10 61:20
sufficient 13:13
suggested 55:8 64:11
suggesting 31:21
Super 21:3,14 22:6
    28:21,22 63:24
supplying 30:18
Supreme 3:15 46:15
    57:16
sure 13:21 19:18
suspenders 55:3
swept 19:19 25:20
system 21:5,7 23:19
    23:20,22 24:7,21
    25:3 28:3,9 30:15
    31:6,16 33:22 34:2
    35:2 36:11 38:22

39:3,12 43:13,22
    54:18 59:6 63:10,18

T

T 2:15 55:15 67:2,2
take 9:5 10:4 12:17,21
    13:16 31:18 39:22
    50:23 51:25
taken 67:10
takes 4:8 12:6 13:13
    28:15 42:15
talk 35:20
talked 45:3 63:18
talking 7:25 39:16
    43:21
tandem 3:9 43:5
tax 54:10,11
taxes 54:9
technological 9:4 17:4
    25:15 48:4,6 49:11
    49:15,17
technology 8:16 19:4
    30:19 40:11,24 41:3
    54:13 57:18
TELEMUNDO 1:16
Teleprompter 5:6
    9:20
television 1:5,6,16
    3:17,23 4:25 8:20
    9:23 19:9,11 28:25
    52:9 61:18 63:10
tell 61:3
telling 58:14
terms 26:3 41:3 48:7
tested 22:17
Thank 18:3 29:22
    58:10,11 62:7,8,9
    65:25 66:2
themself 20:2
thereto 11:14
thing 8:24 9:8 14:7
    23:7,9,12 27:14
    30:25 35:7 36:5
    53:22 55:9 60:20
things 14:4,10

think 5:8 7:8,24 13:13
  15:8,24 18:13 22:16
  23:2,21 30:8 41:23
  50:20 53:16 56:22
  58:14 59:9,10 62:2
third 18:15 23:13
  28:16
THIRTEEN 1:5
three 18:7 27:6
time 16:19,23 17:22
  17:24 25:16,24 29:20
  36:6 37:19,22 52:5
  59:2 61:8,24 64:2
  65:14 66:4
times 16:23 25:23 61:9
  62:3,4
tiny 54:24
today 3:3 64:24
top 5:22 63:5
transcript 67:12
transmission 6:2,7,8
  7:15,21 8:9 10:21
  11:18 24:4 32:9
  33:20 34:17,19,24
  35:9,10,16 53:6,8
  65:15
transmissions 5:17
  6:18 8:4 14:6 18:25
  48:9
transmit 10:10 18:10
  18:18,20 19:7,13,20
  20:10,15 21:21 25:20
  28:19 31:6 38:15
  39:6,7 61:7,14
transmits 31:13 52:8
transmitted 32:12
  37:25 38:3
transmitting 10:13
  31:4 63:2,19
trouble 4:8
true 21:20 32:15 60:20
  67:13
truly 27:11
try 49:2
trying 17:2

turn 52:2
turns 12:7
TV 29:2
TVs 37:14
TWENTIETH 1:5
two 39:24 42:3 43:4
  45:24 48:14
type 30:15

_____

U

ultimately 35:7
understand 3:7 5:8
understood 51:12
unique 10:16,18 11:13
  20:22 24:24 25:2
  27:3 28:11 32:10
  41:18 57:11
UNITED 1:2
UNIVERSAL 1:16
UNIVISION 1:6,6
unlicensed 4:3,7 5:14
  6:14,15 33:24
unsuccessful 34:8
uphold 58:7
upstream 13:18 24:13
use 4:18 13:4 28:24
  30:12,13,14 46:18
  64:14
user 12:4 21:23 32:5
  32:11,12
uses 23:9

_____

V

v 1:10,19
VCR 23:9 24:12 28:7
  61:21
Video-on-Demand
  44:19,22 45:7
view 39:13 55:2 56:2
viewed 6:6 16:7 65:10
  65:12,12
viewer 64:16
viewing 12:25 37:22
  37:24
violate 41:6
violates 64:19 65:20

