Jenner & Block LLP      Chicago
633 West 5th St          Los Angeles
Suite 3600               New York
Los Angeles, CA 90071-2054    Washington, DC
Tel 231 239 5100
www jenner com

Julie A Shepard
Tel 213 239-2207
Fax 213 239-2217
jshepard@jenner com

February 1, 2013

**VIA EMAIL
(NathanNYSDChambers@nysd.uscourts.gov)**

*Highly Confidential –
Subject To Protective Order*

The Honorable Alison J. Nathan
United States District Judge
United States District Court for
   the Southern District of New York
500 Pearl Street, Room 615
New York, NY 10007

*Re:*    *WNET, et al., v. Aereo, Inc., No. 12-Civ.-1540-AJN (S.D.N.Y)- Consolidated*

Dear Judge Nathan:

The WNET Plaintiffs and the ABC Plaintiffs (collectively, "Plaintiffs") submit this letter in response to the Court's January 28, 2013 Order.[1]

## I.    REPORT ON PLAINTIFFS' PRODUCTION TO DATE

Plaintiffs set forth below the documents that they have produced to date to Aereo from the preliminary injunction phase to present. As noted in Section II below, Plaintiffs are in the process of producing additional documents and anticipate more documents will be provided to Aereo in advance of the February 8 hearing pursuant to Plaintiffs' January 14 and January 15 meet and confer proposals to which Aereo responded on January 28. Plaintiffs have produced the following:

- Plaintiffs' non-privileged documents dated before the filing of the lawsuit referring to Aereo, Aereo's technology, Bamboom, Bamboo Entertainment or Chet Kanojia from searches of identified custodians reasonably believed to possess such documents.

- Retransmission consent agreements of ABC, CBS, Fox, and NBC covering their broadcasts in the New York DMA have been produced. Univision's agreements will be produced next week. The other Plaintiffs are not parties to any retransmission consent agreements so they have no such agreements to produce.

---

[1]    Given that there is no page limit imposed on this filing with the Court and that there is overlap in many of the positions of the WNET Plaintiffs and the ABC Plaintiffs stated below, they are jointly submitting this brief. However, both the WNET Plaintiffs and the ABC Plaintiffs reserve their rights to file separate briefs in the future.

- Plaintiffs' documents reflecting the impact of Aereo on Dyle (the mobile distribution system developed by some of the Plaintiffs for reception of their broadcast signals).

- Plaintiffs' copyright registrations issued to date for the copyrighted works for which registrations have been sought. Given (a) the ongoing nature of Aereo's service which continues to retransmit and copy Plaintiffs' programming 7 days a week, 24 hours a day and (b) the copyright registration process in which there is a several month lag time between when applications for works are registered and when a registration is received, Plaintiffs' production of such documents will be ongoing through the time of trial.

- Programming schedules reflecting Plaintiffs' programming that aired on the New York broadcast channels retransmitted by Aereo. Given the ongoing nature of Aereo's service which continues to retransmit and copy Plaintiffs' programming 7 days a week, 24 hours a day, Plaintiffs' production of the schedules of their programming will be ongoing through the time of trial.

- Net gross advertising or underwriting (for the non-profit Plaintiffs) revenues for 2011 and 2012 from Univision.

- All documents that have been identified to date which support Plaintiffs' claims.

- All documents identified to date that evidence damage caused by Aereo.

- Organizational charts of Univision and PBS.

- Document retention policies of Univision, Fox, PBS and ABC.

## II.    REPORT ON DOCUMENTS THAT PLAINTIFFS ARE IN THE PROCESS OF PRODUCING

The following descriptions reflect the documents that Plaintiffs are in the process of gathering, reviewing and producing:

***Nielsen ratings reports for 2011 and 2012 (Request No. 77).*** [2] Plaintiffs agreed to produce the Nielsen ratings reports in their possession that include audience estimates for live broadcast television viewing and C-3 ratings, which are the ratings used by advertisers who pay to place advertisements that air during Plaintiffs' broadcasts. In many instances the reports that the WNET Plaintiffs have gathered and are ready to produce encompass Nielsen ratings estimates for viewing via DVR 1, 3 and/or 7 days after the initial live broadcast of Plaintiffs' programming.

On January 22, 2013, the WNET Plaintiffs sought approval from Aereo's counsel for an addendum to the Protective Order that Nielsen requires before permitting production of Nielsen estimates data. Nielsen asserts its estimates are proprietary and contractually restricts Plaintiffs

---

[2] Aereo's document requests are included as Attachment A hereto.

from producing Nielsen data in litigation. Aereo's counsel has not responded to this request or commented on the draft addendum that they were provided.

Plaintiffs have also sought Nielsen's agreement to a stipulation that would allow Plaintiffs to produce these documents. Plaintiffs' counsel contacted Nielsen's counsel on January 22, 29 and 31 in their efforts to obtain Nielsen's consent. Plaintiffs will produce these documents once the necessary consent is obtained.

*Reports from Google and Comscore (Requests Nos. 78-80).* As with Nielsen, Plaintiffs are in the process of producing any existing reports sufficient to reflect data received from Comscore and/or Google reporting on the viewership of the broadcast channels and/or the infringed works in homes, over the Internet or on mobile devices in 2011 and 2012.

*Retransmission consent agreements (Request No. 45).* Plaintiffs intend to produce additional agreements and updates next week.

*Retransmission consent negotiation documents.* On January 14, Plaintiffs agreed to produce non-privileged documents regarding the negotiation of the retransmission consent agreements that reference (1) Aereo, (2) Filmon, (3) Filmonx, (4) Alki David, (5) ivi, (6) Aereokiller, (7) BarryDriller, (8) Zediva /Zedeva or (9) Chet Kanojia. Plaintiffs' prior Aereo-related document searches encompassed the review for at least some of these documents. Further collection and review efforts for such documents via electronic search has already commenced.

*Mobile and Internet content distribution agreements (Request No. 32).* Plaintiffs are in the process of producing Plaintiffs' licenses of the infringed works for distribution on mobile devices and over the Internet, including license agreements with iTunes, Hulu, Netflix, Microsoft and Amazon, effective at and after the time Aereo launched (March 2012).

Plaintiffs notified Aereo that some of these agreements may be redacted. Redaction is necessary because, in some instances, the agreements to be produced cover not only broadcast programming, but also movies or other content that is not at issue in this litigation. Some agreements also contain highly competitive terms that are irrelevant to this litigation. In all instances, Plaintiffs agreed that the general subject matter of the redaction will be disclosed to Aereo so that Aereo may determine if it wishes to request additional provisions in a meet and confer process. Plaintiffs represented to Aereo that, if Aereo requests that something be unredacted and the parties cannot resolve the issue, then the license will be submitted to the Court for an in camera review and decision.

Further, some mobile content agreements require notice to the counter-party before the agreement may be produced. Plaintiffs have commenced the notification process, but more notifications will be required prior to production. Nevertheless, Plaintiffs are endeavoring to commence production of these agreements to Aereo next week.

*Internet and mobile license agreement negotiations (Request No. 32).* Plaintiffs who have such licenses covering the infringed works will be producing negotiation documents in connection with the mobile and Internet agreements where the negotiation documents refer to Aereo, Filmon, Filmonx, Alki David, ivi, Aereokiller, BarryDriller, Zediva/Zedeva, or Mr. Kanojia. They have

agreed to do so in response to Aereo's demand set forth in it January 28 letter. Plaintiffs have commenced the process of gathering any such documents for production.

*Aggregate net gross licensing revenues on a quarterly basis arising from Internet and mobile licensing of the infringed works (Request No. 67)*. The WNET Plaintiffs are in the process of gathering and providing this information for 2011 and 2012.

*Net gross advertising or underwriting (for the non-profit Plaintiffs) revenues (Request No. 67)*. Univision has provided this information. Other Plaintiffs are in the process of gathering and producing it.

*Board Minutes (Request No. 8)*. Plaintiffs agreed to produce non-privileged board minutes that discuss or mention Aereo, its CEO or Bamboom. Plaintiffs have commenced gathering any such documents and reviewing them for privilege.

*Market research reports, analyses and/or business forecasts from 2011 and 2012 regarding remote DVRs, antennas, DVR measurements including fast-forwarding, and Slingbox (Requests Nos. 63-65)*. Without waiver of their objections that such documents are not relevant, the WNET Plaintiffs offered to search for and produce the following reports, analyses and business forecasts as a way to reach a compromise on a number of Aereo's overbroad requests. Although Aereo has never agreed to these compromise positions, Plaintiffs remain willing to search for and produce the following documents:

- Any non-privileged, non-work product market research reports or analyses commissioned or conducted by any of Plaintiffs in 2011 or 2012 that measures fast forwarding of advertising embedded in their programming using a remote DVR.

- Any non-privileged, non-work product market research report or technology review commissioned or conducted by any of Plaintiffs in 2011 and 2012 regarding the use of any of the infringed works on any mobile device or via remote DVR

- Any non-privileged, non-work product business forecast prepared by any of Plaintiffs in 2011 or 2012 regarding the use of any of the infringed works on any mobile device or via remote DVR.

- Any non-privileged, non-work product market research reports or analyses commissioned or conducted by any of Plaintiffs in 2011 or 2012 reporting on consumer access to the infringed works via remote DVR.

- Any non-privileged, non-work product market research reports or analyses regarding remote DVRs and time-shifting via remote DVRs commissioned or conducted by Plaintiffs in 2011 or 2012.

- Any non-privileged, non-work product market research studies or analyses commissioned by any of Plaintiffs in 2011 or 2012 regarding the market harm or impact from Slingbox.

- Non-privileged, non-work product reports regarding the number of people who watched broadcast television via over-the-air antennas in 2011 and 2012.

Similarly, although Aereo has never agreed to these positions, the ABC Plaintiffs offered to search for and produce, as a reasonable compromise, any market research, business forecasts or similar analyses created or commissioned in 2011 or 2012, for the purpose of assisting Plaintiffs to make business decisions, based on the impact of remote-storage DVRs, Slingbox, Aereo, and services that are related to Aereo, such as ivi, Aereokiller, Zediva and Filmon, and on the economics of Plaintiffs' domestic over-the-air, retransmission, online and mobile markets for their broadcast television programs.

*Plaintiffs' development and deployment of RS-DVR and mobile technology.* The ABC Plaintiffs agreed in their January 15 letter to produce documents, to the extent they exist, created in 2011 or 2012, sufficient to describe any remote-storage DVR technology or technology to distribute broadcast television programming to mobile devices over the Internet developed and deployed by the ABC Plaintiffs. Similarly, the WNET Plaintiffs agreed to produce documents sufficient to describe any remote DVR technology that the WNET Plaintiffs have developed and deployed, including what the cost of those services to consumers are or would be. Plaintiffs have commenced the process of gathering any such documents for production.

*Documents relating to Plaintiffs' lobbying efforts.* The ABC Plaintiffs agreed in their January 15 letter to identify additional relevant custodians, to the extent they exist, involved in lobbying activities and, to the extent they exist, to produce communications in 2011 and 2012 with government agencies, representatives of Congress or their staffs regarding Aereo. Similarly, the WNET Plaintiffs offered to produce lobbying communications that mention Aereo or Bamboom. Aereo has not accepted this compromise position, but Plaintiffs have still commenced the process of gathering any such documents for production.

Plaintiffs estimate that they will complete the production of the documents that they have agreed to provide in approximately two to three weeks.

