# FISH & RICHARDSON P.C.

One Marina Park Drive
Boston, Massachusetts
02210-1878

Telephone
617 542-5070

Facsimile
617 542-8906

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951



ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

HOUSTON

MUNICH

NEW YORK

SILICON VALLEY

SOUTHERN CALIFORNIA

TWIN CITIES

WASHINGTON, DC

<u>VIA E-MAIL</u>

February 1, 2013

Hon. Alison J. Nathan
United States District Judge
Southern District of New York
500 Pearl Street, Rm. 614
New York, New York 10007

Re:  WNET, et al, v. Aereo, Inc., No. 12-Civ. 1540-AJN (S.D.N. Y.) (Consolidated)

Dear Judge Nathan:

Defendant Aereo, Inc. ("Aereo") submits this letter in accordance with your Honor's Order dated January 29, 2013. As set forth in detail below, Aereo has made every effort to comply with the Court's February 22, 2013 deadline for discovery.[1] However, Aereo does believe that an extension of the discovery deadline is required as Plaintiffs have not complied with their discovery obligations.  Indeed, since discovery reopened, Plaintiffs have produced less than 5,000 pages of documents, comprising only 1,231 Copyright Registrations; thirteen Copyright Applications; four Copyright assignments, and two television schedules.  Eight Plaintiffs have not produced a single document.  As explained herein, there is very substantial discovery, directly relevant and critical to Aereo's defense, that Aereo has requested and has not been produced.

Aereo has attempted for more than 6 weeks, through protracted negotiations, to obtain meaningful discovery from Plaintiffs.[2]  However, Plaintiffs' have stonewalled completely, refusing to provide fundamental discovery such as information identifying what repositories exist, and refusing to search central repositories for documents that reference Aereo. In essence, Plaintiffs have taken the position, sometimes expressly, that they should only be required to search for and produce discovery that *supports* their claims, or they have unilaterally imposed such extreme restrictions (*e.g.* unreasonable date restrictions), such that any proposed "compromise" is illusory and will result in no meaningful discovery. Without substantive and complete discovery responses, primarily as to documents (but also interrogatories and requests for admissions), Aereo has not been able to proceed with

---

[1] Although, Aereo believes that that deadline was ambitious given that Aereo has to take discovery from seventeen separate Plaintiffs in order to properly prepare for depositions, prepare its experts and prepare its defense for trial.
[2] Aereo has participated in the exchange of numerous letters and engaged in numerous conferences all with a view toward resolving these issues in good faith and avoiding burdening the Court with these matters.  Unfortunately, that process did not yield progress.

necessary depositions and preparation of its experts.[3]

## AEREO'S PRODUCTION OF DOCUMENTS AND THINGS

Aereo has been entirely forthcoming in its productions in this case. As the Court is aware, Aereo's goal from the outset has been to achieve a complete resolution of this matter as quickly as possible. To that end, Aereo produced an enormous volume of material during the preliminary injunction phase (40,000 pages of documents plus its entire software code). Specifically:

- Aereo provided Plaintiffs with a specific list of repositories existing within Aereo's electronic systems, including descriptions of all email servers, documents servers, development servers and other databases.
- March 22, 2012—the same day the protective order was entered— Aereo produced its entire source code, which most directly illustrates how the Aereo system functions, as well as other key technical documents such as hardware schematics and drawings.
- March 28 –April 26, 2012—Aereo produced technical and schematic documents, emails and document files from key custodians (Chet Kanojia-CEO/Founder, Joe Lipowski-CTO, and Griffin Cherry-VP of User Experience), subscriber information, marketing materials, and patent applications.
- April 20, 2012—Aereo produced an antenna board and allowed a several-hour site inspection of the Aereo equipment and facility.

During the September 19, 2012 Scheduling Conference, Plaintiffs represented to the Court that because of the substantial discovery taken from Aereo during the preliminary injunction phase, their additional discovery would likely be limited to: (i) access to an Aereo subscription; (ii) two antenna boards; (iii) discovery from investors and marketing firms; (iv) information about how the "watch" function is accessed, and (v) database information regarding the manner in which consumers have actually used the Aereo system. *See* Conf. Trans. at 4-7. Contrary to this representation to the Court, both sets of Plaintiffs issued requests effectively seeking production of *every document and thing in Aereo's possession*, much of which has nothing to do with any claim in this case.[4]

Aereo quickly produced the information that Plaintiffs told the Court that they needed:

---

[3] In addition, without substantive responses to its initial discovery requests, Aereo is unable to identify and serve any necessary follow-up requests. Nor is Aereo able to identify a comprehensive list of necessary individual deponents, including potentially third parties.

[4] Plaintiffs have complained that Aereo served ninety-two document requests, while they served fewer. The burden on a party is not created by the *number* of requests, but by the *scope* of the requests.

- On September 28, 2012, granted Plaintiffs access to Aereo memberships;
- On October 24, 2012, produced a detailed and updated list of database servers and electronic information repositories; and
- On October 31, 2012, produced an updated version of its entire source code.

Then, on November 16, 2012, Aereo produced its member database, known as the "Production Database," giving Plaintiffs comprehensive information about how members interact with the Aereo system. The data provided to Plaintiffs tracks Aereo member actions, including member log-ins, recordings (whether "Watch" or "Record"), playbacks, and other data on a per broadcast program basis. This production gave Plaintiffs a highly detailed record of how Aereo members have actually used the system to record individual programs.

Even after Aereo produced the discovery that Plaintiffs told the Court that they needed, Aereo continued to provide documents in response to Plaintiffs' discovery requests. Between November 16 and January 16, 2013, Aereo produced approximately **450,000** additional pages for a total of nearly half of a million pages of documents, including, but not limited to:

- Updated email and document productions for its previously identified custodians, Mr. Kanojia, Mr. Lipowski, and Mr. Cherry;
- Emails and documents from additional custodians: Virginia Lam, Vice President Communications and Government Relations; Amanda Chin, Vice President Acquisition Marketing; Nick Sallon, Director Content & Business Development; Christopher McKay, Director Customer Care and Billing; David Cann, General Manager Expansion; Dan Pond, Senior Principal Hardware Engineer; Brian Loveland, Director, Infrastructure Operations; Nevo Hed, Senior Principal SW Engineer; James Bingham, Senior Principal Engineer; and Ali Cox, former Director Marketing;
- 582 individual "daily reports" generated from the Production Database, further illustrating member use of the system;
- 60 gigabytes of logs from the antenna and streaming servers, which simply reflect the software code in operation; and
- Computer software debug logs and sections of an internal Wiki Plaintiffs requested.

