DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel 212 909 6000
Fax 212 909 6836
www.debevoise.com

January 16, 2012

BY E-MAIL

Hon. Alison J. Nathan
United States District Judge
Southern District of New York
500 Pearl Street, Rm. 615
New York, New York 10007

**American Broadcasting Companies, Inc. et al. v. Aereo, Inc.,
12 CV 1540 (S.D.N.Y.) (AJN)**

Dear Judge Nathan:

The ABC Plaintiffs agree with the central point made in the WNET Plaintiffs' January 16, 2013 letter: Fact discovery cannot be completed in the next five weeks. They continue to believe, however, that it makes much more sense for the Court to stay this matter until May 15, 2013, rather than extend the current fact discovery deadline until that date.

As the Court may recall, at the September 19, 2012 conference, the ABC Plaintiffs expressed their view, given the Second Circuit's expedited treatment of the appeal in this matter, that it made more sense to defer the costs and burdens of discovery until after the Second Circuit ruled. 9/19/12 Tr. 14:19-16:13. The Court's decision not to adopt that approach was driven, in large part, by what was, at that time, complete uncertainty as to how long it might be before (a) argument was held and (b) a decision issued. *Id.* 14:12-18; 47:19-22.

Part of that uncertainty has been eliminated since September. On October 4, 2012 (almost a month before briefing of the appeal even had been completed), the Second Circuit underscored its decision to treat the appeal expeditiously by setting November 30, 2012 as the argument date. 12-2807-cv, 2d Cir., Dkt. 141. (A copy of the transcript of that argument is attached.) It also is worth noting that in the somewhat similar *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012) matter, the Second Circuit issued its decision 89 days after argument – in a non-expedited appeal. Moreover, Judges Chin and Droney, two members of the *ivi* panel, also heard the appeal in this matter, along with Judge Gleeson of the Eastern District of New York. Finally, the Second Circuit's docket shows this Panel already has ruled in three other matters argued that day. Summary Order, *Woodard v. Shanley*, No. 12-361-pr, 2012 WL 6176756 (2d Cir. Dec. 12, 2012); Summary Order, *United States v. Alhakk*, No. 12-155-cr, 2012 WL 6176742 (2d Cir. Dec. 12, 2012); Summary Order, *United States v. Marimon*, No. 11-4921-cr, 2012 WL 6720523 (2d Cir. Dec. 28, 2012).

Regardless of the exact date by which the Second Circuit rules, there is no disputing its decision – however it comes out – will shape the scope of discovery in this case – perhaps eliminating the need for it entirely. For the reasons set forth in your decision, *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 397-402 (S.D.N.Y. 2012), all of the Plaintiffs still continue to suffer irreparable harm. Nonetheless, the ABC Plaintiffs do not believe that, at this point, a 120-day stay until May 15, 2013 will seriously exacerbate the harm suffered to date. Despite claiming it will expand nationwide, Aereo continues to retransmit broadcast television programs from New York City stations only.

In addition to these practical reasons for a short stay of this action until May 15, 2013, there is the additional benefit of avoiding the contentious back and forth on the merits of the discovery disputes that have arisen. The ABC Plaintiffs completely agree with the WNET Plaintiffs that Aereo appears to have adopted a strategy of seeking to penalize Plaintiffs for having sought to protect their copyrights with overly broad and burdensome requests. One example of its unprecedented and extraordinarily burdensome approach was Aereo's insistence on a privilege log that would have required logging of even purely internal communications of *any* outside counsel who *ever* has represented *any* of the Plaintiffs or provided advice or analysis with respect to "Aereo and/or similar technologies (e.g., RS-DVRs, TiVo, DVRs, etc)." 1/11/13 Order, 12 Civ. 1540, Dkt. 158, at 3 (noting such a requirement would be "immensely burdensome"). Another is its 92 post-preliminary injunction document requests. By contrast, the two groups of Plaintiffs, pre- and post-preliminary injunction combined, have requested altogether about only two dozen different categories of documents. The WNET Plaintiffs' letter dated January 16 catalogues the other discovery issues in detail, and, of course, Aereo has its own views on the matter. A short stay avoids the need for the Court to sort through these disputes and allows time for the Second Circuit to rule and guide the scope of further discovery, if any, as this matter proceeds.

Respectfully submitted,

Bruce P. K

Bruce P. Keller

cc: All Counsel of Record

Attachment

# In The Matter Of:

*WNET, THIRTEEN, et al.*
*v.*
*AEREO, INC., F/K/A BAMBOOM LABS, INC.*

---

*HEARING - Vol. 1*
*November 30, 2012*

---

MERRILL CORPORATION
LegaLink, Inc.
179 Lincoln Street
Suite 401
Boston, MA 02110
Phone: 617.542.0039
Fax: 617.542.2119

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

-----------------------------------x

WNET, THIRTEEN, FOX TELEVISION STATIONS, INC., TWENTIETH CENTURY FOX FILM CORPORATION, WPIX, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK LIMITED PARTNERSHIP, AND PUBLIC BROADCASTING SERVICE,

Plaintiffs-Counter-Defendants-Appellants,

v. 12-12786-cv

AEREO, INC., F/K/A BAMBOOM LABS, INC.

Defendant-Counter-Claimant-Appellee.

-----------------------------------x

AMERICAN BROADCASTING COMPANIES, INC., DISNEY ENTERPRISES, INC., CBS BROADCASTING INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA, LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK TELEVISION, LLC, TELEMUNDO NETWORK GROUP, LLC AND WNJU-TV BROADCASTING, LLC,

Plaintiffs-Counter-Defendants-Appellants,

v. 12-2807-cv

AEREO, INC.,

Defendant-Counter-Claimant-Appellee.

-----------------------------------x

November 30, 2012

500 Pearl Street
New York, New York

B E F O R E:
JUDGE DENNIS CHIN
JUDGE CHRISTOPHER DRONEY
JUDGE JOHN GLEESON

ERIC J. FINZ, Hearing Reporter

P A R T I E S:
PAUL M. SMITH, ESQ.
BRUCE P. KELLER, ESQ.
R. DAVID HOSP, ESQ.

PROCEEDINGS

JUDGE CHIN: We have sitting with us again today Judge Gleeson from the Eastern District of New York, and we are grateful for his assistance.

I understand that everyone is here. Accordingly, we'll hear the first cases in tandem.

MR. SMITH: Good morning, your Honors, I'm Paul Smith, representing the WNET appellants in this case.

Congress in the 1976 Copyright Act overruled the Supreme Court and provided services that retransmits broadcast television programs to subscribers is engaging in public performance of those programs and needs a license to retransmit.

Aereo is a business that receives and retransmits broadcast television programming over the internet to its subscribers for a fee. It nevertheless claims to be

PROCEEDINGS

exempt from the rule barring unlicensed retransmission services, primarily arguing that this court in Cablevision carved out an exception to the rule whenever the unlicensed retransmission service takes the trouble to pause and make a copy of the program, interposing that in the screen before sending it on to each individual subscriber.

It also seems to argue that it's not really a retransmission service at all and it is instead a provider of access to equipment that it leases to subscribers who them use it themselves.

Neither of these arguments has my basis in the statute. Indeed, if accepted, either of them would effectively overrule Congress's determination in 1976 that people should not be able to profiteer from broadcast television

PROCEEDINGS

programming by retransmitting it for a fee to their subscribers. The regime that existed before the '76 Act under Fortnightly and Teleprompter would be restored.

Now, regarding Cablevision, I think it's important to understand, and focus on the fact that the issue before the court there was very different from the one here. What you had there was a licensed retransmission service, not an unlicensed retransmission service. Cablevision was a cable company, so it had a license to do the straight through transmissions of all the programs. And the only issue before the court was whether it needed a second license when it was providing the DVR functionality not at the set top, but at the server level.

And the court came to the conclusion that if you focus just

PROCEEDINGS

on that single transmission from the personalized copy to the subscriber, to the individual subscriber assigned to that copy, that that could be viewed as a private transmission rather than a public transmission, or private performance rather than a public performance.

But that case is different from this one because what you're dealing with here is an entirely unlicensed service, so everything Aereo does is unlicensed, from the moment it receives the programming over its antennas, the transmissions it makes from its antennas to its servers, where the programming is processed into internet format.

JUDGE DRONEY: How does that matter whether it's a public performance or not?

MR. SMITH: Your Honor, once

PROCEEDINGS

you start looking at the entire service and everything it does, including the servers that all the subscribers share, the antennas that are used, the wires over which the signal goes before there is even a copy made, then I think the picture looks very different.

And the fact that at some point in that process they interpose a copy and then send it on doesn't mean that their entire service becomes a private transmission.

JUDGE DRONEY: How does the fact of a license matter?

MR. SMITH: Well, the license was what confined the attention of the Cablevision panel just to the final end of the transmission.

JUDGE DRONEY: Is that the basis for its decision?

MR. SMITH: I think it is. That's what they were talking

PROCEEDINGS

about.

After all, there was no issue about the other transmissions that were being made by Cablevision or their receipt of the broadcast programming or anything else, it was just focused on that last transmission.

And so the effect of allowing Cablevision to morph into a decision that authorizes what Aereo does of course would be to mean that everybody can engage in license-free retransmission. Because in current technology, it's virtually cost-free to put these copies of the stream and therefore there would be a whole regime of how television is delivered to people over cable, over satellite, with retransmission consent, with license fees that are paid, that whole thing --

JUDGE CHIN: What about the

PROCEEDINGS

argument that Aereo is simply just providing the equipment that arguably as a technological matter you could take these little antennas and put them on to your home computer and accomplish the same thing, would that make it closer to Cablevision?

MR. SMITH: Your Honor, the notion that you can be a service that serves multiple people and provide some access to distant programming like this and still say all you are is an equipment provider, that argument first was overruled by Congress.

That's essentially what the cable companies argued in Fortnightly and in Teleprompter, that they were just facilitating the subscribers' receipt of television over antennas, and that they were not themselves engaged in any kind of performance.

Page 10

PROCEEDINGS

And the Congress said no, you are not, you're a service that is performing the shows, when you take it in on your antenna and send it on.

And the fact that there are individual antennas can't change that analysis. First of all, in the Transmit Clause Congress was as broad as it possibly could be, said any device or process that involves transmitting programs on to subscribers.

JUDGE DRONEY: How about the unique copies, isn't each recipient of the Aereo service getting a unique copy?

MR. SMITH: There is a copy that's created in the stream of transmission.

JUDGE DRONEY: For each individual; right?

MR. SMITH: Yes, that's the legal issue we're presented with,

Page 11

PROCEEDINGS

whether that can change the analysis.

As a practical matter what that would mean if it does change the analysis is that Congress's determination in 1976 is overruled; there will be no more licensing of retransmission services because everyone will start doing it.

JUDGE DRONEY: Wasn't that the basis of the Cablevision decision, that each was a unique copy thereto?

