UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN BROADCASTING COMPANIES, INC., DISNEY ENTERPRISES, INC., CBS BROADCASTING, INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA, LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK TELEVISION, LLC, TELEMUNDO NETWORK GROUP LLC, and WNJU-TV BROADCASTING LLC, | Civil Action No. 12-CV-1540 (AJN) |
| Plaintiffs/Counterclaim Defendants, | |
| v. | |
| AEREO, INC. | |
| Defendant/Counterclaim Plaintiff. | |
| WNET, THIRTEEN, FOX TELEVISION STATIONS, INC., TWENTIETH CENTURY FOX FILM CORPORATION, WPIX, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK LIMITED PARTNERSHIP, and PUBLIC BROADCASTING SERVICE, | Civil Action No. 12-CV-1543 (AJN) |
| Plaintiffs/Counterclaim Defendants, | |
| v. | |
| AEREO, INC. | |
| Defendant/Counterclaim Plaintiff. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT AEREO, INC.'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

Page

I.    AEREO DOES NOT INFRINGE THE RIGHT OF PUBLIC PERFORMANCE .............7

    A.    This Court's Reasoning in Denying Plaintiffs' Motion for  Preliminary Injunction Compels Summary Judgment for Aereo .................................................7

    B.    Any Dispute Over the Functioning of the Aereo Antennas is Immaterial..............9

II.    AEREO DOES NOT INFRINGE THE RIGHT OF REPRODUCTION .........................11

    A.    Under *Cablevision*, Aereo Cannot Be Held Liable for Providing Technology That Automatically Makes Copies in Response to Consumer Requests ..................................................................................................................11

III.    THERE IS NO INDIRECT INFRINGEMENT OF PLAINTIFFS' ASSERTED REPRODUCTION RIGHT .......................................................................................15

    A.    Consumers Are Entitled To Access Over-the-Air Broadcasts..............................15

    B.    Consumers' Use of the Aereo System To Make Recordings Constitutes a Fair Use Under *Sony* ...........................................................................................16

        1.    The First Factor Favors A Finding of Fair Use Because the Use is Private and Noncommercial....................................................................... 18

        2.    The Second Factor Favors A Finding of Fair Use Because Plaintiffs Invite Consumers to View the Copyrighted Works Free of Charge.................................................................................................. 19

        3.    The Third Factor Favors a Finding of Fair Use Because Plaintiffs Make the Copyrighted Works Available Free of Charge ......................... 19

        4.    The Fourth Factor Favors a Finding of Fair Use Because the Consumers' Use of the Copyrighted Works Does Not Harm the Market for Over-the-air Broadcast Television Programming.................. 20

    C.    *Sony* Is Not Limited to "Complete Time-Shifting" ................................................23

    D.    "Space-Shifting" is Permitted under *Sony* ...........................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page**

*Am. Broad. Cos., Inc. v. Aereo*,
   874 F. Supp. 2d 373 (S.D.N.Y. 2012) ("*Aereo I*") ........................................ passim

*AM General Corp. v. DaimlerChrysler Corp.*,
   246 F. Supp. 2d 1030 (N.D. Ind. 2003) ...................................................................4, 10

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).............................................................................................6

*Cartoon Network LP v. CSC Holdings, Inc.*,
   536 F.3d 121 (2d Cir. 2008) ("*Cablevision*") ................................................ passim

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).............................................................................................6

*CoStar Group, Inc. v. LoopNet, Inc.*,
   373 F.3d 544 (4th Cir. 2004) .....................................................................12, 13, 14

*Disney Enters., Inc. v. Hotfile Corp.*,
   798 F. Supp. 2d 1303 (S.D. Fla. 2011) ...........................................................12

*Emerson Enters., LLC v. Kenneth Crosby New York, LLC*,
   No. 03-Civ-6530, 2009 WL 3190445 (W.D.N.Y. Apr. 21, 2009)...........................6

*Fox Film Corp. v. Doyal*,
   286 U.S. 123 (1932)...........................................................................................20

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   __ U.S. __, 133 S. Ct. 1351, 106 U.S.P.Q.2d 1001 (2013)...................................22

*MSF Holding Ltd. v. Fiduciary Trust Co. Int'l*,
   435 F. Supp. 2d 285 (S.D.N.Y. 2006)................................................................6

*Religious Tech. Center v. Netcom On-Line Comm. Svcs., Inc.*,
   907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*")............................................ passim

*RIAA v. Diamond Multimedia Sys., Inc.*,
   180 F.3d 1072 (9th Cir. 1999) .........................................................................24

*Sony Corp. of America v. Universal Studios Inc.*,
   464 U.S. 417 (1984)........................................................................................ passim

*U.S. Underwriters Ins. Co. v. Zeugma Corp.*,
   No. 97-Civ-8031, 1998 WL 633679 (S.D.N.Y. Sept. 15, 1998) ...........................6

*U.S. v. Paramount Pictures*,
  334 U.S. 131 (1948)................................................................................................20

*Universal City Studios, Inc. et al. v. Sony Corp. of Amer., et al.*,
  480 F. Supp. 429 (C.D. Cal. 1979) ("*Sony I*")................................................... passim

*WNET, Thirteen v. Aereo, Inc.*,
  Nos. 12-Civ-2786, 12-Civ-2807, 2013 WL 1285591 (2d Cir. Apr. 1, 2013) ("*Aereo II*")........................................................................................................ passim

*Wolk v. Kodak Imaging Network, Inc.*,
  No. 10-Civ-4135, 2012 WL 11270 (S.D.N.Y. Jan. 3, 2012)....................................12

**STATUTES**

17 U.S.C. § 107........................................................................................................17

47 U.S.C. § 307....................................................................................................15, 21

17 U.S.C. § 101..........................................................................................................7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) ..................................................................................................6

Defendant Aereo, Inc. ("Aereo") is entitled to summary judgment on Plaintiffs' claims for direct infringement of their alleged public performance right and Plaintiffs' claims for direct and indirect infringement of their asserted reproduction right.[1] The material facts are undisputed and Plaintiffs' claims are foreclosed by the Second Circuit's rulings in this case and in *Cablevision*, and the Supreme Court's ruling in *Sony*.

This Court and the Second Circuit already determined that Aereo does not infringe Plaintiffs' public performance right. *Am. Broad. Cos., Inc. v. Aereo*, 874 F. Supp. 2d 373, 396 (S.D.N.Y. 2012) ("*Aereo I*"); *WNET, Thirteen v. Aereo, Inc.*, Nos. 12-Civ-2786, 12-Civ-2807, 2013 WL 1285591, at *14 (2d Cir. Apr. 1, 2013) ("*Aereo II*"). On a detailed factual record including expert testimony, developed after extensive fact and expert discovery, this Court held that the "performances" made using Aereo were private, <u>not</u> public performances. The Second Circuit in *Aereo II*, relying on the undisputed facts,[2] affirmed that decision and held that consumers' use of the Aereo technology does not violate Plaintiffs' public performance rights because: (1) each member who uses the Aereo system to record and watch television views a unique copy of the program; (2) each transmission is made by the member from that unique copy; and (3) each unique copy is transmitted only to the member who requested it.[3] *Id.* at *9 (citing *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*")). Because that reasoning applies with equal force at this stage, Aereo is entitled

---

[1] On April 30, 2013, ABC Plaintiffs moved to amend their Complaint to include a claim for indirect infringement. (Dkt. No. 191). That motion is pending.

