UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN BROADCASTING COS., INC., DISNEY ENTERPRISES,  INC., CBS BROADCASTING, INC., CBS STUDIOS INC., NBCUNIVERSAL MEDIA, LLC, NBC STUDIOS, LLC, UNIVERSAL NETWORK TELEVISION, LLC, TELEMUNDO NETWORK GROUP LLC, and WNJU-TV BROADCASTING LLC, | Civil Action No. 12-CV-1540 (AJN) (HBP) |
| Plaintiffs/Counterclaim Defendants, | |
| v. | |
| AEREO, INC., | |
| Defendant/Counterclaim Plaintiff. | |
| WNET, THIRTEEN, FOX TELEVISION STATIONS, INC., TWENTIETH CENTURY FOX FILM CORPORATION, WPIX, INC., UNIVISION TELEVISION GROUP, INC., THE UNIVISION NETWORK LIMITED PARTNERSHIP, and PUBLIC BROADCASTING SERVICE, | Civil Action No. 12-CV-1543 (AJN) (HBP) |
| Plaintiffs/Counterclaim Defendants, | |
| v. | |
| AEREO, INC., | |
| Defendant/Counterclaim Plaintiff. | |

**MEMORANDUM OF LAW IN SUPPORT OF AEREO, INC.'S
MOTION FOR EMERGENCY CONSIDERATION
OF PRELIMINARY INJUNCTION ISSUES UPON REMAND**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

PROCEDURAL BACKGROUND ................................................................................. 4

ARGUMENT .................................................................................................................. 5

I.   THE SUPREME COURT HELD THAT AEREO IS A "CABLE SYSTEM" INSOFAR
     AS IT OFFERS "WATCH NOW" FUNCTIONALITY ......................................... 5

     A.   CONGRESS OVERTURNED *FORTNIGHTLY* AND *TELEPROMPTER* WITH
          THREE INEXTRICABLY INTERTWINED AMENDMENTS IN THE 1976 ACT . 6

     B.   THE SUPREME COURT FOUND THAT AEREO'S "WATCH NOW"
          FUNCTIONALITY WAS EXACTLY WHAT CONGRESS INTENDED TO
          REACH WITH ITS AMENDMENTS TO THE COPYRIGHT ACT AIMED AT
          ADDRESSING *FORTNIGHTLY* AND *TELEPROMPTER* ......................................... 8

     C.   DURING ORAL ARGUMENT, THE SUPREME COURT SIGNALED ITS
          INTENT TO MAKE AEREO ELIGIBLE FOR A SECTION 111 COMPULSORY
          LICENSE ................................................................................................... 9

II.  AEREO MEETS THE STATUTORY DEFINITION OF A "CABLE SYSTEM"
     UNDER SECTION 111 .................................................................................... 11

     A.   AEREO IS A FACILITY ............................................................................ 12

     B.   AEREO'S FACILITY RECEIVES SIGNALS ................................................ 13

     C.   AEREO'S EQUIPMENT TRANSMITS THOSE SIGNALS TO SUBSCRIBERS .. 14

     D.   PLAINTIFFS CLAIM AEREO IS A CABLE SYSTEM WITH RESPECT TO
          "WATCH NOW" ...................................................................................... 15

III. AEREO'S ELIGIBILITY FOR A COMPULSORY LICENSE IS CONSISTENT
     WITH CONGRESSIONAL INTENT AND PUBLIC POLICY ..................................... 16

IV.  *WPIX V. IVI*  IS NOT CONTROLLING PRECEDENT ....................................... 17

V.   AEREO MEETS ALL REMAINING REQUIREMENTS FOR SECTION 111 ............. 20

     A.   AEREO HAS FILED STATEMENTS OF ACCOUNT AND DEPOSITED
          ROYALTY FEES WITH THE COPYRIGHT OFFICE ............................................ 20

     B.   AEREO'S "WATCH NOW" TRANSMISSIONS ARE PERMISSIBLE UNDER
          THE FCC'S RULES ................................................................................. 20

VI.  AEREO IS NOT PRECLUDED FROM ASSERTING ENTITLEMENT TO A
     SECTION 111 LICENSE AS A DEFENSE ............................................................... 23

VII. AEREO IS ENTITLED TO EXPEDITED, EMERGENCY RELIEF ............................... 24

CONCLUSION ............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

<u>CASES</u>

*Am. Broad. Cos., Inc. v. Aereo, Inc.*,
  134 S. Ct. 2498 (2014) ................................................................ *passim*

*Am. Broad. Cos., Inc. v. Aereo, Inc.*,
  874 F. Supp. 2d 373 (S.D.N.Y. 2012) ................................................ *passim*

*Arizona v. Shamrock Foods Co.*,
  729 F.2d 1208 (9th Cir. 1984) ................................................................... 24

*Capital Cities Cable, Inc. v. Crisp*,
  467 U.S. 691 (1984) ................................................................................ 16, 17

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008) .......................................................................... 3

*Ecological Rights Found. v. Pac. Gas & Elec. Co.*,
  713 F.3d 502 (9th Cir. 2013) ....................................................................... 21

*EEOC v. McDonnell Douglas Corp.*,
  948 F. Supp. 54 (E.D. Mo. 1996) ................................................................ 21

*Fortnightly Corp. v. United Artists Television, Inc.*,
  392 U.S. 390 (1968) ............................................................................. *passim*

*Maui Land & Pineapple Co. v. Occidental Chem. Corp.*,
  24 F. Supp. 2d 1083 (D. Haw. 1998) ......................................................... 24

*Nat'l Broad. Co., Inc. v. Satellite Broad. Networks, Inc.*,
  940 F.2d 1467–68 (11th Cir. 1991) ....................................................... 21, 22

*Satellite Broad. & Commc'ns Ass'n of Am. v. Oman*,
  17 F.3d 344 (11th Cir. 2011) ................................................................ 21, 22

*Seneca Nation of Indians v. New York*,
  26 F. Supp. 2d 555 (W.D.N.Y. 1998), *aff'd*, 178 F.3d 95 (2d Cir. 1999) ............... 23

*In re Sky Angel*,
  25 FCC Rcd. 3879 (Media Bur. 2010) ........................................................ 21

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*,
  415 U.S. 394 (1974) ............................................................................. *passim*

*Ventura Broad. Co. v. FCC*,
765 F.2d 184 (D.C. Cir. 1985) ............................................................................21

*WNET, Thirteen v. Aereo, Inc.*,
712 F.3d 676 (2d Cir. 2013) ........................................................................3, 4, 7

*WPIX, Inc. v. ivi, Inc.*,
765 F. Supp. 2d 594 (S.D.N.Y. 2011) ............................................................17, 18

*WPIX, Inc. v. ivi, Inc.*,
691 F.3d 275 (2d Cir. 2012) ....................................................................17, 18, 19

## STATUTES

17 U.S.C. § 111 ....................................................................................... *passim*

## OTHER AUTHORITIES

37 C.F.R. § 201.17 ....................................................................................21, 22

56 FED. REG. 31595 (1991) ................................................................................19

62 FED. REG. 18705 (1997) ................................................................................19

H.R. REP. NO. 94-1476 (1976) ....................................................................... *passim*