violation 19:13 30:20
  46:21
violations 54:15
virtual 21:9
virtually 8:17

_____

W

Walker 65:2
wall 16:5
want 17:6 41:25,25
  60:19 61:5
wanted 55:23 63:22
warn 28:12
Washington 37:7
Wasn't 11:11
watch 21:2,14,17 22:6
  24:22 25:4,8 28:25
  36:2 37:16 39:25
  40:15 61:4 63:24
watches 21:23 32:5
watching 25:9 35:25
  37:15 38:10,20,23,24
  39:12 59:18 61:11
way 13:20 14:13 22:22
  24:5 26:17 27:18
  42:12 45:25 59:15
  60:15 64:14,25
ways 42:3
website 11:25
went 25:21 26:22
  27:23 34:25
we'll 3:8 17:24 58:12
  66:3
we're 10:25 17:2 21:24
  27:18 35:8 51:14,16
  53:18 57:21 58:6,7
  60:5,6 61:21,21
WHEREOF 67:20
win 37:3 44:10
wires 7:6
WITNESS 67:20
WNET 1:5 3:12
WNJU-TV 1:17
word 34:5 63:15
words 20:7

work 43:5 53:8
works 15:10 18:23
  63:8
worry 45:11
wouldn't 12:24 44:10
WPIX 1:6
written 58:9,20
wrong 53:14
wrote 65:2

_____

X

x 1:4,13,22
XLVI 63:24

_____

Y

York 1:25,25 3:5 67:3
  67:5,8

_____

1

10:49 66:4
108 20:12
112 20:12
12-12786-cv 1:10
12-2807-cv 1:19
15 29:4
1570 29:7
1960s 19:22
1976 3:14 4:23 11:7
  16:18

_____

2

2012 1:23 67:11,22
21-17 64:2
24 19:16
25,000 38:19
28 62:25 63:5
2807 18:6

_____

3

3 37:19
3rd 37:18
30 1:23 67:10
36 61:6

_____

4

4,000 37:20

---

**5**

**5** 59:17
**5,000** 35:24 36:4
**500** 1:24
**55** 29:5

---

**7**

**71** 29:7
**74** 64:25
**76** 5:5 60:5

# FISH & RICHARDSON P.C.

One Marina Park Drive
Boston, Massachusetts
02210-1878

Telephone
617 542-5070

Facsimile
617 542-8906

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

<u>VIA E-MAIL</u>

January 18, 2013

Hon. Alison J. Nathan
United States District Judge
Southern District of New York
500 Pearl Street, Rm. 614
New York, New York 10007

Re: WNET, et al, v. Aereo, Inc., No. 12-Civ. 1540-AJN (S.D.N. Y.) (Consolidated)

Dear Judge Nathan:



ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

HOUSTON

MUNICH

NEW YORK

SILICON VALLEY

SOUTHERN CALIFORNIA

TWIN CITIES

WASHINGTON, DC

This letter responds to ABC Plaintiffs' correspondence dated January 16, 2013, requesting a stay of discovery until May 15, 2013. ABC Plaintiffs' request should be recognized and rejected for the discovery game-playing it is.

This Court considered and rejected the possibility of a stay of discovery at the scheduling conference on September 21, 2012.[1] In the four months since then, Aereo has expended an enormous amount of time, effort, and financial and human resources complying with its discovery obligations and providing extensive and burdensome discovery productions to the Plaintiffs. As a result, Aereo has now nearly completed its document production, including the production of vast quantities of ESI. By contrast, Plaintiffs have refused to engage in any reasonable or good faith document production process, and the only documents produced by the ABC Plaintiffs since the Preliminary Injunction phase are copyright registrations. As a result, the burdens of discovery have fallen almost entirely on Aereo to date.

It not surprising, then, that ABC Plaintiffs would favor a three-month stay of discovery at this point. A stay would give Plaintiffs three months to review and analyze Aereo's extensive document and data production at their leisure, allowing them a full opportunity to plan out their deposition and trial strategy. And because they have refused to produce documents, ABC Plaintiffs could advance their case secure in the knowledge that Aereo would be deprived of the same opportunity. A stay at this point would thus serve no purpose but to reward Plaintiffs' failure to meet their discovery obligations, and give them a significant tactical litigation advantage.

---

[1] To be clear, Aereo believed a stay was appropriate in September, before the parties began further fact discovery. Once the Court denied the motion for a stay, Aereo fully complied with its discovery obligations in order to move this case forward expeditiously to resolution. Now, Aereo, unlike plaintiffs, has borne the very substantial expense and burden of nearly completing its document production.

FISH & RICHARDSON P.C.