## III.  REPORT ON DOCUMENTS WHICH PLAINTIFFS CONTEND SHOULD NOT HAVE TO NOT BE PRODUCED

Plaintiffs have agreed to produce some documents responsive to virtually all of Aereo's document requests. But, due to the overbreadth of Aereo's 92 requests and its continued unwillingness to reduce the burden of such requests in any meaningful way, many disputes still remain. To the extent Aereo suggests that it has offered compromise positions, such statements are misleading. Aereo's idea of a compromise has primarily been to change the time period of documents to be produced from March 2007 to present instead of April 2006 to present. This is really not a limitation at all.

Due to the fact that Plaintiffs have offered responsive documents to all of Aereo's categories, Plaintiffs reiterate below their pertinent offers, as well as what Aereo demanded in its January 28 letter, to try to crystallize the document productions that are contested. In the process, Plaintiffs explain why they should not have to provide any documents beyond what they have already agreed to provide.

As Aereo's recent demand that Plaintiffs conduct broad electronic searches against all of their repositories exacerbates the undue burden imposed by virtually all of Aereo's document requests, Plaintiffs address this contested demand by Aereo first before addressing Aereo's specific document requests.

## A.    Aereo's Demand That Plaintiffs Conduct Searches Of All Repositories

The contested issue concerns how Plaintiffs conduct their search for responsive documents.

Plaintiffs have and continue to identify custodians that they reasonably believe may possess responsive documents. They have told Aereo who those people are and are gathering and producing the responsive, non-privileged documents from those custodians' files. This approach for gathering and reviewing Plaintiffs' responsive documents is entirely reasonable and all that is required by the Federal Rules and case law. A party need not "examine every scrap of paper . . . in order to comply with its discovery obligations." *See, e.g., Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006). "Rather, it must conduct a diligent search, which involves developing a reasonably comprehensive search strategy. Such a strategy might, for example, include identifying key employees and reviewing any of their files that are likely to be relevant to the claims in the litigation." *Id.* Tellingly, Aereo itself performed such a custodian-based search for responsive documents, not searches across all Aereo employees' repositories.[3] Thus, Aereo cannot in good faith now claim that a custodian-based search (as opposed to an across-all-repositories search) is improper.

Moreover, Plaintiffs will be supplementing their interrogatory responses disclosing additional custodians and the repositories searched for each custodian in connection with their agreement to supplement their production of documents. *See* J. Shepard 1/14/13 letter to D. Hosp, p. 2.

Despite all of this, Aereo is now demanding that each Plaintiff search across *all* document repositories in its company using a six-page list of more than 150 searches that contain such common terms as antenna, consumer, DVR, and satellite. *See* Attachment B to this letter; *see also* D. Hosp. 1/28/13 letter to J. Shepard and B. Keller, p. 4 ("Aereo proposed search terms... *Aereo's proposals were made with the expectation that the searches would be run on all Plaintiffs' repositories*." (emphasis added)). As the WNET Plaintiffs noted in their January 31 letter to this Court, Aereo first made this demand on January 28. *See* M. Elkins 12/18/12 (initial meet and confer letter containing no request for a search using these terms against all Plaintiffs' repositories).

An "all repository search" such as Aereo now demands is unreasonable and unduly burdensome for all Plaintiffs. By way of example, Fox (not including the local stations) hosts at least 19,000 separate email accounts (over 9.2 terabytes of data), over 2,000 Sharepoint sites (over

---

[3]    *See* D. Hosp 11/29/12 letter (noting Aereo would review emails only from 13 employees.) Eventually, Aereo agreed to add one additional custodian and to search specific files of one other custodian, all along maintaining the propriety of Aereo's custodian-based search. *See* D. Hosp 12/14/12 letter; M. Puzella 1/4/13 letter (referring to Aereo's custodian-based search).

5.2 petabytes of data), and over 16,000 desktops/laptops. There is no existing system in place to conduct a centralized search of all of these repositories. Similarly, WNET hosts over 365 separate user accounts and also has no existing system in place to conduct a centralized search of all accounts. Before any search could be conducted, WNET would have to hire, at minimum, one additional IT engineer, create new exchange infrastructure, and export each account individually, a process which would take at minimum 6 months. While circumstances fluctuate between each Plaintiff, all face an undue burden of similar magnitude if required to conduct an "all repositories" search. In such circumstances, the electronically-stored information ("ESI") is deemed inaccessible due to the undue burden imposed. Hence, custodian-based searches such as those conducted by Plaintiffs (and Aereo) are entirely proper.[4] And, Aereo's demand for a search against all repositories should be denied.

**B.** **Aereo's Requests For Documents Related To Actual Damages (Request Nos. 62, 66-70, 72-75)**

Plaintiffs have elected to pursue statutory damages and are entirely making a claim for actual damages. Nevertheless, they have agreed to produce the following damage-related documents: (1) responsive non-privileged documents that evidence the damages that Plaintiffs have suffered due to Aereo; (2) retransmission agreements which themselves reflect the financial terms for retransmission; (3) aggregate gross revenues generated from Internet and mobile license agreements on a quarterly basis for 2011 and 2012[5]; and (4) Plaintiffs' net gross advertising or underwriting revenues for broadcast channels for 2011 and 2012. *See* WNET Plaintiffs' 1/14/13 Proposal and Sections I and II, above.

Plaintiffs have not agreed to produce the following additional documents pertaining to actual damages demanded by Aereo in its January 28 letter:

- Cost and revenue data "generated by each program (or work) on a monthly basis, accounting for any revenue generated in each medium or platform (*e.g.*, advertising revenue, retransmission revenue, revenue from on-line licenses, revenue from DVD sales, and any other source of revenue across all platforms)," and "all data used in

---

[4]     *See Capitol Records, Inc. v. MP3tunes, LLC*, 261 F.R.D. 44, 51, 53-54 (S.D.N.Y. 2009) (finding ESI inaccessible and ordering a custodian- based search; "the EMI Labels, which employ approximately 120 people in the global infrastructure services field and 'probably have two terabytes' of data on their servers, host no ediscovery software on their servers and apparently are unable to conduct centralized email searches of groups of users without downloading them to a separate file and relying on the services of an outside vendor"); *see also*, *W.E. Aubuchon Co., Inc. v. BeneFirst, LLC*, 245 F.R.D. 38, 43 (D. Mass. 2007) (holding that records stored on the defendant's server were inaccessible because the "method of storage and lack of an indexing system" would make searching the records "extremely costly"); *see also*, Fed. R. Civ. Proc. 26(b)(2)(B) (a party "need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost.").

[5]     The ABC Plaintiffs have not agreed to produce such documents.

the ordinary course of business to evaluate the value of programming including the value of any retransmission rights;" and

- "Information that is sufficient to analyze the overall cost and revenues (including the bases and negotiation of such revenue) related to each work for which an infringement is claimed and any potential or actual effects from Aereo and/or Similar Technologies."[6]

Aereo claims it needs these "sales and profitability," "profits," "total annual revenues," "total annual expenses," and "financing" documents relating to "each allegedly infringed work" at issue in this litigation in order to investigate how Aereo has harmed Plaintiffs, both in the context of calculating damages and with respect to the fourth fair use factor on harm to the market caused by Aereo's infringement.[7] There are five simple reasons why Aereo's overly broad requests are improper.

---

[6] In Aereo's January 28 letter, Aereo also demanded that Plaintiffs produce in response to Aereo's damage documents requests: (1) "Advertising ... reports, presentations, and analyses describing the process by which each broadcaster sells national advertising and local advertising;" and (2) "By year," "documents sufficient to show each broadcaster's top one hundred national advertising accounts and periodic reviews for contract negotiations for those accounts, as well as the same information for the top ten local advertising accounts." These documents are not encompassed by Aereo's damage requests and thus are not the subject of a proper document request. *See* footnote 5, *infra*. Moreover, they are irrelevant and unduly burdensome to produce.

[7] Aereo's pertinent requests are as follows:
Request No. 62: "All documents . . . relating to . . . *sales and profitability* . . . of the allegedly infringed works[.]"
Request No. 66: "Documents sufficient to identify Your *total annual profits* related to each allegedly infringed work[.]"
Request No. 67: "Documents sufficient to identify Your *total annual revenues* related to each allegedly infringed work[.]"
Request No. 68: "Documents sufficient to identify Your *total annual expenses* related to each allegedly infringed work[.]"
Request No. 70: "All documents evidencing *any lost profits* suffered by You in relation to the allegedly infringed works."
Request No. 72: "All documents . . . relating to the *financing* of each allegedly infringed work[.]"
Request No. 73: "All documents . . . relating to any and all financial analyses . . . regarding *royalties* . . . for the right to perform any allegedly infringed work[.]"
Request No. 74: "All documents . . . relating to *all royalty statements* of any kind relating to the allegedly infringed work[s.]"
Request No. 75: "All documents . . . relating to any and all financial analyses . . . regarding *advertising or other revenues* . . . in connection with the performance of any allegedly infringed work[.]"
(emphasis added in all quotes).

*First*, Plaintiffs have announced their intention to elect statutory damages in lieu of actual damages under 17 U.S.C. § 504(c). Statutory damages exist under the Copyright Act "precisely because of the difficulties inherent in proving actual damages and profits" given the number of factors other than a single infringer's actions that can influence the commercial success of a given work. *Yurman Design, Inc. v. PAJ, Inc.*, 93 F. Supp. 2d 449, 462 (S.D.N.Y. 2000), *judgment aff'd in part, rev'd in part* by *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001).

*Second*, despite the fact that Plaintiffs are not seeking actual damages, Plaintiffs are going to produce the responsive non-privileged, non-work product documents that evidence the damages that Plaintiffs have suffered due to Aereo. Further, as noted above, Plaintiffs have produced, or will be producing retransmission agreements containing the financial terms for retransmission; aggregate gross revenues generated from Internet and mobile license agreements on a quarterly basis for 2011 and 2012 and Plaintiffs' net gross advertising or underwriting (for the non-profit Plaintiffs) revenues for the broadcast channels for 2011 and 2012. Thus, to the extent that Plaintiffs' actual damages may be considered in the statutory damages analysis, nothing more is required and certainly not the extensive profit and loss information Aereo is demanding.

*Third*, there are myriad factors that impact the sales and profitability of Plaintiffs' works, and the harm caused to Plaintiffs by Aereo's infringement is essentially impossible to glean from sales and profitability information. *See Capitol Record, Inc. v. MP3Tunes, LLC*, 07-cv-9931 (S.D.N.Y. April 12, 2010), Dkt. No. 168 (discovery order) ("*MP3Tunes* Order"). Judge Pauley and Magistrate Judge Maas agreed with this in *MP3Tunes*, holding that the defendant was not entitled to documents relating to sales and profitability because, due to "the plethora of other factors impacting profitability" of plaintiff's works, such data would not help in the calculation of actual damages. *Id.* at 2-3. Additionally, with respect to the fourth fair use factor, the test is not whether Aereo alone would cause market harm, but "whether unrestricted and widespread conduct of the sort engaged in by [Aereo] would result in a substantially adverse impact on the potential market" for Plaintiffs' works. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). Given that Aereo only has a few thousand subscribers, and is only operating in the New York City DMA, it is highly unlikely that the harm it alone causes would be reflected in Plaintiffs' profits and sales information or be measured in terms of current lost advertising revenue.

*Fourth*, whatever minimal relevance the extensive sales, profits, financing, and revenue information requested by Aereo may possess is far outweighed by the burden the requests would impose. Aereo, since its launch in March 2012, has been retransmitting "all the major broadcast networks" 24 hours a day, seven days a week. *See* https://aereo.com/home. There are literally thousands of works for which Aereo is potentially liable. The burden of identifying, gathering and producing cost, revenue, and profit information on a per-work basis, even if possible, would be "enormous." *See MP3Tunes* Order, at 5.