On December 5, 2012, Aereo also produced two additional complete antenna boards and related parts and granted Plaintiffs and their experts a *second* several-hour site visit to further inspect the Aereo facility and equipment and to use the Aereo office to

make their own signal strength measurements.[5]  Aereo also specially contracted with its vendor to build for Plaintiffs—on an expedited basis—a new antenna board test fixture, which is a device that holds the board upright for manufacturing testing. In addition to formal discovery, Aereo has repeatedly answered informal discovery requests in the form of follow-up email and telephone requests by Plaintiffs, such as providing an index to the Aereo Wiki to permit Plaintiffs to identify what they wanted, producing a third-party "data sheet" for hardware, and providing connectors to the antenna boards (which are readily available from third-parties).

## AEREO'S REMAINING PRODUCTION OF DOCUMENTS AND THINGS

**Uncontested Aereo production remaining.** Aereo's production is essentially complete, and the only documents outstanding are: (i) supplemental emails and documents from Mr. Loveland, one of Aereo's engineers; and (ii) supplemental documents from Aereo custodians' personal hard drives.  These documents have already been collected and are under review.  Aereo expects that the production of responsive, non-privileged documents in this remaining group will be completed before the Court's February 8, 2013 hearing.

## AEREO DISCOVERY—ISSUES FOR THE COURT TO ADDRESS

1. **Contested issues concerning Aereo's document production.**

There appear to be four very limited areas of dispute regarding Aereo's document production:

(i) **Production Database in Different Form.** Plaintiffs, without any rationale, demand production of Aereo's Production Database in *native* format, despite the fact that Aereo already produced its Production Database in a format that is easily incorporated into a file structure that allows Plaintiffs to search for the information they need.[6]  Aereo produced the data from the database in non-native form so that it could redact customer personal identifying information ("PII") such as individual member names, telephone numbers, addresses, email addresses, IP addresses, and billing information.  In order to preserve the ability to search the material, output files were created so that they could be reviewed independently as search and sortable Excel files or, at the Plaintiffs' option, re-imported into their own SQL database. Plaintiffs have apparently successfully imported the files into an SQL database—as they presented Aereo deponents with SQL searches that Plaintiffs performed and

---

[5] Despite a Court order prohibiting "destructive" testing during the preliminary injunction phase, Plaintiffs demanded production of two additional new boards because Dr. Volakis' testing rendered the original board inoperable.
[6] The Production Database, is an SQL database, and not a static document, that can be queried by selecting fields of information.

asked them about the search results in their depositions.[7]

(ii) **Production of Member IP Addresses.** Plaintiffs complain separately about Aereo's redaction of its members' IP addresses from the Production Database files.[8] IP addresses are unique identifiers and, accordingly, are PII and are properly redacted. *See*, *e.g.*, 45 C.F.R. § 164.514 (2013) (stating that health care providers may only deem information to be not "individually identifiable health information" once IP address numbers, as well as other identifiers, are removed). *See also Tyler v. Michaels Stores, Inc.*, 840 F. Supp. 2d 438, 444-45 (D. Mass. 2012) (finding ZIP codes to be PII because it "may be used (in conjunction with other data) to identify a specific individual."). Even if, arguendo, IP addresses were not unique identifiers, they can be combined with other data to reveal identity. Plaintiffs' claim that the IP addresses are necessary to check Aereo's claim that it has adequate geo-location methods to exclude member use outside of New York. But Aereo already produced substantial documentation concerning how the multi-step geolocation system works. Moreover, IP addresses are not, alone, always a reliable way to determine the location from which the user is actually accessing the Internet. Because IP addresses are routed throughout the country, IP addresses may not actually reflect the Aereo *member's* true location in New York, but their Internet Service Provider's location elsewhere. Thus, an IP address may appear to indicate a location outside of New York, but this is not dispositive of the user's true location. This is why IP addresses are only one of multiple methods Aereo uses to verify a member's actual location. As a result, Plaintiffs' request for IP addresses not only invades the privacy of Aereo's members, but they have minimal probative value over the geo-location information that Aereo has already produced.

(iii) **Investment information.** Plaintiffs also seek Aereo's communications with investors regarding the financial terms of investments. Aereo has already produced communications with investors about the Aereo system and business plans in response to Plaintiffs' Document Request No. 10.[9] Aereo has objected to, and should not be required to produce documents concerning the negotiations and deal

---

[7] Aereo should not be required to re-produce the relevant information, particularly because production in native format would prevent Aereo from properly redacting customer PII that is mixed in with other data, and would require production of non-responsive fields of information.

[8] WNET raised this issue in one of two letters submitted to the Court on January 29, 2013, after the Court's January 29, 2013 order directing the parties to submit a single letter concerning discovery issues. Plaintiffs apparently did not send that letter to the Court, although it was addressed as such. Plaintiffs resubmitted the letters on January 31, 2013. Aereo incorporates its response to that letter on the IP address issues here. The second letter concerned Aereo's responses to four requests for admissions and is addressed in Section 2 below. If the Court would like a separate letter responses Aereo will do so.

[9] On this issue, Plaintiffs have also issued two rounds of subpoenae to Aereo's investors, which are redundant and appear calculated to harass third-parties who have nothing to do with how the Aereo technology works and whether it infringes copyrights as Plaintiffs claim.

terms related to the specific investments in Aereo. Plaintiffs have not been able to suggest a basis for the relevance of these documents, nor does such a basis exist. It appears, instead, that Plaintiffs are engaging in nothing but a fishing expedition into irrelevant and the most highly confidential financial and sensitive data.

 (iv) **Aereo Valuation**. Aereo has already produced a 2012 profit & loss summary (AEREO00235457), in response to Document Request No. 17, which seeks documents concerning revenues and profits. Aereo has objected, and should not be required to produce, any additional financial information or documents concerning generally the value of Aereo (Req. No. 19). We are aware of no case that suggests that the overall value of a defendant is relevant to any aspect of damages, nor have Plaintiffs been able to direct us to any. Again, this appears to be an attempt to obtain highly confidential and sensitive information for purposes other than in connection with this lawsuit.[10]

## 2. Contested issues concerning Aereo responses to four Requests for Admission

WNET Plaintiffs have identified four Requests for Admission that it claims require further answers. Aereo has fully complied with the rules and provided not only substantive answers, but a further letter concerning those answers in response to Plaintiffs' inquiry. *See* Hosp Letter, dated December 6, 2012.