MR. SMITH: In that particular context where all they were focusing on was that one transmission from that copy that had been created adjunct to a licensed service. But if you're going to allow them to do everything that a retransmission service does, from taking it in on antennas, processing it, having the website where people order it up

Page 12

PROCEEDINGS

and send it on, including live, effectively, so that the copy isn't even perceptible to the user, well, that's a very different proposition. It takes Cablevision and turns it into a complete carte blanche for people to abuse the copyright.

JUDGE GLEESON: Are you familiar with the device called the Slingbox?

MR. SMITH: I am, your Honor, yes.

JUDGE GLEESON: Now, if I were able to afford one, it would allow me to be able to take a broadcast and convert it something on my laptop.

MR. SMITH: It would allow you to take a broadcast and send it on to the internet to one of your devices, yes.

JUDGE GLEESON: That wouldn't be a public performance, my viewing

Page 13

PROCEEDINGS

of it on my laptop would not be a public performance?

MR. SMITH: The use of a Slingbox may or may not involve some copyright infringement. It would not be a public performance, that's correct.

JUDGE GLEESON: The potential audience is just me.

MR. SMITH: That's correct.

JUDGE GLEESON: Your argument I don't think takes sufficient account of the fact that Cablevision is part of the landscape. And once you take that kind of Slingbox phenomenon and then push it back upstream and have it be provided, here by Aereo, in just the same way that Cablevision provided the DVD function, it sure looks like you've got a problem with the Cablevision case.

MR. SMITH: But again, your Honor, even before, before you get

Page 14

PROCEEDINGS

to the creation of the copy and the sending it out over the internet, there is a lot of things that Aereo's already done, including transmissions inside its own facility to get the thing to the server where it's converted into internet format.

And all of those things exist separate and apart from any copy that is made, and are not individualized in the same way, there is no preceding copy.

JUDGE GLEESON: But before it goes to one of its subscribers, is an individualized copy made with a separate hard drive allocable to that subscriber?

MR. SMITH: That's correct, yes.

And the legal question is whether you're going to read that in light of the statute. The statute, after all, makes it

Page 15

PROCEEDINGS

perfectly clear that Congress intended to cover this --

JUDGE GLEESON: I get your argument.

Can we do this consistent with Cablevision?

MR. SMITH: I think this is an important element of how far decisis works. If you have a statutory interpretation by a prior panel that includes some language that covers lots of different other factual situations, that when you get to those other factual situations, and it's perfectly evident that to apply that broad language to those situations you would be acting inconsistent with the statute, then that broad language becomes dictum to the extent it applies to these other fact situations.

I don't think a panel can bind subsequent panels with respect to

Page 16

PROCEEDINGS

factual situations entirely different from the one before the court.

As the fly on the wall put it, it's actually inadequate, the precedent has to be viewed in light of the facts before the panel. Otherwise you say well, you have to follow the law. But the law here is a statute. And Congress could not have been more clear that it intended not to allow people to engage in retransmission businesses of this kind.

Now, they didn't anticipate specific individual copies because this was 1976, but they did say whether it's live or time delayed, it doesn't matter whether it's individual streams, it doesn't matter whether it goes at the same time or different times, same places, different places, any device or process, legislative

Page 17

PROCEEDINGS

history says we're trying to be as absolutely broad as we can because of the kinds of technological advances that are coming, we still want retransmission has to be something that you need to pay for. Because you're profiteering on somebody else's property.

So if this panel says we are bound by this language that was applied to a completely different fact situation, then what you're doing is you're following, I would submit, is dictum, to the extent that that broad language is applied here in this context, you're feeling as if you're bound by something that that panel did not have the authority to bind you on, because they did not have these facts before them at that time.

JUDGE CHIN: You have some rebuttal time. We'll hear from your colleague, Mr. Keller.

PROCEEDINGS

MR. SMITH: I appreciate it, your Honor. Thank you.

MR. KELLER: May it please the court, I'm Bruce Keller, I represent the ABC parties in 2807.

I have three points to make that I hope you'll find complement those made by Mr. Smith. The first is about the Transmit Clause, it's foundational in nature. The second is about Cablevision, it's interpretive, I think those are some of the questions Judge Gleeson was asking. And the third is about Aereo, and it's based on the record.

The Transmit Clause point is really this: When Congress enacted the Transmit Clause it was declaring to businesses that publicly performed copyrighted works are infringing, and if they make their customers capable of receiving transmissions or

PROCEEDINGS

retransmissions of copyrighted performances, regardless of the technology, that business is being outlawed.

And at the core of the Transmit Clause are services that retransmit over-the-air radio or television broadcasts. Every case that has addressed a retransmission of either a radio or television broadcast has concluded it's a violation of the Transmit Clause. Legislative history is clear on that, the Kirkwood case, the FineTime 24 case from this circuit is clear on that.

And to make sure that retransmitters are swept up within the Transmit Clause, Congress instructed courts to reject the 1960s era defense that if all we do is enable someone who otherwise could receive that performance, if we just facilitate what they could

PROCEEDINGS

do for themself, that's not a performance. Congress said it is a performance and if you do it for all of your paying subscribers, that's a public performance.

In other words, the stand in the shoes of the consumer defense was rejected through the new Transmit Clause, that's what Kirkwood/Infinity Broadcasting so holds at pages 108 and 112.

The second point is that Cablevision did not change that Transmit Clause juris prudence. And here's why: The Cablevision panel concluded that the RSDVR service before it was a storage service, not a retransmission service. It was not a retransmission of performances.

And that's why the unique copies that they found meaningful there don't make a difference here. In that remote storage DVR case,

PROCEEDINGS

you could not, for example, watch the Super Bowl --

JUDGE CHIN: There is a storage aspect to the Aereo system?

MR. KELLER: There is a storage aspect to the Aereo system, it is one that they downplay to the virtual exclusion of their retransmission service.

And it is absolutely clear from their own advertising and from the record that they enable their subscribers to watch the Super Bowl as it is broadcast.

JUDGE GLEESON: But even in the watch mode they can stop, they can pause, rewind. Correct?

MR. KELLER: Yes, that is true.

But the Transmit Clause says it doesn't matter when a subscriber, how a user watches a program, we're concerned with whether a retransmitter is

PROCEEDINGS

retransmitting that program.

And the difference between Cablevision and Aereo in this regard is crisp. You could not watch the Super Bowl in real-time as a retransmission of a copyrighted performance through the RSDVR service.

JUDGE GLEESON: How about my Slingbox example, they can, and that's not a public performance, right?

MR. KELLER: So I took your point about the private nature of Slingbox. I think Mr. Smith made clear it's not been tested yet, there is no precedent, there is no court ruling on it.

JUDGE GLEESON: It's hard to figure why any precedent would be construed in such a way to render that a public performance.

MR. KELLER: I'm not arguing whether it is or it isn't.

PROCEEDINGS

I think the bigger point is under the Second Circuit precedent, Kirkwood matters. Kirkwood says that what a consumer might be able to do on his or her own with a piece of equipment is one thing. Cablevision basically says the same thing when it uses the VCR analogy as the analogy that governs the day.

It's another thing when a third party commercial service insinuates itself into the process, they don't get to stand in the shoes of what you could do if you could afford the Slingbox.

JUDGE CHIN: How is the Aereo system different from the Slingbox system as a factual matter?

MR. KELLER: I think that the difference between the Aereo system is that it is a full-fledged service. There are a number of findings in the District Court's

PROCEEDINGS

opinion --

JUDGE CHIN: With a Slingbox you're getting a transmission in some other way, not through --

MR. KELLER: Not through the system.

So what drove the Second Circuit in Cablevision was this notion that the RSDVR service was a storage service. That led directly to the analogy of the VCR in your home moved upstream.

And the Second Circuit concluded that because it was not a retransmission service, it was not a public performance at the point at which you played back what you previously had.

JUDGE DRONEY: So in the Aereo system, if you hit pause on the watch mode for five seconds, is it still a public performance after that or is that a unique copy after you do that?

PROCEEDINGS

MR. KELLER: The unique copies don't matter here when the system enables the subscribers to watch it.

JUDGE DRONEY: It's a private performance then. If you are in a watch mode, you pause it for five seconds and resume watching, does that now become a private performance?

MR. KELLER: No. Because -- and Congress, this gets to the point earlier, Congress contemplated technological devices evolving over time. They said, doesn't matter how you do it. Any device or process that facilitates the retransmission is going to be swept up in the Transmit Clause.

And then went further. It said not only that, you could retransmit at different times, same time, different places, same places, all of it is embraced. The

PROCEEDINGS

eye is on the retransmission service and what it does in terms of retransmitting the initial copyrighted performance.

And the difference between the Cablevision decision and this case is the difference between storage and retransmission.

And how do we know that, we know that from what the Second Circuit subsequently said in the ASCAP case. Because in ASCAP they drew the same distinction between a musical file download, a stored copy of something that was sent on but not in any way that could possibly be perceived, according to the ASCAP panel, as a performance, in a stream. Which they said could very well be a performance.

But Cablevision went further, and this is really crucial. Not only did it distinguish between storage and retransmission, it said

PROCEEDINGS

we are not going to lay down a rule that all unique copies always render something a private performance.

They did it at least three places in the opinion. The first was saying that copies may be relevant to whether or not something's a private performance, based on whether they truly play an audience-limiting function.

Then they said, and another thing, not only is it just relevant and not determinative, they qualified that statement in the very next paragraph when they said, and by the way, we're not analyzing the concept of to the public for all purposes, we are not analyzing the contours of to the public in any great detail.

And then it went on on the very next page to say even more about how cabined they were making

PROCEEDINGS

their decision. They said a different delivery system design may well result in a different analysis of whether there is a public performance.

So they started with the VCR analogy because it was a storage system. They didn't exculpate all retransmission services because they used unique copies, and they warn that different designs may matter. And here you have a very different design.

Which takes me through the third point about Aereo and the record.

Aereo is at the heart of the Transmit Clause because they admit that they are a retransmission service. Super Bowl comes in, Super Bowl goes out, all within seconds. They advertise themselves as a service that you can use to watch television without cable. No

PROCEEDINGS

cable required. Broadcast TV is right on its home page.

That's at pages 15 -- well, page 55 of the record, and Mr. Kanojo said it on the stand at pages 1570 to 71 of the record.

And it's in its very positioning statement. Aereo is a retransmission statement by its own design. And because it doesn't break the retransmission chain, which the Second Circuit found was broken in Cablevision because of the act of storage, and then the subsequent act, private playback, on those facts Aereo does not get the benefit of the Cablevision analysis.

I reserve some time.

JUDGE CHIN: Yes.

MR. KELLER: Thank you very much.

MR. HOSP: Your Honors, David Hosp for Aereo.

PROCEEDINGS

May it please the court, I will respond to a number of the comments that have been made by both attorneys for plaintiffs.

But first, I'd like to make five basic points with respect to this case. First, I think you heard this from opposing counsel, consumers have the right to make private performances. They have the right to use an antenna, they have the right to use a DVR, and they have the right to use a Slingbox type system, an internet connection that allows them to make private performances.