[2] The Second Circuit in *Aereo II* noted ". . . the lone factual dispute below was whether Aereo's antennas function independently or as one unit. The District Court resolved this dispute in favor of Aereo, finding that its antennas operate independently. *Am. Broad. Cos., Inc. v. Aereo*, 874 F. Supp. 2d 373, 381 (S.D.N.Y. 2012). Plaintiffs do not contest this finding on appeal." *Aereo II*, 2013 WL 1285591, at **8-9, n 6.

[3] Neither this Court nor the Second Circuit found the individual antenna aspect necessary to its public performance analysis, but as this Court noted, the existence of the individual antennas makes this case, if anything, a better factual predicate for the principle in *Cablevision* than the *Cablevision* facts themselves. *Aereo I*, 874 F. Supp. 2d at 387.

to summary judgment on Plaintiffs' public performance claim.

*Cablevision* also compels the conclusion that Aereo does not directly infringe Plaintiffs' reproduction claims. The Second Circuit, in *Cablevision*, made clear that direct liability for infringement attaches only to the person or entity actually "doing" the copying. Thus, "designing, housing, and maintaining a system that exists only to produce a copy," as in *Cablevision* and like Aereo does here, creates no liability. Aereo is not "making" the copy; the consumer provides the volitional act or conduct that *causes* the copy to be made.[4] *See id*. at 131-33. As this Court previously found, when a consumer presses "Watch" or "Record," the Aereo system responds automatically, saving a copy of the consumer's requested programming to a hard drive. *Aereo I*, 874 F. Supp. 2d at 377. In both modes, the consumer reproduces or copies the work; Aereo merely provides the technology. Hence, the volitional conduct is indistinguishable from that in *Cablevision*, thereby compelling summary judgment on the direct infringement claim with respect to reproduction.

Nor does Aereo indirectly infringe Plaintiffs' reproduction rights. The Supreme Court's decision in *Sony Corp. of America v. Universal Studios Inc.*, 464 U.S. 417, 434 (1984), holds that indirect liability for infringement cannot exist unless there is an underlying, direct infringer. Plaintiffs' claim for indirect infringement fails as a matter of law because they cannot show that Aereo's *customers* violate copyright law by using Aereo's technology to create unique copies of

---

[4]  While the issue on appeal to the Second Circuit concerned Plaintiffs' public performance claims, Plaintiffs improperly attempted to insert other claims into the appeal, arguing, for example,  that Aereo should not prevail because Aereo was making copies of (reproducing) the transmitted programs, and only "claiming to stand in the shoes of its subscribers." *See* Brief for Plaintiffs-Counter-Defendants-Appellants, *WNET, et al.*, 12-2786-cv (2d Cir.), Dkt. No. 86, at 26-30. The Second Circuit commented directly on the issue of consumer volition, concluding that Aereo's transmissions of unique copies of broadcast television programs are created at its users' requests. *Aereo II*, 2013 WL 1285591 at *11, *14 ("This volitional control over how the copy is played makes Aereo's copies unlike the temporary buffer copies generated incident to Internet streaming."). The facts set forth by the Second Circuit regarding the function and operation of the Aereo system also make repeated reference to the actions of the user, and not Aereo, in making, transmitting, and viewing the copies at issue. *See id.* at *1-3.

Plaintiffs' over-the-air broadcasts for their personal consumption. Just like the consumers in *Sony* who used a Sony Betamax to record and replay over-the-air television transmissions, Aereo consumers have a "fair use" right to copy over-the-air broadcast programs and play back those copies. The only difference is the technology used to record the over-the-air broadcast: Aereo's customers use a more modern remote digital video recorder ("DVR") rather than a Betamax. *Sony* compels the result here: Aereo is entitled to summary judgment on this claim as a matter of law.

## FACTS

The facts necessary for this Court to decide this case on summary judgment are limited, and are not in dispute. The undisputed facts as set forth in this Court's Opinion and Order, and the Second Circuit's affirmance, demonstrate that Aereo is entitled to summary judgment.

### The Aereo Technology

Aereo created and provides innovative technology that enables consumers to accomplish remotely what they could otherwise do at home. At home, a consumer can capture local over-the-air broadcast television via an antenna (including a computer-compatible dongle antenna); make copies of that programming on a computer, VCR, or DVR; and view their recorded content via the Internet on an Internet-connected device such as a television, smartphone, or tablet. SUMF ¶ 1.[5] Aereo simply provides technology that allows the consumer to use that same equipment located remotely to accomplish the very same thing: access an individual remote antenna to tune to a local over-the-air broadcast television station that they choose; make an

---

[5]  This can be accomplished by using a dongle antenna in connection with a computer and uploading the recorded program to the internet for later retrieval. If a DVR is used, this can be done using, for example, a Slingbox. SUMF ¶ 1 n. 2.

individual, unique copy of that programming using their remote DVR; and transmit that unique copy, only to themselves, on their personal Internet-connected device. SUMF ¶¶ 1-3.

**Copies in the Aereo System are Unique and Accessible Only to the Consumer who Made Them**

Using the Aereo technology, the Aereo member can press "Watch" or "Record" to record a program that is currently airing, or she can press "Record" to record a program that is scheduled to air in the future. SUMF ¶ 3. The consumer's act of pressing "Watch" or "Record" creates an individual fixed copy of that program on a hard drive. SUMF ¶¶ 3-4. The recording a consumer makes using the Aereo technology is a unique, separate, and individually identifiable copy of the underlying program. The consumer's copy of the program is associated with and accessible by only that one consumer who made it. SUMF ¶ 3. Like a traditional DVR, the recording the consumer makes during live viewing enables her to pause or rewind live television. SUMF ¶ 4 n. 3. The consumer can play back her own copy of the program to herself at any time after the recording has begun. SUMF ¶ 5. Whether in "Watch" mode or "Record" mode, the consumer is always watching the specific individual recording that she made. *Id*.