2-8 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8.18[E]
(MB, Rev. Ed. 2014) ....................................................................................11, 16

*U.S. Copyright Office Statement of Account SA1-2 (Short Form)*, U.S. COPYRIGHT
OFFICE FORMS, http://www.copyright.gov/ forms/SA1-2c-2011.pdf ....................................22

*The Open Internet Guide*,
FED. COMM. COMMISSION,
http://transition.fcc.gov/cgb/consumerfacts/openinternet.pdf ................................................20

**INTRODUCTION**

Aereo, Inc. ("Aereo") hereby seeks consideration of the preliminary injunction issues in this case on an emergency basis upon remand from the Supreme Court, and now from the Second Circuit vacating this Court's order denying Plaintiffs' motion for preliminary injunction and remanding for further proceedings. Specifically, Aereo seeks an emergency determination that Plaintiffs are not likely to succeed on the merits of any renewed motion for a preliminary injunction because Aereo is entitled to a compulsory license under the Copyright Act, 17 U.S.C. § 111, and thus does not infringe Plaintiffs' public performance rights.

Aereo's "Watch Now" function enables consumers to view transmissions of over-the-air programming on a virtually simultaneous or live basis. Congress adopted Section 111 of the Copyright Act in 1976 so that entities that transmit broadcast television signals could continue to operate notwithstanding the Act's newly defined public performance right and Transmit Clause. Such entities are required to pay to the Copyright Office statutory license fees calculated under Section 111, and these fees are then redistributed to copyright owners. In its recent decision in this case, the Supreme Court ruled that Aereo's "Watch Now" technology is precisely the type of technology Congress intended the Act to reach:

> In sum, having considered the details of Aereo's practices, we find them highly similar to those of the CATV systems in *Fortnightly* and *Teleprompter*. And those are activities that the 1976 amendments sought to bring within the scope of the Copyright Act.

*Am. Broad. Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2511 (2014) (hereinafter, "*Aereo III*") (attached hereto as Exh. 1 to the Declaration of R. David Hosp (hereinafter, "Hosp Decl.")). At oral argument, the Court made clear its understanding that its ruling would entitle Aereo to a Section 111 license when Justice Sotomayor specifically stated, "We say they're a c[]able company, they get the compulsory license." *See* Transcript of Oral Argument, *Aereo III* (Apr.

1

22, 2014) (hereinafter, "SC Hrg. Tr.") (Hosp Decl., Exh. 2) at 5:2-4.  Aereo has filed its forms

for the statutory license and deposited the required statutory fees with the United States

Copyright Office.  As a result, it must be permitted to resume operations.

There can be no question, in light of the Supreme Court's ruling, that Aereo's "Watch

Now" technology qualifies as a "cable system" under Section 111.  The Court specifically found

that Aereo is a facility that receives and transmits television broadcast signals to its subscribers.

*Aereo III*, 134 S. Ct. at 2501.  Notably, this is essentially what Plaintiffs have argued since the

outset of this case.  Thus, because Aereo has paid the statutory license fees required under

Section 111, Plaintiffs can no longer complain that they are not being compensated as copyright

owners, and all of Congress' policy concerns are addressed.  Indeed, one of Congress' primary

motivations in adopting the Act was ensuring that companies providing the public with access to

broadcast television be able to continue that practice without having to negotiate individually

with each copyright owner.  Aereo does nothing more than fulfill that role, and it should

therefore be entitled to a statutory license.  Because Plaintiffs are compensated as copyright

owners in accordance with Section 111, they can no longer claim infringement of their public

performance right, and they have, accordingly, suffered no harm.  By contrast, without certainty

on this issue, the harm to Aereo—which this Court has already recognized in assessing

Plaintiffs' preliminary injunction motion—not only remains, but has grown far more acute.

Aereo did not previously advance the compulsory license provisions of Section 111 in

defending against Plaintiffs' preliminary injunction motions because Aereo's "Watch Now"

technology did not render Aereo a "cable system" under the law of this circuit at the time those

motions were made.  To be a "cable system" under the Act, an entity must make secondary

transmissions of broadcast television to the public.  As both this Court and the Second Circuit

confirmed in its prior decisions, the use of Aereo's "Watch Now" functionality was not making such secondary transmissions to the public under *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (hereinafter, "*Cablevision*").  Rather, consumers used the Aereo "Watch Now" functionality to access an individual antenna and record and transmit their own individual copies of programs to themselves in real time or "live."  *WNET, Thirteen v. Aereo, Inc.*, 712 F.3d 676, 689–93 (2d Cir. 2013) (hereinafter, "*Aereo II*"); *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373, 385 (S.D.N.Y. 2012) (hereinafter, "*Aereo I*").  Now that the Supreme Court has clarified that Aereo's "Watch Now" technology, as a matter of law, renders Aereo a "cable system," Aereo is entitled to a compulsory license under Section 111.

Aereo files this motion for emergency consideration because, unless it is able to resume operations in the immediate future, the company will likely not survive.  The Supreme Court's decision recognizes that Aereo's time-shifted "Record" function does not violate Plaintiffs' public performance rights, but uncoupling that functionality from Aereo's "Watch Now" function requires technological development that will take some time.  In the interim, Aereo is currently incurring staggering costs without accruing any revenue.  The company is figuratively bleeding to death.  And in the parties' joint letter to the Court, filed on July 9, 2014, Plaintiffs made clear their plan to allow that bleeding to continue.

Such a result runs counter to the Supreme Court's intent, which was to rule that Aereo's "Watch Now" technology should qualify Aereo as a cable system under the Copyright Act, and Aereo would be entitled to a statutory license as a result.  Aereo asks this Court to issue a determination that Plaintiffs are not likely to succeed on the merits of any renewed motion for a preliminary injunction, so that Aereo can proceed, as it always has, in accordance with the law including the new state of the law announced by the Supreme Court.

3

## PROCEDURAL BACKGROUND

These cases were filed on March 1, 2012, and Plaintiffs moved for a preliminary injunction challenging, on public performance grounds, only the aspects of Aereo's technology that enable subscribers to view Plaintiffs' copyrighted television programs any time while the over-the-air broadcasts of those programs are still airing.  Extensive discovery was conducted on an expedited basis, and an evidentiary hearing was held on May 30 and 31 of that year.  On July 11, 2012, this Court issued its decision holding, *inter alia*, that the use of the Aereo system involved not a single performance to multiple members of the public, but multiple individual transmissions of individual copies to the users who made the copies.  As a result, Aereo was not performing to the public.  Plaintiffs appealed, but the matter was not stayed in this Court pending appeal; instead, full discovery ensued and was completed except as to expert depositions.

The Second Circuit upheld this Court's ruling, finding that the use of the Aereo system did not result in a public performance because any transmissions made were made from copies created by the user, and transmitted only to the user who created that copy.  *Aereo II*, 712 F.3d at 690.  Plaintiffs petitioned for rehearing *en banc*, and that request was denied.  They then petitioned the Supreme Court for *certiorari*, and Aereo agreed to that request in an attempt to stem the war of attrition and achieve binding national clarity on the issues before the Court.  On January 10, 2014, the Supreme Court granted *certiorari*.