Hon. Alison J. Nathan
January 18, 2013
Page 2

Moreover, there can be no question that, however the Second Circuit rules on this Court's preliminary injunction decision, this case will proceed.  Plaintiffs moved only to enjoin transmissions of over-the-air broadcasts that are not "completely" time-shifted.  Assuming the Second Circuit upholds this Court's denial of Plaintiffs' motion, Plaintiffs have already indicated that they will continue with their reproduction claims.  If the panel were to inexplicably break from established Second Circuit precedent and overturn this Court's denial of Plaintiffs' preliminary injunction motion, the requested injunction would not impact consumers' ability to use Aereo to record programming and play it back to themselves at a later time. In either event, discovery will continue in this case.

Plaintiffs in these consolidated cases have treated discovery as a game.  They have imposed upon Aereo unreasonable discovery demands—demands with which Aereo has substantially complied—while seeking to avoid any discovery on their part.  Now that Aereo has nearly completed its productions, ABC Plaintiffs ask the Court to approve these tactics with a stay.  Their request should be denied.

Very truly yours,

/s/ R. David Hosp

R. David Hosp
Principal

RDH/dzs

cc:  All Counsel of Record

22969656.doc

# Fish & Richardson p.c.

One Marina Park Drive
Boston, Massachusetts
02210-1878

Telephone
617 542-5070

Facsimile
617 542-8906

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

<u>VIA E-MAIL</u>

January 18, 2013

Hon. Alison J. Nathan
United States District Judge
Southern District of New York
500 Pearl Street, Rm. 614
New York, New York 10007

Re: WNET, et al, v. Aereo, Inc., No. 12-Civ. 1540-AJN (S.D.N. Y.) (Consolidated)

Dear Judge Nathan:

This letter responds to WNET Plaintiffs' correspondence dated January 16, 2013, requesting an extension of the fact discovery deadline from February 22, until May 15, 2013. Aereo does not disagree that a fact discovery extension may be required (although Aereo wants the most expeditious resolution of these actions), but believes that the request is premature because very substantial issues with Plaintiffs' production remain pending. As seems a pattern, Plaintiffs have rushed to the Court—apparently in an attempt to gain some tactical advantage—when they knew that Aereo was nearing the point at which it would prepare a letter to the court and motion to compel regarding extraordinary discovery non-compliance by the Plaintiffs. The parties' real dispute is not about the discovery deadline, as Plaintiffs' letter would have the Court believe, but about Plaintiffs' utter failure to engage in good faith discovery. The need for any extension is not occasioned by any failure in Aereo's document production (which has been exhaustive), but by Plaintiffs' delays and refusal to provide clearly relevant production in accordance with their legal obligation. The appropriate length of an extension can only be determined after a resolution of the outstanding disputed issues.

WNET Plaintiffs' assertion that an extension is necessary because Aereo has delayed discovery is patently false. To the extent that the discovery deadline must be extended, it is because Plaintiffs have unreasonably delayed discovery responses, failed to resolve issues promptly or reasonably and refused to produce relevant and necessary documents. In addition, it is important to note that Plaintiffs failed to limit the nature of the discovery sought to what they described at the September 21, 2012 scheduling conference, thus dramatically (and unreasonably) increasing the discovery burdens on Aereo.

The current discovery schedule was adopted by the Court at the urging of WNET Plaintiffs (and over Aereo's objection) based on specific representations that Plaintiffs made regarding the limited scope of the discovery they intended to pursue. Indeed, as everyone recognized, Plaintiffs had already engaged in exhaustive discovery of Aereo and its technology during the Preliminary Injunction phase of this case. In fact, during the scheduling conference, WNET Plaintiffs responded to direct questioning by the Court regarding additional discovery the Plaintiffs would need by stating that discovery would likely be limited to: (1) access to an Aereo subscription; (2) two antenna boards; (3) information about how the "watch" function is accessed; (4) database information regarding the manner in which consumers have actually



ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

HOUSTON

MUNICH

NEW YORK

SILICON VALLEY

SOUTHERN CALIFORNIA

TWIN CITIES

WASHINGTON, DC

FISH & RICHARDSON P.C.

Hon. Alison J. Nathan
January 18, 2013
Page 2


used the Aereo system; and—possibly—(5) non-party minor discovery from investors and marketing firms.