*Fifth*, much of the information Aereo requests is not available in the form that Aereo requests and cannot be produced as such. For example, retransmission revenue is received for the right to retransmit the broadcast signal of a particular station not the individual works transmitted through that signal. That signal transmits a wide variety of works, many of which are not owned by the network receiving retransmission fees. Therefore, breaking this information down on the basis of the works infringed by Aereo is not done by Plaintiffs in the ordinary course of business.

For all of these reasons, in directly analogous cases, courts have rejected fishing expeditions similar to Aereo's when copyright plaintiffs make clear their intention to seek statutory, as opposed to actual, damages. *See MP3Tunes* Order; *see also Arista Records LLC v. Lime Grp. LLC*, No. 06 CV 5936(KMW), 2011 WL 1486640 (S.D.N.Y. Apr. 11, 2011). In *MP3Tunes*, Judge Pauley upheld Magistrate Judge Frank Maas's decision denying the defendant's motion to compel production of "[a]ll documents and things referring or relating to **sales and profitability** information for any EMI-Copyrighted Song at issue in this litigation[.]" *MP3Tunes* Order at 1 (emphasis added). Although Aereo requests this information in nine separate requests rather than one, its requests are no different than the one at issue in *MP3Tunes. See*, fn. 6, *supra*. Judge Maas and Judge Pauley held that because the plaintiff in *MP3Tunes* had elected to receive statutory damages, the documents requested relating to sales and profitability were irrelevant, just as such documents are irrelevant here. *MP3Tunes* Order at 4.

As a result, the documents which Plaintiffs have agreed to produce, and are in the process of producing, are more than sufficient and nothing more should be required to be produced.

## C. Retransmission Consent Agreements (Request No. 45)

Aereo has raised objections regarding some limited redactions that were made to the retransmission consent agreements. However, the production of any redacted agreements is in compliance with the Court's order requiring Plaintiffs to produce retransmission consent agreements because the sections redacted do not deal with retransmission consent for broadcast television. To the contrary, the redacted provisions concern carriage of cable channels. Given that such channels are not the subject of retransmission consent as they are not transmitted over-the-air and are not being retransmitted by Aereo, these portions are irrelevant and not required to be produced under this Court's April 13, 2012 Order.

Plaintiffs will bring unredacted and redacted exemplars of retransmission consent agreements to the February 8 hearing should the Court wish to review them.

## D. Retransmission Consent Negotiations Documents (Request No. 46)

The cornerstone of Aereo's service is delivery of Plaintiffs' live broadcast television over the Internet. As a result, the relevant "similar" technologies to Aereo are Filmon, ivi and Aereokiller, which offer the same broadcast programming over the Internet as Aereo does. Accordingly, in the meet and confer process, Plaintiffs agreed to produce any negotiation documents that refer to Aereo and Mr. Kanojia as well as those referring to Filmon (aka Filmonx and Aereokiller), its CEO Alki David, and ivi.

In its January 28 meet and confer letter setting forth Aereo's counter-proposals, Aereo demanded that Plaintiffs also produce any retransmission consent negotiation documents referencing other technologies like Slingbox, DVRs and RS-DVRs. Plaintiffs have not agreed to do so because these competitively sensitive documents are not relevant. Certainly, Aereo has articulated no reason why *negotiations* mentioning common industry terms such as "DVR" are relevant and should be produced, particularly when Aereo already has the retransmission consent agreement themselves. To the extent that the parties to some retransmission agreements reached agreements with respect to any term pertaining to DVRs, Remote DVR and/or Slingbox, Aereo

already has this information in the agreements themselves. Negotiation documents mentioning these other technologies will not provide any relevant information beyond what Aereo already possesses. And, even to the extent that there could be any marginal relevance to these documents, it would be greatly outweighed by the burden imposed in connection with their production.

Moreover, every justification Aereo has offered for its broad demands for documents such as these negotiation documents pertaining to every time and space shifting television technology that has ever existed (which Aereo refers to as "similar technologies") has fallen far short of establishing a modicum of relevance. *First*, Aereo said "similar technology" documents were relevant to its defenses of waiver, laches and acquiescence. But, that is incorrect. Those defenses are specific to the defendant, *i.e.* Aereo, and consider only the plaintiff's actions vis-à-vis Aereo's unlawful conduct.[8] Plaintiffs' actions or lack thereof vis-à-vis other companies do not provide a basis for Aereo to establish the relevance of the documents that Aereo seeks.

*Second*, Aereo has asserted that such documents are relevant to consumer volition. But again, Aereo is incorrect. To the extent volition is relevant, the question of volition focuses on the technology at issue (*i.e.*, Aereo's system), not any other technology: "*Netcom* and its progeny direct our attention to the volitional conduct that causes the copy to be made. There are only two instances of volitional conduct in this case: Cablevision's conduct in designing, housing, and maintaining a system that exists only to produce a copy, and a consumer's conduct in ordering that system to produce a copy of a specific program." *Cartoon Network, LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) (emphasis added). Hence, volition does not serve as a basis for Aereo to obtain negotiation documents mentioning other technologies.[9] Moreover, Aereo cannot articulate any rationale basis for how its sweeping demands for discovery about the DVR could shed meaningful light on the legal question of Aereo subscriber volition. How users "volitionally"

---

[8]      *See, e.g., Tolliver v. McCants*, 684 F. Supp. 2d 343, 347 (S.D.N.Y. 2010), *aff'd*, 11-2697-CV, 2012 WL 2435575 (2d Cir. June 28, 2012) (an acquiescence defense requires both that "the [plaintiff] had knowledge of defendant's infringing conduct," and that the plaintiff "either intended that his own conduct be relied upon or acted so that the party asserting the estoppel has a right to believe it was so intended"); *Paramount Pictures Corp. v. Carol Publ'g Grp.*, 11 F. Supp. 2d 329, 337 (S.D.N.Y. 1998), *aff'd*, 181 F.3d 83 (2d Cir. 1999) (rejecting estoppel defense based on copyright holder's failure to enforce its rights against other infringers; "extending the doctrine of estoppel so that a defendant may rely on a plaintiff's conduct toward another party is both unsupported by law and pernicious as a matter of policy"); *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir.1984) ("[T]hat Sweetheart may have delayed in enjoining other manufacturers from using the dish designs would not amount to an assurance to Detroit that Sweetheart would not assert its trademark rights against Detroit."); 2 Patry on Copyright § 5:155 ("Waiver refers to the copyright owner's decision not to enforce its rights against one party while still maintaining them for possible enforcement against others."), § 5:157 ("Waiver, properly construed, refers only to a decision not to enforce rights against a particular party[.]").

[9]      If Aereo wants to analogize its technology to another technology like a DVR as the defendant did in *Cablevision*, Aereo is free to do so. With easy access to DVRs, Slingboxes and the other "similar technologies" Aereo can readily ascertain how a consumer orders a DVR or other device to produce a copy. Plaintiffs' documents are not necessary or relevant for that exercise.

interact (or do not) with such devices is a matter of public knowledge and certainly does not require intrusive and burdensome discovery of Plaintiffs.

Negotiation documents mentioning assorted unrelated other technologies will not provide any relevant information eyond what Aereo already possesses. Plaintiffs should not be required to produce any negotiation documents beyond those that they already agreed to search for and produce.

### E.    Internet and Mobile Agreement Negotiation Documents (Request No. 32)

Plaintiffs have agreed to produce any negotiation documents that refer to Aereo, Filmon, Filmonx, Alki David, ivi, Aereokiller, BarryDriller, Zediva/Zedeva or Mr. Kanojia in response to Aereo's demand for negotiation documents pertaining to Internet and mobile licenses.

However, as with the retransmission consent negotiations, Aereo recently demanded that Plaintiffs also produce all Internet and mobile license negotiations referencing Slingbox, DVRs, RS-DVRs or any other "Similar Technology." *See* D. Hosp 1/28/13 letter to J. Shepard and B. Keller. For the same reasons that retransmission consent negotiations referring to such terms are not relevant and should not have be produced, Plaintiffs have refused to agree to Aereo's latest demand, and they should not be required to search for and produce any negotiation documents referencing terms as quotidian as "DVR."

### F.    Market Research for All Time-Shifting and Space-Shifting Technologies (Requests Nos. 63-65)

In these requests, Aereo seeks all documents relating to "market research, technology review, business forecasting, or other analysis" on the subjects of the use of any of Plaintiffs' infringed works on (1) "any mobile device," (2) "any form of digital media" and (3) any "digital video recordation device or on-demand streaming."

As noted above in Section II, while maintaining their relevance objections, Plaintiffs offered to search for and produce a variety of reports that they commissioned or were prepared by them in 2011 and 2012 regarding RS-DVRs, Slingbox, and consumer usage as well as rating reports for television and Internet viewing from Nielsen, comScore and/or Google.

Aereo rejected this compromise offer on January 28, demanding again not only the production of <u>all</u> such reports covering five plus years whether solicited by Plaintiffs or not, but also <u>any communications</u> about such reports. Aereo's demand is without question unduly burdensome. This case is about whether Aereo is infringing Plaintiffs' copyrights, not any of these other technologies. And, any marginal relevance they may have is heavily outweighed by the undue burden it would cause to run a search for responsive documents using such terms like "DVR" or "on-demand" which are part of the daily parlance in the television industry, even if the search was limited to a handful of custodians. And, here, Aereo is demanding an "all repository" search which exponentially increases the already enormous burden. *See* Section III.A, above.

Plaintiffs should not be required to produce any market research documents beyond those that they already agreed to produce.

### G. "Ad-Skipping" Documents

Aereo demands that Plaintiffs produce all documents, dating back to March 2007, "that refer to, reflect, and/or concern any measurement, performed by [Plaintiffs] or on [Plaintiffs'] behalf, of consumers skipping advertising that is embedded in your television programming using VCR, DVR, or any other means." Besides "limiting" the production start date to five years before litigation commenced instead of six, Aereo has refused to modify its request in any manner through the meet and confer process.

Aereo's request seeks information that is not relevant or likely to lead to the discovery of admissible evidence. *First,* Aereo's technology does not enable "ad-skipping," just fast-forwarding through advertising.[10] Hence, no "ad-skipping" documents are relevant to this litigation. *Second,* none of the Plaintiffs is challenging the use of an in-home/traditional DVR or the fast-forwarding of advertising through the use of a traditional DVR. *Third,* Plaintiffs are not claiming irreparable harm in this case by virtue of the fact that Aereo enables fast-forwarding through commercials. Rather, as they have asserted, and the Court already has found, "Aereo will damage Plaintiffs' ability to negotiate with advertisers by siphoning viewers from traditional distribution channels, in which viewership is measured by Nielsen ratings, into Aereo's service which is not measured by Nielsen, artificially lowering these ratings." *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 397-98 (S.D.N.Y. 2012).

As Plaintiffs' limited advertising-related claims do not open the door for Aereo's broad request, Plaintiffs should not be required to produce such documents. However, as a compromise, the WNET Plaintiffs have agreed to provide any non-privileged, non-work product market research report or analysis commissioned or conducted by any of the WNET Plaintiffs in 2011 or 2012 that measures fast forwarding of advertising embedded in their programming using a remote DVR (like the DVR service Aereo offers).[11]

### H. Measurement-Related Documents

Aereo demands not only "[a]ll documents, including but not limited to all Nielson Reports, evidencing, referring, or relating to any of the allegedly infringed works claimed by You in this action, whether directly or indirectly" but moreover all documents concerning Plaintiffs' measurement of interet or mobile device viewership. As explained by Aereo, these requests require Plaintiffs' production of any communication about the daily and/or weekly ratings information that is reported including all memorandum, meeting notes and emails.