WNET Plaintiffs' Requests for Admission Nos. 7 and 8 concern whether certain copies are "buffer copies," a term which is undefined by Plaintiffs. Aereo provided a complete response and, consistent with Fed. R. Civ. P. 26(a)(4), described why it could not admit or deny the request as posed, answered what it could, and denied the rest. As the Court is aware, without additional context, the phrase "buffer copy" is subject to substantially different interpretations in different contexts. A buffer, to the extent it is of merely transitory duration, is not a "copy" under the Copyright Act. *See Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 130 (2d Cir. 2008). A "copy" under the Act requires a material object in which a work is "fixed by any method…from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." A buffer is typically not "fixed" and is thus not a "copy." Because of this undefined term, Aereo could not answer Request Nos. 7 and 8 as posed. The fact that, as Plaintiffs point out in their letter, different parties have used the term differently during the course of the case illustrates why the phrase can be ambiguous and cannot be answered without a definition.

---

[10] In the event that the Court orders production of additional documents concerning these topics, Aereo can produce such documents within ten days of the Court's order.

WNET Plaintiffs' Request for Admission No. 15 asks Aereo to answer an incomplete hypothetical about what Aereo's system "could" do if it were designed differently. This is an entirely improper request for admission. Aereo cannot admit that it could do something it has not done and is not required to speculate to answer requests for admissions. In response, consistent with the rules, Aereo asserted a proper objection and admitted what members can do with the existing technology.

WNET Plaintiffs' Request for Admission No. 20 asks Aereo to admit is has no express authorization from Fox to make any copies of its broadcast programs. Aereo objected because in that context "express authorization" is vague and calls for a legal conclusion. The request, like many of Plaintiffs' other request for admissions also is written to include disputed facts that are central to the litigation. In the Aereo system it is the member, not Aereo, who makes a copy of the broadcast program. And, there really is no serious question that a consumer has the "express authorization" to make copies of over the air broadcasts under existing law. Again, consistent with the rules, Aereo stated that it does not make copies, Aereo's members do, and that those members are entitled under *Sony* and its progeny to make copies of over-the-air television broadcasts. In short, there is no basis whatsoever for Plaintiffs to complain about Aereo's responses.

## PLAINTIFFS' PRODUCTION OF DOCUMENTS

The completeness of Aereo's response to discovery stands in stark contrast to the Plaintiffs' failures. Since the reopening of discovery, Plaintiffs have produced, as a group, virtually nothing to Aereo. Their production between the September 21, 2012 Status Conference, and this Court's January 29, 2013 Order has consisted *only* of 1,231 Copyright Registration Certificates, thirteen (13) Copyright Applications, two (2) television schedules and four (4) certificates of recordation of Copyright Assignments. At least eight Plaintiffs – CBS Broadcasting; CBS Studios; Telemundo Network Group LLC; WNET, Thirteen; WNJU-TV Broadcasting LLC; WPIX, Inc.; Univision Television Group, Inc. and The Universal Network Limited Partnership – *have not produced a single document* during that time. Plaintiffs' refusal to participate in good faith discovery following the Court's status conference in September is particularly remarkable given that the productions that were made at the preliminary injunction phase by Plaintiffs were (in contrast to Aereo's thorough Preliminary Injunction production) similarly paltry. Given this utter failure by Plaintiffs to produce documents of any substance, Aereo's efforts to conduct additional discovery have, to date, been completely frustrated. Aereo needs immediate production of Plaintiffs substantive documents and sufficient time thereafter to select deponents, prepare for and take depositions and serve any necessary follow-up written or deposition discovery in order to be able to prepare its experts and prepare its defense at trial.

## PLAINTIFFS' REMAINING PRODUCTION OF DOCUMENTS

**Uncontested Plaintiffs' Production Remaining.** Plaintiffs' have, throughout the past weeks of conferring, indicated that they intend to produce certain limited documents. However, none of that material has actually been produced as of the writing of this letter, and it is still not entirely clear what specifically will be produced or when. In any event, Plaintiffs' proffered "compromise" proposals are not in compliance with the rules, would impose unreasonable limits on the scope of production, and would cripple Aereo's ability to properly defend this action. Generally, Plaintiffs agree to produce only (1) documents that Plaintiffs believe support their claims; (2) documents that refer to certain services with which Plaintiffs incorrectly equate Aereo, and not documents related to technologies that are actually similar to Aereo; and (3) even as to those documents, only materials created only in 2011 or 2012.[11]

Additionally, this Court's Order apparently spurred WNET Plaintiffs to send documents on February 1, 2013—the date of this letter, which Aereo has not received as of the writing of this letter.

With the limited exceptions of copyright registrations documents, some (redacted) retransmission agreements, and a few non-substantive emails that were produced prior to the preliminary injunction hearing none of these documents have been produced. Plaintiffs can offer no justification for failing to produce these documents.

## PLAINTIFFS' DISCOVERY—ISSUES FOR THE COURT TO ADDRESS

As set forth in detail below, Plaintiffs have expressly refused to search for, collect and produce documents that are directly relevant to core issues in this case, and necessary for Aereo to conduct a fair and reasonable defense of the matter.[12] These refusals to produce documents fall into several categories:

---

[11] For example, and as is discussed more fully, herein, Plaintiffs have offered to produce documents that refer to Aereo or Bamboom. For example, Plaintiffs have agreed to produce external research done regarding cross-platform television consumption, but only for 2011 and 2012. But NBCUniversal's President of Research and Media Development has stated that such research began at least as early as 2008 in connection with the 2008 Olympics. But they limit that production to those documents in the custody of a very small set of hand-selected custodians. Similarly, they have offered to produce certain documents reflecting license agreements for distribution over the Internet, but WNET Plaintiffs limit that production to those effective as of March 2012, and WABC Plaintiffs only agree to produce "representative examples" of such agreements. When examined closely, all of Plaintiffs offers to produce categories of documents contain limitations that defeat the utility of the discovery exercise.

[12] Aereo has offered to limit its request to five years except where the requests concern related technologies and their financial and commercial impact in which cases documents should be collected from the inception of those technologies.

**1. Document Repositories (RFP No. 87).** The federal rules require identification of document repositories and Aereo has further served discovery on this issue. On October 24, upon Plaintiffs' request, Aereo voluntarily provided a list of central document repositories, together with descriptive information. Plaintiffs, however, refused to identify repositories without formal interrogatories, which Aereo then served. In response to those interrogatories, Plaintiffs provided selective and grossly incomplete information[13]. Aereo is entitled to have a complete list of document repositories, together with a description of what type of information is contained in them, so that it has a basis from which to evaluate the searches undertaken by each Plaintiff. In any company, there are both custodian based local repositories—such as a personal computer hard drive—as well as central or shared repositories. Aereo is entitled to a complete list of all central repositories, including, without limitation, databases, data warehouses, contract databases or warehouses, centralized email servers including active exchange, shared drives, storage and back-up. In addition, Aereo is entitled to a list of local repositories that are related to all custodians as discussed below and would include: local files-whether electronic or hard copy—which the custodian uses to store or access data including without limitation, and as appropriate, shared or network drives.