Second, supplying the technology to accomplish this does not constitute a violation of the private performance right. And particularly it does not constitute a direct infringement of any copyright. And that is the only thing that has been challenged

PROCEEDINGS

here, is a direct infringement --

JUDGE CHIN: Do you concede that Aereo is transmitting?

MR. HOSP: Consumers in the Aereo system transmit a copy of --

JUDGE CHIN: My question is, do you concede that Aereo is retransmitting -- that Aereo captures broadcasts and then retransmits them?

MR. HOSP: No, your Honor.

Aereo transmits a copy that has been made by the consumer. That's what's done using the Aereo system. And that is, it's a significant difference.

I take your Honor back to the ASCAP decision --

JUDGE CHIN: How does the consumer -- are you suggesting the consumer is making the copy on her own, or is it doing with it with the assistance of Aereo?

MR. HOSP: Well, your Honor,

PROCEEDINGS

Judge Nathan in her decision was very clear that in fact a consumer makes the copy. She said, whether a user watches a program through Aereo's service as it is being broadcast or after the initial broadcast ends, does not change that the transmission is made from a unique copy previously created by that user, accessible and transmitted only to that user.

JUDGE CHIN: Only the prior creation of that copy, the consumer got it from Aereo. True?

MR. HOSP: Yes. The consumer accessed it through the antenna that Aereo provided.

JUDGE CHIN: It seems to me in Cablevision, there was an ongoing relationship between the consumer and Cablevision. The consumer was receiving the broadcast through Cablevision. Cablevision as a cable provider had the right to do

PROCEEDINGS

that. And then the consumer is making a copy. Instead of doing it in his living room, he's doing it through machinery at Cablevision.

Here there is no ongoing relationship or prior relationship with Aereo. And it's that first capturing of the broadcasting that results in the consumer having it.

So why doesn't that make this case different from Cablevision?

MR. HOSP: It doesn't because the Cablevision court specifically addressed that issue. In fact, it was an issue that was raised by the plaintiffs in that case.

What the plaintiffs said was, in fact they argued to this court, the transmission, where Cablevision split the stream and directed that stream into the RSDVR system, the plaintiffs themselves said that's unlicensed, that's completely out of bounds, nothing that they do

Page 34

PROCEEDINGS

within the RSDVR system is licensed at all.

And this court accepted that. It accepted them at their word, and they said --

JUDGE CHIN: But the plaintiffs were unsuccessful on that point.

But before it got to the point where they were separating the stream, there was a license for that. And doesn't that make this case different?

MR. HOSP: Your Honor, it doesn't make this case different because the transmission that this court considered in Cablevision was the transmission from the individual copy to the individual. And basically what Cablevision said was, the court accepted the plaintiffs' argument that in fact the transmission, the splitting of the stream that went into the RSDVR

Page 35

PROCEEDINGS

system, was not licensed.

And what Cablevision said was, you know what, that doesn't matter. It doesn't matter whether or not that stream is licensed or not, because ultimately the only thing that we're looking at is the nature of the transmission itself.

And the transmission at issue, and this is the fundamental holding of Cablevision, but not just Cablevision, it's the fundamental holding, it's one of the fundamental holdings of ASCAP too. It is that a transmission from an individual copy to a single individual is not a public performance.

JUDGE DRONEY: Let's talk about the individualization of this. Let's hypothetically say Monday Night Football, Giants/Redskins, next Monday, 5,000 Aereo customers are watching it on

Page 36

PROCEEDINGS

their watch function. And none of them has paused it.

Aren't those 5,000 people seeing the exact same thing at the exact same time?

MR. HOSP: They are not, actually. And this was a finding that the court made.

In fact, what happens in the Aereo system is a consumer logs on, they are assigned an antenna. And that individual antenna receives its own individual signal.

And what was shown at the hearing was in fact the signals that are generated in each individual's antenna are different. There was actual, an actual factual determination, there was evidence that showed that in fact antenna A is generating a slightly different signal from antenna B.

JUDGE DRONEY: How is it different?

Page 37

PROCEEDINGS

JUDGE GLEESON: Redskins might win in some homes but lose in others?

MR. HOSP: They might. It might be broadcast differently down in Washington.

No, what was the difference is, again, they're not differences that make a significant impact on the perception and what you are actually sort of seeing.

JUDGE DRONEY: People have different quality TVs too. How is what they're watching different? If they're just on their watch function, they haven't paused it, aren't they seeing the same 3rd down and 3 play at the same time as the 4,000 other customers?

MR. HOSP: Again, they may be viewing it at the same time.

But under Cablevision and under ASCAP what they are viewing, what is being transmitted to them

PROCEEDINGS

is different from what is being transmitted to others.

JUDGE CHIN: You're saying that's an individualized copy?

MR. HOSP: Yes, exactly.

It is both an individual -- --

JUDGE CHIN: Does that make any sense? Millions of people are watching the football game, they get it through Aereo, and put aside the record function, and that's not getting a retransmission from Aereo? That's the position?

MR. HOSP: Under the Transmit Clause, and under particularly --

JUDGE CHIN: But as a matter of common sense. Is it at all logical that, you know, the 25,000 people who are watching it individually on their, through their Aereo system, that they are watching an individualized copy and they're not watching the football game?

PROCEEDINGS

MR. HOSP: It is logical based on the system that Congress put in place.

This all goes back to the Transmit Clause, and what the Transmit Clause says is, that the performance at issue --

JUDGE CHIN: What if you took away the record function completely, and this were just a system for streaming and watching. Like I view. Is that -- and that's perfectly fine?

MR. HOSP: No, no. If you're talking about a streaming service where there is no fixed copy that's being made, then no, that is a public performance issue.

You could see this distinction with respect to --

JUDGE CHIN: But if you take away the record function, instead of two buttons your only choice is to watch, you're saying it still

PROCEEDINGS

would be consistent with the Copyright Act because it's still a copy. Is that the position?

MR. HOSP: Your Honor, just to clarify your hypothetical.

Are you saying that there is still a fixed copy that is cognizable?

JUDGE CHIN: Exact same technology, except that the consumer, the Aereo subscriber does not have the option of hitting a record button. All he can do is watch.

MR. HOSP: That would be a very, very different situation. Because there -- and again, the real question, under Cablevision and ASCAP is whether or not a fixed copy is made. Which is different from a streaming situation.

JUDGE CHIN: The exact same technology except you're not giving the option of letting the person

PROCEEDINGS

record it. Otherwise the technology is the same, in terms of the copying, et cetera, that's all the say.

Would that violate the Copyright Act?

MR. HOSP: If there was -- again, if there is a fixed copy being made, then no, it would not.

Under Cablevision, under my reading of Cablevision, again, you don't need to reach that question because that's not the question that's presented in this case.

But under my reading of Cablevision, what Cablevision says is where you have a unique fixed copy, you now have a reproduction issue. But it's no longer a public performance issue.

And again, coming back to ASCAP, think about it, you're sitting at your computer and you want to listen to a song, you want

PROCEEDINGS

to listen to a song right now. You've got two ways to do it. You can stream it, and if you stream it what's happening is you are actually streaming it from a common copy that other people have access to. And that's a public performance issue. It's not a reproduction issue, because there is no fixed copy that's being made.

The other way you can listen to music right now is to download it. And what you do is you download it, it takes a couple of seconds, there is a couple of seconds delay, and then when you play that, again, within a couple of seconds, what you are playing is an individual copy.

And that's the circumstance that ASCAP, this court examined in ASCAP. What this court said was, you know what, that's not a public performance. It doesn't matter,

PROCEEDINGS

because now you've got a copy issue. You've got a reproduction right issue. These are two rights that work in tandem with each other.

JUDGE DRONEY: Let me ask you about the antennas.

Would you still be arguing that these are not public performances if instead of all these antennas you just had one? Is the system, without that feature, still not a public performance?

MR. HOSP: Well, again, it's a very different case than what we have here. And we do believe that the antennas matter in this case.

But under the holding in Cablevision, where you're talking about a system like this, where there is an individual copy that is being made, under the ruling in Cablevision, under the law as it

PROCEEDINGS

stands in the Second Circuit, that is, if that individual copy is going directly to only one individual and is only accessed by that individual, what you have is a copy issue.

JUDGE GLEESON: But if it was just one retransmission, you wouldn't win; right?

MR. HOSP: If it was --

JUDGE GLEESON: If you had no individual antennas, no individualized copies, you'd lose?

MR. HOSP: Yes. If it was one antenna and no copies being made, at that point you --

JUDGE GLEESON: Does the provider of Video-on-Demand content create a public performance when it provides a movie to someone in Video-on-Demand?

MR. HOSP: Yes, absolutely.

And that's exactly the same situation that the court, the

PROCEEDINGS

Cablevision court addressed when it talked about the on-command in the Redhorn cases.

JUDGE GLEESON: Would it be different if a provider of Video-on-Demand created an individualized hard drive for each of the subscribers, would they then be creating a private performance and not have to worry about paying royalties?

MR. HOSP: That's exactly what ASCAP is. And what ASCAP held was in that situation where what you have is somebody making an individual copy, what you have is a reproduction right issue. But it's not a public performance right issue.

That is exactly the issue that was decided by this court in ASCAP when it said, you know what, these are two rights that function in a complementary way. And Cablevision

Page 46

PROCEEDINGS

recognized that. Cablevision recognized the notion that it was okay that by creating a copy you no longer had a public performance issue, because you now were creating -- you essentially were picking your poison. You were creating a reproduction right issue.

And what Cablevision says is, that's okay because you have another right to go under.

Now, in this particular case, because of the Supreme Court's decision in Sony, we believe that the consumer making the copy is a fair use. And therefore while it does implicate the reproduction right, we believe that it is not a violation of that reproduction right, because it's foreclosed under Sony.

But that's an issue that's being litigated in the District

Page 47

PROCEEDINGS

Court.

JUDGE DRONEY: Can I get back to my antenna question.

It sounded like you said even with one antenna you'd still be arguing the same position under Cablevision that the individualized copies here do not constitute a public performance. That's what you said, right?

MR. HOSP: Your Honor, if we were presented with that, it's my reading of Cablevision that because there is an individual copy, that it would foreclose a public performance finding there.

JUDGE DRONEY: Even with just one antenna?

MR. HOSP: Even with just one antenna. But again, that is not our situation.

JUDGE DRONEY: So why did you build all these antennas?

MR. HOSP: Well, there are a

Page 48

PROCEEDINGS

number of different reasons.

JUDGE DRONEY: Is there any technological reason for it?

MR. HOSP: There is.

Is there a technological reason in terms of?

JUDGE DRONEY: Does it make the transmissions better? Why do it, why do you spend all the money on all these little antennas when you can do it with one big antenna?