**The Function of the Antennas**

The consumer's use of an individual remote antenna as the source of each recording further contributes to the "uniqueness" of each recording.[6] Specifically, each antenna is

---

[6] Plaintiffs attempted to dispute the fact that the Aereo antennas function independently, but after extensive discovery during the preliminary injunction phase of this case, including expert discovery and testimony, they were unable to offer any factual basis for this position and the Court found that each Aereo antenna functions independently to receive the incoming broadcast signal. *Aereo I*, 874 F. Supp. 2d at 379-81. In light of the extensive discovery and testimony, including experts, and the fact that Plaintiffs did not appeal from these factual findings, these findings should be accepted as the law of the case. *See, e.g.*, *AM General Corp. v. DaimlerChrysler Corp.*, 246 F. Supp. 2d 1030, 1033-36 (N.D. Ind. 2003) (plaintiff precluded from arguing at summary judgment construction of contract previously construed in preliminary injunction decision because preliminary injunction decision was not tentative, same legal standard applied, and circumstances of injunction hearing afforded plaintiff full and fair opportunity to litigate the issue). However, no issue with respect to the antennas would change the legal analysis on the merits in any event; Aereo would still be entitled to summary judgment on the public performance claim because the fact inquiry begins and ends with the transmissions made from the RS-DVR; the Court does not look further

connected to its own tuner and feed lines, and each antenna is tuned independently in response to the consumer's commands. SUMF ¶¶ 11, 12. From the moment a signal enters the Aereo system via the consumer's engagement of their individual antenna, that signal is solely associated with and available to the consumer who activated and tuned the antenna. SUMF ¶ 13. Each unique signal has its own attributes and variations. SUMF ¶ 14. The recording made from a consumer's individual antenna is similarly unique and is available only to that consumer. SUMF ¶¶ 12, 14.

### All Recordings in the Aereo System are Made by the Consumer, Not Aereo

The Aereo technology platform enables consumers to use a remote DVR to record local[7] over-the-air television broadcasts at their own convenience and view them on the device of their choice. The Aereo remote DVR functions automatically and only in response to the consumer's instructions and actions. SUMF ¶ 6. It is the consumer who engages in the volitional act of making a recording using the Aereo system. *Id*. Nothing is copied unless initiated and directed by a consumer. SUMF ¶ 7. The Aereo system merely allows consumers to access the programming that Plaintiffs (and other over-the-air broadcasters) have made available to the public through their over-the-air broadcasts, to make individual copies of the programs via a remote DVR, and to play those copies back to themselves. SUMF ¶ 8.

### ARGUMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no

---

upstream to the source of the recording. *See Aereo I*, 874 F. Supp. 2d at 387 ("In fact, the Second Circuit expressly refused to look back at the received signal to conclude that Cablevision was engaged in a public performance, finding a dividing line between the transmissions made by the content providers and the transmissions made by Cablevision.").

[7] The Aereo Terms of Use require consumers to be in their local home market to view their over-the-air broadcasts and allow them to view only the broadcasts available in their home market. Aereo employs various methods to reinforce this policy, including, among other things, checking the billing address associated with the user's credit card to determine where the user resides and verifying the user's IP address when the user accesses the Aereo website. SUMF ¶ 15-16.

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In addition to those materials, detailed testimony was given in connection with the preliminary injunction hearing, this Court made detailed findings of fact, and those findings were not appealed and were adopted by the Second Circuit in *Aereo II*. Whether a fact is "material" is determined by the substantive law defining the claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where parties on a summary judgment motion do not dispute a dispositive material fact, and merely disagree as to the consequence of that undisputed fact under the law, a question of law is presented for the court's interpretation and the court could not be on firmer ground in granting summary judgment as a matter of law." *MSF Holding Ltd. v. Fiduciary Trust Co. Int'l*, 435 F. Supp. 2d 285, 305 (S.D.N.Y. 2006); *see also U.S. Underwriters Ins. Co. v. Zeugma Corp.*, No. 97-Civ-8031, 1998 WL 633679, at *2 (S.D.N.Y. Sept. 15, 1998) ("Summary judgment is appropriate where all facts are undisputed and only questions of law remain to be decided."). "'In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim.'" *Emerson Enters., LLC v. Kenneth Crosby New York, LLC*, No. 03-Civ-6530, 2009 WL 3190445, at *7 (W.D.N.Y. Apr. 21, 2009) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Aereo is entitled to summary judgment because each of Plaintiffs' copyright infringement claims fails based on the undisputed facts and controlling precedent: *Cablevision*, *Sony*, and *Aereo II* (upholding this Court's Opinion denying Plaintiffs' motion for preliminary injunction).

## I.     AEREO DOES NOT INFRINGE THE RIGHT OF PUBLIC PERFORMANCE

Aereo is entitled to summary judgment on Plaintiffs' public performance claim because, as this Court ruled and as the Second Circuit affirmed, each transmission in the Aereo system is private, not public, and therefore does not infringe Plaintiffs' right of public performance.

### A.     This Court's Reasoning in Denying Plaintiffs' Motion for Preliminary Injunction Compels Summary Judgment for Aereo

This Court has already decided Plaintiffs' public performance claims (*Aereo I*), and the Second Circuit affirmed that decision (*Aereo II*). Both decisions begin with a detailed analysis of the language of the Copyright Act's Transmit Clause, 17 U.S.C. § 101 applied to the undisputed facts of this case. The Courts conclude that the language of the Act precludes a finding of infringement in this case because a transmission from an individual consumer's own copy solely by and to the consumer who made that copy is a private performance. Because the Act only reaches public performances, there can be no infringement of the public performance right on the facts presented in this case.

Based on the evidentiary record created at the Court's two-day hearing, this Court found that the critical facts relating to the operation of the Aereo system with respect to the public performance analysis were undisputed.[8] *See Aereo I*, 874 F. Supp. 2d at 376. In particular, it was undisputed that Aereo's system is materially identical to the system in *Cablevision* in the following ways: (1) a unique copy of each television program is created by each consumer who requests that program; (2) each transmission by a consumer using the Aereo system is from the consumer's unique copy; and (3) each transmission of the unique copy is made solely to the

---

[8]  Plaintiffs admitted that "almost none of these technological facts about Aereo's system [are] in dispute." May 30, 2012 Hrg., Tr. at 14:12-15. To the extent that there were any disputed facts, Plaintiffs had ample opportunity to present such facts to the Court. Indeed, the discovery at the preliminary injunction stage included: document production including Aereo's source code and production database; an inspection of Aereo's facility and equipment by Plaintiffs; fifteen fact and expert depositions; four expert reports; and two days of trial with six witnesses.

consumer who made the copy. SUMF ¶ 5. Based on these undisputed facts, this Court denied Plaintiffs' request for a preliminary injunction because "[t]he overall factual similarity of Aereo's service to *Cablevision* on these points suggests that Aereo's service falls within the core of what *Cablevision* held lawful." *Aereo I*, 874 F. Supp. 2d at 386.