In response to the Supreme Court's decision to hear these cases, this Court stayed the proceedings, and it ordered the parties to submit a letter advising this Court of the parties' views as to what should follow the Supreme Court's decision.  The Supreme Court issued its decision in *Aereo III* on June 25, 2014, finding that the purpose underlying the Act's 1976 Amendments and the Act's definition of a "cable system" include Aereo's "Watch Now" technology.  The

parties filed a joint status letter on July 9, 2014.  In that letter, Aereo informed the Court of its

intention to obtain a compulsory license under Section 111 in accordance with *Aereo III*.

Plaintiffs, however, announced their view that Aereo should be enjoined, notwithstanding that

the Supreme Court found that Aereo is required to be treated as a cable system under the Act

with respect to its "Watch Now" technology.[1]  Plaintiffs' attempts to circumvent the Supreme

Court's decision should not be permitted.  The Supreme Court understood that its decision would

mean Aereo is entitled to a statutory license, and that once Aereo paid the statutory fees the Act

requires, Aereo would be in compliance with the law in accordance with Congress' intent.

As of the Second Circuit's orders dated July 31, 2014 vacating the preliminary injunction

order and remanding this case for further proceedings, this Court is now empowered to consider

Aereo's eligibility for a Section 111 compulsory license.  *Aereo II*, 12-2786, Dkt. Nos. 346, 347;

12-2807, Dkt. Nos. 293, 294.  Aereo therefore requests emergency consideration of these issues

and a determination that Plaintiffs are not likely to succeed on the merits of any renewed motion

for a preliminary injunction because Aereo is entitled to a Section 111 compulsory license and

thus does not infringe Plaintiffs' public performance rights.

## ARGUMENT

## I.    THE SUPREME COURT HELD THAT AEREO IS A "CABLE SYSTEM" INSOFAR AS IT OFFERS "WATCH NOW" FUNCTIONALITY

The Supreme Court begins its analysis in *Aereo III* with a discussion of the legislative

motivations behind the 1976 amendments to the Copyright Act.  The Court notes its previous

decisions in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390 (1968) and

---

[1] Plaintiffs stated in the joint letter that, "Plaintiffs will be submitting to the Court a proposed order, consistent with the Supreme Court's decision, that enjoins Aereo from violating Plaintiffs' public performance rights."  Joint Letter, *Aereo I* (No. 1:12cv1540, Dkt. No. 313).  To the extent any such proposed order is submitted, Aereo will assert all appropriate arguments, including those set forth herein, in response to such proposed order or motion.

*Teleprompter Corp. v. Columbia Broad. Sys., Inc.*, 415 U.S. 394 (1974).  In those cases, the Court found that those CATV systems did not "perform" when they received and transmitted over-the-air television signals through cable wires to individual subscribers.  *Aereo III* recognizes that, partially in response to those cases, Congress enacted three inextricably intertwined amendments to the Copyright Act that were intended to bring the transmissions made using the type of technology considered in *Fortnightly* and *Teleprompter* within the scope of the Act's proscriptions: (1) a new definition of "public performance"; (2) the Transmit Clause; and (3) Section 111 (collectively, the "1976 Amendments").

The Court ultimately concluded that Aereo's "Watch Now" technology is equivalent to the technology the Court previously considered in *Fortnightly* and *Teleprompter* (precisely the technology the 1976 Amendments were intended to reach) and that therefore Aereo must be covered under the Act.  The Supreme Court expressly acknowledged at oral argument that such a finding would also bring Aereo under the rights and obligations contained in Section 111's compulsory license provisions.  It would, of course, be fundamentally unfair and illogical to find that Aereo's "Watch Now" functionality means it is a "cable system" under the Act, but that Aereo is not entitled to the protections the Copyright Act affords to all cable systems.  In other words, the benefits and the burdens of cable-company status under the Copyright Act flow together.  As a result, there can be no question that Aereo is entitled to a statutory license in accordance with Section 111, and that is what the Supreme Court understood.

A.     **CONGRESS OVERTURNED *FORTNIGHTLY* AND *TELEPROMPTER* WITH THREE INEXTRICABLY INTERTWINED AMENDMENTS IN THE 1976 ACT**

The Supreme Court makes clear in *Aereo III* that Congress' definitional changes to the concept of what it means to "perform publicly" and its adoption of the Transmit Clause are

directly related to—and intended to address the same technology as—the compulsory license provisions of Section 111.  *Aereo III*, 134 S. Ct. at 2506 ("Congress made these three changes to achieve a similar end: to bring the activities of cable systems within the scope of the Copyright Act.").

The Second Circuit similarly recognized the necessary interdependence between the 1976 Amendments when it acknowledged in *Aereo II* that "[t]he legislative history shows that the Transmit Clause was intended in part to abrogate *Fortnightly* and *Teleprompter* and bring a cable television system's transmission of broadcast television programming within the scope of the public performance right," and that Section 111 was specifically enacted to provide a reasonable royalty under the Copyright Act from those entities whose activities were targeted by the Transmit Clause.  *Aereo II*, 712 F.3d at 685, 699-700 ("'[A] cable television system is performing when it retransmits the broadcast to its subscribers . . . .'" (quoting H.R. REP. NO. 94-1476, at 63 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5677)).  "Congress recognized that requiring cable television systems to obtain a negotiated license from individual copyright holders may deter further investment in cable systems, so it created a compulsory license for retransmissions by cable systems.  *See* 17 U.S.C. § 111(d)."  *Aereo II*, 712 F.3d at 685.

Even Plaintiffs have previously recognized the interrelatedness of the Transmit Clause and Section 111.  In their appellate brief, Plaintiffs warned that "if Aereo's logic were accepted, even ***cable companies—which were the direct target of the Transmit Clause***—could evade the statutory licensing scheme set forth in 17 U.S.C. § 111 simply by erecting antenna farms and making a unique copy for each subscriber of the broadcast programming they transmit to subscribers across cable wire."  Br. for Appellants, *Aereo II* (No. 12-2786, Dkt. No. 86) at 28 (emphasis added).

7

As a result, to the extent Congress intended the Transmit Clause to reach Aereo's "Watch Now" activities insofar as they are "for all practical purposes" the same as those of a traditional cable company, *Aereo III*, 134 S. Ct. at 2507, Congress also intended that Section 111 would reach those activities.

### B. THE SUPREME COURT FOUND THAT AEREO'S "WATCH NOW" FUNCTIONALITY WAS EXACTLY WHAT CONGRESS INTENDED TO REACH WITH ITS AMENDMENTS TO THE COPYRIGHT ACT AIMED AT ADDRESSING *FORTNIGHTLY* AND *TELEPROMPTER*

Having explained the interrelatedness of the three particular 1976 Amendments, the Supreme Court concluded that Aereo's "Watch Now" activities are so similar to those of cable systems that with respect to the "Watch Now" function, Aereo should be treated as a cable system under the Copyright Act.  The Supreme Court specifically stated that "Aereo's activities are substantially similar to those of the CATV companies that Congress amended ***the Act*** to reach."  *Aereo III*, 134 S. Ct. at 2506 (emphasis added).