Aereo learned soon after the scheduling conference that Plaintiffs' statements to the Court about "limited" discovery were highly misleading. On September 24, Plaintiffs served Aereo with a broad set of document requests that sought patently irrelevant documents, including among other things, documents "concerning designs or architectures considered but not adopted in designing or implementing the Aereo System; documents "concerning any actual, contemplated, considered, or proposed business or strategic plans for Aereo or the Aereo System"; and documents "concerning the value of Aereo, the Aereo business, the Aereo system, or the Aereo System technology." Read literally, Plaintiffs' document requests would require Aereo to review and potentially produce nearly every document in its possession.[1]

Although the requests were facially unreasonable and entirely beyond what Plaintiffs had indicated they would seek, Aereo promptly responded to the requests, subject to objections. The company began by producing the categories of information that Plaintiffs had indicated to the Court they would seek from Aereo. Production on all of those topics was substantially completed by the end of October. The only information not produced immediately after Plaintiffs' requests were served was database information regarding consumer use of the Aereo system. With respect to that topic, Aereo conferred with Plaintiffs at the beginning of October to provide, voluntarily, a description of all database and server log information available in the Aereo system, and then sent a written description of the databases and logs on October 24, 2012 (30 days after Plaintiffs served their requests), so that Plaintiffs could identify categories of interest. Plaintiffs did not respond, so Aereo collected and produced voluminous amounts of data from applicable databases and servers.

In total, Aereo has reviewed well over 300,000 documents totaling millions of pages in addition to numerous caches of data, computer code, and other ESI. As a result of this extraordinary effort, Aereo's production is nearly complete, and Plaintiffs' claims that Aereo has "delayed" its production are unsupportable.

By contrast, Plaintiffs have expended most of their resources during this same time avoiding discovery and stonewalling Aereo's reasonable document requests.[2] In response to several requests for the most basic and clearly relevant documents, Plaintiffs initially issued blanket refusals to produce anything. By way of example only, Plaintiffs refused to produce any communications by their boards of directors concerning Aereo or the Aereo technology, as well as documents concerning their deployment of remote storage digital video recorder

---

[1] Plaintiffs contrast the literal number of their requests with the number of Aereo's. But, while Plaintiffs made fewer document requests in number, their scope is unreasonably broad and effectively encompass every document in Aereo.

[2] Indeed, Plaintiffs' primary efforts in connection with discovery seem to be to generate dozens of multipage letters either making aggressive demands for "immediate" production of various items and documents or, ironically, trying to justify how burdensome discovery is to their major network clients.

FISH & RICHARDSON P.C.

Hon. Alison J. Nathan
January 18, 2013
Page 3

technology—documents which are directly related to Plaintiffs' claims of harm. Such
blanket refusals to produce anything in response to many requests going to the core issues of
the case could not reasonably have been made in good faith, but instead appear to have been
interposed for the purpose of forcing Aereo into protracted negotiation to get basic
information. Indeed, Plaintiffs have dragged out the meet-and-confer process with respect to
their refusals to produce documents for more than a month while asking for repeated
extensions and providing incomplete responses. Plaintiffs were well aware that Aereo was
nearly ready, after weeks of unsuccessful attempts to confer and resolve the issues with
plaintiffs, to bring these issues to the Court. Knowing that they could postpone it no longer,
Plaintiffs sent these letters to try to preempt Aereo's filing and further avoid discovery via an
extension or a stay.

To date, Plaintiffs' productions remain woefully incomplete. For example, several Plaintiffs,
including WNET, WPIX, and Univision, have not produced a single document since the
Preliminary Injunction phase. During the current round of discovery, Fox and PBS have only
produced a smattering of minimally useful documents, consisting solely of copyright
registrations and television schedules. Not a single email or written communication has been
produced by any of the WNET Plaintiffs since April 2012.[3] Plaintiffs' dilatory tactics already
forced Aereo to postpone eight 30(b)(6) depositions of the WNET Plaintiffs (as well as nine
depositions of the ABC Plaintiffs) that were previously scheduled so they could be completed
well within the Court's imposed discovery deadline.

An appropriate discovery extension should not be set until document discovery issues are
resolved. If no agreement on these disputes is reached, Aereo will shortly be filing a letter
with respect to these discovery issues that concern material at the very heart of this case. For
these reasons, the Court should deny WNET Plaintiffs' request for a discovery extension until
the outstanding discovery disputes are resolved.

Very truly yours,

/s/ R. David Hosp

R. David Hosp
Principal

RDH/dzs

cc:  All Counsel of Record

30741878.doc

---

[3] Aereo is making one last effort to get Plaintiffs to voluntarily comply with its obligations. If that last
effort is unsuccessful, Aereo will, in a separate letter, provide the Court with detail regarding
Plaintiffs' discovery failures. It is sufficient here to note that Aereo cannot conduct a reasonable
defense in the face of Plaintiffs' wholesale refusal to produce relevant documents.