In response to these overbroad requests, seeking virtually all documents regarding audience measurements, Plaintiffs offered to produce, and are producing, reports sufficient to reflect data received from third parties reporting on the viewership of the broadcast channels and/or the

---

[10]     The only true ad-skipping technology was deployed by Dish Network in 2012 with its Prime Time Anytime/Dish Hopper box for use in consumer's homes. It has no relevance to the issues in this case about Aereo's streaming service and remote DVR which has typical pause, rewind and fast-forward functionality, not ad-skipping capability. Plaintiffs have sued Dish Network.
[11]     Only the WNET Plaintiffs agreed to produce such research.

infringed works in homes, over the Internet or on mobile devices in 2011 and 2012 (*e.g.*, reports regarding Nielsen, Comscore and Google data). Plaintiffs will produce these documents to Aereo upon obtaining approval from Nielsen, comScore and/or Google, as appropriate, to release this information and upon receiving Aereo's consent to modify the protective order accordingly.

Aereo has rejected the sufficiency of this offer and demands that all responsive documents to Request 77-80 be produced.[12] As with most of Aereo's proposed "compromises," Plaintiffs only alteration of these requests was to "limit" them to seeking documents from March 2007 to present instead of from April 2006 to present. Responding to these requests would require Plaintiffs to produce <u>any</u> communication about the daily and/or weekly reporting of ratings information including <u>all</u> memoranda, meeting notes and emails about such reports. Aereo claims that Plaintiffs' "interpretation" of the 5 years of ratings data will somehow relate to Plaintiffs' claims of harm. But this is wrong. *First*, most of the period covered by Aereo's demand falls well before Aereo launched. Plaintiffs are willing to produce data from 2011 so that Aereo may see ratings "before" and "after," if that is its goal, but data from 2008 is simply irrelevant. *Second*, Aereo is limited to the New York City DMA, but nonetheless seeks national ratings data that will prove nothing whatsoever in this litigation. *Third*, Aereo has only about 3,000 subscribers in a city of more than 8 million, and it is unlikely that viewership by the very small number of Aereo subscribers has had, over the past several months, any measurable effect on ratings of programs in the New York City DMA, the country's largest broadcast audience. Hence, no documents besides the Nielsen, comScore and/or Google data reports for 2011 and 2012 should be required.[13]

Aereo also claims that Plaintiffs' offer of third party ratings information is not enough because Aereo wants Plaintiffs' *internal* ratings reports. But, any internal ratings of Plaintiff are irrelevant. Audience estimates ratings are at issue in this case only in so far as viewership of Aereo is not measured in any way recognized by advertisers. No advertisers accept Plaintiffs' *internal* ratings as the yardstick against which to pay for advertising. To the contrary, Nielsen's C3 ratings are the currency of advertisers. Plaintiffs have agreed to produce C3 ratings data. Nothing more should be required.

## I.     Consumer Access Documents (Request No. 26, 27, 28, and 31)

---

[12]     Request No. 77 – "All documents, including but not limited to all Nielson Reports, evidencing, referring, or relating to any of the allegedly infringed works claimed by You in this action, whether directly or indirectly."

Request No. 78 – "All documents concerning Your measurement of consumer viewership of Your allegedly infringed works accessed via the Internet."

Request No. 79 – "All documents concerning Your measurement of consumer viewership of Your allegedly infringed works accessed via mobile device. "

Request No. 80 - repeats Request No. 79 verbatim. Plaintiffs pointed this out before. Nevertheless, Aereo still includes this request in its demands.

[13]     As with other requests, the form of viewership data that exists, if any, varies among the different Plaintiffs.

Aereo has requested all documents that "refer to and/or concern consumer access" to the infringed works via in-home antenna, remote antenna, via the Internet, or via mobile device. *See*, Request No. 26, 27, 28, 31. In response, Plaintiffs offered to produce, and are producing, (a) non-privileged, non-work product reports regarding the number of people who watched broadcast television via over-the-air antennas in 2011 and 2012; (b) the Internet and mobile license agreements described above; and (c) the viewer rating information from Nielsen, Comscore and/or Google Analytics.

Despite this, Aereo still wants more. Aereo has demanded all responsive documents be produced. But, it is inconceivable why the broad swath of documents sought by these requests are relevant. *First*, it is common knowledge that Plaintiffs transmit their programming over-the-air, and that households are entitled to watch these broadcasts, in the privacy of their own homes, using antennas. However, this case is not about legal, private antenna use. It is about Aereo providing Plaintiffs' copyrighted works through an unlicensed commercial service. The law is settled that a for-profit infringer may not escape liability by attempting to stand in the shoes of its consumers. *See Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 112 (2d Cir. 1998) (citing *Princeton Univ. Press v. Mich. Document Svcs., Inc*, 99 F.3d 1381, 1389 (6th Cir. 1996) (en banc)).

*Second*, Aereo seeks documents regarding consumer access to programming via mobile devices or the Internet. Again, it is common knowledge that consumers can lawfully access Plaintiffs' programming through mobile devices and over the Internet via Plaintiffs' own websites or authorized services. Indeed, this is evidenced in documents Plaintiffs have already produced regarding Aereo's impact on Dyle TV, and through Plaintiffs offering their programming over Internet streaming services such as Hulu. But, asking for "all documents" regarding consumer access to programming over the Internet or via mobile devices is well beyond the scope of relevance.

*Third*, Aereo seeks to justify these requests based on Aereo's defenses of waiver and acquiescence. But, as noted above, those defenses focus only on Plaintiffs' response to Aereo's actions, not some non-party. *Tolliver*, 684 F. Supp. 2d at 347; 6 Patry on Copyright § 20:57; 2 Patry on Copyright § 5:157; *id.* § 5:155. Plaintiffs' responses to consumers' or other companies' conduct are not a factor in Aereo's asserted defenses and, thus, these defenses do not show that the requested documents are relevant or likely to lead to the discovery of admissible evidence.

For these reasons, Plaintiffs should not have to produce additional documents on this topic.

### J. Plaintiffs' Transmission of Television Programming over the Internet (Requests Nos. 31, 32, and 43)

Aereo's Request No. 32 seeks "All document that refer to and/or concern Your development, potential development, provision of, potential provision of, release and/or sale of mobile television programming over the Internet, including but not limited to documents concerning the actual or potential costs to consumers for such access." In response, Plaintiffs have already produced documents pertaining to Aereo's impact upon Dyle, licensing agreements for Internet and mobile delivery of the infringed works, and revenue information from such licensing. Plaintiffs have also agreed to produce any documents that Plaintiffs may rely on to show that Aereo adversely

impacted their development or potential development, provision of, potential provision of, release and/or sale of mobile television programming over the Internet.

Nothing more should be required. Certainly in Aereo's January 28 letter, it has not identified why or what additional documents that it thinks are relevant. Nevertheless, Aereo left this request listed as a "disputed" request and therefore Plaintiffs have addressed it.

### K. Slingbox Documents (Request No. 42)

Aereo's request No. 42 seeks "All documents that refer to and/or concern the Slingbox or similar technology, including but not limited to documents referring to and/or concerning the legality of the Slingbox or similar technology." This request is overbroad and seeks documents that are irrelevant. However, to resolve the parties' dispute and without waiver of their objections, Plaintiffs agreed to produce any non-privileged, non-work product market research studies or analyses commissioned by any of Plaintiffs in 2011 or 2012 regarding the market harm or impact from Slingbox.

Aereo rejected Plaintiffs' offer and made no counter proposal to limit this request. In its January 28 letter, Aereo suggested that the documents are relevant to show how Plaintiffs encourage or discourage Internet viewing via Slingbox technology. Here, again, Aereo's argument harkens back to its acquiescence and waiver defenses in an attempt to render Slingbox documents relevant. But, as stated before, only Plaintiffs' conduct with respect to Aereo matters for these defenses. *Tolliver*, 684 F. Supp. 2d at 347; 6 Patry on Copyright § 20:57; 2 Patry on Copyright § 5:157; *id.* § 5:155.

### L. Documents Relating to Lobbying and Communications with the Government (RFPs 44, 52-53, 84-85)[14]

Aereo requests all documents concerning "*any* communications" between Plaintiffs and "*any* government agency" on any topic relating to Plaintiffs' copyrighted works as well as all documents concerning Plaintiffs' "lobbying activities related to broadcast television." These requests are extremely unreasonable. This case is about whether Aereo is infringing Plaintiffs' copyrights under existing law. What Plaintiffs may have communicated with government agencies, members of Congress or lobbyists is not probative of Aereo's liability. Moreover, Plaintiffs are in a highly regulated industries and routinely communicate with the FCC, relevant congressional committees and other government officials. The burden of producing all such communications with the government would be enormous.

Despite being unable to see how any such documents could possibly be relevant, in the meet and confer process, the ABC Plaintiffs agreed as a compromise to identify custodians involved in potentially relevant lobbying activities and to produce communications, if any, in 2011 and 2012

---

[14]     Aereo's Request for Production 44 sought all of Plaintiffs "license agreements with the FCC." Aereo's January 28 letter makes absolutely no mention of such license agreements or Request for Production 44. As such, Plaintiffs assume Aereo is no longer requesting such documents.

with government agencies, representatives of Congress or their staffs regarding Aereo. Similarly, the WNET Plaintiffs offered to produce lobbying communications that mention Aereo or Bamboom.

Aereo rejected Plaintiffs' compromises in its January 28 letter, and instead offered to "limit" its request to all "communications with the FCC, any lobbying group, or any member of Congress (or staff of any member of Congress) regarding changes or potential changes to laws or regulations impacting the rights Plaintiffs have in their programming" and all "communications with the Copyright office relating to the works Plaintiffs claim have been infringed by consumers' use of Aereo." Aereo's proposed limitation is no compromise at all, but merely a restatement of its original unreasonable and equally unduly burdensome.

Plaintiffs should not be required to produce any more than what they have already offered to produce.

### M.    Copyright Ownership Challenges (Requests Nos. 51-53)

Plaintiffs have produced, and are continuing to produce, their copyright registrations for all of the infringed works. Such certificates themselves are presumptive proof of ownership. *See* 17 U.S.C. § 410(c) ("[T]he certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."). Also, where ownership of the copyright is not clear on the face of the registration, Plaintiffs are providing chain of title information. Plaintiffs have also offered to provide additional documentation if Aereo shows a good faith basis for challenging Plaintiffs' ownership of any particular work.

Aereo rejected Plaintiffs' offer in its January 28 letter and did not offer any limitation and thus continues to demand that Plaintiffs produce all documents concerning any communication with the Copyright Office and any other government agency concerning the infringed works. Aereo has provided no basis for the enormous burden that would come from having to locate, review and produce all communications regarding the thousands of infringed works registered by Plaintiffs with the Copyright Office. By way of example, Aereo's request encompasses thousands of registration receipts for applications Plaintiffs electronically file. They are irrelevant because, as Plaintiffs have pointed out to Aereo, the applications and receipts become moot when the Copyright Office issues registration certificates. *See* 17 U.S.C. § 410(c). To the extent Aereo raises a good faith challenge to the ownership of a particular copyright, Plaintiffs' proposal to provide additional documentation is reasonable. There is no reason for Plaintiffs to produce more than they are already producing unless Aereo can articulate a good faith challenge to any particular work.[15]

---

[15]    In its January 28 letter, Aereo again references Document Request No. 54, demanding that Plaintiffs produce "[a]ll deposit copies provided to the Copyright Office of the Library of Congress of the allegedly infringed works." As Plaintiffs have already explained to Aereo, "deposit copies," by definition, are deposited with the Library of Congress and thus are not in Plaintiffs' possession, custody or control, and therefore cannot be produced. Aereo's continued citation to this document request highlights its failure to narrow the issues in dispute before running to the Court.