**Requested relief:** Aereo asks the Court to order Plaintiffs to provide to Aereo a list identifying with reasonably particularity all centralized document repositories and all local repositories of custodians (discussed below), including a specific description of the types of information contained in those repositories, a statement of which repositories have been reviewed to date for responsive documents and the document retention policy applicable to each repository.

**2. Custodians (RFP No. 88).** As noted above, centralized or shared repositories should be disclosed and searched without regard to custodian. But it is, of course, reasonable in this case to limit local searches to those custodians who may have information relevant to the claims and defenses in the case. Aereo has identified a broad list of its own relevant custodians (to which plaintiffs have raised no objection) and undertaken local search and collection from those sources. In contrast, Plaintiffs have selected just a few custodians and completely ignored individuals who

---

[13] For example, Plaintiffs provide no information about any central repositories at all. Plaintiffs have generally identified the repositories as those "associated" with their limited designated custodians, but they fail to give adequate detail about even those repositories. Plaintiffs claim that meeting their basic obligation to identify repositories would be burdensome because they are large companies. That argument fails for at least these reasons: (i) Plaintiffs chose to bring this case and they are, accordingly, subject to the rules like any plaintiff; (ii) it is precisely because they are large that Aereo needs to understand the scope of repositories to ensure that it is getting comprehensive response; (iii) Plaintiffs likely have IT and other resources that have ready access to the centralized and other repository information; and (iv) repositories are likely comprehensively tracked for, among other things, the large volume of subpoenas to which the major defendants respond on a daily basis.

clearly have responsive documents.[14]  For just one example, there is no mention of Alan Wurtzel, NBC's President of Research and Development, has spoken publicly about NBC's extensive research on the *positive* commercial effect of consumer viewing on non-traditional platforms, including the types of mobile platforms and Internet-based platforms on which consumers can access Aereo. Based on many of the statements he made, which are available on YouTube, Mr. Wurtzel has information that would directly support Aereo's defenses in this case. Nonetheless, he was inexplicably left off the list of custodians.

**Request for relief:** Aereo asks the Court to order Plaintiffs to identify to Aereo all custodians who may have discoverable information with respect to Aereo's discovery requests,  including those discussed herein, and to search, collect and produce the local documents of all such custodians who may have information that could lead to the discovery of relevant evidence responsive to Aereo's requests and the further orders of this Court with respect to the scope of discovery.

**3.   Documents Concerning Aereo (RFP Nos. 2-11, 13, 14, 15, 16, 17, 18, 19, 23- 25, 37- 41, 50, 69, 71, 85, 86).** There could be nothing more basic than requiring Plaintiffs to search for and produce all documents and information that concern and/or refer to Aereo, Bamboo, Bamboom, Mr. Kanojia and Barry Diller (in relation to Aereo).[15]  Such documents should be searched for across all repositories that could potentially contain such information.  Plaintiffs have taken the position that they will produce such documents only if they reside with their hand-picked custodians, complaining that to do more would be burdensome because they are large companies.  This is unreasonable on its face.  Each Plaintiff commenced this lawsuit with the goal of shutting down Aereo, and at minimum, they must be required to search for and produce all documents that concern Aereo. Plaintiffs are large companies but they also have large resources including sophisticated IT departments, document retention policies and the like.  They have the capacity to, in addition to custodian-based searches, search all of their central repositories for documents concerning the defendant in this case and should be required to do so.

**Requested relief:**  Aereo asks the Court to order Plaintiffs to search across all potentially applicable repositories, central and local, for all documents which mention or concern Aereo, Bamboo, Bamboom, Kanojia, and/or Diller (in relation to Aereo).

---

[14] By way of example, collectively, Plaintiffs NBC Universal Media LLC, NBC Studios, LLC, Universal Network Telecom, LLC, Telemundo Network Group LLC and WNJU TV Broadcasting collected  documents only from a total of seven custodians.  The notion that the universe of custodians from these five companies that may have responsive documents is limited to seven individuals is simply not credible.  The custodians named by the other Plaintiffs is similarly limited.

[15] With respect to Mr. Diller, it is appropriate and reasonable to conduct such searches for documents referencing or concerning both Mr. Diller and Aereo.

**4.  *Cablevision* Documents (RFP 82).**  Aereo claims, and the Court has so found, that the Aereo technology (other than the antenna) are co-extensive with the technology in the *Cablevision* case.  Many of the Plaintiffs here were Plaintiffs in that case.  In light of the fact that the Cablevision technology is an analog to Aereo's, Aereo is entitled to discover documents and information that relate to or concern the Cablevision RS-DVR technology including, without limitation, Plaintiffs' documents related to, its legality, customer action or volition in using such technology, and the harm and financial and commercial impact allegedly caused to Plaintiffs by that technology (including any analysis or data concerning how those impacts may have changed over time).  For example, Aereo is entitled to discover whether Plaintiffs' viewed the RS-DVR to be harmful at the time it was released but may have later been studied and found to be helpful.  Such documents may be relevant because they would undermine Plaintiffs' allegations of harm and market impact.  Plaintiffs have refused to produce or even search for such documents.

**Requested relief:**  Aereo asks the Court to order Plaintiffs to search for, collect and produce documents relating to, evaluating or commenting on the *Cablevision* case, the manner in which consumers use the Cablevision technology and any financial impact on Plaintiffs' programing resulting form the Cablevision technology, and to produce such documents.  These searches can be limited to documents created on or after January 1, 2005. [16]

**5.  Documents Related to Consumer Use of Antennas (RFP Nos. 2, 12, 15, 18, 20, 21, 26, 27, 39, 86).**  The WNET Plaintiffs[17] take the position that consumer use of a remote antenna rather than an in-home antenna causes them harm. Both sets of Plaintiffs also assert that it is Aereo rather than the consumer that is the "actor" or exercises volition with respect to the use of an Aereo antenna.  As such, documents concerning how consumers access Plaintiffs' programming, including through the similar technologies (e.g., DVRs, remote DVRs, Slingboxes and other like technologies) will likely contain, or will lead to, admissible evidence of Plaintiffs' views of the rights they may properly assert with respect to different technologies.  For example, documents noting that antenna reception is a valuable public right, or discussing whether broadcasters are (and to what degree) entitled to further compensation for receipt of their works via antenna, or documents that concern any efforts to discourage consumer use of antennas are directly relevant to, and will likely lead to information pertaining to the harm Plaintiffs allege and fair use analysis.