MR. HOSP: It makes it clear that there are in fact two bases for this being legal under the Copyright Act. I mean, that's what Judge Nathan made clear, was that the copies themselves, under the law as it is --

JUDGE CHIN: But it seems you're exalting form over substance. You're going through this fiction of using, you know, a million itty-bitty antennas when really you'd rather do it with one,

Page 49

PROCEEDINGS

just to try to fit within Cablevision.

Isn't that what's happening?

MR. HOSP: No, your Honor.

JUDGE CHIN: No? Is there any legitimate business reason for having all of these little itty-bitty antennas?

MR. HOSP: I guess I'm not --

JUDGE CHIN: Any technological reason.

MR. HOSP: Is there any logical reason?

JUDGE CHIN: Technological reason.

MR. HOSP: Technological reason.

The reason for having the antennas is to comply with the Copyright Act. And we believe that in both instances it complies with the Copyright Act.

And again, this is something, the argument that plaintiffs have

Page 50

PROCEEDINGS

made that the court, the District Court paid too much attention to the form of --

JUDGE CHIN: Let's extend this to books. You send an electronic book to a consumer, you make it a little bit different, you put the purchaser's name on it. Does that now suddenly become a private performance?

MR. HOSP: Well, again --

JUDGE CHIN: Under the logic that you're advocating in this case?

MR. HOSP: Again, with respect to books, the public performance right obviously doesn't apply.

But taking your argument for what I think that you're asking, the answer is yes, this, for example, all comes back to ASCAP. If you basically take it in the music industry situation, yes, what this court held was that where you

Page 51

PROCEEDINGS

make a copy, even if you're listening to it right away, where you make a copy, it's not a public performance anymore. And that's important because you do have another right to go under.

And in fact, when you read the Cablevision decision, at the end of the Cablevision decision, the end of the Cablevision decision makes clear that this court understood exactly what it was doing. This court said, you know what, we're not saying that there is no copyright protection here, we're not saying that there aren't possibilities in many instances where you're not going to have a right either under indirect infringement or potentially under your reproduction right. And that's okay.

And it's important to do that because if you take the flip side,

Page 52

PROCEEDINGS

if you turn it around and you say okay, let's accept, for example, these aggregation arguments. What you're saying is every time somebody goes up on a roof and puts an antenna on a roof and then transmits that signal down to their own television, that's now a public performance because that has to be aggregated with the original broadcaster's performance.

Every single question that is raised by the plaintiffs was actually specifically addressed in the Cablevision decision.

JUDGE CHIN: But that's not what's happening here. Aereo is providing the service so the consumer doesn't have to go up on the roof. And the consumer can stay downstairs.

Why isn't that retransmission?

MR. HOSP: Because the analysis is the same under the

Page 53

PROCEEDINGS

Copyright Act in either instance. What the Copyright Act held is -- what the Copyright Act says, what Congress intended, was for the analysis to be the transmission of the performance, rather than the transmission of the work.

And again, this is really what plaintiffs are asking you to do, is overturn Cablevision. That's what's at issue. And what's being said here is that Cablevision is wrong. We disagree with Cablevision.

JUDGE CHIN: I think the District Judge got it right in Cablevision. But of course we're bound by the Circuit decision.

MR. HOSP: And that really is what's, you know, in this instance it's the sort of thing where --

JUDGE GLEESON: And to put your position as just as bluntly, you seem to be reticent to say it

Page 54

PROCEEDINGS

out loud, the model is built around Cablevision?

MR. HOSP: Yes.

JUDGE GLEESON: You don't have all these little antennas because it makes any sense, it's kind of like constructing your business affairs to avoid taxes. Right? It's tax avoidance is different from tax evasion.

But you built this business and the technology with Cablevision in mind to avoid copyright violations; correct?

MR. HOSP: Everyone in this case agrees that Aereo designed this system to comply with copyright and to follow the law as this court laid down in Cablevision.

Now, the plaintiffs --

JUDGE GLEESON: And the reason you have all the little tiny antennas is simple, it's because,

Page 55

PROCEEDINGS

in your view, kind of a belt and suspenders approach to avoiding the public performance?

MR. HOSP: And it follows the law and it follows the Copyright Act.

Now, plaintiffs suggested somehow this is a bad thing that Cablevision -- that Aereo has decided to follow the law. It's an argument that doesn't make sense.

The law, this court decided what the law was. And Aereo followed it to a T. And the law is what it is.

This court -- let me make clear, I believe that the Second Circuit got it right in Cablevision. Because it's the balance between private performance and public performance that Congress indicated it wanted to strike.

And so this is a situation --

Page 56

PROCEEDINGS

JUDGE CHIN: Is it your view that this case is exactly like Cablevision?

MR. HOSP: Well, the District Court --

JUDGE CHIN: Even though there isn't that ongoing relationship between the subscriber and Aereo as there was in Cablevision?

MR. HOSP: Well, your Honor, I believe there is an ongoing relationship.

But the District Court made factual determinations that in fact all of the facts that are relevant to the Cablevision finding are present here. The District Court made those factual findings specifically. And those factual findings have not been challenged.

JUDGE CHIN: You don't think you're asking us to go one step further than Cablevision with this case?

Page 57

PROCEEDINGS

MR. HOSP: No, no. This doesn't extend Cablevision at all. Not even a little bit. This case is on all fours with Cablevision.

The question under Cablevision and under ASCAP, it's not just Cablevision, it's ASCAP as well, and other courts have followed this as well, it's whether or not there is a single unique copy and who can receive that copy. And that's what the law says. And in fact that's how the law stands.

This is why the court -- and this is why the Supreme Court noted that in instances like this where you're dealing with new technology, courts have to be very circumspect about extending copyright.

We're not asking to extend Cablevision. Plaintiffs are asking to extend the Copyright Act. Appellants here are asking you fundamentally to change the law and

Page 58

PROCEEDINGS

to overturn Cablevision. To overturn ASCAP. And in the process to punish Aereo for following the law.

We're asking you not to do this. We're asking you to uphold Judge Nathan's exceptionally well written opinion.

Thank you, your Honor.

JUDGE CHIN: Thank you.

We'll hear rebuttal.

MR. SMITH: Your Honors, I think it's telling that you saw from Mr. Hosp's argument no effort to explain why their service and his particular features with the little antennas and the individual copies should be exempt under the statute as written by Congress.

Congress made the statute as broad as possible. It said the function of retransmission by any device or process, whether it goes to different people, different

Page 59

PROCEEDINGS

places, same time, same place, all of that ought to be requiring a license.

Instead what they did is they designed a system by taking some straight language out of the Cablevision decision and said we think we can exploit this.

But it makes no sense to think that a decision about that one little DVR function changed the statute and that it binds subsequent panels to say well, you can do it this way when in fact, as was brought out in the questioning, they could have 5 million people watching the same Monday Night Football game live over their internet devices without paying a dime in license fees for it.

JUDGE GLEESON: Does this enlarge the audience for the content?

MR. SMITH: It might well,

Page 60

PROCEEDINGS

your Honor.

Another argument that was made by the cable companies before the '76 Act is we're not harming you, we're simply getting your broadcast to more people. And more people seeing the commercials. Congress disagreed with that determination and said, if you're making money off their broadcast programming that they paid to create, you owe them license fees.

What Aereo is saying is we found a way to design around it using stuff in a decision that is about a different factual situation.

The one point I want to make is that the same thing is true with respect to the record function. The statute is clear that a retransmission service that delays is also covered and also requires a license. So if Ivy, for example,

Page 61

PROCEEDINGS

decided to make a copy of Monday Night Football and tell the subscribers you can watch this copy On Demand whenever you want to for the next 36 hours, that would also be covered by the Transmit Clause. It says same time or different times.

JUDGE DRONEY: As long as they're watching the same copy though, right?

MR. SMITH: That is a function that clearly the Transmit Clause covers in that situation.

Now, the only question then is are you going to let Aereo, which has provided this television to them through the antennas and made it available, suddenly say well, we're just a VCR, we're just a DVR, because we make individual copies instead of doing what Ivy would be doing, which is time delayed retransmissions.

PROCEEDINGS

I think the important point is different times is the same as saying delayed times. Delayed retransmission is the same as the live retransmission.

Thank you, your Honor.

JUDGE CHIN: Thank you.

JUDGE GLEESON: Thank you.

MR. KELLER: We are not asking you to overturn the Second Circuit's decision in Cablevision notwithstanding the rulings of the lower court in that case.

It is not the case that Aereo --

JUDGE GLEESON: District judges like overturning the Second Circuit.

MR. KELLER: Mr. Hosp did not answer the question directly, Judge Chin, when you asked him to concede whether Aereo is retransmitting. But Aereo conceded it already, at page 28 of their brief. There they

PROCEEDINGS

say that Aereo is transmitting our copyrighted performances, they're just not doing it directly. It's right at the top of page 28.

So what? A retransmission service, by definition, indirectly retransmits the copyrighted works of the original broadcaster. That is what a cable television system does. It receives a signal, runs it through the cable head end, sends it to its subscribers.

Aereo is a retransmission service in every sense of the word. Judge Nathan made specific findings on that point. She repeatedly talked about Aereo's system transmitting our copyrighted broadcast to Aereo's subscribers.

And, Judge Droney, your point really was the one I wanted to make and never got to. I guarantee you that when you watch Super Bowl XLVI through Aereo, the Giants beat the

PROCEEDINGS

Patriots every time 21-17. It is exactly the same performance.

And the notion that somehow it's encoded differently, the name on the book example, somehow that makes it private, that is not common sensical at all. It is a retransmission service, pure and simple.

Now, Mr. Hosp suggested that without a fixed copy, somehow the result is different. No, it's not. Either way, Congress said you use any device or process, if the end result is that the viewer gets the performance, it's a retransmission of a public performance, that violates the Copyright Act without a license.

Now, why is that important? Because it's all about the difference that clearly separates us today on ASCAP. ASCAP came out the way it did because at page 74

PROCEEDINGS

of that opinion, Judge Walker wrote that a performance, if it's not a performance, it can't be a public performance. That's the holding of ASCAP.

And in that context, the download of a previously stored musical file to somebody's cell phone was viewed, just like we argue Cablevision's RSDVR service should be viewed, was viewed by the panel, as a stored service. It was not perceptible at the time that the original transmission was coming in. There was input, but no output.

And Aereo is not that. It is a pure input/output service. Without a license, it violates the public performance right that the broadcasters have because it sells our broadcast, our performances, to its own subscribers.

Thank you very much.

Page 66

PROCEEDINGS

JUDGE CHIN: Thank you.

We'll reserve decision.

(Time noted: 10:49 a.m.)

Page 67

PROCEEDINGS

CERTIFICATE

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, ERIC J. FINZ, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify that the foregoing proceedings were taken before me on November 30, 2012;

That the within transcript is a true record of said proceedings;

That I am not connected by blood or marriage with any of the parties herein nor interested directly or indirectly in the matter in controversy, nor am I in the employ of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this ____ day of ____________, 2012.