*Cablevision* articulated the following principles for determining whether a performance is "to the public": (1) each transmission must be separately examined, and (2) "the transmit clause directs courts to 'examine who precisely is "capable of receiving" a particular transmission of a performance.'" *Id*. at 384 (citing *Cablevision*, 536 F.3d at 135). As this Court noted, after careful review of the text of the Copyright Act, the Second Circuit "considered the relevant performance to be the discrete transmission of each user's unique playback copy of the television program to that user," and held that where "the potential audience 'capable of receiving' that performance was limited to that user . . . each such performance was private, not public." *Id*. (citing *Cablevision*, 536 F.3d at 125, 135). Accordingly, because "each RS-DVR playback transmission is made to a single subscriber using a single unique copy produced by that subscriber . . . such transmissions are not performances 'to the public.'" *Id*. (quoting *Cablevision*, 536 F.3d at 139).

The Second Circuit agreed with this Court's analysis in *Aereo I*, confirming that Plaintiffs could not succeed on their public performance claim against Aereo: "Thus, just as in *Cablevision*, the potential audience of each Aereo transmission is the single user who requested that program be recorded." *Aereo II*, 2013 WL 1285591, at *9. For the same reasons articulated by this Court, the Second Circuit rejected Plaintiffs' attempts to distinguish *Cablevision*, finding that Plaintiffs' arguments had either been considered and rejected by the Second Circuit in *Cablevision*, or were directly contrary to the Second Circuit's reasoning. Specifically, the Second Circuit rejected Plaintiffs' contention that a copy must be fully "time-shifted" in order to render a

performance private by "breaking the chain" from the broadcast transmission, and noted that this argument has no basis in *Cablevision*, which did not even mention, much less rely on, time-shifting (let alone complete time-shifting) in reaching its holding. *Id.* at *10-12.

Similarly, the Second Circuit rejected Plaintiffs' argument that the copies made in the "Watch" mode have no legal significance. *Id.* The Second Circuit expressly found that:

> Aereo copies do have the legal significance ascribed to the RS-DVR copies in *Cablevision* because the user exercises the same control over their playback. The Aereo user watching a copy of a recorded program that he requested be created, whether using the "Watch" feature or the "Record" feature, chooses when and how that copy will be played back. . . . This volitional control over how the copy is played makes Aereo's copies unlike the temporary buffer copies generated incident to internet streaming.

*Id.* at *11.[9] As to Plaintiffs' argument that all of the transmissions in the Aereo system should be aggregated in determining whether they are "to the public," the Second Circuit noted that "[t]his is nothing more than the *Cablevision* plaintiffs' interpretation of the Transmit Clause, as it equates Aereo's transmissions with the original broadcast made by the over-the-air network rather than treating Aereo's transmissions as independent performances. This approach was explicitly rejected by the *Cablevision* court." *Id.* at *10. Thus, the Second Circuit upheld this Court's refusal to accept Plaintiffs' invitation to look "upstream" to the original broadcast to find that the performances in the Aereo system were "to the public." *Id.* at *11-12. Accordingly, Aereo is entitled to summary judgment on Plaintiffs' public performance claim.

### B.      Any Dispute Over the Functioning of the Aereo Antennas is Immaterial

While Plaintiffs never argued, nor could they, that a consumer cannot use an individual antenna (in-home or remote) to access over-the-air broadcasts, Plaintiffs claimed at the

---

[9] The copies created by the consumer in "Watch" mode also have another critically important practical significance—they enable pause and rewind functionality. SUMF ¶ 5.

preliminary injunction hearing that the Aereo antennas did not function independently.[10] Indeed, despite having submitted two expert reports from their antenna expert, they did not even present their expert at trial. This Court's findings on this matter were made after very substantial discovery, expert inspection and analysis, and testimony before the Court. These findings were fully litigated at the preliminary injunction stage and were not challenged on appeal. Accordingly, these facts cannot and should not be re-litigated. *See*, *e.g.*, *AM General Corp. v. DaimlerChrysler Corp.*, 246 F. Supp. 2d 1030, 1033-36 (N.D. Ind. 2003) (plaintiff precluded from arguing at summary judgment construction of contract previously construed in preliminary injunction because decision at preliminary injunction was not tentative, same legal standard applied, and circumstances of injunction hearing afforded plaintiff full and fair opportunity to litigate the issue). Indeed, to allow a "do-over" after the full and fair hearing that occurred here would be burdensome and inefficient and will not yield a different result.

Notwithstanding that, Plaintiffs' persistent (and baseless) claim that the Aereo antennas do not function independently does not need to be reconsidered in order to grant summary judgment to Aereo. Neither this Court nor the Second Circuit found the antennas necessary to their analysis and conclusion that there is no public performance.[11] Under *Cablevision*, the only relevant factors in determining whether a performance is to the public are (i) the nature of each

---

[10]  The Court found that the Aereo antennas *do* function independently. *Aereo I*, 874 F. Supp. 2d at 381. Aereo demonstrated key facts about how the antennas function: (1) each antenna can be used only by one consumer at any given time; (2) each antenna is connected to its own tuner and feed lines, and each antenna is tuned independently; (3) each antenna is tuned automatically in response to a consumer command, and receives no broadcast signal when it is not being used by a consumer; and (4) the signal from each individual antenna is available only to the consumer who tuned the antenna, and cannot be shared with anyone else. SUMF ¶¶ 9-11.

[11]  As this Court noted, the existence of the individual antennas makes this case, if anything, a better factual predicate for the principle in *Cablevision* than the *Cablevision* facts themselves. *Aereo I,* 874 F. Supp. 2d at 387 ("Indeed, in light of this Court's factual determination that each antenna functions independently, in at least one respect the Aereo system is a stronger case than *Cablevision* for attaching significance to such copies because, unlike *Cablevision* in which multiple copies were all created from a *single* stream of data, each copy made by Aereo's system is created from a *separate* stream of data.") (emphases in original) (internal citations omitted).

particular transmission; and (ii) the potential audience for that specific transmission. *Cablevision*, 536 F.3d at 139-40. Accordingly, based on undisputed facts, the Opinion of this Court, and the Second Circuit decision, summary judgment should be granted on the public performance claim in favor of Aereo.

## II.   AEREO DOES NOT INFRINGE THE RIGHT OF REPRODUCTION

*Aereo II* affirmed *Cablevision* as the law in this Circuit, found the use of the Aereo system squarely within it, and specifically rejected Plaintiffs' attempts to manufacture "factual distinctions" that simply do not exist. *See*, *e.g.*, *Aereo II*, 2013 WL 1285591, at *10-12 (The argument that Aereo has used *Cablevision* to design around copyright law "is an argument that *Cablevision* was wrongly decided; it does not provide a basis for distinguishing *Cablevision*."). Just as *Cablevision*'s public performance analysis compels a finding in favor of Aereo on Plaintiffs' public performance claim, *Cablevision*'s reproduction analysis compels a similar finding on Plaintiffs' reproduction claim. Aereo is not liable for infringement of Plaintiffs' asserted reproduction right because Aereo is not the actor. It does not "do" any copying. The Aereo system—just like the system in *Cablevision*—functions automatically, with no human intervention, in response to consumer commands. Just as in *Cablevision*, Aereo's *members* initiate each recording and provide the volitional conduct that creates the copy of the program they select. Absent the specific action of the consumer in each instance, no reproduction occurs.