Importantly, in reaching this conclusion, the Supreme Court does not limit the application of its reasoning to just the Transmit Clause; rather, it finds that Aereo's "Watch Now" activities were meant to be reached by the entire Act—and specifically by the 1976 Amendments adopted to address the Court's prior decisions in *Fortnightly* and *Teleprompter*.

> In sum, having considered the details of Aereo's practices, we find them highly similar to those of the CATV systems in *Fortnightly* and *Teleprompter*.  And those are activities that the ***1976 amendments*** sought to bring within the scope of the ***Copyright Act.***"

*Id*. at 2511 (emphasis added).

The Supreme Court repeatedly reiterates that Aereo is a cable system under the Act with respect to its "Watch Now" technology under the multiple 1976 Amendments aimed at cable

companies, even where it addresses what it views as minor differences in the manner in which

Aereo's "Watch Now" technology operates as compared to how CATV companies operate.

- "[G]iven Aereo's overwhelming likeness to the cable companies targeted by the *1976 amendments*, this sole technological difference between Aereo and traditional cable companies does not make a critical difference here." *Id.* at 2501 (emphasis added).

- "But the many similarities between Aereo and cable companies, considered in light of Congress' basic purposes *in amending the Copyright Act*, convince us that this difference is not critical here." *Id.* at 2507 (emphasis added).

- "In terms of *the Act's purposes*, these differences do not distinguish Aereo's system from cable systems, which do perform 'publicly.' Viewed in terms of Congress' regulatory objectives, why should any of these technological differences matter? They concern the behind-the-scenes way in which Aereo delivers television programming to its viewers' screens. They do not render Aereo's commercial objective any different from that of cable companies." *Id.* at 2508 (emphasis added).

The fact that the Supreme Court did not limit its application of the Copyright Act's

provisions to just the Transmit Clause, but instead made clear that Aereo's "Watch Now"

technology is within the reach of all of the 1976 Amendments to the Copyright Act, makes clear

that the Transmit Clause and Section 111 cannot be separated in the context of a service with an

"overwhelming likeness" to those in *Fortnightly* and *Teleprompter*. *Id.* at 2501, 2507.

### C. DURING ORAL ARGUMENT, THE SUPREME COURT SIGNALED ITS INTENT TO MAKE AEREO ELIGIBLE FOR A SECTION 111 COMPULSORY LICENSE

To the extent there is any question whether the Supreme Court considered the question of

whether its decision would result in Aereo being eligible for a compulsory license under Section

111 (there is none), an examination of the oral argument transcript makes clear the Court

specifically considered this question and answered it affirmatively. The issue was first raised by

Justice Sotomayor in a colloquy with Plaintiffs' counsel (who then appeared to agree with her),

where she specifically referenced the definition of a "cable system" in Section 111.

> JUSTICE SOTOMAYOR:  . . . But I look at the definition of a cable company, and it seems to fit.
> * * *
> . . .  Makes secondary transmissions by wires, cables, or other communication channels.  It seems to me that a little antenna with a dime fits that definition.  To subscribing members of the public who pay for such service.  I mean, I read it and I say, why aren't they a cable company?
>
> MR. CLEMENT:  Well, Justice Sotomayor, a couple of things. First of all, I mean, I think if you're—if you're already at that point, you've probably understood that just like a cable company, they're public—they're publicly performing and maybe they qualify as a cable company and maybe they could qualify for the compulsory license that's available to cable companies under Section 111 of the statute.
>
> JUSTICE SOTOMAYOR:  But it just gets it mixed up.  Do we have to go to all of those other questions if we find that they're a cable company?  ***We say they're a c[]able company, they get the compulsory license.***

SC Hrg. Tr. at 4:1–5:4 (emphasis added).

Thus, there is no question the Court understood that a finding that Aereo's "Watch Now"

technology renders Aereo a "cable system" would therefore make Aereo eligible for a

compulsory license under Section 111.  Moreover, Justice Breyer, who authored the majority

opinion in *Aereo III*, noted at oral argument that any decision that found Aereo to be a cable

system or its equivalent for the purposes of the Transmit Clause, ***but not*** for Section 111, would

run counter to the purpose of the 1976 Amendments:

> JUSTICE BREYER:  Once you take them out of the compulsory licensing system, they're going to have to find copyright owners, who owns James Agee's pictures?  Who owns something that was written by—like a French silent film in 1915?  I mean, the problem is that they might want to have perfectly good things that people want to watch and they can't find out how to get permission.  That

10

> is a problem that worries me and it worries me again once you kick
> them out of the other systems.

*Id*. at 53:21–54:5.

Here, Justice Breyer references the very policy consideration that drove the adoption of

Section 111—a determination by Congress that the technologies like those considered by the

Court in *Fortnightly* and *Teleprompter*, which it was targeting with the Transmit Clause, should

be entitled to a compulsory license so that they would not have to negotiate individually with

copyright owners.  *See* H.R. REP. NO. 94-1476 at 89 ("[I]t would be impractical and unduly

burdensome to require every cable system to negotiate with every copyright owner whose work

was retransmitted by a cable system."); *see also* 2-8 MELVILLE B. NIMMER & DAVID NIMMER,

NIMMER ON COPYRIGHT § 8.18[E] (MB, Rev. Ed. 2014) ("The compromise solution was to

adopt Section 111, a compulsory license system whereby cable operators are not required to

obtain the consent of copyright owners nor to negotiate fees, but copyright owners are entitled to

be paid proscribed royalties . . . .").  The Court's repeated reference to the interrelated

amendments, to the Act as a whole, and the discussions during oral argument, make clear that

Aereo's eligibility for a compulsory license is an intended consequence of the decision.

## II.   AEREO MEETS THE STATUTORY DEFINITION OF A "CABLE SYSTEM" UNDER SECTION 111

Furthermore, there is no question, in light of the Supreme Court's ruling and comments at

oral argument, that with respect to the "Watch Now" function, Aereo meets all the definitional

requirements of a "cable system" under Section 111.[2]  The undisputed facts developed in this

case and interpreted by the Supreme Court's decision compel this conclusion.

---

[2] Prior to the Supreme Court's decision, under the law of this Circuit, Aereo did not make secondary transmissions under *Cablevision*, and there was some question whether a transmission made, in part, over the Internet could

Section 111 broadly defines a "cable system" as:

> [1] a facility, located in any State, territory, trust territory, or possession of the United States, that [2] in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and [3] makes secondary transmissions of such signals or programs by wires, cables, microwave, or other communications channels to subscribing members of the public who pay for such service.

17 U.S.C. § 111(f)(3).  There is now no question that Aereo (1) is a facility (2) that receives signals of local broadcasters, and (3) those signals are transmitted to subscribers.  Indeed, that is now the law of the case.  Therefore, Aereo is eligible for a statutory license under Section 111.