### N. *Cablevision*-Related Documents (Request No. 82)

Aereo had demanded that Plaintiffs produce "all documents that refer to, reflect, and/or concern *Cartoon Network LP. LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008)" (*Cablevision*). Aereo has failed to explain how documents relating to *Cablevision* are relevant. Moreover, Plaintiffs' positions in that litigation are a matter of public record. With respect to internal documents, it is highly unlikely that Plaintiffs' possess any significant number of non-privileged documents. Requiring Plaintiffs to cull through the communications regarding a case that spanned more than three years and all three levels of the federal courts to find any non-privileged documents that might exist clearly is an undue burden.

Cablevision Systems Corporation ("CSC") is a major contracting party of each of the plaintiffs. To the extent that Aereo would encourage Plaintiffs to run the word "Cablevision" against Plaintiffs' entire document databases, the burden of sorting through innumerable documents referencing Plaintiffs' ongoing relationship with CSC from the minimal numbers of non-privileged documents that may exist discussing the Second Circuit decision in Cablevision, is plainly undue and inappropriate.

Aereo claims that it is not seeking pleadings or public filings. But, as Aereo is well aware, it is impossible to locate all non-public documents concerning *Cablevision* without having to sift through years of public documents and privileged communications in Plaintiffs' files. In addition, any search for "Cablevision" against Plaintiffs' entire document repositories would be particularly burdensome because Cablevision Systems Corporation is a major contracting party of most of Plaintiffs. Since Plaintiffs have already agreed to produce and are producing non-privileged documents regarding Aereo from the files of relevant custodians, to the extent that there are any non-privileged documents in that production that discuss the intersection of Aereo and *Cablevision*, they will be produced and this request is redundant.

### O. Board Minutes (Request No. 8)

In Plaintiffs' January 14 and January 15 letters to Aereo, Plaintiffs agreed to produce non-privileged board of director minutes that discuss Aereo or Bamboom. Because Aereo's January 28 letter misstates Plaintiffs' proposal on this issue, there may be a dispute between the parties. Aereo states that Plaintiffs have agreed to produce board minutes that concern Aereo and Bamboom as well as "all associated documents, notes and presentations." To the extent there is any dispute between the parties, Plaintiffs' proposal is more than sufficient considering the undue burden of Aereo's suggested search and the likely irrelevance of board documents.

## IV. ESTIMATED TIMELINE FOR PRODUCTION OF DISPUTED DOCUMENTS

The Court has asked for an estimated timeline for Plaintiffs' production of the disputed items if they should be ordered to be produced by the Court. Plaintiffs are able to estimate that the production of the documents that they agreed to produce will take approximately two to three weeks from the date of the hearing.

However, it is impossible for them to estimate the time to gather, review and produce the disputed documents. If the Court were not to limit Aereo's demand, it would take a significantly longer time for Plaintiffs to complete their production.

## V.    REPORT ON DISPUTED INTERROGATORIES

There are some interrogatories served by Aereo that are in dispute. Plaintiffs will describe them briefly below.

*Actual Damages Interrogatories*. Four of Aereo's disputed interrogatories (Interrogatories 8-10 and 13) seek detailed information directed toward challenging a claim for actual damages that Plaintiffs are not asserting. Thus, the information is not relevant. Further, although Plaintiffs have agreed to produce all documents evidencing their claim for damages, to require that Plaintiffs quantify "in detail" all actual damages (*see* Interrogatory No. 13) at this time would be improper as it would require premature disclosure of expert discovery and be harassing. If Plaintiffs are not seeking actual damages, they should not have to go through the exercise of quantifying them.

As for Aereo's demand that Plaintiffs identify all persons with knowledge of their profits and losses (*see* Interrogatory No. 8) and revenues and net profits for the last 5 years for the works at issue (*see* Interrogatory No. 9), such information is not relevant given Plaintiffs' election to seek statutory damages. Further, any relevance is greatly outweighed by the burden imposed by these requests, particularly given the documents that Plaintiffs have agreed to provide, namely, retransmission consent agreements, revenue information from Internet and mobile licensing and net gross advertising revenues for two years for the broadcasts.

Interrogatory No. 10 asks Plaintiffs to identify the profits and losses obtained in all channels of distribution for each infringed work. Such information is irrelevant. Plaintiffs' profits and losses go to the issue of damages, not fair use, and have been addressed in Section III.B, *supra*. Indeed, in *Capitol Record, Inc. v. MP3Tunes, LLC*, 07-cv-9931 (S.D.N.Y. April 12, 2010), Dkt. No. 168 (discovery order), the court held a similar request for all documents regarding the "sales and profitability information for any [copyrighted song] at issue in this litigation" were irrelevant because Plaintiffs were "only seeking statutory damages … and thus the relevance of discovery on actual damages would be of limited utility." *Id.* at p. 2. Here too, because Plaintiffs are only seeking statutory damages, documents about Plaintiffs' actual profits and losses would be irrelevant to such a calculation.

*Indentifying Plaintiffs' Employees And Consultants Who Have Accessed Aereo*. Aereo's Interrogatory No. 12 asks Plaintiffs to identify all of their employees or consultants who have used Aereo and to state the nature and purpose of their use. This request seeks information that is irrelevant. It will have no bearing on this case if one or more of Plaintiffs' employees have used Aereo and liked it or disliked it.

Despite this, as a compromise, the WNET Plaintiffs offered to review a list of Aereo's subscribers and users provided by Aereo, and to cross reference that list with their employees to determine which of Aereo's subscribers and users are employees of Plaintiffs. This cross-referencing would be done by outside counsels' staff and pursuant to the Protective Order with an

understanding that Aereo's subscriber list would not be used to contact Aereo's subscribers. Aereo rejected the offer as it does not want to provide its subscriber list even under these conditions.

In the meet and confer process, Aereo suggested that Plaintiffs poll their employees to find out if they are using Aereo. But, this would be likely to intimidate Plaintiffs' employees, and raise employment law concerns. Indeed, Plaintiffs' employees are aware that Plaintiffs have brought a lawsuit against Aereo. To then ask each employee whether he or she has ever accessed aereo.com or used Aereo could make that employee feel threatened. As a result, Plaintiffs would never be able to admit under oath that they obtained complete and accurate information responsive to this interrogatory. Thus, Aereo's suggestion is unworkable. The WNET Plaintiffs remain willing to undertake the cross referencing of lists if Aereo would like them to do so.

***Identifying Works That Are Not Infringed.*** Aereo's Interrogatory No. 4 asks Plaintiffs to identify all works that Aereo has retransmitted that are <u>not</u> infringed. In other words, from the tens of thousands of programming hours that Aereo has chosen to retransmit over Plaintiffs' objection, Aereo wants Plaintiffs to identify any that are in the public domain. Plaintiffs are providing Aereo with the information from which Aereo can perform this task itself.

Specifically, Plaintiffs have and will continue to provide Aereo with the schedules for its programs even though Aereo itself has this information as it provides a programming guide to its subscribers. Such schedules reveal the pre-recorded programming that it is aired. A work that is pre-recorded, *i.e.*, fixed, is entitled to copyright protection. Plaintiffs are also providing Aereo with copyright registrations for the works at issue. Hence, Aereo will have the information that reveals the shows which Aereo retransmitted and which of those works were registered and/or pre-recorded/fixed when shown. From all of this information, Aereo should be able to determine which, if any, works are in the public domain or not subject to copyright protection. Aereo has provided no authority to Plaintiffs that Aereo can shift the burden of this task to Plaintiffs. Moreover, the response of what works are in the public domain requires a legal conclusion. Thus, Plaintiffs have not agreed to provide a response and respectfully submit that a response is not required.

## VI.    REPORT OF DISPUTES INVOLVING AEREO'S RESPONSES TO BE RESOLVED.

The disputes Plaintiffs are aware of with respect to their production of documents to Aereo are noted above. The following additional disputes exist with respect to Aereo's discovery responses to Plaintiffs:

***Completion of Aereo's production of contested documents***. Plaintiffs understand that Aereo's production remains incomplete even as to the documents Aereo has agreed to produce. For example, the date of the last e-mail produced was in November 2012. Further, Aereo has never represented that its production is complete.

***Geo-location documents***. Due to Aereo's refusal to produce critical data which would reveal whether Aereo subscribers are watching or copying Plaintiffs' programming outside of the local New York DMA, the WNET Plaintiffs filed a motion to compel. *See* letter to this Court from J. Shepard dated 1/28/13.

*Aereo's deficient RFA responses.* The WNET Plaintiffs have raised four deficient RFA responses by Aereo in a motion to compel filed with this Court. *See* letter to this Court from J. Shepard dated 1/28/13.

*Aereo's communications with investors and valuation documents.* There are three additional document requests that remain in dispute as Aereo has refused to produce the responsive, non-privileged documents Plaintiffs are seeking. While the parties have fully discussed the issues regarding these three requests, with the most recent call on January 8, Plaintiffs have not yet raised these three requests with the Court because they have been endeavoring to find ways to narrow these requests as they review Aereo's production. However, while it may be possible to narrow these requests, that certainly does not fully resolve the disputes. Hence, Plaintiffs consider these disputes that must be resolved before the completion of discovery. Briefly, those disputes are discussed below.

### Plaintiffs' Request No. 10

This request seeks documents reflecting Aereo's communications with actual or potential investors in Aereo about Aereo's business, technology or system. In response, Aereo only agreed to produce "communications with potential or actual investors in Aereo that concern <u>Aereo's technology</u>" (emphasis added), effectively refusing to produce communications with actual or potential investors about <u>Aereo's business</u>. It has previously been Aereo's position that its business is nothing more than a technology platform. Given these documents' clear relevance, Aereo's position is wrong and Aereo's responsive documents should be produced.

Indeed, Aereo's own limited documents produced to date show the relevance of "Aereo's business" to the issues of market harm and inducement. For example, Aereo's documents show Aereo has promoted its business off of the backs of Plaintiffs. *See, e.g.*, AEREO0019808 ("live sports is a core part of our value proposition"); AEREO 0190205 ("additional poster art request...Duets on Thursday, WABC at 8:00; Perez Hilton All Access on Lady Gaga, also Thursday at 8:00 on WPIX"). While such documents do not discuss Aereo's <u>technology</u>, they are undoubtedly relevant. It would be improper for Aereo to exclude communications with investors concerning similar statements since Aereo and its service are built upon infringement and the funds received from infringement. Moreover, Aereo's own document requests concede the relevance of information regarding Aereo's business and distinguish it from Aereo's technology. *See, e.g.*, Aereo's Request No. 2 ("All documents that refer to, reflect, and/or concern Aereo, including, but not limited to, ... the Aereo Technology, the Aereo antennas, and/or <u>Aereo's business</u>") (emphasis added). At a minimum, these documents are relevant to statutory damages and market harm in a fair use analysis and should be produced.

### Plaintiffs' Request Nos. 17 and 19

Request No. 19 seeks documents concerning the value of Aereo, the Aereo business, the Aereo System, and Aereo technology (collectively, "Aereo Assets"), and Request No. 17 seeks in part Aereo's profit and revenue projections and the communications regarding these projections. In response to these requests, Aereo has attempted to sidestep Request 19 by only offering to produce

documents that are also responsive to Request No. 20 (which sought "documents … concerning any communications with any cable or satellite company concerning the Aereo Assets") and by refusing to produce the documents responsive to Request No. 17. Again, Aereo's position is wrong and responsive documents should be produced.