---

[16] As Aereo has made clear to Plaintiffs, it does not seek the production of public filings, pleadings, transcripts and the like.  Aereo seeks internal commentaries and analyses about the case that are likely to lead to discoverable information.  Because the *Cablevision* case was brought in 2006, Aereo believes that this request can be limited to documents created on or after January 1, 2005.

[17] ABC Plaintiffs have recently stated that they are asserting indirect infringement claims as well, but those claims are not in the ABC Plaintiffs Complaint and should not be permitted to go forward unless an amendment to the Complaint is permitted by motion.

Similarly, documents or studies in Plaintiffs' possession that analyze or comment on whether viewership by consumers using cable delivery systems is more or less economically favorable to Plaintiffs than viewership by consumers using over-the-air antenna technology, are directly relevant to the issues in this case. Plaintiffs have refused to produce any such documents except only with respect to their hand-picked custodians if they specifically mention Aereo.

**Requested relief:** Aereo asks the Court to order Plaintiffs to search for and produce documents regarding the use of home antennas and remote antennas including, without limitation:  (i) documents that indicate any comment, analysis and/or research by Plaintiffs that their profits are affected or diminished by consumer use of antennas; (ii) documents that may indicate any effort to discourage or limit consumer use of antennas; (iii) any information about consumer use of remote antennas or about remote antennas generally (iv) any documents that demonstrate or concern measurement regarding  content  consumed by consumers use of antennas and how such measurement affects the value or profitability of each copyright work.

**6.  Documents Related to Consumer Use of in-home DVRs (RFP No. 29, 30, 33-36, 76).**  For similar reasons, documents analyzing consumer use of in-home DVRs is also directly relevant to the issues in this case, namely: (i) volition (who is "doing" the alleged copying and "making" an alleged public performance) and (ii) any alleged impact of these related technologies on the value of Plaintiffs' programming.  (*see, e.g.*, 17 U.S.C. § 504(c)(2).  Plaintiffs take the position that they are harmed by Aereo's remote-DVR technology and that it is Aereo (not the consumer) that is the "actor" with respect to the remote-DVR. Plaintiffs wrongly calim that there is a legal distinction in copyright law between in-home equipment and remote or cloud-based equipment, but the Second Circuit in *Cablevision* ruled out such a distinction.  Therefore, documents related to consumer use of in-home DVRs and their impact on Plaintiffs are just as relevant as the same documents related to remote-DVRs.  Plaintiffs have refused to produce documents related to set-top DVRs, and agree to produce only a limited set of documents, created in 2011 or 2012, related to remote-DVRs.  Because DVRs have been around for much longer than the past two years, and there is no legal distinction under copyright law between in-home or remote DVRs, Plaintiffs' restrictions are unreasonable.  Nonetheless, because DVR use is so long term and widely adopted, Aereo breaks this out separately to identify appropriate limits that make this undertaking utterly reasonable.

**Requested relief:** Aereo asks the Court to order Plaintiffs to search for, collect and produce documents regarding the use of in-home DVRs including, without limitation: (i) documents related to the volitional conduct involved in operating DVRs, (ii) documents that indicate any comment, analysis and/or research by Plaintiffs that their profits are affected or diminished by consumer use of DVRs (iii) any information about the commercial impact of consumer use of in-home DVRs

versus remote DVRs, (iv) any documents that demonstrate or concern measurement of consumer use of DVRs, in-home, and how such measurement affects the value or profitability of each copyright work, and (v) any documents that concern any differences between the measurement and impact of consumer use of DVR's and consumer use of remote-DVRs.

**7. Other Similar Technology, including Consumer Use of Place-Shifting or Media-Shifting Devices such as SlingBox, Dongles, etc. (RFP Nos. 28, 31, 32, 35, 42, 43, 78-80).** For the same reasons that *Cablevision* and documents relating to RS-DVRs are directly relevant, so too are documents concerning other technologies that are analogues to Aereo. These include without limitation: antennas, dongles, RS-DVRs generally, and place- or media- shifting devices such as SlingBox. These documents bear on Plaintiffs' arguments and views regarding consumer volition, the legality of these devices in Plaintiffs' view, and the financial impact of these devices (or lack thereof) on Plaintiffs.

Plaintiffs have attempted to place unreasonable limitations on production, offering to produce only documents related to technologies against which Plaintiffs' launched successful legal challenges—such as ivi, Filmon, Zediva etc.—but which are not similar to Aereo's technology (although such documents, too, have been produced). Plaintiffs also seek to place an unreasonable temporal limitation on its production, limiting its production to documents created in 2011 and 2012. That timeframe is unreasonable for at least three reasons: (i) it is an inadequate time period to evaluate any impacts and how they may change over time; (ii) it is important to understand how Plaintiffs reacted to and analyzed these new technologies at their inception.[18] Thus, Plaintiffs' "proposal" to produce documents from the last two years is intended to prevent discovery of information that may not be favorable to their position. Plaintiffs cannot limit discovery to only those items they believe favor their cause, or place time restraints in order to intentionally exclude relevant documents. Instead, Plaintiffs should be required to search for and produce responsive documents (from all repositories) for each technology, from the inception of that particular technology.

**Requested relief:** Aereo asks the Court to order Plaintiffs to search across all repositories for, and produce all documents and information that concern or refer to antennas, remote antennas, remote-DVRs, dongles, SlingBox and other place shifting or media shifting devices, from the inception of such technologies, including without limitation, any documents that refer to consumer use of these technologies and to the financial impacts on Plaintiffs resulting from such technologies. Such documents include, but are not limited to: (i) documents that provide any comment, analysis and/or research by Plaintiffs with respect to whether their profits are affected or diminished by consumer use of SlingBox, dongles and other like technologies (ii) any

---

[18] March 28, 2012 Videotaped statement by Alan Wurtzel, President of Research and Media Development for NBC Universal, available at http://www.youtube.com/watch?v=lz3Z0VyugTc

documents that demonstrate or concern measurement of consumer use of SlingBox, dongles, or other like technologies, and how such measurement affects the value or profitability of each copyright work, (iii) any documents that concern any differences between the measurement and impact of consumer use of SlingBox, dongles and other like technologies versus use of Aereo.