______________________
ERIC J. FINZ

A

**ABC** 18:6
**able** 4:24 12:16,17 23:5
**absolutely** 17:3 21:11 44:23
**abuse** 12:8
**accept** 52:3
**accepted** 4:21 34:4,5 34:22
**access** 4:16 9:13 42:7
**accessed** 32:17 44:5
**accessible** 32:11
**accomplish** 9:7 30:19
**account** 13:14
**act** 3:15 5:5 29:15,16 40:3 41:7 48:16 49:21,23 53:2,3,4 55:7 57:23 60:5 64:19
**acting** 15:19
**actual** 36:19,19
**addressed** 19:10 33:15 45:2 52:15
**adjunct** 11:19
**admit** 28:19
**advances** 17:5
**advertise** 28:23
**advertising** 21:12
**advocating** 50:14
**Aereo** 1:11,20 3:21 6:15 8:12 9:2 10:17 13:19 18:16 21:5,7 22:4 23:18,22 24:20 28:16,18 29:9,17,25 31:4,6,8,9,13,15,24 32:15,18 33:8 35:25 36:11 38:11,14,22 40:12 52:18 54:17 55:10,14 56:9 58:4 60:14 61:17 62:16,23 62:24 63:2,14,25 65:18
**Aereo's** 14:5 32:6 63:18,20
**affairs** 54:9
**afford** 12:16 23:17
**aggregated** 52:11
**aggregation** 52:4
**agrees** 54:17
**allocable** 14:18
**allow** 11:21 12:16,20 16:13
**allowing** 8:10
**allows** 30:16
**AMERICAN** 1:14
**analogy** 23:9,10 24:12 28:8
**analysis** 10:9 11:3,6 28:5 29:19 52:25 53:6
**analyzing** 27:18,20
**answer** 50:21 62:21
**antenna** 10:5 30:12 32:17 36:12,13,18,21 36:23 44:16 47:4,6 47:19,21 48:12 52:7
**antennas** 6:17,19 7:5 9:6,23 10:8 11:24 43:8,12,19 44:13 47:24 48:11,24 49:9 49:20 54:6,25 58:18 61:19
**anticipate** 16:16
**anymore** 51:5
**apart** 14:11
**APPEALS** 1:2
**appellants** 1:9,18 3:12 57:24
**applied** 17:12,16
**applies** 15:22
**apply** 15:17 50:18
**appreciate** 18:2
**approach** 55:3
**arguably** 9:4
**argue** 4:13 65:11
**argued** 9:19 33:19
**arguing** 4:4 22:24 43:9 47:7
**argument** 9:2,16 13:12 15:5 34:23 49:25 50:19 55:12 58:15 60:3
**arguments** 4:19 52:4
**ASCAP** 26:13,13,19 31:19 35:15 37:24 40:20 41:23 42:22,23 45:14,14,22 50:22 57:7,8 58:3 64:24,24 65:6
**aside** 38:11
**asked** 62:22
**asking** 18:15 50:20 53:10 56:23 57:21,22 57:24 58:6,7 62:10
**aspect** 21:5,7
**assigned** 6:5 36:12
**assistance** 3:6 31:24
**attention** 7:19 50:3
**attorneys** 30:5
**audience** 13:10 59:23
**audience-limiting** 27:12
**authority** 17:20
**authorizes** 8:12
**available** 61:20
**avoid** 54:9,14
**avoidance** 54:10
**avoiding** 55:3
**a.m** 66:4

B

**B** 2:4 36:23
**back** 13:18 24:18 31:18 39:5 41:22 47:3 50:22
**bad** 55:9
**balance** 55:21
**BAMBOOM** 1:11
**barring** 4:2
**based** 18:16 27:11 39:2
**bases** 48:14
**basic** 30:7
**basically** 23:8 34:21 50:23
**basis** 4:20 7:23 11:12
**beat** 63:25
**believe** 43:18 46:16,20 49:21 55:18 56:12
**belt** 55:2
**benefit** 29:18
**better** 48:9
**big** 48:12
**bigger** 23:2
**bind** 15:24 17:20
**binds** 59:13
**bit** 50:8 57:4
**blanche** 12:8
**blood** 67:15
**bluntly** 53:24
**book** 50:7 64:6
**books** 50:6,17
**bound** 17:11,18 53:19
**bounds** 33:25
**Bowl** 21:3,14 22:6 28:21,22 63:24
**break** 29:12
**brief** 62:25
**broad** 10:11 15:17,20 17:3,16 58:22
**broadcast** 3:17,22 4:25 8:6 12:17,21 19:12 21:15 29:2 32:7,8,23 37:6 60:6 60:11 63:20 65:23
**broadcaster** 63:9
**broadcasters** 65:22
**broadcaster's** 52:12
**broadcasting** 1:7,14 1:15,17 20:11 33:9
**broadcasts** 19:9 31:10
**broken** 29:14
**brought** 59:16
**Bruce** 2:17 18:5
**build** 47:24
**built** 54:2,12
**business** 3:21 19:4 49:7 54:8,12
**businesses** 16:14

18:21
**button** 40:14
**buttons** 39:24

**C**

**C** 67:2,2
**cabined** 27:25
**cable** 5:15 8:21 9:19
  28:25 29:2 32:25
  60:4 63:10,12
**Cablevision** 4:5 5:7,15
  7:20 8:5,11 9:9
  11:12 12:6 13:15,20
  13:23 15:7 18:12
  20:14,16 22:4 23:8
  24:9 26:7,22 29:14
  29:18 32:20,22,24,24
  33:5,12,14,20 34:18
  34:21 35:3,12,13
  37:23 40:19 41:11,12
  41:17,17 43:21,25
  45:2,25 46:2,11 47:8
  47:14 49:3 51:9,10
  51:11 52:16 53:11,13
  53:15,18 54:3,13,21
  55:10,20 56:4,10,17
  56:24 57:3,5,6,8,22
  58:2 59:8 62:12
**Cablevision's** 65:11
**called** 12:11
**capable** 18:24
**captures** 31:10
**capturing** 33:9
**carte** 12:7
**carved** 4:5
**case** 3:13 6:11 13:23
  19:9,15,16 20:25
  26:7,13 30:8 33:12
  33:17 34:14,16 41:15
  43:17,19 46:14 50:15
  54:17 56:3,25 57:4
  62:14,15
**cases** 3:9 45:4
**CBS** 1:14,15
**cell** 65:9

**CENTURY** 1:5
**certify** 67:9
**cetera** 41:4
**chain** 29:12
**challenged** 30:25
  56:21
**change** 10:8 11:2,5
  20:14 32:8 57:25
**changed** 59:12
**Chin** 2:5 3:2 8:25
  17:23 21:4 23:18
  24:3 29:21 31:3,7,20
  32:13,19 34:7 38:4,8
  38:17 39:9,22 40:10
  40:23 48:20 49:6,11
  49:15 50:5,13 52:17
  53:16 56:2,7,22
  58:11 62:8,22 66:2
**choice** 39:24
**CHRISTOPHER** 2:6
**circuit** 1:3 19:16 23:3
  24:9,14 26:12 29:13
  44:2 53:19 55:19
  62:19
**Circuit's** 62:12
**circumspect** 57:19
**circumstance** 42:21
**claims** 3:25
**clarify** 40:6
**Clause** 10:10 18:10,18
  18:20 19:7,13,20
  20:10,15 21:21 25:20
  28:19 38:16 39:6,7
  61:7,14
**clear** 15:2 16:12 19:14
  19:17 21:11 22:17
  32:3 48:13,17 51:12
  55:18 60:22
**clearly** 61:14 64:23
**closer** 9:9
**cognizable** 40:9
**colleague** 17:25
**comes** 28:21 50:22
**coming** 17:5 41:22
  65:16

**comments** 30:4
**commercial** 23:13
**commercials** 60:8
**common** 38:18 42:6
  64:8
**companies** 1:14 9:19
  60:4
**company** 5:15
**complement** 18:8
**complementary** 45:25
**complete** 12:7
**completely** 17:12
  33:24 39:11
**complies** 49:22
**comply** 49:20 54:18
**computer** 9:7 41:24
**concede** 31:3,8 62:22
**conceded** 62:24
**concept** 27:19
**concerned** 21:24
**concluded** 19:12 20:17
  24:15
**conclusion** 5:25
**confined** 7:19
**Congress** 3:14 9:17
  10:2,10 15:2 16:11
  18:19 19:20 20:3
  25:13,14 39:3 53:5
  55:23 58:20,21 60:8
  64:14
**Congress's** 4:22 11:6
**connected** 67:14
**connection** 30:16
**consent** 8:22
**considered** 34:18
**consistent** 15:6 40:2
**constitute** 30:20,22
  47:9
**constructing** 54:8
**construed** 22:22
**consumer** 20:8 23:5
  31:14,21,22 32:3,14
  32:16,21,22 33:2,10
  36:11 40:12 46:17
  50:7 52:20,21

**consumers** 30:10 31:5
**contemplated** 25:15
**content** 44:19 59:24
**context** 11:16 17:17
  65:7
**contours** 27:21
**controversy** 67:18
**convert** 12:18
**converted** 14:8
**copies** 8:18 10:16
  16:17 20:23 25:2
  27:3,8 28:11 44:14
  44:16 47:9 48:18
  58:19 61:22
**copy** 4:9 6:3,5 7:8,12
  10:18,19 11:13,18
  12:3 14:2,11,14,17
  24:24 26:16 31:6,13
  31:22 32:4,10,14
  33:3 34:20 35:17
  38:5,23 39:17 40:4,8
  40:21 41:9,19 42:7
  42:11,20 43:2,23
  44:3,7 45:17 46:4,17
  47:15 51:2,4 57:11
  57:12 61:2,4,11
  64:12
**copying** 41:4
**copyright** 3:14 12:9
  13:6 30:24 40:3 41:7
  48:16 49:21,23 51:16
  53:2,3,4 54:14,19
  55:6 57:20,23 64:19
**copyrighted** 18:22
  19:2 22:8 26:5 63:3
  63:8,19
**core** 19:6
**CORPORATION** 1:6
**correct** 13:8,11 14:20
  21:18 54:15
**cost-free** 8:17
**counsel** 30:9 67:19
**COUNTY** 67:5
**couple** 42:15,16,18
**course** 8:13 53:18

**court** 1:2 3:15 4:4 5:10 5:19,24 16:4 18:5 22:19 30:2 33:14,19 34:4,18,22 36:9 42:22,23 44:25 45:2 45:22 47:2 50:2,3,25 51:12,14 54:20 55:13 55:17 56:6,14,18 57:15,16 62:14
**courts** 19:21 57:9,19
**Court's** 23:25 46:15
**cover** 15:3
**covered** 60:24 61:7
**covers** 15:13 61:15
**create** 44:20 60:12
**created** 10:20 11:19 32:10 45:7
**creating** 45:10 46:4,7 46:9
**creation** 14:2 32:14
**crisp** 22:5
**crucial** 26:23
**current** 8:16
**customers** 18:24 35:25 37:20