### A.   Under *Cablevision*, Aereo Cannot Be Held Liable for Providing Technology That Automatically Makes Copies in Response to Consumer Requests

The Second Circuit in *Cablevision* relied on a long line of well-established case law, beginning with *Religious Tech. Center v. Netcom On-Line Comm. Svcs., Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ("*Netcom*") in finding that Cablevision was not liable for direct infringement with respect to the copies created in its system because the system functioned automatically in

response to consumer commands. *See Cablevision*, 536 F.3d at 131-33 ("Copies produced by the RS-DVR system are 'made' by the RS-DVR customer, and Cablevision's contribution to this reproduction by providing the system does not warrant the imposition of direct liability.").

In *Netcom*, the court found that an Internet Service Provider ("ISP") was not liable for creating a computer system that allowed third parties to post *infringing* material to its website, which resulted in automatic copying of the material onto the ISP's and others' computers. The *Netcom* court noted that the ISP "did not take any affirmative action that directly resulted in copying plaintiffs' works," concluding that "[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation *which is lacking where a defendant's system is merely used to create a copy by a third party*." *Id*. at 1370 (emphasis added). The Fourth Circuit followed *Netcom* in *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004), explaining that "a person had to engage in volitional conduct—specifically, the act constituting infringement—to become a direct infringer," and held that "to establish direct liability [for copyright infringement] . . . *something more must be shown than mere ownership of a machine used by others to make illegal copies*." *Id*. (emphasis added).[12]

Relying on this line of cases, the Second Circuit found that Cablevision was not liable for infringing the asserted reproduction right through its RS-DVR system because it was the consumer, not Cablevision, who "made" the copies. 536 F.3d at 131. The Court recognized that "volitional conduct is an important element of direct liability," and explained that in the case of a

---

[12]  Since then, "courts have repeatedly held that the automatic conduct of software, unaided by human intervention, is not 'volitional'" and cannot give rise to liability for the provider of the technology. *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1309 (S.D. Fla. 2011) (citing *Netcom*, *CoStar*, and others); *see also Wolk v. Kodak Imaging Network, Inc.*, No. 10-Civ-4135, 2012 WL 11270, at *15 (S.D.N.Y. Jan. 3, 2012) (finding no infringement where there was "no dispute that any reproduction, display or transmission of the Plaintiff's images by or through the KODAK Gallery website is an automated process with no human intervention by any employee of the Kodak Defendants."); *Arista Records LLC v. Usenet.com*, Inc., 633 F. Supp. 2d 124, 147-48 (S.D.N.Y. 2009) ("Direct infringement . . . requires a showing that Defendants engaged in some volitional conduct sufficient to show that they actively engaged in distribution of the copies of Plaintiffs' copyrighted . . . recordings.").

system that responded automatically to consumer commands, it was the consumer, not the

technology provider, who supplied the necessary volitional conduct:

> There are only two instances of volitional conduct in this case:
> Cablevision's conduct in designing, housing, and maintaining a
> system that exists only to produce a copy, and a customer's
> conduct in ordering that system to produce a copy of a specific
> program. In the case of a VCR, it seems clear—and we know of no
> case holding otherwise—that the operator of the VCR, the person
> who actually presses the button to make the recording, supplies the
> necessary element of volition, not the person who manufactures,
> maintains, or, if distinct from the operator, owns the machine. We
> do not believe that an RS-DVR customer is sufficiently
> distinguishable from a VCR user to impose liability as a direct
> infringer on a different party for copies that are made automatically
> upon that customer's command.

*Id.* at 131. Cablevision won on summary judgment because "copies produced by the RS-DVR

system are 'made' by the RS-DVR customer, and Cablevision's contribution to this reproduction

by providing the system does not warrant the imposition of direct liability." *Id.* at 133.

*Cablevision*, *Netcom*, and *Costar* stand for the principle that a technology provider cannot

be held directly liable on a copyright claim for providing a machine that responds automatically

to user commands. As in *Cablevision*, Aereo only provides technology that consumers use to

make copies. *Cablevision*, 536 F.3d at 133; SUMF ¶ 6.[13] Plaintiffs do not, and cannot, dispute

that the Aereo system functions automatically in response to a user's commands: No copies are

made until a consumer presses "Watch" or "Record."[14] SUMF ¶ 7.

Aereo cannot be liable for any copies made in either the "Watch" or "Record" modes

because it is the consumer, not Aereo, who makes each recording. The Second Circuit made

---

[13]  In fact, Aereo's system is less "active" than the systems upheld in *Cablevision* and *Costar*. In the Aereo system, no copies are made absent consumer direction; in contrast, Cablevision "buffered" a portion of the copyrighted work before any consumer even initiated a recording, and the ISP in *CoStar* hired employees to screen and "accept" the files at issue before they were copied in the system. *Cablevision*, 536 F.3d at 121; *Costar*, 373 F.3d at 546.
[14]  Like an in-home DVR, a user makes a copy in "Watch" or "Record" mode to enable pause and rewind DVR functionality. SUMF ¶ 5.

repeated reference to  the consumer being the "actor" with respect to the Aereo technology. *Aereo II*, 2013 WL 1285591, at *11 ("The Aereo user watching a copy of a recorded program **that he requested be created, whether using the 'Watch' feature or the 'Record' feature**, chooses when and how that copy will be played back.") (emphasis added). Indeed, the Second Circuit expressly commented on volition: "This volitional control over how the copy is played makes Aereo's copies unlike the temporary buffer copies generated incident to internet streaming." *Id*. Because each copy in the Aereo system—whether in "Watch" mode or "Record" mode—is made only at the request and direction of a user, and the Aereo system functions automatically with no human intervention, Aereo is entitled to summary judgment on Plaintiffs' reproduction claim.

Under *Cablevision*, *CoStar*, and *Netcom*, Aereo's role in designing and maintaining technology that consumers use to make copies is not the volitional conduct necessary to impose direct liability. *See Cablevision*, 536 F.3d at 131. This is so even if the purpose of the technology system is to make copies. *Id.* As the Second Circuit recognized in *Cablevision*, to impose direct liability where the consumer is the actor using a machine to make a copy would render DVR and VCR providers, as well as copy shops, directly liable for copyright infringement. *Id.* Under *Cablevision*, Aereo cannot be held directly liable because Aereo merely provides a machine that responds to user commands to make copies. SUMF ¶ 6; *Cablevision*, 536 F.3d at 131; *see also Netcom*, 907 F. Supp. at 1368 ("Netcom correctly distinguishes *MAI* on the ground that Netcom did not take any affirmative action that directly resulted in copying plaintiffs' works other than by installing and maintaining a system whereby software automatically forwards messages received from subscribers onto the Usenet, and temporarily stores copies on its system.").

In short, because each recording in the Aereo system—whether in "Watch" or in "Record"—is initiated by the consumer, and because the Aereo system functions automatically in response to the consumer's directions, Aereo cannot be held liable for direct infringement of the reproduction right.