### A.      AEREO IS A FACILITY

It is undisputed that Aereo is a facility.  There has been significant evidence submitted in this case that confirms this.  For example, Dr. Paul Horowitz testified regarding Aereo's facility located in Brooklyn, New York.  5/18/12 Declaration of Paul Horowitz, *Aereo I* (No. 1:12cv1540, Dkt. No. 78) ("5/18/12 Horowitz Decl.") at ¶ 63 ("Aereo impartially provides access to all broadcast television stations that can be received at the Brooklyn site . . . .").  In arguments to this Court, Plaintiffs themselves have acknowledged that Aereo is a facility.  *See Aereo I*, 874 F. Supp. 2d at 376–77 ("Aereo's system allows users to access free, over-the-air broadcast television through antennas and hard disks located at Aereo's facilities.").[3]  And, finally, the Supreme Court acknowledged this fact in oral argument and in its written opinion.  *See* SC Hrg. Tr. at 4:1–4 ("JUSTICE SOTOMAYOR: But I look at the definition of a cable company and it seems to fit.  A facility located in any State.  They've got a . . . building in

---

qualify as a secondary transmission under Section 111.  The Supreme Court's decision in *Aereo* has resolved these questions at least with respect to Aereo.
[3] Moreover, as the Court is aware, Plaintiffs and their experts have visited Aereo's facilities in Brooklyn numerous times.

Brooklyn . . . ."); *Aereo III*, 134 S. Ct. at 2501, 2506 ("Aereo uses its own equipment, housed in a centralized warehouse . . . .").

### B.    AEREO'S FACILITY RECEIVES SIGNALS

Nor is it disputed that Aereo's equipment receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission.  *See Aereo I*, 874 F. Supp. 2d at 378.  Dr. Horowitz, again, has already provided detailed testimony to that effect.  5/31/12 PI Hrg. Tr. at 319:4-320:9 (describing how a single Aereo antenna works to receive over-the-air broadcasting); *see also* 5/18/12 Horowitz Decl. at ¶¶ 17–18 ("At the time the selected program is broadcast over the air, an antenna at Aereo . . . is tuned to the broadcast station . . . . The broadcast television signal is received by an antenna and television tuner . . . .").  And, again, Plaintiffs' own arguments confirm that there is no dispute on this point.  *See* Pls.' Prop. Findings of Fact and Conclusions of Law at ¶ 9, *Aereo I* (No. 1:12cv1540, Dkt. No. 102) ("Aereo takes the broadcast signals, receives them on the antenna . . . .") (citing 5/30/12 Hrg. Tr. at 100:11–23).  To the extent Plaintiffs now try to suggest that the point is in doubt, the Supreme Court also acknowledged this fact in *Aereo III*: "A[n] [Aereo] server . . . tunes the antenna to the over-the-air broadcast carrying the show. The antenna begins to receive the broadcast, and an Aereo transcoder translates the signals received . . . . By means of its technology (antennas, transcoders, and servers), Aereo's system 'receive[s] programs that have been released to the public and carr[ies] them by private channels to additional viewers.'" *Aereo III*, 134 S. Ct. at 2503, 2506 (alteration in original); *see also* SC Hrg. Tr. at 4:1–7 ("JUSTICE SOTOMAYOR: But I look at the definition of a cable company, and it seems to fit. . . . They've got a . . . building in Brooklyn . . . that receives signal transmissions or programs broadcast by television broadcast stations.").

13

### C.    AEREO'S EQUIPMENT TRANSMITS THOSE SIGNALS TO SUBSCRIBERS

Nor do Plaintiffs dispute—indeed, it has been their central contention in this litigation—that Aereo's "Watch Now" technology transmits the received signals to subscribing members of the public who pay for the service in "Watch Now" mode. *Aereo I*, 874 F. Supp. 2d at 385; *see also* Reply Br. for Pls.-Counter-Defs.-Appellants at 9, *Aereo II* (No. 12-2807, Dkt. No. 167) ("Aereo captures that original CBS broadcast signal with its antenna boards.  It redirects that signal through Aereo transcoders to an Aereo server. . . . That is the first step in the retransmission chain.  Aereo creates copies of the transcoded signals for multiple subscriber accounts on its servers. . . . That is the second step.  It then passes the programming along to its subscribers, all of whom can watch the retransmitted CBS signal simultaneously and in real-time when logged in to the Aereo website.") (citing 5/30/12 Hrg. Tr. at 82:13–86:19).  This fact that in connection with its "Watch Now" function, Aereo's equipment transmits over-the-air signals is consistent with the evidence that has been put before this Court.  *See, e.g.*, Horowitz Decl. at ¶¶ 17–19.  And, once again, the Supreme Court also acknowledged this fact in *Aereo III*: "[A] server saves the data [representing the television broadcast] in a subscriber-specific folder on Aereo's hard drive. . . . [O]nce several seconds of programming have been saved, Aereo's server begins to stream the saved copy of the show to the subscriber over the Internet. . . ."  *Aereo III*, 134 S. Ct. at 2503; *see also* SC Hrg. Tr. at 4:1–13 ("JUSTICE SOTOMAYOR: But I look at the definition of a cable company, and it seems to fit.  . . . Makes secondary transmissions by wires, cables, or other communication channels.  It seems to me that a little antenna with a dime fits that definition.").

The technological details of Aereo's "Watch Now" technology do not sufficiently distinguish Aereo from the cable companies the 1976 Amendments were intended to reach.  Any

14

suggestion to the contrary by Plaintiffs now would be disingenuous, especially because the

Supreme Court has already expressly rejected such arguments.  "Insofar as there are differences

[between Aereo's activities and the activities of CATV systems], those differences concern not

the nature of the service that Aereo provides so much as the technological manner in which it

provides the service.  We conclude that those differences are not adequate to place Aereo's

activities outside the scope of the Act."  *Aereo III*, 134 S. Ct. at 2511.

### D.     PLAINTIFFS CLAIM AEREO IS A CABLE SYSTEM WITH RESPECT TO "WATCH NOW"

The conclusion that Aereo should be treated as a cable system with respect to its "Watch

Now" function is one that Plaintiffs themselves have repeatedly advocated in this action, arguing

that the only difference between Aereo and most cable companies is that the cable companies

had obtained statutory licenses or permissions from copyright owners.

- "Aereo performs the exact same functions that cable and satellite operators do when they retransmit live, over-the-air broadcast programming to their subscribers, pursuant to negotiated or statutory licenses."  Pls.' Initial Pre-hearing Mem., *Aereo I* (No. 1:12cv1540, Dkt. No. 15) at 3.
- "[T]he Aereo service is like that offered by cable and satellite providers—only unlicensed . . . ."  Pls.' Resp. to Def.'s Prop. Findings of Fact and Conclusions of Law, *Aereo I* (No. 1:12cv1540, Dkt. No. 106) at 27.

Now, based on the Supreme Court's ruling in *Aereo III*, Aereo has applied for a statutory

performance license in accordance with Section 111, and has deposited the fees required under

that provision to the Copyright Office for distribution to copyright owners (including Plaintiffs)

of the programs consumers can watch using the Aereo technology.[4]  As a result, Plaintiffs can no

longer complain they are not being fairly compensated as copyright owners.  Indeed, they are

being compensated exactly as Congress intended.

---

[4] The Copyright Office provisionally accepted the filing in deference to the fact that these issues are pending before the Court.