Here, based on the evidence obtained thus far, Aereo is not profitable and it is questionable that it ever will be in its current form given the technological inefficiency of its system which was adopted in an attempt to avoid the Copyright Act. Moreover, the evidence suggests Aereo was founded, and its technology developed, for purposes of selling Aereo outright and/or licensing its technology. Thus, how Aereo values its technology and company as a whole bears on the question of the damages to award in this case because such valuations are a proxy for Aereo's profits, which could form the basis of Plaintiffs' statutory damages. Along these lines, Plaintiffs recently discovered a document in their review of Aereo's production showing that an investor valued Aereo at $350 million. AEREO0348196 ("Post Deal Valuation: $350 million"). That said, although Plaintiffs would prefer to receive all such documents relating to Aereo's profits and valuation, they are amenable to meeting and conferring to find a way to narrow these requests, including agreeing to have Aereo provide a high-level summary of its profits and valuations that have been performed, once Plaintiffs substantially complete their review of Aereo's documents to ascertain what, if any, similar valuation documents Aereo has produced.

In sum, Plaintiffs are willing to narrow their requests provided that they are assured that they will receive the type of valuation documents mentioned above. But without question, Aereo should produce documents responsive to these three requests prior to the completion of discovery.

## VII.  ADDITIONAL CONSIDERATIONS IMPACTING THE DISCOVERY CUT OFF

In this Section, Plaintiffs briefly address additional considerations potentially impacting the completion of discovery.

***Third Party Discovery***.  The WNET Plaintiffs have served the following third party discovery some of which is or may be disputed:

(a) Subpoena to USANi, LLC, which holds at least a 10% ownership interest in Aereo (USANi has objected and a motion to compel may be necessary);

(b) Subpoena to IAC (return date 2/5/2013);

(c) Subpoena to Highland Capital (return date 2/5/2013);

(d) Subpoena to Google (Aereo filed a Motion to Quash which is under submission);

(e) Subpoena to P&L regarding surveys it conducted for Aereo and of Aereo's subscribers (some documents have been produced and Plaintiffs believe that they will be able to reach agreement about any additional responsive documents that need to be produced).

It is possible that Plaintiffs may identify certain additional, limited discovery to be conducted once their review of Aereo's documents is substantially complete.

*Depositions.* Both sides have noticed depositions, but none have been taken since the preliminary injunction phase other than Plaintiffs' deposition of Aereo's ESI witness. Plaintiffs noticed 8 depositions. Aereo has noticed 15.

Plaintiffs are limited in their ability to take meaningful depositions until Aereo's document production, and the review of Aereo's documents, is complete. Although Plaintiff have enlisted a team reviewers who have logged hundreds of hours reviewing Aereo's production, 21,500 Aereo documents have yet to receive even a first review.

Simultaneously, a review team is also devoted to the review and production of Plaintiffs' documents to Aereo. However, as noted above, the production of the outstanding documents that Plaintiffs agreed to produce will take at least 2 to 3 more weeks. Understandably, Aereo will want to review at least most of these documents before taking depositions.

## VIII. CONCLUSION

As this report reveals, there is a substantial amount of discovery that needs to be completed as discovery has progressed slower than anticipated and involved a number of disputes on both sides. Plaintiffs had proposed May 15 as the new fact discovery cutoff date. That date still appears to be an achievable deadline based on the assumption that Aereo will complete its production promptly and the scope of Plaintiffs' document production remains consistent with what Plaintiffs have agreed to produce so that it may be completed in two to three weeks.

Respectfully submitted,

Julie A. Shepard

cc: All Counsel of Record



**Attachment A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WNET, THIRTEEN, FOX TELEVISION STATIONS, INC., TWENTIETH CENTURY FOX FILM CORPORATION, WPIX, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK LIMITED PARTNERSHIP, and PUBLIC BROADCASTING SERVICE,<br><br>Plaintiffs,<br><br>v.<br><br>AEREO, INC. f/k/a BAMBOOM LABS, INC.,<br><br>Defendant. | Civil Action No. 12-CV-1543 (AJN) |

## DEFENDANT'S SECOND SET OF REQUESTS FOR THE PRODUCTION OF DOCUMENTS AND THINGS

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure ("Federal Rules") and the Local Rules for the United States District Court for the Southern District of New York ("Local Rules"), Defendant Aereo, Inc. ("Aereo" or "Defendant") hereby requests that Plaintiffs WNET, Thirteen, Fox Television Stations, Inc., Twentieth Century Fox Film Corporation, WPIX, Inc., Univision Television Group, Inc., The Univision Network Limited Partnership, and Public Broadcasting Service (collectively, the "WNET Plaintiffs") each individually produce all documents described below for inspection and copying at the offices of Goodwin Procter LLP, 53 State Street, Boston, Massachusetts 02109, within thirty (30) days following service hereof.

## DEFINITIONS

1.     Unless otherwise indicated, Aereo adopts and incorporates herein the uniform definitions for discovery requests set forth in subparagraphs (c) and (d) of Rule 26.3 of the Local Civil Rules of the United States District Court for the Southern District of New York, and the terms used herein are to be construed accordingly.

2.     The "ABC Complaint" means the Complaint filed in *American Broadcasting Companies, Inc. et al. v. Aereo, Inc.*, No. 12-Civ.-1540 (S.D.N.Y.) on March 1, 2012.

3.     The "WNET Complaint" means the Complaint filed in *WNET et al. v. Aereo, Inc., f/k/a Bamboom Labs, Inc.*, No. 12-Civ.-1543 (S.D.N.Y.) on March 1, 2012.

4.     "You" and "Your" mean each and every person and organization identified as a Plaintiff in the WNET Complaint, and includes its officers, directors, employees, partners, and corporate parent, subsidiaries, or affiliates.

5.     "ABC Plaintiffs" means each and every person and organization identified as a Plaintiff in the ABC Complaint, and includes its officers, directors, employees, partners, and corporate parent, subsidiaries, or affiliates.

6.     "WNET Plaintiffs" means each and every person and organization identified as a Plaintiff in the WNET Complaint, and includes its officers, directors, employees, partners, and corporate parent, subsidiaries, or affiliates.

7.     "Joint Plaintiffs" means each and every person and organization identified as a Plaintiff in the ABC Complaint and/or the WNET Complaint, and includes its officers, directors, employees, partners, and corporate parent, subsidiaries, or affiliates.

8.     "Aereo" means Aereo, Inc., formerly known as Bamboom Labs, Inc. and Bamboo-Entertainment, Inc., and includes its officers, directors, employees, and partners.

9.     "Aereo Technology" means any technology developed, owned, or provided by Aereo, the use of which You claim infringes WNET Plaintiffs' copyrights, including the technology developed and provided to consumers by Aereo, which consumers may use to access, view, and record local television broadcasts on the public airwaves.

10.     "Aereo's Board of Directors" means the Board of Directors of Aereo, including Barry Charles Diller, Amish Jani, and Chaitanya ("Chet") Kanojia.

11.     The term "Document" is used herein in its customary broad sense to include all materials discoverable pursuant to Local Civil Rule 26.3(c)(2) and Fed. R. Civ. P. 34(a)(1)(A).

12.     The term "First Request for Production" shall refer to Aereo's First Set of Requests for Production served on March 15, 2012.

## INSTRUCTIONS

1.     All grounds for any objection to a document request shall be stated with specificity. Any ground not stated in an objection within the time period provided by the Federal Rules of Civil Procedure, or any extensions thereof, shall be waived.

2.     Unless otherwise specified herein, these Requests shall apply to the period from April 2006 to the present.

3.     If any document responsive to these requests was, but no longer is in Your possession, custody or control, identify the document and state what disposition was made of it.

4.     The documents responsive to these requests are to be produced as they were kept in the ordinary course of business and are to be labeled in such a way as to show which files or source they came from. Electronically stored information ("ESI") shall be produced as TIFF image files, along with a delimited text file and metadata.

5.     Pursuant to Federal Rule of Civil Procedure 26(e), these requests shall be deemed

3

continuing so as to require further and supplemental production if any WNET Plaintiff receives or generates additional documents between the time of the original production and the time of the trial of this matter.

## DOCUMENT REQUESTS

1.      To the extent not included below, Aereo hereby incorporates and reasserts the requests contained in Aereo's First Request for Production.

2.      All documents that refer to, reflect, and/or concern Aereo, including, but not limited to, all documents that refer to, reflect, and/or concern the Aereo Technology, the Aereo antennas, and/or Aereo's business.

3.      All documents that refer to, reflect, and/or concern Your internal communications concerning Aereo, including, but not limited to, all documents that refer to, reflect, and/or concern Aereo Technology and/or Aereo's business.

4.      All documents that refer to, reflect, and/or concern communications between You and any of the Joint Plaintiffs, including any affiliates, subsidiaries, or parents of such Joint Plaintiffs, concerning Aereo, including, but not limited to, all documents that refer to, reflect, and/or concern Aereo Technology and/or Aereo's business.

5.      All documents that refer to, reflect, and/or concern communications between You and any third party concerning Aereo, including, but not limited to, all documents that refer to, reflect, and/or concern Aereo Technology and/or Aereo's business.

6.      All documents that refer to, reflect, and/or concern and communications between You and any customer of Aereo.

4

7.    All documents that refer to, reflect, and/or concern all public statements made by You concerning Aereo, including, but not limited to, all documents that refer to, reflect, and/or concern Aereo Technology and/or Aereo's business.

8.    All documents that refer to, reflect, and/or concern any discussion by any members of Joint Plaintiffs' boards of directors about Aereo, Aereo's employees, Chaitanya ("Chet") Kanojia, Aereo's Board of Directors, any member of Aereo's Board of Directors, and/or the Aereo Technology.

9.    All documents concerning Your allegation, in Paragraphs 3, 24, 30, 35, 36, 37, 39, 44, 51, and 61 of the WNET Complaint, that Aereo "retransmits" Your alleged copyrighted works.

10.    All documents that support and/or concern Your allegation, in Paragraphs 1, 2, 24, and 29 of the WNET Complaint, that Aereo "streams" the WNET Plaintiffs' broadcasts.

11.    All documents that support and/or concern Your allegation, in Paragraphs 4, 30, 34, 35, and 43 of the WNET Complaint, that Aereo, performs a work "publicly."

12.    All documents that refer to, reflect and/or concern consumers' use of an antenna that is not located in or on their home to access over-the-air broadcast television or any of Your allegedly infringed works.

13.    All documents that support and/or concern Your allegation, in Paragraph 39 of the WNET Complaint, that Aereo has distributed copies of, displayed, or made derivative works based on any of Your alleged copyrighted works.

14.    All documents that support Your contention that Aereo makes any reproduction of any of Your alleged copyrighted works.

5

15.	All documents that support and/or concern Your allegation that it is Aereo and not its members who use the Aereo Technology to access, record, and play back broadcast television.

16.	All documents that support and/or concern Your allegation that an Aereo member does not record a unique copy of any over-the-air broadcasting.

17.	All documents that support and/or concern Your allegation that an Aereo member does not reproduce copies of Your allegedly infringed works.

18.	All documents that support and/or concern any allegation that any Aereo antenna is used simultaneously by more than one Aereo customer.

19.	All documents that support and/or concern any allegation that more than one Aereo member can access, record and/or watch the same transmission.

20.	All documents that refer to, reflect, and/or concern consumers use of an in- or on-home antenna to view over-the-air broadcast television.

21.	All documents that refer to, reflect, and/or concern consumers use of an antenna that is not located in or on their home to access over-the-air broadcast television.

22.	All documents that refer to, reflect, and/or concern consumers use of the internet to view over-the-air broadcast television.