   **8.  Consumer and Other Research, including Ratings and Viewership Research on Alternative Platforms  (RFP Nos. 12, 20-22, 26-31, 35, 63-65, 76, 78-80).**  Aereo is entitled to assess Plaintiffs' arguments about the commercial impact of Aereo's technology, and other related technologies, on the value of their asserted works, because any such impact may affect whether the consumer's use of Aereo's technology constitutes a fair use.  As such, Aereo is entitled to all consumer and other research and ratings and viewership data, including comparison research, concerning consumer use of: antennas, remote antennas, DVRs, Remote DVRs, and media or place shifting devices such as SlingBox and dongles, as well as access to broadcast television over the Internet and on portable devices and how such use does or does not affect the value, security or profitability of each alleged copyrighted work.

Plaintiffs have proposed to limit productions to "official reports" from Nielsen and Comscore from 2011 and 2012.  However, Aereo does not know what those reports concern and how they relate to these and other requests (see advertising below).  Further, Plaintiffs' attempted limitation is unreasonable for at least two reasons.  First, limiting such data to the past two years does not provide sufficient historical information to determine any trends and/or test the allegations of any actual impact.  Second, Plaintiffs exclude informal reports or internal analyses, or independent research into the effects of consumer viewing habits, particularly any analyses broken out by device or platform, (i.e. the Internet, DVRs, tablets, smartphones, etc.), which is the key requirement for comparison and analysis of the alleged commercial impacts or harm that Aereo is accused of causing.  Aereo is aware that such research exists because the President of Research and Media Development for NBC Universal, Alan Wurtzel, has spoken about it publicly and in substantial detail.[19]

Additionally, while the Nielsen and ComScore reports themselves must be produced, Aereo is also entitled to discover any further communications and/or analyses related to such reports (as well as memoranda, emails, meeting notes, etc.), particularly

---

[19] *See, e.*g., Wurtzel videos available at http://www.youtube.com/watch?v=lz3Z0VyugTc, http://www.youtube.com/watch?v=9NIYSEAFDBc, http://www.youtube.com/watch?v=pSFv1ygidys. Plaintiffs' refusal to produce such information is particularly troubling because Mr. Wurtzel's statements indicate that the research contradicts the Plaintiffs' testimony before this Court.  In fact, some of this research existed before the Preliminary Injunction hearing, and yet was not produced.  *See* Wurtzel Interview, March 28, 2012 (http://www.youtube.com/watch?v=lz3Z0VyugTc) (research revealed that, when consumers view television on multiple platforms, "it would actually increase the amount of television that they watched.")  Plaintiffs concealed this research and data through the preliminary injunction phase of this case, but all such materials must be produced now.

because Plaintiffs have claimed harm because, they assert, Nielsen does not track Aereo and other on-line viewing. These documents are likely to comment on the ability of various different rating agencies to track this kind of consumer behavior effectively. In addition, Plaintiffs' interpretation of the research and data, including ratings, and to what they attribute any changes, may be as relevant to Plaintiffs' claims of harm as the raw data themselves. Aereo is entitled to challenge Plaintiffs assertions and Plaintiffs are not permitted to pick and choose what they produce. Moreover, Plaintiffs have suggested that access to programming using Aereo over the Internet could pose a security risk, which would harm plaintiffs even further. Aereo is thus entitled to discovery regarding any research done regarding similar "security risks" with respect to viewing of Plaintiff's programming on other Internet platforms.

The documents set forth herein are crucial to an understanding of any alleged harms, or commercial impact (under fair use) allegedly caused by Aereo.

**Requested relief:** Accordingly, Aereo asks the Court to order Plaintiffs to search across all repositories for documents and information that concern research, data, ratings and comparisons concerning the impact on each asserted copyrighted program's value or profitability of consumers' use of antennas, remote antennas (including Aereo's), DVRs, RS-DVRs, media or space shifting devices such as SlingBox, portable devices and the Internet to access programming, and produce such documents.

**9. Retransmission and License Agreements (RFP Nos. 44-50, 58-60, 62, 71).** Plaintiffs were ordered to produce complete sets of retransmission agreements on April 13, 2012. Plaintiffs have failed to comply with that order by refusing to produce all such agreements and/or by producing heavily redacted copies of such agreements Plaintiffs must produce the un-redacted retransmission agreements immediately. In addition, Aereo has requested the production of other license agreements relating to the performance, reproduction or distribution of Plaintiffs' programming through any media or platform, including any on-line platform, and DVR or RS-DVR platform. Plaintiffs have claimed they are harmed by the use of Aereo's technology by consumers to access their programming. In part, Plaintiffs have claimed that harm is the result of the impact that the use of Aereo will have on the ability to license their programming on various different platforms. In order to test that theory, it is clear that Aereo is entitled to know the terms of those licenses. Aereo is also entitled to documents regarding the negotiations of both the Plaintiffs' retransmission agreements and other licensing agreements to determine whether the existence of Aereo or other similar technologies has had any effect on those negotiations. Plaintiffs cannot make assertions regarding the manner in which Aereo affects their ability to license their programming and not turn over the documents that allow Aereo to test those assertions.

ABC Plaintiffs have offered a completely self-serving "compromise" designed to give only documents supportive to Plaintiffs' claims. For example, they agree only to produce "representative" examples of licensing agreements—and only those currently in effect. ABC Plaintiffs offer no reasonable justification for not producing all license agreements and documents concerning related negotiations. Similarly, WNET Plaintiffs only agree to produce only licenses for distribution of infringed works on mobile devices and over the Internet in place as of March 2012 and aggregate gross revenue from these licenses. This limited information is insufficient to conduct a meaningful analysis.

**Requested relief:** Aereo asks the Court to order Plaintiffs to search for, collect, and produce all retransmission agreements and license agreements, together with related documents concerning negotiations, in unredacted form as well as any and all documents that demonstrate how Aereo caused commercial effects on such agreements.

**10. Advertising Revenue (RFP Nos. 20-22, 26-31, 35, 38, 40, 63, 65, 67, 69-80).** Advertising is the most significant source of revenue for broadcasters. Plaintiffs have argued that their advertising revenue for the programs that have allegedly been infringed is impacted by Aereo because viewers of their programming on Aereo are not currently tracked by Nielsen. As a result, Aereo needs detailed information regarding the advertising revenue generated by the allegedly infringed programs over time to determine what impact Aereo has had, and is likely to have on Plaintiffs' advertising revenue. Plaintiffs have offered only gross advertising revenues on a national basis for 2011 and 2012 (and have not actually produced any such data yet). This does nothing to aid in the critical analysis here. It will not allow Aereo or its experts to analyze any change in revenue as a result of Aereo's launch, or to determine whether any change in advertising revenue is a result of other factors, like increased competition from other forms of entertainment (like cable outlets, independent Internet content, and other distribution platforms—like the Internet, Slingbox and DVRs—that have gone unchallenged by Plaintiffs).