**D**

**David** 2:18 29:24
**day** 23:11 67:21
**dealing** 6:13 57:18
**decided** 45:22 55:11 55:13 61:2
**decision** 7:23 8:12 11:12 26:7 28:2 31:19 32:2 46:16 51:9,10,11 52:16 53:19 59:8,11 60:16 62:12 66:3
**decisis** 15:10
**declaring** 18:21
**Defendant-Counter...** 1:12,21
**defense** 19:22 20:8
**definition** 63:7
**delay** 42:17
**delayed** 16:19 61:24 62:4,4
**delays** 60:23
**delivered** 8:20
**delivery** 28:3
**Demand** 61:5
**DENNIS** 2:5
**design** 28:3,14 29:11 60:15
**designed** 54:17 59:6
**designs** 28:12
**detail** 27:22
**determination** 4:23 11:7 36:20 60:9
**determinations** 56:15
**determinative** 27:15
**device** 10:12 12:11 16:25 25:18 58:24 64:15
**devices** 12:23 25:15 59:20
**dictum** 15:21 17:15
**difference** 20:24 22:3 23:22 26:6,8 31:17 37:8 64:23
**differences** 37:9
**different** 5:11 6:11 7:9 12:5 15:13 16:3,23 16:24 17:12 23:19 25:23,24 28:3,4,12 28:14 33:12 34:14,16 36:18,22,25 37:14,15 38:2 40:17,21 43:17 45:6 48:2 50:8 54:10 58:25,25 60:17 61:8 62:3 64:13
**differently** 37:6 64:5
**dime** 59:21
**direct** 30:23 31:2
**directed** 33:21
**directly** 24:11 44:4 62:21 63:4 67:16
**disagree** 53:14
**disagreed** 60:9
**DISNEY** 1:14
**distant** 9:13
**distinction** 26:14 39:20
**distinguish** 26:24
**District** 3:4 23:25 46:25 50:2 53:17 56:5,14,18 62:17
**doing** 11:10 17:14 31:23 33:3,4 51:13 61:23,24 63:4
**download** 26:15 42:13 42:15 65:8
**downplay** 21:8
**downstairs** 52:22
**drew** 26:14
**drive** 14:18 45:8
**Droney** 2:6 6:22 7:16 7:22 10:15,22 11:11 24:20 25:6 35:20 36:24 37:13 43:7 47:3,18,23 48:3,8 61:10 63:21
**drove** 24:8
**DVD** 13:21
**DVR** 5:21 20:25 30:13 59:12 61:21

**E**

**E** 2:4,4,15 67:2,2
**earlier** 25:14
**Eastern** 3:4
**effect** 8:10
**effectively** 4:22 12:3
**effort** 58:15
**either** 4:21 19:11 51:20 53:2 64:14
**electronic** 50:6
**element** 15:9
**else's** 17:9
**embraced** 25:25
**employ** 67:18
**enable** 19:23 21:13
**enables** 25:4
**enacted** 18:19
**encoded** 64:5
**ends** 32:8
**engage** 8:14 16:14
**engaged** 9:24
**engaging** 3:18
**enlarge** 59:23
**ENTERPRISES** 1:14
**entire** 7:2,13
**entirely** 6:13 16:2
**equipment** 4:16 9:3,15 23:7
**era** 19:22
**ERIC** 2:10 67:6,25
**ESQ** 2:16,17,18
**essentially** 9:18 46:7
**et** 41:4
**evasion** 54:11
**everybody** 8:14
**evidence** 36:20
**evident** 15:17
**evolving** 25:16
**exact** 36:5,6 40:10,23
**exactly** 38:6 44:24 45:13,21 51:13 56:3 64:3
**exalting** 48:21
**examined** 42:22
**example** 21:2 22:11 50:22 52:3 60:25 64:6
**exception** 4:6
**exceptionally** 58:8
**exclusion** 21:9
**exculpate** 28:9
**exempt** 4:2 58:19
**exist** 14:10
**existed** 5:4
**explain** 58:16
**exploit** 59:9
**extend** 50:5 57:3,21,23
**extending** 57:20
**extent** 15:22 17:15
**eye** 26:2

**F**

**F** 2:4 67:2

**facilitate** 19:25
**facilitates** 25:18
**facilitating** 9:21
**facility** 14:7
**fact** 5:9 7:10,17 10:7 13:14 15:23 17:13 32:3 33:15,19 34:23 36:10,16,21 48:14 51:8 56:15 57:13 59:15
**facts** 16:8 17:22 29:17 56:16
**factual** 15:14,15 16:2 23:20 36:19 56:15,19 56:20 60:17
**fair** 46:18
**familiar** 12:11
**far** 15:9
**feature** 43:14
**features** 58:17
**fee** 3:25 5:3
**feeling** 17:18
**fees** 8:23 59:21 60:13
**fiction** 48:23
**figure** 22:21
**file** 26:15 65:9
**FILM** 1:6
**final** 7:21
**find** 18:8
**finding** 36:8 47:17 56:17
**findings** 23:25 56:19 56:21 63:16
**fine** 39:14
**FineTime** 19:16
**FINZ** 2:10 67:6,25
**first** 3:9 9:16 10:9 18:9 27:7 30:6,8 33:8
**fit** 49:2
**five** 24:22 25:8 30:7
**fixed** 39:17 40:8,20 41:9,18 42:11 64:12
**flip** 51:25
**fly** 16:5
**focus** 5:9,25
**focused** 8:8
**focusing** 11:17
**follow** 16:10 54:19 55:11
**followed** 55:15 57:9
**following** 17:14 58:4
**follows** 55:5,6
**football** 35:23 38:10 38:24 59:19 61:3
**foreclose** 47:16
**foreclosed** 46:22
**foregoing** 67:9
**form** 48:21 50:4
**format** 6:21 14:9
**Fortnightly** 5:5 9:20
**found** 20:23 29:13 60:15
**foundational** 18:11
**fours** 57:5
**FOX** 1:5,5
**full-fledged** 23:23
**function** 13:21 27:12 36:2 37:17 38:12 39:10,23 45:24 58:23 59:12 60:21 61:13
**functionality** 5:21
**fundamental** 35:11,13 35:15
**fundamentally** 57:25
**further** 25:21 26:22 56:24
**F/K/A** 1:11

**G**

**game** 38:10,25 59:19
**generated** 36:17
**generating** 36:22
**getting** 10:17 24:4 38:13 60:6
**Giants** 63:25
**Giants/Redskins** 35:24
**giving** 40:24
**Gleeson** 2:7 3:3 12:10 12:15,24 13:9,12 14:15 15:4 18:14 21:16 22:10,20 37:2 44:8,12,18 45:5 53:23 54:5,23 59:22 62:9,17
**go** 46:13 51:7 52:20 56:23
**goes** 7:7 14:16 16:22 28:22 39:5 52:6 58:24
**going** 11:21 14:23 25:19 27:2 44:4 48:22 51:19 61:17
**Good** 3:10
**governs** 23:10
**grateful** 3:5
**great** 27:22
**GROUP** 1:6,16
**guarantee** 63:23
**guess** 49:10

**H**

**hand** 67:21
**happening** 42:5 49:4 52:18
**happens** 36:10
**hard** 14:18 22:20 45:8
**harming** 60:5
**head** 63:12
**hear** 3:8 17:24 58:12
**heard** 30:9
**hearing** 2:10 36:16
**heart** 28:18
**held** 45:14 50:25 53:3
**hereunto** 67:21
**history** 17:2 19:14
**hit** 24:21
**hitting** 40:13
**holding** 35:11,14 43:20 65:5
**holdings** 35:15
**holds** 20:12
**home** 9:7 24:13 29:3
**homes** 37:3
**Honor** 6:25 9:10 12:13 13:25 18:3 31:12,18 31:25 34:15 40:5 47:12 49:5 56:11 58:10 60:2 62:7
**Honors** 3:11 29:24 58:13
**hope** 18:8
**Hosp** 2:18 29:24,25 31:5,12,25 32:16 33:13 34:15 36:7 37:5,21 38:6,15 39:2 39:15 40:5,16 41:8 43:16 44:11,15,23 45:13 47:12,20,25 48:5,13 49:5,10,13 49:17 50:12,16 52:24 53:20 54:4,16 55:5 56:5,11 57:2 62:20 64:11
**Hosp's** 58:15
**hours** 61:6
**hypothetical** 40:6
**hypothetically** 35:22

**I**

**impact** 37:10
**implicate** 46:19
**important** 5:8 15:9 51:6,24 62:2 64:21
**inadequate** 16:6
**includes** 15:12
**including** 7:4 12:2 14:5
**inconsistent** 15:19
**indicated** 55:23
**indirect** 51:20
**indirectly** 63:7 67:17
**individual** 4:11 6:4 10:8,23 16:17,21 34:20,20 35:17,18 36:13,14 38:7 42:20 43:23 44:3,5,6,13 45:17 47:15 58:18 61:22
**individualization**

35:21
**individualized** 14:13 14:17 38:5,23 44:14 45:8 47:8
**individually** 38:21
**individual's** 36:18
**industry** 50:24
**infringement** 13:6 30:23 31:2 51:21
**infringing** 18:23
**initial** 26:4 32:7
**input** 65:16
**input/output** 65:19
**inside** 14:6
**insinuates** 23:14
**instance** 53:2,21
**instances** 49:22 51:18 57:17
**instructed** 19:21
**intended** 15:3 16:13 53:5
**interested** 67:16
**internet** 3:24 6:21 12:22 14:3,9 30:15 59:20
**interpose** 7:12
**interposing** 4:9
**interpretation** 15:11
**interpretive** 18:13
**involve** 13:5
**involves** 10:12
**issue** 5:10,18 8:3 10:25 33:15,16 35:10 39:8 39:19 41:20,21 42:9 42:10 43:3,4 44:7 45:18,20,21 46:6,10 46:24 53:12
**itty-bitty** 48:24 49:9
**Ivy** 60:25 61:23

J

**J** 2:10 67:6,25
**JOHN** 2:7
**Judge** 2:5,6,7 3:2,3 6:22 7:16,22 8:25 10:15,22 11:11 12:10 12:15,24 13:9,12 14:15 15:4 17:23 18:14 21:4,16 22:10 22:20 23:18 24:3,20 25:6 29:21 31:3,7,20 32:2,13,19 34:7 35:20 36:24 37:2,13 38:4,8,17 39:9,22 40:10,23 43:7 44:8 44:12,18 45:5 47:3 47:18,23 48:3,8,17 48:20 49:6,11,15 50:5,13 52:17 53:16 53:17,23 54:5,23 56:2,7,22 58:8,11 59:22 61:10 62:8,9 62:17,21 63:16,21 65:2 66:2
**judges** 62:18
**juris** 20:15