## III.   THERE IS NO INDIRECT INFRINGEMENT OF PLAINTIFFS' ASSERTED REPRODUCTION RIGHT

Plaintiffs' indirect infringement claims depend on the assertion that *consumers* infringe Plaintiffs' alleged copyrights by copying over-the-air broadcasts. These claims cannot be sustained. Consumers are entitled to access local over-the-air broadcasts using antennas, and Plaintiffs do not and cannot claim that such entitlement is any less when a consumer uses a remote antenna. Instead, Plaintiffs' indirect infringement claim appears to be based on the theory that consumers who use the Aereo system to make copies of over-the-air broadcasts are committing copyright infringement. That theory, however, was foreclosed long ago by *Sony*, in which the Supreme Court held that consumers have a fair use right to make recordings of over-the-air television programs for their own personal use. Because Aereo users do not infringe Plaintiffs' reproduction right, Aereo cannot be held liable for indirect infringement. *Id.* at 434 ("To prevail [on their contributory infringement claim], [plaintiffs] *have the burden of proving that users of the Betamax have infringed their copyrights* and that Sony should be held responsible for that infringement.") (emphasis added).

### A.   Consumers Are Entitled To Access Over-the-air Broadcasts

As an initial matter, there is an important policy point to be made. A consumer has a *right* to access local over-the-air broadcasts via an antenna. The Plaintiff broadcasters are granted extremely valuable spectrum that they utilize to make over-the-air broadcasts, and in exchange are *required* to use that spectrum in the public "interest, convenience and necessity." *See* 47

U.S.C. § 307. There can be no dispute in this case that consumers can use an antenna to receive and watch local broadcast television. Plaintiffs have never taken the position in this case, nor could such a position find any basis in law, that consumers cannot use an antenna, in-home or remote, to access broadcast television. Plaintiffs' claims of indirect infringement based on the argument that a consumer's use of a remote DVR to make copies of that over-the-air programming for her own personal use is illegal is a theory that failed long ago. Plaintiffs' indirect claims against consumers are foreclosed by *Sony*.

**B.     Consumers' Use of the Aereo System To Make Recordings Constitutes a Fair Use Under *Sony***

Consumers use the Aereo system to make recordings of the free over-the-air television programs that they have the right to access. Such use falls squarely within the scope of what the Supreme Court held to be lawful (fair use) in *Sony*. 464 U.S. at 417 (consumers have a fair use right to make recordings of broadcast programming for their own personal use). Apparently, Plaintiffs would like to limit the application of Sony to a VCR (or perhaps more particularly, a Betamax). Such a view is nonsensical. The Supreme Court's opinion did not merely bless a particular type of technology, but rather set out the principle that consumers can copy television programming to which they have lawful access for private viewing. That is precisely what consumers do with the Aereo system. Consumers using the Aereo technology access a remote DVR and make recordings of local over-the-air programming. SUMF ¶ 1. Consumers can then view their recordings any time after the recording begins, at their own convenience on a personal Internet-connected device. *Id.* Each consumer makes her own recordings, and is able to watch only the recordings that she has made. SUMF ¶ 3.[15] Because this consumer use is the classic fair use permitted under *Sony*, Aereo cannot be liable for indirect infringement. On this basis alone—

---

[15]   Like in *Sony*, the user can only make recordings of programming they are entitled to receive. SUMF ¶ 8.

that the facts here are squarely within the principles, holding, and policy considerations of

*Sony*—Aereo's request for summary judgment on Plaintiffs' indirect claims should be granted.

Weighing the fair use factors individually in view of *Sony* only reinforces the point. The

contours of what constitutes fair use are set forth in Section 107 of the Act:

> In determining whether the use made of a work in any particular case
> is a fair use the factors to be considered shall include—(1) the purpose
> and character of the use, including whether such use is of a
> commercial nature or is for nonprofit educational purposes; (2)  the
> nature of the copyrighted work; (3)  the amount and substantiality of
> the portion used in relation to the copyrighted work as a whole; and (4)
> the effect of the use upon the potential market for or value of the
> copyrighted work.

17 U.S.C. § 107. These factors are non-exclusive with no single factor controlling, and their

analysis is guided by a case-specific inquiry into the nature of the use.

In the case of the reproduction of over-the-air broadcast television programming by

consumers, the primary, case-specific considerations that guide the analysis of the four factors

are: (1) the fact that the recording is made for the individual's private use; and (2) the fact that

the material copied has been voluntarily made available to consumers by the authors for

broadcast over the public airwaves for free. *Universal City Studios, Inc. et al. v. Sony Corp. of

Amer., et al.*, 480 F. Supp. 429, 450 (C.D. Cal. 1979) ("*Sony I*") (These two realities "narrow the

issues before this court. They shape the four factors of the traditional fair use analysis and guide

the court in defining the expectations of the copyright holder and the public."). With respect to

the private, non-commercial copying of over-the-air broadcasts by consumers, the Supreme

Court has already held that all four factors weigh in favor of a fair use finding because such

copying "merely enables a viewer to see such a work which he had been invited to see free of

charge." *Sony*, 464 U.S. at 449. That finding is binding in this case.

17

1.   **The First Factor Favors A Finding of Fair Use Because the Use is Private and Noncommercial**

Courts, including the Supreme Court, have considered the first fair use factor—the purpose and character of the use—in the context of private copies made by consumers of over-the–air television broadcasts and held that this factor weighs in favor of fair use. *See Sony*, 464 U.S. at 449; *Sony I*, 480 F. Supp. at 454. First, the Supreme Court in *Sony* specifically rejected the argument that copying by individual consumers could somehow be rendered "commercial." *Sony*, 464 U.S. at 449, n.33. The sole purpose of the recording is private. Aereo members watch the individual recordings they make, just as would consumers using a VCR or DVR in their home. SUMF ¶ 15.[16] Second, the purpose of the use both in *Sony* and here is "to increase access to material Plaintiffs choose to broadcast. This increased access is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves." *Id.* And, as noted above, the broadcasters are required to use the spectrum they are granted for the public interest, convenience and necessity.[17] For these reasons, as a matter of law, the first factor favors the consumers and Aereo cannot be liable for indirect infringement.

---

[16]  Plaintiffs have suggested that the fair use holding in *Sony* should be confined to "in home" copying because the discussion in the District Court's decision sometimes refers to copying "in their homes." *See Sony I*, 480 F. Supp. at 454. The issue, however, is not the location of the viewing, but that it is "private." Indeed, the evidence before the District Court was that some of the viewing of the recorded material took place *outside* of the home. Marc Wielage, one of the primary individuals for whose copying the plaintiffs sought to impose vicarious liability on the defendants, often watched videos outside of the home while travelling. *Id.* at 437 ("The Betamax is Wielage's primary hobby; he even has a padded suitcase which he uses to carry his Betamax on trips with him."). Further, again, technologies and the mobility of technologies have evolved since *Sony*. This does not change the legal calculus. Plaintiffs' "in home" argument, particularly made at a time when consumers are pervasively consuming information and content on mobile devices, is just another example of Plaintiffs' efforts to legally box consumers into the use of outdated technology in a misguided effort to try to preserve their pay models. In view of the fact that broadcasters are obligated to act in the public interest, convenience, and necessity with respect to their use of broadcast spectrum, their efforts are not merely misguided, but also raise serious questions about their compliance with the law and whether they are acting in the public interest.