III.    **AEREO'S ELIGIBILITY FOR A COMPULSORY LICENSE IS CONSISTENT WITH CONGRESSIONAL INTENT AND PUBLIC POLICY**

As explained above, the 1976 Amendments represented a balance of competing interests—ensuring a reasonable level of compensation for copyright owners, while permitting companies that were increasing local public access to local broadcast television to continue to develop.  *See Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 711 (1984) ("In devising this system, Congress has clearly sought to further the important public purposes framed in the Copyright Clause . . . of rewarding the creators of copyrighted works and of promoting broad public availability of literature, music, and the other arts." (internal quotation marks omitted)). As the Supreme Court recognized, bringing Aereo's "Watch Now" technology within the reach of the 1976 Amendments (which include Section 111) is fully consistent with Congressional intent and public policy.  *Aereo III*, 134 S. Ct. at 2501, 2506 ("Aereo's activities are substantially similar to those of the CATV companies that Congress amended the Act to reach.").

As Congress noted, the purpose of the interaction between the Transmit Clause and Section 111 was to balance the competing goals of compensating copyright owners and permitting the secondary transmission of over-the-air signals, which Congress viewed as a public benefit.  *See* H.R. REP. NO. 94-1476 at 89; *see also* NIMMER, *supra*, at § 8.18[E] ("The compromise solution was to adopt Section 111, a compulsory license system whereby cable operators are not required to obtain the consent of copyright owners nor to negotiate fees, but copyright owners are entitled to be paid proscribed royalties . . . ."); *cf.* SC Hrg. Tr. at 53:21–54:5 (the concerns Justice Breyer voiced at oral argument in this case).

The sums raised under Section 111's compulsory license system were designed to provide copyright owners with a fair remuneration, but they were also designed to be modest, so that they would not harm access to local programming that CATV systems provided at the time

16

(and that Aereo's "Watch Now" function provides now).  As the House said, "The Committee believes that such payments are modest and will not retard the orderly development of the cable television industry or the service it provides to its subscribers."  H.R. REP. NO. 94-1476 at 91; *see also Capital Cities Cable*, 467 U.S. at 710–11 ("Compulsory licensing not only protects the commercial value of copyrighted works but also enhances the ability of cable systems to retransmit such programs . . . thereby allowing the public to benefit by the wider dissemination of works carried on television broadcast signals.").

In *Aereo III*, the Supreme Court recognized that Aereo's "Watch Now" service is the same local-broadcast-to-local-viewer service that cable systems provide—a service whose development Congress intended to protect when it amended the Copyright Act in 1976.  The Court notes: "Aereo's activities are substantially similar to those of the CATV companies that Congress amended the Act to reach."  *Aereo III*, 134 S. Ct. at 2501, 2506.  And in analyzing the specific details of how Aereo's "Watch Now" technology works, the Court stated:

> In terms of the Act's purposes, these differences do not distinguish Aereo's system from cable systems, which do perform "publicly."  Viewed in terms of Congress' regulatory objectives, why should any of these technological differences matter?  They concern the behind-the-scenes way in which Aereo delivers television programming to its viewers' screens.  They do not render Aereo's commercial objective any different from that of cable companies.

*Id.* at 2508.  And of course, Plaintiffs have urged this point on numerous occasions.  *See, e.g.,* Pls.' Initial Pre-hearing Mem., *Aereo I* (No. 1:12cv1540, Dkt. No. 15) at 3 ("Aereo performs the exact same functions that cable and satellite operators do when they retransmit live, over-the-air broadcast programming to their subscribers, pursuant to negotiated or statutory licenses.").

## IV.   *WPIX V. IVI* IS NOT CONTROLLING PRECEDENT

The question of whether a company transmitting over-the-air broadcasts over the Internet was a "cable system" under Section 111 was addressed once previously in this circuit in *WPIX,*

*Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 598 (S.D.N.Y. 2011) ("*ivi I*"), *aff'd* 691 F.3d 275, 277 (2d

Cir. 2012) ("*ivi II*").  That case, however, is not controlling precedent here for at least two

reasons.  First, under the reasoning of *Aereo III*, the technology at issue in *ivi II* was different

from Aereo's technology and also from the technology in *Fortnightly* and *Teleprompter*.

Second, the Supreme Court has already ruled that, with respect to the "Watch Now" function,

Aereo must be treated as a cable system under the 1976 Amendments.  As a result, any aspect of

the *ivi II* decision inconsistent with that conclusion is no longer good law.

   In *ivi II*, a group of producers and owners of copyrighted television programming sued

ivi, Inc. for streaming their content over the Internet live and without consent.  *ivi II*, 691 F.3d at

277. The ivi service captured signals transmitted by broadcast stations in Seattle, New York,

Chicago, and Los Angeles and streamed those signals to ivi subscribers located anywhere in the

United States so that they could view the programming simultaneously offered by the networks'

affiliates in all of these cities through any Internet-capable device.  *Id.*  ivi conceded it made a

public performance, but argued it could not be liable for infringement because it was a cable

system entitled to a compulsory license under 17 U.S.C. § 111.  *Id.* at 277–78.  In rejecting ivi's

arguments, the Second Circuit concluded that Section 111 was "ambiguous," but found it should

not apply because ivi's service was "vastly different" from cable systems entitled to statutory

licenses.  *Id*. at 284–85.  But the holding in *ivi II* is not applicable here for three reasons: Aereo's

"Watch Now" function (i) is, as the Supreme Court characterized it, "highly similar to" those

cable systems, *Aereo III*, 134 S. Ct. at 2511; (ii) actually satisfies the elements of the definition

of a "cable system" under 17 U.S.C. § 111; and (iii) is easily distinguishable from the ivi service.

   The system considered in *ivi II* was different from Aereo's "Watch Now" technology in

several significant ways.  Most importantly, ivi was not a local service delivering local over-the-

air broadcasts to local subscribers.  This was a critical distinction for the Second Circuit, which noted that Section 111's compulsory license scheme was intended to support localized—rather than nationwide—systems.  *ivi II*, 691 F.3d at 282–83.  As a result, the Court found that ivi's nationwide Internet transmission did not seek to address the important issues of availability of and remote access to local over-the-air television signals, and it was therefore not the type of service Congress intended the compulsory license to cover.  *Id*.  In so holding, the *ivi* Court merely reiterated the Copyright Office's requirement that "a provider of broadcast signals be an inherently localized transmission media of limited availability to qualify as a cable system."  *Id*. at 609 (citing 56 FED. REG. 31595 (July 11, 1991), 62 FED. REG. 18705, 18706 (Apr. 17, 1997)).

The non-local nature of ivi's service is enough to take ivi outside of the reasoning employed by the Supreme Court in *Aereo III*.  Because Aereo's "Watch Now" technology does **not** give its subscribers access to nationwide broadcasts, and instead gives **only** geographically-restricted localized access (with corollary local facilities), and because (as the Supreme Court found) it is virtually identical to the technology Congress addressed in the 1976 Act, Aereo's "Watch Now" technology renders Aereo a "cable system" under the Copyright Act.