23.	All documents supporting Your allegation that Aereo has engaged in direct copyright infringement, including but not limited to:

      a.	All documents evidencing any volitional act of alleged copyright infringement engaged in by Aereo.

      b.	All documents evidencing Aereo's specific knowledge of any allegedly infringing activity.

      c.  All documents evidencing Aereo's material contribution to any allegedly infringing activity.

24.    All documents supporting Your allegation that Aereo has engaged in vicarious copyright infringement, including but not limited to:

      a.  All documents evidencing Aereo's right and ability to control any allegedly infringing activity.

      b.  All documents evidencing Aereo's direct financial benefit from any allegedly infringing activity.

      c.  All documents evidencing Aereo's inducement of any alleged copyright infringement.

25.    All documents evidencing Aereo's inducement of any alleged copyright infringement.

26.    All documents that refer to and/or concern consumer access to Your allegedly infringed works via in-home antenna.

27.    All documents that refer to and/or concern consumer access to Your allegedly infringed works via remote antenna.

28.    All documents that refer to and/or concern consumer access to Your allegedly infringed works via the Internet.

29.    All documents that refer to and/or concern consumer access to Your allegedly infringed works via in-home DVR.

30.    All documents that refer to and/or concern consumer access to Your allegedly infringed works via remote-storage DVR.

31.     All documents that refer to and/or concern consumer access to Your allegedly infringed works via mobile device.

32.     All documents that refer to and/or concern Your development, potential development, provision of, potential provision of, release and/or sale of mobile television programming over the Internet, including but not limited to documents concerning the actual or potential costs to consumers for such access.

33.     All documents that refer to and/or concern Your development, potential development, deployment, and/or potential deployment of remote storage digital video recorder technology, including but not limited to documents concerning the actual or potential costs to consumers for such access.

34.     All documents concerning Your licensing of any of Your allegedly infringed works for use in conjunction with any digital video recorder or service that employs and/or allows the use of digital video recordation technology.

35.     All documents that refer to, reflect, and/or concern an analysis of digital video recorders, remote-storage digital video recorders, and/or any other time-shifting technology (including the Slingbox, dish Network's "Hopper" technology, and DirecTV's Home Media Center HR-34 DVR) as it relates to copyright infringement and/or any impact on Your business.

36.     All documents that refer to, reflect, and/or concern any allegation that consumers do not have the right to record over-the-air broadcast television for personal use.

37.     All documents that refer to, reflect, and/or concern potential or actual changes to Your broadcast programming because of or due to the Aereo Technology.

38.     All documents that refer to, reflect, and/or concern the effect of the Aereo Technology upon the potential market for or value of Your alleged copyrighted works.

8

39. All documents that refer to, reflect, and/or concern the Aereo Technology, including, but not limited to, the Aereo antenna.

40. All documents that refer to, reflect, and/or concern any testing, surveys, or other analysis that you have performed with respect to Aereo, including, but not limited to, all documents that refer to, reflect, and/or concern Aereo Technology and/or Aereo's business.

41. All documents that refer to and/or concern any comparison of the Aereo Technology to any other technology.

42. All documents that refer to and/or concern the Slingbox or similar technology, including but not limited to documents referring to and/or concerning the legality of the Slingbox or similar technology.

43. All documents that refer to and/or concern Dyle, including but not limited to, the creation, development, and implementation of Dyle.

44. All of Your broadcasting license agreements with the FCC.

45. All retransmission consent agreements entered into by any of the WNET Plaintiffs within the past five (5) years.

46. All documents that refer to, reflect, and/or concern the negotiation of Your retransmission consent agreements.

47. All documents that refer to, reflect, and/or concern Your control of the distribution of the alleged copyrighted works under any retransmission agreements.

48. All documents that refer to and/or concern the financial terms of Your retransmission consent agreements.

9

49.     All documents that refer to, reflect, and/or concern internal communications, communications between any of the Joint Plaintiffs, or communications with any third party concerning Your retransmission consent agreements.

50.     All documents and communications that refer to and/or concern the potential impact of the Aereo Technology on Your present or future retransmission consent agreements.

51.     All certificates of copyright registrations for the allegedly infringed works for which You seek relief in this action.

52.     All documents concerning any communications between You and the United States Copyright Office concerning the allegedly infringed works for which You seek relief in this action, including, but not limited to, all applications to register such works.

53.     All documents concerning any communications between You and any government agency concerning the allegedly infringed works for which You seek relief in this action.

54.     All deposit copies provided to the Copyright Office of the Library of Congress of the allegedly infringed works for which You seek relief in this action.

55.     All documents concerning ownership of, or claims of rights in, all of the allegedly infringed works in this action.

56.     All documents concerning ownership at any time of the copyrighted works for which You claim infringement in this action, including documents between You and any person concerning any questions, uncertainty or disputes over Your ownership, co-ownership, administration, control of, or other rights to, any of the allegedly infringing works.

57.     All documents evidencing, referring or relating to the chain of title for all of the allegedly infringed works in this action.

58. All documents concerning assignments, licenses, or any purported license agreement relating to any of the allegedly infringed works claimed by You in this action, including but not limited to documents evidencing, referring, or relating to any and all negotiations thereof.

59. All documents evidencing, referring, or relating to any purported license agreement between You and any person related to the allegedly infringed works claimed by You in this action.

60. All documents evidencing, referring or relating to any and all negotiations relating to any and all license agreements between You and any person related to the allegedly infringed works claimed by You in this action.

61. All documents identifying any and all persons who have any ownership interest in the allegedly infringed works claimed by You in this action.

62. All documents constituting, referring, or relating to any business analyses, including analyses regarding sales and profitability, conducted by or for You in connection with the licensing, assignment, sale, or broadcast of the allegedly infringed works claimed by You in this action.

63. All documents concerning any market research, technology review, business forecasting, or other analysis related to the use of any of Your allegedly infringed works on any mobile device.

64. All documents concerning any market research, technology review, business forecasting, or other analysis related to the use of any of Your allegedly infringed works via any form of digital media.

11

65.     All documents concerning any market research, technology review, business forecasting, or other analysis related to the use of any of Your allegedly infringed works via digital video recordation device or on-demand streaming.

66.     Documents sufficient to identify Your total annual profits related to each allegedly infringed work claimed by You in this action for each of the past ten (10) years.

67.     Documents sufficient to identify Your total annual revenues related to each allegedly infringed work claimed by You in this action for each of the past ten (10) years.

68.     Documents sufficient to identify Your total annual expenses related to each allegedly infringed work claimed by You in this action for each of the past ten (10) years.

69.     All documents evidencing any damage suffered by You due to Aereo.

70.     All documents evidencing any lost profits suffered by You in relation to the allegedly infringed works.

71.     All documents evidencing any loss of business opportunities, including licensing arrangements and retransmission fees, due to Aereo.

72.     All documents evidencing, referring, or relating to the financing of each allegedly infringed work claimed by You in this action.

73.     All documents evidencing, referring, or relating to any and all financial analyses You have performed or maintain regarding royalties paid to You for the right to perform any allegedly infringed work claimed by You in this action.

74.     All documents evidencing, referring, or relating to all royalty statements of any kind relating to the allegedly infringed works claimed by You in this action.

75.     All documents evidencing, referring, or relating to any and all financial analyses You have performed or commissioned regarding advertising or other revenues paid by any third

12

party to You in connection with the performance of any allegedly infringed work claimed by You in this action.

76. All documents that refer to, reflect, and/or concern any measurement, performed by You or on Your behalf, of consumers skipping advertising that is embedded in your television programming using VCR, DVR, or any other means.

77. All documents, including but not limited to all Nielson Reports, evidencing, referring, or relating to any of the allegedly infringed works claimed by You in this action, whether directly or indirectly.

78. All documents concerning Your measurement of consumer viewership of Your allegedly infringed works accessed via the Internet.

79. All documents concerning Your measurement of consumer viewership of Your allegedly infringed works accessed via mobile device.

80. All documents concerning Your measurement of consumer viewership of Your allegedly infringed works accessed via mobile device.

81. All documents concerning communications between You and any person concerning this lawsuit, including without limitation the factual basis for the allegations in the complaint and Your reasons for filing the lawsuit.

82. All documents that refer to, reflect, and/or concern *Cartoon Network LP. LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008).

83. All non-privileged documents that concern or reference this litigation.

84. All documents evidencing, referring, or relating to Your lobbying activities related to broadcast television.

85.     All documents concerning communications about Aereo between You and any government agency or official regarding Aereo.

86.     All documents concerning communications about Aereo between You and any manufacturer of antenna technology.

87.     A copy of Your policies and procedures for the making, distributing, storing, retaining and destroying of documents and records, including but not limited to, electronic documents and emails from April 2006.

88.     Documents sufficient to identify all of Your directors, officers, staff, employees, personnel, and consultants from April 2006 to the present.

89.     Documents sufficient to identify any and all relationships between all persons and/or entities related to You in any way, including but not limited to corporate and joint venture relationships.

90.     All documents responsive to Aereo's First Requests for Production received or generated by You between the time of the original production and the time of the trial in this matter.

91.     A log of all documents withheld on grounds of any privilege, including the attorney-client privilege.

92.     All documents You will use or intend to introduce at trial.

Dated: November 6, 2012

R. David Hosp  (RH 3344)
John C. Englander (admitted *pro hac vice*)
Mark S. Puzella (admitted *pro hac vice*)
Yvonne W. Chan (admitted *pro hac vice*)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
617.570.1000 (tel.)
617.523.1231 (fax)
jenglander@goodwinprocter.com
rhosp@goodwinprocter.com
mpuzella@goodwinprocter.com
ychan@goodwinprocter.com

Michael S. Elkin
Thomas Patrick Lane
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
212.294.6700 (tel)
212.294.4700 (fax)
melkin@winston.com
tlane@winston.com

Jennifer A. Golinveaux (admitted *pro hac vice*)
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111
415.591.1000 (tel)
415.591.1400 (fax)
jgolinveaux@winston.com

Seth Greenstein (admitted *pro hac vice*)
CONSTANTINE | CANNON, LLP
One Franklin Square
1301 K Street, NW, Suite 1050 East
Washington, DC 20005
202.204.3514 (tel.)
202.204.3500 (fax.)
sgreenstein@constantinecannon.com

15

## CERTIFICATE OF SERVICE

I, R. David Hosp, hereby certify that this document was served by email upon all counsel of record on November 6, 2012.