**Requested relief:** Aereo asks the Court to order Plaintiffs to search, collect, and produce across all repositories, information sufficient to identify: (i) advertising revenue, per program, per month, (ii) any documents that concern the impact of Aereo, as well as similar technologies, on advertising revenue, (iii) the methods and results of plaintiffs measurement of viewership, (iv) how those measurements and results impact advertising revenue, (v) whether there has been analysis of the viability of measuring the audience for users of Aereo's remote antenna technology, and (vi) whether in negotiations with any advertisers Aereo or similar technologies have been considered and discussed.

**11. Ad-Skipping (RFP No. 76).** WNET Plaintiffs have made claims that consumer use of Aereo and certain other technologies to record programming and

view it at a later time infringes Plaintiffs' reproduction rights and causes Plaintiffs significant harm. In part, those claims are based on a presumption that consumers who view programming they have recorded have the ability to fast-forward through television commercials ("ad-skip"), potentially reducing the value of (and the amount advertisers are willing to pay for) advertising time on Plaintiffs programs.[20] As a result, documents analyzing the practice of ad-skipping using different technologies , the manner in which consumers interact with recorded programming using DVRs, remote-DVRs and other similar technology and the nature of communications with advertisers on these points will provide information regarding the current value of the programming is, and (consequently) how the addition of the Aereo technology to the range of technological options could impact that value. Because any such research is directly relevant to claims asserted by Plaintiffs, they must produce responsive documents.[21]

**Requested relief:** Aereo asks the Court to order Plaintiffs to search, collect, and produce across all repositories, information sufficient to identify what effects and commercial impacts ad-skipping causes, broken down by device and platform.

**12. Revenue, Expenses, Profit and Loss Per Alleged Copyrighted Work (RFP Nos. 58-60, 62-68, 72-75).** For each alleged copyrighted work asserted against Aereo, Aereo is entitled to understand, over time, the: revenue, sources of revenue, expenses, profit and losses (including how profit and loss is derived). This information is relevant to asserted damages (statutory or otherwise) as well as the fourth fair use factor.

Plaintiffs have refused to provide virtually all of the requested discovery,[22] despite the fact that this information is relevant for two reasons. First, the law is clear that the fact finder may consider actual damages and lost profits in determining the proper amount of statutory damages to be awarded. *See e.g.*, *Yurman Designs Inc. v. PAJ,*

---

[20] Notably, this is another area in which Mr. Wurtzel's public comments contradict Plaintiffs' position. Mr. Wurtzel has said that even with the ability to ad-skip, people still watch commercials and the networks have been successful in proving this to the advertisers.

[21] Plaintiffs' proposal to produce only reports from 2011 and 2012 that pertain to remote-DVRs is unreasonable because ad-skipping is not limited to remote-DVRs, the technology to do so has been available for much longer than two years, and Plaintiffs undoubtedly studied it for much longer than two years. Such limitation is unjustified and likely calculated to hide documents that may support Aereo.

[22] Plaintiffs' proposal to produce only information that supports their claims, (*e.g.* "documents sufficient to show the harm Aereo causes," *see* ABC Plaintiffs' Responses to Documents Requests 62, 66-70, 72-75) and/or high level "aggregated" information is insufficient. Aggregate reports may show fluctuations in overall revenue, including for reasons that have nothing to do with the works-in-suit or the Aereo technology. Aereo is not looking for every invoice and payment, but rather summaries, but it is entitled to discovery beyond Plaintiffs' self-serving limitations, in order to test the Plaintiffs' allegations.

*Inc.*, 93 F. Supp. 2d 449, 462 (S.D.N.Y. 2000), *citing Dumas v. Dagl*, No. 88-CIV-2293, 1990 WL 258343, at *5 (S.D.N.Y. May 22, 1990). Thus, even though Plaintiffs have stated their intention—but not committed to this election to the Court—to seek statutory damages, documents related to actual harm and damages remain potentially relevant and Plaintiffs must produce them.

Second, the requested documents bear on other issues in the case. The WNET Plaintiffs have alleged secondary infringement, which raises the issue of whether a consumer's use of Aereo's technology constitutes fair use. Plaintiffs essentially ignore the point that any harm or financial damages —or lack thereof—that Plaintiffs suffer from consumer use of their remote antenna and DVR is directly relevant to the fourth factor of the fair use analysis under 17 U.S.C. § 107. *See Amsinck v. Columbia Pictures Industries, Inc.*, 862 F.Supp. 1044, 1049 (S.D.N.Y. 1994) (noting that the less adverse impact on the owner, the less public benefit need be shown to sustain non-commercial fair use). Therefore, Aereo is entitled to discovery on the effect that Aereo may have on the value of the individual works that it is alleged to have infringed, including for example, whether any program has lost advertising revenue or its marketability or profitability has otherwise been affected.

In addition, Aereo certainly is entitled to this discovery to challenge the testimony of Plaintiffs' employees who, at the preliminary injunction stage, made unsupported and conclusory claims to the Court that, because of Aereo, the retransmission and other licensing fees that they can derive from their copyrighted works were seriously and adversely affected. We know there is contradictory evidence from the Plaintiffs given that Les Moonves, Chairman of CBS, stated, less than two months later, on an earnings call his belief that Aereo would not affect CBS: "The people who have cried, 'Oh my god, this [Aereo] could hurt retransmission' are really exaggerating greatly,' [i]t is not something I lose sleep over even for five minutes." *See* http://paidcontent.org/2012/08/02/les-moonves-on-aereo-its-not-something-i-lose-sleep-over/, visited January 22, 2013.

> **Requested relief:** Aereo asks the Court to order Plaintiffs to search and produce across all repositories, information sufficient to identify on a per program and monthly basis: (i) total revenue, (ii) sources of revenue (e.g. retransmission fees, advertising revenue, licensing) and the platform to which they are attributable, and (iii) expenses, broken out by platform, profit and loss by platform (together with information sufficient to understand how profit and/or loss is derived). This information is important for Aereo and its experts to be able to analyze, particularly over time, to understand the impact, or lack thereof, that the Aereo technology—or similar technologies—had on Plaintiffs.