K

**Kanojo** 29:6
**Keller** 2:17 17:25 18:4 18:5 21:6,19 22:14 22:24 23:21 24:6 25:2,12 29:22 62:10 62:20
**kind** 9:25 13:17 16:15 54:7 55:2
**kinds** 17:4
**Kirkwood** 19:15 23:4 23:4
**Kirkwood/Infinity** 20:11
**know** 26:10,11 35:4 38:19 42:24 45:23 48:23 51:14 53:21

L

**LABS** 1:11
**laid** 54:20
**landscape** 13:16
**language** 15:12,18,21 17:11,16 59:7
**laptop** 12:19 13:2
**law** 16:10,10 43:25 48:19 54:19 55:6,11 55:13,14,15 57:13,14 57:25 58:5
**lay** 27:2
**leases** 4:17
**led** 24:11
**legal** 10:25 14:22 48:15
**legislative** 16:25 19:14
**legitimate** 49:7
**letting** 40:25
**let's** 35:20,22 50:5 52:3
**level** 5:23
**license** 3:20 5:16,20 7:17,18 8:23 34:12 59:4,21 60:13,25 64:20 65:20
**licensed** 5:12 11:20 34:2 35:2,6
**license-free** 8:15
**licensing** 11:8
**light** 14:24 16:7
**LIMITED** 1:7
**listen** 41:25 42:2,12
**listening** 51:3
**litigated** 46:25
**little** 9:5 48:11 49:8 50:8 54:6,24 57:4 58:18 59:12
**live** 12:2 16:19 59:19 62:6
**living** 33:4
**LLC** 1:15,16,16,16,17
**logic** 50:13
**logical** 38:19 39:2 49:14
**logs** 36:11
**long** 61:10
**longer** 41:20 46:5
**looking** 7:2 35:8
**looks** 7:9 13:22
**lose** 37:3 44:14
**lot** 14:4
**lots** 15:13
**loud** 54:2
**lower** 62:14

M

**M** 2:16
**machinery** 33:5
**making** 27:25 31:22 33:3 45:16 46:17 60:10
**marriage** 67:15
**matter** 6:23 7:17 9:4 11:4 16:20,22 21:22 23:20 25:3,17 28:13 35:4,5 38:17 42:25 43:19 67:17
**matters** 23:4
**mean** 7:13 8:13 11:5 48:16
**meaningful** 20:23
**MEDIA** 1:15
**million** 48:24 59:17
**Millions** 38:9
**mind** 54:14
**mode** 21:17 24:22 25:8
**model** 54:2
**moment** 6:16
**Monday** 35:23,24 59:18 61:2
**money** 48:10 60:10
**morning** 3:10
**morph** 8:11
**moved** 24:13
**movie** 44:21
**multiple** 9:12
**music** 42:13 50:24
**musical** 26:15 65:9

N

**name** 50:9 64:5
**Nathan** 32:2 48:17 63:16
**Nathan's** 58:8
**nature** 18:11 22:15 35:8

**NBCUNIVERSAL**
1:15
**need** 17:7 41:13
**needed** 5:20
**needs** 3:20
**Neither** 4:19
**NETWORK** 1:7,16,16
**never** 63:23
**nevertheless** 3:25
**new** 1:25,25 3:4 20:9
57:18 67:3,5,8
**Night** 35:23 59:18
61:3
**Notary** 67:7
**noted** 57:16 66:4
**notion** 9:11 24:10 46:3
64:4
**notwithstanding**
62:13
**November** 1:23 67:10
**number** 23:24 30:3
48:2

**O**

**O** 2:4
**obviously** 50:18
**okay** 46:4,12 51:23
52:3
**once** 6:25 13:16
**ongoing** 32:20 33:6
56:8,12
**on-command** 45:3
**opinion** 24:2 27:7 58:9
65:2
**opposing** 30:9
**option** 40:13,25
**order** 11:25
**original** 52:11 63:9
65:15
**ought** 59:3
**outlawed** 19:5
**output** 65:17
**overrule** 4:22
**overruled** 3:15 9:17
11:7

**overturn** 53:11 58:2,3
62:11
**overturning** 62:18
**over-the-air** 19:8
**owe** 60:12

**P**

**P** 2:15,17
**page** 27:24 29:3,5
62:25 63:5 64:25
**pages** 20:12 29:4,7
**paid** 8:23 50:3 60:12
**panel** 7:20 15:12,24
16:8 17:10,19 20:17
26:19 65:13
**panels** 15:25 59:14
**paragraph** 27:17
**part** 13:15
**particular** 11:15 46:14
58:17
**particularly** 30:22
38:16
**parties** 18:6 67:16
**PARTNERSHIP** 1:7
**party** 23:13
**Patriots** 64:2
**Paul** 2:16 3:11
**pause** 4:8 21:18 24:21
25:8
**paused** 36:3 37:17
**pay** 17:7
**paying** 20:5 45:11
59:20
**Pearl** 1:24
**people** 4:23 8:21 9:12
11:25 12:8 16:13
36:4 37:13 38:9,20
42:7 58:25 59:17
60:7,7
**perceived** 26:18
**perceptible** 12:4 65:14
**perception** 37:11
**perfectly** 15:2,16
39:14
**performance** 3:19 6:9

6:10,24 9:25 12:25
13:3,7 19:24 20:3,4,6
22:8,12,23 24:17,23
25:7,11 26:5,19,21
27:5,10 28:6 30:21
35:19 39:8,19 41:21
42:9,25 43:15 44:20
45:10,19 46:5 47:10
47:17 50:11,17 51:5
52:10,12 53:7 55:4
55:21,22 64:3,17,18
65:3,4,5,21
**performances** 19:3
20:21 30:11,17 43:11
63:3 65:23
**performed** 18:22
**performing** 10:4
**person** 40:25
**personalized** 6:3
**phenomenon** 13:17
**phone** 65:10
**picking** 46:8
**picture** 7:9
**piece** 23:7
**place** 39:4 59:2
**places** 16:24,24 25:24
25:25 27:7 59:2
**plaintiffs** 30:5 33:17
33:18,23 34:8,23
49:25 52:14 53:10
54:22 55:8 57:22
**Plaintiffs-Counter-...**
1:8,18
**play** 27:11 37:19
42:18
**playback** 29:16
**played** 24:18
**playing** 42:19
**please** 18:4 30:2
**point** 7:11 18:18 20:13
22:15 23:2 24:17
25:14 28:16 34:9,10
44:17 60:19 62:2
63:17,21
**points** 18:7 30:7

**poison** 46:8
**position** 38:14 40:4
47:7 53:24
**positioning** 29:9
**possibilities** 51:18
**possible** 58:22
**possibly** 10:11 26:18
**potential** 13:9
**potentially** 51:21
**practical** 11:4
**precedent** 16:7 22:18
22:21 23:3
**preceding** 14:14
**present** 56:18
**presented** 10:25 41:15
47:13
**previously** 24:19
32:10 65:8
**primarily** 4:4
**prior** 15:11 32:13 33:7
**private** 6:7,8 7:14
22:15 25:6,10 27:4
27:10 29:16 30:11,17
30:21 45:10 50:10
55:21 64:7
**problem** 13:22
**proceedings** 3:1 4:1
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1,9,13
**process** 7:11 10:12
16:25 23:14 25:18

58:3,24 64:15
**processed** 6:20
**processing** 11:24
**profiteer** 4:24
**profiteering** 17:8
**program** 4:9 21:24
22:2 32:5
**programming** 3:23
5:2 6:16,20 8:7 9:14
60:11
**programs** 3:17,19
5:18 10:13
**property** 17:9
**proposition** 12:6
**protection** 51:16
**provide** 9:13
**provided** 3:16 13:19
13:21 32:18 61:18
**provider** 4:16 9:16
32:25 44:19 45:6
**provides** 44:21
**providing** 5:21 9:3
52:19
**prudence** 20:15
**public** 1:7 3:18 6:8,9
6:23 12:25 13:3,7
20:6 22:12,23 24:17
24:23 27:19,21 28:6
35:18 39:19 41:20
42:8,24 43:10,14
44:20 45:19 46:5
47:10,16 50:17 51:4
52:9 55:4,22 64:18
65:4,21 67:7
**publicly** 18:22
**punish** 58:4
**purchaser's** 50:9
**pure** 64:9 65:19
**purposes** 27:20
**push** 13:18
**put** 8:17 9:6 16:5
38:11 39:3 50:8
53:23
**puts** 52:6

**Q**

**qualified** 27:16
**quality** 37:14
**question** 14:22 31:7
40:19 41:13,14 47:4
52:13 57:6 61:16
62:21
**questioning** 59:16
**questions** 18:14

**R**

**R** 2:4,15,18 67:2
**radio** 19:8,11
**raised** 33:16 52:14
**reach** 41:13
**read** 14:23 51:8
**reading** 41:12,16
47:14
**real** 40:19
**really** 4:14 18:19
26:23 48:25 53:9,20
63:22
**real-time** 22:6
**reason** 48:4,7 49:7,12
49:14,16,18,19 54:23
**reasons** 48:2
**rebuttal** 17:24 58:12
**receipt** 8:6 9:22
**receive** 19:24 57:12
**receives** 3:22 6:16
36:13 63:11
**receiving** 18:25 32:23
**recipient** 10:16
**recognized** 46:2,3
**record** 18:17 21:13
28:17 29:5,7 38:12
39:10,23 40:14 41:2
60:21 67:13
**Redhorn** 45:4
**Redskins** 37:2
**regard** 22:5
**regarding** 5:7
**regardless** 19:3
**regime** 5:4 8:19
**reject** 19:21

**rejected** 20:9
**relationship** 32:21
33:7,7 56:8,13
**relevant** 27:9,14 56:16
**remote** 20:25
**render** 22:22 27:4
**repeatedly** 63:17
**Reporter** 2:10 67:7
**represent** 18:6
**representing** 3:12
**reproduction** 41:19
42:10 43:3 45:18
46:9,19,21 51:22
**required** 29:2
**requires** 60:24
**requiring** 59:3
**reserve** 29:20 66:3
**respect** 15:25 30:7
39:21 50:16 60:21
**respond** 30:3
**restored** 5:6
**result** 28:4 64:13,16
**results** 33:10
**resume** 25:9
**reticent** 53:25
**retransmission** 4:3,7
4:14 5:13,14 8:15,22
11:9,22 16:14 17:6
19:10 20:19,21 21:10
22:7 24:16 25:19
26:2,9,25 28:10,20
29:10,12 38:13 44:9
52:23 58:23 60:23
62:5,6 63:6,14 64:9
64:17
**retransmissions** 19:2
61:25
**retransmit** 3:20 19:8
25:23
**retransmits** 3:16,22
31:11 63:8
**retransmitter** 21:25
**retransmitters** 19:19
**retransmitting** 5:2
22:2 26:4 31:9 62:23