[17]  Aereo increases access only to those local over-the-air signals that consumers have the right to access. It is undisputed that Aereo's Terms of Use make clear that members are not permitted to access recorded programming while they are located outside of their local area. SUMF ¶ 16. Aereo employs several methods to limit access to those members located within the local area, including geo-location, credit card verification, and IP address verification. *Id.*

2.     **The Second Factor Favors A Finding of Fair Use Because Plaintiffs Invite Consumers to View the Copyrighted Works Free of Charge**

The second fair use factor requires an inquiry into the nature of Plaintiffs' works. In *Sony*, the Supreme Court found that where the works in question were voluntarily broadcast over local public airwaves, the second fair use factor weighed against a finding of infringement because the Betamax "merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge." *Sony*, 464 U.S. at 449 (citing 17 U.S.C. § 107(2)). The same is true in this case. There is no dispute that Plaintiffs have voluntarily invited the public to view the programming at issue here free of charge. By accepting the valuable license to broadcast over the public airwaves, Plaintiffs have agreed to make those programs available for free to the public.[18] This factor, too, favors a finding of consumer fair use as a matter of law.

3.     **The Third Factor Favors a Finding of Fair Use Because Plaintiffs Make the Copyrighted Works Available Free of Charge**

*Sony* also supports a finding on the third fair use factor in Aereo's favor. 464 U.S. at 449. The third fair use factor considers the amount of the copyrighted work copied. While many Aereo members copy entire programs just as Betamax users copied entire programs, the Supreme Court specifically held that the traditional analysis of this factor cannot be applied where the programming that is copied is programming that has been broadcast free of charge over-the-air. "[W]hen one considers the nature of a televised copyrighted audiovisual work, and that times-shifting [copying using a Betamax] merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced does not have its ordinary effect of militating against a finding of fair use." *Id*. So too here.

---

[18] Indeed, any efforts by Plaintiffs to make broadcast television inaccessible to consumers using antennas raises very serious questions about their use of the spectrum that they have been allocated and their entitlement to the public trust that goes with it.

### 4. The Fourth Factor Favors a Finding of Fair Use Because the Consumers' Use of the Copyrighted Works Does Not Harm the Market for Over-the-air Broadcast Television Programming

The Supreme Court's analysis and holding in *Sony* is controlling on the fourth fair use factor, which requires an inquiry into the impact that consumers' copying of over-the-air broadcast television programming will have on the potential market for those works.[19] *Sony*, 464 U.S. at 451. For the fourth factor to weigh against a finding of fair use, Plaintiffs must demonstrate either (1) that a particular use is harmful; or (2) that if it should become widespread, it would adversely affect the potential market for the copyrighted work.

It is critical to start by noting that the copies made by consumers using Aereo are indistinguishable as a matter of direct factual analogy, logic, and analysis from the copies at issue in *Sony*. While *Sony* involved a Betamax, the holding must extend by direct analogy to modern technologies that accomplish the same thing. Aereo simply offers more modern technology (remote DVR) that the consumer can use for the same purpose that they used a Betamax—to make copies of broadcast programs for private use. On this basis alone, that the factual predicate here is indistinguishable from that in *Sony* except for modern technology—a remote DVR versus a Betamax—the fourth fair use factor favors the consumer and Plaintiffs cannot succeed on their claim for direct infringement. The Court need go no farther to allow summary judgment in favor of Aereo on this claim.

---

[19] The four factor analysis is conducted through the lens of the policy consideration behind the Copyright Act. Copyright owners often assert that the primary purpose of the Act is to compensate authors for their creative works. This is incorrect. *See Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932) ("The sole interest in the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of the authors."). Indeed, "[t]he public benefit derived from the copyright scheme, however, depends on careful balancing. If an author's exclusive rights over his work were unlimited, his personal economic incentive could surpass what is necessary for encouragement and actually work against the public by decreasing access to those works." *Sony*, 480 F. Supp. at 447. Congress and the Supreme Court have made clear that "[t]he copyright law … makes reward to the owner [of copyright] a secondary consideration." *U.S. v. Paramount Pictures*, 334 U.S. 131, 158 (1948).

Even if the Court were to believe that new analysis is required if the technology has evolved from that in *Sony*, that analysis favors Aereo. Plaintiffs have admitted that use of the Aereo system by consumers to make copies has not caused any present harm. *See* Pl. Resp. to Def. Objections at 12 (Apr. 23, 2013) (Dkt. No. 181); Hrg. Tr. 9:12-18 (Mar. 21, 2013). As a result, the burden on Plaintiffs on the fourth factor is raised, and they must prove by a preponderance of the evidence that *material* harm will likely result in the future. *Id.* "[T]his prognostication of irreparable injury is particularly difficult for a court to make when no harm has occurred to date and predictions of future harm are based on personal belief and speculation." *Sony I*, 480 F. Supp. at 451.

Plaintiffs simply cannot meet that burden. Plaintiffs cannot claim commercial harm from the fact that consumers, for their personal use, make copies of programs that Plaintiffs have made available for free public consumption. Indeed, consumers have already been "invited to witness [the programs] in [their] entirety free of charge." *Sony*, 464 U.S. at 449. Moreover, in exchange for the valuable broadcast spectrum to which the FCC grants Plaintiffs a license, Plaintiffs are required by law to operate their stations for "public interest, convenience, and necessity." 47 U.S.C. § 307. They cannot, therefore, claim that the consumer is harming them by copying and watching the very programming the public has a right to watch. Broadcasters such as Plaintiffs have tried and failed to oppose the Betamax and the remote DVR, in each case crying "the sky is falling." But that speculation has not proven true.

Further, as the District Court in *Sony* noted, "[P]laintiffs have marketing alternatives at hand to recoup some of that predicted loss. They stand ready to make their product available in cassettes and compete with the VTR industry. They have proven resilient to change in market practices arising from other technological inventions, *e.g.*, cable television, pay television." *Sony*

*I*, 480 F. Supp. at 452. The Supreme Court affirmed the District Court's reasoning, noting further that its "conclusions are buttressed by the fact that to the extent that time-shifting expands public access to freely broadcast television programs, it yields societal benefits." *Sony*, 464 U.S. at 454.