Although careful examination of the decision reveals that the Second Circuit in *ivi II* premised its reasoning on the distinction that ivi's services were national rather than local (the same reasoning employed by the Copyright Office statements upon which the Second Circuit relied), the Second Circuit stated its ultimate conclusions more broadly when it wrote that "the statute's legislative history, development, and purpose indicate that Congress did not intend for § 111 licenses to extend to Internet retransmissions."  *ivi II*, 691 F.3d at 284.  Such a broad statement can no longer be applied, however, because the Supreme Court ruled in *Aereo III* that the 1976 Amendments were intended to reach Aereo's "Watch Now" activities—even though the

transmissions are made, in part, over the Internet.  In other words, by ruling that Aereo is to be

treated as a cable system under the Act, the Supreme Court has overruled *ivi* to the extent it

could ever have applied.

## V.   AEREO MEETS ALL REMAINING REQUIREMENTS FOR SECTION 111

### A.   AEREO HAS FILED STATEMENTS OF ACCOUNT AND DEPOSITED ROYALTY FEES WITH THE COPYRIGHT OFFICE

As required under Section 111, Aereo has taken steps to file the necessary paperwork to

comply with the statutory licensing requirements set forth in Section 111.  *See* Declaration of

Chaitanya Kanojia ("Kanojia Decl.") submitted herewith at ¶ 8.   Aereo submitted its "Statement

of Account for Secondary Transmissions by Cable Systems" forms and paid all necessary royalty

and filing fees for prior periods[5] on July 10, 2014.  *Id*.  Aereo's application has been

provisionally accepted.  *Id*.

### B.   AEREO'S "WATCH NOW" TRANSMISSIONS ARE PERMISSIBLE UNDER THE FCC'S RULES

The transmissions made using Aereo's "Watch Now" technology are permissible under

the rules, regulations, and authorizations of the FCC because the FCC has expressly rejected any

regulatory oversight of the transmission of television signals over the Internet.  *See The Open*

*Internet Guide*, FED. COMM. COMMISSION, http://transition.fcc.gov/cgb/consumerfacts/

openinternet.pdf (last updated Apr. 25, 2014) ("[T]he FCC does not regulate Internet content or

applications. To the contrary, the FCC seeks to develop and implement high-level, flexible rules

of the road for broadband to ensure that no one - not the government and not the companies that

provide broadband service - can restrict innovation on the Internet.").  The FCC has addressed

---

[5] Aereo filed fourteen Statement of Account forms and paid the associated royalty and filing fees covering the semi-annual reporting periods from January 1, 2012 through December 31, 2013 for each city in which it operated during those periods.  Kanojia Decl. at ¶ 8, n. 1.  Subsequent statements are not yet due to be filed.  *Id*.

this both as a matter of policy, and in its adversarial decisions.  *See In re Sky Angel*, 25 FCC Rcd.

3879, at ¶ 10 (Media Bur. 2010).  As a result, there are no FCC rules or regulations that prohibit

Aereo's "Watch Now" transmissions at issue in this case.

It is well-settled that where a regulatory scheme does not prohibit a particular action, that

action is, as a matter of logic and legal construction, "permissible" under that regulatory scheme.

*Ventura Broad. Co. v. FCC*, 765 F.2d 184, 194 (D.C. Cir. 1985) (holding that FCC decisions

which are not prohibited by statute are permissible); *see also Ecological Rights Found. v. Pac.*

*Gas & Elec. Co.*, 713 F.3d 502, 514 (9th Cir. 2013) (finding that where the EPA had chosen not

to regulate stormwater runoff from the defendants' utility poles, that runoff was in compliance

with the Clean Water Act, even if it was discharged without a permit required by the EPA);

*EEOC v. McDonnell Douglas Corp.*, 948 F. Supp. 54, 55 (E.D. Mo. 1996) (holding that conduct

not prohibited by Missouri Supreme Court Rules of Professional Conduct and Disciplinary Rules

is permissible).

This issue has been addressed specifically in the context of Section 111 and the question

of what is "permissible" under FCC regulations.  In 1991, prior to Congress' adoption of Section

119 of the Copyright Act, which enacted a compulsory license scheme for satellite television

providers, NBC sued Satellite Broadcasting Networks for copyright infringement based on the

fact that the company transmitted NBC's signals through its satellite system.  *Nat'l Broad. Co.,*

*Inc. v. Satellite Broad. Networks, Inc.*, 940 F.2d 1467–68 (11th Cir. 1991), *superseded on*

*different grounds by regulation*, 37 C.F.R. § 201.17(k), as recognized by *Satellite Broad. &*

*Commc'ns Ass'n of Am. v. Oman*, 17 F.3d 344 (11th Cir. 2011)).

In that case, the defendant asserted a compulsory license under Section 111 and asserted

that it was in compliance with FCC regulations because the FCC had chosen not to regulate

satellite television transmissions.  *Id*.  NBC objected, arguing that, even if the FCC did not

regulate satellite transmissions, the satellite transmission were not "permissible" unless the FCC

affirmatively approved of them under its regulations.  *Id*. at 1471.  The Eleventh Circuit rejected

the argument, noting that "[a] minor issue that remains is that § 111(c)(1) gives SBN rebroadcast

rights only if that rebroadcast was "permissible under the rules, regulations, or authorizations" of

the FCC.  ***The short answer is that the rebroadcast was permissible because no rule or***

***regulation forbade it.***"  *Id*. (emphasis added).  The court then elaborated on its reasoning:

> NBC has argued that before SBN's transmissions could become
> "permissible," the FCC had to affirmatively approve them. But to require
> express approval of the FCC would be to reach a result from the FCC's
> inaction that the FCC unequivocally does not intend. The FCC has
> expressed sympathy for NBC's concerns that direct-to-home satellite
> distribution threatens the network-affiliate relationship . . . but the FCC
> has explicitly stated it would not address these concerns until after the
> courts have resolved the copyright infringement issue.

*Id*.

It has long been recognized that the definitional analysis of what constitutes a cable

company under the Copyright Act and the FCC Act are separate and non-coterminous.  The

regulations corresponding to Section 111 state that "a system that meets this definition is

considered a 'cable system' for copyright purposes, even if the FCC excludes it from being

considered a 'cable system' because of the number or nature of its subscribers or the nature of its

secondary retransmissions."  37 C.F.R. § 201.17(b)(2); *see also U.S. Copyright Office Statement

of Account SA1-2 (Short Form)*, U.S. COPYRIGHT OFFICE FORMS, http://www.copyright.gov/

forms/SA1-2c-2011.pdf (last updated May 30, 2014) (quoting C.F.R.).  Indeed, as stated above,

when passing the 1976 Amendments, Congress specifically noted that the Copyright Act served

different purposes than the FCC and warned the FCC "not to rely upon any action of this

Committee as a basis for any significant changes in the delicate balance of regulation in areas

22

where the Congress has not resolved the issue."  H.R. REP. NO. 94-1476 at 89.  In short, the differences in the definitions and the consequences of those differences were fully anticipated by both Congress and the Copyright Office.