_____
R. David Hosp

**Attachment B**

## Aereo's Proposed Search Terms for Plaintiffs

Aereo*
"@aereo.com"
Aireo*
*aireo.com
aero*
Bamboom
Baboom
Bamboo*
Kanojia
Chaitanya
Chet
Sallon
Lipowski
Bingham
Cox
Diller w/50 Aereo
Diller w/50 IAC
Cherry
Cotter
Usani
Hosp
Elkin
IAC
Goodwin
Winston
Nathan
Chin
Volakis
Howowitz
Pozar
"Kevin Reilly" w/35 internet w/35 television
"Kevin Reilly" w/35 "head up asses"
Moonves w/50 Aereo
Brennan w/50 Aereo
Martin w/50 Aereo
Baird w/50 Aereo
Hopkins w/50 Aereo
Bradford w/50 Aereo
Grogin w/50 Aereo
McGuire w/50 Aereo
Meyrowitz w/50 Aereo
Charlier w/50 Aereo
Rodriguez w/50 Aereo

Segaller w/50 Aereo
Feinberg w/50 Aereo
Seiken w/50 Aereo
Bentley w/50 Aereo
Greenfield w/50 Aereo
Cohen w/50 Aereo
Davis w/50 Aereo
Franks w/50 Aereo
Bond w/50 Aereo
Dalvi w/50 Aereo
Iger w/50 Aereo
Burke w/50 Aereo
Sokol w/50 Aereo
Cancela w/50 Aereo
Shapiro w/50 Aereo
Abernethy w/50 Aereo
Murdoch w/50 Aereo
Dowdle w/50 Aereo
Cahill w/50 Aereo
Ciurana w/50 Aereo
Kerger w/50 Aereo
IAC
InterActiveCorp
FirstMark
"First Mark"
FirstRound
"First Round"
"High Line"
HighLine
Highland
"High Land"
Lauder
Antenna /50 mobile
Antenna /50 remote
Antenna w/50 Aereo
RS-DVR
(DVR OR "digital video recorder") w/30 mobile
(DVR OR "digital video recorder") w/30 remote
(DVR OR "digital video recorder") w/30 DirecTV
(DVR OR "digital video recorder") w/30 "dish network"
(DVR OR "digital video recorder") w/30 satellite
(DVR OR "digital video recorder") w/30 infring!
(DVR OR "digital video recorder") w/30 "fair use"
(DVR OR "digital video recorder") w/30 copyright
(DVR OR "digital video recorder") w/30 harm
(DVR OR "digital video recorder") w/50 damage

2

Second Circuit
Keller w/50 Aereo
Fabrizio w/50 Aereo
Joint defense w/50 Aereo
Aereo w/50 win
Aereo w/50 legal
Aereo w/50 cablevision
Aereo w/50 account
Aereo w/50 launch
Aereo w/50 beta
Aereo w/50 invitation
Hopper* w/50 Aereo
"remote storage" w/50 harm
"remote storage" w/50 Aereo
Slingbox*
Slingbox w/50 infring!
Slingbox w/50 legal!
Boxee*
Roku* w/50 Aereo
*ivi*
*ivi.com
ivi w/50 Aereo
*filmon*
*filmon.com
filmon w/50 Aereo
*zediva*
*zediva.com
zedeva w/50 Aereo
wnet w/50 Aereo
Retransmission w/10 Agreement
Aereokiller
"Alki David"
(Television OR TV) w/15 cellular
(Television OR TV) w/15 mobile
(Television OR TV) w/15 telephone
(Television OR TV) w/15 wireless
(Television OR TV) w/15 wifi
(Television OR TV) w/15 internet
Dyle*
(Nielsen OR comscore) /25 internet
(Nielsen OR comscore) /25 mobile
(Nielsen OR comscore) /25 antenna
(Nielsen OR comscore) /25 (DVR or "digital video recorder")
(Nielsen OR comscore) /25 (Live+3 or "Live +3")
(Nielsen OR comscore) /25 (Live+7 or "Live +7")
(Licens* w/20 digital) w/20 (harm OR Aereo)

3

(Licens* w/20 internet) w/20 (harm OR Aereo)
(Licens* w/20 (DVR OR "digital video recorder")) w/20 (harm OR Aereo)
Licens* w/25 antenna
(Licens* w/20 mobile) w/20 (harm OR Aereo)
(Licens* w/20 cellular) w/20 (harm OR Aereo)
(Licens* w/20 telephone) w/20 (harm OR Aereo)
(Licens* w/20 tablet) w/20 (harm OR Aereo)
(Licens* w/20 (computer OR "personal computer" OR laptop OR desktop)) w/20 (harm OR Aereo)
(Licens* w/20 Android) w/20 (harm OR Aereo)
(Licens* w/20 (iPhone OR iPad OR iPod)) w/20 (harm OR Aereo)
(Licens* w/20 *web*) w/20 (harm OR Aereo)
(Licens* w/20 "web-enabled") w/20 (harm OR Aereo)
(Licens* w/20 Hulu*) w/20 (harm OR Aereo)
(Licens* w/20 Netflix*) w/20 (harm OR Aereo)
(Licens* w/20 Amazon*) w/20 (harm OR Aereo)
(Market* w/20 digital) w/20 (harm OR Aereo)
(Market* w/20 internet) w/20 (harm OR Aereo)
(Market* w/20 (DVR OR "digital video recorder")) w/20 (harm OR Aereo)
Market* w/25 antenna
(Market* w/20 mobile) w/20 (harm OR Aereo)
(Market* w/20 cellular) w/20 (harm OR Aereo)
(Market* w/20 telephone) w/20 (harm OR Aereo)
(Market* w/20 tablet) w/20 (harm OR Aereo)
(Market* w/20 (computer OR "personal computer" OR laptop OR desktop)) w/20 (harm OR Aereo)
(Market* w/20 Android) w/20 (harm OR Aereo)
(Market* w/20 (iPhone OR iPad OR iPod)) w/20 (harm OR Aereo)
(Market* w/20 *web*) w/20 (harm OR Aereo)
(Market* w/20 "web-enabled") w/20 (harm OR Aereo)
(Develop* w/20 digital) w/20 (harm OR Aereo)
(Develop* w/20 internet) w/20 (harm OR Aereo)
(Develop* w/20 (DVR OR "digital video recorder")) w/20 (harm OR Aereo)
(Develop* w/25 antenna
(Develop* w/20 mobile) w/20 (harm OR Aereo)
(Develop* w/20 cellular) w/20 (harm OR Aereo)
(Develop* w/20 telephone) w/20 (harm OR Aereo)
(Develop* w/20 tablet) w/20 (harm OR Aereo)
(Develop* w/20 (computer OR "personal computer" OR laptop OR desktop)) w/20 (harm OR Aereo)
(Develop* w/20 Android) w/20 (harm OR Aereo)
(Develop* w/20 (iPhone OR iPad OR iPod)) w/20 (harm OR Aereo)
(Develop* w/20 *web*) w/20 (harm OR Aereo)
(Develop* w/20 "web-enabled") w/20 (harm OR Aereo)
(Distrib* w/20 digital) w/20 (harm OR Aereo)
(Distrib* w/20 internet) w/20 (harm OR Aereo)

4

(Distrib* w/20 (DVR OR "digital video recorder")) w/20 (harm OR Aereo)
Distrib* w/25 antenna
(Distrib* w/20 mobile) w/20 (harm OR Aereo)
(Distrib* w/20 cellular) w/20 (harm OR Aereo)
(Distrib* w/20 telephone) w/20 (harm OR Aereo)
(Distrib* w/20 tablet) w/20 (harm OR Aereo)
(Distrib* w/20 (computer OR "personal computer" OR laptop OR desktop)) w/20 (harm OR Aereo)
(Distrib* w/20 Android) w/20 (harm OR Aereo)
(Distrib* w/20 (iPhone OR iPad OR iPod)) w/20 (harm OR Aereo)
(Distrib* w/20 *web*) w/20 (harm OR Aereo)
(Distrib* w/20 "web-enabled") w/20 (harm OR Aereo)
(Perform* w/20 digital) w/20 (harm OR Aereo)
(Perform* w/20 internet) w/20 (harm OR Aereo)
(Perform* w/20 (DVR OR "digital video recorder")) w/20 (harm OR Aereo)
Perform* w/25 antenna
(Perform* w/20 mobile) w/20 (harm OR Aereo)
(Perform* w/20 cellular) w/20 (harm OR Aereo)
(Perform* w/20 telephone) w/20 (harm OR Aereo)
(Perform* w/20 tablet) w/20 (harm OR Aereo)
(Perform* w/20 (computer OR "personal computer" OR laptop OR desktop)) w/20 (harm OR Aereo)
(Perform* w/20 Android) w/20 (harm OR Aereo)
(Perform* w/20 (iPhone OR iPad OR iPod)) w/20 (harm OR Aereo)
(Perform* w/20 *web*) w/20 (harm OR Aereo)
(Perform* w/20 "web-enabled") w/20 (harm OR Aereo)
"public performance" w/50 Aereo
"private performance" w/50 Aereo
volition w/50 Aereo
antenna w/50 consumer
((Sell OR Sale) /20 digital) w/20 (harm OR Aereo)
((Sell OR Sale) /20 internet) w/20 (harm OR Aereo)
((Sell OR Sale) /20 (DVR OR "digital video recorder")) w/20 (harm OR Aereo)
(Sell OR Sale) /25 antenna
((Sell OR Sale)* /20 mobile) w/20 (harm OR Aereo)
((Sell OR Sale) /20 cellular) w/20 (harm OR Aereo)
((Sell OR Sale) /20 telephone) w/20 (harm OR Aereo)
((Sell OR Sale) /20 tablet) w/20 (harm OR Aereo)
((Sell OR Sale) /20 (computer OR "personal computer" OR laptop OR desktop)) w/20 (harm OR Aereo)
((Sell OR Sale) /20 Android) w/20 (harm OR Aereo)
((Sell OR Sale)* /20 (iPhone OR iPad OR iPod)) w/20 (harm OR Aereo)
((Sell OR Sale) /20 *web*) w/20 (harm OR Aereo)
((Sell OR Sale) /20 "web-enabled") w/20 (harm OR Aereo)
(Stream* w/20 NBC*) w/20 (harm OR Aereo)
(Stream* w/20 ABC*) w/20 (harm OR Aereo)

(Stream* w/20 CBS*) w/20 (harm OR Aereo)
(Stream* w/20 FOX*) w/20 (harm OR Aereo)
(Stream* w/20 WNET*) w/20 (harm OR Aereo)
(Stream* w/20 WPIX*) w/20 (harm OR Aereo)
(Stream* w/20 Univision*) w/20 (harm OR Aereo)
(Stream* w/20 Telemundo*) w/20 (harm OR Aereo)
(Stream* w/20 (PBS* OR "public broadcasting service")) w/20 (harm OR Aereo)
(Stream* w/20 WNJU*) w/20 (harm OR Aereo)
(Stream* w/20 Thirteen*) w/20 (harm OR Aereo)
(Digital* w/20 NBC*) w/20 (harm OR Aereo)
(Digital* w/20 ABC*) w/20 (harm OR Aereo)
(Digital* w/20 CBS*) w/20 (harm OR Aereo)
(Digital* w/20 FOX*) w/20 (harm OR Aereo)
(Digital* w/20 WNET*) w/20 (harm OR Aereo)
(Digital* w/20 WPIX*) w/20 (harm OR Aereo)
(Digital* w/20 Univision*) w/20 (harm OR Aereo)
(Digital* w/20 Telemundo*) w/20 (harm OR Aereo)
(Digital* w/20 (PBS* OR "public broadcasting service")) w/20 (harm OR Aereo)
(Digital* w/20 WNJU*) w/20 (harm OR Aereo)
(Digital* w/20 Thirteen*) w/20 (harm OR Aereo)
"Cartoon Networks LP, LLLP v. CSC Holdings, Inc."
Cablevision w/50 (litigation OR case OR action OR decision)
(Sony OR Betamax) w/15 (litigation OR case OR action OR holding)
Cablevision w/50 (RS-DVR OR DVR OR "digital video recorder")
Infring* w/50 Aereo
(Litigation OR lawsuit) w/25 (DVR OR "digital video recorder")
(Litigation OR lawsuit) w/25 stream*
(Litigation OR lawsuit) w/25 antenna*
Illegal w/25 (DVR OR "digital video recorder")
Illegal w/25 stream*
Illegal w/25 antenna*
Sue* w/25 (DVR OR "digital video recorder")
Sue* w/25 stream*
Sue* w/25 internet
Sue* w/25 antenna*
Notice w/15 infring* w/50 Aereo*
CIMM
"innovative media measurement"
survey w/50 Aereo
reproduction w/50 Aereo*
circuit w/50 Aereo
investor w/50 Aereo

6