> **13. Damages and Commercial Impact Generally (RFP Nos. 35, 38, 40, 41, 50, 62-80).** To the extent that it is not otherwise captured above, Defendants should be required to produce all documents and information across all repositories that concern

how the Aereo technology causes harm and commercial impacts over and above other related and accepted technologies such as consumer in-home antennas, DVRs, remote DVRs and place and media shifting devices including SlingBox and dongles. To defend this case, Aereo must be able to understand and identify the particular harms and impacts of which Plaintiffs complain and how those harms are different than the effects of existing technology long accepted in the market. Plaintiffs have agreed to produce only documents sufficient to show the manner in which Aereo harms Plaintiffs. In other words, Plaintiffs will only produce documents that support their case. In addition, they only agree to produce representative or redacted licensing agreements and national "net gross" [sic][23] advertising revenues for broadcast networks. This is clearly inadequate.

**Requested relief:** Aereo asks the Court to order Plaintiffs to search, collect and produce across all repositories, information sufficient to identify what harms and commercial impacts Aereo causes that are distinct from the impacts and effects caused by these other related technologies such as antennas, DVRs, remote DVRs, and place or media shifting devices such as SlingBox or dongles, as well as for each asserted copyrighted program information sufficient to identify the specific and detailed financial impact on the profit for that program resulting, specifically and only, from the Aereo technology.

**14.    Lobbying (RFP No. 17).** Plaintiffs broadcast their over-the-air signals pursuant to federal licenses. In addition, Plaintiffs' rights with respect to must-carry provisions and retransmission agreements are largely governed by Congress and the FCC. Given that Plaintiffs' claims and Aereo's fair use defenses rely on the various broadcast and licensing rights granted by Congress and regulated by the FCC, the positions that Plaintiffs have taken with those bodies on the proper scope of their rights and obligations  with respect to technologies similar to Aereo are directly relevant to Plaintiffs' claims.  Plaintiffs have refused to produce any such documents except documents from 2011 or 2012 that mention Aereo directly (but, notably, they have not even produced those documents). This is not sufficient.

**Requested relief:** Aereo asks the Court to require plaintiffs to produce documents regarding their lobbying efforts that relate to Aereo but also with respect to similar technologies (e.g., DVRs, remote DVRs, Slingboxes and other like technologies), including communications with the FCC, the Copyright Office and members of congress and their staff.

**15.    Ownership (RFP Nos. 51-57, 61).** It is axiomatic that in order to state a claim, Plaintiffs must prove ownership of each of the works they allege have been infringed. *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).

---

[23] Because WNET Plaintiffs use the phrase "net gross," Aereo does not know if they intended to offer net revenues or gross revenues. Neither would suffice.

As a result, Plaintiffs must produce documents that establish such ownership. Plaintiffs' have refused to provide anything beyond registrations unless ownership is facially unclear or Aereo can establish a "reasonable basis" for challenging the work. This position cannot be justified. Indeed, it is backwards. Certificates of registration are merely prima facie evidence of ownership that may be rebutted. *Nicholls v. Tufenkian Import/Export Ventures*, 367 F. Supp. 2d 514, 520 (S.D.N.Y. 2005). There may be documents that indicate assignments, limited ownership rights or other challenge or defects to their assertions of ownership. It will be nearly impossible for Aereo to challenge ownership, which it is entitled to do, with only the registration. As a result, Plaintiffs must produce all documents directly bearing on their ownership of all rights in the works in question.

**Requested relief:** Aereo asks the Court to order Plaintiffs to search, collect, and produce across all repositories, information related to the ownership of those programs they claim have been infringed. This includes not only registration certificates themselves, but the applications for registration, any and all assignments related to such programs, any documents related to any challenges or dispute related to some or all of Plaintiffs' ownership, and any other documents that relate to Plaintiffs' actual ownerships of the works in question.

## DEPOSITIONS

Plaintiffs' stonewalling on document discovery has frustrated discovery entirely. On November 21, 2012, Aereo timely noticed Fed. R. Civ. P. 30(b)(6) depositions of each Plaintiff as well as certain third party depositions for deposition dates in January. Aereo had to put off the scheduled depositions because Plaintiffs had not produced any substantive documents. Similarly, Aereo noticed depositions of those individuals identified by Plaintiffs in their initial disclosures (and Mr. Wurtzel and Mr. Leslie Moonves) on January 18, 2013, but those depositions also had to be put off due the lack of any documents. Aereo cannot take its Rule 30(b)(6) depositions, or even identify other likely deponents, until and unless Plaintiffs produce their documents.

In contrast, despite having nearly all of Aereo's documents and things, Plaintiffs have only taken one Rule 30(b)(6) deposition on December 5, 2012 and an individual deposition of an employee who works on the Production Database on December 19, 2012. Plaintiffs did not even serve any additional notices of deposition until January 23, 2012, a full week after Plaintiffs asked this Court to extend the discovery deadline or stay discovey.

An issue that has been raised by the parties in their discussions is how many depositions the parties may take. For Aereo's part, merely noticing a single 30(b)(6) deposition of each of the Plaintiffs exceeds the standard 10 depositions that a party may take. Plaintiffs have suggested that Aereo is already over its limit. Given the

size and the nature of the case Aereo obviously should be allowed to take additional depositions. Likewise, with the cases consolidated and the issues overlapping, Plaintiffs should be restricted to a reasonable number of depositions. Aereo hopes to negotiate this issue, however, Aereo notes it as it relates to the document production issue and the parties' respective diligence.

## <u>CONCLUSION</u>

Aereo has proceeded diligently to comply with its discovery obligations both in connection with the preliminary injunction hearing and in connection with the commencement of formal discovery. Consequently, Plaintiffs are in a position where they can schedule and prepare for depositions, prepare their experts and prepare their offense for trial. The issues they are raising now against Aereo are in the nature of ordinary follow-up discovery and Aereo has been diligently complying with those requests while asserting and preserving reasonable objections as appropriate.

In contrast, Plaintiffs have produced almost no meaningful document discovery. They have literally taken the position that they only have to pursue discovery that supports their case and they have not even produced that. Accordingly, Aereo does not have the information required to properly prepare for depositions, initiate follow-up discovery, prepare its experts—particularly as to damages and commercial impact—or defend itself at trial. As the Court knows, the ABC Plaintiffs even took the position, after obtaining virtually all discovery from Aereo, that we should stay the case, thus seeking to essentially prevent all discovery against them. Aereo asks the Court for its assistance in restoring balance and a level playing field and requiring Plaintiffs to comply with the rules of civil procedure. There will certainly need to be an extension of the present fact discovery deadline, at least for Aereo, but Aereo asks that any extension be co-extensive with an order requiring Plaintiffs to produce the documents outlined above no later than ten days from the time an order is entered.

Very truly yours,

/s/ R. David Hosp

R. David Hosp
Principal