**rewind** 21:18
**right** 10:23 22:13 29:3
30:10,12,13,14,21
32:25 42:2,13 43:4
44:10 45:18,19 46:9
46:13,20,22 47:11
50:18 51:3,7,20,22
53:17 54:9 55:19
61:12 63:5 65:21
**rights** 43:4 45:24
**roof** 52:6,7,21
**room** 33:4
**royalties** 45:12
**RSDVR** 20:17 22:9
24:10 33:22 34:2,25
65:11
**rule** 4:2,6 27:2
**ruling** 22:19 43:24
**rulings** 62:13
**runs** 63:11

**S**

**S** 2:15
**satellite** 8:21
**saw** 58:14
**saying** 27:8 38:4 39:25
40:7 51:15,17 52:5
60:14 62:4
**says** 17:2,10 21:21
23:4,8 39:7 41:17
46:11 53:4 57:13
61:8
**screen** 4:10
**second** 1:3 5:20 18:11
20:13 23:3 24:8,14
26:11 29:13 30:18
44:2 55:18 62:11,18
**seconds** 24:22 25:9
28:23 42:16,17,19
**see** 39:20
**seeing** 36:5 37:12,18
60:8
**sells** 65:22
**send** 7:12 10:5 12:2,21
50:6

**sending** 4:10 14:3
**sends** 63:13
**sense** 38:9,18 54:7 55:12 59:10 63:15
**sensical** 64:8
**sent** 26:16
**separate** 14:11,18
**separates** 64:23
**separating** 34:11
**server** 5:22 14:8
**servers** 6:19 7:4
**serves** 9:12
**service** 1:7 4:7,15 5:13 5:14 6:14 7:3,14 9:11 10:3,17 11:20 11:23 20:18,19,20 21:10 22:9 23:13,24 24:10,11,16 26:3 28:21,24 32:6 39:16 52:19 58:16 60:23 63:7,15 64:9 65:11 65:13,19
**services** 3:16 4:3 11:9 19:7 28:10
**set** 5:22 67:21
**share** 7:5
**shoes** 20:8 23:16
**Shorthand** 67:6
**showed** 36:21
**shown** 36:15
**shows** 10:4
**side** 51:25
**signal** 7:7 36:14,23 52:8 63:11
**signals** 36:16
**significant** 31:17 37:10
**simple** 54:25 64:10
**simply** 9:2 60:6
**single** 6:2 35:17 52:13 57:11
**sitting** 3:2 41:24
**situation** 17:13 40:17 40:22 44:25 45:15 47:22 50:24 55:25 60:18 61:15
**situations** 15:14,16,18 15:23 16:2
**slightly** 36:22
**Slingbox** 12:12 13:5 13:17 22:11,16 23:17 23:19 24:3 30:15
**Smith** 2:16 3:10,11 6:25 7:18,24 9:10 10:19,24 11:15 12:13 12:20 13:4,11,24 14:20 15:8 18:2,9 22:16 58:13 59:25 61:13
**somebody** 17:9 45:16 52:6
**somebody's** 65:9
**something's** 27:10
**song** 41:25 42:2
**Sony** 46:16,23
**sort** 37:12 53:22
**sounded** 47:5
**specific** 16:17 63:16
**specifically** 33:14 52:15 56:20
**spend** 48:10
**split** 33:21
**splitting** 34:24
**ss** 67:4
**stand** 20:7 23:15 29:6
**stands** 44:2 57:14
**start** 7:2 11:10
**started** 28:7
**State** 67:3,8
**statement** 27:16 29:9 29:10
**STATES** 1:2
**STATIONS** 1:5
**statute** 4:20 14:24,25 15:20 16:11 58:20,21 59:13 60:22
**statutory** 15:11
**stay** 52:22
**step** 56:23
**stop** 21:17
**storage** 20:18,25 21:5 21:7 24:11 26:8,25 28:8 29:15
**stored** 26:15 65:8,13
**straight** 5:16 59:7
**stream** 8:18 10:20 26:20 33:21,22 34:12 34:25 35:6 42:4,4
**streaming** 39:12,16 40:22 42:6
**streams** 16:21
**Street** 1:24
**strike** 55:24
**STUDIOS** 1:15,15
**stuff** 60:16
**submit** 17:15
**subscriber** 4:12 6:4,5 14:19 21:23 40:12 56:9
**subscribers** 3:18,24 4:17 5:3 7:5 9:22 10:14 14:16 20:5 21:14 25:4 45:9 61:4 63:13,20 65:24
**subsequent** 15:25 29:16 59:14
**subsequently** 26:12
**substance** 48:22
**suddenly** 50:10 61:20
**sufficient** 13:13
**suggested** 55:8 64:11
**suggesting** 31:21
**Super** 21:3,14 22:6 28:21,22 63:24
**supplying** 30:18
**Supreme** 3:15 46:15 57:16
**sure** 13:21 19:18
**suspenders** 55:3
**swept** 19:19 25:20
**system** 21:5,7 23:19 23:20,22 24:7,21 25:3 28:3,9 30:15 31:6,16 33:22 34:2 35:2 36:11 38:22 39:3,12 43:13,22 54:18 59:6 63:10,18

T

**T** 2:15 55:15 67:2,2
**take** 9:5 10:4 12:17,21 13:16 31:18 39:22 50:23 51:25
**taken** 67:10
**takes** 4:8 12:6 13:13 28:15 42:15
**talk** 35:20
**talked** 45:3 63:18
**talking** 7:25 39:16 43:21
**tandem** 3:9 43:5
**tax** 54:10,11
**taxes** 54:9
**technological** 9:4 17:4 25:15 48:4,6 49:11 49:15,17
**technology** 8:16 19:4 30:19 40:11,24 41:3 54:13 57:18
**TELEMUNDO** 1:16
**Teleprompter** 5:6 9:20
**television** 1:5,6,16 3:17,23 4:25 8:20 9:23 19:9,11 28:25 52:9 61:18 63:10
**tell** 61:3
**telling** 58:14
**terms** 26:3 41:3 48:7
**tested** 22:17
**Thank** 18:3 29:22 58:10,11 62:7,8,9 65:25 66:2
**themself** 20:2
**thereto** 11:14
**thing** 8:24 9:8 14:7 23:7,9,12 27:14 30:25 35:7 36:5 53:22 55:9 60:20
**things** 14:4,10

**think** 5:8 7:8,24 13:13 15:8,24 18:13 22:16 23:2,21 30:8 41:23 50:20 53:16 56:22 58:14 59:9,10 62:2
**third** 18:15 23:13 28:16
**THIRTEEN** 1:5
**three** 18:7 27:6
**time** 16:19,23 17:22 17:24 25:16,24 29:20 36:6 37:19,22 52:5 59:2 61:8,24 64:2 65:14 66:4
**times** 16:23 25:23 61:9 62:3,4
**tiny** 54:24
**today** 3:3 64:24
**top** 5:22 63:5
**transcript** 67:12
**transmission** 6:2,7,8 7:15,21 8:9 10:21 11:18 24:4 32:9 33:20 34:17,19,24 35:9,10,16 53:6,8 65:15
**transmissions** 5:17 6:18 8:4 14:6 18:25 48:9
**transmit** 10:10 18:10 18:18,20 19:7,13,20 20:10,15 21:21 25:20 28:19 31:6 38:15 39:6,7 61:7,14
**transmits** 31:13 52:8
**transmitted** 32:12 37:25 38:3
**transmitting** 10:13 31:4 63:2,19
**trouble** 4:8
**true** 21:20 32:15 60:20 67:13
**truly** 27:11
**try** 49:2
**trying** 17:2
**turn** 52:2
**turns** 12:7
**TV** 29:2
**TVs** 37:14
**TWENTIETH** 1:5
**two** 39:24 42:3 43:4 45:24 48:14
**type** 30:15

**U**

**ultimately** 35:7
**understand** 3:7 5:8
**understood** 51:12
**unique** 10:16,18 11:13 20:22 24:24 25:2 27:3 28:11 32:10 41:18 57:11
**UNITED** 1:2
**UNIVERSAL** 1:16
**UNIVISION** 1:6,6
**unlicensed** 4:3,7 5:14 6:14,15 33:24
**unsuccessful** 34:8
**uphold** 58:7
**upstream** 13:18 24:13
**use** 4:18 13:4 28:24 30:12,13,14 46:18 64:14
**user** 12:4 21:23 32:5 32:11,12
**uses** 23:9

**V**

**v** 1:10,19
**VCR** 23:9 24:12 28:7 61:21
**Video-on-Demand** 44:19,22 45:7
**view** 39:13 55:2 56:2
**viewed** 6:6 16:7 65:10 65:12,12
**viewer** 64:16
**viewing** 12:25 37:22 37:24
**violate** 41:6
**violates** 64:19 65:20
**violation** 19:13 30:20 46:21
**violations** 54:15
**virtual** 21:9
**virtually** 8:17

**W**

**Walker** 65:2
**wall** 16:5
**want** 17:6 41:25,25 60:19 61:5
**wanted** 55:23 63:22
**warn** 28:12
**Washington** 37:7
**Wasn't** 11:11
**watch** 21:2,14,17 22:6 24:22 25:4,8 28:25 36:2 37:16 39:25 40:15 61:4 63:24
**watches** 21:23 32:5
**watching** 25:9 35:25 37:15 38:10,20,23,24 39:12 59:18 61:11
**way** 13:20 14:13 22:22 24:5 26:17 27:18 42:12 45:25 59:15 60:15 64:14,25
**ways** 42:3
**website** 11:25
**went** 25:21 26:22 27:23 34:25
**we'll** 3:8 17:24 58:12 66:3
**we're** 10:25 17:2 21:24 27:18 35:8 51:14,16 53:18 57:21 58:6,7 60:5,6 61:21,21
**WHEREOF** 67:20
**win** 37:3 44:10
**wires** 7:6
**WITNESS** 67:20
**WNET** 1:5 3:12
**WNJU-TV** 1:17
**word** 34:5 63:15
**words** 20:7
**work** 43:5 53:8
**works** 15:10 18:23 63:8
**worry** 45:11
**wouldn't** 12:24 44:10
**WPIX** 1:6
**written** 58:9,20
**wrong** 53:14
**wrote** 65:2

**X**

**x** 1:4,13,22
**XLVI** 63:24

**Y**

**York** 1:25,25 3:5 67:3 67:5,8

**1**

**10:49** 66:4
**108** 20:12
**112** 20:12
**12-12786-cv** 1:10
**12-2807-cv** 1:19
**15** 29:4
**1570** 29:7
**1960s** 19:22
**1976** 3:14 4:23 11:7 16:18

**2**

**2012** 1:23 67:11,22
**21-17** 64:2
**24** 19:16
**25,000** 38:19
**28** 62:25 63:5
**2807** 18:6

**3**

**3** 37:19
**3rd** 37:18
**30** 1:23 67:10
**36** 61:6

**4**

**4,000** 37:20

**5**

**5** 59:17
**5,000** 35:24 36:4
**500** 1:24
**55** 29:5

**7**

**71** 29:7
**74** 64:25
**76** 5:5 60:5