Even if the Court were to accept Plaintiffs' speculation about harm, and presume that *some* harm may befall them, the fourth factor still weighs in favor of fair use because Plaintiffs cannot show by a preponderance of the evidence that the harm would be *material*. *Id*. at 451. It is well established that harm that "imperils the existence" of a work is more destructive than is harm that would merely "limit profits." *Sony I*, 480 F. Supp. at 452. Plaintiffs do not even allege that any speculative harm would cause them to cease producing programming. They have merely alleged that the speculative harm could cause them to reconsider the manner in which they distribute their programming. "Copyright law, however, does not protect authors from chance or new considerations in the marketing of their products." *Id.* As the Supreme Court only recently reaffirmed, "no basic principle of copyright law" protects a copyright owner's existing business model against the adverse effects of lawful conduct. *Kirtsaeng v. John Wiley & Sons, Inc.*, __ U.S. __, 133 S. Ct. 1351, 106 U.S.P.Q.2d 1001, 1016 (2013). Any commercial impacts Plaintiffs speculate about are outweighed by the consumers' longstanding rights to receive and record local over-the-air broadcasts. Plaintiffs' efforts to curtail those rights to preserve or enhance other revenue streams are not the type of commercial impact that is cognizable under *Sony* or consistent with the broadcasters' obligation to act in the public interest.

Plaintiffs' complaints of harm are directly undercut by the public policy considerations that give rise to their broadcast licenses. As noted in *Sony*, a finding of fair use is:

> [B]uttressed by the fact that to the extent time-shifting expands public access to freely broadcast television programs, it yields societal benefits. [We previously] acknowledged the public interest in making television broadcasting more available. Concededly, that interest is not unlimited. But it supports an interpretation of the concept of 'fair use' that requires the copyright holder to demonstrate some likelihood of harm before he may condemn a private act of time-shifting as a violation of federal law.

*Sony,* 464 U.S. at 454. Because consumer use of Aereo's platform to record and view free over-the-air broadcast content is the same conduct found to be a fair use in *Sony*, Plaintiffs cannot establish an underlying infringement required for Aereo to be liable as an indirect infringer.

### C.   *Sony* Is Not Limited to "Complete Time-Shifting"

Plaintiffs' argument that *Sony* is limited to "completely time-shifted" copies—copies of complete television programs that can only be viewed after the entire program has finished broadcasting—is incorrect. As this Court already stated, nothing in the *Sony* decision would prevent a consumer from using a Betamax VCR to record the first half of a show and then watch that recording while the second half is still being broadcast. *Aereo I*, 874 F. Supp. 2d at 393. Moreover, Plaintiffs' arbitrary line is not only unfounded, it is also illogical and impractical. Plaintiffs' proposed limitation of *Sony* would mean that the length of time a consumer must wait before she can begin watching her recording would depend solely on the length of the underlying program. This Court already found that Plaintiffs' position would mean that some consumers could begin watching their recordings half an hour after the recording has started, while others may have to wait several hours. *Id.* at 393-94. If a program runs longer than scheduled, then a consumer may unwittingly infringe Plaintiffs' reproduction right by starting to watch her recording too early.

Plaintiffs' proposal to limit *Sony* solely to "completely time-shifted" copies also would render each and every DVR in this country unlawful. DVRs allow consumers to watch a

recording of a program while the program is still in progress and while the recording is still being made. Just like with Aereo, every time a consumer uses a DVR to watch "live" television, she records her selected program and can watch that recording even when the program is still airing. SUMF ¶ 5. This allows the consumer to rewind and pause as she watches the program. *Id.* Plaintiffs' scenario would render every such use an act of infringement by the consumer and would also render each manufacturer secondarily liable. Such an outcome would be contrary to *Sony* and the development of the marketplace over the intervening 30 years.

### D.      "Space-Shifting" is Permitted under *Sony*

Plaintiffs' argument that *Sony* does not apply because Aereo users watch their recordings on personal Internet-enabled devices, rather than on a television, is also unfounded. As noted above, Plaintiffs' attempt to limit *Sony* solely to the facts of that case—namely, the use of a Betamax to record and play back television programs—is plainly not what *Sony* contemplated. *Sony* did not turn on the nature of the monitor used to play back the consumer's recording, but rather the fair use right of the consumers to use technology to record free over-the-air television broadcasts, and to play those recordings back to themselves.

Courts have rejected Plaintiffs' position that *Sony* does not permit "space-shifting," expressly recognizing that under *Sony*, consumers are permitted to make copies of works that they are entitled to access in order to "space-shift" and play back the copies on a different device, for their own personal use. *See, e.g., RIAA v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999) ("The Rio merely makes copies in order to render portable, or 'space-shift,' those files that already reside on a user's hard drive. Such copying is paradigmatic noncommercial personal use entirely consistent with the purposes of the Act.") (citing *Sony*).

Moreover, the Betamax at issue in *Sony* was itself a "space-shifting" technology. The Betamax allowed users to convert over-the-air broadcast signals into a form that could be

recorded onto a tape and then transmitted from the tape to a television set. *See Sony*, 464 U.S. at 422 (The Betamax consisted of a tuner which received signals, a recorder which recorded the signals onto a tape, and an adapter which converted the audiovisual signals into a composite signal.). That tape, and the VCR, were fully portable and could be viewed in infinite other locations.

Plaintiffs' focus on the playback medium is also nonsensical because all television transmission and recording involves the conversion of signals into different formats, whether Betamax tapes, recordable DVDs, or DVR hard drives. *Id.* There is no difference between a consumer's use of the Betamax to make and watch recordings for personal use, and a consumer's use of Aereo to do the same. Because consumers' use of the Aereo technology falls squarely within what *Sony* deemed to be fair use, Plaintiffs' indirect infringement claim fails.

## **CONCLUSION**

Although the technology through which consumers access and use over-the-air broadcast signals has evolved consistently since the invention of television and will continue to evolve, the legal principles that guide the analysis are constant through *Sony*, *Cablevision*, and this case. For the foregoing reasons, Aereo respectfully requests that this Court grant summary judgment in its favor.

Dated: May 14, 2013

Respectfully submitted,

AEREO, INC.

By its attorneys,

  _/s/ R. David Hosp_____
R. David Hosp  (RH 3344)
Mark S. Puzella (admitted *pro hac vice*)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
617.542.5070 (tel)
617.542.8906 (fax)
hosp@fr.com
puzella@fr.com

Seth Greenstein (admitted *pro hac vice*)
CONSTANTINE | CANNON, LLP
One Franklin Square
1301 K Street, NW, Suite 1050 East
Washington, DC 20005
202.204.3514 (tel)
202.204.3500 (fax)
sgreenstein@constantinecannon.com

Michael S. Elkin
Thomas Patrick Lane
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
212.294.6700 (tel)
212.294.4700 (fax)
melkin@winston.com
tlane@winston.com

Jennifer A. Golinveaux (admitted *pro hac vice*)
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111
415.591.1000 (tel)
jgolinveaux@winston.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2013, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*Kathryn Lugo*

Kathryn Lugo