## VI.   AEREO IS NOT PRECLUDED FROM ASSERTING ENTITLEMENT TO A SECTION 111 LICENSE AS A DEFENSE

In light of the Supreme Court's decision in *Aereo III*, it is proper for Aereo to assert the Section 111 license defense at this time.  Aereo did not specifically assert the defense in response to Plaintiffs' motion for a preliminary injunction (the entire procedural focus of the case thus far) because the defense was not available under then-existing and controlling Second Circuit law. Indeed, under *Cablevision* (as both this Court and the Second Circuit held), Aereo did not engage in transmitting to the public.  But because the Supreme Court has now ruled that Aereo's "Watch Now" technology renders Aereo a cable system, Aereo is now eligible to raise the defense.

Further, Plaintiffs have been on notice of Aereo's potential Section 111 license defense since the outset of this case.  Indeed, Aereo asserted "explicit or implied license" as an affirmative defense in its answers to Plaintiffs' complaints.  *See* Ans. to Am. Complt. by Pls. ABC at Aff. Def. No. 8, *Aereo I* (No. 1:12cv1540, Dkt. No. 7), ("Plaintiffs' claims are barred due to an express or implied license or consent."); Ans. to Am. Complt. by Pls. WNET at Aff. Def. No. 9, *Aereo I* (No. 1:12cv1543, Dkt. No. 11) (same).  Under notice pleading standards, the explicit/implicit license defense sufficiently implicates the Section 111 defense, and Plaintiffs were thus given fair warning that Aereo would raise the defense at some point during the case.

Moreover, judicial estoppel cannot be invoked because any arguable "change in position" resulted from circumstances outside Aereo's control—namely, a change in controlling law.  *See Seneca Nation of Indians v. New York*, 26 F. Supp. 2d 555, 565–66 (W.D.N.Y. 1998), *aff'd*, 178 F.3d 95 (2d Cir. 1999) (refusing to extend judicial estoppel to prohibit inconsistent legal stances

where the United States first argued that, under legal precedent, an act implicitly ratified the United States' taking of land, but, after an intervening Supreme Court decision, the United States subsequently argued the same act did not plainly or unambiguously ratify the taking); *see also Maui Land & Pineapple Co. v. Occidental Chem. Corp.*, 24 F. Supp. 2d 1083, 1086 (D. Haw. 1998) (explaining that the application of judicial estoppel "is inappropriate when a party is merely changing its position in response to a change in the law") (citing *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1215–16 (9th Cir. 1984)).

## VII.   AEREO IS ENTITLED TO EXPEDITED, EMERGENCY RELIEF

Aereo's eligibility for a Section 111 compulsory license must be decided on an immediate basis or Aereo's survival as a company will be in jeopardy.  Following the Supreme Court's decision, Aereo temporarily suspended its operations, disabling its members' ability to make or schedule new recordings and their ability to play back any recordings.[6]  *See* Kanojia Decl. at ¶ 7.  Aereo took this extraordinary step despite the absence of an injunction, and despite that it believes it can still operate in accordance with the Supreme Court's decision.  *Id.*

As a result of this good-faith effort, however, Aereo is suffering irreparable harm that could put it out of business.  *Id.* at ¶¶ 9-18.  Such harm is far beyond the irreparable harm this Court already found that Aereo will suffer if an injunction is entered.[7]  *Id.* at ¶¶ 9-10.  In the two

---

[6] As the Court may recall, the Aereo technology was not set up to distinguish between operation of the "Watch Now" function and "Record" function—the only difference between the two was a setting on whether the user's recording was automatically deleted after the conclusion of the program.  *See* Kanojia Decl. at ¶ 7.  As a result, Aereo could not just "turn off" the simultaneous or live viewing. *Id.*

[7] *See, e.g., Aereo I*, 874 F. Supp. 2d at 402.  ("First and foremost, the evidence establishes that an injunction may quickly mean the end of Aereo as a business. . . . The extent of this harm is further manifest in the substantial investment in both labor and capital that Aereo has already expended to develop and launch its system, at least some of which would come to naught if Aereo were to go out of business. (Kanojia Decl. ¶¶ 48–49; Hrg. Tr. at 144:10–24, 238:9–239:17). For example, Mr. Kanojia testified that the development of Aereo's antennas and selecting a site for Aereo's facilities required substantial investment. (Hrg. Tr. at 144:10–24, 145:19–146:10). Further, because Aereo offers users a free 90–day trial, if it is enjoined at this point it will not be able to recoup the money it has spent so far, as it anticipated at the hearing that it would only begin receiving revenue in June 2012.").

24

years since the preliminary injunction hearing, Aereo has continued to hire employees, incur further financial commitments, attract additional investment, and build its goodwill.  *Id*. at ¶ 11. For example, Aereo now employs more than 100 people, over double the number at the time of the preliminary injunction hearing.  *Id*. at ¶ 12.  These employees rely on Aereo for their livelihood; unless the Court addresses this motion for emergency consideration promptly, some or all of these employees' continued employment will be at risk.  *Id*.  Along with employee salaries, Aereo is continuing to pay out other enormous expenses while simultaneously accruing no revenue.  *Id*. at ¶¶ 13-15.  And it is difficult to attract further investment with continued legal uncertainties.  *Id*. at ¶ 16.  Without prompt resolution of the preliminary injunction issues, the company will not be able to generate revenue or additional investments and without the ability to attract investors or collect revenue, the company simply will not be able to survive and the substantial investment of time, effort, and money will be irretrievably lost.  *Id*. at ¶ 17.

In stark contrast, Plaintiffs will suffer no harm in either expedition or the finding of non-infringement requested if they receive the statutory royalty.  Payment of public performance license fees strips Plaintiffs of any complaint that they are being irreparably harmed due to alleged infringement of their "public performance" rights.  They simply cannot be harmed if they receive the copyright licensing fee established by statute.

## CONCLUSION

In light of the foregoing, Aereo respectfully requests that the Court undertake emergency consideration of preliminary injunction issues upon remand, and determine that Plaintiffs are not likely to succeed on the merits of any renewed motion for a preliminary injunction because Aereo is entitled to a Section 111 compulsory license and thus does not infringe Plaintiffs' public performance rights.

Dated: July 31, 2014

Respectfully submitted,

AEREO, INC.

By its attorneys,

  /s/ R. David Hosp
R. David Hosp  (RH 3344)
Mark S. Puzella (admitted *pro hac vice*)
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
617.542.5070 (tel)
617.542.8906 (fax)
hosp@fr.com
puzella@fr.com

Seth Greenstein (admitted *pro hac vice*)
CONSTANTINE | CANNON, LLP
One Franklin Square
1301 K Street, NW, Suite 1050 East
Washington, DC 20005
202.204.3514 (tel)
202.204.3500 (fax)
sgreenstein@constantinecannon.com

Michael S. Elkin
Thomas Patrick Lane
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
212.294.6700 (tel)
212.294.4700 (fax)
melkin@winston.com
tlane@winston.com

Jennifer A. Golinveaux (admitted *pro hac vice*)
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111
415.591.1000 (tel)
jgolinveaux@winston.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2014, I caused the foregoing document to be

electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all counsel of record.


_____*/s/ R. David Hosp*_____
R. David Hosp